UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| WILLIAM FRANKLIN, MD, TOTH ENTERPRISES II, P.A. D/B/A VICTORY MEDICAL & FAMILY CARE, DIAGNOSTIC GESTALT, LLC, KATHERINE KELLER, DO, NATHAN PEKAR, MD, SARITA PRAJAPATI, MD, SHAWN AGENBROAD-ELANDER, NP, and BRITTANI ADAMS, NP,<br><br>    Plaintiffs,<br><br>        vs.<br><br>JEAN-PAUL FORAGE, LEWIS NICHOLS, CLAY ELLIS, and LN PROFESSIONAL MANAGEMENT LLC, d/b/a MEDICAL MANAGEMENT PROFESSIONAL, and ALLIED LAB SOLUTIONS MANAGEMENT, LLC,<br><br>Defendants | Case No. 1:23-CV-00542 |

**PLAINTIFFS' COMPLAINT FOR DAMAGES CAUSED BY DEFENDANTS' VIOLATIONS OF THE FEDERAL RICO STATUTE, BREACH OF FIDUCIARY DUTIES, FRAUD, CONVERSION AND FOR AN ACCOUNTING**

Plaintiffs for their Complaint against Defendants, allege:

**Introduction**

(1)    Plaintiffs have suffered many millions of dollars of business losses as a result of Defendants' conduct during the years 2016 through 2022, including Defendants' violations of the federal Racketeer Influenced and Corrupt Organizations Act, (18 U.S.C. §§1961, *et seq*.) (the "RICO" statute), and this action also seeks damages for Defendants

defrauding of Plaintiffs, for certain Defendants' breach of fiduciary duties owed by Defendants to Plaintiffs, and for the many millions of dollars of Plaintiff's monies that was converted by Defendants to their own use.

(2)     Allied Lab Solutions, LLC ("Allied"), and its investor members which members are Plaintiffs herein, worked together for five years with Defendant LN Professional Management, LLC, *d/b/a* Medical Management Professionals ("MMP") in a common venture to provide lab services to various small rural hospitals throughout Texas; and Allied and MMP were paid by those hospitals.

(3)     Specifically, Allied and MMP rendered substantial assistance in the processing of blood specimens for testing by the small rural hospitals involved and, in exchange,  Allied and MMP were to receive 75% of the money collected by those hospitals from the health insurance companies after the hospitals billed and had been paid by those insurers for the lab work with which Allied and MMP had assisted.

(4)     Specifically, by agreement between Allied and MMP, MMP was to be paid by the hospitals the entire 75% referred to above and then was to pay to Allied 55% of that 75% amount. The payments from MMP to Allied were to be made on a monthly basis because the rural hospitals paid MMP the 75% of what it received from the insurance companies each month for the lab worked billed for the prior month.

(5)     However, for a period of over 5 years the Defendants combined and conspired together to cause MMP repeatedly, month in and month out, to underpay Allied by lying to Allied and its members (some of the Plaintiffs herein) about how much money Defendant MMP had been paid by the hospitals. Each month MMP falsely stated that MMP

2

had received much less than it had actually received, thus underpaying Allied substantially; over the course of the years involved and as a result of these underpayments, Defendants defrauded these Plaintiffs of at least $15,000,000, keeping that money for themselves.

(6)    Unfortunately, Defendant Jean-Paul Forage ("Forage"), who was the managing member of Allied for most of the time during which MMP schemed with MMP with another entity, Defendant Allied Lab Solutions Management, and with the other Defendants to underpay Allied and to underpay the members of Allied who are Plaintiffs herein. The other Defendants persuaded Defendant Forage to join their scheme to defraud and he used his position of trust as the manager of Allied to do so all as will be shown below.

(7)    Moreover, using the same, above-described scheme to defraud, Defendants defrauded Plaintiff Diagnostic Gestalt, LLC ("Gestalt"), another Plaintiff herein, who was a 20% member of MMP and thus entitled to 20% of the profits of MMP from its lab services program. They did so by using the same fraudulent scheme employed to cheat the Plaintiffs who are Allied members, namely, by falsely understating the amount that MMP had earned from its share of the lab services program and thus defrauding Gestalt of substantial sums that MMP should have paid to Gestalt as a 20% member, and as a result they have been defrauded of approximately $5,000,000.

(8)    To further their scheme to defraud Plaintiffs and to obtain money owed to all these Plaintiffs by false and fraudulent pretenses, and Defendants used hundreds of interstate wire communications on a repeated basis to help execute this fraud and to accomplish the objects thereof.

(9)     Each of these hundreds of wire communications is a separate act of racketeering under 18 U.S.C. § 1961(1) because each is a violation of the federal wire fraud statute, 18 U.S.C. §1343, and these many wirings form a pattern of racketeering activity by doing so repeatedly over a five year period under and as defined by 18 U.S.C. §1961(5).

(10)     Defendants also repeatedly violated the money laundering statutes, 18 U.S.C. §§1956 and 1957, by repeatedly engaging in financial transactions and monetary transactions with the funds belonging to Plaintiffs that Defendants which had procured by wire fraud. Each such act of money laundering is a separate act of racketeering and because there were many such acts between 2016 and 2022, these acts constitute a pattern of racketeering under and as defined by 18 U.S.C. §1961(5)

(11)     To further these criminal actions described above and in more detail below, Defendants combined and associated in fact to form an enterprise, within the meaning of 18 U.S.C. §1961(4) to defraud Plaintiffs; and the activities of this enterprise injured Plaintiffs in their business and property within the meaning of 18 U.S.C. §1964, all as all as shown in detail below.

(12)     Defendants conduct also amounts to actionable fraud, conversion, and breach of fiduciary duties owed by Defendants to Plaintiffs, all as shown in detail below.

(13)     As a direct result of all of the above described conduct, Plaintiffs seek damages in the amounts to be proved at trial, and in the case of the RICO claims, they seek those damages to be trebled; Plaintiffs also seek reasonable attorneys' fees. Moreover, Plaintiffs seek punitive damages on the state tort claims made herein and seek an

accounting from Defendants in relation to all monies received by MMP from the hospitals involved, a large part of which was stolen by Defendants instead of being paid to Plaintiffs.

## The Parties

(14)    Plaintiff Toth Enterprises II, P.A. *d/b/a Victory* Medical & Family Care "Victory Medical" is a limited liability company organized under the laws of the state of Texas.  Plaintiff Victory Medical dispenses a wide array of medical services to the public in and around the Austin Texas metropolitan area through a group of caregivers who dispense medical care and treatment, operating from Victory's facilities in and around Austin, Texas. Victory Medical is a member of Allied.

(15)    Plaintiff William Franklin is a resident of Texas and a medical doctor who owns and, with others, operates Victory Medical; he is a member of Allied entitled to his share of the monies earned by Allied, based on his share of its ownership.

(16)    Plaintiff Katherine Keller, a doctor of osteopathy, is a resident of Texas; she is a member of Allied entitled to her share of the monies earned by Allied, based on her share of its ownership.

(17)    Plaintiff Nathan Pekar, a medical doctor, is a resident of Texas; he is a member of Allied entitled to his share of the monies earned by Allied, based on his share of its ownership.

(18)    Plaintiff Shawn Agenbroad-Elander, a medical doctor, is a resident of Texas; he is a member of Allied entitled to his share of the monies earned by Allied, based on his share of its ownership.

5

(19)    Plaintiff Sarita Prajapati, a medical doctor, is a resident of Texas; he is a member of Allied entitled to his share of the monies earned by Allied, based on his share of its ownership..

(20)    Plaintiff Brittani Adams, a nurse practitioner, is a resident of Texas; she is a member of Allied entitled to her share of the monies earned by Allied, based on share of its ownership.

(21)    Plaintiff Diagnostic Gestalt, LLC ("Gestalt") is a limited liability company organized under the laws of the state of Texas with its office located in Austin, Texas; is a member of MMP having a 20% ownership interest in MMP and is therefore entitled to its 20% share of the monies earned by MMP.

(22)    Defendant LN Professional Management, LLC, *d/b/a* Medical Management Professionals ("MMP") is a limited liability company organized under the laws of the state of Texas with its office located in Austin, Texas, with corporate address of 13492 North Highway 183 Ste 120-413, Austin, Texas 78750-2252, and may be served with service of process on its registered agent and managing member Lewis Nichols, at the registered business address of 166 S. Belknap, Stephenville, Texas 76401 or upon the managing member on behalf of the Company at his address 11908 Brookwood Road, Austin, Texas 78750.

(23)    Defendant Allied Lab Solutions Management, LLC ("Allied Management") is a limited liability company organized under the laws of the state of Texas with its office located in Austin, Texas, and may be served with service of process upon its corporate

officer Jean-Pierre Forage, at his address, 15098 Rail Dr., Lakeway, Texas 78734-6282 where he may be served with process.

(24)    Defendant Clay Ellis is a resident of Texas residing at 303 Nautilus Avenue, Lakeway, Travis County, Texas 78738 where he may be served with service of process.

(25)    Defendant Lewis Nichols is a resident of Texas residing at 11908 Brookwood Road, Austin, Texas 78750, where he may be served with service of process.

(26)    Defendant Jean Paul Forage is a resident of Texas residing at 15098 Rail Dr., Lakeway, Texas 78734-6282 where he may be served with process.

## Jurisdiction and Venue

(27)    Subject matter jurisdiction over Counts I and II of this Complaint is conferred upon this Court by 28 U.S.C. §1331 because these Counts arise under the laws of the United States, namely, the RICO statute (18 U.S.C. §§ 1961 *et seq.*) As to Count III, (Fraud), Count IV (Breach of fiduciary duties), and Count V (conversion), this Court has supplemental jurisdiction over these state claims, as conferred by 28 U.S. C. §1367, because the facts giving rise to these state claims are so related to the claims in the action within this Court's original jurisdiction (*i.e.,* the RICO claims) that they form part of the same case or controversy within the meaning of Article III of the U.S. Constitution.

(28)    Venue is proper in this District under 28 U.S.C. §1391(a)(2) because, as shown in detail below, a substantial amount of the events giving rise to the claims made in this action took place within this District.

## Facts Relating to all Counts

### Plaintiff Victory Medical

(29)    Until recently and at all times relevant to this Complaint, Victory, through its medical facilities, have dispensed a wide array of medical services to the public in and around the Austin metropolitan area. Victory Medical contracted with physicians, physicians' assistants, and nurses ("caregivers") to provide them with medical facilities, equipment and administrative support so that they could effectively practice their varying medical specialties from within the Victory's medical facilities located in various locations within the Austin metropolitan area.

(30)    Victory caregivers received office space, examination rooms, medical equipment, and administrative support from Victory in exchange for a percentage of the revenues earned from the medical fees they generated by treating their patients; these fees were billed by Victory and paid to Victory by health care insurers including, most substantially because of its more than 65% market share in Texas, Blue Cross.

(31)    Victory served in excess of 30,000 patients and its doctors routinely ordered blood tests to assist with diagnosis and treatment of their patients.

(32)    The Plaintiffs herein, including Victory, Dr. Franklin and some of Victory's other caregivers, are members of Allied having organized that LLC in 2015 to assist with lab services needed for the testing of blood specimens in the manner described below.

### The Importance of Blood Testing

(33)    Much of medical diagnosis and resulting treatment, including that offered and provided by Victory caregivers, involves the testing of blood specimens taken from

the patient involved which, when tested properly by a lab, can reveal all manner of medical conditions, and the earlier the better for treatment of many of these conditions.

(34)    Blood specimens can be tested at any blood laboratory having the proper staff and blood testing equipment to do the testing. Most hospitals have such a lab at least for basic blood tests and some blood specimens can be sent out to another lab having the proper equipment for more sophisticated testing.  The better equipment a lab has, the more of the many and varying kinds of blood tests it can perform.

(35)    When a person is already an inpatient in a hospital needs lab work, it is most often done on site, with a blood specimen being collected from the patient at the hospital and sent directly to the in-hospital lab for whatever testing had been ordered by the health care provider involved.

(36)    Those patients who are not present at a hospital having a blood lab capable of doing the needed testing but who are in a caregiver's office, can have a blood specimen drawn at that office and then sent via courier to one of numerous labs which can perform the needed lab work. This is commonly done.

(37)    As noted in the recent analysis of this industry contained in Dr. Kathleen Murphy's book *The Profit Machine in the Hospital Basement ("Profit Machine"),* labs remote from the ordering physician are common in all parts of the country where "medical assistants and nurses collect the specimens as a routine part of the physician's practice. Laboratory couriers pick up specimens and deliver them to laboratories for testing." *Id.*, at 69.

(38)    The Victory Medical facilities had their own blood labs but, like many other facilities, these were not fully equipped with the needed testing equipment to allow many of the lab tests needed for proper diagnosis. Thus, during the time periods referred to in this Complaint, Victory Medical caregivers referred out to other labs most of their patients' blood specimens for the needed lab testing. Because Victory caregivers collectively treat many thousands of patients, they had a substantial amount of lab work to send to labs for testing every day.

(39)    Lab testing of blood specimens (hereinafter "lab work") is critical to effective medical diagnosis and treatment. Blood diagnosis can reveal all manner of illnesses and medical conditions from, by way of example, all manner of liver and kidney problems, many types of cancer, AIDS, viral and bacterial infections, heart disease, cholesterol levels, diabetes, and blood disorders, to name just a few. Blood testing is also the most reliable and definitive way of testing for pregnancy.

(40)    Caregivers seek out blood labs with a good reputation for properly performed, quality lab work, and lab work that can be timely performed, as well as labs that are responsive to questions from referring physicians about the test results, and for returning the test results to the ordering caregiver in an easily readable form that allows the caregiver to understand the results of the tests and to fully and easily explain them to his or her patients.

**The Blood Testing Services Provided by Allied and MMP**

(41)    For many years before 2016, Texas caregivers, including those at Victory Medical, had limited choices of diagnostic laboratories to which they could refer blood

samples for diagnostic testing. Quest Diagnostic, Inc. of New Jersey was the main lab to which most lab work was referred and Quest had many lab testing facilities located all over the United States.

(42)    However, because many caregivers from Victory Medical and elsewhere became dissatisfied with the lab services provided by Quest Diagnostics, Plaintiffs Victory Medical and Dr. Franklin got together to form a venture with Defendants Lewis Nichols, Clay Ellis and Forage to provide lab services to some small rural hospitals so that these hospitals could actually perform a high volume of a wide variety of tests that these smaller hospitals could not perform on their own unless assisted with many of the activities required for adequate blood testing.

(43)    To accomplish this venture to provide lab services to rural labs, Plaintiffs formed Allied and Defendants formed MMP, both formed in 2016.

(44)    All the Plaintiffs herein, except Plaintiff Gestalt, became members of Allied and as such were entitled to their membership share of Allied's profits.

(45)    Defendants formed MMP and Plaintiff Gestalt became a member of MMP, having a 20% membership interest in MMP entitling it to 20% of MMP's earnings.

(46)    Every Texas-based LLC, such as Allied, must have a managing member who is appointed to run the day-to-day operations of the LLC. Allied's members appointed Defendant Clay Ellis to be its initial managing member and placed their trust and confidence in him to run the operations of Allied honestly. In 2017, Defendant Ellis resigned as managing member of Allied and Defendant Jean-Paul Forage was appointed as the new managing member of Allied. Once Forage became the managing member, Allied's

members placed their trust and confidence in him to run the operations of Allied honestly. Forage was also the managing member of Allied Management, which was in turn a manager, along with Forage, of Allied.

(47)    Both Forage and Ellis, when operating as the managing member of Allied, had a fiduciary duty to Allied and its members to act with honesty and good faith towards them and to refrain from taking actions that would be against their interests including self-dealing. This was a duty owed by Forage and Ellis to each member of Allied including those members who are Plaintiffs herein.

(48)    Defendant Lewis Nichols was appointed to be the manager of MMP and he was entrusted by its members, including Gestalt, to run the affairs of MMP honestly and to refrain from taking actions that would against be against the interest of Gestalt and  MMP's other members, including self-dealing.

(49)    After being formed and operational in 2016, Allied and MMP entered into a Service Agreement under which they agreed to perform lab services for various rural hospitals which hospitals each operated under-utilized blood labs. A copy of this Service Agreement is annexed as Exhibit "A" hereto and adopted herein by reference as if pleaded in its entirety herein.[1]

---

[1]    This Services Agreement was actually signed by Allied Lab Services Management, LLC ("Allied Management")  which was formed to act as a manager for Allied and to assist Allied in its operations in any way directed by Allied. All of the lab service activities performed under this Agreement as described in this Complaint were performed by Victory staff for Allied and all payments made to Plaintiffs as a result of those services were made by MMP to Allied, not to Allied Management, and Allied then paid their respective shares to its members, including the Plaintiffs herein. Allied performed all the services under the Service Agreement and was paid for those services and thus assumed the rights and duties assumed by Allied Lab Solution Management LLC under the above-referenced Service Agreement under the Service Agreement.   Allied

(50)    From 2016 through 2020 Allied and MMP provided lab services to a group of small rural hospitals allowing each of these hospitals to greatly expand their volume of blood testing which greatly increased the earnings of these hospitals.

(51)    Among the rural hospitals for which Allied and MMP performed lab services were the following: Knox County Hospital District of Knox, Texas, Glen Rose Medical Center in Glen Rose, Texas, Stephens Memorial Hospital in Breckenridge, Texas, and North Runnels Medical Center in Winters, Texas. These and other rural hospitals are hereinafter referred to collectively as the "Participating Rural Hospitals."

(52)    Each of these Participating Rural Hospitals had blood laboratories but given their small size and staffs and lacking some of the needed equipment for certain tests, they could only perform lab testing on a very limited basis.

(53)    In or around 2016, these Participating Rural Hospitals, together with Allied and MMP commenced a program that greatly expanded the lab work these hospitals could perform and thus greatly increasing their earnings.

(54)    Between 2016 and 2020, Allied and MMP, acting under the Service Agreement they had entered (Exhibit A hereto), performed many of the tasks which were part of diagnostic lab testing for these Participating Rural Hospitals. These activities included:

a.    Devising more complete and accurate test panels for testing in order to derive

---

Management simply acted as a nominal manager for Allied and had no role in performing the lab services for which Allied was supposed to be paid as described in this Complaint.

the most thorough tests for various complex medical conditions;

b.      Reviewing the requisition of the lab work requested by the caregivers for the patients whose blood was to be tested, determining the correct tubes into which the blood to be drawn should be placed until tested, drawing the blood at the offices of the caregivers, labeling the tubes of blood as drawn and then determining the best lab for testing and then arranging for that drawn blood, along with the properly labeled tubing and requisition form to the appropriate lab;

c.      Maintaining all of the equipment needed for all those functions described just above, including draw needles, tubes for the blood drawn, rubber tubing for use in the actual blood draw, labels for the drawn blood, and courier packaging for sending the drawn blood to the actual testing lab;

d.      Delivering, by courier, the blood samples to the labs for testing which often included using airplanes given the locations of the Participating Rural Hospital chosen for the tests;

e.      Assuring that the blood samples were delivered by courier to the selected lab in adequate time for the testing to be done before the blood sample spoiled;

f.      Assuring that the blood samples were properly packaged and sealed so that they would not be subject to any contamination;

g.      Selecting the appropriate lab for the testing given the tests involved;

h.      Accessioning (recording) the test orders accompanying the samples in the correct manner in the computer system to assure the correct lab tests;

i.      Supplying the Participating Rural Hospital labs with the needed supplies for

the ongoing lab programs of these labs, including the vast quantities of constantly needed test tubes, chemicals, labels for marking the tested blood, rubber tubing, cotton balls and bandages, among other items and monitoring the inventory of these supplies to make sure that they were replenished in a timely manner;

j.      Developing, perfecting and installing the so-called "Lab Rat" program which, after tests were done, allowed the generation of a diagnostic test report which greatly simplified and made much more clear the test results for both the caregivers and their patients to read and understand;

k.      Downloading these much-improved reports into the system for doctors to easily access and review with their patients;

l.      Arranging and expediting follow-up communications between lab personnel and the caregivers who had ordered the tests; and

m.      Assisting with the billing of completed lab tests to the proper health insurer.

(55)   All of the above-described lab services were a substantial part of the work required by any lab doing blood testing and because Allied and MMP did all this work, all that the labs at the Participating Rural Hospitals had to do was the actual testing, which was much easier, involved much less work and many less employees to accomplish.

(56)   As compensation for the lab services provided by Allied and MMP, the Participating Rural Hospitals agreed to pay and did pay to MMP 75% of the claims for this blood testing that these hospitals submitted to were paid to them by health insurers; and since the Participating Rural Hospitals were paid claims on a monthly basis, these hospitals then paid the 75% of the monthly monies they received each month to MMP.

(57)    Under the Service Agreement between Allied and MMP, when MMP received payments from the Participating Rural Hospitals, MMP was obligated to pay 55% of the monies received by MMP, (which meant 40% of the monies received by the hospitals from the insurance carriers for the billings for the lab work involved) to Allied and to do so monthly once some minor costs were deducted by MMP for costs it had incurred on the processing of the lab work;

(58)    As shown in the diagram next below, Victory doctors would order appropriate tests, have the blood drawn for such tests, and send that blood specimen to MMP to send to the most appropriate lab for the needed testing. The receiving lab would perform the tests, bill the appropriate insurance carrier for the tests and, when paid for the tests by that insurer, would then pay to MMP 75% of that payment. Under the Service Agreement referred to above,  MMP was supposed to pay 55 percent of that payment to Allied or 40 % of od the total received by the hospitals from the insurance carriers.

(59)    The above described method of operation is diagramed as follows:



However, as shown below, MMP failed to pay Allied and its members, plaintiffs herein,

the required amount to Allied of the monies MMP received from the Participating Rural Hospitals and thus defrauded Plaintiffs of millions of dollars.

### Defendants' Scheme to Defraud Plaintiffs

(60)    The Plaintiffs who were members of Allied trusted MMP to pay to Allied each month its agreed upon share of the monies MMP received from the Participating Rural Hospitals. However, MMP, acting through Defendants Nichols and Ellis, did not honor that trust. Instead, they falsely reported to Allied each month that MMP had been paid less by the Participating Rural Hospitals than it had actually been paid and thus paid Allied less than it should have been paid, all in the manner described next below.

(61)    Each month from in or around December, 2016 through at least June, 2020, MMP would receive a report from the Participating Rural Hospitals stating how many claims each hospital had made to the insurance carriers for lab work during the prior month, how many such claims had been paid and the amount paid to each Participating Rural Hospital for those claims. The hospitals would deduct certain costs they had incurred for performing and processing the labs involved and then send 75% of the balance to MMP, as it was required to do under their agreement.

(62)    However, when MMP was then required to make its monthly payments to Allied of its 40% of that payment received by MMP, MMP did not do so.

(63)    Instead, MMP paid Allied millions of dollars less than it was required to pay under the Service Agreement (Exhibit A) between them.

(64)    Each month MMP sent a false report to Allied[2] stating that MMP had received less than it had actually received from the Participating Rural Hospitals and that report was accompanied by a payment for that understated amount. MMP's own accountant called this "skimming."

(65)    These false monthly reports were sent each month to the manager of Allied or Allied Management, who was Defendant Ellis from November 2016 until and thereafter Defendant Forage from April 2017 through June 2020. While each of these two Defendants was acting as the manager of Allied, they would, after receiving the false report from MMP which had been concocted by Defendants Ellis and Lewis to show the understated amount due Allied, then make a false report to each Allied member of the amount received from MMP and then pay each member, Plaintiffs herein, his or her membership share of that understated amount reportedly received from MMP.

(66)    As described (in an affidavit annexed hereto as Exhibit B) under oath by Larry Palmer, the former accountant for MMP, Defendant Clay Ellis who was not a member of MMP but who was acting with the consent of MMP and its managing member Lewis Nichols, also acting for and on behalf of MMP, "skimmed" money each month from what should have been paid to Allied and its members.

---

[2]    Upon information and belief, these monthly reports may have been sent first from MMP to Allied Management, also controlled by Defendant Forage and who was the nominal signatory to the MMP/Allied Service Agreement (Exhibit A). When thus sent, Forage, in furtherance of the scheme detailed below, and acting on his own behalf, on behalf of Allied Management and on behalf of the RICO enterprise described below, then sent the reports on to Allied Members and these reports defrauded those members in the manner referred to below.

(67)    MMP former accountant, Larry Palmer, described this fraud as "skimming"

in a sworn an affidavit as follows:

For various justifications that Clay Ellis would manufacture, it was common that Clay Ellis would skim off the top from funds that belonged to the Allied Companies. Clay Ellis would direct funds above the 55% LN Professionals was entitled to, to be paid to Clay Ellis personally, or Clay Ellis' LLC in Colorado, or one of Clay Ellis' other Texas LLC's, and Lewis Nichols for his role as co-conspirator of LN Professionals LLC. Clay Ellis would tell me to write the checks and because he appeared to have the right to hire, fire, and direct me, complied with his directions.

Any amounts LN Professionals LLC ever paid to any party were at the sole direction of Clay Ellis. While Clay Ellis was not legally an owner of LN Professional Management LLC., and Medical Management Professionals LLC., he directed every operational aspect thereto as though he were the sole owner. As time went on, I became increasingly aware that the accounting Clay Ellis was directing me to do was not legal and looked like there was fraud being committed against the shareholders of the Allied company shareholders.

It was routine for Clay Ellis to manufacture fraudulent settlement statements which did not reflect the actual amounts received by MMP. By increasing the monies paid to him, and then providing false or inaccurate settlement statements, Clay Ellis was written checks in excess of the amounts reflected on the statements. This resulted in him taking more money than he was allowed from the Allied company shareholders. The funds that LN Professionals LLC received from their clients would vary, but the numbers were substantial.  For most months, the revenue that was received and later skimmed and stolen was well over several hundred thousand dollars a month. There were millions of dollars that were received from various hospital clients. There was always a sizeable amount skimmed and taken by Clay Ellis for himself and directed to his personal companies. These payments were taken off the top, before any split to LN Professionals and Allied Lab Solutions, and then to the members of Allied Lab Solutions. The funds that were skimmed or stolen from the Allied company shareholders would be distributed to Clay Ellis and Lewis Nichols, with MJ Cortez already receiving his 10% money off the top.

As part of my duties as the accountant for MMP, I was aware of the

employees and employee compensation. The payments that l am referring to for Clay Ellis which were taken off the top, were not paid to him as an employee, as they were not rerated as employee compensation.

Clay Ellis made all decisions as though he owned LN Professional Management LLC., and Medical Management LLC., and he was compensated at the exact same rate     the legal owner of LN Professional Management LLC., Lewis Nichols. At the same time Clay Ellis was not the legal owner of LN Professional Management LLC., and Medical Management     LLC., he held himself out to all parties he was in-fact the owner of these companies. This would have all believing Clay Ellis was the owner of these two companies and they could reasonably rely on his directions and representations, and reasonably believed him exercising complete and absolute dominion and control of these two companies was derived from his ownership thereof.

Even though Clay Ellis was not properly accounting for funds that should have gone to the Allied Companies' shareholders, he would manufacture statements for me to use to generate payments to the Allied Companies that those at the Allied company shareholders would receive as an accurate and correct reflection of the funds. If Clay Ellis did not manufacture accounting, the Allied companies' shareholders would have received much more revenue than they actually did.

Clay Ellis specifically directed me to write checks to the members of Allied Lab Solutions, including William Franklin, M.D., and Toth II Enterp1ises, P.A. The amounts to those checks were always the net amounts after the monies off the top that Clay Ellis had directed be paid, including M.J. Cortez, but also himself and on multiple occasions one of his corporations, including one corporation which I understood was located in Colorado.

*******

All this suspicious activity was clearly known by Clay Ellis, Lewis Nichols, and MJ Cortez. It is equally clear that all three were aware of the scheme as they were recipients of the checks directed to be sent them by Clay Ellis. All three were clearly acting on concert as they received checks and payments and the statements reflecting the changing accounting and misstatements of revenue which were then sent to Allied Lab Solutions members. This was all

> done at the direction of Clay Ellis to me specifically and I was told to write
> the checks as those statements reflected.

The above quoted statement is taken *verbatim* from Palmer's Affidavit (Exhibit B)
and is adopted herein by reference as if pleaded in its entirety herein. Palmer, the
accountant making this statement, was acting as the accountant for Defendants Clay
Ellis, Lewis Nichols and MMP, and he thus had personal knowledge of the facts
stated above.

(68)    Because the payments referred to above from MMP to Allied were purposely
less than the payments due to Allied each month, having been "skimmed," the monthly
payments made by Allied to each of Allied's members were likewise less than they should
have received each month. Not only did MMP and its manager, Lewis Nichols and Clay
Ellis, know of this monthly underpayment, Defendant Ellis when he was manager of Allied
and Defendant Forage when he was manager of Allied knew of this monthly
underpayment, and falsely reported these understated amounts each month as if they were
the true amounts when they were less than the true amounts.

(69)    Scheming together for the purpose of obtaining money by the above-
described false and fraudulent pretenses, Defendants defrauded each Allied member
Plaintiffs herein)   of their complete share of the amounts paid to MMP from the
Participating Rural Hospitals, and kept for themselves the skimmed money that should
have been paid over to Plaintiffs but was not. These defrauded members included Plaintiffs
Victory, William Franklin, Katherine Keller, Nathan Pekar, Shawn Agenbroad-Elander,
Sarita Prajapati, and Brittani Adams.

(70)    As part of this scheme to defraud and to further its objects, Defendants Ellis, Nichols and MMP, acting by and through Ellis, enlisted Defendant Forage to join in this scheme and assist them by delivering to each of the above named Plaintiffs, as members of Allied, each month, an understated report showing less money than was owed along with a check for such lesser amount and Forage did so knowing that the reports were false and the checks fraudulently represented the lesser amount than was actually owed to each Allied member, the above-named Plaintiffs.

(71)    Defendant Forage knew that the reports sent by him each month reflecting the money due were intentionally understated as were the checks.  Instead of protecting the rights and interests of the members of Allied as was his obligation as the manager of Allied, he assisted Defendants with their skimming of monies due Plaintiffs, doing so by knowingly sending them each month the false reports and understated checks.

**Interstate Wire Communications Furthering Defendants' Scheme**

(72)    In furtherance of their scheme to defraud Plaintiffs in the manner described above, Clay Ellis, with the concurrence and assistance of MMP's managing member Lewis Nichols, would, each month commencing in November 2016 and continuing through at least June, 2018 (at which point accountant Larry Palmer quit), send to Larry Palmer, and when he left MMP in June, 2018 to another accountant or bookkeeper the fraudulently understated dollar amounts described above. These were sent by email and thus by a wire communication in interstate commerce.

(73)    Each of these monthly wire communications intentionally and fraudulently understated the amount owed to Plaintiffs and were therefore in furtherance of the

fraudulent scheme and included the following wire communications:

| Monthly False Data Sent by Wire to Accountant Palmer by Defendants Lewis and Ellis | False Amount Each Month Understating the Amount Actually Received by MMP |
|---|---|
| 11/2016 | $ 227,051.68 |
| 12/2016 | $ 296,282.79 |
| 1/2017 | $ 201,286.54 |
| 2/2017 | $ 312,383.67 |
| 3/2017 | $ 331,741.00 |
| 4/2017 | $ 335,017.84 |
| 5/2017 | $ 306,098.91 |
| 6/2017 | $ 508,657.05 |
| 7/2017 | $ 309,012.14 |
| 8/20177 | $ 319,607.43 |
| 9/2017 | $ 201,370.16 |
| 10/2017 | $ 267,244.62 |
| 11/2017 | $ 380,197.31 |
| 12/2017 | $ 194,963.20 |
| 1/2018 | $ 347,600.89 |
| 2/2018 | $ 404,295.90 |
| 3/2018 | $ 525,026.80 |
| 4/2018 | $ 317,437.00 |
| 5/2018 | $ 442,343.00 |
| 6/2018 | $ 376,438.00 |

(74)    Ellis, with the knowledge and complicity of MMP, for whom Ellis was acting as its manager, along with Defendant Lewis Nichols, would thus intentionally cause the accountant or bookkeeper to prepare the monthly reports to substantially understate the amounts due to Allied, doing so to further the scheme to defraud Plaintiffs.

(75)    Thereafter, and for each of the months between November 2016 through May 2019, an envelope was sent by Ellis to Allied's managing member containing the fraudulently created report described above and this envelope also contained a check payable to Allied for the amount which, as did the reports, falsely understate the total amount owed each month to Allied. This understated check, each month, was deposited for collection by Allied's manager (first Ellis and then Forage) into Allied's bank account and sent for collection back to the account of MMP on which these checks were drawn, using interstate wire communications operated by the Federal Reserve Bank's interbank electronic deposit and collection process or by the correspondent bank collection process which also uses interstate wire communications to effectuate the verification of funds in the check writer's account on which they were drawn and to effect a credit in the payee's account.

(76)    Once the check paid to Allied each month was collected in the above-described manner, Allied wrote and sent a check to each of its members for their member percentage share of the monthly amount supposedly due each member for the falsely understated payments made to MMP from the Participating Rural Hospitals. A copy of the false monthly report was also sent to each member.

(77)    From November 2016 through April 2017, these monthly understated checks were written by Defendant Clay Ellis because he was then the managing member of Allied, and thereafter, through April of 2019, by these checks were written by Defendant Forage because he was, during that time period, the managing member of Allied.

(78)    Thereafter, in a manner which furthered this scheme, these understated

checks were sent by Ellis nd Forage to each Plaintiff and, as was well known to Defendants, Plaintiffs deposited these checks into their respective bank checking accounts and then sent for collection by the Plaintiffs' banks,  using interstate wire communications used by the Federal Reserve Bank's interbank electronic deposit and collection process or by the correspondent bank collection process which also uses interstate wire communications to effectuate the verification of funds in the check writer's account on which they were drawn and then to effect a credit in the payee's account.

(79)   The use of either of these interstate collection methods was well known to occur by Defendants who caused these deposits to occur by sending the checks to Plaintiffs for deposit and thus Defendants caused these interstate wire communications to occur.

(80)   Each of these checks deposited into Plaintiff members' separate checking accounts and then processed by each bank via the above-referenced interstate wire communications were in the following amounts deposited in the following months for the following payees:

| Payee | Month Deposited | Check Amount | Amount Wired for Collection |
|-------|-----------------|--------------|------------------------------|
| Victory | 12/2016 | $ 177,919.75 | $ 177919.75 |
| Victory | 1/2017 | $ 242,951.86 | $ 242951.86 |
| Victory | 2/2017 | $ 165,054.94 | $ 165054.94 |
| Victory | 3/2017 | $ 256,154.61 | $ 256154.61 |
| Victory | 4/2017 | $ 272,027.62 | $ 272027.62 |
| Victory | 5/2017 | $ 274,714.61 | $ 274714.61 |

| Victory | 6/2017 | $ | 251,001.09 | $ | 251001.09 |
| Victory | 7/2017 | $ | 417,098.79 | $ | 417098.79 |
| Victory | 8/2017 | $ | 248,421.54 | $ | 245421.54 |
| Victory | 9/2017 | $ | 256,939.30 | $ | 256939.30 |
| Victory | 10/2017 | $ | 165,123.55 | $ | 165123.55 |
| Victory | 11/2017 | $ | 219,140.58 | $ | 219140.58 |
| Victory | 12/2017 | $ | 311,761.79 | $ | 311761.79 |
| Victory | 1/2018 | $ | 159,869.85 | $ | 159869.85 |
| Victory | 2/2018 | $ | 285,032.71 | $ | 285032.71 |
| Victory | 3/2018 | $ | 331,522.62 | $ | 311522.62 |
| Victory | 4/2018 | $ | 430,522.14 | $ | 430522.14 |
| Victory | 5/2018 | $ | 260,298.34 | $ | 260298.34 |
| Victory | 6/2018 | $ | 362,721.26 | $ | 362721.26 |
| Victory | 7/2018 | $ | 308,679.16 | $ | 308679.16 |
| Victory | 8/2018 | $ | 88,559.18 | $ | 88559.18 |
| Victory | 9/2018 | $ | 65,825.50 | $ | 65825.50 |
| Victory | 10/2018 | $ | 68,171.52 | $ | 68171.52 |
| Victory | 11/2018 | $ | 101,386.44 | $ | 101386.44 |
| Victory | 12/2018 | $ | 88,770.74 | $ | 88770.74 |
| Victory | 1/2019 | $ | 73,298.98 | $ | 73298.98 |
| Victory | 2/2019 | $ | 293,193.46 | $ | 293193.46 |

| Victory | 3/2019 | $ | 529,783.14 | $ | 529783.14 |
|---------|--------|---|------------|---|-----------|
| Victory | 4/2019 | $ | 577,761.34 | $ | 577761.34 |
| Victory | 5/2019 | $ | 509,329.88 | $ | 509329.88 |
| Franklin | 12/2016 | $ | 5,667.33 | $ | 5667.33 |
| Franklin | 1/2017 | $ | 8,888.48 | $ | 8888.48 |
| Franklin | 2/2017 | $ | 6,038.60 | $ | 6038.60 |
| Franklin | 3/2017 | $ | 9,371.51 | $ | 9371.51 |
| Franklin | 4/2017 | $ | 9,952.23 | $ | 9952.23 |
| Franklin | 5/2017 | $ | 10,050.53 | $ | 10050.53 |
| Franklin | 6/2017 | $ | 9,182.97 | $ | 9182.97 |
| Franklin | 7/2017 | $ | 15,259.71 | $ | 15259.71 |
| Franklin | 8/2017 | $ | 9,088.59 | $ | 9088.59 |
| Franklin | 9/2017 | $ | 9,400.22 | $ | 9400.22 |
| Franklin | 10/2017 | $ | 6,041.11 | $ | 6,041.11 |
| Franklin | 11/2017 | $ | 8,017.34 | $ | 8017.34 |
| Franklin | 12/2017 | $ | 11,405.92 | $ | 11405.92 |
| Franklin | 1/2018 | $ | 5,848.90 | $ | 5848.90 |
| Franklin | 2/2018 | $ | 10,428.03 | $ | 10428.03 |
| Franklin | 3/2018 | $ | 12,128.88 | $ | 12128.88 |
| Franklin | 4/2018 | $ | 15,750.81 | $ | 15750.81 |
| Franklin | 5/2018 | $ | 9,523.11 | $ | 9523.11 |
| Franklin | 6/2018 | $ | 13,270.29 | $ | 13270.29 |
| Franklin | 7/2018 | $ | 11,293.14 | $ | 11293.14 |
| Franklin | 8/2018 | $ | 3,239.97 | $ | 3,239.97 |
| Franklin | 9/2018 | $ | 2,408.25 | $ | 2408.25 |

| | | | |
|---|---|---|---|
| Franklin | 10/2018 | $ 2,494.08 | $ 2494.08 |
| Franklin | 11/2018 | $ 3,709.26 | $ 3709.26 |
| Franklin | 12/2018 | $ 3,247.71 | $ 3247.71 |
| Franklin | 1/2019 | $ 2,681.67 | $ 2681.67 |
| Franklin | 2/2019 | $ 10,726.59 | $ 10726.59 |
| Franklin | 3/2019 | $ 19,382.31 | $ 19382.31 |
| Franklin | 4/2019 | $ 21,137.61 | $ 21137.61 |
| Franklin | 5/2019 | $ 18,634.02 | $ 18634.02 |
| **OTHER MEMBERS[3]** | | | |
| OTHER MEMBERS | 12/2016 | $ 20,780.21 | $ 20,780.21 |
| OTHER MEMBERS | 1/2017 | $ 32,591.09 | $ 32,591.09 |
| OTHER MEMBERS | 2/2017 | $ 22,141.53 | $ 22,141.53 |
| OTHER MEMBERS | 3/2017 | $ 34,362.20 | $ 34,362.20 |
| OTHER MEMBERS | 4/2017 | $ 36,491.51 | $ 36,491.51 |
| OTHER MEMBERS | 5/2017 | $ 36,851.94 | $ 36,851.94 |

---

[3]    The term "OTHER MEMBERS" as used herein refers collectively to Plaintiffs Katherine Keller, Nathan Pekar, Shawn Agenbroad-Elander, Sarita Plajapati, and Brittani Adams. As Allied members along with Plaintiff Victory, each was entitled to receive their true member share of what should have been paid by MMP to Allied each month. Yet they each received less than that amount each month as a result of the false and fraudulent understatements made by Defendants about what MMP had actually earned. Thus, the separate checks deposited by each of these five members for the 37 months involved, for a total of 222 separate deposits, was therefore one of a total of 222 separate wire communications in interstate commerce in furtherance of Defendants' scheme to defraud as described in this complaint.

| | | | |
|---|---|---|---|
| OTHER MEMBERS | 6/2017 | $ 33,670.89 | $ 33,670.89 |
| OTHER MEMBERS | 7/2017 | $ 55,952.27 | $ 55,952.27 |
| OTHER MEMBERS | 8/2017 | $ 33,324.83 | $ 33,324.83 |
| OTHER MEMBERS | 9/2017 | $ 34,467.47 | $ 34,467.47 |
| OTHER MEMBERS | 10/2017 | $ 22,150.74 | $ 22,150.74 |
| OTHER MEMBERS | 11/2017 | $ 29,396.91 | $ 29,396.91 |
| OTHER MEMBERS | 12/2017 | $ 41,821.71 | $ 41,821.71 |
| OTHER MEMBERS | 1/2018 | $ 21,445.97 | $ 21,445.97 |
| OTHER MEMBERS | 2/2018 | $ 38,236.11 | $ 38,236.11 |
| OTHER MEMBERS | 3/2018 | $ 44,472.56 | $ 44,472.56 |
| OTHER MEMBERS | 4/2018 | $ 57,752.97 | $ 57,752.97 |
| OTHER MEMBERS | 5/2018 | $ 34,918.07 | $ 34,918.07 |
| OTHER MEMBERS | 6/2018 | $ 48,657.73 | $ 48,657.73 |
| OTHER MEMBERS | 7/2018 | $ 41,408.18 | $ 41,408.18 |
| OTHER MEMBERS | 8/2018 | $ 11,879.89 | $ 11,879.89 |
| OTHER MEMBERS | 9/2018 | $ 8,830.25 | $ 8,830.25 |

| | | | |
|---|---|---|---|
| OTHER MEMBERS | 10/2018 | $ 9,144.96 | $ 9,144.96 |
| OTHER MEMBERS | 11/2018 | $ 13,600.62 | $ 13,600.62 |
| OTHER MEMBERS | 12/2018 | $ 11,908.27 | $ 11,908.27 |
| OTHER MEMBERS | 1/2019 | $ 9,832.79 | $ 9,832.79 |
| OTHER MEMBERS | 2/2019 | $ 39,330.83 | $ 39,330.83 |
| OTHER MEMBERS | 3/2019 | $ 71,068.47 | $ 71,068.47 |
| OTHER MEMBERS | 4/2019 | $ 77,504.57 | $ 77,504.57 |
| OTHER MEMBERS | 5/2019 | $ 68,324.74 | $ 68,324.74 |

(81)  Each of the above referenced checks was for an amount substantially less than the amount actually owed to each of the Plaintiffs which Defendants well knew when these checks were written by Defendants, and Defendants caused them to be delivered to these members for deposit into their respective bank accounts for collection.

(82)  Each of these checks, collected by use of wire communication in interstate commerce, was in furtherance of the scheme to defraud because payment and collection of these checks, and each of them, was an indispensable part of the fraud in order, each month, to continue lulling the Plaintiff members into believing that they were being paid the full amount of what they were owed and these checks, along with the fraudulently understated monthly reports, were used by Defendants to lull each of the Plaintiffs from taking action

to collect the monies actually due each of them and in order to continue, undetected, their scheme and by its continuation to further secure Plaintiffs' trust which allowed Defendants to steal more money each month from Plaintiffs in the manner described above.

(83)    Moreover and also in furtherance of the scheme to defraud, Clay Ellis on a monthly basis, took some of the funds that belonged to Plaintiffs and which he acquired in the above-described manner,  and deposited some of these stolen funds in one of his bank accounts opened in the name of a Colorado entity and these deposits were then sent for collection by interstate wire communications used by the Federal Reserve's interbank electronic deposit and collection process.

(84)    In order to further lull and reassure Plaintiffs that they had actually received accurate amounts each month and that the reports each month had been accurate, and thus to further their scheme to defraud, Defendant Forage caused to be created and then sent to Plaintiffs, in or around February each year from 2017 through 2021, an Internal Revenue Service ("IRS")  Form K-1 stating the amounts paid to each Allied member for the preceding tax year and the amounts stated on these IRS K-1s conformed to the yearly, falsely-understated amounts reflected on the reports sent to Plaintiffs each month.

(85)    These K-1s were sent to each of the Plaintiffs and then, as was well known by Defendants who caused this to happen, these K-1 were electronically filed with the IRS by interstate wire communication each year for the tax years 2016, 2017, 2018, and 2019, and 2020. In total there were at least 50 such interstate wire communications, 10 for each year that these tax returns were filed by Plaintiffs, one each year for each member for the five years involved.

**Defendants Fraudulent Concealment of Additional Monies Received.**

(86)    The last Report sent by MMP to Plaintiffs stating that money had been collected from the Participating Rural Hospitals was in May of 2019 reflecting amounts collected in April 2019. Thereafter the following amounts of money were received by MMP from one of the Participating Rural Hospitals:[4]

| Date Received | Amount Received |
|---|---|
| 5/9/2019 | $3,282.327.93 |
| 6/11/2019 | $1,035.884.75 |
| 7/10/2019 | $188,136.57 |
| 8/14/2019 | $27,752.96 |
| 9/17/2019 | $16,885.78 |
| 10/17/2019 | $19,229.21 |
| 11/19/219 | $148,740.03 |
| 12/12/2019 | $184,024.16 |
| 01/14/2020 | $38,329.28 |
| 2/13/2020 | $47,671.61 |
| 3/19/2020 | $26,689.12 |
| 4/14/2020 | $13,992.17 |
| 5/13/2020 | $6,571.25 |
| 6/16/2020 | $619,414.61 |
| **Total Received:** | **$5,764,082.08.** |

---

[4]      The other Participating Rural Hospitals also sent to MMP substantial sums of money during this same time period in amounts to be proven at trial.

32

(87)    Despite the fact that these millions of additional dollars were paid to MMP by the Participating Rural Hospitals between May 2019 and June 2020, no amounts of the above stated monies were reported to or paid by MMP to Allied's members.

(88)    Instead, Defendants lied to Plaintiffs telling them that no monies had been received after April 2019. Forage did so by so informing an attorney for Plaintiffs and thereafter by informing Plaintiff Franklin. Thereafter Forage so stated in a sworn statement filed in a Travis County Civil Court which is annexed to as Exhibit C hereto as follows:

> As part of my duties, I oversee the implementation of the Agreement and the disbursement of funds that would be received under that Agreement. Since April 2019, there have not been any funds received from LN Professionals, LLC, nor any under its assumed name Medical Management Professionals.
>
> * * *

There are no funds, which were, received which were not distributed.

The above quoted statement is taken *verbatim* from Forages's Affidavit (Exhibit C) and is adopted herein by reference as if pleaded in its entirety herein.

(89)    Defendant Ellis also lied under oath that no money had been paid to MMP by the Participating Rural Hospitals after April 2019, doing so in a sworn deposition he gave, a copy of which is attached hereto as Exhibit D at pages 84 and 85:

> Q. And the last time LN Professional Management had any business for which it was paid would be in the spring of 2019; is that true?
>
> A. That is correct.

The above quoted statement is taken *verbatim* from Ellis's Deposition (Exhibit D) and that deposition is adopted herein by reference as if pleaded in its entirety herein.

33

(90)    However, both of these just quoted statements were knowingly false when made. Stephen Kuehler, the CEO of one of the Participating Rural Hospitals, Knox County Hospital, swore in an affidavit, a copy of which is annexed hereto as Exhibit E, that between April 2019 and June 2020, his hospital paid to MMP millions of dollars for lab services under its agreement with MMP. He swears in that affidavit that from May 2019 through June 2020, just his hospital alone (and there were others) paid over $2,400,000 to MMP. As Kuehler stated:

> The total amount paid to MMP from May 2019 to June 2020 was $2,425,725.17.

The above quoted statement is taken *verbatim* from Kuehler's Affidavit (Exhibit E) and the entire affidavit is adopted herein by reference as if pleaded in its entirety herein. At trial, Plaintiffs will show that in fact the amount paid by all the Participating Rural Hospitals was many more millions of dollars than $2,425,725.17.

(91)    Moreover, the Kuehler declaration attached monthly statements about what was paid to MMP and attached the actual cancelled checks paid to MMP by Knox Hospital showing those payments.  Forage's and Ellis' above quoted assertions that there was no revenue received after April 2020 were therefore knowingly false and were made in furtherance of the scheme to defraud and to help conceal this fraud.

(92)    Instead of paying any of this money to Allied as MMP was obligated to do under the Service Agreement which is Exhibit A hereto, and in furtherance of the

34

fraudulent scheme alleged herein and in order to effect the object thereof, this money received by MMP in and after May, 2019, a substantial portion of which belonged to Plaintiffs, was instead fraudulently taken by MMP and the checks paying over these monies by the Participating Rural Hospitals to MMP were deposited by MMP into its bank, the Cedar Branch of Comerica Bank, for collection to the accounts of the Participating Rural Hospitals. All such collections were by interstate wire communications used by the Federal Reserve's interbank electronic deposit and collection process. After May 2019, there were 12 such deposits by MMP between June, 2019 and June, 2020.

### Additional Concealment of Defendants' Wrongful Conduct and Plaintiffs Discovery of this Conduct

(93)    By their fraudulent understatement of funds due each month to Plaintiffs, and their concealment of the true amount paid MMP and thus due Plaintiffs, Defendants concealed from April 2016 until this fraud was discovered in January 2021 when Plaintiffs learned from the affidavit of Steve Kuehler, Knox CEO that Defendants had been taking for themselves millions of dollars of payments due Plaintiffs after these payments were received from the Participating Rural Hospitals.

(94)    Therefore, up through at least January 11, 2021 both because Defendants concealed their wrongful conduct from April 2016 as stated above and because both Forage and Ellis falsely stated to Plaintiffs that no money was received after April, 2019, Plaintiffs were unaware that Defendants had been skimming money from 2016 through April 2019 and thereafter unaware that Defendants had concealed altogether millions of dollars paid to them by Participating Rural Hospitals rom May 2019 through June 2020.

(95)    It was only in January 2021 that Plaintiffs examined cancelled checks of one of the Participating Rural Hospitals and determined from that examination that Defendants had been paid much more than they stated to Plaintiffs that they had been paid and thus had defrauded Plaintiffs by the amounts that Plaintiffs were underpaid.

(96)    Defendant Forage, Allied's manager in October 2020, without the consent of its members which consent requited by law, terminated Allied as an LLC by filing termination papers with the Texas Secretary of State thus ending its legal existence and thus its right to make any claims for money it was owed. He also similarly terminated Allied Management.

(97)    Sometime in 2022, Plaintiffs, through an attorney and then by Plaintiff William Franklin, requested Forage to reopen Allied so that it could legally pursue all these millions of dollars that were owed to it by MMP under the Service Agreement which is Exhibit A hereto.

(98)    In furtherance of Defendants' scheme to defraud and to assist in its concealment, Defendant Forage refused to reopen Allied and instead falsely stated to Plaintiffs that no money was owed Allied by MMP, an assertion he well knew was false.

**The Defendants Failed to Pay to Plaintiffs Additional Monies Owed**

(99)    In or around the summer of 2022, Knox Hospital, one of the Participating Rural Hospitals paid to MMP approximately $6,000,000 for lab services performed by both Allied and MMP under the Service Agreement annexed as Exhibit A hereto. This sum represented MMP and Allied's portion of monies that had been belatedly paid to MMP by one of the insurance carriers involved, Blue Cross, and thus 40% of that money was owed

by MMP to Allied under the Service Agreement (Exhibit A hereto).

(100)  Instead of paying Allied that 40%, and in furtherance of the scheme to defraud, Defendants false informed Plaintiffs that all this money was used to pay past due expenses incurred by MMP in performing its share of the lab services agreements. That assertion is knowingly false and made to deceive Plaintiffs into believing that none of this money paid by Knox Hospital to MMP was owed to Allied and thus to Plaintiffs.

**The Related Scheme to Defraud Plaintiff Gestalt**

(101)  Plaintiff Gestalt is a member of MMP and has been since 2016.

(102)  Gestalt's membership share of MMP is 20% and as such it is entitled to 20% of the monies MMP has earned since 2016.

(103)  Gestalt trusted MMP, and Ellis and Nichols who were managing and operating MMP, to pay over to Gestalt all that was owed it as a 20% MMP member.

(104)  However, in furtherance of the above referenced scheme to defraud and in order to accomplish its objects, commencing in or around December 2016 and continuing through the date of the filing of this Complaint, Defendant MMP, through Defendants Nichols and Ellis who were acting for, on behalf of, and with the intent to benefit MMP, intentionally underpaid Plaintiff Gestalt monies that were due Plaintiff Gestalt.

(105)  The above referenced conduct stated by accountant Palmer (see para. 69 above) applies equally to these Defendants' scheming to defraud Gestalt of the money due it from the lab services program.

(106)  As a result, Plaintiff Gestalt has been underpaid by in excess of $5,000,000 and this money is now due and owing.

(107)  Defendants paid to Gestalt by checks much less than was due Plaintiff Gestalt and these checks were written for amounts lower than the amounts actually due Gestalt and by these fraudulently understated numbers fraudulently stated to Gestalt that they reflected the higher amount that was actually due for the period for which these checks covered. There were at least 8 such checks and they all were caused to be collected by use of interstate wire communications in the same manner as described above at paras. 74 through 84 of this Complaint.

(108)  Each of these checks lulled Plaintiff Gestalt into believing that they stated the actual amounts due to Gestalt and thus defrauded Gestalt and caused it to continue to believe and accept the amounts stated on each of these checks as the truthful amount actually due to Gestalt and thus lulled Gestalt into refraining from action to obtain the balance of the monies due it.

(109)  In order to conceal and cover up their fraud against Plaintiff Gestalt, and to lull Gestalt into believing that it was being paid member distributions each year reflecting the full amount owed to it each year, these Defendants combined to issue each year to Gestalt an IRS Form K-1 which purported to inform Plaintiff of the amounts earned by MMP each year and her distributions based on a 20% ownership interest in MMP. Yet the amounts stated on each of these 10K-s for each year involved were knowingly false because the amounts stated thereon, while they accurately reflected the distributions that Plaintiff Gestalt had received for the tax year involved, understated the amount that she should have received and would have received had Defendants not taken a substantial amount of the gross revenue received by MMP and concealed that taking from Gestalt.

(110)   Instead of accurately stating the amounts earned each year by MMP and thus the 20% due each year to Gestalt, Defendants thus falsely and substantially understated the amounts that were due to Gestalt by concealing from Gestalt "the substantial amounts skimmed" by Defendants Nichols and Ellis, to use the description used by their accountant, Larry Palmer, as quoted in para. 63 above.

(111)   In order to lull Gestalt into believing that the amounts it received from MMP were the actual amounts due rather than the amounts after Defendants had skimmed from the amounts due, Defendants sent Gestalt, each year for 2016, 2017, 2018, and 2019, an IRS From K-1s falsely understating the earnings and thus the share due Gestalt. These false 10-Ks caused Plaintiff to be lulled into believing that the amounts stated on the 10-K's were accurate when, in truth, they were substantially lower than they should have been, all to deceive Plaintiff and this lulling further cause Gestalt not to take action to recover what was actually due it (*i.e.*, its share of the monies skimmed by and on behalf of Defendants as described by accountant Larry Palmer). Each of these 10-Ks was sent by email from MMP to Gestalt by wire communications in interstate commerce.

(112)   These K-1s were electronically filed, one each in 2017, 2018, 2019, and 2020, and each of these fillings was by interstate an interstate wire communication. These lulling K-1's were each a separate act of wire fraud in violation of 18 U.S.C. §1343 because this lulling was in furtherance of the scheme to defraud.

(113)   All of the conduct described above has cheated Plaintiff Gestalt of many millions of dollars which was their fair share of the monies earned by MMP from the lab services program. As will be shown at trial, Gestalt has been injured in its business and

property by at least $5,000,000 as a result of Defendants' fraud.

## COUNT ONE

### (RICO Violations under 18 U.S.C. 1962(c) against All Defendants)

(114)    Plaintiffs repeat and reallege all the allegations made above and adopt them by reference as if they were repleaded in their entirety in this paragraph.

(115)    Defendants, acting in concert with each other while acting in and affecting interstate commerce, in violation of 18 U.S.C. § 1962(c), engaged in repeated acts of racketeering under and as defined by U.S.C.§1961(1), forming a pattern of racketeering under U.S.C.§1961(5)  and these Defendants associated in fact to form an enterprise under as defined by U.S.C.§1961(4) and participated in its racketeering activities within the meaning of 18 U.S.C.§1961(1) by the repeated acts forming a pattern of racketeering activity, all as described in this Complaint.

### Defendants' Pattern of Racketeering Acts

(116)    Defendants associated together to gain the trust of Plaintiffs by a series of lies about the amount of money that Plaintiffs were due from the lab services program, doing so by intentionally understating that amount over a six-year period, and then taking that money for themselves and depositing that money in their accounts and for their own use and benefit.

(117)    Defendants furthered this fraud by the many interstate wirings referred to above commencing at paragraph 74  through 89, and also at paragraphs 89 and 114 through 115, including use of such wirings to further the scheme to defraud in the manner described above;  falsely understating the amounts owed to Plaintiffs and sending lulling K-1s by

wire communications in interstate commerce as alleged above which falsely understating the amounts owed to each of the Plaintiffs all in furtherance of Defendants scheme to defraud.

(118)   Each of these wirings was an act of wire fraud within the meaning of 18 U.S.C §1343 and each such act of wire fraud was an act of racketeering under and as defined by 18 U.S.C.§1961(5).

(119)   These many acts of racketeering constituted a pattern of illegal activity under and as defined by U.S.C.§1961(4) because they all occurred within a ten-year period as specified in that section.

(120)   Thereafter, once these funds were collected by MMP, it wrote checks to each Defendant which Defendants deposited into their own banks, and which were then sent for collection to the account of MMP by interstate commerce in the manner described in paras. 74 through 89 of this Complaint.

(121)   Moreover, when MMP received money from the Participating Rural Hospitals after April, 2019 and through June 2020 none of which was paid to Plaintiffs, these monies were deposited by MMP into its bank account and each such deposit was sent for collection by the bank collection process by wire communications in interstate commerce as described above and as such each such collection was therefore a separate act of mail fraud in violation of 18 U.S.C §1343.

(122)   This latter banking activity was also money laundering in violation of 18 U.S.C §§ 1956 and 1957 because these banking transactions were all with money obtained by wire fraud and as such they were each a specified unlawful activity within the meaning

of §§1956 and 1957, and each such act of a specified unlawful activity was a separate act of money laundering under 18 U.S.C. § 1956, and also a separate illegal monetary transaction in violation of 18 U.S.C. § 1957, all in relation to Defendants' scheme to Defraud Plaintiffs.

(123)    These repeated acts of money laundering and illegal monetary transactions were each a separate act of racketeering forming part of the pattern of racketeering because both money laundering and engaging in monetary transactions involving a specified unlawful activity are separate acts of racketeering under §1961(1) of the RICO statute. These acts thus became part of the pattern of racketeering activity engaged in by Defendants.

(124)    Accordingly, from 2016 through 2022, Defendants have engaged in a pattern of racketeering activity by their repeated acts of wire fraud and money laundering and this pattern has been ongoing from at least December 2016 through at least the end of 2022.

### The Enterprise Formed by Defendants and the Participation by Each Defendant

(125)    Defendants formed an enterprise through which they combined and conspired together to perpetrate their pattern of Racketeering. They acted in concert through MMP which was the enterprise joined by each of these Defendants for the illegal conduct described above.

(126)    Each of the Defendants used MMP to perpetrate the fraud by controlling MMP and using it, its bank account, and its false monthly reports to defraud Plaintiffs in

the manner described above.

(127)    Defendant Clay Ellis took money belonging to the Plaintiffs, wired it to his own bank accounts, lied to Plaintiffs in the reports about the amount of money that was due Plaintiffs and wrote MMP bank account checks to Allied from December 2016 through June 2020 which fraudulently underpaid Plaintiffs the amounts actually due them for their efforts. Ellis also lied under oath in his deposition in December 2020 by stating that payments from the Participating Rural Hospitals had stopped as of April 2019 when in fact, as Ellis then well knew, millions of dollars of such payments were received by MMP from May 2020 through June, 2020. Ellis also, while acting as the manager of Allied, misrepresented to each of the other Plaintiffs on a monthly basis from 2016 through April 2017 the monies that were due them by fraudulent understating those amounts and fraudulently paying by check such fraudulently understated amounts.

(128)    Defendant Jean Paul Forage took over the management of Allied in April 2017 and thereafter took money belonging to the Plaintiffs, lied to the other Plaintiffs in the reports sent to each Allied member, Plaintiffs herein, about the amount of money that was due to each Allied member, and wrote checks to these Plaintiffs from November 2016 through April 2019 which fraudulently underpaid Plaintiffs the amounts due to them for their efforts. Defendant Forage then lulled Plaintiffs into believing these fraudulent understatements by sending or causing to be sent false IRS Form K-1s to each member for the tax years 2016, 2017, 2018, 2019 and 2020 as described above and also closed Allied improperly in order to impede Plaintiffs from using Allied to bring claims against MMP and the other Defendants, falsely telling the Plaintiffs that it was closed because no more

money was due any of them after April 2019.

(129)   Defendant Lewis Nichols participated in the enterprise in his role as manager of MMP by aiding and abetting Forage and Ellis by confirming their false statements to Plaintiffs about the monies earned by MMP, and acting as the manager of MMP, by accepting some of the monies that had he knew had been taken from what was owed to Plaintiffs, doing so knowingly and assisting each month with the payment to Plaintiffs of checks drawn on MMP for sums less that what was owed Plaintiffs and, as manager of MMP,  allowing MMP to be used to perpetrate this scheme. Nichols also actively engaged in the depositing of the checks for collection knowing that some of the monies involved should not have been deposited in MMP's bank account because it belonged to Plaintiffs.

(130)   Defendant MMP participated in the enterprise because all the other defendants were acting within their scope of their duties for MMP and the acts of these other Defendants were at least in part to benefit MMP; MMP also operated the bank account at Comerica Bank that used to further the scheme to defraud and the money laundering activities described above; and finally MMP was the entity that, through the other Defendants, used interstate wire communications described above to further this scheme to defraud.

(131)   Defendant Allied Management took part in this enterprise by falsely pretending that its manager, Defendant Forage, was acting as a fiduciary for Allied and its members while actually deceiving them by the false representations and reports described above and thus actively participating in the scheme and sending its false statements to

44

Allied in order to carry out that scheme.

(132)    All of the defendants thus associated in fact to conduct and participate in the enterprise as prohibited under 18 U.S.C. § 1962(c).

(133)    The above-described actions caused injury to the business and property of Plaintiffs within the meaning of 18 U.S.C. § 1964 in the amounts to be proven at trial and amounting to at least $15,000,000 to Plaintiffs who are members of Allied and $5,000,000 to Gestalt, which is a member of MMP.  Defendants should pay to Plaintiffs all such proven damages which should be trebled, along with paying Plaintiffs' reasonable attorneys' fees.

## COUNT TWO

### (RICO 18 USC § 1962(d) against all Defendants)

(134)    Plaintiffs repeat and reallege all the allegations made above and adopt them by reference as if they were repleaded in their entirety in this paragraph.

(135)    Each Defendant, in the manner described above, combined and conspired to conduct and participate in the above-described enterprise's activities in violation of 18 U.S.C. §1962(d).

(136)    Defendants' conspiracy caused injury to the business and property of Plaintiffs within the meaning of 18 U.S.C. § 1964 in the amounts to be proven at trial and amounting to at least $15,000,000 to Plaintiffs who are members of Allied and $5,000,000 to Gestalt, which is a member of MMP.  Defendants should pay to Plaintiffs all such proven damages which should be trebled, along with paying Plaintiffs' reasonable attorneys' fees.

## COUNT THREE

### (Breach of Fiduciary Duties against Clay and Forage)

(137)  Plaintiffs repeat and reallege all the allegations made above and adopt them by reference as if they were repleaded in their entirety in this paragraph.

(138)  Both Forage and Ellis, while acting as the managing member of Allied had a fiduciary duty to act in the best interest of Allied's members, including Plaintiffs, and were obligated under law not to self-deal at the expense of these members of Allied, including Plaintiffs.

(139)  By making repeated false statements to Plaintiffs and taking their money by the acts of fraud and by self-dealing, all in the manner stated above, these Defendants breached their fiduciary duties to Plaintiffs and thereby damaged Plaintiffs in the amounts to be proven at trial, and amounting to at least $15,000,000 to Plaintiffs who are members of Allied and $5,000,000 to Gestalt, which is a member of MMP.

## COUNT FOUR

### (Fraud against all Defendants)

(140)  Plaintiffs repeat and reallege all the allegations made above and adopt them by reference as if they were repleaded in their entirety in this paragraph.

(141)  All of the Defendants false statements referred to above were relied upon by Plaintiffs to their detriment because they accepted them as true and thus accepted millions of dollars less than they were owed; Defendants intended by their false statements to defraud Plaintiffs; and this fraud has damaged Plaintiffs in the amounts to be proven at trial.

(142)  As to the specific time, place, and manner that these Defendants made the false and fraudulent statements to Plaintiffs, these are detailed, among other paragraphs in

this Complaint, in paragraph 66 above and were in writing; these are the monthly reports made by MMP to Allied and were sent to Plaintiffs by Defendants each month from April 2016 through December 2020.

(143)  Plaintiffs relied on these reports to their detriment because they believed them to be true statements of the amounts earned when in fact, they were false.

(144)  Plaintiffs were also sent yearly IRS K-1 reports which were also false because they understated the amounts due Plaintiffs; and as to the time, place and manner of these K-1s, they were sent each year from 2017 through 2021 in or around February of each such year as detailed in paragraphs 85 to 86, above.

(145)  Plaintiffs relied on these K-1s to their detriment because they believed them to be true statements of the amounts earned when in fact, they were false.

(146)  These acts of fraud by Defendants were not only fraudulent but were intentional or reckless causing the harm to Plaintiffs and as such Plaintiffs are entitled to punitive damages against Defendants in an amount to be proven at trial and these damages, to the extent proven, should be added to the compensatory damages which will be proven at trial and which amount to at least $15,000,000 to Plaintiffs who are members of Allied and $5,000,000 to Gestalt, which was a member of MMP.

## COUNT FIVE

### (Conversion against all Defendants)

(147)   Plaintiffs repeat and reallege all the allegations made above and adopt them by reference as if they were repleaded in their entirety in this paragraph.

(148)  By taking millions of dollars of money rightly belonging to Plaintiffs

47

Defendants have converted that money to their own use and deprived Plaintiffs of that money and Plaintiffs have been damaged by that converted money in amounts to be proven at trial.

(149)  These acts of conversions by Defendants were not only fraudulent but were intentional or reckless causing the harm to Plaintiffs, and as such Plaintiffs are entitled to punitive damages against Defendants in an amount to be proven at trial and these damages, to the extent proven, should be added to the compensatory damages which will be proven at trial and which amount to at least $15,000,000 to Plaintiffs who are members of Allied and $5,000,000 to Gestalt, which was a member of MMP.

## The Need for an Accounting and for a Restraining Order

(150)  Defendants have demonstrated over the last six years that they are not worthy of belief nor trust.

(151)  At present they have taken and hold at least $20,000,000 belonging to Plaintiffs. Given their wrongful conduct alleged above, Defendants should be restrained from transferring any of that money until the trial of this action.

(152)  This Court should also order an accounting of all the monies received by MMP from the Participating Rural Hospitals from 2016 through the present date and account for any expenses MMP incurred in performing their services under the Service Agreement which is Exhibit A to this Complaint.

(153)  The Application for Mandatory Injunctive Relief will be made by separate instrument as required under Rule CV-65 of the Local Court Rules, as required.

WHEREFORE, Plaintiffs ask this Court for judgment as follows:

A.  For compensatory damages in the amounts proven at trial on Counts ONE, TWO, THREE, FOUR, and FIVE;

B.  For treble damages on any compensatory damages awarded on Counts ONE, and TWO;

C.  For reasonable attorneys' fees incurred in relation to the prosecution of the claims stated in Counts ONE and TWO;

D.  For punitive damages awarded at trial on Counts THREE, FOUR, and FIVE;

E.  For an Order restraining any transfer by Defendants of any money in their possession which was derived by payments made by the Participating Rural Hospitals, and for an accounting of all such money received and any expenses incurred by MMP in relation to its services performed under the Service Agreement which is Exhibit A to this Complaint.

F.  For all taxable costs of suit;

G.  For such other and further belief as this Court deems just.

**PLAINTIFFS' DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38, Fed. R. Civ. Pro, Plaintiffs Demand trial by jury of all issues so triable.

Respectfully submitted,

COLLMER LAW GROUP
/s/ Mark W. Collmer___
Mark W. Collmer, Esq.
State Bar No. 0462420
Mark@Collmerlaw.com
3700 Montrose
Houston, Texas 77006

Tel: (713) 337-4040
Fax: (713) 337-4040


MARKHAM READ ZERNER LLC

*/s/ John J.E. Markham, II*
John J.E. Markham, II (MA BBO No. 638579)
(*Pro Hac Vice Application Pending*)
One Commercial Wharf West
Boston, Massachusetts 02110
Tel: (617) 523-6329
jmarkham@markhamreadzerner.com
bzerner@markhamreadzerner.com
*Counsel for Plaintiffs (Pro Hac Vice)*

*Counsel for Plaintiffs*

50