# COMPLAINT EXHIBIT D

## DEPOSITION TRASCRIPT OF DEFENDANT CLAY ELLIS

## Page 1

NO. D-1-GN-20-003469

| | |
|---|---|
| TOTH ENTERPRISES II, P.A., ) IN THE DISTRICT COURT OF | |
| and WILLIAM FRANKLIN, M.D.,) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| VS. ) TRAVIS COUNTY, T E X A S | |
| ) | |
| CLAY ELLIS, ) | |
| ) | |
| Defendant. ) 201ST JUDICIAL DISTRICT | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF
CLAY ELLIS
DECEMBER 21, 2020

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF CLAY ELLIS, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on December 21, 2020, from 9:03 a.m. to 2:21 p.m., via Zoom videoconference, before PHYLLIS WALTZ, RMR, CRR, CRC, Texas CSR, TCRR, Louisiana CCR, in and for the State of Texas, recorded by machine shorthand, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto; that the deposition shall be read and signed before any Notary Public.

## Page 2

```
 1                    A P P E A R A N C E S
 2
 3   COUNSEL FOR PLAINTIFFS:
         Mr. Mark W. Collmer
 4       COLLMER LAW GROUP
         3700 Montrose Boulevard, Suite 100
 5       Houston, Texas  77010
         Tel:  (713) 337-4040
 6       Fax:  (713) 337-4044
         E-mail:  mark@collmerlaw.com
 7
 8   COUNSEL FOR DEFENDANT:
         Mr. Jeffrey Jackson "Jeff" Hobbs
 9       ARMBRUST & BROWN, P.L.L.C.
         100 Congress Avenue, Suite 1300
10       Austin, Texas  78701
         Tel:  (512) 435-2371
11       Fax:  (512) 435-2360
         E-mail:  jhobbs@abaustin.com
12
13   VIDEOGRAPHER:
         Ms. Kayla Brown
14
15   ALSO PRESENT:
         Mr. William Franklin
16       Ms. Michelle Holle
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1                        INDEX
 2                                          PAGE
     Appearances  . . . . . . . . . . . . . . . . . . . .   2
 3
     CLAY ELLIS
 4       Examination by Mr. Collmer . . . . . . . .   4
 5   Signature and changes  . . . . . . . . . . . . . . 165
     Reporter's Certificate . . . . . . . . . . . . . . 167
 6
 7                      EXHIBITS
 8
 9                                          PAGE
     EXHIBIT NO. 1  . . . . . . . . . . . . . . . . . .  59
         MMP Distribution Report for November 2016
         Collection Activity
```

```
11:59 10
        11
        12
        13
        14
        15
        16
        17
        18
        19
        20
        21
        22
        23
        24
        25
```

## Page 4

```
 1            THE VIDEOGRAPHER:  The time is 9:03 a.m.
 2   We're on the record.
 3            THE REPORTER:  This is the court reporter.
 4   Today's date is December 21, 2020.  This is the oral
 5   deposition of Clay Ellis, and it is being conducted
 6   remotely in accordance with the 29th Emergency Order
 7   regarding the COVID-19 State of Disaster, Paragraphs 2
 8   b. and c.  The witness is located in Austin, Texas.
 9            My name is Phyllis Waltz, CSR No. 6813.
10            I am administering the oath and reporting
11   the deposition remotely by stenographic means from
12   Pearland, Texas.  The witness' identification has been
13   confirmed by Mr. Hobbs.
14                    CLAY ELLIS,
09:04 15   having been first duly sworn, testified as follows:
16                  E X A M I N A T I O N
17   BY MR. COLLMER:
18       Q.  Tell us your name, please.
19       A.  Clay Ellis.
09:04 20       Q.  Do you have a middle name?
21       A.  Edward.
22       Q.  Mr. Ellis, how old are you?
23       A.  48.
24       Q.  Let's see, are you a medical doctor?
09:04 25       A.  I am not.
```

Worldwide Court Reporters, Inc.
( 800) 745-1101

## Page 5

```
             1      Q.  Are you any kind of licensed medical
             2   professional?
             3      A.  I am not.
             4      Q.  Have you ever been?
09:05        5      A.  No.
             6      Q.  Did you go to college?
             7      A.  I did, but I did not graduate.  I do not hold
             8   a degree, no, sir.
             9      Q.  Okay.  When did you go to college,
09:05       10   approximately, just generally?
            11      A.  Early '90s.
            12      Q.  Is that when you -- did you graduate from high
            13   school in the early '90s as well?
            14      A.  Yes, sir, I did.
09:05       15      Q.  Where were you born and raised?
            16      A.  Born in Nacogdoches, Texas, raised in Austin,
            17   Texas.
            18      Q.  And from the time that you dropped out of
            19   college until the end of the '90s, what kind of work did
09:05       20   you do?
            21      A.  I worked in administration for a company
            22   called J&L Partners.
            23      Q.  What kind of entity is that?
            24      A.  That's a privately held trust that had several
09:06       25   different corporations and companies under its umbrella.
```

## Page 6

```
             1   I worked for the owner directly.
             2      Q.  What were you doing there?
             3      A.  Several different things.  Administrative
             4   mainly, staffing, logistics, things of that nature.
09:06        5      Q.  At this time you were in your early 20s?
             6      A.  I believe that would be accurate.
             7      Q.  What qualified you to handle logistics for a
             8   trust at that time?
             9      A.  Well, I started at a young age with the
09:06       10   company and just progressed, moved up within the company
            11   over the 14 years of employment.
            12      Q.  After you left that company after 14 years,
            13   what kind of work did you do?
            14      A.  More administrative, logistical support, and
09:06       15   worked with providers, physicians, and integrated
            16   medicine, preventative healthcare.
            17      Q.  What does the term logistical support mean to
            18   you?
            19      A.  Logistical support means getting samples,
09:07       20   professionals, clients, patients from A to B.
            21      Q.  How did you get into that business?  Or was
            22   that the business of -- was JL -- I forgot the other
            23   letter.
            24      A.  No, it was not.  I always had a interest in
09:07       25   health and fitness.  I worked with different companies
```

## Page 7

```
             1   while I was still employed with J&L Partners.  It went
             2   from sports supplements to medical.  So it was just a
             3   progression.
             4      Q.  And when did you stop -- what year did you
09:07        5   stop at J&L Partners?
             6      A.  I don't know exactly.  The principal owner of
             7   JL was -- passed away.  So I stayed on for a couple
             8   years, and then -- then we dissolved all the assets.  I
             9   think that was in -- I couldn't even tell you exactly --
09:08       10   2008, 2007.
            11      Q.  After you left that entity, you said you got
            12   into the -- something to do with -- with medical and it
            13   looks like you said putting people in touch with others.
            14   I forgot the exact phrase that you addressed.  Was that
09:08       15   with a particular company?
            16      A.  It was one that I had founded in 2008, 2009,
            17   called Eroo.
            18      Q.  I'm sorry, I didn't mean to cut you off.
            19   There was a little lag.  What was the name of the
09:08       20   company in '08 that you founded?
            21      A.  Eroo Management.
            22      Q.  Spell that for me.
            23      A.  E-r-o-o.
            24      Q.  E-r-o-o?
09:08       25      A.  Correct.
```

## Page 8

```
             1      Q.  Okay.  You're the sole owner?
             2      A.  I am.
             3      Q.  Is it still in business?
             4      A.  It is.
09:09        5      Q.  Does it have any revenue?
             6      A.  It does.
             7      Q.  Is that your primary means of support
             8   currently?
             9      A.  During the pandemic, I would say yes.
09:09       10      Q.  All right.  What does Eroo Management do?
            11      A.  Similar.  It does outsourcing of supportive
            12   staff, runs and manages, payroll, things of that nature,
            13   supplies.
            14      Q.  Do you have any kind of licenses besides a
09:09       15   driver's license? /
            16      A.  I do not.
            17      Q.  Have you ever held -- ever held any other
            18   kinds of licenses besides a driver's license?
            19      A.  No, sir.
09:09       20      Q.  Have you ever been convicted of a felony?
            21      A.  No, sir.
            22      Q.  Have you ever owned any other companies
            23   besides Eroo Management?
            24      A.  A few over the years, yes, sir.
09:10       25      Q.  What type of companies?
```

Worldwide Court Reporters, Inc.
(800) 745-1101

## Page 9

1     A. Similar in nature.
2     Q. How many?
3     A. Probably three.
4     Q. What are their names?
09:10  5     A. Clay-Shell and Salang Wellness.
6     Q. The first one is Clay-Shell?
7     A. Yes, my name and my wife's name.
8     Q. S-h-e-l-l?
9     A. Correct.
09:10  10    Q. And the second one was Select. I couldn't
11    understand the last.
12    A. I'm sorry?
13    Q. The second name of the company. The second
14    company.
09:10  15    A. Salang, S-a-l-a-n-g.
16    Q. Is there a third company?
17    A. Eroo, Salang, and Clay-Shell.
18    Q. Okay. Is there a company -- are you familiar
19    with a company called Max Total Health?
09:11  20    A. Oh, yes, sir, I am.
21    Q. What is that?
22    A. It provided resources for Eroo Management.
23    Q. Was that a company or a d/b/a?
24    A. It was a L.L.C.
09:11  25    Q. Do you own it?

## Page 10

1     A. I do.
2     Q. Are there L.L.C.s that you own other than
3     companies such as Clay-Shell, Salang, and Eroo, one of
4     you the companies being Max Total Health? Are there
09:11  5     others?
6     A. There are. I've been involved in a lot of
7     different businesses over the years. I think CIA and
8     CIRA might be listed under me. I'm not sure.
9     Q. Might be listing under you, meaning you might
09:12  10    be had listed at the Secretary of State as being an
11    owner of the company; is what you mean?
12    A. Correct.
13    Q. What does CIA, other than Central Intelligence
14    Agency, stand for, in your acronym of the company?
09:12  15    A. CIA would be my business associates' idea of a
16    joke, and it's Clayisawesome, L.L.C., as well as
17    Clayisreallyawesome, L.L.C. I love explaining that to
18    people.
19    Q. Is the real name of the company Clayisawesome,
09:12  20    L.L.C.?
21    A. Yes, sir.
22    Q. And Clayisreallyawesome, L.L.C.?
23    A. Yes, sir.
24    Q. What is the business of Clayisawesome, L.L.C.?
09:12  25    A. Clayisawesome, L.L.C., just holds assets. It

## Page 11

1     doesn't have any employees. Clayisreallyawesome is a
2     management company that provides services for
3     Clayisawesome, L.L.C.
4     Q. And what kind of assets does Clayisawesome,
09:13  5     L.L.C., hold?
6     A. Logistical, aviation, transportation.
7     Q. Are these the two airplanes that's -- that you
8     have ownership interest or Clayisawesome, L.L.C., has
9     interest in?
09:13  10    A. That is correct.
11    Q. Is that a King Air 350?
12    A. It is not.
13    Q. What is it?
14    A. A B200.
09:13  15    Q. Sorry. What's the other one?
16    A. A cirrus. It's just an aircraft.
17    Q. When were those purchased in relation -- or
18    just when were they purchased?
19    A. Those particular aircraft?
09:14  20    Q. Right.
21    A. I'm not exactly sure, to be honest with you,
22    because they were replacing other aircraft. I think one
23    was 2017 and one would be in 2018.
24    Q. As far as the purchase date?
09:14  25    A. Yes, sir.

## Page 12

1     Q. Does any -- does Clayisawesome, L.L.C., did it
2     have any involvement in providing any kind of support
3     for LN Partners?
4     A. Yes, it contracted with LN at times to supply
09:14  5     transportation, when different needs that were -- came
6     about in the course of doing business.
7     Q. And is this transportation of lab tests or
8     flying, for example, Lewis Nichols to various places?
9     A. No, generally speaking, it was other support
09:15  10    staff as well as Mr. Nichols was on some of those
11    flights as well as moving samples.
12    Q. The samples for Allied Lab Services, which had
13    a contract with Lewis Nichols' partners, those samples
14    were taken to various hospitals, correct?
09:15  15    A. Various different locations, depending on the
16    logistical need, yes.
17    Q. How did they get from their point of origin to
18    the labs?
19    A. I'm -- I'm sorry, can you --
09:15  20    Q. Sure, no problem. Say, for example, I'm a
21    patient for Victory Medical and I need to have a
22    urinalysis done, all right. So there is a cup. Pees in
23    the cup. And that cup goes -- somehow it ends up at a
24    hospital, a hospital lab, for example, being tested.
09:16  25    How does --

3 (Pages 9 to 12)

Worldwide Court Reporters, Inc.
( 800) 745-1101

Page 13

```
 1        A.  Okay.  No 1, we didn't do urinalysis, but I
 2   understand, so where your question is now.  So it
 3   wouldn't have been for support from Victory, per se,
 4   because Victory is in a very easy-to-reach hub.  In the
09:16  5   case that there was a problem with patient care, where
 6   in the course of doing business a weather-related or an
 7   instance where normal means would not be sufficient,
 8   then those would have been providing logistical support
 9   to get those samples in a timely fashion to the facility
09:16 10   so that it did not disrupt patient care.
11        Q.  All right.  So let's -- let's see what
12   actually was done.  Is there a blood sample that was
13   handled just through the --
14        A.  Correct.
09:17 15        Q.  Okay.  So let's say there is a vial sitting at
16   Victory Medical.  How does that vial -- who picks the
17   vial up from Victory Medical?
18        A.  Courier.
19        Q.  Okay.  The courier is employed by whom?
09:17 20        A.  The courier would have been employed probably
21   by LN.
22        Q.  All right.  And then the courier is told to go
23   pick it up from whatever clinic it is and take it where,
24   typically?  Just by way of example.
09:17 25        A.  To either the distribution center or to one of
```

Page 14

```
 1   the other facilities that was actually performing the
 2   testing.
 3        Q.  And the distribution center would be owned by
 4   what company?
09:17  5        A.  LN.
 6        Q.  Where -- does LN have a distribution center
 7   now?
 8        A.  I believe they do not.
 9        Q.  Okay.  When is the last time LN had a
09:17 10   distribution center?
11        A.  It would be hard to say.
12        Q.  What was --
13        A.  I don't think LN had any more activity after,
14   I don't know, early spring of last year.
09:18 15        Q.  That's spring of 2019?
16        A.  That would be correct.
17        Q.  So after the spring of 2019, LN didn't have
18   any more of this -- the testing distribution we're going
19   to describe, but that's -- so this will be what happened
09:18 20   before it stopped doing business, basically; is that
21   fair?
22        A.  I believe that would be a fair assessment,
23   yes.
24        Q.  Okay.  So -- so let's talk about, let's say,
09:18 25   October of 2018.  It's somewhat arbitrary.  It doesn't
```

Page 15

```
 1   really matter when.  But there is a blood vial at
 2   Victory Medical Clinic.  It's picked up by our courier
 3   employed by LN Partners.
 4        A.  Okay.
09:18  5        Q.  He takes it to a distribution center for LN
 6   Partners.  What is -- what is a distribution center to
 7   LN Partners?  Is it just an office where people gather
 8   stuff, or does it act like a medical facility, with
 9   freezers and things of that nature?
09:19 10        A.  It was medical in nature.  They did quality
11   control, to make sure that they were viable samples, so
12   that they could report to the providers, in case it
13   became aware that there was going to be a disruption for
14   that patient.  And then they were the necessary
09:19 15   facilities for the testing.
16        Q.  What was the address of the distribution
17   center for LN Partners when it had an active business
18   before the end of the spring of 2019?
19        A.  Palm Springs in northwest Austin.  I couldn't
09:19 20   tell you the exact address.
21        Q.  It's kind of foreign to me.  So is this a big
22   place or small place?
23        A.  It was -- I'm -- you're asking me, that's a
24   relative term.  I think the space was less than 2,000
09:20 25   square feet.
```

Page 16

```
 1        Q.  And how many people would be working in that
 2   less than 2,000 square feet?
 3        A.  Again, I'd have to speculate, but it depends
 4   on the volume of business that they were performing at
09:20  5   the time.  Somewhere between six and 12 people.
 6        Q.  Okay.  And the six to 12 people that are
 7   there, are they medical professionals?
 8        A.  Some are, yes.
 9        Q.  And what -- what level of professional --
09:20 10   medical professional are they?
11        A.  Phlebotomists and medical assistants, MAs.
12        Q.  For the gentlemen of the jury -- ladies and
13   gentlemen of the jury, a phlebotomist is someone who
14   takes blood, correct?
09:20 15        A.  Yes.
16        Q.  What is the other type of person that was
17   there?
18        A.  Medical assistant.
19        Q.  Is that a licensed physician?
09:21 20        A.  It can be.
21        Q.  Who employ -- who was the employer of the
22   phlebotomists?
23        A.  That were on staff, doing the "diprom"
24   testing?
09:21 25        Q.  Yes, sir.
```

4 (Pages 13 to 16)

Page 17

```
              1      A. I believe that would be LN.
              2      Q. LN Partners, L.L.C.?
              3      A. I believe that's correct.
              4      Q. And the medical assistants would be employed
09:21         5   by LN Partners, L.L.C.?
              6      A. That would be correct.
              7      Q. Did you participate in the decision to close
              8   the distribution center?
              9      A. I did not.
09:21        10      Q. When was the distribution center closed, as
             11   best you can recall?
             12      A. Again, it would probably be the early spring
             13   of 2019. I can't -- I -- you're asking me to speculate,
             14   but when they ceased to process samples, the
09:22        15   distribution center was not acting as a distribution
             16   center at that point.
             17      Q. Your best recollection is that the
             18   distribution center for LN Partners closed in the early
             19   spring of 2019?
09:22        20      A. That is correct.
             21      Q. After the dis-- well, if this -- if a blood
             22   vial is not going to the distribution and there are some
             23   occasions where the vial went directly to the testing
             24   lab, correct? Courier picks it up and goes straight to
09:22        25   the lab?
```

Page 18

```
              1      A. I would say that would be extremely rare, but
              2   I can't say that it never happened.
              3      Q. Okay. The general procedure, though, is pick
              4   the vial up, go to the distribution center, and from
09:22         5   there redistribute those samples to where they're going
              6   to be tested; is that an accurate description?
              7      A. That's correct.
              8      Q. All right. Did you participate in any part of
              9   the decision on where to send samples?
09:22        10      A. On a regular basis, no. I might be contacted
             11   if there was a special circumstance.
             12      Q. You were not competent to know what type of
             13   test needs to be done in what lab facility, correct?
             14      A. Again, I'm not a licensed professional. I
09:23        15   know, as far as logistics timing goes. So if there was
             16   a special need for a patient to be distributed to a
             17   certain facility, those kind of questions might have
             18   flowed through me.
             19      Q. Would this -- by way of example, it would be
09:23        20   like you would know if, for example, I don't know, Smith
             21   Hospital has extra capacity, they can run a test
             22   quickly, send it there? That's the kind of decision
             23   we're talking about?
             24      A. No, sir. If, for whatever reason, somebody at
09:23        25   the facility failed to produce that sample in a timely
```

Page 19

```
              1   fashion. And if you're going to use Victory as a
              2   example, let's use them. The phlebotomist that drew
              3   that patient at their facility, you know, after the
              4   courier picked up, noticed that they had missed two
09:24         5   patients or a patient, then I would probably get those
              6   calls.
              7      Q. What, then, is the role of the airplanes as
              8   far as moving samples around, where they don't have a --
              9   or do they have any role as far as moving of the samples
09:24        10   around?
             11      A. In the instance where there was weather coming
             12   in and normal carriers could not or couriers could not
             13   provide those services in a timely fashion because
             14   everything that was done was done based on patient
09:24        15   necessity and there is only a viable amount of time or a
             16   small amount of time that those samples are viable, so
             17   then a decision would be made to utilize those -- the
             18   aircraft in order to provide those services.
             19      Q. Did the aircraft have pilots on staff or are
09:24        20   they rented on a per-trip basis?
             21      A. Depending on the aircraft, it could be per --
             22   per -- per trip basis.
             23      Q. In 2018 and 2019 was there any -- a pilot that
             24   typically would handle the flights for LN Partners'
09:25        25   samples?
```

Page 20

```
              1      A. We had a couple different pilots at that time.
              2   I believe there was an incidence where we had a crash, a
              3   plane went down, and therefore there was some turnover
              4   and utilizing different pilots.
09:25         5      Q. One of your planes or the Clayisawesome planes
              6   went down?
              7      A. That is correct.
              8      Q. What was the tail number?
              9      A. I'd have to give you that information. It's
09:25        10   been a long time.
             11      Q. What kind of plane was it?
             12      A. It was a piston, Cirrus.
             13      Q. A Cirrus?
             14      A. Uh-huh, correct.
09:26        15      Q. SR20 or SR22?
             16      A. 22.
             17      Q. Anybody killed?
             18      A. Fortunately, not. That's why we use Cirrus.
             19   They have a parachute.
09:26        20      Q. Where was -- when did this happen?
             21      A. I believe it was in 2017, but I don't know
             22   exactly for sure. I'd have to get those dates for you.
             23      Q. Do you recall the time -- the season of the
             24   year that it was?
09:26        25      A. It had to have been -- I believe it was in the
```

Worldwide Court Reporters, Inc.
(800) 745-1101

Page 21

early fall.

Q. Where did it crash?

A. Somewhere between California and Arizona.

Q. That's a line. Does it mean somewhere in the California, Arizona area; you're not sure which side of the border it's on?

A. Exactly right.

Q. Okay.

A. The plane was in transport. It was -- went down due to a oil leak, the motor seized, and they pulled the chute. And, again, it was in some rural area between California and Arizona.

Q. Was it transporting samples for LN Partners at the time?

A. No, it was a new acquisition. It was actually in -- in transport.

Q. Okay. Of the planes that are being -- or transporting LN Partners' materials -- I just want to focus on that right, if you don't mind.

A. Okay.

Q. Is that going to be the B200 in the 2017, 2018 time frame?

A. Some, yes.

Q. Was there another serious -- Cirrus that was purchased to replace the one that went down?

Page 22

A. That is correct.

Q. Okay. What's the tail number of that one?

A. 594 Tango Sierra.

Q. What's the -- that's the Cirrus SR22?

A. Correct.

Q. And the B200, what's the tail number on that?

A. 800 Tango Sierra.

Q. You collected names, right, the TS is the name that you picked or someone picked?

A. No. There is --

Q. Why is the name the same call number?

A. I never -- the tail numbers, I guess you can pick them. We never did that. The tail numbers were existing when the purchase of the aircraft. There was no need to change them, so we didn't.

Q. And none of them had been used in any respect with regard to LN Partners since the spring of 2019, the end of the spring of 2019 or early spring of 2019, right?

A. I would have to check, but I'm sure that they've had ongoing business, so they have been used to certain capacity. Ongoing business, I mean different meetings and things of that nature.

Q. Is part of your business at Clayisawesome, L.L.C., is to rent out the planes?

Page 23

A. On occasion.

Q. Lease the planes?

A. On occasion.

Q. Did LN Partners shut down in the spring of 2019 for, essentially, lack of revenue?

A. That is correct, to my under- --

Q. I'm sorry?

A. I said, that is correct, to my understanding.

Q. Are you a partial owner of LN Partners?

A. I am not.

Q. Have you ever been?

A. I have not.

Q. Are you employed in any capacity by LN Partners or have you ever been employed in any capacity by LN Partners?

A. I was employed by LN Partners as a clinical consultant.

Q. When was that?

A. Oh, that was early on.

Q. The time frame for the LN Partners and the ALS, Allied Lab Services, is roughly 2016 through the first quarter of 2019; is that your understanding? Approximately. Or am I --

A. Well, as you're aware, I do not own the company or I transferred ownership, sold the company to

Page 24

another entity in early spring of 2018.

Q. Okay. LN Partners, from your understanding, did -- did business with ALS -- I'm sorry -- yeah, Allied Lab Services from the end of 2016 through when you left in 2018, according to your testimony; is that right?

A. I am aware that they had a continued relationship after that point. That would be my testimony.

Q. Do you know Lewis Nichols?

A. I do.

Q. How well do you know Mr. Nichols?

A. Fairly well, I would say.

Q. Is he only a business associate, or is he also a casual -- a friend?

A. Well, you know, I try not to do business with people I don't like. So I guess I would consider him a friend.

Q. Do y'all socialize?

A. On occasion.

Q. You've been to each other's homes?

A. I'm sure we have.

Q. Did he discuss with you when LN Partners stopped making any money?

A. I'm sure he did.

Worldwide Court Reporters, Inc.
( 800) 745-1101

Page 25

1    Q.  And is that how you come to the understanding
2    that it stopped making money, stopped bringing in money
3    in early of -- the first portion of 2019, spring, we
4    could say?
09:32 5    A.  That is correct.
6    Q.  Okay.  We'll change gears a little bit.
7    A.  I'm sorry?
8    Q.  I'm going to change gears just a little bit.
9    Let me go back in the history a little bit, of the
09:32 10   companies and the setup.
11   A.  Okay.
12   Q.  You are familiar with Allied Lab Solutions,
13   L.L.C.?
14   A.  I am.
09:32 15   Q.  Were you involved in the setting up of Allied
16   Lab Solutions, L.L.C.?
17   A.  I was.
18   Q.  Before Allied Lab Solutions existed, what were
19   you doing for employment?
09:32 20   A.  Running and managing Eroo Management.
21   Q.  Did Eroo Management ever have any employees?
22   A.  They did.
23   Q.  How many?
24   A.  Three to five.
09:33 25   Q.  And are they you and other people?  You and

Page 26

1    others?  Are you included in that three to five?
2    A.  I'd be included in that three to five.
3    Q.  And who were the other employees of Eroo
4    Management that you were working with before -- just
09:33 5    before starting Allied Lab Services -- Solutions?
6    A.  I'm trying to -- sorry, I'm trying to remember
7    names.  It's been a little awhile.  Christine -- I can't
8    remember her last name.  She was my assistant.  And then
9    Tabitha Cortez.  My wife does the books for Eroo.
09:34 10   Q.  What is the name of your wife?
11   A.  Rachel.
12   Q.  Last name?
13   A.  Ellis.
14   Q.  Is Rachel Ellis also the bookkeeper for -- was
09:34 15   she the bookkeeper also for Allied Lab Solutions?
16   A.  No, she was not.
17   Q.  Who was the bookkeeper for Allied Lab
18   Solutions?
19   A.  I handled most of that personally.
09:34 20   Q.  When Allied Lab Solutions was first started,
21   are you the person that thought of -- dreamed of the
22   idea of its -- its existence, or did somebody come to
23   you with that suggestion?
24   A.  I don't even remember.  I can't recall.
09:34 25   Q.  Were you involved in the incorporation of

Page 27

1    Allied Lab Solutions?
2    A.  I was.
3    Q.  And were you responsible, did you take
4    responsibility in setting it up?
09:35 5    A.  Yes, of course.
6    Q.  And did you retain the lawyer to set up Allied
7    Lab Solutions?
8    A.  I did.
9    Q.  And who was that?
09:35 10   A.  At the time that was Bruce Baldwin.
11   Q.  And were you -- did you --
12   A.  Sorry, that -- actually, that was incorrect.
13   At that time that gentleman would have been Landon
14   Northcutt was the attorney.  Bruce Baldwin came in
15   afterwards.
16   Q.  And you paid for Landon Northcutt to set up
17   Allied Lab Solutions?
18   A.  I did.
19   Q.  You made the determination of what kind of
09:35 20   corporation it was going to be?
21   A.  I did.
22   Q.  You made the determination of what type of
23   work it was going to do?
24   A.  I did.
09:35 25   Q.  You set up the bank accounts for Allied Lab

Page 28

1    Solutions?
2    A.  I did.
3    Q.  You made the determination of what type of
4    bank accounts to maintain for Allied Lab Solutions; is
09:36 5    that correct?
6    A.  Well, I set them up, so I would say yes.
7    Q.  You were responsible for maintaining the bank
8    accounts for Allied Lab Solutions from its inception
9    until you were no longer involved, per your testimony;
09:36 10   is that correct?
11   A.  That is correct.
12   Q.  At the time you said you were no longer
13   involved with Allied Lab Solutions, who was the
14   signatory on the bank accounts for Allied Lab Solutions?
09:36 15   A.  After I sold the company, transferred
16   ownership?
17   Q.  Before.  Just before.
18   A.  Just before?  That would have been me.
19   Q.  Okay.  So from the inception of Allied Lab
09:36 20   Solutions until you, quote, sold the company, close
21   quote, you not only set up, but also maintained the bank
22   accounts for Allied Lab Solutions; is that true?
23   A.  That is correct.
24   Q.  And when you sold the company, did you at that
09:37 25   time go to the banks and transfer the signatory

7 (Pages 25 to 28)

Page 29

1  information to somebody else?

2  A.  I don't -- I'm not up on the entire process,

3  but, yes.  At that time I had no more involvement with

4  keeping the records or anything to do with the bank

09:37 5  accounts for Allied.

6        MR. COLLMER:  Objection; nonresponsive.

7  Q.  (BY MR. COLLMER)  That was kind of a specific

8  question.  At the time you sold the company, did you go

9  to the banks and transfer the signatory information to

09:37 10  somebody else?

11  A.  Again, at that time, whatever the process is,

12  I had no more -- other involvement with maintaining or

13  keeping the records for Allied.

14        MR. COLLMER:  Objection; nonresponsive.

09:38 15  Q.  (BY MR. COLLMER)  At the time you sold the

16  company, do you remember whether or not you physically

17  went to a bank and changed the signatory information?

18  A.  Whether I physically went to the bank.  I

19  cannot remember exactly what the process was, as I've

09:38 20  told you.  As of the time that I transferred it, I no

21  longer had control of any of the Allied accounts.

22        MR. COLLMER:  Object to that as

23  nonresponsive and I don't know.

24  Q.  (BY MR. COLLMER)  When you set up the

09:38 25  corporation, did you set up the accounting as well?

Page 30

1  A.  The accounting, as far as the bank accounts?

2  Q.  No, this is, like, the internal accounting for

3  Allied Lab Solutions.  At the time you set up the

4  company, you have to have some accounting, right?

09:39 5  You've got to have a list of --

6  A.  It was set up primarily.  It was very easy

7  for -- for the shareholders to validate that everything

8  was done according to contract.

9  Q.  And are you the person that set up that

09:39 10  accounting?

11  A.  That set up that -- the way of accounting

12  that?

13  Q.  Correct.

14  A.  Sure.  I -- I was the owner of the company;

09:39 15  therefore, I would be responsible for those duties.

16  Q.  And did you -- at that time, at the very

17  beginning the company it didn't have any employees,

18  right, other than yourself?  No other employees, right?

19  A.  Uh-huh.  That is correct.

09:39 20  Q.  Have you given a deposition before?

21  A.  No, sir.

22  Q.  No?

23  A.  No.

24  Q.  In an ordinary conversation, I can hear you go

09:39 25  uh-huh or something like that.  She actually types down

Page 31

1  literally only words.  She can type down uh-huh, huh-uh,

2  but it becomes ambiguous.  That's why I asked, was it --

3  normally, I'd just ask for clarification purposes of

4  that record, for her record.

09:40 5  A.  No, I -- I'm sorry, there is a lag between us.

6  I don't have a whole lot of experience with Zoom

7  meetings, either.  So I'm trying to be as articulate and

8  forthcoming as I possibly can.  But I think every now

9  and then I'm only catching, like, every third word that

09:40 10  you're saying.

11  Q.  Well, let me have an agreement with you.  If

12  you do not understand a question that I ask, I would

13  like you not to answer that question, but ask me to

14  rephrase it.

09:40 15  A.  Okay, yes, sir.

16  Q.  And if you believe you're only catching every

17  one out of three words that I'm saying, I -- I really

18  want you to stop and let me know that you -- I have not heard

19  the question fully.

09:40 20  A.  Okay.

21  Q.  So we can have the agreement at the end of the

22  deposition that you will -- if you did not understand

23  the question or you have not heard all of the question,

24  as you understand it, you will have stopped me;

09:40 25  otherwise, we will assume if you're answering, you are

Page 32

1  answering the question that is posed.

2  A.  Can you --

3  Q.  Correct?

4  A.  I believe that to be correct.

09:41 5  Q.  Are you the person that determined the type of

6  software to set up the accounting or the books for

7  Allied Lab Solutions?

8  A.  Yes, sir.

9  Q.  And where was the computer or the computers

09:41 10  for Allied Lab Solutions physically located at the

11  inception of when you incorporated Allied Lab Solutions?

12  A.  They would have been located at my home

13  office.

14  Q.  And -- and is that where the books and records

09:41 15  of Allied Lab Solutions were maintained?

16  A.  Until the time that I sold it, that is

17  correct.

18  Q.  And at the time that you sold Allied Lab

19  Solutions, did you transfer the computer; in other

09:42 20  words, hand over the computer to the person to whom you

21  say you sold Allied Lab Solutions?

22  A.  No, sir, I didn't hand over the computer, no,

23  sir.

24  Q.  Where is that computer?

09:42 25  A.  That's a good question.  Well, I don't have

8  (Pages 29 to 32)

## Page 33

```
            1    that computer or any of them from -- for that matter.
            2    After 2018 there was no need to keep a lot of the
            3    equipment.  So a lot of it was donated to Goodwill or
            4    other entities.
09:42       5        Q.  All right.  Are you saying that after 2018 the
            6    computer on which you maintained the books and records
            7    of Allied Lab Solutions was given away?
            8        A.  I believe so, yes, sir.
            9        Q.  Did you yourself make that decision to give it
09:42      10    away?
           11        A.  I'm in the habit of doing that quite often,
           12    about every two years, yes, sir.
           13        Q.  About every two years you get rid of the
           14    computer on which you have your books and records?
09:43      15        A.  I update most of my office equipment and
           16    donate the items.
           17        Q.  I didn't hear it.
           18        A.  I normally would, yes, sir.
           19        Q.  What was the type of program on which you had
09:43      20    the books and records of Allied Lab Solutions?
           21        A.  Excel.
           22        Q.  And then Excel -- the Excel program had a
           23    backup, correct?
           24        A.  That would be assuming something that I don't
09:43      25    know.
```

## Page 34

```
            1        Q.  You do not know whether or not it had a backup
            2    in the cloud?
            3        A.  I'm barely literate when it comes to
            4    computers, sir.  I'm sorry, but, no, I don't know.
09:43       5        Q.  But is it your testimony that the computer on
            6    which you had the books and records of Allied Lab
            7    Solutions, that you got rid of it in -- somewhere in
            8    2018?
            9        A.  That would be correct.
09:44      10        Q.  You did not keep a copy of any of the books
           11    and records of this company?
           12        A.  No, sir.
           13        Q.  You didn't keep it on a Zip drive?
           14        A.  No, sir.
09:44      15        Q.  So you have no idea what's contained in those
           16    books and records; is that right?
           17        A.  No, I do not.  I gave all of the records as
           18    they would appear to the current or previous owner,
           19    No. 1, and you are aware of that, too, Mr. Collmer,
09:44      20    because I directed you to that, and I believe you have
           21    received those documents.
           22        MR. COLLMER:  Object to all that as
           23    nonresponsive.
           24        THE WITNESS:  Okay.
09:45      25        MR. COLLMER:  Would you mind reading the
```

## Page 35

```
            1    question for the witness, please, and for me.
            2        (The last question was read by the
            3        reporter.)
            4        Q.  (BY MR. COLLMER)  Okay.  I'm going to ask that
09:45       5    question again.  You have no idea what's contained in
            6    the books and records for Allied Lab Solutions; is
            7    that a true statement?
            8        A.  Well, I need you to rephrase the question,
            9    because to say that I have forgotten, are you saying
09:45      10    that I'm of the mind that I don't remember anything or
           11    recall anything about Allied?  Or are you asking me if I
           12    know specifics about Allied.
           13        Q.  You do not remember any specifics about Allied
           14    from the books and records; is that true?
09:46      15        A.  Not specific details, no, sir.  It's been, you
           16    know, April of 2018.
           17        Q.  So if there is a specific month and I ask
           18    about revenue for that month, you don't remember
           19    anything like that; is that true?
09:46      20        A.  Not any specifics, no, sir.
           21        Q.  And if I ask you generally, though, about
           22    what's contained in the books and records from when you
           23    set up the company, you would know about that, though,
           24    correct?
09:46      25        A.  To the best of my ability, that I can recall.
```

## Page 36

```
            1        Q.  You would have had -- and as part of your
            2    responsibilities to the corporation, you would have had
            3    records of who were the subscribers, true?
            4        A.  That is correct.
09:46       5        Q.  You would have had records of revenue; is that
            6    correct?
            7        A.  Up until that date, that is correct.
            8        Q.  You would have had records of revenue on a
            9    monthly basis; is that correct?
09:47      10        A.  That is correct.
           11        Q.  You would have had let's call them the monthly
           12    reports, I think you -- what's the name you used for
           13    them?
           14        A.  Uh-huh.
09:47      15        Q.  Based on revenues.  Do you remember that?
           16        A.  That would be correct, yes, sir.
           17        Q.  And you would have generated those monthly
           18    reports?  Is that part of your duties?
           19        A.  Yes, sir.
09:47      20        Q.  So when money came in to Allied Lab Solutions,
           21    you actually looked at the number and you did the
           22    calculations for how the distribution was going to be;
           23    is that true?
           24        A.  That is correct.
09:47      25        Q.  Was there anybody else who was ultimately
```

Worldwide Court Reporters, Inc.
( 800) 745-1101

Page 37

1  responsible at Allied Lab Solutions, other than you, for
2  making those determinations?
3      A.  Up until the spring of 2018, no, sir, those
4  decisions would have been mine.
09:47 5      Q.  Okay.  Well, at the time you sold the company,
6  which you said was in 2018 --
7      A.  Yes, sir.
8      Q.  -- you did not hand -- physically hand over
9  the computer; is that correct?
09:48 10     A.  You know -- no, sir.  I don't -- I handed over
11  all the books and documents as well as control of the --
12  the -- the bank accounts.  So all that stuff is on
13  record there.  But I don't remember physically handing
14  over equipment and computers, no, sir.
09:48 15     Q.  Did you download the information onto some
16  sort of portable drive?
17     A.  Did I download the information?
18        No, sir, I don't believe so.
19     Q.  The books and records of Allied Lab Solutions
09:48 20  existed on your computer in your Excel program, among
21  other locations on the computer; is that correct?
22     A.  I would believe so, yes, sir.
23     Q.  At the time you sold the company, how did you
24  get the information contained in the Excel program to
09:49 25  the new owner or, you know, to the new owner of Allied

Page 38

1  Lab Solutions?
2      A.  I believe that information would have been
3  obtainable through the -- the account and passwords and,
4  therefore, able to transfer ownership and delete me off
09:49 5  those accounts at that time.
6      Q.  So the information was stored not on your
7  computer, but somewhere else, in the cloud?
8      A.  I believe so.
9      Q.  And where was it stored?  What entity?
09:49 10     A.  Again, I'm not a computer expert.  You're
11  asking me to speculate.  I don't know.
12     Q.  I'm not asking you to speculate.  I just want
13  to know what you know from then.  You, yourself, would
14  have put the books and records of Allied Lab Solutions
09:50 15  in the cloud somewhere; is that true?
16     A.  I believe so.
17     Q.  And then you would have given access to that
18  information in the Cloud to this -- the subsequent
19  purchaser of Allied Lab Solutions; is that correct?
09:50 20     A.  That is correct.
21     Q.  On your computer, though, would also existed
22  the Excel program; is that correct?
23     A.  The Excel program, yes, sir, it would exist on
24  my computer.  It exists -- yeah, Excel, it does.
09:50 25     Q.  So even though you would have sold the company

Page 39

1  to the subsequent purchaser, it still -- its books,
2  accounting information still existed on your computer in
3  your possession, correct?
09:50 4      A.  Up until 2018, yes, sir.  I don't know the
5  exact dates.
6      Q.  And then at that time you gave it away?  The
7  physical computer.
8      A.  I -- like I said, I update my equipment on a
9  semi-regular basis.  You know, this is now litigation in
09:51 10  the end of 2020.  I didn't think that that would be an
11  issue, that I would be asked to keep these items.  So in
12  the course of doing business and upgrading equipment, I
13  donated them.  That's not an irregular occurrence.
14     Q.  Not for you?
09:51 15     A.  Not for anyone, that I'm aware of.
16     Q.  So at the time when you transferred the
17  permission to access the software in the cloud or access
18  the storage in the cloud of the books and records of
19  Allied Lab Solutions, you still had on your computer at
09:51 20  your house the books and records of Allied Lab
21  Solutions, correct?
22     A.  That is incorrect.
23     Q.  How is that incorrect?
24     A.  Because I transferred any ownership that I
09:52 25  would have had or access to those documents at that

Page 40

1  point.  So when you're asking me do I have Excel, yes, I
2  have Excel.  Do I have access to any documents related
3  to ALS?  I do not.
4      Q.  At the time you sold the company, say, one
09:52 5  month after, you still had that information on your
6  computer in your house, true?
7      A.  I don't know the exact date, but I don't
8  believe so.  The computer that I used on a daily basis,
9  I still had possession of, I'm sure, at that point.  Did
09:52 10  I have access to the documents that you're asking me
11  about?  And the answer to that is no.
12     Q.  So you did not have access to information on
13  your own computer; is that true?
14     A.  Which pertains to Allied Lab Solutions, that
09:52 15  is true.
16     Q.  And how did you disable yourself from looking
17  at the books and records of Allied Lab Solutions on your
18  own computer?
19     A.  One, I didn't warehouse that information.
09:53 20  And, as I said, I -- when I transferred all of that, all
21  of that information changed the same time the bank
22  accounts did.  I no longer had access to the bank
23  accounts or those records.
24     Q.  Did you erase any information off of your
09:53 25  computer?

Worldwide Court Reporters, Inc.
( 800) 745-1101

Page 41

1    A. I'm sure I did.

2    Q. When you erased -- did you erase all of the

3    books and records of Allied Lab Solutions from your

4    computer?

09:53  5    A. I would have done so in my normal practice or

6    activities before I donate the equipment. So I do a

7    scan to make sure I don't have personal information or

8    business information on those computers. I mean --

9    Q. And do you have any proof that you actually

09:53 10    gave that specific computer to anybody?

11    A. No, sir. I mean, I -- I don't get an itemized

12    list when I make donations. I just get a, you know,

13    blanket bill that everybody else does.

14    Q. Since you set up Allied Lab Solutions, L.L.C.,

09:54 15    did you also set up Allied Lab Solutions Management,

16    L.L.C.?

17    A. I did.

18    Q. And you retained the lawyer to draft the

19    paperwork for Allied Lab Solutions Management, L.L.C.?

09:54 20    A. I believe so, that is correct.

21    Q. You retained the lawyer to draft the

22    subscription a- -- subscription agreements?

23    A. I believe that to be correct.

24    Q. Did you pay for -- retain the lawyer to set up

09:54 25    the formation documents for Allied Lab Solutions

Page 42

1    Management, L.L.C.?

2    A. Yes, sir, I would believe so.

3    Q. Did you retain the lawyer that drafted the MSO

4    services agreement between Allied Lab Solutions, I

09:55  5    think, Management, L.L.C., and LN Professional

6    Management, L.L.C.?

7    A. Allied Lab Solutions. Can you repeat the

8    question? I'm sorry.

9    Q. Did you pay for the lawyer to draft the

09:55 10    document on an MSO services agreement LN Professional

11    Management, L.L.C., and Allied Lab Solutions Management,

12    L.L.C.?

13    A. I'm not sure, to be honest. I don't know. So

14    you're asking me specifically if I did or the only other

09:55 15    entity that would have would be LN. So either LN did or

16    myself, as Allied.

17    Q. All right. You're familiar with that

18    document, though, correct?

19    A. Yeah, I would be. I haven't looked at it in

09:56 20    quite some time, but I would be familiar with it.

21    Q. I'm going to show you this document right

22    here. Do you recognize that, the MSO services agreement

23    between LN Professional Management, L.L.C., and Allied

24    Lab Solutions Management, L.L.C.?

09:56 25    A. I'd have to read over it, but it looks

Page 43

1    familiar.

2    Q. Well, you take as long as you want. I'll go

3    down page by page. But does this look like the document

4    that you're familiar with?

09:56  5    A. Again, I'd have to read the whole thing. It

6    does look like the -- the -- the document that I'm

7    familiar with. There was a few drafts. So I don't know

8    if this the signed and executed copy, but I would

9    hope you do.

09:57 10    Q. Well, you see this portion right here where it

11    says "Execution Version"? Do you see that?

12    A. I do.

13    (Phone ringing.)

14    THE WITNESS: Figure out how to do this.

09:57 15    Q. (BY MR. COLLMER) Now, I do not have a signed

16    version of the MSO services agreement currently. Are

17    you familiar with whether or not that such a document

18    existed and, in fact, it was signed?

19    A. Again, just because it says "Execution

09:57 20    Version" on the corner, I'm not a hundred percent sure;

21    and I don't have the signed copy in front of me, so I

22    don't know if that was a draft. I know there was

23    several drafts within at the time, that even though it

24    said executed version, we'd go through and find typos or

09:58 25    things that needed to be changed, and that was done so.

Page 44

1    So -- so I would need to see an actual signed version

2    before I could specifically say that that was the one,

3    yes or no.

4    Q. Did you set up the bank accounts for Allied

09:58  5    Lab Solutions Management?

6    A. I did, yes.

7    Q. What bank?

8    A. IBC.

9    Q. Did you set up the -- and you said the bank

09:58 10    accounts were set up for Allied Lab Solutions, L.L.C.,

11    you did that, correct?

12    A. Yes, sir.

13    Q. Also at IBC?

14    A. Allied Lab Solutions?

09:58 15    Q. Right.

16    A. Yes, sir.

17    Q. Are those the on- -- is that the only bank

18    where there were accounts that you set up for Allied Lab

19    Solutions or Allied Lab Solutions Management?

09:58 20    A. That is correct.

21    Q. Why did you set up -- why did you create

22    Allied Lab Solutions Management?

23    A. Why did I create Allied Lab Solutions

24    Management?

09:59 25    Q. Right.

11  (Pages 41 to 44)

Page 45

1    A.  Because -- I'm sorry, let me get comfortable.
2        There was other Allied or Allied Lab Solutions
3    entities, and the Allied Lab Solutions Management was
4    more created to act as, basically, a trust account, so
09:59 5   that there wasn't any problems with distributing the
6    funds to the -- the correct entity.
7        Q.  How many entities besides Allied Lab Solutions
8    I existed that were under the control, financial,
9    anyway, of Allied Lab Solutions Management?
09:59 10  A.  I believe there was four.
11       Q.  Allied Lab Solutions II, I'm guessing?
12   Because there is a I, right?
13       A.  Correct, yes.
14       Q.  And what were the other ones?  III and IV?
10:00 15  A.  III and IV.  Well, under my -- at the time
16   that I still owned the company, that sounds right.
17   There was at least four.  I don't know if they added to
18   them after the fact.
19       Q.  Did you set up the supervision in the con --
10:00 20  in the original agreement to set up Allied Lab
21   Solutions, how it was going to be supervised?
22       A.  I'm sorry, I only caught about half of that.
23   Can you repeat the question?
24       Q.  Not a problem.  We -- earlier we discussed a
10:00 25  subscription agreement that they -- that you set up,

Page 46

1    drafted or were responsible for retaining a lawyer that
2    drafted the subscription agreement form.
3        A.  Okay.
4        Q.  And that -- that refer -- that form refers to
10:01 5   another agreement that is a -- it's called amended.  Let
6    to exactly what it's called here.
7        But it's the contract formation agreement that
8    is the -- I'm sorry, the corporation formation
9    agreement.
10:01 10  A.  Are you asking me at the time that it was set
11   up, was I responsible for that?
12       Q.  Yeah.  For drafting it, yes.
13       A.  I believe so.  I would have retained the
14   attorney that drafted that document.
10:01 15  Q.  You're the one that made the decision on how
16   it was that the corporation was going to be monitored or
17   supervised what's called the amended and restated
18   company agreement of Allied Lab Solutions, L.L.C., dated
19   July the 1st of 2016?  Does that sound familiar to you?
10:02 20  A.  Again, Allied -- anything that Allied Lab
21   Solutions sounds -- sounds familiar.  But you're talking
22   about a document that I haven't seen, obviously, since
23   2016, if that's what it says.  So it would be hard for
24   me to see if that was actually an executed document or a
10:02 25  draft.

Page 47

1    Q.  So if there is not an executed document, but
2    you continue to do business, are you saying that you
3    never had done business unless you had an executed
4    document, so therefore we should look for one or that
10:02 5   you had ex -- or had in existence and you handed out
6    the amended and restated company agreements along with
7    the subscription agreement that were unsigned?
8        A.  Again, you're asking me to comment on
9    something that's -- that I don't remember.  I would
10:03 10  believe, as in the course of doing business, that we --
11   there would have been executed documents with live
12   signatures.  That would be my understanding or
13   recollection.
14       Q.  Well, you agree with me that it is improper to
10:03 15  hand out an amended and restated company agreement of
16   Allied Lab Solutions, L.L.C., to potential subscribers
17   unless that is the one that is ultimately going to serve
18   as the amended and restated company agreement of Allied
19   Lab Solutions?
10:03 20  A.  Yes, sir, generally speaking.  Again, though,
21   a lot of these amended and "reinstated" agreements were
22   floated because to make sure there wasn't any conflicts.
23   You know, Toth or Victory or any of our other
24   subscribers, if they had, you know, angst about it,
10:04 25  might have offered suggestions of changes.  Therefore,

Page 48

1    that's why I can't comment or speculate that that one
2    was floated, without signatures, because at the time
3    there was, you know, several people involved and
4    everybody had an opinion.  So I'm not -- I can't say for
10:04 5   certain that that was the document that you're in
6    possession of.
7        Q.  So as you sit here, you cannot even tell me if
8    there is an amended and restated company agreement of
9    Allied Lab Solutions dated July the 1st of 2016 that was
10:04 10  the operative agreement for Allied Lab Solutions?
11       A.  I can't sit here and tell you with absolute
12   certainty that the document you're presenting me with is
13   the document that was signed into an agreement, no, sir.
14       Q.  Are you aware of any other amended and
10:05 15  restated company agreement of Allied Lab Solutions,
16   L.L.C., other than the one dated July the 1st of 2016?
17       A.  I don't even remember the document that you're
18   talking about.  You're talk -- you're telling me about a
19   document from July 1st of 2016.  Again, I would have to
10:05 20  look at it.  And you're talking about a long time ago.
21   So, no, I can't tell you that.
22       Q.  And nor can you tell me whether or not you
23   handed out unsigned copies of the amended and restated
24   company agreement of Allied Lab Solutions as part of
10:05 25  your trying to get subscriptions to the company,

12  (Pages 45 to 48)

Page 49

correct?

A. I would assume that if you have the document without signatures, that in the course of us trying to proof a document that was signed, that those copies could have been distributed to other partners in ALS.

10:06  Q. As you sit here today, can you remember ever seeing a fully executed by all signatories copy of the amended and restated company agreement of Allied Lab Solutions?

10:06  A. I don't remember. I don't -- I don't recall. I'm sorry. But, you know, again, it was a very long time ago, and there was a lot of contracts. So I would have to see a signed document.

Q. As you sit here today, you don't remember if
10:06  there ever -- it even existed; is that a true statement?

A. I remember that there was several documents back and forth. I don't know of the actual document that was signed. Without actually seeing a signed live signature, I can't comment, sir. I'm sorry.

10:07  Q. So, therefore, to answer my question, which is, as you sit here now, do you ever remember seeing a signed copy of the amended and restated company agreement? The answer to that question is, no, I don't remember such? Is that a true statement?

10:07  A. I know that there was a document signed. What

Page 50

I'm saying is is the document you're presenting me with, I can't say with absolute certainty was the executed document.

10:07  Q. So you remember actually seeing one that was signed by all the signatures on the agreement; is that right?

A. Again, you're asking me a question of -- I have already answered, that I don't remember or recall exactly, but I would assume that all those documents
10:07  would have signatures. You're just showing me a copy without signatures and then asking me if that is the correct document, and I can't comment on that. I don't know.

Q. That's not what I'm asking, actually. I want
10:08  to know if you have a present recollection of a fully executed copy of the company agreement for Allied Lab Solutions, L.L.C.

A. If I had a fully -- if I remember a fully signed document amended statement?

10:08  Q. Right, as you sit here now.

A. I believe so. I mean, again, there was a lot of documents going back and forth. But in the course of doing business, and we did business from 2016 to 2018 early spring, so I would have had, I believe, a signed
10:08  document.

Page 51

MR. COLLMER: Okay. I object to that as nonresponsive.

Q. (BY MR. COLLMER) I understand you believe
10:09  that. I just want to know if you remember seeing one or you think I should have had one, but I don't remember seeing one. I need to know that to whether to go look for one or not go look for one. That's what I'm trying to get at. I need to know if you have a recollection of seeing a fully executed agreement with all the blanks,
10:09  everybody signing on that document, or not.

A. Okay. I want to answer, as best I can, your question. You're asking me a yes-or-no. And I -- at this point do I remember seeing that specific document that you're pointing to? I would have to say
10:09  no. Is one that was similar to that in existence? I would say yes.

Q. The signatories on the document, do you remember who was supposed to sign that document?

A. Can you...
10:09  Q. Yes, the amended and restated agreement.

A. For Allied Lab Management?

Q. No, for Allied Lab Solutions, L.L.C.

A. For Allied Lab Solutions or Allied Lab Solutions Management?
10:10  Q. No, I'm asking just about Allied Lab Solutions

Page 52

right now.

A. So ALS I, II, III, or IV?

Q. Allied Lab Solutions, L.L.C., amended and restated company agreement, dated July the 1st of 2016,
10:10  do you ever remember seeing a signed, fully executed agreement?

A. In 2016? I don't recollect that now, no, sir.

Q. Do you -- part of the -- the way the company was set up, the way you set it up was that there is a
10:10  supervision of Allied Lab Solutions by the board of managers. Does that sound familiar to you?

A. That does, yes, sir.

Q. The way that you set the company up was that the board of managers would simply supervise the
10:11  business of Allied Lab Solutions?

A. It was set up to where any shareholder could ask for and -- and receive that documentation at the time that I was doing business. I be- -- that, I believe, to be correct.

10:11  MR. COLLMER: I need to object to that as nonresponsive.

Q. (BY MR. COLLMER) I just need to know, is the supervision of the company was set up the way the way you set it up, did it involve the supervisors being
10:11  the -- that was run by the board of managers? It's a

13 (Pages 49 to 52)

Page 53

1  term of art in the agreement.  Does that sound familiar?
2      A.  You're pulling an excerpt of a contract that I
3  haven't seen in years.  I would say, again, in response
4  to your question, that it was set up to where any
10:11  5  shareholder could ask to review such records and they
6  would be provided.
7      Q.  Did Allied Lab Solutions Management run Allied
8  Lab Solutions on a day-to-day basis?
9      A.  Allied Lab Solutions Management, again, was
10:12  10  set up more so as a trust account, so that there wasn't
11  the un-- commingling of funds that were due to other
12  entities.
13      Q.  Who ran Allied Lab Solutions on a day-to-day
14  basis?
10:12  15      A.  Allied Lab Solutions would have been me.
16      Q.  All right.  Who ran Allied Lab Solutions
17  Management on a day-to-day basis?
18      A.  That would have been me, also.
19      MR. COLLMER:  We've been going an hour and
10:12  20  something.  I could take a break.  I -- I can go seven
21  hours.  It's up to you, really.  Do you want to take a
22  break or keep going?
23      THE WITNESS:  Me?
24      MR. COLLMER:  Right.
10:13  25      THE WITNESS:  A break would be good.  I

Page 54

1  can use the rest room, if that's all right.
2      MR. COLLMER:  All right.  We'll come back
3  at 10:00 -- it's not far.  10:30, 10:25, something like
4  that.
10:13  5      THE WITNESS:  Let's just say 10:30, for
6  round numbers.
7      MR. COLLMER:  Say 10:30, for round
8  numbers, that's fine.  I'll see you guys back at 10:30.
9  We'll go back on.  All right.
10:13  10      THE VIDEOGRAPHER:  The time is 10:13 a.m.
11  We're off the record.
12      (Recess from 10:13 a.m. to 10:30 a.m.)
13      THE VIDEOGRAPHER:  The time is 10:30 a.m.
14  We're on the record.
10:30  15      Q.  (BY MR. COLLMER)  Mr. Ellis, why did you set
16  up Allied Lab Solutions, L.L.C.?  Why did you create it?
17      A.  It was a business opportunity to help -- help
18  providers and healthcare professionals throughout the
19  state.  It was -- seemed like a good idea at the time.
10:30  20      Q.  Why did you choose that as a way to make money
21  over an alternative way?  Why --
22      A.  Because it was set up to be compliant with
23  both state and federal regulation, and everything in
24  healthcare is very, very much regulated.  So I wanted to
10:30  25  make sure I was in a hundred percent compliance.

Page 55

1  According to attorneys that I had had at the time that
2  works or represented people in healthcare said that this
3  is how the company needed to be set up.
4      Q.  Why did you feel you were qualified to set up
10:31  5  that company and run it?
6      A.  Because at the time I'd been working with
7  providers for a long period of time, had working
8  relationships with different entities, and that's why we
9  did it.
10:31  10      Q.  And did you -- were you trying to make money
11  on the interface between in-house lab charges and
12  hospital charges for lab reimbursement rates for
13  insurance company -- by insurance companies?
14      A.  I'm sorry, can you repeat that question?
10:32  15      Q.  Certainly.  Insurance companies reimburse lab
16  tests, blood tests being run-in house at a clinic, for
17  example, at a certain rate; is that your understanding?
18      A.  That would be how healthcare works, correct.
19      Q.  And in the -- and if the blood test, though,
10:32  20  is run at the hospital, that the insurance reimbursement
21  rate was higher?
22      A.  In some instances, yes.  But you're asking me
23  to speculate.  I don't know what the -- the contract
24  rates are for facilities throughout the state.
10:32  25      Q.  Is it generally that reimbursement rates for

Page 56

1  blood tests, for example, are run at hospitals are
2  reimbursed at a higher rate than they are at an in-house
3  rate at a doctor's clinic?
4      A.  I don't know what the in-house rate at a
10:33  5  doctor's clinic would be.  Simply, most of the
6  facilities don't have an in-house lab.  All of it's sent
7  to other laboratories.  Based on what I've seen from
8  other billing, it depens on the testing.  Some of the
9  other facilities seem to charge considerably more.
10:33  10      Q.  Well, how were you going to sell Allied Lab
11  Solutions, L.L.C.'s benefits to a doctor?
12      A.  Patient care.  We actually did a better job.
13  I've been heavy in lab my entire career in healthcare.
14  Because we rely on laboratory services for these
10:33  15  providers to add or treat certain conditions of
16  patients, it's always been a sticking point that the
17  failure rates were too high amongst the laboratories
18  that were available at the time, and so we thought we
19  could fix that problem by adding the services in-house;
10:34  20  therefore, providing better services for patients and
21  providers.
22      Q.  Well, sir, are you saying that when you were
23  trying to encourage someone to subscribe to Allied Lab
24  Solutions, L.L.C., the sole basis for encouraging them
10:34  25  to sign a subscription and make a capital contribution

Worldwide Court Reporters, Inc.
( 800) 745-1101

Page 57

1   was patient care?
2       A. That is not the entire thing, but that's the
3   No. 1 thing.
4       Q. And what's No. 2?
10:34 5     A. Based on the -- the viability of the company,
6   there would have to be profit involved.
7       Q. Was the -- isn't it true that the primary
8   selling point was that you could make a lot more money
9   when the labs are run through the hospitals?
10:35 10    A. No.
11      Q. At their lab?
12      A. No.
13      Q. And so of the subscribers that existed in
14  2019, are you telling us that you told each of them
10:35 15  that -- that the primary purpose of setting up and
16  becoming a subscriber to Allied Lab Solutions is patient
17  care?
18      A. The No. 1 goal in healthcare always is, first
19  and foremost, patient care. So the secondary goal would
10:35 20  be to maintain these facilities in order to continue to
21  provide services. And of course, part of that formula
22  would be profit.
23          MR. COLLMER: Okay. Objection;
24  nonresponsive.
10:35 25    Q. (BY MR. COLLMER) If I go speak to, for

Page 58

1   example, Dr. John Kim, he was a subscriber, correct, in
2   the company, right?
3       A. Absolutely.
4       Q. And when you were trying to sell Dr. John Kim
10:36 5  on becoming a subscriber, isn't it true that you told
6   him that this is a way to make substantially more money
7   than running those tests either in-house or through an
8   outhouse lab such as LabCorp?
9       A. No, sir, that is incorrect. As a matter of
10:36 10  fact, I don't remember ever having a conversation with
11  Dr. Kim involving lab.
12      Q. So how did you encourage Dr. Kim to become a
13  subscriber?
14      A. I don't believe I had any direct conversations
10:36 15  with Dr. Kim as far as becoming a describ- --
16  prescriber. I would talk to your client on that one.
17      Q. Talk to their client, what do you mean their
18  client?
19      A. Your client.
10:37 20    Q. Okay. How about Dr. Nomita Kim, did you speak
21  with her?
22      A. Again, most of our interactions with Ms. Kim
23  was based on patients that we -- or I should say clients
24  of -- of Eroo and patients of Victory. But, no, I
10:37 25  didn't have any direct contact with her as far as the

Page 59

1   profitability. You would have to talk to your client.
2       Q. Okay. I'll talk to my client, if I need to,
3   but I need to know what you said. That's why -- that's
4   why I'm asking questions of what you. So you needn't
10:37 5  direct me to talk to my client, because I can talk to
6   him. I need to know your information, not his.
7       A. All right.
8       Q. So if the answer to my question is I didn't
9   have any direct communication, that's kind of what I
10:37 10  want to get at, as opposed to do I have another source
11  of information. Okay. That's what I'm trying to
12  recommend.
13      A. All right. I don't have any recollection of
14  ever having lab-related conversations with Nomita Kim.
10:37 15    Q. Did you talk to Dr. Nathan Carr?
16      A. I had several conversations with Dr. Pekar.
17  It was involving adding different testing as well as
18  reference ranges and things of that nature.
19      Q. And did you -- was he a subscriber?
10:38 20    A. He was.
21      Q. And did you send to him the subscriber
22  information?
23      A. Did I send it to him directly? No, sir.
24      Q. I didn't ask directly. Did you send to
10:38 25  Dr. Pekar the subscriber information, either directly or

Page 60

1   through an intermediary?
2       A. Well, again, so you're asking me -- I can
3   respond to that. I sent all the subscriber information
4   to Michelle Holle, who works for Dr. Franklin, as well
10:38 5  as Dr. Franklin himself. But the subscriber's
6   situation, individually, I did not.
7       Q. Okay. So did -- other than singling out
8   Dr. William Franklin, did you send subscriber
9   information to any other subscriber directly?
10:39 10    A. In reference to Allied I or ALS?
11      Q. ALS, Allied Lab Solutions, we call it I, I
12  think. Yes.
13      A. No, sir, I did not.
14      Q. How about for Allied Lab Solutions II?
10:39 15    A. I believe that was a different circumstance.
16  So I would say yes.
17      Q. Allied Lab Solutions II, were you a larger
18  percentage owner of Allied Lab Solutions II --
19      A. No.
10:39 20    Q. -- than you were a -- pardon me?
21      A. Continue. I apologize. I didn't mean to
22  interrupt.
23      Q. No, no, no. I thought I saw that you had a
24  larger percentage on one of these ALS entities than your
10:40 25  subscriber information on ALS, we'll call it ALS I; is

15  (Pages 57 to 60)

Page 61

1    that correct?

2    A.  I believe that to be correct.

3    Q.  And did you have -- on ALS II did you have a

4    33 percent interest?

10:40  5    A.  I believe so.

6    Q.  Okay.  And in ALS III what was your percentage

7    interest?

8    A.  I don't recall.  I believe it was 5 percent or

9    under, somewhere in that nature.

10:40  10    Q.  In ALS IV?

11    A.  I don't believe I had retained interest in ALS

12    IV.

13    Q.  Were you a subscriber in ALS IV?

14    A.  I was the manager, but not a subscriber, I'm

10:40  15    not -- I don't necessarily know the correct terminology

16    there.

17    Q.  Okay.  And were you paid for doing your work

18    for ALS IV?

19    A.  Yes, I was.

10:40  20    Q.  And how were you being paid?  As a percentage

21    of the revenue?

22    A.  Management percentage, yes, sir.

23    Q.  What.  What was that percentage in ALS IV?

24    A.  I don't remember, to be honest with you.  It

10:41  25    varied.  There were other managers or people that helped

Page 62

1    me with those duties in a lot of these different

2    entities.  So I don't -- I'm -- I don't remember

3    which -- how the distribution was made.

4    Q.  Are the members of ALS II you, William

10:41  5    Franklin, and Lewis Nichols?

6    A.  I believe that to be incorrect.

7    Q.  Who was the other member, if not yourself and

8    Dr. Franklin?

9    A.  I believe there was a Hugo Lopez, there was

10:41  10    a -- again, to be a hundred percent accurate, I would

11    have to defer to the owners of Allied, because I know

12    that there was other people on that, I believe.  I just

13    don't know how -- who and exactly how many.

14    Q.  Isn't it true that you were one of the owners

10:42  15    of Allied Lab Solutions II?

16    A.  That would be correct.

17    Q.  Okay.  And you still are, as we sit here

18    today, an owner of Allied Lab Solutions II, correct?

19    A.  No, sir, I was informed that Allied Lab

10:42  20    Solutions II is no longer exist.

21    Q.  It was dissolved or no longer does business?

22    A.  I believe it was dissolved, according to what

23    I've -- my recollection and what I've been told, at the

24    same time Al- -- all the Allied entities were dissolved

10:42  25    or however that -- they went about that.

Page 63

1    Q.  Are you saying that Allied Lab Solutions,

2    L.L.C., is dissolved, as we sit here today?

3    A.  It's my understanding that it is.

4    Q.  How did you come to that understanding?

10:42  5    A.  Through conversations with the owner.

6    Q.  And that would be?

7    A.  That would be Jean-Pierre Forage.

8    Q.  And did you call him or did he call you about

9    that dissolving the company?

10:43  10    A.  I received a letter that the company had been

11    dissolved.

12    Q.  Was that letter dated in October of 2020,

13    October the 5th of 2020?

14    A.  Again, I don't know the exact date or -- or

10:43  15    what it was dated as, but, you know, that sounds to

16    be -- no, I think it was 2019.

17    Q.  Well, no.  Did you just get a letter within

18    the last two months from Dr. Forage, saying that he was

19    going to be applying to dissolve the company and you

10:43  20    were a subscriber?

21    A.  No, sir, I -- well, again, I'm not clear on

22    the dates, but I do know that I did receive a letter.

23    Q.  You got a K-1 for 2019, correct?

24    A.  I believe that to be the case, yes, sir.

10:44  25    Q.  And the K-1 was issued in January of 2020 for

Page 64

1    2019, right?

2    A.  I'd have to check.  I'm not sure.  If there

3    was profit and then there was distributions, then I

4    would have received a K-1 for revenue that was received

10:44  5    in 2019.

6    Q.  As you sit here right now, though, you cannot

7    recall if within the last two months you got a letter

8    from Dr. Forage stating that he was applying to and

9    going to dissolve Allied Lab Solutions, L.L.C., correct?

10:44  10    A.  Within the last two months I would say that

11    I'm fairly certain that I did not receive a letter in

12    the last two months, no.

13    Q.  All right.  The last two and a half months,

14    just to say -- well, no, three months, since, say,

10:45  15    December 21st.

16    A.  Let's say sometime in the distant past I do

17    remember receiving a letter stating that the -- the

18    companies were dissolved.

19    Q.  That's going to be this fall, correct?

10:45  20    A.  I don't -- I would assume that you'd have the

21    same documents, sir.  I don't know.  I don't have them

22    in front of me.  If you want to produce them, I'll look

23    at it and see if it's the same one I received.

24    Q.  Well, I get to run the depo my way, actually.

10:45  25    I think there is a letter from Dr. Forage, in the books

16  (Pages 61 to 64)

Page 65

1 and records that I received from Dr. Forage that has
2 your name on it, and it says October the 5th of 2020.
3 Do you remember such a letter, getting it?
4    A.  No, sir, not -- not at that time.  I believe
10:45 5 I -- I remember receiving a letter, and I thought it was
6 earlier than that, but I know my attorney produced
7 evidence for you.  And so if you have it, I'm sure we
8 have it on record and I can give you the exact date.
9 But I don't have that -- I don't have it in front of me,
10:46 10 so I can't really comment, as it is.
11    Q.  You don't remember when you got it.  And if I
12 show you the letter, you're just going to be reading me
13 the date off of the letter; isn't that true?
14    A.  That would probably be correct, yes, sir.
10:46 15    Q.  Okay.  How did you determine that Dr. Franklin
16 was a person to whom you wanted to market your Allied
17 Lab Solutions services?
18    A.  I'd been doing business with Franklin for the
19 better part of a decade.  So I believe we had several
10:46 20 conversations about it.
21    Q.  And you were doing business with him as what?
22    A.  As -- well, Eroo.  So we did patient services,
23 basically, outsource, administrative, referral.
24    Q.  And the Eroo -- what is the gross revenue of
10:47 25 Eroo in the year 2016, when you contacted Dr. Franklin

Page 66

1 about possibly being an investor or a subscriber in --
2    A.  I don't have that --
3    Q.  -- Allied Lab Solutions?
4    A.  I don't have that information in front of me,
10:47 5 sir.
6    Q.  Is this a little business or a great big
7 business?
8    A.  I --
9    Q.  Or somewhere in between?
10:47 10    A.  It's relevant to the eye of the beholder.  You
11 know, to me it was, you know, relatively large business.
12 To somebody else it would probably be considered small.
13 I don't know.
14    Q.  Do you agree with me that the revenue for
10:48 15 Allied Lab Solutions, all the entities combined, was in
16 the millions of dollars on an annualized basis from
17 2017, 2018?
18    A.  Okay, I -- I would say that was correct.
19    Q.  And it was potentially tens of millions of
10:48 20 dollars for all the entities combined, correct?
21    A.  If it would continue, I would say that that
22 was accurate.
23    Q.  And by comparison to those numbers, how does
24 Eroo compare?
10:48 25    A.  Again, money for partners versus money for a

Page 67

1 company that I own are two different things.  I think
2 Eroo was -- it -- was and is profitable.  Did it make as
3 much money or does it make as much money for my partners
4 as Allied?  I would say no.
10:49 5    Q.  Does Eroo have -- do you have partners in
6 Eroo?
7    A.  I do not.
8    Q.  Did you have partners in Eroo in 2016?
9    A.  I did not.
10:49 10    Q.  Have you ever had any partners in Eroo?
11    A.  I have not.
12    Q.  So all the profit, if there is a profit from
13 Eroo, goes to you?
14    A.  That is correct.
10:49 15    Q.  Eroo has never had an employee, have they?
16    A.  Yes, they have.
17    Q.  What year?
18    A.  I'd have to look, but they've had different
19 employees throughout the years, actually, from 2014
10:49 20 to -- to probably 2019.
21    Q.  The business of Eroo before Allied Lab
22 Solutions was to provide what to Dr. Franklin
23 specifically?
24    A.  We referred them patients.  So we prescreened
10:50 25 providers, which we were in the process of doing before

Page 68

1 the relationship with Franklin, where patients -- or
2 clients would come to us seeking doctors that were
3 qualified and treating certain conditions, and we would
4 therefore do the administrative side and then refer to
10:50 5 them to providers that specialized in those needs.
6    Q.  How did people find out that Eroo existed?
7    A.  Through a website.  On-line presence as well
8 as marketing.
9    Q.  What's the name of the website?
10:50 10    A.  Max Health.
11    Q.  And is the purpose of -- is Max Health
12 still -- website still active?
13    A.  It is.
14    Q.  And is the purpose of the Max Health website
10:50 15 essentially vitamins?
16    A.  Selling vitamins and educational on integrated
17 medicine.  So it's there to educate patients on some of
18 the treatments that are -- these providers are capable
19 of administering.
10:51 20    Q.  Do you talking about treating people with
21 brain cancers --
22    A.  No, integrated medicine preventing --
23    Q.  -- or more physically fit?
24    A.  Physically fit, wellness, people that --
10:51 25 hormone replacement therapy, people that are looking to

17 (Pages 65 to 68)

Page 69

1  stay fit and active as they age.
2  Q.  So Max Health is not a -- for example, a
3  cancer referral entity, right?
4  A.  No, it would not be.
10:51  5  Q.  Max Health is not a referral in the event that
6  I have some systematic medical problem, correct?
7  A.  No.
8  Q.  Max Health does not serve as a referral for
9  any kind of -- of disease, correct?
10:51  10  A.  No, Max Health is, basically, people that are
11  trying to look for doctors that look at anti-aging,
12  basically.
13  Q.  Is Max Health essentially a wellness referral
14  source?
10:52  15  A.  Yes, that's correct.
16  Q.  It is not -- it does not set itself out as
17  providing medical care, correct?
18  A.  It does not.
19  Q.  It specifically says it does not provide
10:52  20  medical level of care, correct?
21  A.  A hundred percent.  Like I said, it's for
22  educational purposes.
23  Q.  So somebody would go and, say, they want to
24  be -- they want to -- they don't want to age as quickly
10:52  25  as they are; they want to get some vitamins and have a

Page 70

1  well -- a whole system wellness program.  You at Max
2  Health would not be recommending they go to a specific
3  doctor, would you, to treat a condition?
4  A.  We would refer them to physicians that
10:53  5  would -- that would meet that criteria.  So if they were
6  looking for doctors that specialize in wellness and
7  integrated medicine, we would pair them with doctors
8  that advertise to specialize in -- in treating those
9  conditions.
10:53  10  Q.  But if it's someone that goes on the Max
11  Health website and says that I have a -- I have colon
12  cancer and I need to see a doctor, that's not what Max
13  Health can refer on, correct?
14  A.  No, that is correct, we do --
10:53  15  Q.  It is not to --
16  THE WITNESS:  I'm sorry.  I do have a
17  restroom.
18  Q.  (BY MR. COLLMER)  If someone goes on the Max
19  Health website to treat a medical condition, Max Health
10:53  20  is not making a referral to a doctor for treatment of a
21  medical condition; isn't that true?
22  A.  No.  Your understanding or your question is --
23  doesn't -- I -- I don't understand it.  I don't --
24  again, it's for educational purposes, based on certain
10:54  25  criteria for wellness, you know, anti-aging,

Page 71

1  supplements, as well as doctors that would refer.  So if
2  you're talking about doctors that -- that participate in
3  integrated medicine or internal medicine or M.D.s, they
4  would be responsible for those type of referrals.  So it
10:54  5  says on the website it's for educational purposes.  If
6  they're paired with a physician, I would assume that
7  they would take those type of needs to an actual M.D.,
8  who would then refer them to a specialist or treat them,
9  if that was their ability to do so.
10:54  10  Q.  Max Health had no kind to provide medical
11  advice, true?
12  A.  We do not provide medical advice, no.
13  Q.  And so your involvement with Dr. Franklin was
14  by virtue of Max Health referrals for wellness?
10:55  15  A.  Correct.
16  Q.  Is that the only basis of on which you knew
17  Dr. Franklin?
18  A.  I would say so.  That's how I was introduced
19  to Dr. Franklin, yes.
10:55  20  Q.  Who introduced you to him?
21  A.  A mutual friend.
22  Q.  What's his name or her name?
23  A.  It's been a long time since I've spoken to
24  her, but she was a nutritionist from one of the
10:55  25  facilities where both Franklin and I were familiar.

Page 72

1  Q.  Which facility?
2  A.  I believe at the time she was working at
3  Gold's Gym.  She owned her own business to the Planet
4  Fitness doctor or Plan Fit to something like -- along
10:56  5  those -- those lines.
6  Q.  And you don't know her name, as you sit here
7  now?
8  A.  I'm terrible with names.  It might come to me.
9  If you don't mind, I'll -- you know, I'll chime in with
10:56  10  it, if I can remember, at some point.  I can -- I'm good
11  with faces.  I'm terrible with names.
12  Q.  And so based upon your finding his name from
13  this unidentified person, you then reached out to him,
14  or was he, like, at the gym and y'all introduced each,
10:56  15  chanced into each other at the time?
16  A.  No, I believe she reached out to him and then
17  he, in turn, called me.  I don't -- you're talking about
18  things that happened almost a decade ago.
19  Q.  And then, based upon that, you and your --
10:56  20  your Max Health wellness site developed a relationship
21  with Dr. Franklin to refer patients, refer people to
22  him, correct?
23  A.  Correct.
24  Q.  Okay.  And in return for referring people to
10:57  25  him, did he pay you?

18  (Pages 69 to 72)

Page 73

```
         1      A.  He was supposed to.
         2      Q.  And are you saying that he did not?
         3      A.  I'm saying -- yes, that is correct.  Well, he
         4  did.  But are you asking if he fulfilled his contract?
10:57    5  That would be -- the answer is no.
         6      Q.  So how much do you believe Dr. Franklin should
         7  have paid you for referring these wellness patients to
         8  him that he did not pay?
         9      A.  I think at some point counsel gave you those
10:57   10  invoices.  I don't have them in front of me, and I don't
        11  know exactly how much it was.
        12      Q.  How much do you think Dr. Franklin should have
        13  paid you per patient for the Max Health referral of
        14  potential patients to him?
10:58   15      A.  Again, it was for fee for service patients,
        16  and it was based on a percentage.  So --
        17      Q.  Percentage of what?
        18      A.  Most of it was through the pharmacy that he
        19  controlled.  So I didn't receive referrals or a specific
10:58   20  fee for each patient.  It depended upon their
        21  involvement or the scale of involvement.
        22      Q.  And are you saying that if the -- if you
        23  referred somebody to Dr. Franklin out of your wellness
        24  clinic and that person went to Dr. Franklin and they got
10:58   25  some prescriptions filled at the pharmacy, that you
```

Page 74

```
         1  wanted some of that money from the pharmaceutical
         2  charges?
         3      A.  If there was fee for service, then I was paid
         4  a percentage based on what that cash price would have
10:59    5  been, yes, sir.
         6      Q.  Okay.  But I'm asking a specific different
         7  question.  I'm saying are you en- -- are you saying that
         8  you are entitled to a percentage of the pharmaceutical
         9  charges?
10:59   10      A.  Okay.  I'm trying to be as specific as I
        11  possibly can.  So if it was fee for service, meaning the
        12  patient was paying cash or the client was paying cash
        13  for these prescriptions that were filled through his
        14  pharmacy, then I would or Eroo would retain a percentage
10:59   15  as revenue, yes.
        16      Q.  All right.  So it's not a fee for the service
        17  that he provides?  In other words, if he's charging for
        18  a specific type of exam, you're not saying you're
        19  entitled to some of that?  You're saying you are
11:00   20  entitled to some of the money for the prescriptions that
        21  he recommends to these people; is that correct?
        22      A.  If it was fee for service, that is correct.
        23  There is a difference between things that run through
        24  insurance carriers and what is -- is paid for by the
11:00   25  providers -- or, I mean, the -- the clients in cash.
```

Page 75

```
         1      Q.  Okay.  So, in other words, it's a percentage
         2  of the charges that the pharmacy, which are uninsured,
         3  charges that they're paying you believe or Eroo was
         4  making a claim for some percentage of those charges for
11:00    5  the pharmacological provisions?
         6      A.  Correct, pharmaceutical supplements as well as
         7  prescriptions, yes.  It sounds like I'm splitting hairs,
         8  but it's a -- a very specific difference.
         9      Q.  Well, it's illegal to pay for referral of
11:01   10  patients, correct?
        11      A.  Illegal to pay for referrals of patients.
        12      Q.  Correct.
        13      A.  You know, again, I'm not an attorney or a
        14  healthcare professional -- I mean, healthcare
11:01   15  professional or healthcare attorney specialist, but
        16  depending on the nature of the fee, it would be illegal
        17  or legal.
        18      Q.  And is the complaint against Dr. Franklin, is
        19  it related to anything to do with Allied Lab Solutions?
11:01   20      A.  Complaint against Dr. Franklin?  You'll have
        21  to enlighten me.
        22      Q.  The money you say Dr. Franklin owes you, does
        23  that have anything to do with any persons who were
        24  patients at Allied Lab Solutions or is it separate
11:02   25  people that were not involved in Allied Lab Solutions
```

Page 76

```
         1  care?
         2          Let me give you an example.  Might make it
         3  easier.
         4      A.  I was --
11:02    5      Q.  Patient A is -- goes to your wellness Max
         6  Health to Dr. Franklin.  Patient A does not -- gets
         7  certain things filled at the pharmacological website and
         8  has a blood test run that is -- that goes to Allied Lab
         9  Solutions, that hierarchy.  Are you saying that there
11:02   10  are no patients that have both for which you're claiming
        11  against Dr. Franklin that you want some of the money,
        12  not insured payments paid at the pharmacy, but those
        13  patients may have also gone through the lab?
        14      A.  Okay.  No. 1, I'm not claiming anything.  You
11:03   15  are.  But I would -- I would have to say that there
        16  might be some that were Max Health referrals or -- or
        17  clients.  But to say that one was exclusive to the other
        18  would be incorrect or inaccurate.
        19      Q.  All right.  When did you -- after you set up
11:03   20  Allied Lab Solutions Management, L.L.C., to serve as the
        21  manager for Allied Lab Solutions, L.L.C., did you know
        22  already that LN Partners, L.L.C., was going to set up a
        23  companion entity LN Partners Management, L.L.C.?
        24      A.  No, I did not.
11:04   25      Q.  Okay.  Was that set up before or after you set
```

19 (Pages 73 to 76)

Page 77

```
         1    up Allied Lab Solutions Management, that you recall?
         2       A.  I'm not aware that that entity exists, or
         3    would it be in my capacity as a officer in ALS or ALS
         4    Management to have that information.
11:04    5       Q.  As an officer of A -- Allied Lab Solutions and
         6    as an officer of Allied Lab Solutions Management, you
         7    did not know of the existence of LN Partners Management;
         8    is that a true statement?
         9       A.  LN Partners Management, I am -- no, I have no
11:04   10    knowledge of that.
        11       Q.  Are you familiar with anything called LN
        12    Management?
        13       A.  Again, you're asking specifics, you know.  I
        14    know LN Professional Management.  I don't know if you're
11:05   15    asking the question incorrectly or if there is another
        16    entity that you're asking me if I know of its existence.
        17    And so do you want to clarify?
        18       Q.  No, I could ask for -- well, I don't know if
        19    there is a companion one that was just parallel to
11:05   20    Allied Lab.  You are aware of LN Professional
        21    Management, L.L.C., correct?
        22       A.  That is the only LN entity I am aware of, yes,
        23    sir.
        24       Q.  At the time you set up Allied Lab Solutions
11:05   25    Management, did you know of the existence of LN
```

Page 78

```
         1    Professional Management, L.L.C.?
         2       A.  At the time I set up Allied Lab Solutions, was
         3    I aware of LN Professional Management?
         4       Q.  Uh-huh, yes.
11:05    5       A.  Yes, sir.
         6       Q.  All right.  How?
         7       A.  Because I knew the parties that set it up.
         8       Q.  Did Lewis Nichols tell you why it was
         9    important to set up a ALS Management separately to
11:06   10    manage ALS?
        11       A.  I don't believe we discussed that, no.
        12       Q.  And tell me why, as you sit here now, do you
        13    think it was beneficial to set up ALS Management?
        14       A.  I believe we already covered that, but I will
11:06   15    again, sir.  To make sure that there wasn't any
        16    commingling of the wrong funds.  It was a -- basically,
        17    as I stated, a trust account.
        18       Q.  And the commingling would be done by you,
        19    correct?
11:06   20       A.  It would be done by me?  How so, sir?
        21       Q.  Because the money comes in to ALS accounts
        22    over which you have control.
        23       A.  In -- up until 2018, yes, sir.  So if funds
        24    came in to ALS or Allied Lab Solutions Management, then
11:07   25    they were distributed to the appropriate shareholders.
```

Page 79

```
         1       Q.  All right.  So, but you said you wanted to
         2    do -- avoid any commingling of funds.  The only persons
         3    that have control over the accounts are you; isn't that
         4    true?
11:07    5       A.  If the -- if Allied Lab Management didn't
         6    exist, then it would necessitate much more issues with
         7    distribute -- distributing of funds.  I'm -- I'm not
         8    following where -- what you're asking me.
         9       Q.  I'm asking about the concern about
11:07   10    commingling.  And if -- since you were the only person
        11    who has control over the bank accounts, if there is
        12    commingling, it would be commingling done by you?
        13       A.  So if Allied Lab Management did not exist,
        14    then we would have an issue with moving funds to the
11:08   15    appropriate facilities.
        16          MR. COLLMER:  Objection; nonresponsive.
        17       Q.  (BY MR. COLLMER)  At the time you were setting
        18    up Allied Lab Solutions Management with the concern
        19    about commingling of funds, the only person who had
11:08   20    signatory rights or management rights over the accounts
        21    was -- of Allied Lab Solutions Management was you and
        22    Allied Lab Solutions was you?
        23       A.  The issue would be, actually, if those
        24    entities -- the funds that was due and owing would have
11:08   25    to flow through several different accounts.  Allied Lab
```

Page 80

```
         1    Management only provided services so that it would
         2    facilitate the ease and the necessary people being paid
         3    according to their pro rata shares.
         4          MR. COLLMER:  Objection; nonresponsive.
11:09    5       Q.  (BY MR. COLLMER)  Did Max Total Health, was
         6    they -- were they a subscriber?
         7       A.  They were.
         8       Q.  Were you a subscriber, also?
         9       A.  Individually?
11:09   10       Q.  Yes.
        11       A.  No, sir, I don't believe so.
        12       Q.  A letter from Dr. Forage is Clay Ellis/Max
        13    Total Health, as far as the address line.
        14       A.  Okay.
11:09   15       Q.  Is that because it was going to you, but,
        16    really, Max Total Health was the subscriber?  Is that
        17    your understanding?
        18       A.  Yes, sir.
        19       Q.  And did Max Total Health -- that's a -- is
11:09   20    that a corporation or a d/b/a?  I can't remember?
        21       A.  I believe it's an L.L.C.
        22       Q.  L.L.C.  And you were the -- you were the total
        23    owner of Max Total Health at the time?
        24       A.  That is correct.
11:10   25       Q.  Right?
```

20  (Pages 77 to 80)

Page 81

1    A. That is correct.

2    Q. So did Max Total Health pay for a

3    subscription?

4    A. Yes, it did.

11:10  5    Q. Okay. And did it pay at the regular

6    subscription price?

7    A. Yes, sir.

8    Q. Okay. Did you sell any subscription or try to

9    sell a subscription to Kim Wiley?

11:11  10    A. No, sir.

11    Q. Do you know who she is?

12    A. I am very aware of who Kim Wiley is, yes.

13    Q. Who do you think she is?

14    A. She worked in a similar capacity to me and ran

11:11  15    a health and wellness aspect of Dr. Franklin's practice.

16    Q. Is Kim Wiley a subscriber to LN Partners?

17    A. I believe so.

18    Q. All right. Does -- is LN Partners set up like

19    L -- ALS, Allied Lab Solutions, with a number of

11:11  20    subscribers to it for LN Partners?

21    A. Again, you're asking me to speculate. So I

22    know that, I believe, Kim Wiley and Lewis Nichols are --

23    are partners in -- in Allied.

24    Q. Have you ever been a subscriber to LN?

11:11  25    A. I have not.

Page 82

1    Q. Has your brother-in-law ever been a subscriber

2    to LN?

3    A. He has not.

4    Q. Is there a M. J. Cortez that's been a

11:12  5    subscriber to LN Partners?

6    A. I believe so, yes.

7    Q. And what is his relationship to you?

8    A. He's been a long-time friend and associate.

9    Q. Is he a stepbrother?

11:12  10    A. He is not.

11    Q. Okay. So there is no familial relation with

12    M. J. Cortez; is that right?

13    A. That is correct.

14    Q. Have you -- did you ever sell any interest in

11:12  15    LN Partners to M. J. Cortez?

16    A. I did not. I would not be able to in my

17    capacity, because I -- it would not be mine to sell.

18    Q. Whose would it be to sell?

19    A. I'm sorry? The partners. I've never been a

11:13  20    partner. So how could I sell a subscription to them

21    when I don't own it?

22    Q. Has Max Health ever been a partner of LN

23    Partners?

24    A. It has not.

11:13  25    Q. Has any entity over which you are an owner

Page 83

1    ever been a partner in LN Partners?

2    A. It has not.

3    Q. Has any entity over which you have been -- you

4    are an owner of -- the owner of the company ever been an

11:13  5    interest holder in any of Lewis Nichols' L.L.C.s?

6    A. Outside of -- no.

7    Q. Did a company any -- yourself or any company

8    you control receive payment for transportation of the

9    delivery of the materials and the results from the labs?

11:13  10    A. For logistical services?

11    Q. Yes.

12    A. No.

13    Q. Okay. You have -- you received payment from

14    LN Partners; is that correct?

11:14  15    A. Yes, I have.

16    Q. And those payments from LN Partners, do they

17    continue today?

18    A. I believe so. They were suspended and then

19    reinstated under a lesser amount.

11:14  20    Q. Is that on an agreement between yourself and

21    LN Partners?

22    A. LN Professional Management?

23    Q. I'm sorry, LN Professional Management is the

24    management entity for LN Partners, correct?

11:14  25    A. Again, I don't -- I am not aware of an LN

Page 84

1    Partners. So I can't speculate on that.

2    Q. All right. So you have an agreement with LN

3    Professional Management; is that correct?

4    A. Yes.

11:15  5    Q. Okay. Is that you individually or you as a

6    sole owner of another L.L.C. or limited partnership?

7    A. Only -- I have a salary through LN

8    Professional Management.

9    Q. Is the salary based upon revenue?

11:15  10    A. It is not.

11    Q. Does LN Professional Management have any

12    revenue?

13    A. None that I'm aware of at this time.

14    Q. And the last time that LN Professional

11:15  15    Management had any revenue, according to you, is in?

16    A. Sometime in early 2019, I believe.

17    Q. Spring of 2019; is that right?

18    A. We -- we stepped over each other. Can you

19    repeat?

11:16  20    Q. All right. My apologies. That's the problem

21    with these Zoom. There is a bit of a lag and I can

22    actually see, but I don't hear words in some varying

23    order. My apologies.

24    You have an agreement with LN Professional

11:16  25    Management for a salary, right?

21  (Pages 81 to 84)

Page 85

```
        1     A.  I am paid a salary, correct.
        2     Q.  Are you currently being paid a salary?
        3     A.  Yes.
        4     Q.  And you are so -- as you sit here now, you are
11:16   5   currently an employee of LN Professional Management?
        6     A.  That is correct.
        7     Q.  What is your title at LN Professional
        8   Management?
        9     A.  Clinical consultant.
11:16  10     Q.  And what are your duties as a clinical
       11   consultant at LN Professional Management?
       12     A.  Research.  So looking into specific equipment
       13   and things of that nature that could facilitate the
       14   processing or increasing of business.
11:17  15     Q.  But LN Professional Management has no business
       16   currently; is that true?
       17     A.  That is correct.
       18     Q.  And the last time LN Professional Management
       19   had any business for which it was paid would be in the
11:17  20   spring of 2019; is that true?
       21     A.  That is correct.
       22     Q.  Are you responsible for maintaining any aspect
       23   of the collections for LN Professional Management?
       24     A.  No, sir.
11:17  25     Q.  Do you review the collections for LN
```

Page 86

```
        1   Professional Management?
        2     A.  No, sir.
        3     Q.  How many employees does LN Professional
        4   Management have?
11:17   5     A.  Currently?
        6     Q.  Yes, sir.
        7     A.  I'd say probably five or six, possibly.
        8     Q.  Are -- you're one of them.
        9     A.  Uh-huh.
11:18  10     Q.  And the other -- is Lewis Nichols one of
       11   the other employees of LN Professional Management?
       12     A.  I would say yes.
       13     Q.  Who are the other employees of LN Professional
       14   Management right now?
11:18  15     A.  M. J. Cortez and Rebecca Smith.
       16     Q.  That's four.  Is there five?
       17     A.  I believe possibly Dana White.
       18     Q.  The MMA guy?
       19     A.  No.  She's female.
11:18  20     Q.  Oh, sorry.  And what is Dana White's title?
       21     A.  Admin, administrative, data entry.
       22     Q.  Because there is no revenue, is it true that
       23   Dana White has no responsibilities on a day-to-day
       24   basis?
11:19  25     A.  I would say that her responsibilities are much
```

Page 87

```
        1   less now, but I couldn't tell you exactly what it is
        2   that she does on a daily basis.
        3     Q.  Does -- is there a location where everybody
        4   shows up for work?
11:19   5     A.  That was Palm Springs.
        6     Q.  How about Rebecca Smith?
        7     A.  She works remotely, I believe.
        8     Q.  And she is a bookkeeper?
        9     A.  No, she is not.
11:19  10     Q.  What is her job?
       11     A.  She is billing.
       12     Q.  Because there is no business, she has no
       13   billing to do, correct?
       14     A.  That -- well, I think some of it has to do
11:20  15   with maintaining the referral records.
       16     Q.  But as far as billing is concerned, that is a
       17   nullity, as there is nothing to bill, correct?
       18     A.  That is correct.
       19     Q.  What does M. J. Cortez do?
11:20  20     A.  I think he's overseeing at this point the --
       21   the winding down period.
       22     Q.  Is that winding down of LN Professional
       23   Management?
       24     A.  To a certain extent, yes.
11:21  25     Q.  What else is he winding down?
```

Page 88

```
        1     A.  Well, yeah, so when you go from a much larger
        2   company to a smaller company, he's overseeing that
        3   process.
        4     Q.  Does M. J. Cortez show up for work every day,
11:21   5   or no need for that?
        6     A.  Again, we're in the middle of a pandemic, so
        7   most people are working remotely.  I can't speculate on
        8   what their locations are on a day-to-day basis.
        9     Q.  Do you talk to him on a day-to-day basis?
11:21  10     A.  I do not.
       11     Q.  Okay.  When's the last time you spoke with
       12   him?
       13     A.  Mmm, probably early last week.
       14     Q.  About what?
11:21  15     A.  Nothing pertaining to work.
       16     Q.  Did you speak with M. J. Cortez about me
       17   possibly calling him as a witness in this case?
       18     A.  Absolutely not.
       19     Q.  Did you speak to Rebecca Smith and state that
11:21  20   I might be getting a call from me?
       21     A.  I believe Rebecca Smith was on a possible list
       22   of witnesses for deposition.  So I have told her that
       23   she might be called upon to give a deposition.
       24     Q.  And did you discuss her potential testimony?
11:22  25     A.  I did not.
```

Worldwide Court Reporters, Inc.
( 800) 745-1101

Page 89

```
         1            Q.  Did you discuss with her that I was going to
         2     ask her about any revenue from LN Professional
         3     Management from the -- in 2020 or the 2019 period?
         4            A.  No.
11:22    5            Q.  Okay.  Did you send her an e-mail?
         6            A.  No.
         7            Q.  Did you send M. J. Cortez or Dana White an
         8     e-mail about potentially being a witness in this
         9     lawsuit?
11:22   10            A.  No.
        11            Q.  Is Rebecca Smith related to Lewis Nichols?
        12            A.  No.
        13            Q.  All right.  How about you?
        14            A.  No.
11:23   15            Q.  Well, not you to Nichols.  You to Rebecca?
        16            A.  No, that's -- I'm sorry.  That's no.
        17            Q.  You're not related to Lewis Nichols, right?
        18            A.  No.
        19            Q.  How about Lewis Nichols, what is his title?
11:23   20            A.  Title in respect to?
        21            Q.  LN Professional Management.
        22            A.  CEO.
        23            Q.  Okay.  M. J. Cortez does not have a title, or
        24     does he have a title?
11:23   25            A.  I believe -- well, no, I don't believe he has
```

Page 90

```
         1     a title.
         2            Q.  Rebecca Smith has no title; is that right?
         3            A.  We didn't spend -- no.
         4            Q.  Is there only -- are you an officer of LN
11:23    5     Professional Management?
         6            A.  I am not.
         7            Q.  Have you ever been?
         8            A.  No.
         9            Q.  And what -- do you have a title at the
11:24   10     company?
        11            A.  Clinical consultant.
        12            Q.  That's the title?
        13            A.  That is the title.
        14            Q.  Under the agreement as it was originally set
11:24   15     up and as you had described in the subscription
        16     agreement, were you trying to explain to people simply
        17     from the documents how it would work when revenue was
        18     received?
        19            A.  I'm sorry.
11:24   20            Q.  That was inartful.  I'll explain it to you.
        21     The subscription agreement itself has a description of
        22     the company, of Allied Lab Solutions, right?
        23            A.  The last two times you've posed that question,
        24     you broke up both times.
11:25   25            Q.  Okay.  I'll try not to break up.
```

Page 91

```
         1            You -- the subscription agreement that you
         2     sent out has a description of Allied Lab Solutions,
         3     correct?
         4            A.  Are you asking me the -- the contracts that
11:25    5     the shareholders signed had a detailed portion of it?
         6            Q.  They do.  They describe what Al- -- the
         7     business of Allied Lab Solutions, correct?
         8            A.  I haven't seen that document in a while, but I
         9     would say that would be correct.
11:25   10            Q.  And that was your intent in generating the
        11     subscription agreement paperwork to have them sign, was
        12     it not, so they would have some understanding of what
        13     the business is and what they were going to be obligated
        14     to do and what they could expect to receive?
11:26   15            A.  Yes.
        16            Q.  And you chose the words to put in the
        17     subscription agreement, correct?
        18            A.  Well, my attorneys chose the words.
        19            Q.  You made the decision whether or not they
11:26   20     accurately reflected what you intended people to see and
        21     hear about your company Allied Lab Solutions?
        22            A.  Well, again, I had to defer to attorneys on
        23     that.  So...
        24            Q.  Okay.  Based upon their reviewing, but when
11:26   25     you're sending it out, your intent was to accurately
```

Page 92

```
         1     reflect what Allied Lab Solutions was going to do?
         2            A.  That would be the intent, correct.
         3            Q.  And it was going to accurately reflect, by
         4     your intent, of what the subscribers were expected to do
11:26    5     in order to be entitled to benefits under the agreement;
         6     is that also true?
         7            A.  Based on legal counsel, yes.
         8            Q.  Okay.  And were you intending that the person,
         9     by filling out the subscription and sending in the
11:27   10     check, would thereby become a member of Allied -- a
        11     subscriber or a member of Allied Lab Solutions, L.L.C.?
        12            A.  Whichever they -- entity they were -- they
        13     were participating in.
        14            Q.  Okay.  And did you send out anything different
11:27   15     or separate from the subscription agreement and possibly
        16     the agreement, such as a PowerPoint or any other kind of
        17     marketing material that went with your sales pitch or
        18     your sales documents that you wanted them to execute?
        19            A.  That would pertain to revenue, no.  The only
11:27   20     thing that we sent out was information on the tests that
        21     we were capable of providing.  So it was all, basically,
        22     clinical stuff.
        23            Q.  The -- what were the hospitals whose labs you
        24     were going to be using for Allied Lab Solutions?  What
11:28   25     are their names?
```

Worldwide Court Reporters, Inc.
(800) 745-1101

Page 93

1    A. Stevens Memorial, Glen Rose Medical, and Knox
2  Community Hospital, I believe.
3    Q. Knox County Hospital?
4    A. Okay. County, Community, sorry.
11:28 5    Q. Stevens Memorial. And is that in -- where is
6  Stevens Memorial located?
7    A. I don't know. I can't recall the exact
8  location. I think it's in Stevens County. It's
9  northwest of Brownsville, I believe.
11:29 10    Q. Did you go and speak to somebody at Stevens
11  Memorial in order to set up this arrangement whereby it
12  would be receiving blood to test?
13    A. I -- did I personally?
14    Q. Yes, sir.
11:29 15    A. No, sir.
16    Q. Who went?
17    A. I believe that would have been Landon -- well,
18  for -- are you specifically asking me about Allied Lab
19  Solutions?
11:29 20    Q. Yes. No, I'm asking you about any arrangement
21  with Stevens Memorial -- somebody had to go to them
22  directly and say will you -- will you take these tests?
23  At least, will you accept these tests for testing?
24    A. That would --
11:29 25    Q. Somebody had to --

Page 94

1    A. That would not have been in my job
2  description, no.
3    Q. Okay. Well, did you, in fact, do it, even
4  though it wasn't in your job description?
11:29 5    A. I had conversations with them, but, no, not --
6  not setting them up, no.
7    Q. Who did you speak with at Stevens Memorial?
8    A. Again, it's been a long time. I can't
9  remember the gentleman's name. I believe he's no longer
11:30 10  there.
11    Q. Okay. And what was his title, if you recall
12  that?
13    A. I believe he was the CEO of the hospital.
14    Q. And did you discuss with him the arrangement
11:30 15  that needed to be done and how the moneys were to be
16  paid?
17    A. No, sir.
18    Q. All right. Did someone that you know of
19  discuss that with him?
11:30 20    A. No, sir.
21    Q. Okay. So, as far as you know, he had no idea
22  how he was going to get paid from anything you knew
23  personal?
24    A. He wouldn't have gotten paid from me, no, sir.
11:30 25    Q. No. The question is as far as you know of

Page 95

1  personally, your personal knowledge, you don't know if
2  he knew in any way how he was going to be paid for
3  whatever services the hospital was going to provide; is
4  that a true statement?
11:31 5    A. That's a very inaccurate question. So I don't
6  know how to answer it.
7    Q. Okay. Did you have any communications with
8  anybody at Knox County or Knox Community Hospital?
9    A. Did I have communication with them? Yes.
11:31 10    Q. Did you have any communications with them
11  during the -- the setup, before any labs -- materials
12  provided to be tested, as far as the setup arrangement
13  with Knox County or Knox Community, whichever name it
14  is?
11:31 15    A. Set up an arrangement? No. And I -- I still
16  don't understand your question. You need to be a little
17  bit more specific.
18    Q. Not a problem. The hospital's sitting up
19  there. Assume for me at the beginning they've never
11:31 20  heard of Lewis Nichols, they've never heard of LN
21  Professional Management, they have never heard of Allied
22  Lab Solutions. At some point someone spoke with them as
23  to whether or not they had capacity that could be used.
24    A. Okay.
11:32 25    Q. Were you involved in that part of that?

Page 96

1    A. No.
2    Q. Were you involved with any sales part of LN
3  Professional Management Services?
4    A. Sales part of LN Professional Services? No.
11:32 5    Q. Okay. Who do you know, if you do, that spoke
6  with Knox County Hospital about the services that were
7  being requested to be provided in the testing
8  arrangement that was going to be done?
9    A. As far as the services that would be provided?
11:32 10    Q. Right.
11    A. Services. So, again, I believe your first
12  question was -- was completely different than what
13  you're asking me now. If you're asking about the
14  services that we provided, I would be in contact with
11:33 15  them to see if they were capable of providing the
16  services. But as far as financial arrangement or
17  reimbursement, that would not -- no.
18    Q. You met Michelle Holle?
19    A. Yes, I know Michelle very well.
11:33 20    Q. How do you know her?
21    A. She's the CEO at her -- or head administer for
22  all of Victory's different enterprises, I should say.
23    MR. COLLMER: Objection; nonresponsive.
24    Q. (BY MR. COLLMER) How do you know her?
11:33 25    A. She works for Victory Medical.

24 (Pages 93 to 96)

Page 97

1    Q.  And you know her by virtue of what?  You go
2    and you talk to her?  You only talk to her on the phone?
3    How do you know her?
4        A.  I know her as the executive in charge of
11:34 5   Victory Medical.  So she was No. 2 to Dr. Franklin.  And
6    my interactions were usually with her.
7        Q.  Did you pay for Max Rust as the lawyer to do
8    his drafting?
9        A.  I did not.
11:34 10  Q.  Who paid him?
11       A.  I'm not aware of who paid Mr. Rust.
12       Q.  Okay.  Do you consider him to be your
13   attorney?
14       A.  I do not.
11:34 15  Q.  Do you consider him of being able to explain
16   the financial arrangement between Allied Lab Solutions,
17   LN Professional Management, and -- and whatever Knox
18   County Hospital, for example?
19       A.  I would not.
11:35 20  Q.  You don't think he's competent to explain it?
21       A.  I was -- you know, I'm not sure Rust is not an
22   attorney.
23       Q.  Oh, what is he?
24       A.  That's a good question.
11:35 25  Q.  You don't know what he is professionally?

Page 98

1        A.  I believe at one time he was an attorney.  He
2    was introduced to me as an attorney.  I became aware
3    that he is not a licensed member of the bar at some
4    point after that.
11:35 5   Q.  Did he lose his licensure as a result of
6    anything to do with these MSOs?
7        A.  I do not believe so.
8        Q.  Why do you think -- what is your understanding
9    of why he lost his licensure?
11:35 10  A.  According to what I've read, some -- some
11   thing he had been involved with years before I was
12   introduced to him.
13       Q.  Do you know the CEO of Glen Rose?
14       A.  I do.
11:36 15  Q.  Who is that?
16       A.  Ray Reynolds.
17       Q.  When did you last speak to Ray Reynolds?
18       A.  Mmm, probably in excess of a year, maybe eight
19   months, something like that.
11:36 20  Q.  What was the occasion for having a
21   conversation with him?
22       A.  Checking on how the facility is doing, things
23   of that nature.
24       Q.  Were you calling about any outstanding
11:36 25  invoices or bills?

Page 99

1        A.  No, sir.
2        Q.  Who was the CEO of Stephenville -- or Stevens
3    Memorial?  Sorry.
4        A.  You asked me that question.  And, as I stated,
11:36 5   I can't remember the gentleman's name, but I know
6    that -- I'm fairly certain that the gentleman that I had
7    dealings with is no longer there.
8        Q.  SJH, is that an acronym for another one of the
9    testing places?
11:37 10  A.  I'm sorry, can you repeat that?
11       Q.  SJH, I've seen that on one of these collection
12   sheets.  Is that an acronym for that hospital, or is
13   that another hospital?
14       A.  SJH?
11:37 15  Q.  Yeah.
16       A.  All right.  No.  I'm unfamiliar with that.
17   Sorry.
18       Q.  And at Knox County, do you know who the CEO of
19   Knox County is now?
11:37 20  A.  Of Knox?
21       Q.  Yeah.
22       A.  So we're going from Stevens Memorial to Knox.
23   So are you asking me about Knox?
24       Q.  I am.
11:37 25  A.  Okay.

Page 100

1        Q.  Just asking if you know the CEO of Knox County
2    Hospital?
3        A.  Yes.
4        Q.  Who is that?
11:37 5   A.  Stephen Kuehler.
6        Q.  And is he the person with whom you had
7    involvement as far as the services of -- of -- to be
8    rendered by them under the arrangement with Allied Lab
9    Services and LN Professionals?
11:38 10  A.  My conversations with Steven would be in
11   context of the ability of the laboratory to perform
12   the -- the testing.
13       Q.  Did you discuss anything as far as collections
14   with Stephen Kuehler?
11:38 15  A.  I'm sorry?
16       Q.  Did you discuss financial collection with him?
17       A.  I -- no, I don't believe I discussed
18   financials with him.
19       Q.  When you were communicating with -- on -- to
11:39 20  Toth Enterprises II, P.A., were you speaking with --
21   only with William Franklin or were you also speaking
22   with Michelle Holle?
23       A.  I was also speaking with Michelle Holle.
24       Q.  As far as the original subscription agreement
11:39 25  and before it was signed, did you have -- did you speak

25  (Pages 97 to 100)

Page 101

```
      1    to William Franklin or Michelle Holle or both?
      2       A.  Can you repeat that?  I'm sorry, you broke up.
      3       Q.  No problem.  At some point -- and I'm going to
      4    give you some context -- you have to talk to
11:39 5    Dr. Franklin about whether or not he wants to be a
      6    subscriber in your company Allied Lab Solutions?
      7       A.  Uh-huh.
      8       Q.  Fair enough?
      9          And at some point somebody said, hey, Toth
11:40 10   Enterprises II exists.  Did you speak with Dr. Franklin
     11    about Toth Enterprises or Michelle Holle, as far as
     12    trying to get them signed up and on the bottom line, as
     13    a subscriber?
     14       A.  The way you worded the question, I didn't -- I
11:40 15   didn't solicit Toth Enterprises' participation.  They
     16    solicited mine.  So that would probably be Dr. Franklin.
     17    But I believe Michelle Holle was there in those
     18    conversations.
     19       Q.  Did you solicit Dr. Franklin on behalf of
11:40 20   Allied Lab Solutions?
     21       A.  Again, the concept of Allied Lab Solutions, I
     22    believe Dr. Franklin solicited me.  So when you're
     23    asking me about ALS, Mr. Franklin was involved in the
     24    decisions that led to ALS.
11:41 25      Q.  So you're saying Mr. -- Dr. Franklin solicited
```

Page 102

```
      1    you to set up a company which you would own; is that
      2    what you're saying?
      3       A.  That is correct.
      4       Q.  And you're saying Dr. Franklin solicited you
11:41 5    to set up a company Allied Lab Solutions Management,
      6    which you would own?
      7       A.  He's -- he advised me that it would be a good
      8    business opportunity, correct.
      9          MR. COLLMER:  Objection; nonresponsive.
11:41 10      Q.  (BY MR. COLLMER)  Did Dr. Franklin solicit you
     11    to set up Allied Lab Solutions Management, the company
     12    which you owned 100 percent?
     13       A.  All of the Allied entities discussed and
     14    Mr. Franklin wanted -- advised that it would be a good
11:42 15   business opportunity, correct.
     16          MR. COLLMER:  Okay.  I didn't ask that
     17    question.  Objection; nonresponsive.
     18       Q.  (BY MR. COLLMER)  Are you telling us that
     19    Dr. Franklin solicited you to set yourself up at a
11:42 20   company which you owned and managed by another company
     21    which you owned exclusively?
     22       A.  Dr. Franklin was aware of all of the Allied
     23    entities and the reasoning behind setting them up and
     24    advised me that it would be a good opportunity to do so.
11:42 25      Q.  The question I asked, though, was about
```

Page 103

```
      1    solicitation.  Are you saying that he solicited you to
      2    set up your own company and managed by your own company?
      3       A.  He mentioned that that would be a good idea,
      4    yes.
11:42 5       Q.  And then you made the decision to actually set
      6    the companies up, true?
      7       A.  Under some -- I'm looking for the right
      8    terminology here, but I was given advice from
      9    Mr. Franklin to do so.
11:43 10      Q.  As a business opportunity, but not as that how
     11    to set the companies up?  That was a decision you made
     12    on your own, isn't it?
     13       A.  I'd say that 'd be inaccurate, because before
     14    anybody and any subscriptions were signed off on, like I
11:43 15   said, there was several documents and draft documents
     16    that all of the shareholders had the opportunity to make
     17    suggestions, because, otherwise, they wouldn't have
     18    signed them.
     19          MR. COLLMER:  I object to that as
11:43 20   nonresponsive.
     21       Q.  (BY MR. COLLMER)  Did you want Dr. Franklin to
     22    be a subscriber?
     23       A.  Did I want Dr. Franklin to be a subscriber?  I
     24    valued Victory Medical and the financial agreements that
11:44 25   we had had, the business relationships we had had in the
```

Page 104

```
      1    past.  So I thought that it would be a good way to
      2    proceed, having them involved.
      3          MR. COLLMER:  Objection; nonresponsive.
      4       Q.  (BY MR. COLLMER)  You're telling us in 2018
11:44 5    you sold -- quote, sold the company, close quote,
      6    whatever that involves, correct?
      7       A.  Correct.
      8       Q.  How did you dec-- who told you to sell the
      9    company?
11:44 10      A.  No one told me to sell the company.  As you've
     11    stated, that I owned Allied Management and Allied ALS,
     12    as the manager, I made an executive decision to do so.
     13       Q.  You and you alone made that decision, correct?
     14       A.  I made the shareholders aware of my intent to
11:45 15   do so.
     16       Q.  But you and you alone made the decision to
     17    sell at the time that you, in fact, did sell, correct?
     18       A.  After taking the advisement and noticing or
     19    knowing that no one had a potential issue with it, I
11:45 20   went ahead and did sell, yes.
     21          MR. COLLMER:  Object to everything
     22    nonresponsive other than "yes."
     23       Q.  (BY MR. COLLMER)  Did anybody at -- that was a
     24    subscriber force you out of Allied Lab Solutions?
11:45 25      A.  Force me out, no, sir.
```

26 (Pages 101 to 104)

Page 105

```
         1        I answered. Did you not hear the answer?
         2        Q. No, I'm sorry.
         3        A. Okay. No, sir, no one forced me out.
         4        Q. Okay. When you left Allied Lab Solutions, did
11:46    5    you in writing advise ever before the sale that the sale
         6    was going -- going to happen?
         7        A. I believe so.
         8        Q. You were obligated to let the subscribers and
         9    members of the L.L.C. know that you were selling
11:46   10    whatever interest you had in the company, correct?
        11        A. I believe that to be true, and I made every
        12    attempt and talked to all of the shareholders. It would
        13    have done no good to execute a sale and then the
        14    shareholders had issue with that. No one expressed any
11:47   15    issue at all.
        16        Q. The revenue that had been received by -- was
        17    being received by Allied Lab Solutions in 2018 was
        18    substantial, was it not, during that year, like,
        19    hundreds of thousands of dollars?
11:47   20        A. If hundreds of thousands is your idea of
        21    substantial, that would be a correct statement.
        22        Q. Okay. And you were getting a percentage of
        23    those hundreds of thousands of dollars, as a subscriber,
        24    correct?
11:47   25        A. Yes, sir.
```

Page 106

```
         1        Q. Was there any reason other than -- well, why
         2    did you want to sell?
         3        A. Because Allied was -- had limited other
         4    resources for revenue. When executing the sale, I had
11:48    5    given most of my colleagues and people that I valued
         6    their opinion and their -- and had put trust in me. So
         7    I effected the sale because Mr. Forage had other sources
         8    of revenue that could be added to ALS and then therefore
         9    make it more sustainable long term.
11:48   10        Q. So your idea in selling your interest was it
        11    was going to help the subscribers, including yourself?
        12        A. Correct.
        13        Q. This company which you had set up had brought
        14    in millions of dollars in the interim years and was
11:49   15    still bringing in that kind of money at the time of the
        16    sale; is that a true statement?
        17        A. At the time of the sale, I would say that's
        18    probably -- I -- you know, without seeing the exact
        19    numbers, but I'd say that's probably accurate, yes, sir.
11:49   20        Q. And when was it that you say you sold the
        21    company?
        22        A. I believe it was in early spring of 2018.
        23        Q. And this company, which it brought in millions
        24    of dollars and was continuing to do so on an annualized
11:49   25    basis, you sold the company to Dr. Forage for how much
```

Page 107

```
         1    money?
         2        A. I gave over the controlling interest that I
         3    had. I don't believe I recall the monetary amount that
         4    was involved, but I'm -- you know, I can't tell you
11:50    5    exactly.
         6        Q. Does a dollar sound like the right number?
         7        A. I know it was -- it was low.
         8        Q. Well, would you say it was $10?
         9        A. I couldn't tell you.
11:50   10        Q. It could be a dollar or $10, but it's a low
        11    number, correct?
        12        A. As based on the percentage of revenue that was
        13    generated, it was probably, yeah, considerably low.
        14        Q. If Dr. Forage says you sold to him for a
11:50   15    dollar, you would have -- you would not be in a position
        16    to disagree with him as far as that being the number,
        17    correct?
        18        A. I -- well, depending on what Dr. Forage would
        19    say, I'd defer to him.
11:51   20        Q. Okay.
        21        A. I can't remember.
        22        Q. But you don't recall after you sold the
        23    company and signed the paperwork and got your check, in
        24    whatever small amount it was, that you went right out
11:51   25    and bought -- made any kind of purchase at all in
```

Page 108

```
         1    celebration, true?
         2        A. No, I wouldn't have been celebrating, no, sir.
         3        Q. Okay.
         4        A. Again -- well, no.
11:51    5        Q. Do you want to volunteer something? Your
         6    lawyer would tell you don't volunteer.
         7            Did you want to add something to that answer?
         8        A. No.
         9        Q. Did Dr. Forage pay you by handing you, I
11:51   10    believe he -- a dollar, but whatever the amount it was,
        11    in cash or did you actually got a check or a cashier's
        12    check?
        13        A. I don't -- I don't recall.
        14        Q. Do you recall whether or not he, actually, in
11:51   15    fact, did hand you a dollar or you had to wait for a
        16    check from Dr. Forage?
        17        A. I don't recall what the amount was or how it
        18    was administered. Again, I -- I sold the -- my
        19    management interest in the company in order to sustain
11:52   20    viability for all the shareholders, myself included.
        21        Q. I'd like to go back into kind of how the
        22    arrangement was set up with the percentages, if you
        23    don't mind. Okay. I know it's changing gears a little
        24    bit, but I just want to kind of get an understanding of
11:52   25    it.
```

Page 109

```
 1      The money -- when the labs are picked up or
 2  the -- I guess, the blood's picked up and transported by
 3  yourself under your transportation services that --
 4  arrangement you had or by a courier to a hospital lab,
11:53  5  tests are run on it at the lab for which they in turn
 6  charge an insurance carrier; is that the intended setup
 7  of the arrangement?
 8      A.  We intended to -- right.  So, yeah, I --
 9  trying to...
11:53 10      Q.  And the hospital itself would bill a insurance
11  provider, for example, Blue Cross/Blue Shield, right?
12      A.  If that facility had administered or provided
13  that testing, then they would have billed for those
14  services, correct.
11:53 15      Q.  And they'll then get a check for the services
16  that they provided from the insurance carrier, right?
17      A.  That's how it works, yes, sir.
18      Q.  And the arrangement, as you understand it, was
19  that the hospital would keep 25 percent of the revenue?
11:54 20      A.  I'm not aware of the exact percentages, but --
21  so, yes, the hospitals would -- would keep a certain
22  percentage of whatever revenue was generated.
23      Q.  And then of the remainder moneys, that is, the
24  75 percent, approximately 53 percent of that remainder
11:54 25  would flow down to Allied Lab Solutions or Allied Lab
```

Page 110

```
 1  Solutions Management, depending upon the collection;
 2  isn't that true?
 3      A.  I would say that's inaccurate.
 4      Q.  Well, you ran Allied Lab Solutions Management,
11:54  5  right?
 6      A.  I ran Allied Lab Solutions Management from --
 7  up until 2018.  But that figure is highly escalated.
 8  That's inaccurate.  There's never a 53 percent that was
 9  distributed, that I'm aware of.
11:55 10      Q.  What percentage of money do you believe was --
11  it's 53 percent of the 70 percent.  That comes out to be
12  39.75 percent of the total revenue received by the
13  hospital.  Does that sound like the correct number to
14  you, according to how you were running Allied Lab
11:55 15  Solutions Management at the time?
16      A.  I know that the percentage would have been
17  under 40 percent.  So if you're saying that, that sounds
18  more to my recollection.  I've never seen anyone
19  reimburse over -- over 39 percent, 39, 40 percent.
11:55 20      Q.  The intent is to keep the number of
21  reimbursement under 40 percent, correct?
22      A.  I don't think it's intended.  It's just fair
23  market value, depending on the contracts.
24      Q.  So if there is a million dollars received by
11:56 25  the hospital under that arrangement, 25 percent or
```

Page 111

```
 1  250,000 will be kept by the hospital; 39.75 percent
 2  would be kept -- ultimately end up at Allied Lab
 3  Solutions Management, and the difference, the middle
 4  number there, which is 35.25 percent, would be kept by
11:56  5  LN Professionals, correct?
 6      A.  I think after a certain amount of percentage
 7  for costs of goods and services and net collections,
 8  fair market value, I think that number is probably
 9  accurate.
11:56 10      Q.  So if there is a million dollars received --
11  if there is a check for a million dollars received by
12  the hospital, they're supposed to send $750,000 in a
13  check to LN Professionals, which is, in turn, is
14  obligated to send a check to Allied Lab Solutions
11:57 15  Management --
16      A.  Incorrect.
17      Q.  -- right?
18      A.  No.
19      Q.  Was the hospital supposed to split the funds?
11:57 20      A.  There would be a profit share after the cost
21  of goods and services.
22      Q.  The cost of goods and services for the labs
23  was fairly nominal, correct?
24      A.  I would not believe so, no.
11:57 25      Q.  For example, on a million dollar billing you
```

Page 112

```
 1  might have a cost of goods and services being around, I
 2  don't know, $2100, for example?
 3      A.  No, that had -- that's highly inaccurate.
 4      Q.  Okay.  Well, let's see here.  Give me a second
11:58  5  to look at these.
 6          All right.  I want to share screen.  You were
 7  correct, I was wrong on those numbers.  Well, let me see
 8  here, the final one.
 9          Can you see that okay?
11:59 10      A.  I can.
11      Q.  It's an "MMP Distribution Report" for
12  "November 2016 Collection Activity."  Do you see that?
13      A.  Uh-huh.
14      Q.  All right.  And I'm going to -- just for
11:59 15  utility here, let's -- I'm going to give it -- let's
16  call this -- I'm going to call this Exhibit 1, all
17  right, so we don't lose it.
18      A.  Okay.
19          MR. COLLMER:  All right.  I assume the
11:59 20  court reporter will make that -- put the sticker on top
21  of it, make it look pretty, at least let's identify it.
22      Q.  (BY MR. COLLMER)  Exhibit 1 is a November 2016
23  MMP Distribution Report.  It says Glen Rose and it says
24  SMH, and this is talking about the number of cases.  And
12:00 25  the next line is gross income.  Do you see that?  I'll
```

28  (Pages 109 to 112)

Page 113

```
      1   make it bigger.
      2        Do you see that?
      3        It looks like the gross income is $574,000 to
      4   them, right?
12:00 5        Are you with me?
      6        A.  I see what you're driving at, but I don't
      7   think those are -- I wouldn't term it as gross
      8   without -- okay.  I'm looking at it.  Which line are you
      9   at?
12:00 10       Q.  Right underneath gross income is the lab
     11   costs.  There is an MMP fulfillment.
     12        A.  I don't see anywhere where it says gross
     13   income, I'm sorry.  I don't see gross anywhere on here.
     14   So you're going to have to be a little more specific.
12:00 15       Q.  All right.  Well, I'll draw a line right where
     16   it is, to make it easier to find.  Do you see an arrow
     17   right here?
     18        A.  No.
     19        Q.  It says gross?
12:01 20       A.  That's a bad copy, so I can't -- it's hard for
     21   me to make out.  I can -- I see where you're looking
     22   now.
     23        Q.  Well, how about now?  Can you see it okay?
     24        A.  Well, you're going to have to -- to -- like I
12:01 25   said, I see it now.  It was a bad copy.  But I need you
```

Page 114

```
      1   to shrink your screen there so I can -- there we go,
      2   okay.
      3        Q.  Gross income.  And it shows gross income, and
      4   this is an MMP report as opposed to a hospital report
12:01 5   from two hospitals.  So MMP gets in as revenue $574,000
      6   in their portion and there are lab costs associated with
      7   that, which reduces it down to the net income to MMP of
      8   468,366.13.  Do you see that?
      9        A.  Uh-huh.
12:01 10       Q.  Is that a "yes"?
     11        A.  I see it, yes.
     12        Q.  All right.  And then from that there is a
     13   residual income number of 187,346.45 and then that
     14   therefore the income is distributed, it looks like a net
12:02 15   income of 187,472 that is then distributed.  Is that
     16   your understanding of what MMP did, at least in November
     17   of 2016 for Allied I?
     18        A.  Correct.
     19        Q.  All right.
12:02 20       A.  My understanding.
     21        Q.  Okay.  So that looks to me like 40 percent, I
     22   guess, less a management fee, if Allied has a management
     23   fee of 1 percent, right?
     24        A.  Correct.
12:02 25       Q.  That was your management fee, right?  You
```

Page 115

```
      1   collected that?
      2        A.  Correct.
      3        Q.  The remainder of it, the $185,000 was to be
      4   distributed to the subscribers?
12:02 5        A.  Correct.
      6        Q.  All right.  Now, is that how the arrangement
      7   was?  So when money was received by MMP between -- that
      8   means they got money from the hospital after it took its
      9   share, and then in -- as a gross distribution, in other
12:03 10   words, they take their costs, and there is a net
     11   recovery or net distribution that then is supposed to go
     12   out to -- to the -- to -- I'm sorry, to Allied Lab --
     13   Allied Lab Solutions Management to distribute to the
     14   subscribers?
12:03 15       A.  Correct.
     16        Q.  All right.  So if we find a million dollar
     17   check -- in that scenario there is a million dollar
     18   check and, say, there is $750,000 received by MMP, MMP
     19   is the d/b/a for LN Professional Management, right?
12:04 20       A.  That is correct.
     21        Q.  So that's, essentially, the same as LN, right?
     22   That's just a d/b/a for it.  The money is received by
     23   them and they're then supposed to, in turn, send the
     24   money to Allied Lab Solutions?
12:04 25       A.  Per the --
```

Page 116

```
      1        Q.  Right?
      2        A.  Per the contracts at that time, yes, depending
      3   on what the contracts were, as far as the contract
      4   between LN and Allied Lab Solutions and then whatever
12:04 5   that was, then, yes.
      6        Q.  Are you aware of any different contract
      7   between Allied Lab Solutions Management, either
      8   individually or on behalf of Allied Lab Solutions,
      9   L.L.C., than the one that existed at the inception of
12:04 10   the project, where you set them up and reached an
     11   agreement with LN Professionals Management?
     12        A.  From the time that I owned the company, no, I
     13   am not aware of any other contracts or any other entity,
     14   no.
12:05 15       Q.  So if there is -- and there was -- if there is
     16   revenue that is received during the time you were
     17   running it, but under those contracts, if there is a
     18   revenue received by the hospital and the revenue was
     19   then subsequently received by MMP, it is supposed to be
12:05 20   distributed down to LN Professionals Management, which
     21   in turn gives it to lab -- Allied Lab Solutions
     22   Management and distributes it per the subscription
     23   agreements, which you would get some?
     24        A.  Per the agreements, yes.  I'm assuming that
12:05 25   the --
```

29 (Pages 113 to 116)

Page 117

1    Q.  If there is not money -- if there is money
2  that is received by the hospital and a check written to
3  LN Professionals Management and it doesn't get
4  distributed down to Allied Lab Solutions Management,
12:06  5  then there is a problem?
6    A.  Yes, then there would be a problem, but I'm
7  not aware of that ever happening.
8    Q.  Okay.  And have you ever known Lewis Nichols
9  to take money that was not his, that he was not
12:06  10  authorized to take?
11    A.  Never.
12    Q.  Have you ever known M. J. Cortez to take any
13  money to which he was not entitled?
14    A.  Never.
12:06  15    Q.  Have you ever known Rebecca Smith to take
16  money to which she was not entitled?
17    A.  Never.
18    Q.  Have you ever known Dana White to take money
19  to which she was not entitled?
12:07  20    A.  Never.
21    Q.  So if there is money that is received by LN
22  Professionals Management from whatever hospital is, not
23  the county hospital, let's say, it is not received by LN
24  Professional -- I'm sorry, by lab -- Allied Lab
12:07  25  Solutions -- let me re-ask that.

Page 118

1    If there is money received from Knox County
2  Hospital by MMP and that money is not -- the percentage
3  is not distributed to Allied Lab Solutions Management or
4  Allied Lab Solutions, then that is improper, according
12:07  5  to your setup of the arrangement?
6    A.  If that ever happened, that would be improper;
7  but, to my knowledge, it never did.
8    Q.  And if that did happen, then the place where
9  the money is diverted is in the mill, because it's sent
12:08  10  from the hospital and then not received by Allied Lab
11  Solutions?
12    A.  To my knowledge, every distribution was made
13  according to contract.  All the partners were -- or
14  shareholders, I should say, were treated fairly.
12:08  15    MR. COLLMER:  Okay.  Objection;
16  nonresponsive.
17    Q.  (BY MR. COLLMER)  I'm just trying to find --
18  identify for the ladies and gentlemen of the jury where
19  we're going to look for the diversion.  If there is a
12:08  20  check from Knox County Hospital to MMP.  But there is no
21  corresponding check to Allied Lab Solutions or Allied
22  Lab Solutions Management, the place to look where the
23  money is is in that middle level, where LN Professionals
24  Management is located; is that true?
12:09  25    A.  Again, I would say that would be inaccurate.

Page 119

1    Within the time frame that I was a owner of ALS, all of
2  the supporting documents that you just showed me were
3  built in a way that it would be very easy for the
4  shareholders to reverse engineer that, so that they
12:09  5  could make sure that there was not any impropriety;
6  therefore the need for that would not exist, you know.
7  So I don't -- I don't see that that has any relevance.
8    You have access -- if you want to stick to the
9  facts for which you've brought this case, you have
12:09  10  access to all the ALS, I would assume by now, and all of
11  the bank records would correlate with that.  So if there
12  was any impropriety, it would be unbeknownst or unaware
13  to me.
14    MR. COLLMER:  Objection; nonresponsive.
12:10  15    Q.  (BY MR. COLLMER)  I'm just asking you where
16  you -- how you set the arrangement up with the various
17  companies.  If you would agree with me that if that
18  money is missing, the diversion has to be in the middle
19  level at the LN Partners, LN Professional Management,
12:10  20  L.L.C., level?
21    A.  Again, I'm unaware of any funds that are
22  missing.  So I can't confer with your theory in response
23  to what you're asking me.  As far as I know, everything
24  was set up so that it would be very easy for the
12:10  25  shareholders to follow and to determine if there was any

Page 120

1  impropriety.
2    Q.  It would be wrongful if the money is received
3  from Knox County Hospital by MMP and it not be
4  redistributed in accordance with the proper percentages
12:11  5  to LN -- to a lab -- I'm sorry, Allied Lab Solutions
6  Management, ALS Management, right?
7    A.  As -- in my position as ALS, when I was there,
8  I was appointed because the shareholders trusted me to
9  provide accurate and detailed descriptions so that those
12:11  10  things wouldn't happen.  And as far as my involvement
11  has been with any of these facilities, that has never
12  been an issue nor has it ever occurred.
13    MR. COLLMER:  Objection; nonresponsive.
14    Q.  (BY MR. COLLMER)  As far as the arrangement,
12:11  15  though, the way it's set up, I'm just talking about the
16  setup, if money -- if there is a Knox County Hospital or
17  Glen Rose County Hospital, for that matter, if there is
18  a Glen Rose County Hospital check to MMP and no
19  correlating check or distribution to ALS Management, the
12:11  20  problem lies in the middle at MMP, in that scenario,
21  right?
22    A.  Again, I have never seen anything to indicate
23  that the -- that actions that you've described would be
24  an issue, nor has there been any kind of problem with --
12:12  25  with those type of things occurring.  There was a

Page 121

1  dis- -- a dis- -- not distraction. I would say a
2  disruption in the revenue cycle, which has made it very
3  difficult for us to move forward, which the
4  shareholders, all of the shareholders, including
12:12  5  Mr. Franklin, are aware of. And so, no, I don't -- I
6  don't have any answer for you there.
7       MR. COLLMER: Okay. Objection;
8  nonresponsive. That's not what I asked. I'm sorry.
9       THE WITNESS: I've lost the audio. I
12:13  10  can't hear.
11       MR. COLLMER: We've been going for an hour
12  and a half or so. Do you want to take a break for a
13  couple minutes? Or do you guys -- what do you want to
14  do?
12:13  15       MR. HOBBS: He needs to get some food at
16  some point. And, Mr. Collmer, when do you think -- do
17  you want to take a lunch break or do you think you're
18  going to wrap up?
19       MR. COLLMER: We can take 45. I got to go
12:13  20  through all this stuff. I got -- I have to go through
21  these individual accountings. Do you want to take 45 or
22  an hour or something like that?
23       It doesn't matter to me. I'm not going
24  very far.
12:13  25       THE WITNESS: I'll defer to my counsel,

Page 122

1  whatever Mr. Hobbs wants to do.
2       MR. COLLMER: Whatever you're comfortable
3  with is fine. I'm not--
4       MR. HOBBS: He needs some food. Do you
12:13  5  want to just come -- try to just come back at 12:45?
6       MR. COLLMER: 30 minutes, that's fine.
7  Yeah, is that all right?
8       THE WITNESS: Can we say 1:00? I don't
9  have food readily available. I got to fix something.
12:14  10       MR. COLLMER: We can say 1:15. I'm not --
11  I'm just in my office. I never leave this desk these
12  days, unfortunately. Let's go off the record while
13  we're doing this. I'm paying for this.
14       THE VIDEOGRAPHER: The time is 12:14 p.m.
12:14  15  We're off the record.
16       (Recess from 12:14 p.m. to 1:01 p.m.)
17       THE VIDEOGRAPHER: Okay. The time is
18  1:01 p.m. We're on the record.
19       Q. (BY MR. COLLMER) When you sold the company,
01:01  20  tell me why at that moment, why then, why that specific
21  moment did you decide to sell it then instead versus six
22  months later or some earlier time?
23       I guess for structure, was there a
24  precipitating event that you concluded made you want to
01:01  25  sell the company?

Page 123

1       A. No, sir.
2       Q. So that the time for the sale was just picked
3  by you generally, without reference to a specific
4  incident which made you conclude you wanted to get rid
01:02  5  of the company?
6       A. That's correct.
7       Q. With regard to the records of ALS Management.
8       A. Okay.
9       Q. Did anybody ever maintain the records of ALS
01:02  10  Management other than you?
11       A. No.
12       Q. Did you -- as part of your work as the ALS
13  Management director, did you maintain a log of tests
14  that were available to be conducted?
01:03  15       A. I would say that would be accurate.
16       Q. Did you maintain a log of clients for whom you
17  had picked up records or picked up vials, blood vials?
18       A. ALS?
19       Q. ALS Management.
01:03  20       A. No, sir, I did not.
21       Q. Did you -- did ALS maintain those -- a log of
22  clients that were -- for who their material was picked
23  up?
24       A. No, the clinics themselves did.
01:03  25       Q. So even though you picked up these blood vials

Page 124

1  from the clinics, or your company did, you didn't have a
2  record of what you picked up? ALS Management nor ALS
3  had a record of what they picked up?
4       A. That would be correct, in saying so. Those
01:04  5  records were kept with the facilities, not with ALS.
6       Q. So if someone contacted ALS and said you
7  received fees for work done, how would you know that
8  what they have received fees for were accurate --
9  accurately reflects the correct number and the specific
01:04  10  clients for whom those services were provided?
11       A. If there was something in dispute, then ALS or
12  the -- the facilities or -- or disputed time period
13  would be given to me by that facility.
14       Q. You as the -- do you call yourself the
01:05  15  managing director of ALS Management? Is that how you
16  refer to yourself? At the time.
17       A. At the time, okay, sure.
18       Q. And as the managing director of ALS Management
19  and the managing director of ALS, you did not maintain
01:05  20  any books and records concerning who was to be billed
21  for the specific tests that were conducted?
22       A. Again, all of those tests and -- and people
23  would have gone through the various people. Those
24  facilities have those records. And then they would
01:05  25  provide those to ALS if they thought that there was

31 (Pages 121 to 124)

Page 125

1        something inappropriate.
2                MR. COLLMER:  Okay.  Objection;
3        nonresponsive.
4        Q.  (BY MR. COLLMER)  I just want to know, they
01:05   5    may have records, too.  I need to know what it is
6        that -- that you as the managing director of ALS
7        Management had or kept.
8        A.  I wouldn't --
9        Q.  That's why I'm asking it that away.  Okay.
01:05  10   A.  No, I --
11       Q.  As managing director of ALS Management, you
12       yourself did not keep a log anywhere of who had -- whose
13       blood was being tested?
14       A.  The logs that were kept were provided to me by
01:06  15   the -- the facilities that did the testing.
16       Q.  And when you received those logs from the
17       facilities doing the testing, what did you do with those
18       logs?  Did you keep them?
19       A.  No, I did not.
01:06  20   Q.  Why not?
21       A.  Well, I didn't want to be responsible for
22       anything that might run afoul of HIPAA.  So, in general
23       terms, I wasn't given the exact information, as far as
24       the patient and the -- the amounts of volume that was in
01:06  25   question.

Page 126

1        Q.  Whatever logs -- whatever logs you did receive
2        from the medical facilities about specific clients and
3        pickup and tests, you destroyed those?
4        A.  Did I destroy them?  Yes, sir.  Yeah, I didn't
01:07   5    archive them, that is correct.
6        Q.  Was there any kind of records retention policy
7        that you were following, that you were trying to follow?
8        A.  A retention policy that I was trying to follow
9        at ALS?
01:07  10   Q.  Yes, sir.
11       A.  Just the accounting.  Just the basic
12       accounting.  Not as far as keeping up with medical
13       records and things of that point, no.
14       Q.  Did you have any records that you ran a
01:07  15   calculation about the profits per tests?
16       A.  Profits per test, no, sir, I don't believe --
17       Q.  Or for similar tests or per client?
18       A.  Can you repeat the question?
19       Q.  Absolutely.  There is an overlap, I'm sorry.
01:08  20   Did you have any calculation of the profitability of
21       having tests run?
22       A.  No, sir, no, I did not.
23       Q.  Did you -- you as the managing director were
24       responsible for making sure the money that was received
01:08  25   by ALS Management was distributed to the correct

Page 127

1        subscribers, right?
2        A.  Correct.
3        Q.  Did -- in order to do that, you have to do
4        certain calculations for money in the door and then,
01:08   5    basically, what is being distributed, correct?
6        A.  Right.  So those volume reports were generated
7        and then assimilated and then passed out to the
8        shareholders.  So the shareholders at that time could
9        see if the numbers didn't match, what they had accounted
01:09  10   for themselves.  And in that instance they would bring
11       that to my attention.
12       Q.  All right.  So --
13       A.  But, to my knowledge, that never happened.
14       Q.  The calculation is done on a monthly basis.
01:09  15   You have a monthly revenue, have a check that shows up
16       at the door.  You then do -- generate a monthly
17       collection report when you were doing the work for -- as
18       the managing director of ALS, ALS Management, correct?
19       A.  Correct.
01:09  20   Q.  And then with each check that you sent to a
21       subscriber, did you send the ALS or ALS Management
22       collection report with its calculations?
23       A.  The copy that you showed me earlier would have
24       been the report that was received by the shareholders.
01:09  25   Q.  All right.  And then there is another page I

Page 128

1        didn't show, but it's -- which is the individual
2        shareholders and how much each of them are getting,
3        correct?
4        A.  That wouldn't be distributed on a monthly
01:10   5    basis, but it would -- I believe, to my recollection,
6        the overall volume report would have been a part of
7        that.
8        Q.  All right.  That way the person knows how much
9        is the gross revenue number and how much their net is to
01:10  10   them for that month, right?
11       A.  I would believe so.
12       Q.  That was the intent of it, right?
13       A.  Yeah, right.
14       Q.  The maintenance of those records, those
01:10  15   monthly reports, that also in part of the materials
16       that you deleted off of your computer?
17       A.  I don't believe the -- the word deleted is an
18       appropriate delineation.  The most all or all of the
19       records would have been cloud based.  So there wasn't
01:10  20   any storage of said documents.  They would have all been
21       part of a -- that program.  And then when I gave over
22       access, I would no longer have any access to it.
23               MR. COLLMER:  Okay.  Objection;
24       nonresponsive.
01:11  25   Q.  (BY MR. COLLMER)  The document itself is

Page 129

1    created on your computer, saved, and then uploaded to
2    the cloud, correct?
3         A.  No, sir, I did not archive any documents on a
4    drive.
01:11  5         Q.  How do you think you can upload something to
6    the cloud unless it is a specific file?
7         A.  You just scan it, right, you would scan the
8    information and then into the -- into the appropriate
9    software.
01:11 10         Q.  So it becomes a folder on your computer,
11    right, or in a folder on your computer, right?
12         A.  Okay, yes.
13         Q.  You e-mail that into the cloud or save it to
14    the cloud program?  It can be Microsoft 365 or it could
01:12 15    be some other cloud based program?
16         A.  Correct, correct.
17         Q.  So what that means is on your computer is that
18    folder, because you don't -- it has to be on your
19    computer in order --
01:12 20         A.  Okay, I see what you're saying.  I do not have
21    that folder.  If that folder exists, then it was
22    deleted.
23         Q.  All right.  So all the folders regard -- on
24    the monthly calculations, you deleted those off of your
01:12 25    computer, right?

Page 130

1         A.  After -- yeah, after ownership was
2    transferred, there wasn't any reason for me to maintain
3    those records.
4              MR. COLLMER:  Object --
01:12  5         A.  The records were transferred to these owners,
6    and then it became their responsibility.
7              MR. COLLMER:  Objection; nonresponsive.
8         Q.  (BY MR. COLLMER)  When did you first delete
9    one of the monthly collection calculations off of your
01:12 10    computer?
11         A.  Again, you're asking me to speculate, but I
12    would say at some point soon after I was no longer
13    the -- the transfer -- soon after I transferred
14    ownership of ALS.
01:13 15         Q.  So up until the time you sold your interest in
16    ALS and ALS Management, you did maintain those records
17    or had copies of those records on your computer; is that
18    a true statement?
19         A.  As it pertains to the software that was
01:13 20    managing it, correct.
21         Q.  And then after the sale, you went in and
22    deleted them on your computer, correct?
23         A.  True.  Yes, true.
24         Q.  And it is your testimony that even the
01:13 25    computer itself on which that material was stored is

Page 131

1    gone from your possession; is that true?
2         A.  That is true.  I know I replaced my computer
3    sometime in late 2018, and I remember that because I had
4    a virus or something.  The thing didn't work.
01:14  5         Q.  And the storage, the cloud program, what --
6    with what company was that?
7         A.  I believe I said it was Excel.  But I
8    apologize, I believe I was inaccurate with that
9    statement.  I believe it's QuickBooks.
01:14 10         Q.  Okay.  Well, QuickBooks -- does QuickBooks --
11    are you saying QuickBooks has a cloud for you with your
12    name on it?
13         A.  I believe at the time that was correct.
14         Q.  Okay.  And it would be a QuickBooks account
01:14 15    under your name, correct?
16         A.  I would have to look at it to be a hundred
17    percent accurate, but it would be in a account under my
18    control.
19         Q.  And is that QuickBooks account still under
01:14 20    your control?
21         A.  As I stated earlier, it is not.  At the time
22    that the company transferred owners, all of that
23    material was given to the new owner.
24         Q.  Do you still have QuickBooks on your computer?
01:15 25         A.  I have a account for QuickBooks, yes.

Page 132

1         Q.  And do you still use the same ID registration
2    that you used at the time?
3         A.  As I stated previously, no, sir, I do not.
4         Q.  Okay.  So you went and bought another license
01:15  5    from the same QuickBooks program; is that what you're
6    telling us?
7         A.  Yes, sir, because all of those records that
8    pertain to Allied Lab Solutions were transferred to the
9    new owners, and I then had no more access nor password
01:15 10    control of any of those documents.
11         Q.  So then on your -- in your purchase history
12    there will be two QuickBooks purchases, one license
13    you're saying you don't have anymore, and one that you
14    currently have; is that right?
01:16 15         A.  I don't know that to be a hundred percent
16    accurate, no.
17         Q.  Did you keep a copy of any of the ALS, ALS
18    Management records for tax purposes?
19         A.  No.  After -- other than my tax returns, which
01:16 20    are on file, that's it.
21         Q.  At one time you maintained a record of banking
22    records for deposits of revenue for ALS Management,
23    right?
24         A.  Yes, sir.
01:16 25         Q.  Those were deleted off your computer, right?

33 (Pages 129 to 132)

## Page 133

1    A.  All of the bank records were available on the

2    net, through the bank that controls those records.

3    There was never a time where I had to download them and

4    keep them on a device.  If they needed to be accessed,

01:17  5    they could be accessed through the portal that the bank

6    provided.  And at the time that I transferred ownership,

7    the bank changed all the passwords so that I no longer

8    had access.

9    Q.  Are you telling us you never downloaded any of

01:17 10    the banking records onto your own individual computer

11    for ALS Management, that is, banking records for ALS

12    Management?

13    A.  Absolutely.  I'm telling you absolutely that.

14    I didn't download any of those records.

01:17 15    Q.  And you're also telling us you never

16    downloaded the banking records for ALS, L.L.C., onto

17    your computer as well, right?

18    A.  ALS, L.L.C.?  I'm saying that any records that

19    were held with the bank were not put on a device in my

01:18 20    control.  They were all cloud based.  I had a log-in and

21    access password that at the time that those accounts

22    were transferred ownership, I no longer have.

23    Q.  So when you're doing your monthly reports, you

24    were not looking at a physical document; you're looking

01:18 25    at internet portal site, without storing anything on

## Page 134

1    your computer directly from the bank; is that what

2    you're telling us?

3    A.  That would be accurate, yes, sir.

4    Q.  Okay.  I think I asked this before:  You have

01:18  5    never seen Lewis Nichols take any money that was not his

6    or he was not authorized to take; is that what you're

7    telling us?

8    A.  That is correct.

9    Q.  Okay.  When did you meet, first meet Mr. --

01:18 10    well, first meet.  When did you meet Lewis Nichols?

11    A.  I was introduced to him by Dr. Franklin.

12    Q.  Where?

13    A.  His office, Dr. Franklin's office.

14    Q.  About -- about when?

01:19 15    A.  Sometime in 20 -- late 2014 or mid 2015.  It's

16    hard to say.

17    Q.  And what were you doing at Dr. Franklin's

18    office?

19    A.  I was asked to be there.  It was on his

01:19 20    request.

21    Q.  And was the purpose of the meeting to

22    introduce you to Lewis Nichols, as you understood it?

23    A.  Amongst other people, yes.

24    Q.  Were you meeting other people in addition to

01:19 25    Lewis Nichols, or there were a lot of people meeting

## Page 135

1    Lewis Nichols?

2    A.  Other people in addition to Lewis Nichols that

3    were there on Mr. Franklin's request.

4    Q.  And what was the purpose of the meeting, as

01:19  5    you understood it?

6    A.  The purpose of the meeting was to make a

7    business introduction to try to find a solution for some

8    of the laboratory problems that we were currently faced

9    with.

01:20 10    Q.  How long had you been a salaried employee at

11    LN Professionals?

12    A.  That's hard to say.  On and off since probably

13    2017.

14    Q.  Was there some period of time when you were

01:20 15    both a salaried employee of LN Professionals and the

16    managing director of ALS Management?

17    A.  As -- yeah, I was -- yes.  I was employed --

18    are you asking me if I was employed with LN and then

19    manager of ALS?

01:21 20    Q.  At the same time?

21    A.  At the same time?

22    Q.  Right.

23    A.  I believe there was some overlap, yes.

24    Q.  At the time you were employed by LN

01:21 25    Professionals, were you being paid as an employee?

## Page 136

1    A.  I'm sorry, can you ask -- repeat the question?

2    Q.  You were working for LN Professionals when

3    there was overlap for your managing director

4    responsibilities for ALS Management, were you being paid

01:21  5    by LN Professionals as an employee of LN Professionals?

6    A.  That would be correct.

7    Q.  Was there any period of time when you were

8    working for LN Professionals that you were not being

9    paid as an employee of the company?

01:21 10    A.  I would -- yes, I would say that there was

11    probably a time, because ALS's interests were to -- for

12    the company to prosper.  So there was some duties

13    that -- that I performed because I had an obligation to

14    the shareholders.

01:22 15    Q.  Did you disclose to anyone, any subscriber of

16    ALS that you were also working as an employee of LN

17    Professionals?

18    A.  Other than William Franklin.

19    Q.  Dr. Franklin?

01:22 20    A.  There was probably others, but I know that it

21    came up in conversation with Mr. Franklin.

22    Q.  Did you bring that up or he brought it up?

23    A.  I don't remember, but it wasn't a secret.

24    Q.  What was said about it?

01:22 25    A.  That it was a very time-consuming process that

34 (Pages 133 to 136)

Page 137

```
        1   was taking my duties and time away from family and
        2   friends and my other businesses and that it was
        3   understood that I deserved to be compensated at some
        4   point for that.
01:22   5       Q.  By LN Professionals?
        6       A.  Yes, sir.
        7       Q.  Does LN Professionals always have any other
        8   clients other than ALS or ALS Management at the time
        9   that you stopped working for ALS and ALS Management?
01:23  10       A.  Yes, sir, they did.
       11       Q.  And who were they?  Are there many or few?
       12   Let's start with that.
       13       A.  I'm sorry?
       14       Q.  Are there many or few?
01:23  15       A.  I'm -- I'm -- again, you're asking me to make
       16   a judgment, and that's a relative term.  Was there --
       17   there was probably more than ALS, correct.
       18       Q.  But you are not sure, as you sit here, whether
       19   or not LN Professionals had any other clients other than
01:23  20   ALS and ALS Management in April of 2018, when you sold
       21   your interest?
       22       A.  No.  You haven't asked me that, and I am aware
       23   that they had other clients at that time.
       24       Q.  What other clients?
01:24  25       A.  I believe there was Synergist was one, was the
```

Page 138

```
        1   name of a company.  I'd have to dig deeper.  Like I
        2   said, it's been a long time since I've thought about any
        3   of those.
        4       Q.  Would you say that the vast majority of the
01:24   5   revenue was sourced through clients associated with ALS
        6   and ALS Management?
        7       A.  I would say that's inaccurate.  As I said,
        8   they had other clients besides ALS.
        9       Q.  And where were those clients having the same
01:24  10   kind of work as with ALS and ALS Management?
       11       A.  I would assume -- well, that would be fair to
       12   assume, yes, sir.
       13       Q.  Okay.  And you don't remember, as you sit
       14   here, who those unidentified people, unrecalled people
01:24  15   are, correct?
       16       A.  Again, you're -- now, it's been a long time.
       17       Q.  Do you know why LN Professionals are employing
       18   people when they have no revenue?
       19       A.  They are trying to maintain records necessary
01:25  20   to facilitate a point in time where they could continue
       21   to do business.
       22       Q.  Are you involved with the lawsuit against Blue
       23   Cross/Blue Shield in arbitration?
       24       A.  Am I involved in it?  No, sir.
01:25  25       Q.  Have you been asked to be -- serve as a
```

Page 139

```
        1   witness in that case?
        2       A.  No, sir.
        3       Q.  You are aware of the litigation, correct?
        4       A.  I think the entire state of Texas is aware,
01:25   5   sir.
        6       Q.  You are aware of it, correct?
        7       A.  Yes.
        8       Q.  You're aware there is a 30-million-dollar
        9   claim being asserted by the hospital against Blue
01:25  10   Cross/Blue Shield, the beneficiary of that claim which
       11   would be, among others, LN Professionals and
       12   derivatively Allied Lab Solutions?
       13       A.  Per third-party interest, I -- I'm assuming
       14   so, yes, sir.
01:26  15       Q.  And have you participated with Rebecca Smith
       16   in performing the calculations for revenue that would
       17   ultimately -- not ultimately, but would in the interim
       18   come to LN Professionals or MMP?
       19       A.  No, Rebecca Smith is more revenue cycle
01:26  20   management.  So she's more billing.  I don't think she
       21   has maintained those type of records.
       22       Q.  Who did the calculations?  Yourself?
       23       A.  Myself for LN?
       24       Q.  Yes.
01:26  25       A.  No, sir.
```

Page 140

```
        1       Q.  Who did the calculations to determine that the
        2   likely revenue from the Blue Cross/Blue Shield lawsuit
        3   of Knox County Hospital, that revenue which would be
        4   received by LN Professionals or MMP?
01:27   5       A.  That would have been probably performed by the
        6   bookkeeper.
        7       Q.  Who's the bookkeeper?
        8       A.  At the time I believe it was Dylan, and I -- I
        9   don't have his last name.  I don't remember his last
01:27  10   name.
       11       Q.  You know the lawsuit is currently ongoing,
       12   correct?
       13       A.  I'm sorry?
       14       Q.  The arbitration is currently ongoing, correct?
01:27  15       A.  Well, I -- I would assume so.  It hasn't been
       16   finalized.
       17       Q.  And there had been no settlement, correct, as
       18   you know?  Do you understand?  Right?
       19       A.  I -- no, there has been no settlement.  I
01:27  20   would believe that, again, those -- those -- that
       21   information would be readily available, if there had
       22   been.
       23       Q.  Why do you think it'd be readily available
       24   from an arbitration to third parties not in the
01:27  25   arbitration?
```

35 (Pages 137 to 140)

Page 141

1    A. Well, the details of the -- the settlement

2    would not be. But the fact that there was a settlement

3    or a reinstatement of relationships would have shown up

4    on numerous different websites or through, I'm sorry,

01:28 5    reporters.

6    Q. Is it your understanding that a reinstatement

7    has occurred with regard to Blue Cross/Blue Shield, of

8    the hospital's ability to charge for the services?

9    A. I'm -- I'm sorry?

01:28 10    Q. Are you of the opinion that -- is it your

11    understanding there has been a reinstatement?

12    A. I'm not aware of that being the case, no, sir.

13    Q. And by reinstatement, I mean, the opposite

14    corollary to that is there was a -- there was a

01:28 15    suspension of payments from Blue Cross/Blue Shield to

16    the hospitals for the kinds of lab charges that MMP was

17    involved in, correct?

18    A. There was an overall suspension of payments

19    that was industry wide, in response to entities that had

01:29 20    done things in a fraudulent manner. That was the -- the

21    pretext that the carriers used to stop any payments to

22    the facilities. Those were very broad. And -- yeah.

23    Q. Are you saying that Blue Cross/Blue Shield, to

24    your knowledge, has not reinstated the ability to charge

01:29 25    for the lab services to the bene- -- with MMP as the

Page 142

1    beneficiary?

2    A. That is correct. I'm saying that the

3    facilities incurred broad-ranging denial of -- for

4    charges for services rendered for an extended period of

01:30 5    time.

6    Q. If there is a pay -- a reinstatement of the

7    payments and payment of the back payments for MMP, that

8    is, LN Professionals, would you be entitled to a

9    percentage of that recovery?

01:30 10    A. I would say as it -- if there is a settlement

11    of some degree, based on the you, know, involvement or

12    the individuals members share, then those conversations

13    would be ongoing. But you're asking me to speculate if

14    there ever will be or what that -- the outcome will be,

01:31 15    and I'm not -- I'm not aware of those conversations.

16    Q. Okay. Did you hear me say please speculate?

17    I didn't say that.

18    A. Are you asking me too speculate? I didn't

19    know that I was allowed to do that. Because if you're

01:31 20    asking me a specific question, I can answer it. But if

21    you're asking me to answer questions that -- that are

22    based in theory, it's very hard for me to say. We could

23    be talking about $5 or 500 million. We could be talking

24    about anything. And I apologize, but it's very -- like

01:31 25    I said, it's -- it's not something that I can say with

Page 143

1    absolute certainty.

2    Q. Do you believe that $500 million is the number

3    involved in the lawsuit with Blue Cross/Blue Shield?

4    A. I think that the carriers in the state of

01:32 5    Texas have been allowed to circumvent law to the degree

6    that -- the probably real figure, not that we're talking

7    here, is losses to healthcare providers in the billions

8    of dollars. But it's not what it pertains to or in

9    these conversations. Sorry.

01:32 10    Q. Do you have responsibility for distributing

11    any funds of LN Professionals or MMP to any subscribers?

12    A. That would fall to the new owners of ALS and

13    the owners, but that's not for me to speculate.

14    MR. COLLMER: Objection; nonresponsive.

01:32 15    Q. (BY MR. COLLMER) This is my question.

16    A. Okay.

17    Q. Do you have any responsibility to distribute

18    funds of LN Professionals or MMP to any of their

19    subscribers?

01:33 20    A. So are you -- okay. I just need you to refine

21    this. Are you asking me if I have a moral obligation to

22    do so, or are you saying do I have a legal obligation to

23    do so?

24    Q. Do you -- have you distributed funds of LN

01:33 25    Professionals, a/k/a, MMP, to any of the subscribers of

Page 144

1    LN Professionals?

2    A. After such time that I was uninvolved with

3    the -- the business, or are you asking me prior to April

4    of 2018?

01:33 5    Q. At any time.

6    A. So you're ask -- so then can you please

7    rephrase the question to be more specific?

8    Q. Have you ever distributed LN Professional

9    funds to any subscribers of LN Professionals?

01:34 10    A. Oh, no. The answer is no.

11    Q. Did you ever take -- distribute any funds of

12    MMP to any of the subscribers LN Professionals? If you

13    think that's a distinction.

14    A. Okay. No. So you're asking me the same

01:34 15    question, just in a different way. And the answer is

16    no, I have not.

17    Q. So you never gave a check to Kim Wiley from LN

18    Professionals; is that true?

19    A. I have never given Kim Wiley a check, no.

01:34 20    Q. You never gave her the check or a check from

21    LN Professionals, is what I'm asking.

22    A. Did I ever give Kim Wiley a check?

23    Q. From LN Professionals, that is her

24    distribution from them.

01:34 25    A. I have -- to my knowledge, I have never

36 (Pages 141 to 144)

Page 145

```
      1   physically handed Kim a check.  If at some point the
      2   distribution checks and Kim's might have been delivered
      3   to the same envelope.  But I have never physically given
      4   Kim Wiley a check associated with LN Professional
01:35 5   Management.
      6        Q.  Because that would not be part of your duties
      7   at LN Professional Management, correct?
      8        A.  That is correct.
      9        Q.  You would not be authorized to do that,
01:35 10  correct?
      11       A.  I would not be authorized to distribute
      12  partnership shares to -- to LN Partners?
      13       Q.  Yeah.
      14       A.  No, that --
01:35 15       Q.  Correct.
      16       A.  It would fall upon the CEO of the company and
      17  the -- the owners, not myself.
      18       Q.  So you were not authorized to do that,
      19  correct?
01:35 20       A.  That would be correct.
      21       Q.  You were not authorized to take her check in
      22  your possession, correct?
      23       A.  That would be correct.
      24       Q.  When you were working for LN Professionals,
01:36 25  has your salary varied from the beginning until now?
```

Page 146

```
      1        A.  Yes, it has.
      2        Q.  And what is the basis for the variance, as you
      3   understand it?
      4        A.  To distribute the -- disruption in revenue.
01:36 5   So when -- when LN ceased to be profitable, then I
      6   ceased to get a paycheck.
      7        Q.  So you don't have a paycheck from LN
      8   Professionals anymore?
      9        A.  It was reinstated at some point.  To be very
01:36 10  clear, I'm not very clear exactly, at some point this
      11  year, at a very significantly reduced rate.  So...
      12       Q.  What percentage difference are we talking
      13  about?
      14       A.  I would say probably less than a third.
01:37 15       Q.  Okay.  If there is evidence, even during the
      16  time that you were working for LN Professionals but were
      17  no longer employed as the managing director of ALS
      18  Management, that to the extent of $1.3 million was
      19  received by ALS Professionals, that would come as news
01:38 20  to you, correct?
      21       A.  I'm sorry.  So, again, you know, it's like
      22  alphabet soup.  We're kind of jumping all over.  Can you
      23  rephrase, please?
      24       Q.  Let me make it a little -- get out of the
01:38 25  SpaghettiOs for a second, okay.
```

Page 147

```
      1        A.  Okay.
      2        Q.  I guess, just all Os.  If 3.282327.93 million
      3   dollars was received in May of 2019 by MMP, you don't
      4   have any idea about that, right?
01:38 5        A.  $3.2 million.  Wow.  No, I would say I don't.
      6   I don't -- I don't have any knowledge of $3.2 million
      7   being received.  Sorry.
      8        Q.  3.2, whatever their percentage of that money,
      9   let's say 40 percent of that was not sent to ALS
01:39 10  Management in May or June of 2019, you just have no idea
      11  what happened to that money, right?
      12       A.  So are you saying that -- that you have the
      13  bank records that would say that there was money that
      14  was distributed?  Because if I don't have those bank
01:39 15  records and you're talking about 2019, you're asking me
      16  about things that I can't respond to.  I don't mean to
      17  be argumentative, but it's -- you're asking me about an
      18  ALS account of millions of dollars and then was or was
      19  not that money distributed.  That would have been things
01:39 20  that you had access to as far as the bank records,
      21  correct?
      22            MR. COLLMER:  Objection; nonresponsive.
      23       Q.  (BY MR. COLLMER)  And I get to ask the
      24  questions here, not the reverse.
01:39 25       A.  Okay.  Well, I don't understand the question
```

Page 148

```
      1   that you're posing to me, so --
      2        Q.  I'll ask my questions -- I'll ask my questions
      3   the way I want to ask them, and you can give an answer
      4   or not.  But I'd like to be able to ask the question.
01:40 5   I'm not sure you're answering the question I'm asking.
      6        A.  Okay.
      7        Q.  It's more cumbersome.  In May of 2019 are you
      8   aware of MMP receiving a check from Knox County Hospital
      9   for 3.282327.93 million dollars?
01:40 10       A.  I am not.
      11       Q.  At that time you were working for LN
      12  Professionals, correct?
      13       A.  I was, I believe, yes, sir.  Or, yeah, I would
      14  have to check.  I mean, if you're asking if I was a
01:40 15  salaried employee at that time, I'm not sure if I was or
      16  not.
      17       Q.  Just was your salary in any way affected by
      18  the $3.2 million received by -- plus as received from
      19  Knox County Hospital in May of 2019?
01:41 20       A.  I would say no, sir.
      21       Q.  Your salary is the same regardless, from --
      22       A.  Unfortunately, sir, my salary has done nothing
      23  but declined.  So I would think that if there was this
      24  amount that I'm unaware of or the exact amounts that I'm
01:41 25  unaware of, it wouldn't have helped my financial
```

Worldwide Court Reporters, Inc.
( 800) 745-1101

Page 149

1    situation right now, because, again, my salary has been

2    greatly decreased.

3        Q.  Is your salary anywhere in the range of seven

     figures?

01:41 5      A.  It is not.

6        Q.  Is it anywhere in the range of six figures in

7    May of 2019?

8        A.  No, sir.  I'm -- I'm fairly confident that it

9    was not.

01:41 10     Q.  Has it ever gone into six figures during the

11   time you worked for or been working for MMP, LN

12   Professional Management?

13       A.  Yes, sir.

14       Q.  For what -- when?  What window?

01:42 15     A.  I believe from -- again, I would have to

16   check.  But you're asking me to speculate.  I don't have

17   it in front of me.  I think it was '17 to mid '18.

18       Q.  Since you left and sold your interest in LN

19   Management -- I'm sorry, in ALS Management, in ALS, your

01:42 20  salary has been under six figures the entire time; is

21   that your testimony?

22       A.  Okay.  I'm trying to follow you.  You broke up

23   there a little bit.  You're saying since?

24       Q.  I'll ask it again, just in case it's not clear

01:43 25  on the transcript.

Page 150

1            From the time you sold your interest in ALS

2    Management up until now, your salary has not been in six

3    figures at any time; is that true?

4        A.  I would -- I would believe that to be

01:43 5   accurate, yes, sir.

6        Q.  There have been no, I'd say call them bonus

7    distributions on top of that a sizable amount?

8        A.  No, sir.

9        Q.  That's a true statement, right?

01:43 10     A.  To the best of my knowledge, yes, sir.

11       Q.  Well, you would remember if you got a

12   250,000-dollar bonus, would you not, or a

13   hundred-thousand-dollar bonus, would you?

14       A.  Yes, I definitely would.

01:43 15     Q.  If $3.2 million is received by MMP and there

16   is no corresponding money paid to ALS, ALS Management,

17   do you have any opinion on where that money might be?

18       A.  As far as I'm -- it's always been my

19   understanding that any distribution or money that was

01:44 20  distributed to LN was then distributed to the partners.

21   I don't -- I don't -- so, no, I don't know where this

22   is.  And, I don't know.  You're asking the questions,

23   though, right.  So I'm...

24       Q.  No, I'm asking you if you have any idea where

01:44 25  that money might be.  Because, as you can understand,

Page 151

1    that might be of concern to somebody who sees that

2    check, as to --

3        A.  Right.

4        Q.  I have not seen the corollary check.

01:44 5   A.  Okay.  Well, as you have said --

6        Q.  You'd want to -- you'd want ask, where do you

7    think that money might be?  That's what we're asking.

8        A.  Okay.  I'm not aware that there was ever a

9    3.2-million-dollar check, if there was, the specifics of

01:45 10  it.  You're asking me to speculate again, but as-- to my

11   knowledge, as a passive have -- maintaining a passive

12   interest in ALS, that any distributions that were due

13   and owing to ALS were distributed to the partners, and

14   those documents would be available through the bank

01:45 15  accounts that you, I assume, have access to, since

16   you've subpoenaed them.

17           MR. COLLMER:  Okay.  Objection;

18   nonresponsive.

19       Q.  (BY MR. COLLMER)  You were, I don't know

01:45 20  intentionally or inadvertently.  I'm not saying money to

21   ALS.  I'm saying money received by MMP, by LN

22   Professional Management of $3.2 million.

23       A.  Okay.

24       Q.  And there has been no corollary redistribution

01:45 25  of that money.  Do you know who would be in possession

Page 152

1    of that money?

2        A.  Okay.  So if there was a -- but, again,

3    you're -- is this a fact, or are you speculating and

4    saying that there was $3.2 million and nothing got

01:46 5   distributed, who was that money entitled to or are you

6    saying that this, in fact, happened or is this just

7    another hypothetical?

8        Q.  If there is money received by MMP and it is

9    not redistributed, the money is still in the possession

01:46 10  of MMP or somebody who has access and has taken the

11   money from MMP, from the accounts?

12       A.  If that was to occur, it would be improper.

13   If there was money due and owing from a contractual

14   basis, then it would be distributed, to my knowledge.

01:47 15     Q.  Or should be distributed?

16       A.  Yes.

17       Q.  So who pays for the aircraft to be maintained?

18       Q.  Who pays for the aircraft to be maintained?

19       Q.  Correct.

01:47 20     A.  That usually falls on the responsibility of

21   the owners.

22       Q.  Are you the only owner of those two aircraft?

23       A.  Am I the only owner?  No.

24       Q.  What percentage of the aircraft do you own?

01:47 25     A.  50 percent.

38  (Pages 149 to 152)

Page 153

1    Q.  Who owns the other 50 percent and thus the
2  other 50 percent of the bills?
3    A.  Dire Straits.
4    Q.  Dire Straits is a company, an L.L.C. company
01:47  5  owned 100 percent by Lewis Nichols, correct?
6    A.  That is correct.
7    Q.  Okay.  And so therefore Lewis Nichols, through
8  that company Dire Straits, owns half of each of those
9  airplanes, of which you own the other half, through your
01:48 10  CIA, Inc., Clay is acceptable or awesome?
11    A.  Well, I would say that the bank would tend to
12  disagree with you, since they are by far the largest
13  owner of said aircraft, but, yes.
14    Q.  And are the notes -- there are notes on both
01:48 15  aircraft, right?
16    A.  Correct.
17    Q.  How old is the B200?
18    A.  How old?
19    Q.  Yes.
01:48 20    A.  I believe it was -- it's a 1982.
21    Q.  And how about the Cirrus?
22    A.  That one is a 2018.
23    Q.  Costs about 700,000 new?
24    A.  I would say that's fairly accurate.
01:49 25    Q.  And you do not know how to fly it, right?

Page 154

1    A.  I don't know how to fly it?  No, I do know how
2  to fly it, yes, sir.
3    Q.  You're not legally entitled to fly it?
4    A.  I am legally entitled to fly it, yes, sir.
01:49  5    Q.  So you're a pilot?
6    A.  I have my permit, yes, sir.  So I am not
7  allowed to fly anyone else, no passengers, but I can fly
8  the plane.
9    Q.  You have a learner's permit?
01:49 10    A.  I guess, yes, provisional license, yes.
11    Q.  You do not have your private pilot license,
12  correct?
13    A.  No, that is correct.
14    Q.  All right.  So you just have a student pilot's
01:49 15  license?
16    A.  And of which entitles me to fly the aircraft,
17  just not to move passengers.
18    Q.  And you have to -- so you've solo'd in the
19  aircraft?
01:50 20    A.  I have, yes.
21    Q.  And so, therefore, you can fly touch and goes
22  or one airport direct, but you cannot fly for hire or
23  take anybody who is not your professor, correct -- your
24  teacher, rather, your CFI, right?
01:50 25    A.  Yeah, that's fairly accurate.

Page 155

1    Q.  Okay.  And you are not cert- -- and that's --
2  that's interesting.
3       You are not certified at all in the B200,
4  right?  You're not allowed to fly that, period, correct?
01:50  5    A.  That is correct.
6    Q.  All right.  So other than your learner's
7  permit, every time you get in that aircraft, if you're
8  going to go somewhere or take somebody with you, you
9  have to have a pilot?
01:50 10    A.  Yes, sir.
11    Q.  So is there a full-time pilot for these two
12  aircraft?
13    A.  As I've said, there has been in the past.  And
14  I believe LN still has a pilot on staff.
01:51 15    Q.  When was the last time -- when did you last
16  pay for a full-time pilot, either directly or through
17  one of your manage -- your ownership companies?
18    A.  For a full-time pilot, it's been, gaw,
19  probably 2018, I would say.
01:51 20    Q.  And for how long did you employ that full-time
21  pilot?
22    A.  Probably a little while after the incident
23  where the plane crashed.
24    Q.  When would that -- when would that -- you
01:51 25  don't know when that was, right?  Or you don't recall

Page 156

1  when it --
2    A.  Not the exact dates.  I mean, the -- the pilot
3  was shell shocked and didn't want to get back into a
4  cockpit, as a matter of, you know, good faith.  You
01:52  5  know, it was kind of bad for somebody to get fired for
6  something that was out of their control, so...
7    Q.  You do not know the month and year of that
8  crash?
9    A.  Not as I'm sitting here, no.  I'd have to look
01:52 10  all that up.
11    Q.  Just so I'm clear for the ladies and gentlemen
12  of the jury, they're going to want to hear this, You as
13  the owner of a aircraft do not know the month and year
14  that it crashed?
01:52 15    A.  I told you in earlier statements that the
16  crash happened, I believe, in the fall of 2017.  I would
17  have to go through my records --
18    Q.  You, as the owner of the aircraft, cannot tell
19  me in what state it crashed?
01:52 20    A.  It was -- went down somewhere between the
21  California and Arizona border.  I don't know exactly the
22  location, no, sir.
23    Q.  Do you remember the name of the pilot that was
24  on it when it crashed?
01:53 25    A.  I do.

Page 157

1    Q.  What's that?

2    A.  Marc Cohen.

3    Q.  And is he local, in Houston or in Austin or in

Texas?

01:53  5    A.  He was -- well, I mean, you asked me three --

6    he worked for the manufacturer and moved down here under

7    that, and so he was local.  I believe he has left Texas

8    now and is employed through someone else.

9    Q.  Is Marc Cohen part of the Cirrus program, that

01:53  10   when you buy a Cirrus aircraft, he comes with the

11   aircraft to help train you in the aircraft?

12   A.  He was, but not under our employment at the

13   time.

14   Q.  No, he's -- he's retained and paid for by

01:54  15   Cirrus for that part, right?

16   A.  So you asked me if he ever worked in that

17   capacity, and my answer is, according to what he told

18   me, yes.  Was he employed doing that at the time of the

19   crash?  The answer is no.  Did he maintain the

01:54  20   certifications?  Yes.  Was he working as an independent

21   contractor at the time?  Yes.

22   Q.  Where is the Cirrus being kept right now?

23   A.  You'd have to ask the insurance company that.

24   Q.  Where is your current Cirrus kept?

01:54  25   A.  Either in Georgetown or in Spicewood.

Page 158

1    Q.  Where is your current B200 being kept?

2    A.  Georgetown.

3    Q.  Is there a hangar up there?

4    A.  Yes, there is.

01:54  5    Q.  What's the hangar?

6    A.  Aerojet.

7    Q.  That's the FBO, right?

8    A.  Correct.

9    Q.  Is that a hangar?

01:55  10   A.  I'm sorry?

11   Q.  Do they have a hangar, that you keep it in

12   their hangar?

13   A.  Correct.

14   Q.  And that's -- is that where the Cirrus is

01:55  15   being kept as well?

16   A.  No, I said that the Cirrus splits its time

17   between there and Spicewood.

18   Q.  And is Spicewood at a hangar, or do you have a

19   fly-in?

01:55  20   A.  I'm sorry, a fly-in?

21   Q.  Fly-in, where there is a hangar on back of a

house.

23   A.  Oh, no.  No, it's kept at a hangar.

24   Q.  At Spicewood Airport?

01:55  25   A.  Correct.

Page 159

1    Q.  You understand some "skeptimism" I may have

2    from somebody who makes less than six figures a year,

3    but you have to pay half of a B200 and an SR22?

4        That strikes me as those numbers don't match

up.

01:56  6    A.  Well, as it pertains to this conversation, I

7    understand that.  But that doesn't pertain to my overall

8    financial situation, no.

9    Q.  The only sources of revenue that you have

01:56  10   right now are -- is the Max Total Health and the moneys

11   from either Medical Management Professionals or -- or LN

12   Partners Management?

13   A.  As we established Eroo Management, Eroo.

14   Q.  How profitable is Eroo for you?  Are we

01:57  15   talking six figures, seven figures, two figures?

16   A.  Again, you're asking me to speculate.  I'm not

17   looking at my tax returns right now.  So I'd say it's --

18   it's fairly profitable.

19   Q.  Does profitable to mean I make more there than

01:57  20   I do at LN Professionals or less?

21   A.  More.

22   Q.  More.

23       Is Eroo paid by LN Partners Management?

24   A.  It is not.

01:57  25   Q.  Is it paid by Medical Management

Page 160

1    Professionals?

2    A.  It is not.

3    Q.  Is it paid by any company with any

4    relationship to any of the companies involved in the

01:57  5    lawsuit we're here about today?

6    A.  It is not.

7    Q.  Is Eroo an acronym for something?

8    A.  No.

9    Q.  Where did you come up with it?  Just out of

01:58  10   curiosity.

11   A.  That -- that company was formed a long time

12   ago.  So coming up with names for companies, obviously,

13   is difficult.  So anytime you can find something that

14   hasn't been taken, that's kind of how that occurred.

01:58  15   Because after you go to the -- you know, to submit it

16   and when you get denied five times, you just start

17   getting creative.

18   Q.  Like Kangi Roo?  I mean, it's just kind of

19   bizarre.  It's just kind of out there.  It doesn't stand

01:58  20   for anything, right?

21   A.  Correct.

22       MR. COLLMER:  All right.  I'm going to

23   take a break and see if I have any more questions.  Do

24   you want to take 15 minutes or so?

01:58  25       MR. HOBBS:  Sure.  Do you need a full 15

Page 161

1    or 10 or -- take as much as you want.
2           MR. COLLMER:  I need to talk to my other
3    people.
4           MR. HOBBS:  At 2:15?
5           MR. COLLMER:  I'll come back on when I'm
6    ready.  You can just stay there, for that matter.  But
7    give me 10 or 15 and then ask, double check.  If I start
8    earlier, I'll hop on again, and you'll be there sooner.
9    Okay.
01:59 10           MR. HOBBS:  I'll come back at 2:15.
11           THE VIDEOGRAPHER:  The time is 1:59 p.m.
12    We're on -- we're off the record.
13           (Recess from 1:59 p.m. to 2:16 p.m.)
14           THE VIDEOGRAPHER:  The time is 2:16 p.m.
02:16 15    We're on the record.
16       Q.  (BY MR. COLLMER)  The man whose name I
17    mentioned is Max Rust is actually Mac Rust, M-a-c Rust;
18    is that correct?
19       A.  Are you asking me?
02:16 20       Q.  I am asking you.
21       A.  I believe so.
22       Q.  Okay.  And I had asked you a question whether
23    or not you ever gave any of the LN Professional
24    Management checks, distribution checks to Kim Wiley, and
02:16 25    you said that you had not done so; is that true?

Page 162

1       A.  That Is true.
2       Q.  Did you ever give any of the distribution
3    checks to Michelle Holle or Dr. William Franklin to give
4    to Kim Wiley?
02:17 5       A.  I believe at one point early on, AND if
6    somebody requested me if, you know, I had a meeting down
7    there, they asked me, hey, can you drop this off, and so
8    I did.
9           MR. COLLMER:  Objection; nonresponsive.
02:17 10       Q.  (BY MR. COLLMER)  My question is have you ever
11    given any distribution checks of LN Professional
12    Management to Michelle or William Franklin to give to
13    Kim Wiley?  And is the answer to my question yes?
14       A.  I believe at one point, yes.
02:17 15       Q.  How many times do you think that happened?
16       A.  Not very many.
17       Q.  When was that in relationship to when you say
18    you sold the company to Jean-Pierre Forage?
19       A.  It was probably prior to that.
02:18 20       Q.  Since selling ALS and ALS Management, you have
21    not distributed any funds of Medical Management
22    Professionals or LN Partners or LN Professionals
23    Management to Kim Wiley; is that a true statement?
24       A.  Since I have sold the company, I have not made
02:18 25    any distributions, period.

Page 163

1       Q.  Okay.  And, as I recall -- this goes way
2    back to the beginning.  I just need to confirm.  You
3    cannot direct me to where there is a copy of the amended
4    and restated company agreement of Allied Lab Solutions
02:19 5    that is executed fully, correct?
6       A.  If you don't have that document in your
7    possession, I don't know where I would be able to
8    produce that.
9       Q.  You have never seen such a document fully
02:19 10    executed, though; isn't that true?
11       A.  That's not my understanding, no, sir, I didn't
12    say that.
13       Q.  So you do recall seeing that document fully
14    executed?
02:19 15       A.  I recall there was a lot of executed
16    documents.  For me to say a hundred percent certainty, I
17    don't know that that was one of them is inaccurate.
18       Q.  Okay.  Are you the only officer of Eroo?
19       A.  That is correct.
02:20 20       Q.  And also the only shareholder as well, right?
21       A.  Uh-huh.  Yes.  Sorry.
22       Q.  Have you understood all my questions today?
23       A.  I -- I believe so, to your frustration.  Some
24    of them not as well as you would have liked, I guess.
02:20 25    That's why I apologize when I asked for clarification.

Page 164

1       Q.  I appreciate that.  So we can assume that if
2    you've answered the question, you have understood the
3    question as it's phrased or asked for a clarification or
4    if you didn't hear the question questions because of
02:20 5    the --
6       A.  I would hope so.
7       Q.  Right?
8       A.  Yes.
9           MR. COLLMER:  All right.  I'll pass the
02:21 10    witness.  Thank you.
11           MR. HOBBS:  No questions from me at this
12    time.
13           THE VIDEOGRAPHER:  And before we go off
14    the record, I'd like to ask Mr. Hobbs if you would like
02:21 15    a copy of the transcript or video today.
16           MR. HOBBS:  Yes, both.
17           THE VIDEOGRAPHER:  Okay.  The time is
18    2:21 p.m.  We're off the record.
19           (The deposition concluded at 2:21 p.m.)
20
21
22
23
24
25

## Page 165

1    WITNESS CORRECTIONS AND SIGNATURE

2

3    CLAY ELLIS              DECEMBER 21, 2020

4        Please indicate changes on this sheet of paper,

     giving the change, page number, line number and reason

5    for the change. Please sign each page of changes.

6    PAGE/LINE    CORRECTION    REASON FOR CHANGE

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24

     _____

25            CLAY ELLIS

## Page 166

1        I, CLAY ELLIS, have read the foregoing

     deposition and hereby affix my signature that same is

2    true and correct, except as noted above.

3

4    _____

         CLAY ELLIS

5

6    STATE OF T E X A S    )

     COUNTY OF _____    )

7

8        Before me, _____, on

     this day personally appeared CLAY ELLIS, known to me, or

9    proved to me under oath or through _____))

     (description of identity card or other document)), to be

10   the person whose name is subscribed to the foregoing

     instrument and acknowledged to me that they executed the

11   same for the purposes and consideration therein

     expressed.

12

         Given under my hand and seal of office on

13   this, the _____ day of _____, _____.

14

15

     _____

16        NOTARY PUBLIC IN AND FOR THE

          STATE OF TEXAS

17   My Commission Expires: _____

18

19

20

21

22

23

24

25

## Page 167

1        NO. D-1-GN-20-003469

2    TOTH ENTERPRISES II, P.A., ) IN THE DISTRICT COURT OF

     and WILLIAM FRANKLIN, M.D.,)

3                    )

         Plaintiffs,    )

4                    )

     VS.            ) TRAVIS COUNTY, T E X A S

5                    )

     CLAY ELLIS,        )

6                    )

         Defendant.    ) 201ST JUDICIAL DISTRICT

7

         REPORTER'S CERTIFICATION

8    ORAL AND VIDEOTAPED DEPOSITION OF

              CLAY ELLIS

9         DECEMBER 21, 2020

10       I, PHYLLIS WALTZ, a Texas Certified

11   Shorthand Reporter, Texas Certified Realtime Reporter,

12   Louisiana Certified Court Reporter, Registered Merit

13   Reporter, Certified Realtime Reporter, and Certified

14   Realtime Captioner, in and for the State of Texas,

15   hereby certify the following:

16       That this witness, CLAY ELLIS, was duly

17   sworn by the officer and that the transcript of the oral

18   deposition is a true record of the testimony given by

19   the witness;

20       That the deposition was submitted on

21   _____ to the witness or to the attorney for the

22   witness for examination, signature and return to me by

23   _____, 2021;

24       That the amount of time used by each party

25   at the deposition is as follows:

## Page 168

1        Mr. Mark W. Collmer - 3:51

2        Mr. Jeffrey J. Hobbs - 0:00

3        That pursuant to information given to the

4    deposition officer at the time said testimony was taken,

5    the following includes counsel for all parties of

6    record:

         Mr. Mark W. Collmer and Mr. Conrad B.

7        Guthrie, ATTORNEYS for PLAINTIFFS

8

         Mr. Jeffrey J. Hobbs, ATTORNEY for

9        DEFENDANT

10       I further certify that I am neither

11   counsel for, related to, nor employed by any of the

12   parties or attorneys in the action in which this

13   proceeding was taken, and further that I am not

14   financially or otherwise interested in the outcome of

15   the action.

16       Further certification requirements

17   pursuant to Rule 203 of TRCP will be certified to after

18   they have occurred.

19

20

21

22

23

24

25

42 (Pages 165 to 168)

Page 169

```
 1        Certified to by me this 11TH of JANUARY,
 2   2021.
 3
 4           _____
             PHYLLIS WALTZ, RMR, CSR, CRC
 5           Expiration Date:  12/31/21
             TEXAS CSR, TCRR NO. 6813
 6           Expiration Date:  12/31/21
             LOUISIANA CCR NO. 2011010
 7           Expiration Date:  12/31/21
 8
     Worldwide Court Reporters, Inc.
 9   Firm Certification No. 223
     3000 Weslayan, Suite 235
10   Houston, Texas  77027
     (713) 572-2000
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 170

```
 1        FURTHER CERTIFICATION UNDER RULE 203 TRCP
 2
 3           The original deposition was _____ was not
 4   _____ returned to the deposition officer on
 5   _____, 2021;
 6           If returned, the attached Changes and
 7   Signature page contains any changes and the reasons
 8   therefor;
 9           If returned, the original deposition was
10   delivered to Mr. Mark W. Collmer, Custodial Attorney;
11           That $_____ is the deposition officer's
12   charges to the Plaintiffs for preparing the original
13   deposition transcript and any copies of exhibits;
14           That the deposition was delivered in
15   accordance with Rule 203.3, and that a copy of this
16   certificate was served on all parties shown herein and
17   filed with the Clerk.
18           Certified to by me this _____ day of
19   _____, 2021.
20           _____
             PHYLLIS WALTZ, RMR, CRR, CRC
21           Expiration Date:  12/31/21
             TEXAS CSR, TCRR NO. 6813
22           Expiration Date:  12/31/21
             LOUISIANA CCR NO. 2011010
23           Expiration Date:  12/31/21
     Worldwide Court Reporters, Inc.
24   Firm Certification No. 223
     3000 Weslayan, Suite 235
25   Houston, Texas  77027
```

| **A** |
|---|

**a-** 41:22
**a.m** 1:14 4:1
  54:10,12,12,13
**a/k/a** 143:25
**ability** 35:25
  71:9 100:11
  141:8,24
**able** 38:4 82:16
  97:15 148:4
  163:7
**above-styled**
  1:13
**absolute** 48:11
  50:2 143:1
**absolutely** 58:3
  88:18 126:19
  133:13,13
**accept** 93:23
**acceptable**
  153:10
**access** 38:17
  39:17,17,25
  40:2,10,12,22
  119:8,10
  128:22,22
  132:9 133:8,21
  147:20 151:15
  152:10
**accessed** 133:4,5
**account** 38:3
  45:4 53:10
  78:17 131:14
  131:17,19,25
  147:18
**accounted** 127:9
**accounting**
  29:25 30:1,2,4
  30:10,11 32:6
  39:2 126:11,12
**accountings**
  121:21
**accounts** 27:25
  28:4,8,14,22
  29:5,21 30:1
  37:12 38:5
  40:22,23 44:4

44:10,18 78:21
  79:3,11,20,25
  133:21 151:15
  152:11
**accurate** 6:6
  18:6 62:10
  66:22 106:19
  111:9 120:9
  123:15 124:8
  131:17 132:16
  134:3 150:5
  153:24 154:25
**accurately**
  91:20,25 92:3
  124:9
**acknowledged**
  166:10
**acquisition**
  21:15
**acronym** 10:14
  99:8,12 160:7
**act** 15:8 45:4
**acting** 17:15
**action** 168:12,15
**actions** 120:23
**active** 15:17
  68:12 69:1
**activities** 41:6
**activity** 3:10
  14:13 112:12
**actual** 44:1
  49:17 71:7
**add** 56:15 108:7
**added** 45:17
  106:8
**adding** 56:19
  59:17
**addition** 134:24
  135:2
**address** 15:16
  15:20 80:13
**addressed** 7:14
**Admin** 86:21
**administer**
  96:21
**administered**
  108:18 109:12

**administering**
  4:10 68:19
**administration**
  5:21
**administrative**
  6:3,14 65:23
  68:4 86:21
**advertise** 70:8
**advice** 71:11,12
  103:8
**advise** 105:5
**advised** 102:7
  102:14,24
**advisement**
  104:18
**Aerojet** 158:6
**affix** 166:1
**afoul** 125:22
**age** 6:9 69:1,24
**Agency** 10:14
**ago** 48:20 49:12
  72:18 160:12
**agree** 47:14
  66:14 119:17
**agreement**
  31:11,21 42:4
  42:10,22 43:16
  45:20,25 46:2
  46:5,7,9,18
  47:7,15,18
  48:8,10,13,15
  48:24 49:8,23
  50:5,16 51:9
  51:20 52:4,6
  53:1 83:20
  84:2,24 90:14
  90:16,21 91:1
  91:11,17 92:5
  92:15,16
  100:24 116:11
  163:4
**agreements**
  41:22 47:6,21
  103:24 116:23
  116:24
**ahead** 104:20
**Air** 11:11

**aircraft** 11:16
  11:19,22 19:18
  19:19,21 22:14
  152:17,18,22
  152:24 153:13
  153:15 154:16
  154:19 155:7
  155:12 156:13
  156:18 157:10
  157:11,11
**airplanes** 11:7
  19:7 153:9
**airport** 154:22
  158:24
**Al-** 62:24 91:6
**Allied** 12:12
  23:21 24:4
  25:12,15,18
  26:5,15,17,20
  27:1,6,17,25
  28:4,8,13,14
  28:19,22 29:5
  29:13,21 30:3
  32:7,10,11,15
  32:18,21 33:7
  33:20 34:6
  35:6,11,12,13
  36:20 37:1,19
  37:25 38:14,19
  39:19,20 40:14
  40:17 41:3,14
  41:15,19,25
  42:4,7,11,16
  42:23 44:4,10
  44:14,18,19,22
  44:23 45:2,2,3
  45:7,9,11,20
  46:18,20,20
  47:16,18 48:9
  48:10,15,24
  49:8 50:16
  51:21,22,23,23
  51:25 52:3,10
  52:15 53:7,7,9
  53:13,15,16
  54:16 56:10,23
  57:16 60:10,11

60:14,17,18
  62:11,15,18,19
  62:24 63:1
  64:9 65:16
  66:3,15 67:4
  67:21 75:19,24
  75:25 76:8,20
  76:21 77:1,5,6
  77:20,24 78:2
  78:24 79:5,13
  79:18,21,22,25
  81:19,23 90:22
  91:2,7,21 92:1
  92:10,11,24
  93:18 95:21
  97:16 100:8
  101:6,20,21
  102:5,11,13,22
  104:11,11,24
  105:4,17 106:3
  109:25,25
  110:4,6,14
  111:2,14
  114:17,22
  115:12,13,24
  116:4,7,8,21
  117:4,24 118:3
  118:4,10,21,21
  120:5 132:8
  139:12 163:4
**allowed** 142:19
  143:5 154:7
  155:4
**alphabet** 146:22
**ALS** 23:21 24:3
  40:3 49:5 52:2
  60:10,11,24,25
  60:25 61:3,6
  61:10,11,13,18
  61:23 62:4
  77:3,3 78:9,10
  78:13,21,24
  81:19 101:23
  101:24 104:11
  106:8 119:1,10
  120:6,7,19
  123:7,9,12,18

123:19,21
124:2,2,5,6,11
124:15,18,19
124:25 125:6
125:11 126:9
126:25 127:18
127:18,21,21
130:14,16,16
132:17,17,22
133:11,11,16
133:18 135:16
135:19 136:4
136:16 137:8,8
137:9,9,17,20
137:20 138:5,6
138:8,10,10
143:12 146:17
146:19 147:9
147:18 149:19
149:19 150:1
150:16,16
151:12,13,21
162:20,20
**ALS's** 136:11
**alternative**
54:21
**ambiguous** 31:2
**amended** 46:5
46:17 47:6,15
47:18,21 48:8
48:14,23 49:8
49:22 50:19
51:20 52:3
163:3
**amount** 19:15
19:16 83:19
107:3,24
108:10,17
111:6 148:24
150:7 167:24
**amounts** 125:24
148:24
**angst** 47:24
**annualized**
66:16 106:24
**answer** 31:13
40:11 49:20,23

51:11 59:8
73:5 95:6
105:1 108:7
121:6 142:20
142:21 144:10
144:15 148:3
157:17,19
162:13
**answered** 50:8
105:1 164:2
**answering** 31:25
32:1 148:5
**anti-aging** 69:11
70:25
**anybody** 20:17
36:25 41:10
95:8 103:14
104:23 123:9
154:23
**anymore** 132:13
146:8
**anytime** 160:13
**anyway** 45:9
**apologies** 84:20
84:23
**apologize** 60:21
131:8 142:24
163:25
**appear** 34:18
**Appearances**
3:2
**appeared** 166:8
**applying** 63:19
64:8
**appointed** 120:8
**appreciate**
164:1
**appropriate**
78:25 79:15
128:18 129:8
**approximately**
5:10 23:23
109:24
**April** 35:16
137:20 144:3
**arbitrary** 14:25
**arbitration**

138:23 140:14
140:24,25
**archive** 126:5
129:3
**area** 21:5,11
**argumentative**
147:17
**Arizona** 21:3,5
21:12 156:21
**ARMBRUST**
2:9
**arrangement**
93:11,20 94:14
95:12,15 96:8
96:16 97:16
100:8 108:22
109:4,7,18
110:25 115:6
118:5 119:16
120:14
**arrow** 113:16
**art** 53:1
**articulate** 31:7
**as--** 151:10
**asked** 31:2
39:11 99:4
102:25 121:8
134:4,19
137:22 138:25
157:5,16
161:22 162:7
163:25 164:3
**asking** 15:23
17:13 35:11
38:11,12 40:1
40:10 42:14
46:10 47:8
50:7,11,14
51:12,25 55:22
59:4 60:2 73:4
74:6 77:13,15
77:16 79:8,9
81:21 91:4
93:18,20 96:13
96:13 99:23
100:1 101:23
119:15,23

125:9 130:11
135:18 137:15
142:13,18,20
142:21 143:21
144:3,14,21
147:15,17
148:5,14
149:16 150:22
150:24 151:7
151:10 159:16
161:19,20
**aspect** 81:15
85:22
**asserted** 139:9
**assessment**
14:22
**assets** 7:8 10:25
11:4
**assimilated**
127:7
**assistant** 16:18
26:8
**assistants** 16:11
17:4
**associate** 24:14
82:8
**associated** 114:6
138:5 145:4
**associates'**
10:15
**assume** 31:25
49:2 50:9
64:20 71:6
95:19 112:19
119:10 138:11
138:12 140:15
151:15 164:1
**assuming** 33:24
116:24 139:13
**attached** 1:20
170:6
**attempt** 105:12
**attention** 127:11
**attorney** 27:14
46:14 65:6
75:13,15 97:13
97:22 98:1,2

167:21 168:8
170:10
**attorneys** 55:1
91:18,22 168:7
168:12
**audio** 121:9
**Austin** 2:10 4:8
5:16 15:19
157:3
**authorized**
117:10 134:6
145:9,11,18,21
**available** 56:18
122:9 123:14
133:1 140:21
140:23 151:14
**Avenue** 2:9
**aviation** 11:6
**avoid** 79:2
**aware** 15:13
23:24 24:7
34:19 39:15
48:14 77:2,20
77:22 78:3
81:12 83:25
84:13 97:11
98:2 102:22
104:14 109:20
110:9 116:6,13
117:7 121:5
137:22 139:3,4
139:6,8 141:12
142:15 148:8
151:8
**awesome** 153:10
**awhile** 26:7

---

**B**

**b** 4:8 6:20 168:7
**B200** 11:14
21:21 22:6
153:17 155:3
158:1 159:3
**back** 25:9 49:17
50:22 54:2,8,9
108:21 122:5
142:7 156:3

158:21 161:5
161:10 163:2
**backup** 33:23
34:1
**bad** 113:20,25
156:5
**Baldwin** 27:10
27:14
**bank** 27:25 28:4
28:7,14,21
29:4,17,18
30:1 37:12
40:21,22 44:4
44:7,9,17
79:11 119:11
133:1,2,5,7,19
134:1 147:13
147:14,20
151:14 153:11
**banking** 132:21
133:10,11,16
**banks** 28:25
29:9
**bar** 98:3
**barely** 34:3
**based** 19:14
36:15 56:7
57:5 58:23
70:24 72:12,19
73:16 74:4
84:9 91:24
92:7 107:12
128:19 129:15
133:20 142:11
142:22
**basic** 126:11
**basically** 14:20
45:4 65:23
69:10,12 78:16
92:21 127:5
**basis** 18:10
19:20,22 36:9
39:9 40:8 53:8
53:14,17 56:24
66:16 71:16
86:24 87:2
88:8,9 106:25

127:14 128:5
146:2 152:14
**be-** 52:18
**becoming** 57:16
58:5,15
**beginning** 30:17
95:19 145:25
163:2
**behalf** 101:19
116:8
**beholder** 66:10
**believe** 6:6 14:8
14:22 17:1,3
20:2,21,25
31:16 32:4
33:8 34:20
37:18,22 38:2
38:8,16 40:8
41:20,23 42:2
45:10 46:13
47:10 50:21,24
51:3 52:19
58:14 60:15
61:2,5,8,11
62:6,9,12,22
63:24 65:4,19
72:2,16 73:6
75:3 78:11,14
80:11,21 81:17
81:22 82:6
83:18 84:16
86:17 87:7
88:21 89:25,25
93:2,9,17 94:9
94:13 96:11
98:1,7 100:17
101:17,22
105:7,11
106:22 107:3
108:10 110:10
111:24 126:16
128:5,11,17
131:7,8,9,13
135:23 137:25
140:8,20 143:2
148:13 149:15
150:4 153:20

155:14 156:16
157:7 161:21
162:5,14
163:23
**bene-** 141:25
**beneficial** 78:13
**beneficiary**
139:10 142:1
**benefits** 56:11
92:5
**best** 17:11,17
35:25 51:11
150:10
**better** 56:12,20
65:19
**big** 15:21 66:6
**bigger** 113:1
**bill** 41:13 87:17
109:10
**billed** 109:13
124:20
**billing** 56:8
87:11,13,16
111:25 139:20
**billions** 143:7
**bills** 98:25 153:2
**bit** 25:6,8,9
84:21 95:17
108:24 149:23
**bizarre** 160:19
**blanket** 41:13
**blanks** 51:9
**blood** 13:12 15:1
16:14 17:21
55:16,19 56:1
76:8 93:12
123:17,25
125:13
**blood's** 109:2
**Blue** 109:11
138:22 139:9
140:2 141:7,15
141:23 143:3
**board** 52:10,14
52:25
**bonus** 150:6,12
150:13

**bookkeeper**
26:14,15,17
87:8 140:6,7
**books** 26:9 32:6
32:14 33:6,14
33:20 34:6,10
34:16 35:6,14
35:22 37:11,19
38:14 39:1,18
39:20 40:17
41:3 64:25
124:20
**border** 21:6
156:21
**born** 5:15,16
**bottom** 101:12
**bought** 107:25
132:4
**Boulevard** 2:4
**brain** 68:21
**break** 53:20,22
53:25 90:25
121:12,17
160:23
**bring** 127:10
136:22
**bringing** 25:2
106:15
**broad** 141:22
**broad-ranging**
142:3
**broke** 90:24
101:2 149:22
**brother-in-law**
82:1
**brought** 106:13
106:23 119:9
136:22
**Brown** 2:9,13
**Brownsville**
93:9
**Bruce** 27:10,14
**built** 119:3
**business** 6:21,22
8:3 10:15,24
12:6 13:6
14:20 15:17

16:4 22:21,22
22:24 24:3,14
24:16 39:12
41:8 47:2,3,10
50:23,23 52:15
52:18 54:17
62:21 65:18,21
66:6,7,11
67:21 72:3
85:14,15,19
87:12 91:7,13
102:8,15
103:10,25
135:7 138:21
144:3
**businesses** 10:7
137:2
**buy** 157:10

---
**C**
**c** 2:1 4:8
**calculation**
126:15,20
127:14
**calculations**
36:22 127:4,22
129:24 130:9
139:16,22
140:1
**California** 21:3
21:5,12 156:21
**call** 22:11 36:11
60:11,25 63:8
63:8 88:20
112:16,16
124:14 150:6
**called** 5:22 7:17
9:19 46:5,6,17
72:17 77:11
88:23
**calling** 88:17
98:24
**calls** 19:6
**cancer** 69:3
70:12
**cancers** 68:21
**capable** 68:18

92:21 96:15
**capacity** 18:21
  22:22 23:13,14
  77:3 81:14
  82:17 95:23
  157:17
**capital** 56:25
**Captioner**
  167:14
**card** 166:9
**care** 13:5,10
  56:12 57:1,17
  57:19 69:17,20
  76:1
**career** 56:13
**Carr** 59:15
**carrier** 109:6,16
**carriers** 19:12
  74:24 141:21
  143:4
**case** 13:5 15:12
  63:24 88:17
  119:19 139:1
  141:12 149:24
**cases** 112:24
**cash** 74:4,12,12
  74:25 108:11
**cashier's** 108:11
**casual** 24:15
**catching** 31:9,16
**caught** 45:22
**cause** 1:14
**CCR** 1:16 169:6
  170:22
**ceased** 17:14
  146:5,6
**celebrating**
  108:2
**celebration**
  108:1
**center** 13:25
  14:3,6,10 15:5
  15:6,17 17:8
  17:10,15,16,18
  18:4
**Central** 10:13
**CEO** 89:22

94:13 96:21
98:13 99:2,18
100:1 145:16
**cert-** 155:1
**certain** 18:17
  22:22 48:5
  55:17 56:15
  64:11 68:3
  70:24 76:7
  87:24 99:6
  109:21 111:6
  127:4
**Certainly** 55:15
**certainty** 48:12
  50:2 143:1
  163:16
**certificate** 3:5
  170:16
**certification**
  167:7 168:16
  169:9 170:1,24
**certifications**
  157:20
**certified** 155:3
  167:10,11,12
  167:13,13
  168:17 169:1
  170:18
**certify** 167:15
  168:10
**CFI** 154:24
**chanced** 72:15
**change** 22:15
  25:6,8 165:4,5
  165:6
**changed** 29:17
  40:21 43:25
  133:7
**changes** 3:5
  47:25 165:4,5
  170:6,7
**changing** 108:23
**charge** 56:9 97:4
  109:6 141:8,24
**charges** 55:11
  55:12 74:2,9
  75:2,3,4

141:16 142:4
170:12
**charging** 74:17
**check** 22:20
  64:2 92:10
  107:23 108:11
  108:12,16
  109:15 111:11
  111:13,14
  115:17,18
  117:2 118:20
  118:21 120:18
  120:19 127:15
  127:20 144:17
  144:19,20,20
  144:22 145:1,4
  145:21 148:8
  148:14 149:16
  151:2,4,9
  161:7
**Checking** 98:22
**checks** 145:2
  161:24,24
  162:3,11
**chime** 72:9
**choose** 54:20
**chose** 91:16,18
**Christine** 26:7
**chute** 21:11
**CIA** 10:7,13,15
  153:10
**CIRA** 10:8
**circumstance**
  18:11 60:15
**circumvent**
  143:5
**cirrus** 11:16
  20:12,13,18
  21:24 22:4
  153:21 157:9
  157:10,15,22
  157:24 158:14
  158:16
**Civil** 1:18
**claim** 75:4 139:9
  139:10
**claiming** 76:10

76:14
**clarification**
  31:3 163:25
  164:3
**clarify** 77:17
**Clay** 1:5,9,11
  3:3 4:5,14,19
  80:12 153:10
  165:3,25 166:1
  166:4,8 167:5
  167:8,16
**Clay-Shell** 9:5,6
  9:17 10:3
**Clayisawesome**
  10:16,19,24,25
  11:3,4,8 12:1
  20:5 22:24
**Clayisreallya...**
  10:17,22 11:1
**clear** 63:21
  146:10,10
  149:24 156:11
**Clerk** 170:17
**client** 58:16,17
  58:18,19 59:1
  59:2,5 74:12
  126:17
**clients** 6:20
  58:23 68:2
  74:25 76:17
  123:16,22
  124:10 126:2
  137:8,19,23,24
  138:5,8,9
**clinic** 13:23 15:2
  55:16 56:3,5
  73:24
**clinical** 23:16
  85:9,10 90:11
  92:22
**clinics** 123:24
  124:1
**close** 17:7 28:20
  104:5
**closed** 17:10,18
**cloud** 34:2 38:7
  38:15,18 39:17

39:18 128:19
129:2,6,13,14
129:15 131:5
131:11 133:20
**cockpit** 156:4
**Cohen** 157:2,9
**colleagues** 106:5
**collected** 22:8
  115:1
**collection** 3:10
  99:11 100:16
  110:1 112:12
  127:17,22
  130:9
**collections**
  85:23,25
  100:13 111:7
**college** 5:6,9,19
**Collmer** 2:3,4
  3:4 4:17 29:6,7
  29:14,15,22,24
  34:19,22,25
  35:4 43:15
  51:1,3 52:20
  52:22 53:19,24
  54:2,7,15
  57:23,25 70:18
  79:16,17 80:4
  80:5 96:23,24
  102:9,10,16,18
  103:19,21
  104:3,4,21,23
  112:19,22
  118:15,17
  119:14,15
  120:13,14
  121:7,11,16,19
  122:2,6,10,19
  125:2,4 128:23
  128:25 130:4,7
  130:8 143:14
  143:15 147:22
  147:23 151:17
  151:19 160:22
  161:2,5,16
  162:9,10 164:9
  168:1,7 170:10

colon 70:11
combined 66:15
  66:20
come 25:1 26:22
  54:2 63:4 68:2
  72:8 122:5,5
  139:18 146:19
  160:9 161:5,10
comes 34:3
  78:21 110:11
  157:10
comfortable
  45:1 122:2
coming 19:11
  160:12
comment 47:8
  48:1 49:19
  50:12 65:10
commingling
  53:11 78:16,18
  79:2,10,12,12
  79:19
Commission
  166:17
communicating
  100:19
communication
  59:9 95:9
communicatio...
  95:7,10
Community
  93:2,4 95:8,13
companies 5:25
  6:25 8:22,25
  10:3,4 25:10
  55:13,15 64:18
  103:6,11
  119:17 160:4
  160:12
companion
  76:23 77:19
company 5:21
  6:10,10,12
  7:15,20 9:13
  9:14,16,18,19
  9:23 10:11,14
  10:19 11:2

14:4 23:25,25
28:15,20,24
29:8,16 30:4
30:14,17 34:11
35:23 37:5,23
38:25 40:4
45:16 46:18
47:6,15,18
48:8,15,24,25
49:8,22 50:16
52:4,8,13,23
55:3,5,13 57:5
58:2 63:9,10
63:19 67:1
83:4,7,7 88:2,2
90:10,22 91:21
101:6 102:1,5
102:11,20,20
103:2,2 104:5
104:9,10
105:10 106:13
106:21,23,25
107:23 108:19
116:12 122:19
122:25 123:5
124:1 131:6,22
136:9,12 138:1
145:16 153:4,4
153:8 155:17
157:23 160:3
160:11 162:18
162:24 163:4
compare 66:24
comparison
  66:23
compensated
  137:3
competent
  18:12 97:20
complaint 75:18
  75:20
completely
  96:12
compliance
  54:25
compliant 54:22
computer 32:9

32:19,20,22,24
33:1,6,14 34:5
37:9,20,21
38:7,10,21,24
39:2,7,19 40:6
40:8,13,18,25
41:4,10 128:16
129:1,10,11,17
129:19,25
130:10,17,22
130:25 131:2
131:24 132:25
133:10,17
134:1
computers 32:9
  34:4 37:14
  41:8
con- 45:19
concept 101:21
concern 79:9,18
  151:1
concerned 87:16
concerning
  124:20
conclude 123:4
concluded
  122:24 164:19
condition 70:3
  70:19,21
conditions 56:15
  68:3 70:9
conducted 4:5
  123:14 124:21
confer 119:22
confident 149:8
confirm 163:2
confirmed 4:13
conflicts 47:22
Congress 2:9
Conrad 168:7
consider 24:17
  97:12,15
considerably
  56:9 107:13
consideration
  166:11
considered

66:12
consultant
  23:17 85:9,11
  90:11
contact 58:25
  96:14
contacted 18:10
  65:25 124:6
contained 34:15
  35:5,22 37:24
contains 170:7
context 100:11
  101:4
continue 47:2
  57:20 60:21
  66:21 83:17
  138:20
continued 24:7
continuing
  106:24
contract 12:13
  30:8 46:7 53:2
  55:23 73:4
  116:3,6 118:13
contracted 12:4
contractor
  157:21
contracts 49:12
  91:4 110:23
  116:2,3,13,17
contractual
  152:13
contribution
  56:25
control 15:11
  29:21 37:11
  45:8 78:22
  79:3,11 83:8
  131:18,20
  132:10 133:20
  156:6
controlled 73:19
controlling
  107:2
controls 133:2
conversation
  30:24 58:10

98:21 136:21
  159:6
conversations
  58:14 59:14,16
  63:5 65:20
  94:5 100:10
  101:18 142:12
  142:15 143:9
convicted 8:20
copies 48:23
  49:4 130:17
  170:13
copy 34:10 43:8
  43:21 49:7,22
  50:10,16
  113:20,25
  127:23 132:17
  163:3 164:15
  170:15
corner 43:20
corollary 141:14
  151:4,24
corporation
  27:20 29:25
  36:2 46:8,16
  80:20
corporations
  5:25
correct 7:25 9:9
  10:12 11:10
  12:14 13:14
  14:16 16:14
  17:3,6,20,24
  18:7,13 20:7
  20:14 22:1,5
  23:6,8 25:5
  28:5,10,11,23
  30:13,19 32:3
  32:4,17 33:23
  34:9 35:24
  36:4,6,7,9,10
  36:16,24 37:9
  37:21 38:19,20
  38:22 39:3,21
  41:20,23 42:18
  44:11,20 45:6
  45:13 49:1

50:12 52:19
55:18 58:1
61:1,2,15
62:16,18 63:23
64:9,19 65:14
66:18,20 67:14
69:6,9,15,17
69:20 70:13,14
71:15 72:22,23
73:3 74:21,22
75:6,10,12
77:21 78:19
80:24 81:1
82:13 83:14,24
84:3 85:1,6,17
85:21 87:13,17
87:18 91:3,7,9
91:17 92:2
102:3,8,15
104:6,7,13,17
105:10,21,24
106:12 107:11
107:17 109:14
110:13,21
111:5,23 112:7
114:18,24
115:2,5,15,20
123:6 124:4,9
126:5,25 127:2
127:5,18,19
128:3 129:2,16
129:16 130:20
130:22 131:13
131:15 134:8
135:20 136:6
137:17 138:15
139:3,6 140:12
140:14,17
141:17 142:2
145:7,8,10,15
145:19,20,22
145:23 146:20
147:21 148:12
152:19 153:5,6
153:16 154:12
154:13,23
155:4,5 158:8

158:13,25
160:21 161:18
163:5,19 166:2
**CORRECTION**
165:6
**CORRECTI...**
165:1
**correlate** 119:11
**correlating**
120:19
**corresponding**
118:21 150:16
**Cortez** 26:9 82:4
82:12,15 86:15
87:19 88:4,16
89:7,23 117:12
**cost** 111:20,22
112:1
**costs** 111:7
113:11 114:6
115:10 153:23
**counsel** 2:3,8
73:9 92:7
121:25 168:5
168:11
**county** 1:4 93:3
93:4,8 95:8,13
96:6 97:18
99:18,19 100:1
117:23 118:1
118:20 120:3
120:16,17,18
140:3 148:8,19
166:6 167:4
**couple** 7:7 20:1
121:13
**courier** 13:18,19
13:20,22 15:2
17:24 19:4
109:4
**couriers** 19:12
**course** 12:6 13:6
27:5 39:12
47:10 49:3
50:22 57:21
**court** 1:2 4:3
112:20 167:2

167:12 169:8
170:23
**covered** 78:14
**COVID-19** 4:7
**crash** 20:2 21:2
156:8,16
157:19
**crashed** 155:23
156:14,19,24
**CRC** 1:16 169:4
170:20
**create** 44:21,23
54:16
**created** 45:4
129:1
**creative** 160:17
**criteria** 70:5,25
**Cross/Blue**
109:11 138:23
139:10 140:2
141:7,15,23
143:3
**CRR** 1:16 169:4
170:20
**CSR** 1:16 4:9
169:5 170:21
**cumbersome**
148:7
**cup** 12:22,23,23
**curiosity** 160:10
**current** 34:18
157:24 158:1
**currently** 8:8
43:16 85:2,5
85:16 86:5
132:14 135:8
140:11,14
**Custodial**
170:10
**cut** 7:18
**cycle** 121:2
139:19

_____
**D**

**d** 103:13
**D-1-GN-20-00...**
1:1 167:1

**d/b/a** 9:23 80:20
115:19,22
**daily** 40:8 87:2
**Dana** 86:17,20
86:23 89:7
117:18
**data** 86:21
**date** 4:4 11:24
36:7 40:7
63:14 65:8,13
169:5,6,7
170:21,22,23
**dated** 46:18 48:9
48:16 52:4
63:12,15
**dates** 20:22 39:5
63:22 156:2
**day** 88:4 166:8
166:13 170:18
**day-to-day** 53:8
53:13,17 86:23
88:8,9
**days** 122:12
**dealings** 99:7
**dec-** 104:8
**decade** 65:19
72:18
**December** 1:9
1:14 4:4 64:15
165:3 167:9
**decide** 122:21
**decision** 17:7
18:9,22 19:17
33:9 46:15
91:19 103:5,11
104:12,13,16
**decisions** 37:4
101:24
**declined** 148:23
**decreased** 149:2
**deeper** 138:1
**Defendant** 1:6
2:8 167:6
168:9
**defer** 62:11
91:22 107:19
121:25

**definitely**
150:14
**degree** 5:8
142:11 143:5
**delete** 38:4
130:8
**deleted** 128:16
128:17 129:22
129:24 130:22
132:25
**delineation**
128:18
**delivered** 145:2
170:10,14
**delivery** 83:9
**denial** 142:3
**denied** 160:16
**depended** 73:20
**depending**
12:15 19:21
75:16 107:18
110:1,23 116:2
**depends** 16:3
**depens** 56:8
**depo** 64:24
**deposition** 1:8
1:11,20 4:5,11
30:20 31:22
88:22,23
164:19 166:1
167:8,18,20,25
168:4 170:3,4
170:9,11,13,14
**deposits** 132:22
**derivatively**
139:12
**describ-** 58:15
**describe** 14:19
91:6
**described** 90:15
120:23
**description** 18:6
90:21 91:2
94:2,4 166:9
**descriptions**
120:9
**deserved** 137:3

desk 122:11
destroy 126:4
destroyed 126:3
detailed 91:5
  120:9
details 35:15
  141:1
determination
  27:19,22 28:3
determinations
  37:2
determine 65:15
  119:25 140:1
determined 32:5
developed 72:20
device 133:4,19
difference 74:23
  75:8 111:3
  146:12
different 5:25
  6:3,25 10:7
  12:5,15 20:1,4
  22:22 55:8
  59:17 60:15
  62:1 67:1,18
  74:6 79:25
  92:14 96:12,22
  116:6 141:4
  144:15
difficult 121:3
  160:13
dig 138:1
diprom 16:23
Dire 153:3,4,8
direct 58:14,25
  59:5,9 154:22
  163:3
directed 34:20
directly 6:1
  17:23 59:23,24
  59:25 60:9
  93:22 134:1
  155:16
director 123:13
  124:15,18,19
  125:6,11
  126:23 127:18

135:16 136:3
  146:17
dis- 17:21 121:1
  121:1
disable 40:16
disagree 107:16
  153:12
Disaster 4:7
disclose 136:15
discuss 24:23
  88:24 89:1
  94:14,19
  100:13,16
discussed 45:24
  78:11 100:17
  102:13
disease 69:9
dispute 124:11
disputed 124:12
disrupt 13:10
disruption
  15:13 121:2
  146:4
dissolve 63:19
  64:9
dissolved 7:8
  62:21,22,24
  63:2,11 64:18
dissolving 63:9
distant 64:16
distinction
  144:13
distraction
  121:1
distribute 79:7
  115:13 143:17
  144:11 145:11
  146:4
distributed
  18:16 49:5
  78:25 110:9
  114:14,15
  115:4 116:20
  117:4 118:3
  126:25 127:5
  128:4 143:24
  144:8 147:14

147:19 150:20
  150:20 151:13
  152:5,14,15
  162:21
distributes
  116:22
distributing
  45:5 79:7
  143:10
distribution 3:9
  13:25 14:3,6
  14:10,18 15:5
  15:6,16 17:8
  17:10,15,15,18
  17:22 18:4
  36:22 62:3
  112:11,23
  115:9,11
  118:12 120:19
  144:24 145:2
  150:19 161:24
  162:2,11
distributions
  64:3 150:7
  151:12 162:25
DISTRICT 1:2
  1:6 167:2,6
diversion
  118:19 119:18
diverted 118:9
doctor 4:24
  56:11 70:3,12
  70:20 72:4
doctor's 56:3,5
doctors 68:2
  69:11 70:6,7
  71:1,2
document 42:10
  42:18,21 43:3
  43:6,17 46:14
  46:22,24 47:1
  47:4 48:5,12
  48:13,17,19
  49:2,4,13,17
  49:25 50:1,3
  50:12,19,25
  51:10,14,17,18

91:8 128:25
  133:24 163:6,9
  163:13 166:9
documentation
  52:17
documents
  34:21 37:11
  39:25 40:2,10
  41:25 47:11
  49:16 50:9,22
  64:21 90:17
  92:18 103:15
  103:15 119:2
  128:20 129:3
  132:10 151:14
  163:16
doing 6:2 12:6
  13:6 14:20
  16:23 25:19
  33:11 39:12
  47:10 50:23
  52:18 61:17
  65:18,21 67:25
  98:22 122:13
  125:17 127:17
  133:23 134:17
  157:18
dollar 107:6,10
  107:15 108:10
  108:15 111:25
  115:16,17
dollars 66:16,20
  105:19,23
  106:14,24
  110:24 111:10
  111:11 143:8
  147:3,18 148:9
donate 33:16
  41:6
donated 33:3
  39:13
donations 41:12
door 127:4,16
double 161:7
download 37:15
  37:17 133:3,14
downloaded

133:9,16
Dr 58:1,4,11,12
  58:15,20 59:15
  59:16,25 60:4
  60:5,8 62:8
  63:18 64:8,25
  65:1,15,25
  67:22 71:13,17
  71:19 72:21
  73:6,12,23,24
  75:18,20,22
  76:6,1 80:12
  81:15 97:5
  101:5,10,16,19
  101:22,25
  102:4,10,19,22
  103:21,23
  106:25 107:14
  107:18 108:9
  108:16 134:11
  134:13,17
  136:19 162:3
draft 41:18,21
  42:9 43:22
  46:25 103:15
drafted 42:3
  46:1,2,14
drafting 46:12
  97:8
drafts 43:7,23
draw 113:15
dreamed 26:21
drew 19:2
drive 34:13
  37:16 129:4
driver's 8:15,18
driving 113:6
drop 162:7
dropped 5:18
due 21:10 53:11
  79:24 151:12
  152:13
duly 1:13 4:15
  167:16
duties 30:15
  36:18 62:1
  85:10 136:12

137:1 145:6
**Dylan** 140:8

**E**

**E** 1:4 2:1,1 4:16
  166:6 167:4
**e-mail** 2:6,11
  89:5,8 129:13
**E-r-o-o** 7:23,24
**earlier** 45:24
  65:6 122:22
  127:23 131:21
  156:15 161:8
**early** 5:11,13
  6:5 14:14
  17:12,18 21:1
  22:18 23:19
  24:1 25:3
  50:24 84:16
  88:13 106:22
  162:5
**ease** 80:2
**easier** 76:3
  113:16
**easy** 30:6 119:3
  119:24
**easy-to-reach**
  13:4
**educate** 68:17
**educational**
  68:16 69:22
  70:24 71:5
**Edward** 4:21
**effected** 106:7
**eight** 98:18
**either** 13:25
  31:7 42:15
  58:7 59:25
  116:7 155:16
  157:25 159:11
**Ellis** 1:5,9,11 3:3
  4:5,14,19,22
  26:13,14 54:15
  165:3,25 166:1
  166:4,8 167:5
  167:8,16
**Ellis/Max** 80:12

**Emergency** 4:6
**employ** 16:21
  155:20
**employed** 7:1
  13:19,20 15:3
  17:4 23:13,14
  23:16 135:17
  135:18,24
  146:17 157:8
  157:18 168:11
**employee** 67:15
  85:5 135:10,15
  135:25 136:5,9
  136:16 148:15
**employees** 11:1
  25:21 26:3
  30:17,18 67:19
  86:3,11,13
**employer** 16:21
**employing**
  138:17
**employment**
  6:11 25:19
  157:12
**en-** 74:7
**encourage** 56:23
  58:12
**encouraging**
  56:24
**ends** 12:23
**engineer** 119:4
**enlighten** 75:21
**enterprises** 1:2
  96:22 100:20
  101:10,11
  167:2
**Enterprises'**
  101:15
**entire** 29:2
  56:13 57:2
  139:4 149:20
**entities** 33:4
  45:3,7 53:12
  55:8 60:24
  62:2,24 66:15
  66:20 79:24
  102:13,23

141:19
**entitled** 74:8,19
  74:20 92:5
  117:13,16,19
  142:8 152:5
  154:3,4
**entitles** 154:16
**entity** 5:23 7:11
  24:1 38:9
  42:15 45:6
  69:3 76:23
  77:2,16,22
  82:25 83:3,24
  92:12 116:13
**entry** 86:21
**envelope** 145:3
**equipment** 33:3
  33:15 37:14
  39:8,12 41:6
  85:12
**erase** 40:24 41:2
**erased** 41:2
**Eroo** 7:17,21
  8:10,23 9:17
  9:22 10:3
  25:20,21 26:3
  26:9 58:24
  65:22,24,25
  66:24 67:2,5,6
  67:8,10,13,15
  67:21 68:6
  74:14 75:3
  159:13,13,14
  159:23 160:7
  163:18
**escalated** 110:7
**essentially** 23:5
  68:15 69:13
  115:21
**established**
  159:13
**event** 69:5
  122:24
**everybody**
  41:13 48:4
  51:10 87:3
**evidence** 65:7

146:15
**ex-** 47:5
**exact** 7:14 15:20
  39:5 40:7
  63:14 65:8
  93:7 106:18
  109:20 125:23
  148:24 156:2
**exactly** 7:6,9
  11:21 20:22
  21:7 29:19
  46:6 50:9
  62:13 73:11
  87:1 107:5
  146:10 156:21
**exam** 74:18
**examination** 3:4
  167:22
**example** 12:8,20
  12:24 13:24
  18:19,20 19:2
  55:17 56:1
  58:1 69:2 76:2
  97:18 109:11
  111:25 112:2
**Excel** 33:21,22
  33:22 37:20,24
  38:22,23,24
  40:1,2 131:7
**excerpt** 53:2
**excess** 98:18
**exclusive** 76:17
**exclusively**
  102:21
**execute** 92:18
  105:13
**executed** 43:8
  43:24 46:24
  47:1,3,11 49:7
  50:2,16 51:9
  52:5 163:5,10
  163:14,15
  166:10
**executing** 106:4
**Execution** 43:11
  43:19
**executive** 97:4

104:12
**Exhibit** 3:9
  112:16,22
**exhibits** 3:7
  170:13
**exist** 38:23
  62:20 79:6,13
  119:6
**existed** 25:18
  37:20 38:21
  39:2 43:18
  45:8 49:15
  57:13 68:6
  116:9
**existence** 26:22
  47:5 51:15
  77:7,16,25
**existing** 22:14
**exists** 38:24 77:2
  101:10 129:21
**expect** 91:14
**expected** 92:4
**experience** 31:6
**expert** 38:10
**Expiration**
  169:5,6,7
  170:21,22,23
**Expires** 166:17
**explain** 90:16,20
  97:15,20
**explaining**
  10:17
**expressed**
  105:14 166:11
**extended** 142:4
**extent** 87:24
  146:18
**extra** 18:21
**extremely** 18:1
**eye** 66:10

**F**

**faced** 135:8
**faces** 72:11
**facilitate** 80:2
  85:13 138:20
**facilities** 14:1

15:15 55:24
56:6,9 57:20
71:25 79:15
120:11 124:5
124:12,24
125:15,17
126:2 141:22
142:3
**facility** 13:9
15:8 18:13,17
18:25 19:3
72:1 98:22
109:12 124:13
**fact** 43:18 45:18
58:10 94:3
104:17 108:15
141:2 152:3,6
**facts** 119:9
**failed** 18:25
**failure** 56:17
**fair** 14:21,22
101:8 110:22
111:8 138:11
**fairly** 24:13
64:11 99:6
111:23 118:14
149:8 153:24
154:25 159:18
**faith** 156:4
**fall** 21:1 64:19
143:12 145:16
156:16
**falls** 152:20
**familial** 82:11
**familiar** 9:18
25:12 42:17,20
43:1,4,7,17
46:19,21 52:11
53:1 71:25
77:11
**family** 137:1
**far** 11:24 18:15
19:8,9 30:1
54:3 58:15,25
80:13 87:16
94:21,25 95:12
96:9,16 100:7

100:13,24
101:11 107:16
116:3 119:23
120:10,14
121:24 125:23
126:12 147:20
150:18 153:12
**fashion** 13:9
19:1,13
**Fax** 2:6,11
**FBO** 158:7
**federal** 54:23
**fee** 73:15,20
74:3,11,16,22
75:16 114:22
114:23,25
**feel** 55:4
**fees** 124:7,8
**feet** 15:25 16:2
**felony** 8:20
**female** 86:19
**figure** 43:14
110:7 143:6
**figures** 149:4,6
149:10,20
150:3 159:2,15
159:15,15
**file** 129:6 132:20
**filed** 170:17
**filled** 73:25
74:13 76:7
**filling** 92:9
**final** 112:8
**finalized** 140:16
**financial** 45:8
96:16 97:16
100:16 103:24
148:25 159:8
**financially**
168:14
**financials**
100:18
**find** 43:24 68:6
113:16 115:16
118:17 135:7
160:13
**finding** 72:12

**fine** 54:8 122:3,6
**fired** 156:5
**Firm** 169:9
170:24
**first** 4:15 9:6
23:22 25:3
26:20 57:18
96:11 130:8
134:9,10
**fit** 68:23,24 69:1
72:4
**fitness** 6:25 72:4
**five** 25:24 26:1,2
86:7,16 160:16
**fix** 56:19 122:9
**flights** 12:11
19:24
**floated** 47:22
48:2
**flow** 79:25
109:25
**flowed** 18:18
**fly** 153:25 154:1
154:2,3,4,7,7
154:16,21,22
155:4
**fly-in** 158:19,20
158:21
**flying** 12:8
**focus** 21:19
**folder** 129:10,11
129:18,21,21
**folders** 129:23
**follow** 119:25
126:7,8 149:22
**following** 79:8
126:7 167:15
168:5
**follows** 4:15
167:25
**food** 121:15
122:4,9
**Forage** 63:7,18
64:8,25 65:1
80:12 106:7,25
107:14,18
108:9,16

162:18
**force** 104:24,25
**forced** 105:3
**foregoing** 166:1
166:10
**foreign** 15:21
**foremost** 57:19
**forgot** 6:22 7:14
**forgotten** 35:9
**form** 46:2,4
**formation** 41:25
46:7,8
**formed** 160:11
**formula** 57:21
**forth** 49:17
50:22
**forthcoming**
31:8
**Fortunately**
20:18
**forward** 121:3
**founded** 7:16,20
**four** 45:10,17
86:16
**frame** 21:22
23:20 119:1
**Franklin** 1:2
2:15 60:4,5,8
62:5,8 65:15
65:18,25 67:22
68:1 71:13,17
71:19,25 72:21
73:6,12,23,24
75:18,20,22
76:6,11 97:5
100:21 101:1,5
101:10,16,19
101:22,23,25
102:4,10,14,19
102:22 103:9
103:21,23
121:5 134:11
136:18,19,21
162:3,12 167:2
**Franklin's**
81:15 134:13
134:17 135:3

**fraudulent**
141:20
**freezers** 15:9
**friend** 24:15,18
71:21 82:8
**friends** 137:2
**front** 43:21
64:22 65:9
66:4 73:10
149:17
**frustration**
163:23
**fulfilled** 73:4
**fulfillment**
113:11
**full** 160:25
**full-time** 155:11
155:16,18,20
**fully** 31:19 49:7
50:15,18,18
51:9 52:5
163:5,9,13
**funds** 45:6 53:11
78:16,23 79:2
79:7,14,19,24
111:19 119:21
143:11,18,24
144:9,11
162:21
**further** 168:10
168:13,16
170:1

| G |
| --- |

**gather** 15:7
**gaw** 155:18
**gears** 25:6,8
108:23
**general** 18:3
125:22
**generally** 5:10
12:9 35:21
47:20 55:25
123:3
**generate** 127:16
**generated** 36:17
107:13 109:22

127:6
**generating**
91:10
**gentleman**
27:13 99:6
**gentleman's**
94:9 99:5
**gentlemen** 16:12
16:13 118:18
156:11
**Georgetown**
157:25 158:2
**getting** 6:19
65:3 88:20
105:22 128:2
160:17
**give** 20:9 33:9
65:8 76:2
88:23 101:4
112:4,15
144:22 148:3
161:7 162:2,3
162:12
**given** 30:20 33:7
38:17 103:8
106:5 124:13
125:23 131:23
144:19 145:3
162:11 166:12
167:18 168:3
**gives** 116:21
**giving** 165:4
**Glen** 93:1 98:13
112:23 120:17
120:18
**go** 5:6,9 13:22
18:4 25:9
28:25 29:8
30:24 43:2,24
51:6,7 53:20
54:9 57:25
69:23 70:2
88:1 93:10,21
97:1 108:21
114:1 115:11
121:19,20
122:12 155:8

156:17 160:15
164:13
**goal** 57:18,19
**goes** 12:23 17:24
18:15 67:13
70:10,18 76:5
76:8 154:21
163:1
**going** 14:18
15:13 17:22
18:5 19:1
21:21 25:8
27:20,23 35:4
36:22 42:21
45:21 46:16
47:17 50:22
53:19,22 56:10
63:19 64:9,19
65:12 76:22
80:15 89:1
91:13 92:1,3
92:24 94:22
95:2,3 96:8
99:22 101:3
105:6,6 106:11
112:14,15,16
113:14,24
118:19 121:11
121:18,23
155:8 156:12
160:22
**Gold's** 72:3
**good** 32:25
53:25 54:19
72:10 97:24
102:7,14,24
103:3 104:1
105:13 156:4
**goods** 111:7,21
111:22 112:1
**Goodwill** 33:3
**gotten** 94:24
**graduate** 5:7,12
**great** 66:6
**greatly** 149:2
**gross** 65:24
112:25 113:3,7

113:10,12,13
113:19 114:3,3
115:9 128:9
**GROUP** 2:4
**guess** 22:12
24:17 109:2
114:22 122:23
147:2 154:10
163:24
**guessing** 45:11
**Guthrie** 168:7
**guy** 86:18
**guys** 54:8
121:13
**gym** 72:3,14

—————

**H**
**habit** 33:11
**hairs** 75:7
**half** 45:22 64:13
121:12 153:8,9
159:3
**hand** 32:20,22
37:8,8 47:15
108:15 166:12
**handed** 37:10
47:5 48:23
145:1
**handing** 37:13
108:9
**handle** 6:7 19:24
**handled** 13:13
26:19
**hangar** 158:3,5
158:9,11,12,18
158:21,23
**happen** 20:20
105:6 118:8
120:10
**happened** 14:19
18:2 72:18
118:6 127:13
147:11 152:6
156:16 162:15
**happening**
117:7
**hard** 14:11

46:23 113:20
134:16 135:12
142:22
**head** 96:21
**health** 6:25 9:19
10:4 68:10,11
68:14 69:2,5,8
69:10,13 70:2
70:11,13,19,19
71:10,14 72:20
73:13 76:6,16
80:5,13,16,19
80:23 81:2,15
82:22 159:10
**healthcare** 6:16
54:18,24 55:2
55:18 56:13
57:18 75:14,14
75:15 143:7
**hear** 30:24
33:17 84:22
91:21 105:1
121:10 142:16
156:12 164:4
**heard** 31:18,23
95:20,20,21
**heavy** 56:13
**held** 5:24 8:17
8:17 133:19
**help** 54:17,17
106:11 157:11
**helped** 61:25
148:25
**hereto** 1:20
**hey** 101:9 162:7
**hierarchy** 76:9
**high** 5:12 56:17
**higher** 55:21
56:2
**highly** 110:7
112:3
**HIPAA** 125:22
**hire** 154:22
**history** 25:9
132:11
**Hobbs** 2:8 4:13
121:15 122:1,4

160:25 161:4
161:10 164:11
164:14,16
168:2,8
**hold** 5:7 11:5
**holder** 83:5
**holds** 10:25
**Holle** 2:16 60:4
96:18 100:22
100:23 101:1
101:11,17
162:3
**home** 32:12
**homes** 24:21
**honest** 11:21
42:13 61:24
**hop** 161:8
**hope** 43:9 164:6
**hormone** 68:25
**hospital** 12:24
12:24 18:21
55:12,20 93:2
93:3 94:13
95:3,8 96:6
97:18 99:12,13
100:2 109:4,10
109:19 110:13
110:25 111:1
111:12,19
114:4 115:8
116:18 117:2
117:22,23
118:2,10,20
120:3,16,17,18
139:9 140:3
148:8,19
**hospital's** 95:18
141:8
**hospitals** 12:14
56:1 57:9
92:23 109:21
114:5 141:16
**hour** 53:19
121:11,22
**hours** 53:21
**house** 39:20
40:6 55:16

158:22
**Houston** 2:5
   157:3 169:10
   170:25
**hub** 13:4
**Hugo** 62:9
**huh-uh** 31:1
**hundred** 43:20
   54:25 62:10
   69:21 131:16
   132:15 163:16
**hundred-thou...**
   150:13
**hundreds**
   105:19,20,23
**hypothetical**
   152:7

**I**

**IBC** 44:8,13
**ID** 132:1
**idea** 10:15 26:22
   34:15 35:5
   54:19 94:21
   103:3 105:20
   106:10 147:4
   147:10 150:24
**identification**
   4:12
**identify** 112:21
   118:18
**identity** 166:9
**II** 1:2 45:11 52:2
   60:14,17,18
   61:3 62:4,15
   62:18,20
   100:20 101:10
   167:2
**III** 45:14,15
   52:2 61:6
**illegal** 75:9,11
   75:16
**important** 78:9
**improper** 47:14
   118:4,6 152:12
**impropriety**
   119:5,12 120:1

**in-house** 55:11
   56:2,4,6,19
   58:7
**inaccurate**
   76:18 95:5
   103:13 110:3,8
   112:3 118:25
   131:8 138:7
   163:17
**inadvertently**
   151:20
**inappropriate**
   125:1
**inartful** 90:20
**inception** 28:8
   28:19 32:11
   116:9
**incidence** 20:2
**incident** 123:4
   155:22
**included** 26:1,2
   108:20
**includes** 168:5
**including**
   106:11 121:4
**income** 112:25
   113:3,10,13
   114:3,3,7,13
   114:14,15
**incorporated**
   32:11
**incorporation**
   26:25
**incorrect** 27:12
   39:22,23 58:9
   62:6 76:18
   111:16
**incorrectly**
   77:15
**increasing** 85:14
**incurred** 142:3
**independent**
   157:20
**INDEX** 3:1
**indicate** 120:22
   165:4
**individual**

121:21 128:1
   133:10
**individually**
   60:6 80:9 84:5
   116:8
**individuals**
   142:12
**industry** 141:19
**information**
   20:9 29:1,9,17
   37:15,17,24
   38:2,6,18 39:2
   40:5,12,19,21
   40:24 41:7,8
   59:6,11,22,25
   60:3,9,25 66:4
   77:4 92:20
   125:23 129:8
   140:21 168:3
**informed** 62:19
**instance** 1:12
   13:7 19:11
   127:10
**instances** 55:22
**instrument**
   166:10
**insurance** 55:13
   55:13,15,20
   74:24 109:6,10
   109:16 157:23
**insured** 76:12
**integrated** 6:15
   68:16,22 70:7
   71:3
**Intelligence**
   10:13
**intended** 91:20
   109:6,8 110:22
**intending** 92:8
**intent** 91:10,25
   92:2,4 104:14
   110:20 128:12
**intentionally**
   151:20
**interactions**
   58:22 97:6
**interest** 6:24

11:8,9 61:4,7
   61:11 82:14
   83:5 105:10
   106:10 107:2
   108:19 130:15
   137:21 139:13
   149:18 150:1
   151:12
**interested**
   168:14
**interesting**
   155:2
**interests** 136:11
**interface** 55:11
**interim** 106:14
   139:17
**intermediary**
   60:1
**internal** 30:2
   71:3
**internet** 133:25
**interrupt** 60:22
**introduce**
   134:22
**introduced**
   71:18,20 72:14
   98:2,12 134:11
**introduction**
   135:7
**investor** 66:1
**invoices** 73:10
   98:25
**involve** 52:24
**involved** 10:6
   25:15 26:25
   28:9,13 48:3
   57:6 75:25
   95:25 96:2
   98:11 101:23
   104:2 107:4
   138:22,24
   141:17 143:3
   160:4
**involvement**
   12:2 29:3,12
   71:13 73:21,21
   100:7 120:10

142:11
**involves** 104:6
**involving** 58:11
   59:17
**irregular** 39:13
**issue** 39:11
   79:14,23
   104:19 105:14
   105:15 120:12
   120:24
**issued** 63:25
**issues** 79:6
**it'd** 140:23
**itemized** 41:11
**items** 33:16
**IV** 45:14,15 52:2
   61:10,12,13,18
   61:23

**J**

**J** 82:4,12,15
   86:15 87:19
   88:4,16 89:7
   89:23 117:12
   168:2,8
**J&L** 5:22 7:1,5
**Jackson** 2:8
**January** 63:25
   169:1
**Jean-Pierre**
   63:7 162:18
**Jeff** 2:8
**Jeffrey** 2:8
   168:2,8
**jhobbs@abau...**
   2:11
**JL** 6:22 7:7
**job** 56:12 87:10
   94:1,4
**John** 58:1,4
**joke** 10:16
**judgment**
   137:16
**JUDICIAL** 1:6
   167:6
**July** 46:19 48:9

48:16,19 52:4
**jumping** 146:22
**June** 147:10
**jury** 16:12,13
  118:18 156:12
_____
**K**
**K-1** 63:23,25
  64:4
**Kangi** 160:18
**Kayla** 2:13
**keep** 33:2 34:10
  34:13 39:11
  53:22 109:19
  109:21 110:20
  125:12,18
  132:17 133:4
  158:11
**keeping** 29:4,13
  126:12
**kept** 111:1,2,4
  124:5 125:7,14
  157:22,24
  158:1,15,23
**killed** 20:17
**Kim** 58:1,4,11
  58:12,15,20,22
  59:14 81:9,12
  81:16,22
  144:17,19,22
  145:1,4 161:24
  162:4,13,23
**Kim's** 145:2
**kind** 5:1,19,23
  6:13 8:14 11:4
  12:2 15:21
  18:17,22 20:11
  27:19 29:7
  59:9 69:9
  71:10 92:16
  106:15 107:25
  108:21,24
  120:24 126:6
  138:10 146:22
  156:5 160:14
  160:18,19
**kinds** 8:18

141:16
**King** 11:11
**knew** 71:16 78:7
  94:22 95:2
**know** 7:6 14:14
  18:12,15,20,20
  19:3 20:21
  24:10,12,16
  29:23 31:18
  33:25 34:1,4
  35:12,16,23
  37:10,25 38:11
  38:13,13 39:4
  39:9 40:7
  41:12 42:13
  43:7,22,22
  45:17 47:23,24
  48:3 49:11,17
  49:25 50:13,15
  51:4,6,8 52:22
  55:23 56:4
  59:3,6 61:15
  62:11,13 63:14
  63:15,22 64:21
  65:6 66:11,11
  66:13 70:25
  72:6,9 73:11
  75:13 76:21
  77:7,13,14,14
  77:16,18,25
  81:11,22 93:7
  94:18,21,25
  95:1,6 96:5,19
  96:20,24 97:1
  97:3,4,21,25
  98:13 99:5,18
  100:1 105:9
  106:18 107:4,7
  108:23 110:16
  112:2 119:6,23
  124:7 125:4,5
  131:2 132:15
  136:20 138:17
  140:9,11,18
  142:11,19
  146:21 150:21
  150:22 151:19

151:25 153:25
  154:1,1 155:25
  156:4,5,7,13
  156:21 160:15
  162:6 163:7,17
**knowing** 104:19
**knowledge**
  77:10 95:1
  118:7,12
  127:13 141:24
  144:25 147:6
  150:10 151:11
  152:14
**known** 117:8,12
  117:15,18
  166:8
**knows** 128:8
**Knox** 93:1,3
  95:8,8,13,13
  96:6 97:17
  99:18,19,20,22
  99:23 100:1
  118:1,20 120:3
  120:16 140:3
  148:8,19
**Kuehler** 100:5
  100:14
_____
**L**
**L** 81:19
**L.L.C** 9:24
  10:16,17,20,22
  10:24,25 11:3
  11:5,8 12:1
  17:2,5 22:25
  25:13,16 41:14
  41:16,19 42:1
  42:5,6,11,12
  42:23,24 44:10
  46:18 47:16
  48:16 50:17
  51:22 52:3
  54:16 56:24
  63:2 64:9
  76:20,21,22,23
  77:21 78:1
  80:21,22 84:6

92:11 105:9
  116:9 119:20
  133:16,18
  153:4
**L.L.C.'s** 56:11
**L.L.C.s** 10:2
  83:5
**lab** 12:7,12,24
  17:24,25 18:13
  23:21 24:4
  25:12,16,18
  26:5,15,17,20
  27:1,7,17,25
  28:4,8,13,14
  28:19,22 30:3
  32:7,10,11,15
  32:18,21 33:7
  33:20 34:6
  35:6 36:20
  37:1,19 38:1
  38:14,19 39:19
  39:20 40:14,17
  41:3,14,15,19
  41:25 42:4,7
  42:11,24 44:5
  44:10,14,18,19
  44:22,23 45:2
  45:3,7,9,11,20
  46:18,20 47:16
  47:19 48:9,10
  48:15,24 49:8
  50:16 51:21,22
  51:23,23,25
  52:3,10,15
  53:7,8,9,13,15
  53:16 54:16
  55:11,12,15
  56:6,10,13,23
  57:11,16 58:8
  58:11 60:11,14
  60:17,18 62:15
  62:18,19 63:1
  64:9 65:17
  66:3,15 67:21
  75:19,24,25
  76:8,13,20,21
  77:1,5,6,20,24

78:2,24 79:5
  79:13,18,21,22
  79:25 81:19
  90:22 91:2,7
  91:21 92:1,11
  92:24 93:18
  95:22 97:16
  100:8 101:6,20
  101:21 102:5
  102:11 104:24
  105:4,17 109:4
  109:5,25,25
  110:4,6,14
  111:2,14
  113:10 114:6
  115:12,13,24
  116:4,7,8,21
  116:21 117:4
  117:24,24
  118:3,4,10,21
  118:22 120:5,5
  132:8 139:12
  141:16,25
  163:4
**lab-related**
  59:14
**LabCorp** 58:8
**laboratories**
  56:7,17
**laboratory**
  56:14 100:11
  135:8
**labs** 12:18 57:9
  83:9 92:23
  95:11 109:1
  111:22
**lack** 23:5
**ladies** 16:12
  118:18 156:11
**lag** 7:19 31:5
  84:21
**Landon** 27:13
  27:16 93:17
**large** 66:11
**larger** 60:17,24
  88:1
**largest** 153:12

**late** 131:3
134:15
**law** 2:4 143:5
**lawsuit** 89:9
138:22 140:2
140:11 143:3
160:5
**lawyer** 27:6
41:18,21,24
42:3,9 46:1
97:7 108:6
**leak** 21:10
**learner's** 154:9
155:6
**Lease** 23:2
**leave** 122:11
**led** 101:24
**left** 6:12 7:11
24:5 105:4
149:18 157:7
**legal** 75:17 92:7
143:22
**legally** 154:3,4
**lesser** 83:19
**let's** 4:24 13:11
13:11,15 14:24
14:24 19:2
36:11 54:5
64:16 112:4,15
112:15,21
117:23 122:12
137:12 147:9
**letter** 6:23 63:10
63:12,17,22
64:7,11,17,25
65:3,5,12,13
80:12
**level** 16:9 69:20
118:23 119:19
119:20
**Lewis** 12:8,13
24:10 62:5
78:8 81:22
83:5 86:10
89:11,17,19
95:20 117:8
134:5,10,22,25

135:1,2 153:5
153:7
**license** 8:15,18
132:4,12
154:10,11,15
**licensed** 5:1
16:19 18:14
98:3
**licenses** 8:14,18
**licensure** 98:5,9
**lies** 120:20
**liked** 163:24
**limited** 84:6
106:3
**line** 21:4 80:13
101:12 112:25
113:8,15 165:4
**lines** 72:5
**list** 30:5 41:12
88:21
**listed** 10:8,10
**listing** 10:9
**literally** 31:1
**literate** 34:3
**litigation** 39:9
139:3
**little** 7:19 25:6,8
25:9 26:7 66:6
95:16 108:23
113:14 146:24
149:23 155:22
**live** 47:11 49:18
**LN** 12:3,4 13:21
14:5,6,9,13,17
15:3,5,7,17
17:1,2,5,18
19:24 21:13,18
22:17 23:4,9
23:13,15,16,20
24:2,23 42:5
42:10,15,15,23
76:22,23 77:7
77:9,11,14,20
77:22,25 78:3
81:16,18,20,24
82:2,5,15,22
83:1,14,16,21

83:22,23,24,25
84:2,7,11,14
84:24 85:5,7
85:11,15,18,23
85:25 86:3,11
86:13 87:22
89:2,21 90:4
95:20 96:2,4
97:17 100:9
111:5,13
115:19,21
116:4,11,20
117:3,21,23
118:23 119:19
119:19 120:5
135:11,15,18
135:24 136:2,5
136:5,8,16
137:5,7,19
138:17 139:11
139:18,23
140:4 142:8
143:11,18,24
144:1,8,9,12
144:17,21,23
145:4,7,12,24
146:5,7,16
148:11 149:11
149:18 150:20
151:21 155:14
159:11,20,23
161:23 162:11
162:22,22
**local** 157:3,7
**located** 4:8
32:10,12 93:6
118:24
**location** 87:3
93:8 156:22
**locations** 12:15
37:21 88:8
**log** 123:13,16,21
125:12
**log-in** 133:20
**logistical** 6:14
6:17,19 11:6
12:16 13:8

83:10
**logistics** 6:4,7
18:15
**logs** 125:14,16
125:18 126:1,1
**long** 20:10 43:2
48:20 49:11
55:7 71:23
94:8 106:9
135:10 138:2
138:16 155:20
160:11
**long-time** 82:8
**longer** 28:9,12
29:21 40:22
62:20,21 94:9
99:7 128:22
130:12 133:7
133:22 146:17
**look** 43:3,6 47:4
48:20 51:6,7
64:22 67:18
69:11,11 112:5
112:21 118:19
118:22 131:16
156:9
**looked** 36:21
42:19
**looking** 40:16
68:25 70:6
85:12 103:7
113:8,21
133:24,24
159:17
**looks** 7:13 42:25
113:3 114:14
114:21
**Lopez** 62:9
**lose** 98:5 112:17
**losses** 143:7
**lost** 98:9 121:9
**lot** 10:6 31:6
33:2,3 47:21
49:12 50:21
57:8 62:1
134:25 163:15
**Louisiana** 1:16

167:12 169:6
170:22
**love** 10:17
**low** 107:7,10,13
**lunch** 121:17

**M**

**M** 4:16 82:4,12
82:15 86:15
87:19 88:4,16
89:7,23 117:12
**M-a-c** 161:17
**M.D** 1:2 71:7
167:2
**M.D.s** 71:3
**Mac** 161:17
**machine** 1:17
**maintain** 28:4
57:20 123:9,13
123:16,21
124:19 130:2
130:16 138:19
157:19
**maintained**
28:21 32:15
33:6 132:21
139:21 152:17
152:18
**maintaining**
28:7 29:12
85:22 87:15
151:11
**maintenance**
128:14
**majority** 138:4
**making** 24:24
25:2 37:2
70:20 75:4
126:24
**man** 161:16
**manage** 78:10
155:17
**managed** 102:20
103:2
**management**
7:21 8:10,23
9:22 11:2

25:20,21 26:4
41:15,19 42:1
42:5,6,11,11
42:23,24 44:5
44:19,22,24
45:3,9 51:21
51:24 53:7,9
53:17 61:22
76:20,23 77:1
77:4,6,7,9,12
77:14,21,25
78:1,3,9,13,24
79:5,13,18,20
79:21 80:1
83:22,23,24
84:3,8,11,15
84:25 85:5,8
85:11,15,18,23
86:1,4,11,14
87:23 89:3,21
90:5 95:21
96:3 97:17
102:5,11
104:11 108:19
110:1,4,6,15
111:3,15
114:22,22,25
115:13,19
116:7,11,20,22
117:3,4,22
118:3,22,24
119:19 120:6,6
120:19 123:7
123:10,13,19
124:2,15,18
125:7,11
126:25 127:18
127:21 130:16
132:18,22
133:11,12
135:16 136:4
137:8,9,20
138:6,10
139:20 145:5,7
146:18 147:10
149:12,19,19
150:2,16

151:22 159:11
159:12,13,23
159:25 161:24
162:12,20,21
162:23
**manager** 61:14
76:21 104:12
135:19
**managers** 52:11
52:14,25 61:25
**manages** 8:12
**managing** 25:20
124:15,18,19
125:6,11
126:23 127:18
130:20 135:16
136:3 146:17
**manner** 141:20
**manufacturer**
157:6
**Marc** 157:2,9
**Mark** 2:3 168:1
168:7 170:10
**mark@collme...**
2:6
**market** 65:16
110:23 111:8
**marketing** 68:8
92:17
**MAs** 16:11
**match** 127:9
159:4
**material** 92:17
123:22 130:25
131:23
**materials** 21:18
83:9 95:11
128:15
**matter** 15:1 33:1
58:9 120:17
121:23 156:4
161:6
**Max** 9:19 10:4
68:10,11,14
69:2,5,8,10,13
70:1,10,12,18
70:19 71:10,14

72:20 73:13
76:5,16 80:5
80:16,19,23
81:2 82:22
97:7 159:10
161:17
**mean** 6:17 7:18
10:11 21:4
22:22 41:8,11
50:21 58:17
60:21 74:25
75:14 141:13
147:16 148:14
156:2 157:5
159:19 160:18
**meaning** 10:9
74:11
**means** 4:11 6:19
8:7 13:7 115:8
129:17
**medical** 4:24 5:1
7:2,12 12:21
13:16,17 15:2
15:8,10 16:7
16:10,11,18
17:4 69:6,17
69:20 70:19,21
71:10,12 93:1
96:25 97:5
103:24 126:2
126:12 159:11
159:25 162:21
**medicine** 6:16
68:17,22 70:7
71:3,3
**meet** 70:5 134:9
134:9,10,10
**meeting** 134:21
134:24,25
135:4,6 162:6
**meetings** 22:23
31:7
**member** 62:7
92:10,11 98:3
**members** 62:4
105:9 142:12
**Memorial** 93:1

93:5,6,11,21
94:7 99:3,22
**mentioned**
103:3 161:17
**Merit** 167:12
**met** 96:18
**Michelle** 2:16
60:4 96:18,19
100:22,23
101:1,11,17
162:3,12
**Microsoft**
129:14
**mid** 134:15
149:17
**middle** 4:20
88:6 111:3
118:23 119:18
120:20
**mill** 118:9
**million** 110:24
111:10,11,25
115:16,17
142:23 143:2
146:18 147:2,5
147:6 148:9,18
150:15 151:22
152:4
**millions** 66:16
66:19 106:14
106:23 147:18
**mind** 21:19
34:25 35:10
72:9 108:23
**mine** 37:4 82:17
101:16
**minutes** 121:13
122:6 160:24
**missed** 19:4
**missing** 119:18
119:22
**MMA** 86:18
**Mmm** 88:13
98:18
**MMP** 3:9
112:11,23
113:11 114:4,5

114:7,16 115:7
115:18,18
116:19 118:2
118:20 120:3
120:18,20
139:18 140:4
141:16,25
142:7 143:11
143:18,25
144:12 147:3
148:8 149:11
150:15 151:21
152:8,10,11
**moment** 122:20
122:21
**monetary** 107:3
**money** 24:24
25:2,2 36:20
54:20 55:10
57:8 58:6
66:25,25 67:3
67:3 74:1,20
75:22 76:11
78:21 106:15
107:1 109:1
110:10 115:7,8
115:22,24
117:1,1,9,13
117:16,18,21
118:1,2,9,23
119:18 120:2
120:16 126:24
127:4 134:5
147:8,11,13,19
150:16,17,19
150:25 151:7
151:20,21,25
152:1,5,8,9,11
152:13
**moneys** 94:15
109:23 159:10
**monitored**
46:16
**month** 35:17,18
40:5 128:10
156:7,13
**monthly** 36:9,11

36:17 127:14
127:15,16
128:4,15
129:24 130:9
133:23
**months** 63:18
64:7,10,12,13
64:14 98:19
122:22
**Montrose** 2:4
**moral** 143:21
**motor** 21:10
**move** 121:3
154:17
**moved** 6:10
157:6
**moving** 12:11
19:8,9 79:14
**MSO** 42:3,10,22
43:16
**MSOs** 98:6
**mutual** 71:21

_____
**N**

**N** 2:1 4:16,16
**Nacogdoches**
5:16
**name** 4:9,18,20
7:19 9:7,7,13
10:19 22:8,11
26:8,10,12
36:12 65:2
68:9 71:22,22
72:6,12 94:9
95:13 99:5
131:12,15
138:1 140:9,10
156:23 161:16
166:10
**names** 9:4 22:8
26:7 72:8,11
92:25 160:12
**Nathan** 59:15
**nature** 6:4 8:12
9:1 15:9,10
22:23 59:18
61:9 75:16

85:13 98:23
**necessarily**
61:15
**necessary** 15:14
80:2 138:19
**necessitate** 79:6
**necessity** 19:15
**need** 12:16,21
18:16 22:15
33:2 35:8 44:1
51:6,8 52:20
52:22 59:2,3,6
70:12 88:5
95:16 113:25
119:6 125:5
143:20 160:25
161:2 163:2
**needed** 43:25
55:3 94:15
133:4
**needn't** 59:4
**needs** 12:5 18:13
68:5 71:7
121:15 122:4
**neither** 168:10
**net** 111:7 114:7
114:14 115:10
115:11 128:9
133:2
**never** 18:2 22:12
22:13 47:3
67:15 82:19
95:19,20,21
110:8,18
117:11,14,17
117:20 118:7
120:11,22
122:11 127:13
133:3,9,15
134:5 144:17
144:19,20,25
145:3 163:9
**new** 21:15 37:25
37:25 131:23
132:9 143:12
153:23
**news** 146:19

**Nichols** 12:8,10
24:10,12 62:5
78:8 81:22
86:10 89:11,15
89:17,19 95:20
117:8 134:5,10
134:22,25
135:1,2 153:5
153:7
**Nichols'** 12:13
83:5
**nominal** 111:23
**Nomita** 58:20
59:14
**nonresponsive**
29:6,14,23
34:23 51:2
52:21 57:24
79:16 80:4
96:23 102:9,17
103:20 104:3
104:22 118:16
119:14 120:13
121:8 125:3
128:24 130:7
143:14 147:22
151:18 162:9
**normal** 13:7
19:12 41:5
**normally** 31:3
33:18
**Northcutt** 27:14
27:16
**northwest** 15:19
93:9
**not--** 122:3
**Notary** 1:21
166:16
**noted** 166:2
**notes** 153:14,14
**noticed** 19:4
**noticing** 104:18
**November** 3:9
112:12,22
114:16
**nullity** 87:17
**number** 20:8

22:2,6,11
36:21 81:19
107:6,11,16
110:13,20
111:4,8 112:24
114:13 124:9
128:9 143:2
165:4,4
**numbered** 1:14
**numbers** 22:12
22:13 54:6,8
66:23 106:19
112:7 127:9
159:4
**numerous** 141:4
**nutritionist**
71:24

_____
**O**

**O** 4:16
**oath** 4:10 166:9
**object** 29:22
34:22 51:1
52:20 103:19
104:21 130:4
**Objection** 29:6
29:14 57:23
79:16 80:4
96:23 102:9,17
104:3 118:15
119:14 120:13
121:7 125:2
128:23 130:7
143:14 147:22
151:17 162:9
**obligated** 91:13
105:8 111:14
**obligation**
136:13 143:21
143:22
**obtainable** 38:3
**obviously** 46:22
160:12
**occasion** 23:1,3
24:20 98:20
**occasions** 17:23
**occur** 152:12

**occurred** 120:12
141:7 160:14
168:18
**occurrence**
39:13
**occurring**
120:25
**October** 14:25
63:12,13 65:2
**offered** 47:25
**office** 15:7 32:13
33:15 122:11
134:13,13,18
166:12
**officer** 77:3,5,6
90:4 163:18
167:17 168:4
170:4
**officer's** 170:11
**Oh** 9:20 23:19
86:20 97:23
144:10 158:23
**oil** 21:10
**okay** 5:9 8:1
9:18 13:1,15
13:19 14:9,24
15:4 16:6 18:3
21:8,17,20
22:2 24:2 25:6
25:11 28:19
31:15,20 34:24
35:4 37:5 46:3
51:1,11 57:23
58:20 59:2,11
60:7 61:6,17
61:23 62:17
65:15 66:18
72:24 74:6,10
75:1 76:14,25
80:14 81:5,8
82:11 83:13
84:5 88:11
89:5,23 90:25
91:24 92:8,14
93:4 94:3,11
94:21 95:7,24
96:5 97:12

99:25 102:16
105:3,4,22
107:20 108:3
108:23 112:4,9
112:18 113:8
113:23 114:2
114:21 117:8
118:15 121:7
122:17 123:8
124:17 125:2,9
128:23 129:12
129:20 131:10
131:14 132:4
134:4,9 138:13
142:16 143:16
143:20 144:14
146:15,25
147:1,25 148:6
149:22 151:5,8
151:17,23
152:2 153:7
155:1 161:9,22
163:1,18
164:17
old 4:22 153:17
153:18
on- 44:17
On-line 68:7
ones 45:14
ongoing 22:21
22:22 140:11
140:14 142:13
operative 48:10
opinion 48:4
106:6 141:10
150:17
opportunity
54:17 102:8,15
102:24 103:10
103:16
opposed 59:10
114:4
opposite 141:13
oral 1:8,11 4:4
167:8,17
order 4:6 19:18
57:20 84:23

92:5 93:11
108:19 127:3
129:19
ordinary 30:24
origin 12:17
original 45:20
100:24 170:3,9
170:12
originally 90:14
Os 147:2
other's 24:21
outcome 142:14
168:14
outhouse 58:8
Outside 83:6
outsource 65:23
outsourcing
8:11
outstanding
98:24
overall 128:6
141:18 159:7
overlap 126:19
135:23 136:3
overseeing
87:20 88:2
owes 75:22
owing 79:24
151:13 152:13
owned 8:22 14:3
45:16 72:3
102:12,20,21
104:11 116:12
153:5
owner 6:1 7:6
8:1 10:11 23:9
30:14 34:18
37:25,25 60:18
62:18 63:5
80:23 82:25
83:4,4 84:6
119:1 131:23
152:22,23
153:13 156:13
156:18
owners 62:11,14
130:5 131:22

132:9 143:12
143:13 145:17
152:21
ownership 11:8
23:25 28:16
38:4 39:24
130:1,14 133:6
133:22 155:17
owns 153:1,8
_____
**P**
P 2:1,1
P.A 1:2 100:20
167:2
P.L.L.C 2:9
p.m 1:15 122:14
122:16,16,18
161:11,13,13
161:14 164:18
164:19
page 3:2,8 43:3
43:3 127:25
165:4,5 170:7
PAGE/LINE
165:6
paid 27:16 61:17
61:20 73:7,13
74:3,24 76:12
80:2 85:1,2,19
94:16,22,24
95:2 97:10,11
135:25 136:4,9
150:16 157:14
159:23,25
160:3
pair 70:7
paired 71:6
Palm 15:19 87:5
pandemic 8:9
88:6
paper 165:4
paperwork
41:19 91:11
107:23
parachute 20:19
Paragraphs 4:7
parallel 77:19

pardon 60:20
part 18:8 22:24
36:1,18 48:24
52:8 57:21
65:19 95:25
96:2,4 123:12
128:6,15,21
145:6 157:9,15
partial 23:9
participate 17:7
18:8 71:2
participated
139:15
participating
92:13
participation
101:15
particular 7:15
11:19
parties 78:7
140:24 168:5
168:12 170:16
partner 82:20
82:22 83:1
partners 5:22
7:1,5 12:3,13
15:3,6,7,17
17:2,5,18
21:13 22:17
23:4,9,14,15
23:16,20 24:2
24:23 49:5
66:25 67:3,5,8
67:10 76:22,23
77:7,9 81:16
81:18,20,23
82:5,15,19,23
83:1,14,16,21
83:24 84:1
118:13 119:19
145:12 150:20
151:13 159:12
159:23 162:22
Partners' 19:24
21:18
partnership
84:6 145:12

party 167:24
pass 164:9
passed 7:7 127:7
passengers
154:7,17
passive 151:11
151:11
password 132:9
133:21
passwords 38:3
133:7
patient 12:21
13:5,10 15:14
18:16 19:3,5
19:14 56:12
57:1,16,19
65:22 73:13,20
74:12 76:5,6
125:24
patients 6:20
19:5 56:16,20
58:23,24 67:24
68:1,17 72:21
73:7,14,15
75:10,11,24
76:10,13
pay 41:24 42:9
72:25 73:8
75:9,11 81:2,5
97:7 108:9
142:6 155:16
159:3
paycheck 146:6
146:7
paying 74:12,12
75:3 122:13
payment 83:8
83:13 142:7
payments 76:12
83:16 141:15
141:18,21
142:7,7
payroll 8:12
pays 152:17,18
Pearland 4:12
Pees 12:22
Pekar 59:16,25

people 7:13
10:18 15:7
16:1,5,6 24:17
25:25 48:3
55:2 61:25
62:12 68:6,20
68:24,25 69:10
72:21,24 74:21
75:25 80:2
88:7 90:16
91:20 106:5
124:22,23
134:23,24,25
135:2 138:14
138:14,18
161:3
per-trip 19:20
percent 43:20
54:25 61:4,8
62:10 69:21
102:12 109:19
109:24,24
110:8,11,11,12
110:17,19,19
110:21,25
111:1,4 114:21
114:23 131:17
132:15 147:9
152:25 153:1,2
153:5 163:16
percentage
60:18,24 61:6
61:20,22,23
73:16,17 74:4
74:8,14 75:1,4
105:22 107:12
109:22 110:10
110:16 111:6
118:2 142:9
146:12 147:8
152:24
percentages
108:22 109:20
120:4
perform 100:11
performed
136:13 140:5

performing 14:1
16:4 139:16
period 55:7
87:21 89:3
124:12 135:14
136:7 142:4
155:4 162:25
permission
39:17
permit 154:6,9
155:7
person 16:16
26:21 30:9
32:5,20 65:16
72:13 73:24
79:10,19 92:8
100:6 128:8
166:10
personal 41:7
94:23 95:1
personally
26:19 93:13
95:1 166:8
persons 75:23
79:2
pertain 92:19
132:8 159:7
pertaining
88:15
pertains 40:14
130:19 143:8
159:6
pharmaceutical
74:1,8 75:6
pharmacologi...
75:5 76:7
pharmacy 73:18
73:25 74:14
75:2 76:12
phlebotomist
16:13 19:2
phlebotomists
16:11,22
phone 43:13
97:2
phrase 7:14
phrased 164:3

Phyllis 1:15 4:9
167:10 169:4
170:20
physical 39:7
133:24
physically 29:16
29:18 32:10
37:8,13 68:23
68:24 145:1,3
physician 16:19
71:6
physicians 6:15
70:4
pick 13:23 18:3
22:13
picked 15:2 19:4
22:9,9 109:1,2
123:2,17,17,22
123:25 124:2,3
picks 13:16
17:24
pickup 126:3
pilot 19:23
154:5,11 155:9
155:11,14,16
155:18,21
156:2,23
pilot's 154:14
pilots 19:19 20:1
20:4
piston 20:12
pitch 92:17
place 15:22,22
118:8,22
places 12:8 99:9
Plaintiffs 1:3,12
2:3 167:3
168:7 170:12
Plan 72:4
plane 20:3,11
21:9 154:8
155:23
planes 20:5,5
21:17 22:25
23:2
Planet 72:3
please 4:18 35:1

142:16 144:6
146:23 165:4,5
plus 148:18
point 12:17
17:16 24:8
40:1,9 51:13
56:16 57:8
72:10 73:9
87:20 95:22
98:4 101:3,9
121:16 126:13
130:12 137:4
138:20 145:1
146:9,10 162:5
162:14
pointing 51:14
policy 126:6,8
portable 37:16
portal 133:5,25
portion 25:3
43:10 91:5
114:6
posed 32:1
90:23
posing 148:1
position 107:15
120:7
possession 39:3
40:9 48:6
131:1 145:22
151:25 152:9
163:7
possible 88:21
possibly 31:8
66:1 74:11
86:7,17 88:17
92:15
potential 47:16
73:14 88:24
104:19
potentially
66:19 89:8
PowerPoint
92:16
practice 41:5
81:15
precipitating

122:24
preparing
170:12
prescreened
67:24
prescriber
58:16
prescriptions
73:25 74:13,20
75:7
presence 68:7
present 2:15
50:15
presenting
48:12 50:1
pretext 141:21
pretty 112:21
preventative
6:16
preventing
68:22
previous 34:18
previously
132:3
price 74:4 81:6
primarily 30:6
primary 8:7
57:7,15
principal 7:6
prior 144:3
162:19
private 154:11
privately 5:24
pro 80:3
probably 9:3
13:20 17:12
19:5 65:14
66:12 67:20
86:7 88:13
98:18 101:16
106:18,19
107:13 111:8
135:12 136:11
136:20 137:17
140:5 143:6
146:14 155:19
155:22 162:19

**problem** 12:20
13:5 45:24
56:19 69:6
84:20 95:18
101:3 117:5,6
120:20,24
**problems** 45:5
135:8
**procedure** 1:19
18:3
**proceed** 104:2
**proceeding**
168:13
**process** 17:14
29:2,11,19
67:25 88:3
136:25
**processing**
85:14
**produce** 18:25
64:22 163:8
**produced** 1:12
65:6
**professional** 5:2
16:9,10 18:14
42:5,10,23
75:14,15 77:14
77:20 78:1,3
83:22,23 84:3
84:8,11,14,24
85:5,7,11,15
85:18,23 86:1
86:3,11,13
87:22 89:2,21
90:5 95:21
96:3,4 97:17
115:19 117:24
119:19 144:8
145:4,7 149:12
151:22 161:23
162:11
**professionally**
97:25
**professionals**
6:20 16:7
54:18 100:9
111:5,13

116:11,20
117:3,22
118:23 135:11
135:15,25
136:2,5,5,8,17
137:5,7,19
138:17 139:11
139:18 140:4
142:8 143:11
143:18,25
144:1,9,12,18
144:21,23
145:24 146:8
146:16,19
148:12 159:11
159:20 160:1
162:22,22
**professor**
154:23
**profit** 57:6,22
64:3 67:12,12
111:20
**profitability**
59:1 126:20
**profitable** 67:2
146:5 159:14
159:18,19
**profits** 126:15
126:16
**program** 33:19
33:22 37:20,24
38:22,23 70:1
128:21 129:14
129:15 131:5
132:5 157:9
**progressed** 6:10
**progression** 7:3
**project** 116:10
**proof** 41:9 49:4
**proper** 120:4
**prosper** 136:12
**proved** 166:9
**provide** 19:13
19:18 57:21
67:22 69:19
71:10,12 95:3
120:9 124:25

**provided** 9:22
53:6 80:1
95:12 96:7,9
96:14 109:12
109:16 124:10
125:14 133:6
**provider** 109:11
**providers** 6:15
15:12 54:18
55:7 56:15,21
67:25 68:5,18
74:25 143:7
**provides** 11:2
74:17
**providing** 12:2
13:8 56:20
69:17 92:21
96:15
**provisional**
154:10
**provisions** 1:19
75:5
**Public** 1:21
166:16
**pulled** 21:11
**pulling** 53:2
**purchase** 11:24
22:14 107:25
132:11
**purchased**
11:17,18 21:25
**purchaser** 38:19
39:1
**purchases**
132:12
**purpose** 57:15
68:11,14
134:21 135:4,6
**purposes** 31:3
69:22 70:24
71:5 132:18
166:11
**pursuant** 1:18
168:3,17
**put** 38:14 91:16
106:6 112:20
133:19

**putting** 7:13

**Q**

**qualified** 6:7
55:4 68:3
**quality** 15:10
**quarter** 23:22
**question** 13:2
29:8 31:12,13
31:19,23,23
32:1,25 35:1,2
35:5,8 42:8
45:23 49:20,23
50:7 51:12
53:4 55:14
59:8 70:22
74:7 77:15
90:23 94:25
95:5,16 96:12
97:24 99:4
101:14 102:17
102:25 125:25
126:18 136:1
142:20 143:15
144:7,15
147:25 148:4,5
161:22 162:10
162:13 164:2,3
164:4
**questions** 18:17
59:4 142:21
147:24 148:2,2
150:22 160:23
163:22 164:4
164:11
**QuickBooks**
131:9,10,10,11
131:14,19,24
131:25 132:5
132:12
**quickly** 18:22
69:24
**quite** 33:11
42:20
**quote** 28:20,21
104:5,5

**R**

**R** 2:1
**Rachel** 26:11,14
**raised** 5:15,16
**ran** 53:13,16
81:14 110:4,6
126:14
**range** 149:3,6
**ranges** 59:18
**rare** 18:1
**rata** 80:3
**rate** 55:17,21
56:2,3,4
146:11
**rates** 55:12,24
55:25 56:17
**Ray** 98:16,17
**re-ask** 117:25
**reached** 72:13
72:16 116:10
**read** 1:20 35:2
42:25 43:5
98:10 166:1
**readily** 122:9
140:21,23
**reading** 34:25
65:12
**ready** 161:6
**real** 10:19 143:6
**really** 15:1
31:17 53:21
65:10 80:16
**Realtime** 167:11
167:13,14
**reason** 18:24
106:1 130:2
165:4,6
**reasoning**
102:23
**reasons** 170:7
**Rebecca** 86:15
87:6 88:19,21
89:11,15 90:2
117:15 139:15
139:19
**recall** 17:11
20:23 26:24
35:11,25 49:10

50:8 61:8 64:7
77:1 93:7
94:11 107:3,22
108:13,14,17
155:25 163:1
163:13,15
**receive** 52:17
63:22 64:11
73:19 83:8
91:14 126:1
**received** 34:21
63:10 64:4,4
64:23 65:1
83:13 90:18
105:16,17
110:12,24
111:10,11
115:7,18,22
116:16,18,19
117:2,21,23
118:1,10 120:2
124:7,8 125:16
126:24 127:24
140:4 146:19
147:3,7 148:18
148:18 150:15
151:21 152:8
**receiving** 64:17
65:5 93:12
148:8
**Recess** 54:12
122:16 161:13
**recognize** 42:22
**recollect** 52:7
**recollection**
17:17 47:13
50:15 51:8
59:13 62:23
110:18 128:5
**recommend**
59:12
**recommending**
70:2
**recommends**
74:21
**record** 1:19 4:2
31:4,4 37:13

54:11,14 65:8
122:12,15,18
124:2,3 132:21
161:12,15
164:14,18
167:18 168:6
**recorded** 1:17
**records** 29:4,13
32:14 33:6,14
33:20 34:6,11
34:16,17 35:6
35:14,22 36:3
36:5,8 37:19
38:14 39:18,20
40:17,23 41:3
53:5 65:1
87:15 119:11
123:7,9,17
124:5,20,24
125:5 126:6,13
126:14 128:14
128:19 130:3,5
130:16,17
132:7,18,22
133:1,2,10,11
133:14,16,18
138:19 139:21
147:13,15,20
156:17
**recovery** 115:11
142:9
**redistribute**
18:5
**redistributed**
120:4 152:9
**redistribution**
151:24
**reduced** 146:11
**reduces** 114:7
**refer** 46:4 68:4
70:4,13 71:1,8
72:21,21
124:16
**reference** 59:18
60:10 123:3
**referral** 65:23
69:3,5,8,13

70:20 73:13
75:9 87:15
**referrals** 71:4
71:14 73:19
75:11 76:16
**referred** 67:24
73:23
**referring** 72:24
73:7
**refers** 46:4
**refine** 143:20
**reflect** 92:1,3
**reflected** 91:20
**reflects** 124:9
**regard** 22:17
123:7 129:23
141:7
**regarding** 4:7
**regardless**
148:21
**Registered**
167:12
**registration**
132:1
**regular** 18:10
81:5
**regulated** 54:24
**regulation** 54:23
**reimburse** 55:15
110:19
**reimbursed**
56:2
**reimbursement**
55:12,20,25
96:17 110:21
**reinstated** 47:21
83:19 141:24
146:9
**reinstatement**
141:3,6,11,13
142:6
**related** 40:2
75:19 89:11,17
168:11
**relation** 11:17
82:11
**relationship**

24:8 68:1
72:20 82:7
160:4 162:17
**relationships**
55:8 103:25
141:3
**relative** 15:24
137:16
**relatively** 66:11
**relevance** 119:7
**relevant** 66:10
**rely** 56:14
**remainder**
109:23,24
115:3
**remember** 26:6
26:8,24 29:16
29:19 35:10,13
35:18 36:15
37:13 47:9
48:17 49:6,10
49:14,16,21,24
50:4,8,18 51:4
51:5,13,18
52:5 58:10
61:24 62:2
64:17 65:3,5
65:11 72:10
80:20 94:9
99:5 107:21
131:3 136:23
138:13 140:9
150:11 156:23
**remotely** 4:6,11
87:7 88:7
**rendered** 100:8
142:4
**rent** 22:25
**rented** 19:20
**repeat** 42:7
45:23 55:14
84:19 99:10
101:2 126:18
136:1
**rephrase** 31:14
35:8 144:7
146:23

**replace** 21:25
**replaced** 131:2
**replacement**
68:25
**replacing** 11:22
**report** 3:9 15:12
112:11,23
114:4,4 127:17
127:22,24
128:6
**reporter** 4:3,3
35:3 112:20
167:11,11,12
167:13,13
**Reporter's** 3:5
167:7
**reporters** 141:5
169:8 170:23
**reporting** 4:10
**reports** 36:12,18
127:6 128:15
133:23
**represented**
55:2
**request** 134:20
135:3
**requested** 96:7
162:6
**requirements**
168:16
**Research** 85:12
**residual** 114:13
**resources** 9:22
106:4
**respect** 22:16
89:20
**respond** 60:3
147:16
**response** 53:3
119:22 141:19
**responsibilities**
36:2 86:23,25
136:4
**responsibility**
27:4 130:6
143:10,17
152:20

**responsible** 27:3
  28:7 30:15
  37:1 46:1,11
  71:4 85:22
  125:21 126:24
**rest** 54:1
**restated** 46:17
  47:6,15,18
  48:8,15,23
  49:8,22 51:20
  52:4 163:4
**restroom** 70:17
**result** 98:5
**results** 83:9
**retain** 27:6
  41:24 42:3
  74:14
**retained** 41:18
  41:21 46:13
  61:11 157:14
**retaining** 46:1
**retention** 126:6
  126:8
**return** 72:24
  167:22
**returned** 170:4
  170:6,9
**returns** 132:19
  159:17
**revenue** 8:5 23:5
  35:18 36:5,8
  61:21 64:4
  65:24 66:14
  74:15 84:9,12
  84:15 86:22
  89:2 90:17
  92:19 105:16
  106:4,8 107:12
  109:19,22
  110:12 114:5
  116:16,18,18
  121:2 127:15
  128:9 132:22
  138:5,18
  139:16,19
  140:2,3 146:4
  159:9

**revenues** 36:15
**reverse** 119:4
  147:24
**review** 53:5
  85:25
**reviewing** 91:24
**Reynolds** 98:16
  98:17
**rid** 33:13 34:7
  123:4
**right** 8:10 11:20
  12:22 13:11,22
  18:8 21:7,19
  22:8,19 24:6
  30:4,18,18
  33:5 34:16
  42:17,21 43:10
  44:15,25 45:12
  45:16 50:6,20
  52:1 53:16,24
  54:1,2,9 58:2
  59:7,13 64:1,6
  64:13 69:3
  74:16 76:19
  78:6 79:1
  80:25 81:18
  82:12 84:2,17
  84:20,25 86:14
  89:13,17 90:2
  90:22 94:18
  96:10 99:16
  103:7 107:6,24
  109:8,11,16
  110:5 111:17
  112:6,14,17,19
  113:4,10,15,15
  113:17 114:12
  114:19,23,25
  115:6,16,19,21
  116:1 120:6,21
  122:7 127:1,6
  127:12,25
  128:8,10,12,13
  129:7,11,11,23
  129:25 132:14
  132:23,25
  133:17 135:22

  140:18 147:4
  147:11 149:1
  150:9,23 151:3
  153:15,25
  154:14,24
  155:4,6,25
  157:15,22
  158:7 159:10
  159:17 160:20
  160:22 163:20
  164:7,9
**rights** 79:20,20
**ringing** 43:13
**RMR** 1:16 169:4
  170:20
**role** 19:7,9
**Roo** 160:18
**room** 54:1
**Rose** 93:1 98:13
  112:23 120:17
  120:18
**roughly** 23:21
**round** 54:6,7
**Rule** 168:17
  170:1,15
**Rules** 1:18
**run** 18:21 52:25
  53:7 55:5,20
  56:1 57:9
  64:24 74:23
  76:8 109:5
  125:22 126:21
**run-in** 55:16
**running** 25:20
  58:7 110:14
  116:17
**runs** 8:12
**rural** 21:11
**Rust** 97:7,11,21
  161:17,17,17

        **S**
**S** 1:4 2:1 166:6
  167:4
**S-a-l-a-n-g** 9:15
**S-h-e-l-l** 9:8
**Salang** 9:5,15,17

  10:3
**salaried** 135:10
  135:15 148:15
**salary** 84:7,9,25
  85:1,2 145:25
  148:17,21,22
  149:1,3,20
  150:2
**sale** 105:5,5,13
  106:4,7,16,17
  123:2 130:21
**sales** 92:17,18
  96:2,4
**sample** 13:12
  18:25
**samples** 6:19
  12:11,12,13
  13:9 15:11
  17:14 18:5,9
  19:8,9,16,25
  21:13
**save** 129:13
**saved** 129:1
**saw** 60:23
**saying** 31:10,17
  33:5 35:9 47:2
  50:1 56:22
  63:1,18 73:2,3
  73:22 74:7,7
  74:18,19 76:9
  101:25 102:2,4
  103:1 110:17
  124:4 129:20
  131:11 132:13
  133:18 141:23
  142:2 143:22
  147:12 149:23
  151:20,21
  152:4,6
**says** 43:11,19
  46:23 65:2
  69:19 70:11
  71:5 107:14
  112:23,23
  113:12,19
**scale** 73:21
**scan** 41:7 129:7

  129:7
**scenario** 115:17
  120:20
**school** 5:13
**screen** 112:6
  114:1
**se** 13:3
**seal** 166:12
**season** 20:23
**second** 9:10,13
  9:13 112:4
  146:25
**secondary** 57:19
**secret** 136:23
**Secretary** 10:10
**see** 4:24 13:11
  43:10,11 44:1
  46:24 49:13
  54:8 64:23
  70:12 84:22
  91:20 96:15
  112:4,7,9,12
  112:25 113:2,6
  113:12,13,16
  113:21,23,25
  114:8,11 119:7
  127:9 129:20
  160:23
**seeing** 49:7,18
  49:21 50:4
  51:4,6,9,13
  52:5 106:18
  163:13
**seeking** 68:2
**seen** 46:22 53:3
  56:7 91:8
  99:11 110:18
  120:22 134:5
  151:4 163:9
**sees** 151:1
**seized** 21:10
**Select** 9:10
**sell** 56:10 58:4
  81:8,9 82:14
  82:17,18,20
  104:8,10,17,17
  104:20 106:2

122:21,25
**selling** 57:8
68:16 105:9
106:10 162:20
**semi-regular**
39:9
**send** 18:9,22
59:21,23,24
60:8 89:5,7
92:14 111:12
111:14 115:23
127:21
**sending** 91:25
92:9
**sent** 56:6 60:3
91:2 92:20
118:9 127:20
147:9
**separate** 75:24
92:15
**separately** 78:9
**serious** 21:24
**serve** 47:17 69:8
76:20 138:25
**served** 170:16
**service** 73:15
74:3,11,16,22
**services** 11:2
12:12 19:13,18
23:21 24:4
26:5 42:4,10
42:22 43:16
56:14,19,20
57:21 65:17,22
80:1 83:10
95:3 96:3,4,6,9
96:11,14,16
100:7,9 109:3
109:14,15
111:7,21,22
112:1 124:10
141:8,25 142:4
**set** 27:6,16,25
28:6,21 29:24
29:25 30:3,6,9
30:11 32:6
35:23 41:14,15

41:24 44:4,9
44:10,18,21
45:19,20,25
46:10 52:9,9
52:13,16,23,24
53:4,10 54:15
54:22 55:3,4
69:16 76:19,22
76:25,25 77:24
78:2,7,9,13
81:18 90:14
93:11 95:15
102:1,5,11,19
103:2,5,11
106:13 108:22
116:10 119:16
119:24 120:15
**setting** 25:15
27:4 57:15
79:17 94:6
102:23
**settlement**
140:17,19
141:1,2 142:10
**setup** 25:10
95:11,12 109:6
118:5 120:16
**seven** 53:20
149:3 159:15
**share** 111:20
112:6 115:9
142:12
**shareholder**
52:16 53:5
163:20
**shareholders**
30:7 78:25
91:5 103:16
104:14 105:12
105:14 108:20
118:14 119:4
119:25 120:8
121:4,4 127:8
127:8,24 128:2
136:14
**shares** 80:3
145:12

**sheet** 165:4
**sheets** 99:12
**shell** 156:3
**Shield** 109:11
138:23 139:10
140:2 141:7,15
141:23 143:3
**shocked** 156:3
**shorthand** 1:18
167:11
**show** 42:21
65:12 88:4
128:1
**showed** 119:2
127:23
**showing** 50:10
**shown** 141:3
170:16
**shows** 87:4
114:3 127:15
**shrink** 114:1
**shut** 23:4
**side** 21:5 68:4
**Sierra** 22:3,7
**sign** 51:18 56:25
91:11 165:5
**signatories** 49:7
51:17
**signatory** 28:14
28:25 29:9,17
79:20
**signature** 3:5
49:19 165:1
166:1 167:22
170:7
**signatures** 47:12
48:2 49:3 50:5
50:10,11
**signed** 1:21 43:8
43:15,18,21
44:1 48:13
49:4,13,18,18
49:22,25 50:5
50:19,24 52:5
91:5 100:25
101:12 103:14
103:18 107:23

**significantly**
146:11
**signing** 51:10
**similar** 8:11 9:1
51:15 81:14
126:17
**simply** 52:14
56:5 90:16
**singling** 60:7
**sir** 5:8,14 8:19
8:21,24 9:20
10:21,23 11:25
16:25 18:24
30:21 31:15
32:8,22,23
33:8,12,18
34:4,12,14
35:15,20 36:16
36:19 37:3,7
37:10,14,18,22
38:23 39:4
41:11 42:2
44:12,16 47:20
48:13 49:19
52:7,12 56:22
58:9 59:23
60:13 61:22
62:19 63:21,24
64:21 65:4,14
66:5 74:5
77:23 78:5,15
78:20,23 80:11
80:18 81:7,10
85:24 86:2,6
93:14,15 94:17
94:20,24 99:1
104:25 105:3
105:25 106:19
108:2 109:17
123:1,20 126:4
126:10,16,22
129:3 132:3,7
132:24 134:3
137:6,10
138:12,24
139:2,5,14,25
141:12 148:13

148:20,22
149:8,13 150:5
150:8,10 154:2
154:4,6 155:10
156:22 163:11
**sit** 48:7,11 49:6
49:14,21 50:20
62:17 63:2
64:6 72:6
78:12 85:4
137:18 138:13
**site** 72:20
133:25
**sitting** 13:15
95:18 156:9
**situation** 60:6
149:1 159:8
**six** 16:5,6 86:7
122:21 149:6
149:10,20
150:2 159:2,15
**sizable** 150:7
**SJH** 99:8,11,14
**skeptimism**
159:1
**small** 15:22
19:16 66:12
107:24
**smaller** 88:2
**SMH** 112:24
**Smith** 18:20
86:15 87:6
88:19,21 89:11
90:2 117:15
139:15,19
**socialize** 24:19
**software** 32:6
39:17 129:9
130:19
**sold** 23:25 28:15
28:20,24 29:8
29:15 32:16,18
32:21 37:5,23
38:25 40:4
104:5,5 106:20
106:25 107:14
107:22 108:18

122:19 130:15
137:20 149:18
150:1 162:18
162:24
**sole** 8:1 56:24
84:6
**solicit** 101:15,19
102:10
**solicitation**
103:1
**solicited** 101:16
101:22,25
102:4,19 103:1
**solo'd** 154:18
**solution** 135:7
**Solutions** 25:12
25:16,18 26:5
26:15,18,20
27:1,7,17 28:1
28:4,8,13,14
28:20,22 30:3
32:7,10,11,15
32:19,21 33:7
33:20 34:7
35:6 36:20
37:1,19 38:1
38:14,19 39:19
39:21 40:14,17
41:3,14,15,19
41:25 42:4,7
42:11,24 44:5
44:10,14,19,19
44:22,23 45:2
45:3,7,9,11,21
46:18,21 47:16
47:19 48:9,10
48:15,24 49:9
50:17 51:22,23
51:24,25 52:3
52:10,15 53:7
53:8,9,13,15
53:16 54:16
56:11,24 57:16
60:11,14,17,18
62:15,18,20
63:1 64:9
65:17 66:3,15

67:22 75:19,24
75:25 76:9,20
76:21 77:1,5,6
77:24 78:2,24
79:18,21,22
81:19 90:22
91:2,7,21 92:1
92:11,24 93:19
95:22 97:16
101:6,20,21
102:5,11
104:24 105:4
105:17 109:25
110:1,4,6,15
111:3,14
115:13,24
116:4,7,8,21
117:4,25 118:3
118:4,11,21,22
120:5 132:8
139:12 163:4
**somebody** 18:24
26:22 29:1,10
66:12 69:23
73:23 93:10,21
93:25 101:9
151:1 152:10
155:8 156:5
159:2 162:6
**somewhat** 14:25
**soon** 130:12,13
**sooner** 161:8
**sorry** 7:18 9:12
11:15 12:19
23:7 24:3 25:7
26:6 27:12
31:5 34:4 42:8
45:1,22 46:8
49:11,19 55:14
70:16 82:19
83:23 86:20
89:16 90:19
93:4 99:3,10
99:17 100:15
101:2 105:2
113:13 115:12
117:24 120:5

121:8 126:19
136:1 137:13
140:13 141:4,9
143:9 146:21
147:7 149:19
158:10,20
163:21
**sort** 37:16
**sound** 46:19
52:11 53:1
107:6 110:13
**sounds** 45:16
46:21,21 63:15
75:7 110:17
**soup** 146:22
**source** 59:10
69:14
**sourced** 138:5
**sources** 106:7
159:9
**space** 15:24
**SpaghettiOs**
146:25
**speak** 57:25
58:20 88:16,19
93:10 94:7
98:17 100:25
101:10
**speaking** 12:9
47:20 100:20
100:21,23
**special** 18:11,16
**specialist** 71:8
75:15
**specialize** 70:6,8
**specialized** 68:5
**specific** 29:7
35:15,17 41:10
51:13 70:2
73:19 74:6,10
74:18 75:8
85:12 95:17
113:14 122:20
123:3 124:9,21
126:2 129:6
142:20 144:7
**specifically**

42:14 44:2
67:23 69:19
93:18
**specifics** 35:12
35:13,20 77:13
151:9
**speculate** 16:3
17:13 38:11,12
48:1 55:23
81:21 84:1
88:7 130:11
142:13,16,18
143:13 149:16
151:10 159:16
**speculating**
152:3
**Spell** 7:22
**spend** 90:3
**Spicewood**
157:25 158:17
158:18,24
**split** 111:19
**splits** 158:16
**splitting** 75:7
**spoke** 88:11
95:22 96:5
**spoken** 71:23
**sports** 7:2
**spring** 14:14,15
14:17 15:18
17:12,19 22:17
22:18,18 23:4
24:1 25:3 37:3
50:24 84:17
85:20 106:22
**Springs** 15:19
87:5
**square** 15:25
16:2
**SR20** 20:15
**SR22** 20:15 22:4
159:3
**staff** 8:12 12:10
16:23 19:19
155:14
**staffing** 6:4
**stand** 10:14

160:19
**start** 137:12
160:16 161:7
**started** 6:9
26:20
**starting** 26:5
**state** 1:17 4:7
10:10 54:19,23
55:24 88:19
139:4 143:4
156:19 166:6
166:16 167:14
**stated** 1:19
78:17 99:4
104:11 131:21
132:3
**statement** 35:7
49:15,24 50:19
77:8 95:4
105:21 106:16
130:18 131:9
150:9 162:23
**statements**
156:15
**stating** 64:8,17
**stay** 69:1 161:6
**stayed** 7:7
**stenographic**
4:11
**stepbrother**
82:9
**Stephen** 100:5
100:14
**Stephenville**
99:2
**stepped** 84:18
**Steven** 100:10
**Stevens** 93:1,5,6
93:8,10,21
94:7 99:2,22
**stick** 119:8
**sticker** 112:20
**sticking** 56:16
**stop** 7:4,5 31:18
141:21
**stopped** 14:20
24:24 25:2,2

31:24 137:9
**storage** 39:18
　128:20 131:5
**stored** 38:6,9
　130:25
**storing** 133:25
**straight** 17:24
**Straits** 153:3,4,8
**strikes** 159:4
**structure**
　122:23
**student** 154:14
**stuff** 15:8 37:12
　92:22 121:20
**submit** 160:15
**submitted**
　167:20
**subpoenaed**
　151:16
**subscribe** 56:23
**subscribed**
　166:10
**subscriber**
　57:16 58:1,5
　58:13 59:19,21
　59:25 60:3,8,9
　60:25 61:13,14
　63:20 66:1
　80:6,8,16
　81:16,24 82:1
　82:5 92:11
　101:6,13
　103:22,23
　104:24 105:23
　127:21 136:15
**subscriber's**
　60:5
**subscribers** 36:3
　47:16,24 57:13
　81:20 92:4
　105:8 106:11
　115:4,14 127:1
　143:11,19,25
　144:9,12
**subscription**
　41:22,22 45:25
　46:2 47:7

56:25 81:3,6,8
81:9 82:20
90:15,21 91:1
91:11,17 92:9
92:15 100:24
116:22
**subscriptions**
　48:25 103:14
**subsequent**
　38:18 39:1
**subsequently**
　116:19
**substantial**
　105:18,21
**substantially**
　58:6
**sufficient** 13:7
**suggestion**
　26:23
**suggestions**
　47:25 103:17
**Suite** 2:4,9
　169:9 170:24
**supervise** 52:14
**supervised**
　45:21 46:17
**supervision**
　45:19 52:10,23
**supervisors**
　52:24
**supplements** 7:2
　71:1 75:6
**supplies** 8:13
**supply** 12:4
**support** 6:14,17
　6:19 8:7 12:2,9
　13:3,8
**supporting**
　119:2
**supportive** 8:11
**supposed** 51:18
　73:1 111:12,19
　115:11,23
　116:19
**sure** 10:8 11:21
　12:20 15:11
　20:22 21:5

22:20 24:22,25
30:14 40:9
41:1,7 42:13
43:20 47:22
54:25 64:2
65:7 78:15
97:21 119:5
124:17 126:24
137:18 148:5
148:15 160:25
**suspended**
　83:18
**suspension**
　141:15,18
**sustain** 108:19
**sustainable**
　106:9
**sworn** 1:13 4:15
　167:17
**Synergist**
　137:25
**system** 70:1
**systematic** 69:6

------

**T**

**T** 1:4 4:16 166:6
　167:4
**Tabitha** 26:9
**tail** 20:8 22:2,6
　22:12,13
**take** 13:23 27:3
　43:2 53:20,21
　71:7 93:22
　115:10 117:9
　117:10,12,15
　117:18 121:12
　121:17,19,21
　134:5,6 144:11
　145:21 154:23
　155:8 160:23
　160:24 161:1
**taken** 1:13 12:14
　152:10 160:14
　168:4,13
**takes** 15:5 16:14
**talk** 14:24 48:18
　58:16,17 59:1

59:2,5,5,15
88:9 97:2,2
101:4 161:2
**talked** 105:12
**talking** 18:23
　46:21 48:18,20
　68:20 71:2
　72:17 112:24
　120:15 142:23
　142:23 143:6
　146:12 147:15
　159:15
**Tango** 22:3,7
**tax** 132:18,19
　159:17
**TCRR** 1:16
　169:5 170:21
**teacher** 154:24
**Tel** 2:5,10
**tell** 4:18 7:9
　15:20 48:7,11
　48:21,22 78:8
　78:12 87:1
　107:4,9 108:6
　122:20 156:18
**telling** 48:18
　57:14 102:18
　104:4 132:6
　133:9,13,15
　134:2,7
**tend** 153:11
**tens** 66:19
**term** 6:17 15:24
　53:1 106:9
　113:7 137:16
**terminology**
　61:15 103:8
**terms** 125:23
**terrible** 72:8,11
**test** 18:13,21
　55:19 76:8
　93:12 126:16
**tested** 12:24
　18:6 95:12
　125:13
**testified** 4:15
**testimony** 24:5,9

28:9 34:5
88:24 130:24
149:21 167:18
168:4
**testing** 14:2,18
　15:15 16:24
　17:23 56:8
　59:17 93:23
　96:7 99:9
　100:12 109:13
　125:15,17
**tests** 12:7 55:16
　55:16 56:1
　58:7 92:20
　93:22,23 109:5
　123:13 124:21
　124:22 126:3
　126:15,17,21
**Texas** 1:16,17
　1:18 2:5,10 4:8
　4:12 5:16,17
　139:4 143:5
　157:4,7 166:16
　167:10,11,14
　169:5,10
　170:21,25
**Thank** 164:10
**theory** 119:22
　142:22
**therapy** 68:25
**therefor** 170:8
**thing** 43:5 57:2
　57:3 92:20
　98:11 131:4
**things** 6:3,4 8:12
　15:9 22:23
　43:25 59:18
　67:1 72:18
　74:23 76:7
　85:13 98:22
　120:10,25
　126:13 141:20
　147:16,19
**think** 7:9 10:7
　11:22 14:13
　15:24 31:8
　36:12 39:10

42:5 51:5
60:12 63:16
64:25 67:1
73:9,12 78:13
81:13 87:14,20
93:8 97:20
98:8 110:22
111:6,8 113:7
121:16,17
129:5 134:4
139:4,20
140:23 143:4
144:13 148:23
149:17 151:7
162:15
**third** 9:16 31:9
140:24 146:14
**third-party**
139:13
**thought** 26:21
56:18 60:23
65:5 104:1
124:25 138:2
**thousands**
105:19,20,23
**three** 9:3 25:24
26:1,2 31:17
64:14 157:5
**time** 4:1 5:18
6:5,8 14:9 16:5
19:15,16 20:1
20:10,23 21:14
21:22 23:20
27:10,13 28:12
28:25 29:3,8
29:11,15,20
30:3,16 32:16
32:18 37:5,23
38:5 39:6,16
40:4,21 42:20
43:23 45:15
46:10 48:2,20
49:12 52:18
54:10,13,19
55:1,6,7 56:18
62:24 65:4
71:23 72:2,15

77:24 78:2
79:17 80:23
84:13,14 85:18
88:11 94:8
98:1 104:17
106:15,17
110:15 116:2
116:12,16
119:1 122:14
122:17,22
123:2 124:12
124:16,17
127:8 130:15
131:13,21
132:2,21 133:3
133:6,21
135:14,21,24
136:7,11 137:1
137:8,23 138:2
138:16,20
140:8 142:5
144:2,5 146:16
148:11,15
149:11,20
150:1,3 155:7
155:15 157:13
157:18,21
158:16 160:11
161:11,14
164:12,17
167:24 168:4
**time-consuming**
136:25
**timely** 13:9
18:25 19:13
**times** 12:4 90:23
90:24 160:16
162:15
**timing** 18:15
**title** 85:7 86:20
89:19,20,23,24
90:1,2,9,12,13
94:11
**today** 49:6,14
62:18 63:2
83:17 160:5
163:22 164:15

**Today's** 4:4
**toe** 142:18
**told** 13:22 29:20
57:14 58:5
62:23 88:22
104:8,10
156:15 157:17
**top** 112:20 150:7
**total** 9:19 10:4
80:5,13,16,19
80:22,23 81:2
110:12 159:10
**Toth** 1:2 47:23
100:20 101:9
101:11,15
167:2
**touch** 7:13
154:21
**train** 157:11
**transcript**
149:25 164:15
167:17 170:13
**transfer** 28:25
29:9 32:19
38:4 130:13
**transferred**
23:25 28:15
29:20 39:16,24
40:20 130:2,5
130:13 131:22
132:8 133:6,22
**transport** 21:9
21:16
**transportation**
11:6 12:5,7
83:8 109:3
**transported**
109:2
**transporting**
21:13,18
**TRAVIS** 1:4
167:4
**TRCP** 168:17
170:1
**treat** 56:15 70:3
70:19 71:8
**treated** 118:14

**treating** 68:3,20
70:8
**treatment** 70:20
**treatments**
68:18
**trip** 19:22
**true** 28:22 35:7
35:14,19 36:3
36:23 38:15
40:6,13,15
49:15,24 57:7
58:5 62:14
65:13 70:21
71:11 77:8
79:4 85:16,20
86:22 92:6
95:4 103:6
105:11 106:16
108:1 110:2
118:24 130:18
130:23,23
131:1,2 144:18
150:3,9 161:25
162:1,23
163:10 166:2
167:18
**trust** 5:24 6:8
45:4 53:10
78:17 106:6
**trusted** 120:8
**try** 24:16 81:8
90:25 122:5
135:7
**trying** 26:6,6
31:7 48:25
49:3 51:7,11
55:10 56:23
58:4 59:11
69:11 74:10
90:16 101:12
109:9 118:17
126:7,8 138:19
149:22
**TS** 22:8
**turn** 72:17 109:5
111:13 115:23
116:21

**turnover** 20:3
**two** 11:7 19:4
33:12,13 63:18
64:7,10,12,13
67:1 90:23
114:5 132:12
152:22 155:11
159:15
**type** 8:25 16:16
18:12 27:22
28:3 31:1 32:5
33:19 71:4,7
74:18 120:25
139:21
**types** 30:25
**typically** 13:24
19:24
**typos** 43:24

**U**

**uh-huh** 20:14
30:19,25 31:1
36:14 78:4
86:9 101:7
112:13 114:9
163:21
**ultimately** 36:25
47:17 111:2
139:17,17
**umbrella** 5:25
**un-** 53:11
**unaware** 119:12
119:21 148:24
148:25
**unbeknownst**
119:12
**under-** 23:6
**underneath**
113:10
**understand** 9:11
13:2 31:12,22
31:24 51:3
70:23 95:16
109:18 140:18
146:3 147:25
150:25 159:1,7
**understanding**

23:8,22 24:2
25:1 47:12
55:17 63:3,4
70:22 80:17
91:12 98:8
108:24 114:16
114:20 141:6
141:11 150:19
163:11
**understood**
134:22 135:5
137:3 163:22
164:2
**unfamiliar**
99:16
**unfortunately**
122:12 148:22
**unidentified**
72:13 138:14
**uninsured** 75:2
**uninvolved**
144:2
**unrecalled**
138:14
**unsigned** 47:7
48:23
**update** 33:15
39:8
**upgrading**
39:12
**upload** 129:5
**uploaded** 129:1
**urinalysis** 12:22
13:1
**use** 19:1,2 20:18
54:1 132:1
**usually** 97:6
109:17 152:20
**utility** 112:15
**utilize** 19:17
**utilizing** 20:4

_____ **V** _____

**validate** 30:7
**value** 110:23
111:8
**valued** 103:24

106:5
**variance** 146:2
**varied** 61:25
145:25
**various** 12:8,14
12:15 119:16
124:23
**varying** 84:22
**vast** 138:4
**version** 43:11,16
43:20,24 44:1
**versus** 66:25
122:21
**viability** 57:5
108:20
**viable** 15:11
19:15,16
**vial** 13:15,16,17
15:1 17:22,23
18:4
**vials** 123:17,17
123:25
**Victory** 12:21
13:3,4,16,17
15:2 19:1
47:23 58:24
96:25 97:5
103:24
**Victory's** 96:22
**video** 164:15
**videoconference**
1:15
**VIDEOGRAP...**
2:13 4:1 54:10
54:13 122:14
122:17 161:11
161:14 164:13
164:17
**VIDEOTAPED**
1:8,11 167:8
**virtue** 71:14
97:1
**virus** 131:4
**vitamins** 68:15
68:16 69:25
**volume** 16:4
125:24 127:6

128:6
**volunteer** 108:5
108:6
**VS** 1:4 167:4

_____ **W** _____

**W** 2:3 168:1,7
170:10
**wait** 108:15
**Waltz** 1:16 4:9
167:10 169:4
170:20
**want** 21:18
31:18 38:12
43:2 50:14
51:4 53:21
59:10 64:22
69:23,24,24,25
76:11 77:17
103:21,23
106:2 108:5,7
108:24 112:6
119:8 121:12
121:13,17,21
122:5,24 125:4
125:21 148:3
151:6,6 156:3
156:12 160:24
161:1
**wanted** 54:24
65:16 74:1
79:1 92:18
102:14 123:4
**wants** 101:5
122:1
**warehouse**
40:19
**wasn't** 45:5
47:22 53:10
78:15 94:4
125:23 128:19
130:2 136:23
**way** 13:24 18:19
30:11 52:8,9
52:13,23,23
54:20,21 58:6
64:24 95:2

101:14 104:1
119:3 120:15
128:8 144:15
148:3,17 163:1
**we'll** 25:6 54:2,9
60:25
**we're** 4:2 14:18
18:23 54:11,14
88:6 99:22
118:19 122:13
122:15,18
143:6 146:22
151:7 160:5
161:12,12,15
164:18
**We've** 53:19
121:11
**weather** 19:11
**weather-related**
13:6
**website** 68:7,9
68:12,14 70:11
70:19 71:5
76:7
**websites** 141:4
**week** 88:13
**wellness** 9:5
68:24 69:13
70:1,6,25
71:14 72:20
73:7,23 76:5
81:15
**went** 7:1 17:23
20:3,6 21:9,25
29:17,18 62:25
73:24 92:17
93:16 104:20
107:24 130:21
132:4 156:20
**Weslayan** 169:9
170:24
**When's** 88:11
**whichever** 92:12
95:13
**White** 86:17,23
89:7 117:18
**White's** 86:20

**wide** 141:19
**wife** 26:9,10
**wife's** 9:7
**Wiley** 81:9,12
81:16,22
144:17,19,22
145:4 161:24
162:4,13,23
**William** 1:2
2:15 60:8 62:4
100:21 101:1
136:18 162:3
162:12 167:2
**winding** 87:21
87:22,25
**window** 149:14
**witness** 1:12 4:8
34:24 35:1
43:14 53:23,25
54:5 70:16
88:17 89:8
121:9,25 122:8
139:1 164:10
165:1 167:16
167:19,21,22
**witness'** 4:12
**witnesses** 88:22
**word** 31:9
128:17
**worded** 101:14
**words** 31:1,17
32:20 74:17
75:1 84:22
91:16,18
115:10
**work** 5:19 6:13
27:23 61:17
87:4 88:4,15
90:17 123:12
124:7 127:17
131:4 138:10
**worked** 5:21 6:1
6:15,25 81:14
149:11 157:6
157:16
**working** 16:1
26:4 55:6,7

136:2,8,16
137:9 145:24
146:16 148:11
149:11 157:20
**works** 55:2,18
60:4 87:7
96:25 109:17
**Worldwide**
169:8 170:23
**wouldn't** 13:3
94:24 103:17
108:2 113:7
120:10 125:8
128:4 148:25
**Wow** 147:5
**wrap** 121:18
**writing** 105:5
**written** 43:23
117:2
**wrong** 78:16
112:7
**wrongful** 120:2

**X**

**X** 1:4 4:16 166:6
167:4

**Y**

**y'all** 24:19 72:14
**yeah** 24:3 38:24
42:19 46:12
88:1 99:15,21
107:13 109:8
122:7 126:4
128:13 130:1
135:17 141:22
145:13 148:13
154:25
**year** 7:4 14:14
20:24 65:25
67:17 98:18
105:18 146:11
156:7,13 159:2
**years** 6:11,12
7:8 8:24 10:7
33:12,13 53:3
67:19 98:11
106:14

**yes-or-no** 51:12
**young** 6:9

**Z**

**Zip** 34:13
**Zoom** 1:15 31:6
84:21

**0**

**0:00** 168:2
**08** 7:20

**1**

**1** 3:9 13:1 34:19
57:3,18 76:14
112:16,22
114:23
**1.3** 146:18
**1:00** 122:8
**1:01** 122:16,18
**1:15** 122:10
**1:59** 161:11,13
**10** 107:8,10
161:1,7
**10:00** 54:3
**10:13** 54:10,12
**10:25** 54:3
**10:30** 54:3,5,7,8
54:12,13
**100** 2:4,9 102:12
153:5
**11TH** 169:1
**12** 16:5,6
**12/31/21** 169:5,6
169:7 170:21
170:22,23
**12:14** 122:14,16
**12:45** 122:5
**1300** 2:9
**14** 6:11,12
**15** 160:24,25
161:7
**165** 3:5
**167** 3:5
**17** 149:17
**18** 149:17
**185,000** 115:3
**187,346.45**

114:13
**187,472** 114:15
**1982** 153:20
**1st** 46:19 48:9
48:16,19 52:4

**2**

**2** 3:2 4:7 57:4
97:5
**2,000** 15:24 16:2
**2:15** 161:4,10
**2:16** 161:13,14
**2:21** 1:15 164:18
164:19
**20** 134:15
**2007** 7:10
**2008** 7:10,16
**2009** 7:16
**2011010** 169:6
170:22
**2014** 67:19
134:15
**2015** 134:15
**2016** 3:9 23:21
24:4 46:19,23
48:9,16,19
50:23 52:4,7
65:25 67:8
112:12,22
114:17
**2017** 11:23
20:21 21:21
66:17 135:13
156:16
**2018** 11:23
14:25 19:23
21:21 24:1,5
33:2,5 34:8
35:16 37:3,6
39:4 50:23
66:17 78:23
104:4 105:17
106:22 110:7
131:3 137:20
144:4 153:22
155:19
**2019** 14:15,17

15:18 17:13,19
19:23 22:17,18
22:18 23:5,22
25:3 57:14
63:16,23 64:1
64:5 67:20
84:16,17 85:20
89:3 147:3,10
147:15 148:7
148:19 149:7
**201ST** 1:6 167:6
**2020** 1:9,14 4:4
39:10 63:12,13
63:25 65:2
89:3 165:3
167:9
**2021** 167:23
169:2 170:5,19
**203** 168:17
170:1
**203.3** 170:15
**20s** 6:5
**21** 1:9,14 4:4
165:3 167:9
**2100** 112:2
**21st** 64:15
**22** 20:16
**223** 169:9
170:24
**235** 169:9
170:24
**25** 109:19
110:25
**250,000** 111:1
**250,000-dollar**
150:12
**29th** 4:6

**3**

**3.2** 147:5,6,8
148:18 150:15
151:22 152:4
**3.2-million-do...**
151:9
**3.282327.93**
147:2 148:9
**3:51** 168:1

**30** 122:6
**30-million-dol...**
139:8
**3000** 169:9
170:24
**33** 61:4
**337-4040** 2:5
**337-4044** 2:6
**35.25** 111:4
**350** 11:11
**365** 129:14
**3700** 2:4
**39** 110:19,19
**39.75** 110:12
111:1

**4**

**4** 3:4
**40** 110:17,19,21
114:21 147:9
**435-2360** 2:11
**435-2371** 2:10
**45** 121:19,21
**468,366.13**
114:8
**48** 4:23

**5**

**5** 61:8 142:23
**50** 152:25 153:1
153:2
**500** 142:23
143:2
**512** 2:10,11
**53** 109:24 110:8
110:11
**572-2000** 169:10
**574,000** 113:3
114:5
**59** 3:9
**594** 22:3
**5th** 63:13 65:2

**6**

**6813** 4:9 169:5
170:21

**7**

**70** 110:11
**700,000** 153:23
**713** 2:5,6 169:10
**75** 109:24
**750,000** 111:12
  115:18
**77010** 2:5
**77027** 169:10
  170:25
**78701** 2:10

---
**8**
---
**800** 22:7

---
**9**
---
**9:03** 1:14 4:1
**90s** 5:11,13,19