# EXHIBIT 8

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

________________________________

WILLIAM FRANKLIN, MD, TOTH ENTERPRISES II, P.A. d/b/a VICTORY MEDICAL & FAMILY CARE, DIANOSTIC GESTALT, LLC, SCHARON SHEPARD, NP, KATHERINE KELLER, DO, NATHAN PEKAR, MD, SARITA PRAJAPATI, MD, SHAWN AGENBROAD-ELANDER, NP, and BRITTANI ADAMS, NP,

Plaintiffs,

v.

JEAN-PAUL FORAGE, LEWIS NICHOLS, CLAY ELLIS, and LN PROFESSIONAL MANAGEMENT LLC, d/b/a MEDICAL MANAGEMENT PROFESSIONAL, and ALLIED LAB SOLUTIONS MANAGEMENT, LLC,

Defendants.

________________________________

Case No. 1:23-CV-00542-RP

DEPOSITION OF

LAWRENCE D. PALMER

DATE: Wednesday, March 6, 2024

TIME: 10:07 a.m.

LOCATION: Griffith & Griffith
514 East Houston Avenue
Crockett, TX 75835

REPORTED BY: Cynthia P. Smith

JOB NO.: 6496801

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS WILLIAM FRANKLIN, MD, TOTH ENTERPRISES II, P.A. D/B/A VICTORY MEDICAL & FAMILY CARE, DIANOSTIC GESTALT, LLC, SCHARON SHEPARD, NP, KATHERINE KELLER, DO, NATHAN PEKAR, MD, SARITA PRAJAPATI, MD, SHAWN AGENBROAD-ELANDER, NP, and BRITTANI ADAMS, NP:

W. PAUL MILLER, ESQUIRE
SARAH SHUMATE-CONNOR, ESQUIRE
Germer Beaman & Brown PLLC
One Barton Skyway
1501 South Mopac Expressway, Suite A400
Austin, TX 78746
pmiller@germer-austin.com
sshumate@germer-austin.com
(512) 472-0288

BRIDGET A. ZERNER, ESQUIRE (by videoconference)
Markham Read Zerner LLC
908 Main Street
Waldoboro, ME 04572
bzerner@markhamreadzerner.com
(617) 523-6329

A P P E A R A N C E S (Cont'd)

ON BEHALF OF DEFENDANTS JEAN-PIERRE FORAGE, LEWIS NICHOLS, LN PROFESSIONAL MANAGEMENT LLC, D/B/A MEDICAL MANAGEMENT PROFESSIONAL, AND ALLIED LAB SOLUTIONS MANAGEMENT, LLC:

RAY CHESTER, ESQUIRE
IAN DAVIS, ESQUIRE (by videoconference)
McGinnis Lochridge LLP
1111 West 6th Street, Building B, Suite 400
Austin, TX 78703
rchester@mcginnislaw.com
idavis@mcginnislaw.com
(512) 495-6000

ON BEHALF OF DEFENDANT CLAY ELLIS:

JEFF HOBBS, ESQUIRE
Armbrust & Brown PLLC
100 Congress Avenue
Austin, TX 78701
jhobbs@abaustin.com
(512) 435-2371

MR. CHESTER: Thank you.

EXAMINATION

BY MR. CHESTER:

Q Mr. Palmer, give us your full name, please.

A Lawrence Douglas Palmer.

Q Have you ever given any sworn testimony before?

A No, this is a first.

Q All right. Do you understand the legal significance of the oath you just took?

A Yes.

Q You understand that your testimony today is sworn and is under penalty or perjury in the state of Texas?

A Yes.

Q And you know what perjury is; right?

A Yes.

Q All right. What is your work address, please, sir?

A 513 West Chestnut, Grapeland, one word, 75844.

Q 75844?

A 844.

Q And what is your home address, please, sir?

A Same.

A No.
Q Do you try and hold yourself out to the same ethical standards as a CPA?
A Hard to say. I don't know what those are.
Q Okay. Well, we'll explore those in a bit. You wouldn't knowingly violate any ethical standards that apply to CPAs. Would you?
A No.
Q Okay. Now I'm sure you're familiar with the civil and criminal penalties under federal law for filing a false tax return as a PTIN holder; correct?
A Vaguely.
Q You're aware that there are civil and criminal penalties for a tax return preparer knowingly filing a false return; right?
A Yes.
Q Okay. You're just not exactly sure what the sentence or the penalties would be?
A Right. Yeah.
Q Now what years did you work for LN Professionals?
A 2015 or '16 through 2018.
Q Okay. I've got paperwork indicating that you left LN in the early part of October 2018. Does that sound right to you?

BY MR. CHESTER:

Q Now do you recognize your signature on the third page of Exhibit 5?

(Exhibit 5 was marked for identification.)

A I do.

Q And also, it's on page 4, too; right?

A Yes.

Q And you signed this under penalty of perjury; right?

A Yes.

Q You were aware of that when you signed this?

A Yes.

Q Meaning that if it was false and knowingly false, you could be charged with the criminal offense of perjury; right?

A Right.

Q Okay. Now did Attorney Kelly Dawson prepare this declaration?

A Well, he called me. I -- I couldn't even tell you when. Apparently, he had a beef with Clay, something about defamation or libel. I'm not sure what the distinction is. Then asked me for a -- a write-up about pretty much right -- just this first part. Okay. So I sent -- I wrote it up and sent to

him.

And -- and then, like, a year later, long time -- a lot of time had passed. He said, "Here, I -- I made some changes, just, you know, sign and send it back to me," which is what I did. And I really didn't hardly read it, because, well, just I didn't care. So yeah. And so I signed this and sent it back. Yeah.

Q Okay. But --

A But not -- but let me add.

Q Go ahead.

A But, well, since -- since this came back, I actually read it. And honestly, all I -- part that I wrote is, like, the first page, page and -- about page and a half. A lot of this -- definitely should've read it, but I didn't -- is -- is him reworking it, really.

Yeah. Certainly, this is not part of what I wrote to him. And I've reached out to him since this -- and I reached out to him. I think I sent him an email. And I sent him a text requesting my original draft. And, you know, haven't heard a thing back.

Q Okay. So problem is you signed this entire document --

A Yeah, I got it.
Q -- under penalty of perjury.
A Correct.
Q So you understand the situation that we're in here today?
A Yes.
Q And are you telling me that some of this information didn't come from you?
A Yes.
Q And which parts didn't come from you?
A Well, page -- let's see. I never had anything about on page 2, paragraph -- third one down. I never -- I never said, "Clay Ellis skimmed." Because to best of my knowledge, he didn't. Yeah. And paragraph five, the one, "It was routing for Clay Ellis to manufacture fraudulent statements." That's not me.
MR. HOBBS: I'm sorry, sir. Which one was that for the record?
THE WITNESS: One, two, three, four, five.
BY MR. CHESTER:
Q Second page.
A Oh, yeah. I'm sorry. Page 2.
Q Starts with, "It was routine for Clay Ellis

to manufacture." That's the paragraph you're referring to; right?

A Correct.

Q That did not come from you; right?

A No.

Q It's not even true. Is it?

A No.

Q Okay. What else?

A Oh, the books were clean.

Q I'm sorry?

A The books were clean. You know, they were -- were what they were.

Q The LN books were clean; right?

A Correct.

Q Nobody was skimming. Were they?

A No.

Q You would've known about it because you did everybody's tax returns; right?

A You would think so. Yeah.

Q And you wouldn't have filed false tax returns, obviously; right?

A No. Nope.

Q Okay. All right. What other parts are not true?

A Paragraph below that.

was, so.

Q Let's look --

A Let's look at the partners, see -- yeah. Maybe I can -- might remember. No, I saw those names. I don't even recognize those names anymore, outside of Dire Straits and -- I think -- I forget what MJ's was as well. It wasn't Torque Wrench. Do any of these have a Colorado --

Q I don't know.

A No. I -- I didn't see it. Torque Wrench was one of the original partners. They got bought out. That -- I forget his name. One of the -- one of the partners or companies had their offices, like, right up the street from us. And I would hand deliver a check to them each month. And I -- but I -- I can't remember the name.

Q Well, let's go back here to the declaration where we left off.

A All right.

Q I believe we were on page 3. Oh, yeah. We were in the second full paragraph that begins, "Clay Ellis specifically directed me to write checks." You recall that's where we left off?

A Yeah. Yeah. And I think -- I think that's correct. And one of them was located in -- in

Colorado.

Q But were these illegal skimming checks that you sent to Colorado?

A No, this was checks in the ordinary course of business. And, well, the one located in Colorado was the one I would deliver down the street. Yeah.

Q Okay. All right. But that wasn't skimming. That wasn't fraudulent. That was just payments in the normal course of business; right?

A Correct.

MR. MILLER: Objection. Leading.

BY MR. CHESTER:

Q Okay. All right. And what else is not true? What about the next paragraph?

A Well, there wasn't any inconsistent or arbitrary accounting.

Q What about fraudulent accounting? Was there any of that going on when you were the accountant there?

A No. No, I wouldn't -- don't think any of that was mine.

Q This whole paragraph on page 3 that begins, "Clay Ellis always explained away inconsistent and arbitrary accounting," none of those are your words and you don't --

A I don't think so. I --
Q You don't stand by any of those words; right?
A I don't stand by that at all.
Q Okay. What about the next paragraph? What suspicious activity is that referring to? Do you have any idea?
A No. I don't -- I don't stand by that either.
Q Okay. There was no suspicious activity; right?
A No. Just once a month after all the accounting's done and the spreadsheets were complete, you know, it just -- it all flows through to the bottom. You write checks to the five partners or -- yeah, five partners, I guess it is. Yeah.
Q Okay. All right. Let's go back to page 1. So first paragraph just says who you are and you're over 21. I guess that part's true; right?
A I'm guessing so.
Q You're a professional accountant. Were you in Travis County at the time you signed this?
A I was in -- well, I lived -- no, I was up in Houston County. Yeah.
Q Okay. September 6, 2022?

A Yeah. Yeah.

Q Okay. Did you travel to Travis County when you signed this?

A No.

Q Okay. So even where it says, "Executed by Larry Palmer in Travis County, Austin," that's not even true; right?

A That's correct. Yeah.

Q It's correct that it's not true; right?

A It's correct that it's not true. Yeah.

Q Thank you. Okay. And so in case this does go to a district attorney, you were located where when you --

A Houston County.

Q Houston County.

A Grapeland. Where I am now. Yeah.

Q Okay. All right. Let's go back to page 1, second paragraph. What about the last sentence of the second paragraph where it says all these different legal entities Clay Ellis was the purported owner. You knew Clay Ellis wasn't the owner; right?

MR. MILLER: Objection. Leading.

THE WITNESS: I can't tell you right now who owned -- I mean, let's see -- Dire Straits. I can't tell you now who owned these others. I don't

know.

BY MR. CHESTER:

Q Okay. But let's talk about LN Professional. Clay Ellis was not an owner of that; right?

A Correct.

Q You knew that because you filled out his tax returns; right?

A Correct. Yeah.

MR. MILLER: Objection. Leading.

BY MR. CHESTER:

Q And he was an employee of that; right?

A He was an employee.

Q And you W-2'ed him; right?

A Yes.

Q Okay. So when it says, "Different legal entities, all of which Clay Ellis was the purported owner," since "all of which" would've included LN Professional, that's not a true statement. Is it?

MR. MILLER: Objection. Leading.

THE WITNESS: No. He wasn't -- he wasn't a partner. He wasn't an owner of the company.

BY MR. CHESTER:

Q Right. And he wasn't a purported owner either. Was he? Of LN Professional?

A No.

Q Okay. All right. And then going to the next paragraph, the third paragraph on page 1, the one that begins, "Although Clay Ellis directed," you refer to Clay Ellis's longtime friend MJ Cortez as his -- it says "con conspirator." I think that's supposed to be co-conspirator. "To further Clay Ellis's scheme to defraud the Allied company shareholders."

A And that is -- that is not my wording at all. No. No. It was -- it's, like, the same reason Franklin. The way Lewis explained it to me was, because Clay owned a -- the clinic in Corpus, and the same thing applied to Franklin, because he owned Victory. There had to be -- for them to -- for the doctor to order samples -- for him to order samples and then get paid, that was a conflict of interest for the medical practice. So you had to, you know, back off a step to get rid of that conflict of interest, is the way it was explained to me.

MR. MILLER: Objection. Non-responsive.

BY MR. CHESTER:

Q Okay. Well, let me get specific about this declaration that you signed under penalty of perjury. That's why I have to ask you these questions; all right?

A I got it.
Q But if they're not your words, you tell us; okay?
A Yeah.
Q First of all, did Clay Ellis have a scheme to defraud the Allied company shareholders to your knowledge?
A No.
Q Okay. Secondly, was MJ Cortez a co-conspirator in this scheme that didn't exist?
A No, he was -- he was a partner.
Q Okay. And what about the next sentence, that this was done by Clay Ellis paying MJ Cortez 10 percent of MMP revenue to remain silent about the fraudulent accounting. Is that true?
A No. No. The payment would be made directly to MJ -- his partner's -- you know, MJTX [sic], whatever it was. And then MJ would then write a check to Clay for -- if I remember, it was for 90 percent. They'd take 10.
Q Okay. But was there anything fraudulent about that?
A No.
Q It was all reported on the tax returns and?
A Everything's reported.

Q Okay. And he wasn't paying -- so Clay Ellis paying 10 percent to MJ Cortez for him to remain silent about fraudulent accounting, that's just --

A Those weren't -- that wasn't my wording.

Q That's just not true. Is it?

A No. No. That's just -- that's just the way the money flowed.

Q Not only is it not your wording, but you were there, and you were the accountant, and you can affirmatively testify that is not true; right?

MR. MILLER: Objection. Leading.

THE WITNESS: Well, correct. Yeah. Actually, my -- my conversations with Kelly Dawson had to do with a libel or whatever lawsuit. It had nothing to do with any of this, so.

MR. MILLER: Objection. Non-responsive.

BY MR. CHESTER:

Q Okay. Let's go to the second page. And I think we have almost covered every paragraph. But I don't remember if we talked about the first full paragraph on page 2 that begins, "Clay Ellis then directed." Tell me if those are your words and if they're accurate.

A This doesn't make sense to me.

Q He's not the most eloquent author. Is he?
A Well, just this doesn't --
Q Can we leave it that the second full paragraph on page 2 beginning, "Clay Ellis then directed," that whole paragraph doesn't make sense to you?
A It doesn't now. It doesn't -- this doesn't match my memory of the money flow. But I -- yeah, it's likely it's been -- it's been -- some time has passed.
Q Let's look at the next paragraph. It starts, "For various justifications." Then you say, "It was common that Clay Ellis would skim off the top from funds that belonged to Allied companies." That's not true. Is it?
A That's not true. Yeah, we covered that earlier. But yeah. No, that is not true.
Q Okay. And then in the next paragraph, the one that begins, "Any amounts LN Professionals ever paid." And the last sentence you say, or Kelly Dawson said, "As time went on, I became increasingly aware that the accounting Clay Ellis was directing me to do was not legal." Is that accurate?
MR. MILLER: Objection. Form.
THE WITNESS: No.

BY MR. CHESTER:
Q Okay. "And it looked like there was fraud being committed against the shareholders of the Allied company shareholders." Is that accurate?
A Again, no.
Q Okay. So a fair summary of this, Mr. Palmer -- correct me if I'm wrong -- but the first paragraph identifying that you're over 21 and the second paragraph identifying that you're an accountant and when you worked at LN, those are accurate. But the rest of this declaration is not accurate and not your words. Is that a fair summary?
A Well, bits -- bits and pieces of them are my words, with a lot of other stuff tacked on.
Q Right. But there was no fraudulent accounting; right?
MR. MILLER: Objection. Leading.
THE WITNESS: Yeah. Correct.
BY MR. CHESTER:
Q No skimming; right?
A No skimming.
MR. MILLER: Objection.
BY MR. CHESTER:
Q By Clay Ellis or anyone else; right?
MR. MILLER: Objection. Leading.

THE WITNESS: Oh, not -- not at my level, no. And --

BY MR. CHESTER:

Q Okay. Well, I mean, you would've known about it; right?

A Well, if something was done at the -- I mean, I didn't do Allied's accounting. And I didn't do other accounting. But -- but no. This level, no. It was all straightforward.

Q But you actually sent the statements and the checks to the Allied entities. Didn't you?

A Mm-hmm.

Q And they were accurate; right?

MR. MILLER: Objection. Leading.

THE WITNESS: Yes. To the best of my knowledge, yeah. Yeah.

BY MR. CHESTER:

Q And you would've known; right? Because you --

A Yeah. I was -- yeah.

Q You were the accountant; right?

A Right.

Q Okay.

MR. MILLER: Same objection.

THE WITNESS: Oh, let him finish?

BY MR. CHESTER:

Q All right, Mr. Palmer. We're back from a break. Are you ready to continue?

A Mm-hmm. Yeah.

Q I want to go back to the conversations between you and Kelly Dawson surrounding you signing this declaration, Exhibit 5. I know you said you sent him a one-page declaration that had no allegations of fraudulent accounting or skimming; right?

A That's -- that's my memory. Yes.

Q Okay. Because there were none when you worked there; right?

A Correct.

MR. MILLER: Objection. Leading.

BY MR. CHESTER:

Q So did you convey any information to him at any time in any form that would support some of the things that he wrote in this declaration, such as fraudulent accounting, skimming, anything like that?

A No.

Q Okay. So he completely just made that up on his own; right?

A Yes.

Q Okay. Now when he sent you this declaration to sign under oath with things he had made up on his

own, did he ask you if you had any documents to back up any of these accusations?

A No.

Q Did he ask you if there was anyone else at LN that would've been aware of the skimming that he could contact and get an affidavit from?

A No.

Q For example, if this widespread skimming and fraudulent accounting had been going on, Dylan Parks would've known about it, too; right?

MR. MILLER: Objection. Leading.

THE WITNESS: No. Not -- no. No. Dylan came down on the tail end, you know. And like I say, he -- he was a wiz on a spreadsheet, but he didn't -- he didn't know very much about -- you know, he knew the basics of keeping books. That's about it.

BY MR. CHESTER:

Q All right. But did Mr. Dawson ask you for any corroborating or supporting evidence to back up the allegations that he made in this declaration?

A No.

Q Okay. Now I know you and Mr. Ellis didn't part on the best of terms, but do you consider yourself friendly with Lewis Nichols?

A Yeah. Yes. Yeah.

Q I mean, he employed you for many years; right?
A Yeah. Yes. Yes.
Q Okay. And now that you've read this declaration, it says that he was in on all this fraudulent accounting and skimming; right?
A Well, that's what it says. That -- that's not -- not what I said.
Q Right. Would you care to apologize to Mr. Nichols for having signed --
A For having signed it? Sorry. Yes.
Q Okay. And as far as the judge or jury that might be hearing this case, what would you say they should do in terms of relying on the truth and veracity of this declaration you signed?
A I'd say not to rely on it. Discard it.
Q All right. Now have you had any conversations with a gentleman named John Markham?
A Yes. Not -- not conversations. I think -- I think he was the one who was going to quash the -- the first -- the first subpoena, I think.
Q Okay. All right. Is that what Dawson told you?
A I think so. Yes.
Q Okay. Because they were working together;



EXHIBIT
5

CAUSE NO. D-1-GN-20-003463

| | | |
|---|---|---|
| TOTH ENTERPRISES II, P.A., AND WILLIAM FRANLIN, M.D., *Plaintiffs.,* | § § § § | IN THE DISTRICT COURT<br><br>201st JUDICIAL DISTRICT |
| v. | § § § | |
| CLAY ELLIS *Defendant* | § § | TRAVIS COUNTY, TEXAS |

**UNSWORN DECLARATION OF LARRY PALMER**

THE STATE OF TEXAS §
COUNTRY OF TRAVIS §

"My name is Larry Palmer. I am over the age of 21 years old, I am of sound mind, I am capable of making this Declaration, and I do so freely. I have personal knowledge of the facts contained herein, I attest that the statements herein are true accurate and correct.

I am a professional accountant, in Travis County, Austin, Texas. In or around mid-2015, I was hired by Clay Ellis to work as the accountant for LN Professional Management LLC., d/b/a Medical Management Professionals—("LN"), Allied Lab Solutions Management LLC., and Allied Lab Solutions LLC. I continued working with these companies until mid-2018. These were different legal entities all of which were Clay Ellis was the purported owner and directed all day-to-day operations.

Although Clay Ellis directed every day-to-day operation, was in-charge of all financial accounts, was in-charge of all hiring and firing, I found out later, Clay Ellis, did not have his name on the various companies he owned, aside from Allied Lab Solutions Management LLC., and Allied Lab Solutions LLC. His longtime friend, Michael John Cortez-a/k/a MJ Cortez, acted as Clay Elli's con-conspirator to further Clay Ellis' scheme to defraud the Allied company shareholders. This was done namely by Clay Ellis paying MJ Cortez 10% of MMP revenue to remain silent about fraudulent accounting for the funds that would flow down stream from MMP.

My duties included all accounting operations, which included receiving funds from the medical facilities that were clients of Medical Management Professionals LLC. As it was set up, clients would pay Medical Management Professionals LLC, then Medical Management Professionals LLC, would pay LN Professional Management LLC., then LN Professional Management LLC., would make payment to Allied Lab Solutions Management LLC., and Allied Lab Solutions LLC. At the time of the initial payment, Clay Ellis changed how the money was to be distributed. Instead of the funds being sent to LN Professional Management LLC, he directed that 10% of the money

off the top was to be sent to MJ Cortez, another employee at MMP. MJ Cortez did not have authority to hire, fire, manage, or direct me in my role as accountant, nor was he a principal of MMP. However, even lacking any meaningful role, Clay Ellis directed that MJ Cortez's 10% be skimmed off the top for his participation in the Ellis scheme.

Clay Ellis then directed the balance of those funds, minus MJ Cortez's 10%, to be paid to LN Professional Management LLC. The agreement with LN Professional Management LLC, and the Allied Companies was that LN Professional Management LLC., was to receive 55% of the revenue, and the rest payable between the Allied companies. With the 10% directed by Clay Ellis to be paid to MJ Cortez, the net to LN Professional Management was less than that to which it was entitled and consequently, the net received by Allied Lab Solutions members was also reduced.

For various justifications that Clay Ellis would manufacture, it was common that Clay Ellis would skim off the top from funds that belonged to the Allied Companies. Clay Ellis would direct funds above the 55% LN Professionals was entitled to, to be paid to Clay Ellis personally, or Clay Ellis' LLC in Colorado, or one of Clay Ellis' other Texas LLC's, and Lewis Nichols for his role as co-conspirator of LN Professionals LLC. Clay Ellis would tell me to write the checks and because he appeared to have the right to hire, fire, and direct me, complied with his directions.

Any amounts LN Professionals LLC ever paid to any party were at the sole direction of Clay Ellis. While Clay Ellis was not legally an owner of LN Professional Management LLC., and Medical Management Professionals LLC., he directed every operational aspect thereto as though he were the sole owner. As time went on, I became increasingly aware that the accounting Clay Ellis was directing me to do was not legal and looked like there was fraud being committed against the shareholders of the Allied company shareholders.

It was routine for Clay Ellis to manufacture fraudulent settlement statements which did not reflect the actual amounts received by MMP. By increasing the monies paid to him, and then providing false or inaccurate settlement statements, Clay Ellis was written checks in excess of the amounts reflected on the statements. This resulted in him taking more money than he was allowed from the Allied company shareholders. The funds that LN Professionals LLC received from their clients would vary, but the numbers were substantial. For most months, the revenue that was received and later skimmed and stolen was well over several hundred thousand dollars a month. There were millions of dollars that were received from various hospital clients. There was always a sizeable amount skimmed and taken by Clay Ellis for himself and directed to his personal companies. These payments were taken off the top, before any split to LN Professionals and Allied Lab Solutions, and then to the members of Allied Lab Solutions. The funds that were skimmed or stolen from the Allied company shareholders would be distributed to Clay Ellis and Lewis Nichols, with MJ Cortez already receiving his 10% money off the top.

As part of my duties as the accountant for MMP, I was aware of the employees and employee compensation. The payments that I am referring to for Clay Ellis which were taken off the top, were not paid to him as an employee, as they were not rerated as employee compensation.

Clay Ellis made all decisions as though he owned LN Professional Management LLC., and Medical Management LLC., and he was compensated at the exact same rate at the legal owner of LN Professional Management LLC., Lewis Nichols. At the same time Clay Ellis was not the legal owner of LN Professional Management LLC., and Medical Management LLC., he held him self

out to all parties he was in-fact the owner of these companies. This would have all believing Clay Ellis was the owner of these two companies and they could reasonably rely on his directions and representations, and reasonably believed him exercising complete and absolute dominion and control of these two companies was derived from his ownership thereof.

Even though Clay Ellis was not properly accounting for funds that should have gone to the Allied Companies' shareholders, he would manufacture statements for me to use to generate payments to the Allied Companies that those at the Allied company shareholders would receive as an accurate and correct reflection of the funds. If Clay Ellis did not manufacture accounting, the Allied companies' shareholders would have received much more revenue than they actually did.

Clay Ellis specifically directed me to write checks to the members of Allied Lab Solutions, including William Franklin, M.D., and Toth II Enterprises, P.A. The amounts to those checks were always the net amounts after the monies off the top that Clay Ellis had directed be paid, including M.J. Cortez, but also himself and on multiple occasions one of his corporations, including one corporation which I understood was located in Colorado.

Clay Ellis always explained away inconsistent and arbitrary accounting. Over time, I found their accounting to be suspect, I feared fraudulent accounting. I challenged Clay Ellis about these inaccuracies. My demand for strict accounting to Clay Ellis was met with fierce rejection and culminated in me leaving that company. I refused to be complicit in these fraudulent accounting schemes, and this unethical and fraudulent. In reality, I was one of the few Clay Ellis was unable to buy silence from.

All this suspicious activity was clearly known by Clay Ellis, Lewis Nichols, and MJ Cortez. It is equally clear that all three were aware of the scheme as they were recipients of the checks directed to be sent them by Clay Ellis. All three were clearly acting on concert as they received checks and payments and the statements reflecting the changing accounting and misstatements of revenue which were then sent to Allied Lab Solutions members. This was all done at the direction of Clay Hill to me specifically and I was told to write the checks as those statements reflected."

Executed on this 6th day of September, 2022, by Larry Palmer, in Travis County, Austin, Texas, United States of America.

By: [signature]
Larry Palmer
DECLARANT

Date: 9/6/22

CAUSE NO. D-1-GN-20-003463

| | | |
|---|---|---|
| TOTH ENTERPRISES II, P.A., AND | § | IN THE DISTRICT COURT |
| WILLIAM FRANLIN, M.D., | § | |
| *Plaintiffs.*, | § | |

| | | |
|---|---|---|
| | § | 201st JUDICIAL DISTRICT |
| | § | |
| v. | § | |
| | § | |
| CLAY ELLIS, et al., | § | TRAVIS COUNTY, TEXAS |
| *Defendant* | § | |

**UNSWORN DECLARATION**

(Texas Civil Practice and Remedies Code, Section §132.001)

My name is: Larry Palmer

My date of birth is: 12/09/55

My address is: PO Box 190 Grapeland, TX 75844

I declare under penalty of perjury that all information in the attached document entitled Unsworn Declaration of Larry Palmer, I have personal knowledge of, are true, accurate and correct.

Signed in Travis County, Austin, Texas on 6th day of September, 2022.

By: [signature]
Larry Palmer

Pursuant to Texas Civil Practice and Remedies Code Section §132.001, an unsworn declaration may be used in lieu of a written sown declaration, verification, certification, oath, or affidavit required by statute or required by a rule, order or requirement adopted as provided by law. This provision does not apply to a lien required to be filed with a county clerk, an instrument concerning real or personal property required to be filed with a county clerk, or an oath of office or an oath required to be taken before a specified official other than a notary public. An unsworn declaration made under this section must be 1). in writing, 2). signed by the person making the declaration as true under penalty of perjury and 3). in substantially the form used above.

**(END OF DOCUMENT)**