# EXHIBIT A

```
 1              UNITED STATES DISTRICT COURT

 2              WESTERN DISTRICT OF TEXAS

 3                    AUSTIN DIVISION

 4      _____

 5      WILLIAM FRANKLIN, MD, TOTH

 6      ENTERPRISES II, P.A. d/b/a

 7      VICTORY MEDICAL & FAMILY CARE,

 8      DIANOSTIC GESTALT, LLC,

 9      SCHARON SHEPARD, NP, KATHERINE

10      KELLER, DO, NATHAN PEKAR, MD,

11      SARITA PRAJAPATI, MD, SHAWN

12      AGENBROAD-ELANDER, NP, and

13      BRITTANI ADAMS, NP,

14              Plaintiffs,

15          v.                        Case No.

16      JEAN-PAUL FORAGE, LEWIS NICHOLS,    1:23-CV-00542-

17      CLAY ELLIS, and LN PROFESSIONAL     RP

18      MANAGEMENT LLC, d/b/a MEDICAL

19      MANAGEMENT PROFESSIONAL, and

20      ALLIED LAB SOLUTIONS

21      MANAGEMENT, LLC,

22              Defendants.

23      _____

24

25
                                          Page 1
```

1                  DEPOSITION OF

2              LAWRENCE D. PALMER

3    DATE:           Wednesday, March 6, 2024

4    TIME:           10:07 a.m.

5    LOCATION:       Griffith & Griffith

6                    514 East Houston Avenue

7                    Crockett, TX 75835

8    REPORTED BY:    Cynthia P. Smith

9    JOB NO.:        6496801

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                          Page 2

```
 1                    A P P E A R A N C E S

 2      ON BEHALF OF PLAINTIFFS WILLIAM FRANKLIN, MD, TOTH

 3      ENTERPRISES II, P.A. D/B/A VICTORY MEDICAL & FAMILY

 4      CARE, DIANOSTIC GESTALT, LLC, SCHARON SHEPARD, NP,

 5      KATHERINE KELLER, DO, NATHAN PEKAR, MD, SARITA

 6      PRAJAPATI, MD, SHAWN AGENBROAD-ELANDER, NP, and

 7      BRITTANI ADAMS, NP:

 8           W. PAUL MILLER, ESQUIRE

 9           SARAH SHUMATE-CONNOR, ESQUIRE

10           Germer Beaman & Brown PLLC

11           One Barton Skyway

12           1501 South Mopac Expressway, Suite A400

13           Austin, TX 78746

14           pmiller@germer-austin.com

15           sshumate@germer-austin.com

16           (512) 472-0288

17

18           BRIDGET A. ZERNER, ESQUIRE (by videoconference)

19           Markham Read Zerner LLC

20           908 Main Street

21           Waldoboro, ME 04572

22           bzerner@markhamreadzerner.com

23           (617) 523-6329

24

25
```

Page  3

```
 1              A P P E A R A N C E S (Cont'd)
 2    ON BEHALF OF DEFENDANTS JEAN-PIERRE FORAGE, LEWIS
 3    NICHOLS, LN PROFESSIONAL MANAGEMENT LLC, D/B/A MEDICAL
 4    MANAGEMENT PROFESSIONAL, AND ALLIED LAB SOLUTIONS
 5    MANAGEMENT, LLC:
 6          RAY CHESTER, ESQUIRE
 7          IAN DAVIS, ESQUIRE (by videoconference)
 8          McGinnis Lochridge LLP
 9          1111 West 6th Street, Building B, Suite 400
10          Austin, TX 78703
11          rchester@mcginnislaw.com
12          idavis@mcginnislaw.com
13          (512) 495-6000
14
15    ON BEHALF OF DEFENDANT CLAY ELLIS:
16          JEFF HOBBS, ESQUIRE
17          Armbrust & Brown PLLC
18          100 Congress Avenue
19          Austin, TX 78701
20          jhobbs@abaustin.com
21          (512) 435-2371
22
23
24
25
```

Page  4

1                 A P P E A R A N C E S (Cont'd)

2     ALSO PRESENT:

3            Rob Curnock, Videographer

4            Lewis Nichols, Defendant

5            Clay Ellis, Defendant

6            Lindsey Reyes, Paralegal, Germer Beaman & Brown

7            PLLC (by videoconference)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page  5

```
 1                    I N D E X
 2   EXAMINATION:                              PAGE
 3        By Mr. Chester                          9
 4        By Mr. Hobbs                           77
 5        By Mr. Miller                          79
 6        By Mr. Chester                        212
 7        By Mr. Miller                         219
 8
 9                   E X H I B I T S
10   NO.            DESCRIPTION                 PAGE
11   Exhibit 1       Confidential                18
12   Exhibit 2       Confidential                19
13   Exhibit 3       Confidential                22
14   Exhibit 4       Confidential                23
15   Exhibit 5       Confidential                27
16   Exhibit 6       Confidential                44
17   Exhibit 7       Confidential                50
18   Exhibit 8       Confidential                61
19   Exhibit 9       Confidential                65
20   Exhibit 10      Confidential                67
21   Exhibit 11      Confidential                73
22   Exhibit 12      Confidential               180
23   Exhibit 13      Confidential               187
24   Exhibit 14      Confidential               207
25
```

Veritext Legal Solutions
800-336-4000

```
 1              P R O C E E D I N G S
 2              THE VIDEOGRAPHER:  We're now on the
 3    record.  The time is 10:07 a.m., March 6, 2024.  This
 4    is the deposition of Larry Palmer.
 5              THE REPORTER:  Good morning.  My name
 6    is Cynthia Smith, and I'm the reporter assigned by
 7    Veritext to take the record of this proceeding.  We
 8    are now on the record.  The time is 10:08 a.m.
 9              This is the deposition of Larry Palmer
10    taken in the matter of Toth Enterprises II, P.A., et
11    al. vs. Jean-Pierre Forage, et al. on Wednesday, March
12    6, 2024.I am a notary authorized to take
13    acknowledgments and administer oaths in Texas.
14              Additionally, absent an objection on
15    the record before the witness is sworn, all parties
16    and the witness understand and agree that any
17    certified transcript produced from the recordings of
18    this proceeding:
19                  - is intended for all uses permitted
20                     under applicable procedural and
21                     evidentiary rules and laws in the
22                     same manner as a deposition recorded
23                     by stenographic means; and
24                  - shall constitute written stipulation
25                     of such.
```

Page 7

1          At this time will everyone in

2   attendance please identify yourselves for the record.

3          MR. CHESTER:  Ray Chester for all the

4   defendants except Clay Ellis.

5          MR. HOBBS:  And Jeff Hobbs for the

6   defendant Clay Ellis.

7          MR. MILLER:  Paul Miller and Sarah

8   Shumate-Connor for the plaintiffs.

9          THE REPORTER:  Paul Miller.  Got it.

10  Okay.

11         MS. ZERNER:  Good morning.  This is

12  Bridget Zerner who is also for the plaintiffs.  And I

13  just wanted to let everyone know it's possible that

14  John Markham, my partner representing the plaintiffs

15  as well, may log on.  Just in case the court reporter

16  sees that.  Thank you all.

17         THE REPORTER:  Okay.  Mr. Palmer, will

18  you please raise your right hand, sir?

19  WHEREUPON,

20             LAWRENCE D. PALMER,

21  called as a witness and having been first duly sworn

22  to tell the truth, the whole truth, and nothing but

23  the truth, was examined and testified as follows:

24         THE REPORTER:  All right.  Counsel, you

25  may proceed.

Page 8

1          MR. CHESTER:  Thank you.

2                  EXAMINATION

3     BY MR. CHESTER:

4          Q    Mr. Palmer, give us your full name, please.

5          A    Lawrence Douglas Palmer.

6          Q    Have you ever given any sworn testimony

7     before?

8          A    No, this is a first.

9          Q    All right.  Do you understand the legal

10    significance of the oath you just took?

11         A    Yes.

12         Q    You understand that your testimony today is

13    sworn and is under penalty or perjury in the state of

14    Texas?

15         A    Yes.

16         Q    And you know what perjury is; right?

17         A    Yes.

18         Q    All right.  What is your work address,

19    please, sir?

20         A    513 West Chestnut, Grapeland, one word,

21    75844.

22         Q    75844?

23         A    844.

24         Q    And what is your home address, please, sir?

25         A    Same.

```
 1          Q     Same.  And what do you do for a living?
 2          A     Tax and bookkeeping.  Tax work and
 3    bookkeeping.
 4          Q     You prepare tax returns?
 5          A     I do.
 6          Q     All right.  Are you represented by counsel
 7    here today?
 8          A     No.
 9          Q     You had the opportunity to engage counsel
10    and chose not to; correct?
11          A     Yeah.  Correct.
12          Q     All right.  Are you self-employed?
13          A     Yes.
14          Q     Do you have a business name?
15          A     Palmer Tax and Bookkeeping.
16          Q     What is your education, please, sir?
17          A     I've got a BBA and -- and about three-
18    fourths of a master's.
19          Q     Where's your BBA from?
20          A     Southwest Texas.
21          Q     I believe they call it Texas State now.
22          A     They call -- I call it Southwest Texas.
23          Q     Got you.  Is that in accounting?
24          A     Yeah.
25          Q     And your partial MBA work, is that in
```

Veritext Legal Solutions
800-336-4000

1    accounting as well?

2        A    Yeah.

3        Q    Could you give us a summary of your work

4    history over the years after graduating college?

5        A    It's been a while.  Let's see.  Revenue

6    agent for the IRS for, I don't know, nine years, I --

7    yeah, something like that.  I forget exactly how long.

8    And then part of Chevron's -- first job was with

9    Chevron when they merged with Gulf.  And ended up in

10   East Bay near San Francisco and worked for them for a

11   little while.  And then I came back here and the IRS

12   and -- geez.  Just a number of accounting jobs since

13   then.  Been self-employed for some time, about 30

14   years.

15       Q    How long?

16       A    About 30.

17       Q    Thirty years?

18       A    Yeah.

19       Q    What does exactly a revenue agent for the

20   IRS do?

21       A    The revenue agent, my job is I audited high

22   net worth individuals and partnerships and

23   corporations.  Oh, I was a field agent.

24       Q    During your time as a field agent, did you

25   become familiar with various federal statutes and

1    regulations governing the IRS and taxpayers?

2        A    Yeah.

3        Q    And currently, you're a tax return preparer?

4        A    Correct.

5        Q    And how long have you -- you have a PTIN?

6        A    Yes.

7        Q    How long have you had a PTIN?

8        A    Probably about 30 years -- for a long time.

9        Q    Okay.  Is this still current?

10        A    Yeah.

11        Q    What do you have to do to get a PTIN?

12        A    Oh, you have to get fingerprinted and --

13    gosh.  I think they do -- I guess they do a background

14    check.  I'm not -- I'm not real sure.  It's not --

15    it's not particularly hard to get.  Yeah.

16        Q    Are you also certified as an enrolled

17    preparer by the IRS?

18        A    I think I still got a current enrolled

19    agent.

20        Q    That's what I meant, enrolled agent.  Yeah.

21        A    Yeah, by virtue of being a revenue agent,

22    basically.

23        Q    And what do you have to do to become an

24    enrolled agent by the IRS?

25        A    Well, when I -- when I got enrolled, my time

Page 12

1    at IRS qualified me to do it.

2         Q    Okay.  What would a private account have to

3    do, just in general?

4         A    I don't know.  I don't know.

5         Q    Take some training and what not?

6         A    I think -- I don't know.  I honestly don't

7    know.

8         Q    Okay.  All right.  Have you taken any

9    continuing education in the field of accounting since

10   college?

11        A    Not in a long time.  Yeah.

12        Q    Okay.  But you did at some point?

13        A    Yeah, initially.  Yeah.

14        Q    And what types of subject matters were

15   covered in that continuing education?

16        A    Oh, just tax law changes from year to year,

17   that kind of thing.

18        Q    Are you a CPA?

19        A    No.

20        Q    Have you ever been a CPA?

21        A    No.

22        Q    Have you ever taken any steps to become one?

23        A    Yes.

24        Q    What steps did you take?

25        A    Well, back when I was going to do it --

Page 13

```
1    let's see here.  The exam was five parts.  And you had
2    to take at least two at one time.  And I took the
3    first two parts and passed them.  And then -- then I
4    had a child and just never pursued it.  I -- I've also
5    worked with small businesses and just, you know -- I
6    wouldn't -- I'm not a corporate guy, you know.  I'm
7    not a law -- an accounting firm kind of guy.  So just
8    the need for it just kind of diminished over the
9    years.
10       Q    Okay.  But in terms of your qualifications
11   to become a CPA, you have a four-year degree in
12   accounting; right?
13       A    You have to -- I think, at that time, you
14   had to have at least 30 hours.  And I had, I think, 33
15   or 36.
16       Q    Okay.  And then do you have to do some
17   additional postgraduate work in accounting to become a
18   CPA?
19       A    I don't think so.
20       Q    All right.  And you have to work as an
21   accountant under a CPA; right?
22       A    Yeah.  Yeah, there was some -- like, yeah,
23   you had to have a -- a year, maybe two, I think, at
24   that time.  Again, keep in mind this was 1985.  Yeah.
25       Q    Okay.  And you had that requirement
```

Page 14

1    satisfied?

2         A    Yeah.

3         Q    Okay.  And so you took two parts of the five

4    part test; right?

5         A    Mm-hmm.  Yes.

6         Q    You have to answer -- yeah, because "uh-huh"

7    and "uh-unh" look the same.

8         A    Yeah.

9         Q    And did you pass those two parts?

10        A    I did.

11        Q    Okay.  And did you do any studying for the

12   other parts?

13        A    I started to.  And just -- like I say, just

14   lost interest.  I had a child.  By the time I even

15   thought about it again, it's, "Eh, screw it."

16        Q    Yeah.  Did you become familiar during your

17   studies and your test-taking with the ethical rules

18   that apply to CPAs?

19        A    Yeah.  You know, a part of the undergraduate

20   is a B law course, and we go through that.

21        Q    Right.  Are you familiar with the code of

22   professional conduct for CPAs?

23        A    Not really.

24        Q    Okay.  You didn't study that when you were

25   taking the test?

Page 15

1        A     No.

2        Q     Do you try and hold yourself out to the same

3    ethical standards as a CPA?

4        A     Hard to say.  I don't know what those are.

5        Q     Okay.  Well, we'll explore those in a bit.

6    You wouldn't knowingly violate any ethical standards

7    that apply to CPAs.  Would you?

8        A     No.

9        Q     Okay.  Now I'm sure you're familiar with the

10   civil and criminal penalties under federal law for

11   filing a false tax return as a PTIN holder; correct?

12       A     Vaguely.

13       Q     You're aware that there are civil and

14   criminal penalties for a tax return preparer knowingly

15   filing a false return; right?

16       A     Yes.

17       Q     Okay.  You're just not exactly sure what the

18   sentence or the penalties would be?

19       A     Right.  Yeah.

20       Q     Now what years did you work for LN

21   Professionals?

22       A     2015 or '16 through 2018.

23       Q     Okay.  I've got paperwork indicating that

24   you left LN in the early part of October 2018.  Does

25   that sound right to you?

Veritext Legal Solutions
800-336-4000

```
 1        A    Yeah, it's about right.
 2        Q    Okay.  And while you were working at LN,
 3    they had a DBA of MMP; right?
 4        A    Yes.
 5        Q    Okay.  And you know what a DBA is; right?
 6        A    Yes.
 7        Q    It means it's the same company.  They just
 8    use a different name; right?
 9        A    Yes.
10        Q    Okay.  So you realized that LN Professionals
11    and MMP are the same company; right?
12        A    Yeah.
13        Q    And you knew that all along; right?
14        A    Yeah.
15        Q    Okay.  And you prepared the tax returns for
16    LN Professionals for tax years 2016 and 2017; correct?
17        A    Yes.
18              MR. CHESTER:  And all these exhibits
19    that I'm going to be marking today, Madame Court
20    Reporter, are subject to a protective order entered in
21    this case, and for it to be considered confidential.
22              THE REPORTER:  Yes, sir.
23    BY MR. CHESTER:
24        Q    Let me show you Exhibit 1.
25    //
```

Page 17

```
 1                      (Exhibit 1 was marked for
 2                      identification.)
 3          A     Okay.
 4          Q     And ask you if you recognize this as the LN
 5    Professional Management tax return for the tax year
 6    2016?
 7          A     Yes.
 8          Q     And at the bottom under preparer, that is
 9    you; correct?
10          A     Correct.
11          Q     We redacted your PTIN and also the
12    employer's ID.  But other than that, this looks
13    complete; right?
14          A     Looks to be.  Yeah.
15          Q     Yeah.  Now you were an employee of LN at
16    this time?
17          A     Yes.
18          Q     Why did you use the term "Palmer Tax and
19    Bookkeeping" with the Lexington address?
20          A     Oh, that's -- I did it just because that's
21    what I do my tax returns under.
22          Q     Okay.  Even though you were an employee of
23    LN?
24          A     Yeah.
25          Q     All right.  Do you recognize Exhibit 2 as a
```

Page 18

1    copy of the 2017 tax return for LN?

2                    (Exhibit 2 was marked for

3                    identification.)

4        A     Yes.

5        Q     And you also prepared that tax return;

6    correct?

7        A     Correct.

8        Q     And so the civil and criminal penalties for

9    filing a false tax return that we were referring to

10   earlier, those would apply to these tax returns if

11   they turned out to be false, since you were the

12   preparer; correct?

13       A     Yes.

14       Q     Okay.  And these tax returns show who the

15   owners of the company are.  Don't they?

16       A     Yes, all the partners.  Right.

17       Q     Right.  And that's customary; right?

18       A     Yes.

19       Q     Yeah.  Now did you also prepare the K-1s for

20   the owners of LN -- do you mind if I call LN

21   Professionals just LN?

22       A     That's fine.  I don't care.

23       Q     Did you also prepare the K-1s?

24       A     Yeah, they're -- they're included as part of

25   the return.  Sure.

Veritext Legal Solutions
800-336-4000

1        Q    Okay.  So for each of the years that you
2    worked at LN, you prepared the company tax returns and
3    also the K-1s for the owners; right?
4        A    Yes.
5        Q    And did you also prepare the W-2s for the
6    employees?
7        A    Yes.
8        Q    Now were MJ Cortez and Lewis Nichols of LN
9    during the years you were there?
10       A    MJ Cortez was a partner.  And let me look at
11   the K-1.  Let's see.  I don't know who was Torque
12   Wrench --
13       Q    Dire Straits would've been Lewis's?
14       A    Yes.  Yeah.
15       Q    Yeah.  So Lewis Nichols's wholly owned LLC,
16   Dire Straits, was an owner, correct, of LN?
17       A    Yes.  Yes.
18       Q    And you prepared K-1s for each of the
19   owners?
20       A    Yes.
21       Q    Right.  And then you also prepared Lewis
22   Nichols's personal tax returns.  Didn't you?
23       A    Mm-hmm.
24       Q    For many years; right?
25       A    Yeah.  For a number of years.  Yeah.

Veritext Legal Solutions
800-336-4000

1        Q     Including the years you worked at LN; right?

2        A     Yes.

3        Q     And you also prepared MJ Cortez's personal

4    tax returns.  Did you not?

5        A     Yes.

6        Q     And you also prepared Clay Ellis's tax

7    returns; right?

8        A     Yes.

9        Q     And Clay Ellis was employee of LN; true?

10       A     Yes.

11       Q     And you would've prepared Clay Ellis's W-2s;

12   right?

13       A     Yes.

14       Q     Now do you remember at one point

15   volunteering to do the tax returns for all of the

16   employees at LN?

17       A     Yeah.

18       Q     Did you end up doing that or?

19       A     I don't think I did any of them.  I -- but

20   I'm not a hundred percent sure.

21       Q     Okay.  And then even after you left LN in

22   October of 2018, you defended Lewis Nichols in an IRS

23   audit of his personal tax returns; right?

24       A     Correct.

25       Q     And he paid you $5,000 for that in 2019;

1   right?

2        A    Yeah.  That sounds right.

3        Q    Is Exhibit 3 a copy of the check where

4   Mr. Nichols paid you to defend him in the audit in

5   2019?

6                  (Exhibit 3 was marked for

7                  identification.)

8        A    Yes.

9        Q    Okay.  And did that audit last several

10  months throughout most of 2019?

11       A    It took some time.  I -- I forget just how

12  long it took.  Couple months anyway.

13       Q    Okay.  And were there one or more meetings

14  with the auditor at your office?

15       A    At Lewis's office.

16       Q    Okay.  Were there also at least one meeting

17  at your office, keeping in mind that you had left LN

18  at this point?

19       A    Yeah.  No.  I think I just at Lewis's.

20  Yeah.

21       Q    Okay.  But you were representing him; right?

22       A    Yes.

23       Q    And that sort of confirms that you're an

24  enrolled agent; right?  Because you have to be an

25  enrolled agent to represent someone in an audit.  Is

Page 22

1      that right?

2           A    Yes.   That's correct.

3           Q    Okay.   Then in 2018 right before you left,

4      you sent all the necessary tax information to the new

5      accountant that was going to take over, Holly

6      Sparkman.   Do you remember that?

7           A    I remember the name.   I -- yeah.   I -- I

8      gave her whatever she asked for.

9           Q    That would've been customary; right?

10          A    Yeah.

11          Q    And do you recognize Exhibit 4 as an email

12     string that shows you transmitting various tax

13     information on LN and the owners to the new CPA, Holly

14     Sparkman?

15                    (Exhibit 4 was marked for

16                     identification.)

17          A    Yes.

18          Q    Okay.   Now did you sign any false tax

19     returns during your time at LN?

20          A    No.

21          Q    Okay.   You didn't sign any false tax returns

22     for LN or for Clay Ellis personally or for MJ Cortez

23     or for Lewis Nichols; right?

24          A    Right.   Correct.

25          Q    Because having worked for the IRS, you

Page 23

```
 1    realize if you'd signed as a return preparer a false

 2    tax return, you could be subject to civil and criminal

 3    federal penalties; right?

 4         A    Sure.  Right.

 5         Q    And you would not have done that; right?

 6         A    No.

 7         Q    Did you fill out any false K-1s during your

 8    time at LN?

 9         A    No.

10         Q    Did you fill out any false W-2s during your

11    time at LN?

12         A    No.

13         Q    Did you make any false statements during

14    2019 during the course of you defending Lewis Nichols

15    in his IRS audit?

16         A    No.

17         Q    Now do you remember a gentleman named Dylan

18    Parks?

19         A    Yes.

20         Q    He came in a few months before you left and

21    joined the accounting department at LN; right?

22         A    Right.

23         Q    And worked with you in that regard?

24         A    Mm-hmm.  Yeah, I trained him up.

25         Q    Okay.  And it looks like from the emails
```

Page 24

1    I've seen he joined in about May of 2018.  You left in

2    October.  So that would've been about a five-month

3    overlap.  Does that sound about right?

4         A    Yeah.  That sounds about right.

5         Q    Okay.  And y'all were the only two

6    accountants there?

7         A    Yeah.

8         Q    Okay.  So y'all worked closely?

9         A    Yeah.

10        Q    And you were training him?

11        A    I was training him.  He -- actually, he's

12   training me on -- he didn't -- he didn't know a lot of

13   accounting.  He had schooling, but no experience.  But

14   he was a wiz on spreadsheets.  He did really good.  So

15   he actually showed me a lot of things on spreadsheets.

16        Q    Okay.  So you were showing him the company

17   business and general accounting --

18        A    And -- and he showed me a faster way to do

19   it.  Yeah.

20        Q    And then he was an Excel guy?

21        A    Yes.

22        Q    All right.

23                   THE WITNESS:  Y'all got a --

24                   THE REPORTER:  Yeah.  And just --

25   you're good.  Just allow him to finish the question

1   and then you respond, please.

2                    THE WITNESS:  Oh, go ahead.

3                    THE REPORTER:  Thank you.

4   BY MR. CHESTER:

5        Q    And you and Mr. Parks became friends.

6   Didn't you?

7        A    Not particularly.

8        Q    Okay.  Did you have him over to your house?

9        A    Was he ever at my house?  I don't think so.

10       Q    You don't remember him coming over the day

11  after you left the employment of LN and coming over

12  and having a drink with you at your house?

13       A    No, but I guess it could've happened.

14       Q    Okay.  You're not saying it didn't happen.

15  You're just saying you don't remember; right?

16       A    Correct.

17       Q    All right.  Now you never said anything to

18  Mr. Parks about any fraudulent accounting or false tax

19  returns being committed at LN Professionals.  Did you?

20       A    No.

21       Q    And he never said anything about that to you

22  either.  Did he?

23       A    No.

24                    MR. CHESTER:  Here you go, Paul.

25                    MR. MILLER:  Thank you.

Page 26

```
 1    BY MR. CHESTER:
 2         Q    Now do you recognize your signature on the
 3    third page of Exhibit 5?
 4                    (Exhibit 5 was marked for
 5                    identification.)
 6         A    I do.
 7         Q    And also, it's on page 4, too; right?
 8         A    Yes.
 9         Q    And you signed this under penalty of
10    perjury; right?
11         A    Yes.
12         Q    You were aware of that when you signed this?
13         A    Yes.
14         Q    Meaning that if it was false and knowingly
15    false, you could be charged with the criminal offense
16    of perjury; right?
17         A    Right.
18         Q    Okay.  Now did Attorney Kelly Dawson prepare
19    this declaration?
20         A    Well, he called me.  I -- I couldn't even
21    tell you when.  Apparently, he had a beef with Clay,
22    something about defamation or libel.  I'm not sure
23    what the distinction is.  Then asked me for a -- a
24    write-up about pretty much right -- just this first
25    part.  Okay.  So I sent -- I wrote it up and sent to
```

Page 27

1    him.

2            And -- and then, like, a year later, long

3    time -- a lot of time had passed.  He said, "Here,

4    I -- I made some changes, just, you know, sign and

5    send it back to me," which is what I did.  And I

6    really didn't hardly read it, because, well, just I

7    didn't care.  So yeah.  And so I signed this and sent

8    it back.  Yeah.

9        Q    Okay.  But --

10       A    But not -- but let me add.

11       Q    Go ahead.

12       A    But, well, since -- since this came back, I

13   actually read it.  And honestly, all I -- part that I

14   wrote is, like, the first page, page and -- about page

15   and a half.  A lot of this -- definitely should've

16   read it, but I didn't -- is -- is him reworking it,

17   really.

18            Yeah.  Certainly, this is not part of what I

19   wrote to him.  And I've reached out to him since

20   this -- and I reached out to him.  I think I sent him

21   an email.  And I sent him a text requesting my

22   original draft.  And, you know, haven't heard a thing

23   back.

24       Q    Okay.  So problem is you signed this entire

25   document --

Page 28

```
 1        A     Yeah, I got it.

 2        Q     -- under penalty of perjury.

 3        A     Correct.

 4        Q     So you understand the situation that we're

 5   in here today?

 6        A     Yes.

 7        Q     And are you telling me that some of this

 8   information didn't come from you?

 9        A     Yes.

10        Q     And which parts didn't come from you?

11        A     Well, page -- let's see.  I never had

12   anything about on page 2, paragraph -- third one down.

13   I never -- I never said, "Clay Ellis skimmed."

14   Because to best of my knowledge, he didn't.  Yeah.

15   And paragraph five, the one, "It was routing for Clay

16   Ellis to manufacture fraudulent statements."  That's

17   not me.

18              MR. HOBBS:  I'm sorry, sir.  Which one

19   was that for the record?

20              THE WITNESS:  One, two, three, four,

21   five.

22   BY MR. CHESTER:

23        Q     Second page.

24        A     Oh, yeah.  I'm sorry.  Page 2.

25        Q     Starts with, "It was routine for Clay Ellis
```

Page 29

1    to manufacture."  That's the paragraph you're

2    referring to; right?

3          A    Correct.

4          Q    That did not come from you; right?

5          A    No.

6          Q    It's not even true.  Is it?

7          A    No.

8          Q    Okay.  What else?

9          A    Oh, the books were clean.

10         Q    I'm sorry?

11         A    The books were clean.  You know, they

12   were -- were what they were.

13         Q    The LN books were clean; right?

14         A    Correct.

15         Q    Nobody was skimming.  Were they?

16         A    No.

17         Q    You would've known about it because you did

18   everybody's tax returns; right?

19         A    You would think so.  Yeah.

20         Q    And you wouldn't have filed false tax

21   returns, obviously; right?

22         A    No.  Nope.

23         Q    Okay.  All right.  What other parts are not

24   true?

25         A    Paragraph below that.

Veritext Legal Solutions
800-336-4000

1        Q     "As part of my duties"?

2        A     Correct.

3        Q     That paragraph's not true as well?

4        A     Correct.

5        Q     Okay.  What else?

6        A     Page 3, paragraph -- the first full

7   paragraph.

8        Q     That starts, "Even though Clay Ellis was not

9   properly accounting"?  That one?

10       A     Correct.  Yeah.

11       Q     That's not true?

12       A     Correct.

13       Q     Okay.  What else?

14       A     Well, next paragraph down.  The first part

15   is -- is all correct.  He directed me to write checks

16   to the members of Allied Lab and the different

17   partners.

18       Q     Right.  Because that was part of the

19   business; right?

20       A     Yeah.  And MJ Cortez was one of the

21   partners.  I'm not sure about a corporation located in

22   Colorado.  But, well, no.  One of the partners was

23   based in Colorado.  I forget the guy's name.  Their --

24   their director or accountant or something, he would

25   fly down from Colorado.  I forget which partner that

Page 31

1    was, so.

2         Q    Let's look --

3         A    Let's look at the partners, see -- yeah.

4    Maybe I can -- might remember.  No, I saw those names.

5    I don't even recognize those names anymore, outside of

6    Dire Straits and -- I think -- I forget what MJ's was

7    as well.  It wasn't Torque Wrench.  Do any of these

8    have a Colorado --

9         Q    I don't know.

10        A    No.  I -- I didn't see it.  Torque Wrench

11   was one of the original partners.  They got bought

12   out.  That -- I forget his name.  One of the -- one of

13   the partners or companies had their offices, like,

14   right up the street from us.  And I would hand deliver

15   a check to them each month.  And I -- but I -- I can't

16   remember the name.

17        Q    Well, let's go back here to the declaration

18   where we left off.

19        A    All right.

20        Q    I believe we were on page 3.  Oh, yeah.  We

21   were in the second full paragraph that begins, "Clay

22   Ellis specifically directed me to write checks."  You

23   recall that's where we left off?

24        A    Yeah.  Yeah.  And I think -- I think that's

25   correct.  And one of them was located in -- in

                                              Page 32

1    Colorado.

2        Q    But were these illegal skimming checks that

3    you sent to Colorado?

4        A    No, this was checks in the ordinary course

5    of business.  And, well, the one located in Colorado

6    was the one I would deliver down the street.  Yeah.

7        Q    Okay.  All right.  But that wasn't skimming.

8    That wasn't fraudulent.  That was just payments in the

9    normal course of business; right?

10       A    Correct.

11                MR. MILLER:  Objection.  Leading.

12   BY MR. CHESTER:

13       Q    Okay.  All right.  And what else is not

14   true?  What about the next paragraph?

15       A    Well, there wasn't any inconsistent or

16   arbitrary accounting.

17       Q    What about fraudulent accounting?  Was there

18   any of that going on when you were the accountant

19   there?

20       A    No.  No, I wouldn't -- don't think any of

21   that was mine.

22       Q    This whole paragraph on page 3 that begins,

23   "Clay Ellis always explained away inconsistent and

24   arbitrary accounting," none of those are your words

25   and you don't --

Page 33

```
 1       A    I don't think so.  I --

 2       Q    You don't stand by any of those words;

 3  right?

 4       A    I don't stand by that at all.

 5       Q    Okay.  What about the next paragraph?  What

 6  suspicious activity is that referring to?  Do you have

 7  any idea?

 8       A    No.  I don't -- I don't stand by that

 9  either.

10       Q    Okay.  There was no suspicious activity;

11  right?

12       A    No.  Just once a month after all the

13  accounting's done and the spreadsheets were complete,

14  you know, it just -- it all flows through to the

15  bottom.  You write checks to the five partners or --

16  yeah, five partners, I guess it is.  Yeah.

17       Q    Okay.  All right.  Let's go back to page 1.

18  So first paragraph just says who you are and you're

19  over 21.  I guess that part's true; right?

20       A    I'm guessing so.

21       Q    You're a professional accountant.  Were you

22  in Travis County at the time you signed this?

23       A    I was in -- well, I lived -- no, I was up in

24  Houston County.  Yeah.

25       Q    Okay.  September 6, 2022?
```

Page 34

1        A     Yeah.  Yeah.

2        Q     Okay.  Did you travel to Travis County when

3   you signed this?

4        A     No.

5        Q     Okay.  So even where it says, "Executed by

6   Larry Palmer in Travis County, Austin," that's not

7   even true; right?

8        A     That's correct.  Yeah.

9        Q     It's correct that it's not true; right?

10       A     It's correct that it's not true.  Yeah.

11       Q     Thank you.  Okay.  And so in case this does

12   go to a district attorney, you were located where when

13   you --

14       A     Houston County.

15       Q     Houston County.

16       A     Grapeland.  Where I am now.  Yeah.

17       Q     Okay.  All right.  Let's go back to page 1,

18   second paragraph.  What about the last sentence of the

19   second paragraph where it says all these different

20   legal entities Clay Ellis was the purported owner.

21   You knew Clay Ellis wasn't the owner; right?

22              MR. MILLER:  Objection.  Leading.

23              THE WITNESS:  I can't tell you right

24   now who owned -- I mean, let's see -- Dire Straits.  I

25   can't tell you now who owned these others.  I don't

Page 35

```
1    know.
2    BY MR. CHESTER:
3        Q    Okay.  But let's talk about LN Professional.
4    Clay Ellis was not an owner of that; right?
5        A    Correct.
6        Q    You knew that because you filled out his tax
7    returns; right?
8        A    Correct.  Yeah.
9                MR. MILLER:  Objection.  Leading.
10   BY MR. CHESTER:
11       Q    And he was an employee of that; right?
12       A    He was an employee.
13       Q    And you W-2'ed him; right?
14       A    Yes.
15       Q    Okay.  So when it says, "Different legal
16   entities, all of which Clay Ellis was the purported
17   owner," since "all of which" would've included LN
18   Professional, that's not a true statement.  Is it?
19               MR. MILLER:  Objection.  Leading.
20               THE WITNESS:  No.  He wasn't -- he
21   wasn't a partner.  He wasn't an owner of the company.
22   BY MR. CHESTER:
23       Q    Right.  And he wasn't a purported owner
24   either.  Was he?  Of LN Professional?
25       A    No.
```

Veritext Legal Solutions
800-336-4000

```
 1        Q    Okay.  All right.  And then going to the
 2   next paragraph, the third paragraph on page 1, the one
 3   that begins, "Although Clay Ellis directed," you refer
 4   to Clay Ellis's longtime friend MJ Cortez as his -- it
 5   says "con conspirator."  I think that's supposed to be
 6   co-conspirator.  "To further Clay Ellis's scheme to
 7   defraud the Allied company shareholders."
 8        A    And that is -- that is not my wording at
 9   all.  No.  No.  It was -- it's, like, the same reason
10   Franklin.  The way Lewis explained it to me was,
11   because Clay owned a -- the clinic in Corpus, and the
12   same thing applied to Franklin, because he owned
13   Victory.  There had to be -- for them to -- for the
14   doctor to order samples -- for him to order samples
15   and then get paid, that was a conflict of interest for
16   the medical practice.  So you had to, you know, back
17   off a step to get rid of that conflict of interest, is
18   the way it was explained to me.
19                  MR. MILLER:  Objection.  Non-
20   responsive.
21   BY MR. CHESTER:
22        Q    Okay.  Well, let me get specific about this
23   declaration that you signed under penalty of perjury.
24   That's why I have to ask you these questions; all
25   right?
```

Page 37

```
 1        A     I got it.

 2        Q     But if they're not your words, you tell us;

 3    okay?

 4        A     Yeah.

 5        Q     First of all, did Clay Ellis have a scheme

 6    to defraud the Allied company shareholders to your

 7    knowledge?

 8        A     No.

 9        Q     Okay.  Secondly, was MJ Cortez a co-

10    conspirator in this scheme that didn't exist?

11        A     No, he was -- he was a partner.

12        Q     Okay.  And what about the next sentence,

13    that this was done by Clay Ellis paying MJ Cortez 10

14    percent of MMP revenue to remain silent about the

15    fraudulent accounting.  Is that true?

16        A     No.  No.  The payment would be made directly

17    to MJ -- his partner's -- you know, MJTX [sic],

18    whatever it was.  And then MJ would then write a check

19    to Clay for -- if I remember, it was for 90 percent.

20    They'd take 10.

21        Q     Okay.  But was there anything fraudulent

22    about that?

23        A     No.

24        Q     It was all reported on the tax returns and?

25        A     Everything's reported.
```

Page 38

1      Q    Okay.  And he wasn't paying -- so Clay Ellis

2   paying 10 percent to MJ Cortez for him to remain

3   silent about fraudulent accounting, that's just --

4      A    Those weren't -- that wasn't my wording.

5      Q    That's just not true.  Is it?

6      A    No.  No.  That's just -- that's just the way

7   the money flowed.

8      Q    Not only is it not your wording, but you

9   were there, and you were the accountant, and you can

10   affirmatively testify that is not true; right?

11                MR. MILLER:  Objection.  Leading.

12                THE WITNESS:  Well, correct.  Yeah.

13   Actually, my -- my conversations with Kelly Dawson had

14   to do with a libel or whatever lawsuit.  It had

15   nothing to do with any of this, so.

16                MR. MILLER:  Objection.  Non-

17   responsive.

18   BY MR. CHESTER:

19      Q    Okay.  Let's go to the second page.  And I

20   think we have almost covered every paragraph.  But I

21   don't remember if we talked about the first full

22   paragraph on page 2 that begins, "Clay Ellis then

23   directed."  Tell me if those are your words and if

24   they're accurate.

25      A    This doesn't make sense to me.

1        Q    He's not the most eloquent author.  Is he?

2        A    Well, just this doesn't --

3        Q    Can we leave it that the second full

4    paragraph on page 2 beginning, "Clay Ellis then

5    directed," that whole paragraph doesn't make sense to

6    you?

7        A    It doesn't now.  It doesn't -- this doesn't

8    match my memory of the money flow.  But I -- yeah,

9    it's likely it's been -- it's been -- some time has

10   passed.

11       Q    Let's look at the next paragraph.  It

12   starts, "For various justifications."  Then you say,

13   "It was common that Clay Ellis would skim off the top

14   from funds that belonged to Allied companies."  That's

15   not true.  Is it?

16       A    That's not true.  Yeah, we covered that

17   earlier.  But yeah.  No, that is not true.

18       Q    Okay.  And then in the next paragraph, the

19   one that begins, "Any amounts LN Professionals ever

20   paid."  And the last sentence you say, or Kelly Dawson

21   said, "As time went on, I became increasingly aware

22   that the accounting Clay Ellis was directing me to do

23   was not legal."  Is that accurate?

24                  MR. MILLER:  Objection.  Form.

25                  THE WITNESS:  No.

Page 40

1 BY MR. CHESTER:

2  Q Okay.  "And it looked like there was fraud

3 being committed against the shareholders of the Allied

4 company shareholders."  Is that accurate?

5  A Again, no.

6  Q Okay.  So a fair summary of this,

7 Mr. Palmer -- correct me if I'm wrong -- but the first

8 paragraph identifying that you're over 21 and the

9 second paragraph identifying that you're an accountant

10 and when you worked at LN, those are accurate.  But

11 the rest of this declaration is not accurate and not

12 your words.  Is that a fair summary?

13  A Well, bits -- bits and pieces of them are my

14 words, with a lot of other stuff tacked on.

15  Q Right.  But there was no fraudulent

16 accounting; right?

17     MR. MILLER:  Objection.  Leading.

18     THE WITNESS:  Yeah.  Correct.

19 BY MR. CHESTER:

20  Q No skimming; right?

21  A No skimming.

22     MR. MILLER:  Objection.

23 BY MR. CHESTER:

24  Q By Clay Ellis or anyone else; right?

25     MR. MILLER:  Objection.  Leading.

Page  41

1                         THE WITNESS:  Oh, not -- not at my

2     level, no.  And --

3     BY MR. CHESTER:

4         Q    Okay.  Well, I mean, you would've known

5     about it; right?

6         A    Well, if something was done at the -- I

7     mean, I didn't do Allied's accounting.  And I didn't

8     do other accounting.  But -- but no.  This level, no.

9     It was all straightforward.

10        Q    But you actually sent the statements and the

11    checks to the Allied entities.  Didn't you?

12        A    Mm-hmm.

13        Q    And they were accurate; right?

14                        MR. MILLER:  Objection.  Leading.

15                        THE WITNESS:  Yes.  To the best of my

16    knowledge, yeah.  Yeah.

17    BY MR. CHESTER:

18        Q    And you would've known; right?  Because

19    you --

20        A    Yeah.  I was -- yeah.

21        Q    You were the accountant; right?

22        A    Right.

23        Q    Okay.

24                        MR. MILLER:  Same objection.

25                        THE WITNESS:  Oh, let him finish?

                                                Page 42

1    Okay.

2    BY MR. CHESTER:

3        Q    Now are you aware that Mr. Dawson has had

4    his law license suspended by the state bar for

5    unethical actions in this litigation?

6        A    No.

7        Q    He didn't tell you that when you emailed him

8    last week?

9        A    No.  Like -- like I said before, I've

10   emailed him and texted him, and I haven't gotten any

11   responses.  No.

12       Q    All right.  Did Mr. Dawson pay you any money

13   to sign this?

14       A    No.

15       Q    Has anybody paid you any money since you

16   left LN related to this lawsuit, meaning Dr. Franklin,

17   for example?

18       A    No.

19       Q    Any of his companies?

20       A    No.

21       Q    Any of his lawyers?

22       A    No.

23       Q    John Markham?

24       A    No.

25       Q    Kelly Dawson?

Page  43

```
 1        A     No.
 2        Q     Lewis paid you $5,000 to help him in the
 3   audit; right?
 4        A     For the audit.  Yeah.  Right.
 5                   MR. MILLER:  Objection.  Leading.
 6   BY MR. CHESTER:
 7        Q     No one else had paid you any money?
 8        A     Correct.
 9        Q     And no one paid you to sign this inaccurate
10   declaration under penalty of perjury?
11        A     Correct.
12        Q     Do you wish you hadn't signed it now?
13        A     Absolutely.
14        Q     I bet so.
15        A     'Cause I didn't even take the time to read
16   it.
17                   MR. MILLER:  Objection.  Non-
18   responsive.
19   BY MR. CHESTER:
20        Q     Exhibit 6 is a copy of the subpoena that you
21   were served with that compelled your appearance here
22   today; correct?
23                   (Exhibit 6 was marked for
24                   identification.)
25        A     Yes.
```

Page 44

```
 1          Q     And would you flip with me to Exhibit A,
 2     page 2.  And I want to ask you -- first, let me just
 3     ask you generally, have you brought any documents with
 4     you today?
 5          A     No.
 6          Q     Did you review any documents to prepare for
 7     the deposition?
 8          A     No.
 9          Q     What about your declaration?  Did you review
10     that?
11          A     Yeah, I did -- yeah -- review that.  And
12     it's like, "Oh, shit."
13          Q     Okay.  Because didn't you ask Mr. Hobbs to
14     send you a copy of it?
15          A     Yes.  Yes.
16          Q     And he did send you a copy; right?
17          A     He did.
18          Q     And you read it?
19          A     Yes.  That's -- yeah.
20          Q     And did you see that you had signed it under
21     penalty of perjury?
22          A     Yes, I did.
23          Q     And what was your reaction?
24          A     Oh, shit.
25          Q     All right.  Do you have any -- now you said
```

Page 45

1    you texted and emailed Kelly Dawson.  Did you say last
2    week or?
3         A    Yeah.  I -- if I look it up.  Last -- yeah,
4    I think it was last week.  Maybe the week before.
5         Q    You didn't happen to bring printed copies of
6    those.  Did you?
7         A    No.
8         Q    Do you mind showing us on your phone?
9         A    I'm -- I'm looking for the text now.  Well,
10   not here.  No results.  Man, I swear I texted him.
11   But it's not here.
12        Q    Do you have any older texts with Kelly
13   Dawson?
14        A    Nothing came up when I did a search.
15        Q    Because I'm giving you fair warning I'm
16   going to show you some in a minute.
17        A    Okay.
18        Q    Did you delete your old texts with Kelly
19   Dawson?
20        A    Quite possibly.  I deleted everything --
21   Kelly, texts from Clay, from Lewis.  Just, you know,
22   that time was done.
23        Q    Okay.  Not for any improper purposes.  Just
24   to clear out your phone?
25                   MS. SHUMATE-CONNOR:  Objection.

                                        Page 46

```
 1                    THE WITNESS:  Clean -- yeah, clear out
 2     my phone.
 3     BY MR. CHESTER:
 4          Q    All right.  What about the email that you
 5     mentioned to Mr. Dawson.  Do you have that?
 6          A    I don't have it.
 7          Q    Okay.  Luckily, I do.
 8          A    Okay.  Good.
 9          Q    Now do you have any documents from your time
10     at LN Professional?
11          A    No.  Well, outside of tax returns.  But no.
12     No.  Company stuff?  No.
13          Q    Did you keep the tax returns or?
14          A    Yeah.  Yeah.
15          Q    Okay.  That's something a tax return
16     preparer should do; right?
17                    MR. MILLER:  Objection.  Leading.
18                    THE WITNESS:  Correct.
19     BY MR. CHESTER:
20          Q    Okay.  And so these are the documents you
21     were asked to bring today if you had them.  And now
22     I'm looking at 4, 5, and 6.
23          A    Okay.
24          Q    And the gist of these document requests are,
25     if you have any documents backing up the stuff in the
```

Page 47

```
 1    declaration, we'd like to see them.  But since you've
 2    already told me there was no skimming and there was no
 3    fraudulent accounting, then I assume you don't have
 4    any documents showing that there was skimming or
 5    fraudulent accounting; right?
 6         A    That's correct.
 7                   MR. MILLER:  Objection.  Leading.
 8    BY MR. CHESTER:
 9         Q    Because as far as you know, no such
10    documents exist; right?
11         A    Correct.
12                   MR. MILLER:  Same objection.
13    BY MR. CHESTER:
14         Q    All right.  And would the same be true of 7
15    and 8?  You don't have any documents supporting those
16    quotes from your declaration because those quotes are
17    not true?
18         A    I'm sorry.  I've got the federal tax return
19    documents.  Is that --
20         Q    Right.  I was just asking about 7 and 8.
21         A    Oh, 7 and 8?
22         Q    Right.
23         A    Correct.
24         Q    Okay.  You do have the federal tax returns,
25    as is customary for a tax return preparer; right?
```

Page 48

```
 1        A     Correct.
 2        Q     All communications with law enforcement or
 3   any other party regarding any illegal or improper
 4   action you claim to have observed at LN Professional.
 5   I'm assuming there are none?
 6        A     There are none.  There -- there was no
 7   communication.
 8        Q     Because there was no illegal or improper
 9   actions that you observed; right?
10        A     Correct.
11              MR. MILLER:  Objection.  Leading.
12   BY MR. CHESTER:
13        Q     Okay.  And you don't have a CPA license.  Do
14   you have any other professional licenses?
15        A     No.
16        Q     Okay.  All right.  We've been going about an
17   hour.  Do you need a break or you want to keep going?
18        A     No.  I'm -- I'm ready to get this done as
19   quickly as possible.
20        Q     Okay.  All right.  Let's do it.
21        A     Got things to do.
22        Q     Me too.
23              MR. CHESTER:  Here you go, Paul.
24              MR. MILLER:  Oh, thank you.
25   //
```

Veritext Legal Solutions
800-336-4000

1   BY MR. CHESTER:

2        Q    Do you recognize Exhibit 7 as some text

3   messages between you and Kelly Dawson?

4                   (Exhibit 7 was marked for

5                   identification.)

6        A    Yup.

7        Q    And the first one is dated September 5th of

8   '22; right?

9        A    Yup.

10       Q    That would've been the day before you signed

11  the declaration; right?

12       A    Yup.

13       Q    "Hey, Larry.  Don't want to bother.  Just

14  checking if you had any thoughts on the declaration.

15  Thanks."  That's what Kelly Dawson wrote to you;

16  right?

17       A    Yes.

18       Q    And you said:  "It's on the way.  One typo.

19  Page 1"; right?

20       A    Mm-hmm.

21       Q    And let me show you something.

22       A    Yeah, it's the one I circled.

23       Q    Okay.  That was the circle.  So you did read

24  it enough to be able to circle a typo on page 1;

25  right?

Page 50

1          A     Yeah.  Yes.

2          Q     Okay.  All right.  Then he says, "Thank

3     you."  And then we jump to August 8, '23, "Any news on

4     the subpoena?"  That's what you wrote.  What was that

5     about?

6          A     I'd been subpoenaed to do this earlier.

7     And -- and he -- he said he was going to get that

8     quashed.  And -- and it was getting close to that

9     subpoena date.  So I texted him, "Have any news on

10    that?"

11         Q     Mr. Dawson told you that he was going to

12    quash the federal subpoena issued in this case?

13                    MR. MILLER:  Objection.  Leading.

14    Objection.  Form.

15                    THE WITNESS:  Yes.  Yeah.

16    BY MR. CHESTER:

17         Q     Okay.  He didn't mention anything about his

18    state bar disciplinary proceedings ongoing and his

19    pending suspension of his bar license?

20                    MR. MILLER:  Objection.  Form.

21                    THE WITNESS:  No.

22    BY MR. CHESTER:

23         Q     That didn't come up?

24         A     No.

25         Q     Would you have been interested to know that,

Page 51

1   if the guy that drafted the declaration that you

2   signed under penalty of perjury is in trouble with the

3   state bar for unethical activities in this case?

4                    MR. MILLER:  Objection.  Form.

5                    THE WITNESS:  Yeah.  Like I say, I

6   didn't even read -- read through the first subpoena

7   about who the case -- I thought -- again, what my --

8   my conversations with Kelly had to do with the -- with

9   the libel thing.  It had nothing to do with, you know,

10  skimming money or anything like that.

11                   MR. MILLER:  Objection.  Non-

12  responsive.

13  BY MR. CHESTER:

14      Q    Okay.  Let's go back to the first page,

15  please.  September 5, '22, you and Mr. Dawson are

16  texting each other.  You understood he was an

17  attorney; right?

18      A    Yes.

19      Q    And who did you think he was representing as

20  of September 5th of '22?

21      A    I thought it was the thing between him and

22  Clay.

23      Q    Okay.  Now you were aware that Mr. Dawson

24  had previously represented LN Professionals; right?

25      A    Yes.

                                        Page 52

```
 1                    MR. MILLER:  Objection.  Leading.
 2                    THE WITNESS:  Yeah.  I -- I'd provided
 3     him with some documents.  And yeah -- or not.
 4                    MR. MILLER:  Objection.  Non-
 5     responsive.
 6     BY MR. CHESTER:
 7          Q    Because he would come to the office when you
 8     worked there; right?
 9          A    He'd come -- yeah, a couple of times, I
10     think.  Yeah.  That had to do -- he was trying to help
11     LN -- we'd started having billing -- or getting paid
12     problems with Blue Cross Blue Shield.  He was trying
13     to -- if I remember right, that -- that's what it was
14     about.  Yeah.
15                    MR. MILLER:  Objection.  Non-
16     responsive.
17     BY MR. CHESTER:
18          Q    But the point is, Mr. Dawson was
19     representing LN as their lawyer; right?
20          A    Yes.  Right.  Yeah.
21                    MR. MILLER:  Objection.  Leading.
22     BY MR. CHESTER:
23          Q    With all the duties that accompany that;
24     right?
25                    MR. MILLER:  Objection.  Form.
```

Page 53

1    Leading.

2                    THE WITNESS:  Yeah.  I assume so.  You

3    know, Lewis or Clay would say:  "Hey, this guy's

4    coming in.  You give him what he wants."  Okay.  Yeah.

5                    MR. MILLER:  Objection.  Non-

6    responsive.

7    BY MR. CHESTER:

8         Q    Okay.  And then did you know if that

9    representation of LN by Mr. Dawson had been terminated

10   as of September 5th of '22?

11        A    I was -- yeah.  No, he wasn't -- he -- none

12   of this had anything to do with him working for LN at

13   all.  Is that -- is that what you're asking?

14        Q    No.  I'm asking, you know, when someone

15   hires a lawyer, sometimes there's an engagement

16   letter.  Sometimes they just shake hands, they start

17   paying them.  And then at some point, the engagement

18   ends and the lawyer no longer represents the client.

19   You with me so far?

20        A    Yeah.  Yeah.

21        Q    Okay.  And I'm asking you, do you know if

22   Mr. Dawson's representation of LN had ended as of

23   September 5th, or you just didn't know one way or the

24   other?

25        A    I -- I assumed it did.

Page 54

1      Q    Okay.  Did he say anything about it, who he

2   represented?

3      A    No.  No.

4      Q    Okay.  Now were you aware that, as of

5   September 5th of '22, Mr. Dawson was representing the

6   plaintiffs in this case, Dr. Franklin and his bunch?

7      A    No.

8              MR. MILLER:  Objection.  Leading.

9   Objection.  Form.

10  BY MR. CHESTER:

11     Q    He didn't tell you that?

12     A    No.

13     Q    Were you aware that, as of September 5th of

14  '22, Mr. Dawson was also representing Knox County

15  Hospital?

16     A    No.

17     Q    And the three of those groups were all suing

18  each other.  Did he tell you any of that?

19     A    No.

20             MR. MILLER:  Objection.  Form.

21             THE WITNESS:  No.

22  BY MR. CHESTER:

23     Q    I know you're not a lawyer, but does that

24  strike you as a potential ethical conflict for a

25  lawyer to be representing all three sides?

Page 55

```
 1                       THE REPORTER:  Leave it on the table.
 2    You can just leave it on the table.
 3                       THE WITNESS:  Okay.  It's okay here?
 4                       THE REPORTER:  I can --
 5                       THE WITNESS:  All right.
 6                       MR. MILLER:  Objection.  Form.
 7    BY MR. CHESTER:
 8         Q    Let me start that over for you.
 9                       THE WITNESS:  Okay.
10                       THE REPORTER:  Yes.
11                       THE WITNESS:  Go ahead.  I missed half
12    of that.
13    BY MR. CHESTER:
14         Q    I'm not asking for a legal opinion.  But
15    just as a layperson, a non-lawyer, does it strike you
16    as an ethical if Mr. Dawson was representing all three
17    sides in a three-party fight with litigation going on?
18                       MR. MILLER:  Objection.  Form.
19                       THE WITNESS:  It seems like you'd have
20    some serious conflicts of interest.
21    BY MR. CHESTER:
22         Q    Yes, sir.  And he didn't tell you any of
23    that?
24         A    No.
25         Q    Okay.  And then did he tell you that he was
```

Page 56

1    co-counsel with John Markham, representing

2    Dr. Franklin in litigation in Travis County at this

3    time, September of '22?

4        A    No.

5                MR. MILLER:  Objection.  Form.

6                THE WITNESS:  This -- essentially, this

7    is the sum total of our communications.  You know, we

8    didn't have in-depth chats.

9    BY MR. CHESTER:

10       Q    I understand.  But there's ongoing state bar

11   proceedings.  There may be criminal enforcement

12   involving Mr. Dawson.  So I need to ask you these

13   questions; okay?

14       A    Okay.  Yeah.  Yeah, that's fine.

15       Q    All right.  So he said he was going to get

16   the federal subpoena quashed; right?

17       A    Mm-hmm.

18                MR. MILLER:  Objection.  Leading.

19   BY MR. CHESTER:

20       Q    And you knew it was a federal subpoena

21   because it says so right on the front, United States

22   District Court; right?

23                MR. MILLER:  Objection.  Form.

24                THE WITNESS:  I certainly do now.

25   //

1    BY MR. CHESTER:

2         Q    Okay.  He says, "I'll call right now and

3    check."  Did he call you?

4         A    Yeah, he would have.  Yeah.

5         Q    What'd he say?

6         A    He says, "You don't have to worry about it,"

7    basically.

8         Q    Don't have to worry about a federal

9    subpoena?

10        A    No, meaning he got it quashed.

11        Q    Did you ask him to send you any paperwork on

12   that?

13        A    No.

14        Q    May I suggest that in the future you might

15   want to do that?

16        A    Yes.

17        Q    Just to cover yourself.

18        A    In the -- in the future, when a lawyer calls

19   me up and says something like -- I'm just going to

20   say, "Fuck off," and just hang up the phone.

21                   MR. MILLER:  Objection.  Non-

22   responsive.

23   BY MR. CHESTER:

24        Q    All right.  Perhaps we'll leave a blank in

25   the deposition for any colorful language.  And then,

Veritext Legal Solutions
800-336-4000

```
1    "I'll call you back."  You say he told you it was

2    taken care of at that point?

3         A    Well -- well, here, "Still waiting to hear

4    back."  And so he must've called me after -- anyway.

5    Oh, no, no.  This is him to me.  Yeah.  He --

6         Q    He says he's still waiting to hear.

7         A    He's still waiting to hear back.  Yeah.

8         Q    And then you say:  "It's the 11th.  Time is

9    short."  And then he says, "I'll call you this

10   morning."

11        A    Then he must've called me.

12        Q    And is that when he told you --

13        A    Is that -- is that -- yeah, that's when

14   the -- yeah.  That's the end of it.

15        Q    That's the end of it.

16        A    Yeah.  Yeah.

17        Q    Okay.  And do you have any other text

18   messages between you and Mr. Dawson besides what's on

19   Exhibit 7?

20        A    I swear -- I swear I thought I just sent one

21   to him, but it's not there.

22        Q    Okay.  Now tell me a little more about why

23   you thought you were signing this declaration.

24   Something a libel or something.  I didn't catch that

25   part.
```

Page 59

```
1        A    When he first called me, he said, oh, that
2   Clay was trying to -- was actively trying wreck his
3   career.  Something to that effect.  And -- and that he
4   had libeled him and wanted to know my -- my relation
5   with -- with Clay.  That's pretty much it.
6        Q    Okay.  Did he say how he had libeled him?
7        A    No.  No.
8        Q    Okay.  And so why didn't you say:  "That's
9   none of my business.  Why are you calling me"?
10       A    In retrospect, that would've been the
11  correct answer.  But I didn't.
12                MS. SHUMATE-CONNOR:  Objection.  Non-
13  responsive.
14  BY MR. CHESTER:
15       Q    Did you have any personal animosity with
16  Mr. Ellis?
17       A    I don't particularly care for him, but that
18  has, you know, nothing to do with this.  He didn't
19  particularly care for me.
20       Q    Is he the one who let you go at LN?
21       A    Mm-hmm.
22       Q    Okay.
23                MR. HOBBS:  Is that a yes?
24                THE WITNESS:  Yes.
25                THE REPORTER:  Thank you.
```

Page 60

1    BY MR. CHESTER:

2        Q    And is that why you signed the declaration

3    under penalty of perjury?

4        A    No.

5        Q    Because you were mad at Clay Ellis or?

6        A    No.  I wouldn't -- I -- I completely forgot

7    about -- you know, this is years after the fact.  And,

8    you know, life's too short to get caught up in stuff

9    like that.

10       Q    Okay.  So I've showed you Exhibit 8, which

11   is an email from Kelly Dawson to you on September 2nd

12   of 2022.

13                  (Exhibit 8 was marked for

14                  identification.)

15       A    I'm sorry.  Say that again.

16       Q    Well, you can look right here.  September

17   2nd of 2022, email from Kelly to you; right?

18       A    Yes.

19       Q    Okay.  And just to put it in timeframe,

20   those texts we were looking at were September 5th --

21       A    5th and 6th.

22       Q    And then you signed the declaration on

23   September 6th; right?

24       A    Mm-hmm.

25       Q    So this is four days before you signed the

Page 61

1    declaration?

2         A    Correct.

3         Q    Okay.  And he says:  "Take a look at this

4    and let me know what you think.  I went off the notes

5    I took from our call last week.  I can call you to go

6    over it if you'd like."  And then he's got a draft

7    declaration attached to it.  Do you recall getting

8    this email and this draft declaration?

9         A    I do now.

10        Q    Okay.  I'm going to show you some

11   differences in a minute between this draft and the one

12   you actually signed; okay?

13        A    Okay.

14        Q    But I wanted to ask you, generally, did you

15   have any input into the changes between the draft and

16   the one you signed?

17        A    No.

18        Q    Okay.  So Kelly Dawson completely drafted

19   this first draft on September 2nd all by himself;

20   right?

21        A    Well, I had sent him mine prior to this.

22   But this is -- yeah.  I -- the answer's yes, I think.

23        Q    Okay.  Well, what did you send him?

24        A    The -- originally, like, you know, whatever

25   year -- year before this, when he called me up saying

1   he had the beef with Clay.  I sent him a -- a

2   declaration.  It was maybe -- maybe a page, barely

3   over a page long.  It wasn't a three-page thing.  So

4   does that answer your --

5        Q    Yes.  Do you have a copy of it?

6        A    No.  That's why I texted him and said, "Send

7   me a copy of the original -- of the original I sent

8   you," when I read this.  And again, I -- I've heard

9   nothing from him.

10                  MR. MILLER:  Objection.  Non-

11   responsive.

12   BY MR. CHESTER:

13        Q    And what did that one-page declaration that

14   you sent him say?

15        A    Well, pretty much, you know, the -- the

16   stuff at the top and how -- and, you know, how -- you

17   know, my duties included, you know, cutting the checks

18   and this and that, you know.

19        Q    But it didn.t have anything about fraudulent

20   accounting or false tax returns; did it?

21                  MR. MILLER:  Objection.  Leading.

22                  THE WITNESS:  No.  No.  Didn't have

23   anything to do with skimming or anything else.  No.

24                  MR. MILLER:  Non-responsive.

25   //

Veritext Legal Solutions
800-336-4000

1   BY MR. CHESTER:

2       Q    Mr. Dawson just added all that himself?

3       A    Yes.

4       Q    Okay.  And so he sends you this draft on

5   September 2nd.  Did y'all talk between -- well, let me

6   ask you one more thing.  He says, "I went off the

7   notes I took from our call last week."  He didn't

8   mention anything about the earlier one-page draft that

9   you sent him in this email.  Is this refreshing your

10  recollection at all about how --

11      A    Not really.  No.

12                  MR. MILLER:  Objection.  Leading.

13  BY MR. CHESTER:

14      Q    Okay.  And you said you sent him this one-

15  page declaration a year earlier?

16      A    Well, that's in '22.  So I think, yeah.  I

17  mean, a lot of time went by from the first time he

18  called me and then this, you know.

19      Q    Okay.  So in any event, he sends you this

20  draft on September the 2nd.  And did you call him back

21  and say, "Hey, a lot of this stuff isn't true"?

22      A    No.  I didn't even read through it.  I -- my

23  interest level in this was so low.

24      Q    I'm sorry.  What was the last --

25      A    My interest level in this was so low.

Veritext Legal Solutions
800-336-4000

```
1           Q    All right.  How about now?  Are you more
2     interested now or?
3           A    Yeah.
4           Q    Okay.  I'm going to hand you Exhibit 9.  So
5     now we have an email from Mr. Dawson to you on
6     September 5th; right?
7                     (Exhibit 9 was marked for
8                     identification.)
9           A    Yup.  Yes.
10          Q    Subject matter is "Revised declaration";
11    right?
12          A    Yes.  And this looks like it's the final.
13          Q    That's what it looks like to me as well.
14          A    I mean, just -- just glancing, you know.
15          Q    That's what it looks like to me as well.
16                     MR. MILLER:  Objection.  Non-
17    responsive.
18    BY MR. CHESTER:
19          Q    And Mr. Dawson says:  "Hi, Larry.  I made a
20    couple of changes to this.  Let me know when you have
21    an opportunity to review it."  So did you have any
22    input into the changes between the September 2nd draft
23    that Dawson created and the final draft that Dawson
24    created?
25          A    No.
```

Page 65

1        Q    Okay.  HE just made some changes on his own?

2        A    Correct.

3        Q    And sent it to you, and you didn't even read

4   it, you just signed it?

5        A    Yes.

6        Q    Did he tell you anything like:  "Listen,

7   we're going to be using this in court.  It's under

8   penalty of perjury.  So you need to make sure every

9   word in this is accurate"?  Did he tell you anything

10  like that?

11       A    No.

12       Q    Did he go through it with you on the phone,

13  like, line by line?

14       A    No.

15       Q    "Are you sure this is accurate?  Are you

16  sure this is accurate?"

17       A    No.  No, he did not.

18       Q    All right.  You weren't under the impression

19  that he was representing you at that point.  Were you?

20       A    No.

21       Q    Okay.

22            MR. CHESTER:  Here you go, Paul.

23            THE WITNESS:  Oh, yeah.  There we go.

24  This is the one I sent him, yeah, just the other day.

25  //

Page 66

```
 1    BY MR. CHESTER:
 2         Q    This is the email you were referring to
 3    earlier?
 4                   (Exhibit 10 was marked for
 5                   identification.)
 6         A    Right.  Yeah.
 7         Q    Okay.  February 21st, about two weeks ago,
 8    something like that?
 9         A    Yeah.
10         Q    "I need a copy of the original affidavit I
11    sent you before you made the changes."  Is that what
12    you said?
13         A    Yes.
14         Q    And were you referring to the September 2nd
15    draft that Kelly Dawson did --
16         A    No.
17         Q    -- or were you referring to the one-pager
18    you had sent him several months earlier?
19         A    Yes.  Yes.
20         Q    Okay.  Because you didn't retain a copy of
21    it?
22         A    I did not.  And I've searched.
23         Q    Okay.  And did you get any response from
24    Mr. Dawson?
25         A    No.
```

Page 67

1        Q     And then did you text him after that?

2        A     I thought I did, but it's not on there.

3        Q     Okay.  Do you have any texts with Kelly

4    Dawson on your phone right now?

5        A     No.

6        Q     Okay.  Why were you wanting a copy of the

7    original affidavit?

8        A     Well, after I read this, it started getting

9    real.  I said, "What the hell?"  I -- you know, I -- I

10   was saying, "What actually did I -- did I actually

11   send you?"  'Cause it didn't look like this.

12       Q     Okay.  And he never responded?

13       A     Correct.

14              MR. CHESTER:  All right.  How about a

15   ten-minute break?

16              MR. MILLER:  That's great.

17              THE WITNESS:  Where do these go?

18              MR. CHESTER:  You can just leave them

19   right there.  We'll give them to the court reporter.

20              THE VIDEOGRAPHER:  The time is 11:22,

21   and we are now off the record.

22              (Off the record.)

23              THE VIDEOGRAPHER:  We're back on the

24   record.  The time is 11:37.

25   //

Page 68

1    BY MR. CHESTER:

2        Q    All right, Mr. Palmer.  We're back from a

3    break.  Are you ready to continue?

4        A    Mm-hmm.  Yeah.

5        Q    I want to go back to the conversations

6    between you and Kelly Dawson surrounding you signing

7    this declaration, Exhibit 5.  I know you said you sent

8    him a one-page declaration that had no allegations of

9    fraudulent accounting or skimming; right?

10       A    That's -- that's my memory.  Yes.

11       Q    Okay.  Because there were none when you

12   worked there; right?

13       A    Correct.

14                MR. MILLER:  Objection.  Leading.

15   BY MR. CHESTER:

16       Q    So did you convey any information to him at

17   any time in any form that would support some of the

18   things that he wrote in this declaration, such as

19   fraudulent accounting, skimming, anything like that?

20       A    No.

21       Q    Okay.  So he completely just made that up on

22   his own; right?

23       A    Yes.

24       Q    Okay.  Now when he sent you this declaration

25   to sign under oath with things he had made up on his

Page 69

1    own, did he ask you if you had any documents to back

2    up any of these accusations?

3         A    No.

4         Q    Did he ask you if there was anyone else at

5    LN that would've been aware of the skimming that he

6    could contact and get an affidavit from?

7         A    No.

8         Q    For example, if this widespread skimming and

9    fraudulent accounting had been going on, Dylan Parks

10   would've known about it, too; right?

11                 MR. MILLER:  Objection.  Leading.

12                 THE WITNESS:  No.  Not -- no.  No.

13   Dylan came down on the tail end, you know.  And like I

14   say, he -- he was a wiz on a spreadsheet, but he

15   didn't -- he didn't know very much about -- you know,

16   he knew the basics of keeping books.  That's about it.

17   BY MR. CHESTER:

18        Q    All right.  But did Mr. Dawson ask you for

19   any corroborating or supporting evidence to back up

20   the allegations that he made in this declaration?

21        A    No.

22        Q    Okay.  Now I know you and Mr. Ellis didn't

23   part on the best of terms, but do you consider

24   yourself friendly with Lewis Nichols?

25        A    Yeah.  Yes.  Yeah.

Page 70

1      Q    I mean, he employed you for many years;
2  right?
3      A    Yeah.  Yes.  Yes.
4      Q    Okay.  And now that you've read this
5  declaration, it says that he was in on all this
6  fraudulent accounting and skimming; right?
7      A    Well, that's what it says.  That -- that's
8  not -- not what I said.
9      Q    Right.  Would you care to apologize to
10  Mr. Nichols for having signed --
11      A    For having signed it?  Sorry.  Yes.
12      Q    Okay.  And as far as the judge or jury that
13  might be hearing this case, what would you say they
14  should do in terms of relying on the truth and
15  veracity of this declaration you signed?
16      A    I'd say not to rely on it.  Discard it.
17      Q    All right.  Now have you had any
18  conversations with a gentleman named John Markham?
19      A    Yes.  Not -- not conversations.  I think --
20  I think he was the one who was going to quash the --
21  the first -- the first subpoena, I think.
22      Q    Okay.  All right.  Is that what Dawson told
23  you?
24      A    I think so.  Yes.
25      Q    Okay.  Because they were working together;

Page 71

1    right?

2                    MR. MILLER:  Objection.  Leading.

3                    THE WITNESS:  I don't know if they were

4    working together or not.  He -- you know, I don't know

5    what their relationship was.

6    BY MR. CHESTER:

7        Q    And were you interested in getting this

8    subpoena quashed?

9        A    Yeah.  I wasn't looking forward to doing

10   this, you know.

11       Q    Okay.  Was Mr. Dawson interested in getting

12   this subpoena quashed?

13       A    Yeah, he seemed to be.

14       Q    Yeah.  We can see why now; right?

15                   MR. MILLER:  Objection.  Leading.

16                   THE WITNESS:  I -- I don't have an

17   opinion on it.  But, you know, I don't know -- I don't

18   know who's zooming who and I don't care, you know.

19   Honestly, it's just --

20   BY MR. CHESTER:

21       Q    But have you ever communicated directly with

22   Mr. Markham?

23       A    I think he called me when he got it quashed.

24   Or -- or one of them called me.

25       Q    Okay.  And tell me about that conversation.

                                        Page 72

1          A     Well, can't even tell you for sure if we

2     even had one.  But if we did have one, it was probably

3     a 30-second phone call.  I mean, I've never had a

4     conversation with him that I recall.

5          Q     Okay.  Let me show you this Exhibit 11.

6                     (Exhibit 11 was marked for

7                     identification.)

8          A     Yeah, I don't remember this at all.  Okay.

9     But it -- this says I got it.

10         Q     This is an email from Markham to you dated

11    January 13th of 2023, so about 14 months ago; right?

12         A     Correct.

13         Q     Do you remember getting it now?

14         A     No.

15         Q     Okay.  He says he's very interested in your

16    affidavit and that it's very helpful.  Do you know

17    what he meant by that?

18         A     No.

19         Q     He said, "We're about to bring a lawsuit

20    against Clay Ellis for skimming."  Did you call him up

21    and say:  "Wait a minute.  Clay Ellis never skimmed

22    anything"?

23         A     No.

24         Q     Why not?

25         A     There was -- you know what?  There's

Page 73

```
 1    honestly a good chance this would've gone to my junk
 2    email, which I clear out, you know every day, every
 3    other day.  And I could've seen that -- I could've
 4    seen John Markham and said, "I -- I don't even know
 5    who this is."  So, you know, I've got so much crap in
 6    there.  I really don't remember seeing this at all.
 7         Q    Okay.  Well, let me ask you this.  If a
 8    lawyer called you and said:  "We've read your
 9    declaration.  We're getting ready to file a federal
10    RICO case alleging that Clay Ellis was skimming based
11    solely on your sworn declaration," would you have told
12    them:  "Hey, wait a minute.  That's not even true.  I
13    didn't even draft that."
14         A    Had they approached me like that, yeah.
15    But, you know --
16         Q    Did Mr. Markham ever ask you for any
17    corroborating evidence?
18         A    No.
19         Q    Did he ever even ask you if the declaration
20    was true?
21         A    No.
22         Q    He says, "I'm quite hopeful I can speak with
23    you sometime in the next week."  Did you speak with
24    him?
25         A    I can't remember speaking to him.  Again,
```

Page 74

1    I -- he might have been the one that called me about

2    quashing the earlier subpoena.  I really don't

3    remember a conversation with him.

4        Q    He says, "Because there's some additional

5    information I would like to obtain from you."  Do you

6    recall?  Does that ring a bell?

7        A    Well, I know -- I know he hasn't received

8    any additional information from me.

9        Q    Okay.  Other than your general message today

10   that the books at LN Professional were squeaky clean

11   and this declaration is not accurate, do you have any

12   other information relevant to this lawsuit?

13                   MR. MILLER:  Objection.  Form.

14                   THE WITNESS:  No.

15   BY MR. CHESTER:

16       Q    Okay.  Did you ever do the books for Allied

17   Management or ALS One?

18       A    I don't remember.  I might have, but I don't

19   remember.

20       Q    Okay.  But you certainly transmitted the

21   statements and the checks from LN Professional to

22   Allied Management; right?

23                   MR. MILLER:  Objection.  Leading.

24                   THE WITNESS:  Well, through Clay.  I

25   mean, I -- here, you know.  Sometimes we -- we would

Page 75

```
 1   wire checks to him.  And I -- and I would drive that
 2   one check down the street.  I think we mailed checks
 3   sometimes.  That -- yeah, that was the extent.
 4   BY MR. CHESTER:
 5        Q    But there were also statements explaining --
 6        A    Yeah, statements -- yes.  Yeah.
 7        Q    How many lab tests and --
 8        A    Yeah.  I turned that -- I turned that over,
 9   and -- and Clay would, you know -- would okay it.
10   Yeah.
11        Q    Right.  But you prepared those statements;
12   right?
13        A    Yes.
14                MR. MILLER:  Objection.  Leading.
15   BY MR. CHESTER:
16        Q    And they were accurate; right?
17                MR. MILLER:  Same objection.
18                THE WITNESS:  Best of my knowledge.
19   BY MR. CHESTER:
20        Q    Okay.  And you're not aware of any
21   underpayment or defrauding of Allied Management or ALS
22   One by LN Professionals; right?
23        A    Correct.
24                MR. MILLER:  Objection.  Leading.
25                MR. CHESTER:  Thank you, sir.
```

Page 76

```
 1                    I'll pass the witness.
 2                    MR. HOBBS:  Can I borrow it?  I got
 3      some follow-up.
 4                    MR. CHESTER:  Oh.  Yup.
 5                        EXAMINATION
 6      BY MR. HOBBS:
 7           Q    Mr. Palmer, I've got some brief follow-up.
 8           A    Okay.
 9           Q    So I'll try and get you out of here quickly.
10      I believe you confirmed earlier that your employment
11      by LN ceased sometime around October of 2018.  Is that
12      right?
13           A    Right.  Correct.
14           Q    And I believe you also confirmed that you
15      were terminated by Clay Ellis from LN?
16           A    Correct.
17           Q    And do you recall both Clay Ellis and MJ
18      Cortez being with you in person to let you know that
19      you were going to be let go?
20                    MR. MILLER:  Objection.  Leading.
21                    THE WITNESS:  No.  No.  That -- that's
22      correct.  Yeah.
23      BY MR. HOBBS:
24           Q    Okay.  Since that time when Mr. Ellis and
25      Mr. Cortez informed you that your employment with LN
```

Page 77

```
 1    was terminating, have you had any communications with
 2    Clay Ellis in person, text, phone call, any at all?
 3         A    No.
 4         Q    So has Clay Ellis made any attempt to
 5    persuade you from disavowing the declaration testimony
 6    that we've seen marked as Exhibit 5 to your
 7    deposition?
 8         A    I've had no communication with him.  So no.
 9         Q    Similar question for Mr. Nichols.  Has Lewis
10    Nichols made any attempt to persuade you to disavow
11    the declaration testimony we've seen marked as Exhibit
12    5?
13         A    I've had no communication with Lewis either.
14    So no.
15         Q    And then has Mr. Cortez made any attempt to
16    persuade you to disavow your declaration testimony
17    we've seen marked as Exhibit 5?
18         A    No.  I haven't had any communication with
19    him -- him either.
20         Q    And just more broadly, has anybody contacted
21    you to persuade you to disavow any of the declaration
22    testimony that's been marked as Exhibit 5 before any
23    of your testimony here today?
24         A    No.
25                   MR. HOBBS:  That's all I have right
```

Page 78

```
 1    now.
 2                    THE WITNESS:  Oh, okay.
 3                        EXAMINATION
 4    BY MR. MILLER:
 5         Q    Mr. Palmer, it's my turn to ask you some
 6    questions.
 7         A    Yes.  Okay.
 8         Q    You doing okay?
 9         A    Yup.
10         Q    Let me remind you, my name is Paul Miller.
11    I represent the plaintiffs in this case.
12         A    Okay.
13         Q    You understand I'm on the other side from
14    Mr. Chester and Mr. Hobbs in this case.
15         A    All right.
16         Q    You understand that?
17         A    Yes.
18         Q    Has anyone offered to pay you for your time
19    being here today?
20         A    Yes.
21         Q    Okay.  And who's offered to pay you?
22         A    I don't even know his name, 'cause I
23    wasn't -- wasn't even going to worry about it.
24                    MR. CHESTER:  Markham?
25                    THE WITNESS:  No.  Did I speak with you
```

Page 79

```
 1    last week?
 2                      MR. CHESTER:  No.
 3                      THE WITNESS:  No.  Who'd I speak with?
 4                      MR. MILLER:  Let me object to the
 5    sidebar from Chester suggesting that it was Markham.
 6                      THE WITNESS:  There was -- they -- they
 7    said, "You can charge out any billable hour for any
 8    preparation and time spent doing this."  I didn't
 9    even -- I didn't save his number in my phone.  But
10    let's see.  Days back.  I don't know.  I'm sorry.  I
11    don't even know.
12    BY MR. MILLER:
13         Q    Well, mister --
14         A    But -- well, no, just there was an offer to
15    pay me for my time prepping and -- and my time here
16    today.
17         Q    I understand you're looking at the other
18    lawyers, but --
19         A    Oh, I'm -- I'm sorry.  Yeah.  I apologize.
20         Q    Let me finish.  We don't want to get our
21    court reporter mad at us.
22                      THE REPORTER:  Thank you.
23                      THE WITNESS:  I don't either.
24    BY MR. MILLER:
25         Q    Your response is, you're looking at the
```

Veritext Legal Solutions
800-336-4000

1    other lawyers who just questioned you, but I'm asking

2    the questions now.

3        A    Okay.  Very good.

4        Q    When we're talking --

5        A    Absolutely.

6        Q    Thank you.  Are you expecting to be paid for

7    your time today?

8        A    No, I'm not going to -- I had no intention

9    of -- of submitting a bill to whoever it was.

10       Q    I don't want to rehash a bunch of old

11   testimony, but I do have an outline here.  So if I'm

12   checking things off, taking some time between

13   questions, it's just so I don't re-plow over them;

14   okay?

15       A    Sure.

16       Q    My understanding based on your testimony is

17   that you used to work as an employee for LN

18   Professional Management.  Is that true?

19       A    Yes.  MMP, LN Professional.  You're right.

20       Q    And can we have the agreement that if any of

21   the lawyers today or myself reference LN Professional

22   Management or MMP, we're referring to the same

23   company?

24       A    Yes.

25       Q    And you were an employee for LN?

Page 81

```
 1        A     Correct.  Correct.
 2        Q     And were you an employee for any other
 3    entities at the time that you were an employee for LN?
 4        A     No.
 5        Q     Were you ever an employee for Allied Lab
 6    Solutions?
 7        A     No.
 8        Q     Were you ever an employee for Allied Lab
 9    Solutions Management?
10        A     No.
11        Q     Did you do the books for Allied Lab
12    Solutions or Allied Lab Solutions Management?
13        A     I don't remember.
14        Q     If you did prepare the books for either of
15    those companies, would it have been through your
16    company, Palmer Bookkeeping?
17        A     No.
18        Q     Who would you have done it through then,
19    sir?
20        A     I would've just done it on the same -- on my
21    workstation at work, so.
22        Q     Well, let me stop you there.  If you weren't
23    an employee for Allied, in what capacity would you
24    have done the books?
25        A     Just because I had to be at that office 40
```

Page 82

1    hours, and it was about ten hours of work a week.  And

2    so, all right, you know, I would've just done it

3    there.  I wouldn't have done just -- I didn't do it as

4    part of my employment.  It was just ancillary things

5    that -- that would've been assigned to me.

6         Q    Are you telling us that, through your

7    employment with LN, you would have just done the books

8    for Allied just for free?

9         A    Yeah.  Yes.

10        Q    Who would've instructed you, or who did

11   instruct you, as part of your employment with LN, that

12   you would be doing the books for Allied?

13        A    That would -- it would've been Clay.

14        Q    And when we say, "Doing the books for

15   Allied," does that mean books for Allied Lab Solutions

16   as well as Allied Lab Solutions Management?

17        A    I don't know.  I don't remember.

18        Q    Any documents that come to mind that we

19   could look at to determine whether or not you were

20   involved in the preparation of the books for either of

21   those Allied companies?

22        A    Nothing -- I have nothing.  Any -- any work

23   I would've done for them would've been done on my

24   workstation there.

25        Q    Okay.  We marked some exhibits earlier.  For

Page 83

1    example, Exhibit 1 and 2 were tax returns in 2016 and

2    2017 for LN Professional Management.  Your preparer

3    information was on there.  Did you prepare similar

4    returns for the Allied companies in those years?

5         A    I think so.

6         Q    Okay.  And if you had prepared those, based

7    on your memory -- I understand you're sort of

8    guessing -- would you have put your preparer

9    information on there?

10        A    Yes.

11        Q    Did I understand your testimony that you

12   left LN sometime in 2018?

13        A    I believe -- I believe it was October.

14   Yeah.

15        Q    Okay.  You keep looking at Mr. Chester.

16        A    I -- it just -- right.  I'm looking at you

17   now.

18        Q    Your best memory is October?

19        A    Yes.

20        Q    Were you a W-2 employee for LN?

21        A    Yes.

22        Q    And just to be abundantly clear about this

23   point, were you receiving W-2 forms from any other

24   company during the time that you were employed by LN?

25        A    No.

Page 84

```
 1        Q    Was LN your sole source of income during the
 2   time period that you were working there?
 3        A    No.
 4        Q    Did you do bookkeeping services on the side?
 5        A    Yes.
 6        Q    Under what name or trade name did you do
 7   that work?
 8        A    Palmer Tax and Bookkeeping.
 9        Q    Could you estimate the amount of time you
10   spent working as an employee of LN during the time
11   period you were there versus doing bookkeeping
12   services on the side?
13        A    Estimate, 75 percent of the time was at LN.
14        Q    Outside of your W-2 income, did you receive
15   any other compensation for your employment with LN?
16        A    No.
17        Q    When you say 75 percent of the time you
18   devoted your workday to LN, does that mean of the 40-
19   hour workweek, roughly 75 percent of those hours would
20   be on behalf of LN?
21        A    No.  What you asked me was how much of my
22   time did I spend on bookkeeping as opposed to working
23   for LN.  That was 75.
24        Q    Let me make sure I understood my question so
25   that we're communicating.  My understanding is that
```

Page 85

1    you were an employee of LN from approximately 2015 to

2    October of 2018?

3         A    Correct.

4         Q    During that period of employment, you were

5    also doing bookkeeping on the side unrelated to your

6    employment at LN?

7         A    Correct.

8         Q    What my question was, and I apologize if it

9    wasn't clear, what was the split of your time?  In

10   other words, how much time were you spending working

11   as an employee of LN versus doing bookkeeping on the

12   side?

13        A    I spent 40 hours in the office at LN.  And

14   then I worked out of my home, you know, during tax

15   season probably 30 hours a week.  The rest of the

16   year, five to ten.  Yeah.

17        Q    So throughout your employment with LN, you

18   were a full-time 40-hour-a-week employee?

19        A    Yeah.

20        Q    And anything you did outside of that was on

21   your own time when you weren't working for LN?

22        A    Yeah.

23        Q    You made a comment earlier that -- and I'm

24   paraphrasing.  I apologize.  I don't want to misquote

25   you.  So let me know if I --

Page 86

1          A      Okay.  Go ahead.

2          Q      You made the comment earlier that, "The

3     amount of time that it took me to do my job was about

4     ten hours per week."  And so I --

5          A      I probably -- I think I said 20, but yeah.

6          Q      What did you do with the rest of your time

7     during the 40-hour workweek?

8          A      Goof around on -- on the internet, talk to

9     MJ.  Just, you know, Clay wanted me there, you know,

10    during certain hours, so there I was.

11         Q      What were your working hours?

12         A      It was an eight -- eight to five kind of

13    thing.

14         Q      Did you have an office that you went to?

15         A      I went to the -- yeah, the -- the company

16    offices.  Yeah.

17         Q      And where were the company offices located?

18         A      Gosh.  I can't give you an address.  They're

19    in Austin.  I can't remember the address.  It might be

20    on one of these tax returns.  Yeah, here it is.  13581

21    Pond Springs Road, Suite 101.

22         Q      During your time as an employee of LN, was

23    the office address at that Pond Springs Road the

24    entire time?

25         A      Right when I first got on, I actually -- I

Page 87

1    was still living in Lexington.  And for a short time,

2    I worked out of the house.

3        Q    When you were hired by LN initially in

4    approximately 2015, you were working remote out of

5    your home in Lexington, Texas?

6        A    At the very first, yes.

7        Q    Shortly after you started your employment,

8    did you move to Austin and begin working out of the

9    Pond Springs office?

10       A    About a year into it.

11       Q    When you were terminated, as I understand

12   it, in 2018, did that termination occur at the Pond

13   Springs office?

14       A    That occurred at the -- at the -- at LN --

15   at another office that LN had.  And I couldn't -- on

16   Brookwood.

17       Q    How many offices did LN have?

18       A    Best of my knowledge, just the two.

19       Q    Who was present on a daily basis at the Pond

20   Springs location while you were working for LN?

21       A    MJ, the -- the billing -- billing people,

22   the distribution -- the blood distribution people, and

23   me.  Clay was there three, four days a week.  And

24   Lewis would pop in every once in a while.

25       Q    All right.  You mentioned another location.

Page 88

1    I think you said something along the lines of brook

2    something?

3         A    I think Brookwood Road.  Yeah.

4         Q    Who was present, if you know, at that

5    particular location?

6         A    That's where -- well, that was Lewis and

7    Clay.  That was, like, the executive office.

8         Q    So as far as you knew, Lewis Nichols and

9    Clay Ellis officed out of the Brookwood location,

10   whereas everybody else that you described officed out

11   of the Pond Springs location?

12        A    Yeah.  The worker bees were over at Pond

13   Springs.

14        Q    MJ, is that MJ Cortez?

15        A    Correct.

16        Q    You know what those initials stand for?

17        A    No.

18        Q    What's his affiliation with LN or --

19        A    Well, he was -- he was a logistics manager,

20   I guess, for lack of a better term.  And just kind of

21   ran just the day to day, getting the blood in the

22   door, getting it processed, and getting it out, and,

23   you know -- and shipped to the hospitals for

24   processing, you know.

25        Q    MJ Cortez, did he own or was he a part

1    owner, if you know, of LN?

2        A    He had a company that was a partner.

3        Q    And was that company -- and feel free to

4    look at the tax returns if you need to.  But was that

5    company MJCX Professional Services?

6        A    I believe that's correct.

7        Q    If you know, what was MJ Cortez's background

8    in terms of his professional background?

9        A    I think he worked for Spectrum before he

10   came there, running -- I think he was, like -- he had

11   a crew of installers.  Yeah.

12                   MR. MILLER:  Off the record just for a

13   second.

14                   THE VIDEOGRAPHER:  The time is 12:02,

15   and we are now off the record.

16                   (Off the record.)

17                   THE VIDEOGRAPHER:  We're back on the

18   record.  The time is 12:03.

19   BY MR. MILLER:

20       Q    Mr. Palmer, before the break, I was asking

21   you about Mr. Cortez's, that is MJ Cortez's,

22   background.  You said he used to --

23       A    I think -- I think his -- his job prior to

24   that was at Spectrum.

25       Q    And Spectrum, that's the cable company?

1        A      Yeah.  Yes.  Yes.

2        Q      Any idea what he was doing there in terms of

3    his role?

4        A      Just vaguely, it had do with installation, I

5    believe.

6        Q      You mentioned that MJ was performing

7    logistic service for LN.  What did you mean by that?

8        A      Well, you know, just making sure things ran,

9    people showed up, things ran, and, you know, blood got

10   in the door on a timely basis, and then got processed,

11   and distributed properly to the people who did the

12   blood -- who -- who did the analysis of the blood.

13       Q      Did y'all --

14       A      You know, making sure all the computers

15   worked.  Just -- you know, just all the stuff.  It was

16   just --

17       Q      Did y'all actually have blood samples at the

18   Pond Springs office location?

19       A      Yes.

20       Q      I'm trying to learn from you.

21       A      You go ahead.

22       Q      But in terms of the program, were blood

23   samples taken at a facility --

24       A      No, the blood samples -- oh, I'm sorry.  Go

25   ahead.  You finish your question.

Veritext Legal Solutions
800-336-4000

1     Q    It's all right.  Just for the record --

2     A    No.  No.  Sure.  That's fine.

3     Q    Were blood simples taken and then

4  transferred to Pond Springs to be disbursed out to

5  some lab somewhere?  Tell me how that worked.

6     A    Correct.  Well, the individual doctors would

7  have -- would have the blood drawn.  We had couriers

8  to go pick up the blood, get them back to us.  Then

9  they were sorted -- sorted in such a way to -- you

10  know, some were going to Glen Rose and some went

11  wherever else we did.  And there -- and there was a

12  reason for it.  I don't know what it was.  But then so

13  we'd get them all packaged up and get the couriers out

14  the door to get them delivered.

15     Q    All right.  And you mentioned Knox County

16  Hospital --

17     A    Knox.  That's what it was.  I'm sorry.

18     Q    All right.  Now as I understand it based on

19  what you're telling me, samples of blood were taken by

20  physicians.  The samples were then delivered to the

21  Pond Springs location.  And from there, they went out

22  to testing facilities.  Is that true?

23     A    Yeah.  The blood samples were -- were put

24  outside the office door.  You know, you'll have Quest

25  and whatever, you know, and then there was MMP.  And

Page 92

1    so we -- again, our couriers went to pick it up and
2    then bring it back.
3         Q    And then from there, the blood went to the
4    testing places?
5         A    Correct.
6         Q    And the testing places, as it relates to MMP
7    and Allied, were those Knox County Hospital, Glen Rose
8    Hospital, and Stephens Memorial Hospital?
9         A    Stephens, that's right.  Yes.
10        Q    Any other testing facilities related to MMP
11   and Allied?
12        A    No.
13        Q    You mentioned there were billing people in
14   the office.  Do you know any names?
15        A    No.  No.  I -- I don't.  I didn't have a lot
16   of contact with them.
17        Q    Approximately how many billing people are
18   you referring to?
19        A    Four maybe.
20        Q    And over the approximately two and a half,
21   three years you worked there, did you meet these
22   people and know their name and simply forgot, or
23   just --
24        A    Yes.  Oh, I knew their names at one time.
25   Yes.

1          Q     You just don't remember as you sit here
2     today?
3          A     Correct.
4          Q     You mentioned distribution people.  Who were
5     you referring to there?
6          A     Well, we had -- we had, like, a lead.  I
7     forget her name.  So blood would come in, she would
8     check them, and -- and it was just set up to where
9     certain things went into certain places.  And they
10    were -- they were broken up as to which hospital they
11    were going to.
12         Q     Understood.  Who were the distribution
13    people?
14         A     Her -- well, basically, she -- she was the
15    lead and -- and the couriers -- the couriers.  And
16    she'd tell them where to put the stuff.
17         Q     The distribution people and the billing
18    people, were they employees of LN?
19         A     Yes.
20         Q     Did you have an office at the Pond Springs
21    location?
22         A     Yes.  I had a workstation.
23         Q     And you had a computer in there?
24         A     Yes.
25         Q     Was it a desktop or a laptop?

Page 94

1        A       Desktop.

2        Q       Did you have the same computer the entire

3    time you worked out of the Pond Springs office?

4        A       I think so.

5        Q       Do you remember what kind it was?

6        A       It was a PC.

7        Q       Was it a Dell?

8        A       I think so.

9        Q       What happened to that computer, if you know,

10   when you left?

11       A       I have no idea what happened to it after I

12   left.

13       Q       With respect to your work and things that

14   needed to be saved while you were working on them on

15   your desktop, was there a cloud drive, a server, or

16   something that you could access to save important and

17   relevant information?

18       A       They -- it was saved -- it was saved

19   locally.

20       Q       What does that mean?

21       A       It means it wasn't on the cloud.

22       Q       When you say locally --

23       A       Locally -- I want to say we did backups, and

24   they were -- you know, and they were stored on site, I

25   believe.

Veritext Legal Solutions
800-336-4000

1        Q     Let's talk about two things.  When you say

2    locally, do you mean there was a server on site that

3    important, relevant documents that you created on your

4    desktop were saved to?

5        A     I'm not sure.  We had -- we had a computer

6    guy, a contractor.  And I think -- I want to say I

7    think he had it set up to -- to automatically do --

8    run a backup periodically.

9        Q     Who was the computer guy?

10       A     Couldn't tell you his name.

11       Q     You mentioned it was a contractor?

12       A     Yeah.

13       Q     Not an employee?

14       A     Not an employee.

15       Q     So there should be an invoice or something

16   along those lines to LN for that particular

17   individual's services?

18       A     Yes.

19       Q     Do you recall if that person provided IT

20   services as needed or was there some sort of monthly

21   subscription.

22       A     It was as needed, I believe.

23       Q     You also mentioned something about backups.

24   What did you mean by that?

25       A     I -- I mean, I forget whether we actually

Veritext Legal Solutions
800-336-4000

1   had any external hard drive, or we backed up the

2   computer or whether something was set to back it up to

3   another server.

4       Q    When you say another server --

5       A    Well, another computer.  You know, in case

6   my hard drive crashed, you'd -- you'd want a backup.

7       Q    Do you remember one way or another whether

8   you had an external hard drive that you backed your

9   computer up to?

10      A    No.

11      Q    You mentioned something about the IT guy

12  setting up some sort of automatic backup.  You recall

13  that testimony?

14      A    Yeah.  I believe that -- I mean, I -- I

15  think that was the case, but I'm not a hundred percent

16  sure now.

17      Q    All your work, I assume, and with respect to

18  accounting, was done on your desktop.  Is that true?

19      A    Yes.

20      Q    Did you create Excel sheets?

21      A    Yes.

22      Q    Did you create Excel sheets about revenues

23  coming in and expenses?

24      A    Yes.

25      Q    Did you create Excel sheets regarding

Page 97

1    distributions to companies like Allied?

2        A    Yes.

3        Q    All that was saved on your computer?

4        A    Yes.

5        Q    And as far as you believe, based on this

6    particular IT guy, he had it set up where that stuff

7    would be backed up periodically?

8        A    I think so.  But again, I'm not 100 percent

9    sure.

10       Q    What accounting program or software, if any,

11   was utilized?

12       A    QuickBooks.

13       Q    My understanding is that QuickBooks has a

14   cloud-based platform.

15       A    It does.

16       Q    Did you use the cloud-based platform?

17       A    No.  No.  It was QuickBooks desktop.  It was

18   not QuickBooks online.

19       Q    Did it require a username and password to

20   access it from your desktop?

21       A    Yes.

22       Q    Did you have to access the internet to get

23   on QuickBooks?

24       A    No.

25       Q    When you left the company in 2018, where

1   were the QuickBook data files related to the

2   bookkeeping that you were performing during your

3   employment?

4        A    On Pond Springs Road -- the office on Pond

5   Springs Road.

6        Q    And when you say on the office, they were

7   either backed up as you mentioned it, or at least

8   saved to your computer?

9        A    Yes.  Yes.

10       Q    What sort of Excel spreadsheets did you

11   create as it relates to accounting?

12       A    Well, we use those to determine payouts to

13   the different entities.  And basically, it tied -- it

14   tied a revenue stream to the bloodwork to the person

15   who ordered it.

16       Q    And you created all that information in a

17   spreadsheet?

18       A    Yes.

19       Q    And was it your job to create that

20   spreadsheet?

21       A    Yes.

22       Q    Was it your job to update it?

23       A    Yes.

24       Q    Did you do that on a monthly basis or how

25   often?

Page 99

1      A    Well, the -- the basic spreadsheet -- no, I

2  updated -- I updated monthly.  Yes.

3      Q    Was the spreadsheet that you're referring

4  to, is that what was used to determine how much Allied

5  and/or its shareholders would be paid --

6      A    Yes.

7      Q    You created that?

8      A    Yes.

9      Q    Where did you get the information in order

10  to determine how much Allied and its shareholders

11  should be paid?

12      A    Well, there -- there was a basic operating

13  agreement between hose parties and us, and --

14  concerning how the revenue was split.  And so you'd

15  bake it into the formulas, and just put in the

16  revenue, and everything else flows from there.

17      Q    So these spreadsheets had formulas embedded

18  within them, and you would put in information, and it

19  would spit out information?

20      A    Correct.

21      Q    Where did you get the information that you

22  put into the spreadsheet on a monthly basis?

23      A    That ultimately came from the -- the

24  contractual agreements between us and the -- the

25  Allieds and the other doctors.

Page 100

1      Q      Right.  But as I understand it, how much

2    allied and its shareholders would be distributed in

3    part was based on how much revenue came in?

4      A      Yes.

5      Q      Where did you get the revenue number from?

6      A      The revenue number came from the -- the

7    hospital.  Yes.  We had a collections department.  Oh,

8    you know what?  We did have another office for the

9    collection people.  I forget where that was.  Yeah.

10   But it was strictly -- I forget her name, too.

11          But the -- the hospital collected the money

12   from the insurance companies, and took their -- their

13   split, which I disagreed with, and then would send us

14   the remittance.  So we know how much we collected by

15   patient for -- you know, for -- and the -- and the

16   patient was tied to a doctor.  So you put all those

17   into the spreadsheet and it spits how much is due to

18   the different entities.

19     Q      The revenue that you received from the

20   hospitals, did somebody give you that number to put

21   into the spreadsheet?

22     A      No.  It's what -- it's what hit the bank.

23     Q      Okay.  So would you get a wire from the

24   hospitals, or would you get checks, or a combination?

25     A      Checks, I think.  Checks.  I think it was

Page 101

1    checks.

2         Q    So would you collect the checks and deposit

3    them?

4         A    Yeah, I collected them out of the mailbox.

5         Q    And then deposit them into an MMP account?

6         A    Yes.

7         Q    And the revenue number that you put into the

8    spreadsheet was based on the checks that you collected

9    and then deposited into the accounts?

10        A    Mm-hmm.  Yeah, we had a list of patients

11   that each -- each processing facility got -- got paid

12   on.  And that tied to the check.  And that tied to the

13   bank account.  Yeah.

14        Q    Did anybody provide you with information

15   that would go into the spreadsheets that were used to

16   calculate Allied and its shareholders' distributions?

17        A    Well, again, those came from the -- the

18   contractual arrangement, you know, so.

19        Q    I understand what you're saying about the

20   contractual arrangement.  What I'm asking --

21        A    Okay.  What are you asking?

22        Q    You got a spreadsheet that's got formulas

23   embedded into it based on the service agreement;

24   right?

25        A    Right.

Veritext Legal Solutions
800-336-4000

1      Q      But you got to put information into the
2    Excel spreadsheet in order to determine what the
3    revenue share is; correct?
4      A      Yes.
5      Q      Did anybody provide you those numbers that
6    you needed to put into the spreadsheet?
7      A      Yes.
8      Q      Who provided them to you?
9      A      That would've come from billing -- our
10   billing department.
11     Q      Were those people on site at Pond Springs or
12   were they elsewhere?
13     A      No.  They were in a -- a house that was
14   rented for them.  Maybe Manor or something like that.
15   It was remote.
16     Q      Like, Manor, Texas?
17     A      Yeah, something like that.
18     Q      So there's, like, a residential house?
19     A      Yeah.
20     Q      And this is where the billers worked?
21     A      Yes.
22     Q      And they would provide you information that
23   you would then use to put into the spreadsheet?
24     A      They would -- yes.  Yes.
25     Q      What specific information did you get from

Page 103

1    these billers at this residential house in Manor to

2    put into this spreadsheet?

3        A    The -- how much we collected by patient.

4        Q    How would you receive that information?

5        A    We received it -- it was our -- our billing

6    people -- the system's -- the system on site at Pond

7    Springs would -- would be updated.  So yeah.

8        Q    By you?

9        A    No.  No, no.  By -- by the billing

10    department.

11        Q    What system?

12        A    Just they've got a list of -- they've got a

13    list of patients.  Some have been paid.  Some have not

14    been paid.  And they, you know, basically -- my

15    understanding was they just kind of hammered on the

16    ones that hadn't been paid yet, and, you know, make

17    sure -- you know, and try to get payment on them.

18        Q    Trying to make this as simple as possible.

19        A    Yeah, I'm trying to remember.

20        Q    My understanding is that you had some

21    spreadsheets that you would update on a monthly basis

22    on your computer at the Pond Springs location;

23    correct?

24        A    Correct.

25        Q    And when you put your numbers into the

1    spreadsheet, it would tell you how much Allied and its
2    shareholders were entitled to receive?
3         A    Correct.
4         Q    What I'm trying to understand is where you
5    got your information in terms of revenue dollars.  My
6    understanding, based on what you said, is you got it
7    from the people who were working out of a house in
8    Manor.
9         A    That's part of it.  And -- and part of my
10   job was reconciling that to the money we actually got.
11        Q    You said that your system would be
12   periodically updated by those people in Manor?
13        A    The people doing the billing at Pond
14   Springs, their computer was tied in -- I believe, was
15   tied into the billing department over in Manor, and
16   they would get updated.
17        Q    And what system was that?
18        A    I don't know.  I don't know.
19        Q    Well, did you not have to access it in order
20   to update your spreadsheets?
21        A    No, I didn't have to access it.
22        Q    How was the information transmitted to you
23   on a monthly basis so that you could update your
24   spreadsheets?
25        A    I don't remember exactly how I got it.

                                        Page 105

1     Q     Was it by email?

2     A     No.  No.  I -- I got it from somebody there

3  at Pond Springs.

4     Q     Do you recall who?

5     A     No.

6     Q     Was it Mr. Ellis or --

7     A     No, it wasn't -- no.  No, it wasn't Clay or

8  Lewis.

9     Q     Was it Mr. Cortez?

10     A     No.  I think it was -- ultimately, it was

11  the one who ran the billing department in Manor, the

12  overseer.

13     Q     So the overseer of the billing department at

14  the house in Manor gave you the revenue information to

15  put into the Excel spreadsheet on a monthly basis?

16     A     I think that was the case.

17     Q     And how did that person deliver the

18  information to you?

19     A     I don't remember.

20     Q     You did this on a monthly basis over two and

21  a half years; correct?

22     A     Correct.

23     Q     And your testimony is that you don't recall

24  how you received that information from the individual

25  in Manor?

Page 106

1          A     I forget now exactly how the flow went.
2     Yes.
3          Q     I understand that revenue was put into these
4     spreadsheets on a monthly basis in order to
5     calculate --
6          A     The monthly payments.  Oh, I'm sorry.
7          Q     -- to calculate the monthly payments?
8          A     Yes.
9          Q     What other information had to be put into
10    the spreadsheet on a monthly basis to determine
11    monthly payouts?
12         A     MMP's share and the top -- you know, top
13    line income.  And there's -- MMP was -- came off of
14    that.  And I think that's pretty much it.
15         Q     You would get the revenue numbers from this
16    person in Manor.  You don't recall how you got it, but
17    you would put that into the spreadsheet every month
18    for the two and half years that you worked there;
19    true?
20         A     Correct.  Yes.
21         Q     You can't tell me whether it was hand
22    delivered, given to you over the telephone, emailed,
23    or mailed to you; correct?
24         A     Correct.  I -- I will say I think it was
25    some -- it was electronic, but I don't think -- I

                                        Page 107

1   don't think it was an email.

2        Q    What other form of electronic means can

3   somebody send you revenue information so you can

4   update an Excel spreadsheet --

5        A    Well, we had the billing people there on

6   site.  And they could -- I -- how do you do that?  I

7   might have gotten an updated -- updated information

8   from them every month.

9        Q    So are you changing your testimony where you

10  earlier said it was from the person who oversaw the

11  operations at the house in Manor?

12       Q    Well, it kind -- they worked hand in hand.

13       A    So which is it?  Did you get it from the

14  people on site, or did you get it from the person who

15  worked at the house in Manor?

16       A    I don't remember.  I really don't.

17       Q    You put the income or revenue into the Excel

18  spreadsheet on a monthly basis every month for two and

19  a half years; correct?

20       A    Correct.

21       Q    What other information did you put into the

22  Excel spreadsheet in order to determine the monthly

23  payouts?

24       A    The MMP -- MMP percentage.

25       Q    Well, that was a formula; right?

Page 108

1      A     Yes.  Right.

2      Q     That would always be the same --

3      A     Right.  Exactly.

4      Q     And what was that percentage?  Do you

5   recall?

6      A     No.

7      Q     Okay.  Outside of the revenue that you would

8   have to put into the spreadsheet on a monthly basis,

9   was there any other information that you had to

10  include into this Excel spreadsheet in order to

11  calculate the payouts?

12     A     I don't recall.  If I had one of them -- one

13  of them in -- if I could access it, I could tell you

14  what -- what each line was.  But there wasn't -- there

15  weren't a lot, I mean, if any.  I mean, basically,

16  it's a -- it was a straightforward service agreement,

17  you know.

18     Q     And just to be clear, what you're doing with

19  these spreadsheets is saying:  "Okay, here's how much

20  revenue we've brought in from the hospital.  I'm going

21  to put that number into the spreadsheet.  And based on

22  the contractual arrangement, we've got formulas

23  embedded in this Excel spreadsheet.  Once we put the

24  revenue in, it spits out the profit share"?

25     A     Yes.

Page 109

1      Q    Were expenses included, if any, within that

2   spreadsheet?

3      A    I believe so.

4      Q    What expenses?  And whose expenses?

5      A    I think -- I think we built in an overhead

6   amount.  I think.  I think that's what -- you know,

7   after we -- after we did it for six months, you know,

8   when everything's up and running, it's going to be

9   this much every month.

10      Q    Was that a fixed number, the overhead, or

11   did that fluctuate, or was it based on a percentage of

12   revenue?

13      A    No.  It was a fixed number.

14      Q    Do you recall how much?

15      A    I do not.

16      Q    And whose overhead was that?

17      A    Well, it's the -- the overhead of the

18   offices, the rental of the offices, and, you know,

19   payroll, just all -- you know, just the overhead.

20      Q    Of the company?

21      A    Of MMP.

22      Q    And just to be clear, LN?

23      A    Yes.

24      Q    Okay.  So are you saying that, in addition

25   to LN's percentage share of the revenues, there was

Page 110

1    also an overhead amount that was deducted from the
2    revenue every month?
3         A    I believe that's the case.  Yes.
4         Q    But you're not certain?
5         A    Not 100 percent.
6         Q    Any other deductions outside of this
7    possible overhead deduction that you're not certain
8    amount?
9         A    No.  No.
10        Q    Now when you prepared this Excel
11   spreadsheet, after you put in the numbers and it spit
12   out the profit share, what did you do with it?
13        A    I took those to Clay.
14        Q    How did you deliver them to Clay?
15        A    Walk about 10 feet and hand them to him.
16        Q    You physically printed out copies, you
17   walked over to Clay's office, and you physically
18   handed him the copies?
19        A    Yeah.  Yes, sir.
20        Q    And did you save a copy of that to your
21   computer?
22        A    Yes.
23        Q    And every month when you did the same
24   process, you received the revenue information from
25   wherever you got it from, you would put that revenue

                                        Page 111

1    information in the Excel spreadsheet, you'd save it to

2    your desktop or wherever you saved it on your

3    computer, and then you'd print out a copy and deliver

4    it to Clay?

5         A    Correct.

6         Q    And where exactly on the computer did you

7    save these reports every month?

8         A    I just would've created a file for, you

9    know, Excel.  I forget what we called the report.

10        Q    And the file, would you access that by going

11   to the drives?

12        A    Well, it was just -- it was stored on your

13   basic C drive.  Yeah.

14        Q    So there was a C drive at MMP that your

15   computer had access to, where you had a file that kept

16   all these reports?

17        A    Yes.

18        Q    And the day that you were walked out or left

19   MMP, all those files that you had created were saved

20   there?

21        A    Yes.

22        Q    At no point in time did you ever delete

23   them?

24        A    No.

25        Q    You had no reason to delete them?

Page 112

```
 1        A     No.
 2        Q     The creation of these spreadsheets, that was
 3   done by you as an employee of MMP on behalf of Allied
 4   companies or the Allied shareholders so they knew what
 5   they should be getting every month?
 6        A     Yes.
 7        Q     Who was your boss or superior at MMP?
 8        A     Well, I reported to MJ to a point.  But
 9   mainly to Clay, Clay and Lewis.
10        Q     Was Clay the individual who asked you to
11   create these reports on a monthly basis?
12        A     Yes.
13        Q     Do you know if Clay had any involvement in
14   determining how much revenue would be reported to you?
15        A     Well, Clay was involved in setting up --
16   setting up the system -- setting up, you know, all
17   the -- all the systems in place.  So did that answer
18   your question?
19        Q     Let me ask you a few more to see.
20        A     Okay.
21        Q     Every month, you got this revenue number.  I
22   know you don't recall how you got it.  But was Clay
23   involved in determining how much revenue would be
24   reported to you, if you know?
25        A     No, I don't think he was.  No.
```

Page 113

1      Q    How can you be certain?

2      A    Well, because I can be, you know, relatively

3   certain because when it's all said and done, the

4   number -- the number that we say we should have gotten

5   from our billing department matches that check we got

6   from the -- from the hospital.

7      Q    And how did you reconcile those amounts on a

8   monthly basis?

9      A    Well, we got a hundred dollars from the

10  hospital.  And, you know, ten went to Allied, ten went

11  here, ten went there, ten went there.  Well -- I'm

12  sorry -- we got a hundred dollars from the hospital.

13  Our billing department says we should get a hundred

14  dollars from the hospital.  Okay.

15     Q    How did you perform that reconciliation on a

16  monthly basis?

17     A    From the detail given to me by the billing

18  department.  Yes.

19     Q    Okay.  So in other words, you would say --

20  and I know you don't remember how you got the

21  information from the billing department, but they'd

22  tell you, to use your example, a hundred dollars from

23  Knox County.  Would you go look at the bank accounts

24  and make sure there was a hundred dollar check from

25  Knox County that month?

Page 114

1      A    I would ordinarily make the deposit or hand

2    it to Clay or whoever to go make the deposit.

3      Q    Was there some sort of accounting software

4    that was used to actually do that reconciliation?  In

5    other words, billing tells you something.  Did you go

6    into QuickBooks or any other accounting software to --

7      A    To do reconciliation?  No.  No.

8      Q    Did you utilize online banking to verify

9    that:  "Okay, billing department says we should get

10   this from this hospital.  Let me go check the online

11   banking to make sure we actually got it"?

12     A    Yes.  I -- I reconciled the bank accounts

13   every month.  Yes.

14     Q    What bank?

15     A    There was Comerica and there was IBC.  I

16   think IBC.

17     Q    So LN or MMP had a bank account or accounts

18   at Comerica Bank?

19     A    Correct.

20     Q    They also had an account or accounts at IBC?

21     A    Yes.

22     Q    And we're talking about LN Professional

23   Management?

24     A    Yeah.

25     Q    Any other bank accounts?

Page 115

1      A    No.

2      Q    The only way you could verify the revenue

3  that should be coming in from a hospital was to rely

4  on what billing told you?

5      A    Yes.  Yeah.

6      Q    Because otherwise you would have no idea?

7      A    That's correct.  Yeah.

8      Q    Was Clay involved in the billing?

9      A    In that he was -- he -- director of

10  operations, he was involved in all aspects.

11      Q    So he was involved in billing?

12      A    Yes.

13      Q    Did he oversee the billing?

14      A    He had a -- he had a manager in billing.

15      Q    But did he oversee the manager in the

16  billing department?

17      A    Yeah.  Yes.

18      Q    Fair to say that Clay directed the day-to-

19  day operations of MMP?

20      A    Yes.

21      Q    And he had authority over everybody who

22  worked there?

23      A    Yes.

24      Q    And if Clay were to give you an order, it'd

25  be something you would do?

Page 116

1        A     Yes.

2        Q     Same for any of the other employees?

3        A     Yes.

4        Q     Including the employees at the billing

5    department?

6        A     Yes.

7        Q     You had online access to accounts at

8    Comerica and IBC.  Is that true?

9        A     Yes.

10       Q     How many accounts at Comerica, do you know?

11       A     MMP had one account.

12       Q     And did they have more than one account at

13   IBC, if you know?

14       A     Just the one.  Just one that I'm -- yeah.

15   Yeah.  Just the one.

16       Q     Okay.  So you knew of two accounts that MMP

17   had?

18       A     Well, and they didn't have them at the same

19   time.  I think -- like, I want to say we started off

20   with Comerica and we went to IBC, but it might be the

21   other way around.

22       Q     All right.  I want to talk to you a little

23   bit more about the calculations for the revenue share

24   to Allied and its shareholders.

25       A     Okay.

                                        Page 117

1      Q     Broad view, there was a revenue number that

2    came in that was given to you for the spreadsheet;

3    right?

4      A     Yes.

5      Q     You believe there was an overhead number

6    that was fixed that was included in the spreadsheet?

7      A     Yes.

8      Q     Then the breakdown of the revenue and how it

9    was to be distributed among the Allied shareholders

10   was based on a formula that was baked into the

11   spreadsheets?

12     A     Yes.

13     Q     And so suffice it to say, all you needed in

14   order to calculate this revenue share was the revenue,

15   which was provided to you by the billing department,

16   because all the other information was already baked

17   into the spreadsheet?

18     A     It was the revenue given to me by the

19   billing department coupled with tying that to what we

20   actually receive.  This is -- this is the money we've

21   received.

22     Q     In those two bank accounts that you knew

23   about?

24     A     Yes.

25     Q     Goes without saying that if there were other

Page 118

1    accounts that you didn't know about, you wouldn't know

2    if MMP was receiving any additional Monday?

3         A    Correct.

4         Q    Did you ever make a copy of any of these

5    spreadsheets that you created on a monthly basis?

6         A    I created a copy every month to give to

7    Clay.

8         Q    Okay.  And that was a physical copy?

9         A    Yes.

10        Q    Do you recall in the two and a half years if

11   you ever emailed any of these Excel spreadsheets to

12   anyone?

13        A    I don't think I did.  No.

14        Q    Can you be certain that there would never be

15   an email from you to anyone attaching one of these

16   spreadsheets?

17        A    I don't remember ever -- ever doing -- doing

18   it electronically.

19        Q    If, as you understand it, the spreadsheets

20   were backed up on a periodic basis, then other people

21   had access to them besides yourself.  Is that true?

22        A    I -- yes.

23        Q    Who else had access to these spreadsheets

24   besides yourself?

25        A    Well, let's see.  Theoretically --

Page 119

1    theoretically, I guess, MJ, Clay, and then Dylan when

2    he came on board.  I -- yeah.

3         Q    What about Lewis?  As far as you know, did

4    he have access to these spreadsheets?

5         A    Theoretically, he could have.

6         Q    Right.  Because they were saved to a

7    location where other people --

8         A    Right.  They were saved -- they were

9    saved -- oh, sorry.

10        Q    I apologize.

11        A    I'm sorry.  I'm sorry.

12        Q    Because they were saved to a location where

13   other people could access them; true?

14        A    Yes.

15        Q    As far as you knew, Clay or MJ could get on

16   their desktop and take a look at these spreadsheets if

17   they wanted?

18        A    Yes.

19        Q    As I understand it, no one assisted you with

20   the preparation of these spreadsheets outside of

21   providing you with the revenue number and perhaps

22   initially putting in the formulas for the revenue

23   share?

24        A    Correct.

25        Q    Were these spreadsheets ever changed after

                                      Page 120

1    they were created?

2         A    No.

3         Q    At least to your knowledge?

4         A    To -- to my knowledge, no.

5         Q    Do you know the distinction, if any -- let

6    me strike that and ask a better question.  What was

7    the purpose, if you know, of Allied Lab Solutions

8    Management?

9         A    The purpose?

10        Q    Why did it exist independent of Allied Lab

11   Solutions, if you know?

12        A    I don't know.

13        Q    You have any idea what role Allied Lab

14   Solutions Management played versus Allied Lab

15   Solutions?

16        A    No.  No.

17        Q    What is Dire Straits, LLC?

18        A    Dire Straits, LLC, was the LLC owned by

19   Lewis Nichols.

20        Q    And was Dire Straits a partner or owner of

21   LN?

22        A    Yes.

23        Q    And the other owner of LN was MJCX

24   Professional Services?

25        A    That was one of them as well.  Yes.

                                          Page 121

1      Q      And that was owned by MJ Cortez?

2      A      Correct.

3      Q      Fair to say that, in essence, Lewis Nichols

4    and MJ Cortez owned LN?

5      A      They owned part of it.  The owners are --

6    the partners are Torque Wrench, LLC, 20 percent,

7    Diagnostic Gestalt, LLC, 20 percent, Empath Partners,

8    LLC, 20 percent, Dire Straits, LLC, 20, and MJCX

9    Professional Services, 20 percent.

10     Q      That was in the tax year 2016?

11     A      I'm looking at 2017 right now.

12     Q      Was that different than tax year 2016?

13     A      I don't think so.  I'll look.  In '16, Dire

14   Straits, Torque Wrench, MJCX, Diagnostic Gestalt,

15   Empath Partners.  Yup, that's it.

16     Q      And I know you don't have the document in

17   front of you, but was there a change in that ownership

18   or partner structure for tax year 2018, if you know?

19     A      Yes, I believe there was.

20     Q      Do you know what it was?

21     A      I think Torque Wrench had -- had his

22   partnership interest bought out.

23     Q      Do you know who bought it out?

24     A      I think just MMP, the company, did.

25     Q      And how about -- did you say Empath?  Were

                                              Page 122

1    they involved in 2018 tax year, if you know?

2          A    That's the only -- only change I'm aware of

3    was Torque Wrench.

4          Q    Were you terminated from LN?

5          A    Yes.

6          Q    For what reason?

7          A    Well, revenue was down.  And -- and we

8    basically brought on my replacement.  And so yeah.  I

9    was getting paid more.  It's a cost -- I -- I guess

10   it's a cost-saving measure.

11         Q    As far as you know, did your leaving the

12   company have anything to do with something you did,

13   something you failed to do, outside of just maybe a

14   change in revenue and you were being too expensive?

15         A    Nothing else that I can think of.

16         Q    In other words, when you were let go, they

17   didn't say, "Mr. Palmer, we're letting you go because

18   you did this, or we asked you to do this, but you

19   didn't"?

20         A    No.

21         Q    What did they say to you when they let you

22   go?

23         A    Nothing really.  Just nothing.  "You're

24   being let go."  I said, "All right."

25         Q    Who let you go?

Page 123

1       A      Clay.

2       Q      Anybody else in the conversation?

3       A      MJ was there.

4       Q      But did anybody else hear the conversation?

5       A      Anybody else hear it?  No, nobody but the

6   three of us in the room.

7       Q      So in the room when you were let go was Clay

8   Ellis, MJ Cortez, and yourself?

9       A      Correct.

10      Q      And was it Mr. Ellis who told you that you

11  were being let go?

12      A      Correct.

13      Q      Was anything else said?

14              MR. CHESTER:  Objection.  Asked and

15  answered.

16              THE WITNESS:  I was going to say not --

17  no.  He was short and sweet as termination should be.

18  BY MR. MILLER:

19      Q      Did you ask for a reason why you were being

20  let go?

21      A      No.  No, I -- I mean, hell, I saw it coming.

22      Q      What do you mean by that?

23      A      Well, they brought on Dylan when revenues

24  were going down, and brought him on about a third my

25  price, and had me train him.  I mean, you know, it's

                                        Page 124

1    not my first rodeo, man.

2         Q    Do you know why revenues were down in 2018?

3         A    They were down primarily because Blue Cross

4    Blue Shield stopped or highly curtailed -- I'm not

5    sure if they stopped completely -- payments.

6         Q    Payments for?

7         A    Bloodwork.

8         Q    In other words, these hospitals would

9    perform the tests, but they weren't begin reimbursed

10   by the insurance carriers?

11        A    Correct.

12        Q    And mainly Blue Cross Blue Shield?

13        A    If I -- yeah.  Blue -- I think Blue Cross

14   Blue Shield was the -- yeah.

15        Q    Earlier, you were asked some questions about

16   your relationship with Mr. Ellis.  And I don't recall

17   exactly what you said.  But I got the impression that

18   you and Mr. Ellis don't have a good relationship?

19        A    We didn't really get along, you know.  But

20   this was work, you know.

21        Q    Did something sour between you and

22   Mr. Ellis?

23        A    Nothing in particular.  It's just

24   personality wise.  We have -- we just have different

25   personalities.

                                        Page 125

1       Q    After you left in October of 2018, did you

2   do any additional work for LN?

3       A    For LN?  No.

4       Q    Did you do any additional work for any of

5   the partners of LN?

6       A    I did an audit for -- for Lewis.

7       Q    Outside of that audit for Lewis Nichols, did

8   you do any other work for the partner entities or the

9   owners of those entities?

10      A    No.

11      Q    Outside that $5,000 payment from Mr. Nichols

12  associated with that audit, did you receive any

13  payments after you left from LN, any of its entities,

14  or any of the owners of the partners?

15      A    No.

16      Q    Did you receive any payments from Mr. Ellis?

17      A    No.

18      Q    Outside of the 5,000 from Lewis Nichols, did

19  you receive any other payments from him?

20      A    No.

21      Q    How about Mr. Cortez?

22      A    No.

23      Q    How about from any person that you know to

24  be associated with LN Professional Management, its

25  partners, or the owners of the partners?

Page 126

1          A      No.

2          Q      When you left LN in October of 2018, did you

3     have any additional correspondence with Mr. Ellis,

4     Lewis Nichols, MJ Cortez?

5          A      With MJ.  Right -- I was the agent on a --

6     on a nonprofit that we had started.  And I had -- I

7     had to meet MJ at the bank so he -- I was a signer on

8     the -- on the account.  And so --

9          Q      So you had to meet at the bank so that you

10    could turn those --

11         A      Over to MJ.  Yeah.

12         Q      Okay.  So outside of that meeting at the

13    bank for this nonprofit after you were terminated,

14    have you had any other correspondence or meetings,

15    telephone calls, emails with MJ Cortez?

16         A      No.

17         Q      No text messages with MJ Cortez?

18         A      No.

19         Q      I understand that you probably talked with

20    Lewis Nichols about the tax audit.  Outside of that in

21    2019, have you had any telephone calls, emails, text

22    messages, or meetings with Lewis Nichols?

23         A      No.

24         Q      How about Mr. Ellis?  After you left in

25    2018, did you have any phone calls, meetings, text

Page 127

1    messages, or emails from Mr. Ellis?

2         A    No.

3         Q    Same question for Dylan Parks, who I

4    understood took over your position.  Did you speak

5    with him after you left in 2018?

6         A    Well, apparently he came to my house once

7    for a drink right after, like the day after, I think

8    it was said.  But he -- I -- I had a couple of very

9    brief -- he called me with a question:  "How do we do

10   this?  How do we do that?"

11        Q    How about JP Forage?  Do you know who that

12   is?

13        A    I met him a couple of times.  He -- I forget

14   who he was associated with.  And I forget his exact

15   relationship to the company.

16        Q    After you left in 2018, have you had any

17   texts, phone calls, emails, or meetings with JP

18   Forage?

19        A    No.

20        Q    How about Landon Northcutt?  Do you know who

21   that is?

22        A    Landon Northcutt was one of the original

23   attorneys up in Stephenville when the company first

24   started.  But -- but as -- are you asking me if I had

25   any further --

                                        Page 128

1       Q    I will ask that.

2       A    Oh, okay.

3       Q    After you left the company, did you have any

4   further correspondence with him?

5       A    No.

6       Q    Who is Rebecca Smith?

7       A    Rebecca -- oh, Rebecca Smith was the head of

8   billing.  Yeah.

9       Q    And is she related to any of the other

10  employees, owners of these companies in any way, if

11  you know?

12      A    Not that I know of.

13      Q    Do you know who Mac Rust is?

14      A    Mac Rust.  Mac Rust.  I think what -- I

15  think he was another attorney in the same office as

16  Northcutt.

17      Q    What's your telephone number?

18      A    (512) 971-2413.

19      Q    Is that a cell phone or landline?

20      A    Cell.

21      Q    Do you have a landline?

22      A    No.

23      Q    With respect to your business that you

24  operate out of your home, do you use your cell phone?

25      A    Yes.

Page 129

```
 1        Q    How long has that been the case?
 2        A    I don't know.  Twenty-five years.
 3        Q    Fair to say that while you were at LN and
 4   since leaving LN, you haven't had any landlines?
 5        A    Correct.
 6        Q    Okay.  And your telephone number has always
 7   been the (512) 971-2413 number?
 8        A    Correct.
 9        Q    Do you have MJ Cortez's number in your
10   phone?
11        A    Well, let's see.
12             MR. CHESTER:  I'm going to object to
13   putting that on the record.  We can give it to you
14   privately if there's a reason for it.
15             THE WITNESS:  No need.  It's not.
16             MR. CHESTER:  So don't read it out
17   line, please.
18             THE WITNESS:  No, I don't.
19   BY MR. MILLER:
20        Q    Do you have MJ Cortez's number on your
21   phone?
22        A    I do not.
23        Q    Do you have Clay Ellis's number on your
24   phone?
25        A    I do not.
```

Page 130

1      Q     Have you checked?

2      A     I will, but I do not.   Nope.

3      Q     Let me ask it this way.   Have you ever had

4   MJ Cortez's or Clay Ellis's number on your phone?

5      A     I have in the past.   Correct.

6      Q     Did you delete their numbers from your

7   phone?

8      A     Yes, I did.

9      Q     When did that happen?

10      A     Shortly after I left.

11      Q     How about Lewis Nichols?   Do you have him on

12   your phone?

13      A     No.

14      Q     Did you ever have Lewis Nichols in your

15   phone?

16      A     Yes.

17      Q     Did you delete him?

18      A     Yes.

19      Q     When did you delete him?

20      A     Probably a little later than I deleted Clay

21   and MJ.

22      Q     Was there a reason you deleted Lewis

23   Nichols, MJ Cortez, and Clay Ellis from your phone?

24      A     I no longer worked there.

25      Q     Was that the reason why you deleted their

Page 131

1    numbers?

2        A    Yes.

3        Q    How about JP Forage?  Do you have his number

4    in your phone?

5        A    I'll check.  I -- I'd be surprised.  No.

6        Q    Do you recall ever having JP Forage's number

7    in your phone?

8        A    No.

9        Q    I apologize if I asked you this.  Do you

10   know who Dana White is?

11       A    Dana White was one of the billing girls

12   there at Pond Springs.

13       Q    Was Rebecca Smith the head billing person?

14       A    Yes.

15       Q    Was she the person at the house in Manor?

16       A    Yes.

17       Q    Was she the person who would give you the

18   revenue on a monthly basis?

19       A    I'm not sure if I got it directly from her

20   or if I got it -- if -- or if she just declared the

21   month closed, and then I got it, you know, from one of

22   the girls in the office.

23       Q    How was it that you became employed by LN in

24   approximately 2015?  How --

25       A    I knew -- I knew Lewis previously.

Page 132

1      Q      And how did you know Lewis?

2      A      Tax work.  Doing his tax returns.

3      Q      What was the opportunity as it was described

4    to you when you came on board at LN?

5      A      Just keeping the books and just the general

6    accounting functions.

7      Q      Did you know any of the other employees or

8    partners at LN other than Lewis Nichols?

9      A      I didn't know them.  I met Dr. Franklin.  He

10   was good friends with my former brother-in-law.  And I

11   met him 30 years ago one time.  He had -- he bought me

12   great aunt's house in Travis Heights that had a pool

13   and a tennis court.  And we went up there one time and

14   had drinks, but 30 years ago.  Long, long time.

15     Q      And that's the only time you've ever met or

16   talked with Dr. Franklin?

17     A      Correct.

18     Q      Where were you living when you were working

19   for LN in Austin?

20     A      Well, for the first -- for the first year or

21   so, I was living in Lexington.  And then the drive got

22   to me, so I moved into town.  Found a house about a

23   mile from the office.

24     Q      Do you recall what street that was?

25     A      No.  It might be on one of these returns.

Page 133

1    Yes.   12705 Acadian Trail.

2         Q    And did you reside at that address there in

3    Austin throughout the rest of your tenure at LN?

4         A    Yes.

5         Q    After you left LN in October of 2018,

6    where'd you go after that?

7         A    Oh, about a year -- about a year later,

8    moved up here to Grapeland.

9         Q    What'd you do after you left LN, in terms of

10   employment?

11        A    Went to work for a -- a tax prep firm,

12   Marshall Financial Services.

13        Q    Did you work for them for approximately a

14   year?

15        A    No, less than that.  One tax season.  So

16   early January through late April.

17        Q    And then after that did you start working

18   for yourself again?

19        A    I worked myself the whole time.  And yes, I

20   continued to -- yeah.  I still do today.

21        Q    And then moved out to Grapeland?

22        A    Correct.

23        Q    And we're here in Crockett, Texas, now.  And

24   Grapeland, I understand it, is pretty nearby?

25        A    Ten miles.

                                          Page 134

1        Q    Did you grow up in this area?

2        A    No.  No, I grew up in -- I was born and

3    raised in Austin.

4        Q    You have any family out in this area?

5        A    Yeah, well, mother-in-law.  That's why we're

6    here, taking care of her.

7        Q    Currently married?

8        A    Yes.

9        Q    What's your wife's name?

10       A    Julia.

11       Q    Same last name?

12       A    Yes.

13       Q    How long have y'all been together or

14   married?

15       A    Twenty-two years.  I better not get that

16   wrong if it ever comes back out.  That's --

17       Q    We won't show her the transcript.

18       A    Ninety -- wait, hang on.  '99, that would

19   make it twenty -- 24.

20       Q    And was she living with you in Austin while

21   you were working at LN?

22       A    Yes.

23       Q    Your cell phone number that you gave me,

24   who's your carrier?

25       A    Mint.

Page 135

1      Q    Outside of the Palmer Tax and Bookkeeping
2   company, are you an owner, director, member on any
3   other companies?
4      A    No.
5      Q    As you understand it, what was LN in the
6   business of doing?
7      A    LN?  Processing bloodwork.
8      Q    Did you clock hours or were you on salary?
9      A    I was salary.
10     Q    And did you receive a W-2 every year?
11     A    Yes.
12     Q    I understand that LN had a services
13  agreement with Allied Lab Solutions Management.  Are
14  you aware of other service agreements that MMP had
15  with any other companies?
16     A    I think they had a service agreement with
17  the -- all the partners.
18     Q    What do you mean by all the partners?  What
19  do you mean by that?
20     A    Well, shoot.  Let's see.  I'm not a hundred
21  percent sure now if -- if the -- the service
22  agreements probably were with the doctor groups as
23  opposed to the partners.  In order to let us be
24  their -- their -- instead of using Quest, you know,
25  use us instead.

Page 136

```
 1        Q    Here's the reason I'm asking.  And I can
 2   show you a service agreement that I have that's
 3   between LN Professional Management and Allied Lab
 4   Solutions Management.  Outside of that particular
 5   services agreement, are you aware of any others that
 6   LN Professional Management had?
 7        A    Well, we had service agreements with -- if
 8   we're writing somebody a check, we have an agreement
 9   with them, how much that check's going to be.  So the
10   other people that we cut checks to.
11        Q    Have you seen those agreements?
12        A    Probably not.  No.  It was -- it was -- to
13   the best of my knowledge, it was the same for each --
14   you know, for each -- each entity.
15        Q    Outside of the LN and Allied relationship,
16   the blood testing relationship, did LN do business
17   with any other entities related to the collection and
18   testing of blood samples, outside those connected to
19   Allied?
20        A    Yes.  I mean, I -- we cut, I don't know, a
21   dozen checks a month.  You know, so yeah.  So yeah,
22   and it wasn't all -- it wasn.t all Allied by any
23   stretch.
24        Q    And maybe a better way to ask it is, those
25   spreadsheets that we were talking about where you did
```

Page 137

```
 1    your calculation of what Allied and its shareholders

 2    should receive every month, did you do a similar one

 3    for unrelated companies?

 4          A    Yes.  Yes.

 5          Q    And you had those spreadsheets, and they

 6    were saved as well?

 7          A    Yes.  Yes.  Absolutely.  Yeah.

 8          Q    And it was the same process that we

 9    described earlier; correct

10          A    For those unrelated entities?

11          A    Yes.

12          Q    And everybody that you described earlier had

13    access to those spreadsheets as well.

14          A    Yes.

15          Q    And you got the revenue number and all that

16    information in the same way?

17          A    Yes.  Yeah.  It was -- everything was the

18    same.  Correct.

19          Q    And as far as -- strike that.  When you left

20    the company in October of 2018, all those spreadsheets

21    that you had created, you saved?

22          A    Yes.

23          Q    Were you involved in transmitting

24    information to Allied shareholders about their revenue

25    share?
```

Page 138

1      A    No.  I mean, once the check was written to

2    Allied, how it got disbursed once it was in Allied,

3    that was, you know, past me.  So yeah, I --

4      Q    Sure.  Let me ask a little bit better

5    question.  The spreadsheets that you prepared every

6    month that were saved, those spreadsheets, were those

7    distributed, if you know, to Allied and its

8    shareholders?

9      A    I -- yeah.  I would -- I would think so.

10   Yes.

11     Q    Do you know who did that?

12     A    I would think Clay probably would have.

13     Q    Did you ever do that?

14     A    No.  I don't think.  No.  There -- there

15   would be no need for me to because that -- you know,

16   Clay's the one -- Clay's the chief operations officer

17   or whatever, and he's the one who -- you know, who

18   dealt with them, so.

19     Q    If you know, how did Clay distribute those

20   Excel spreadsheets related to revenue share to Allied

21   and its shareholders?

22     A    Strictly a guess, but it probably would have

23   been attached to the check.  Or -- or if it was a

24   wire, it would've been emailed to them, I -- yeah, I

25   guess.  I'm not -- yeah, I'm not sure.

Page 139

1        Q     So if it was emailed to them, it would've

2    been by Clay, not by you?

3        A     As memory serves, that would be correct.

4    Yeah.  But he also could've instructed me to send it

5    to them.  And -- and if that were the case, I

6    would've.

7        Q     Do you have any idea, as you sit here right

8    now, where these spreadsheets are that you created?

9        A     I have no idea where they are now.

10        Q     Do you have access to them in any way?

11        A     Do I?  No, I do not.

12        Q     Have you had access to them since you left

13    in October of 2018?

14        A     No.

15        Q     Outside of perhaps preparing some tax

16    records for tax returns for the Allied companies, were

17    you involved as an employee or otherwise for the

18    Allied companies?

19        A     No.

20        Q     All your work, in essence, was done on

21    behalf of LN?

22        A     Yes.

23        Q     If wires were used to send checks to

24    shareholders or Allied companies, who at LN instigated

25    those wires?

1       A       Probably MJ, I would think.

2       Q       You did not?

3       A       I couldn't.

4       Q       What does that mean?

5       A       Well, to do a wire, you -- you have to, you

6    know, be one of two people.  I didn't have signature

7    authority on the account.

8       Q       Who had signature authority on the Comerica

9    and IBC accounts?

10      A       I think it was MJ, Lewis, and Clay.  Yeah.

11   I think.

12      Q       With respect to checks that were written to

13   Allied or its shareholders, who actually cut those

14   checks and signed them?

15      A       I cut the checks and there were -- and there

16   were two signature checks.  And ordinarily, that would

17   MJ and Clay that signed the checks.

18      Q       Were those checks mailed to Allied and its

19   shareholders?

20      A       I don't know.

21      Q       You weren't involved in the delivery of the

22   checks?

23      A       No.  Except for the one down the street,

24   that one organization down the -- the street.  I'd

25   just drive it up and drop it off.

Page 141

1      Q     Do you recall the name of that organization?

2      A     Man, I do not.  And -- no, I don't.

3      Q     You had online access to Comerica and IBC,

4   but you were not allowed to wire money or write

5   checks?

6      A     Correct.  Well, I wasn't -- I wasn't allowed

7   to sign checks.

8      Q     Okay.  Fair enough.  Did you ever review any

9   service agreements between LN and Allied?

10     A     Yes, in order to set up the spreadsheet.

11   Just one time.

12     Q     So let me go back over that, because I was

13   under the impression that the spreadsheet was already

14   set up for you.

15     A     No, I had to have the -- the mechanics of

16   the operating agreement in order to set it up.

17     Q     But that was just a one-time occurrence?

18     A     Right.  Right.

19     Q     Because once you got the formulas in there,

20   you didn't need to go back in and change them?

21     A     Correct.

22     Q     And you were the one who set up the

23   formulas?

24     A     Yes.

25     Q     Based on information you gathered from

Veritext Legal Solutions
800-336-4000

1    where?

2         A    Well, the overhead was gathered from

3    operating for -- for a time.  You know, see what that

4    operate -- the overhead burden would be.  And then the

5    rest was the split outlined in the -- in the service

6    agreement.

7         Q    Was the overhead that you're referring to

8    outlined in the service agreement?

9         A    Yes.  Yeah, it was money in plus our

10   overhead, here's the split on the net income.

11        Q    And as I understand your testimony thus far,

12   the overhead was determined after several months of

13   doing the work.  You guys were able to figure out what

14   your overhead costs were?

15        A    Yes.  Yes.

16        Q    And in terms of the monthly calculations in

17   the spreadsheet, that overhead became a fixed number

18   that was included?

19        A    Yes, I believe so.

20        Q    And that information was disclosed on the

21   spreadsheets that you created?

22        A    Yes.

23        Q    And as far as any other deductions from the

24   revenue, there were none outside of the overhead that

25   you just described?

Page 143

1      A    The percentage that goes to MMP.

2      Q    Fair enough.

3      A    And that's it.

4      Q    Okay.  So in other words, MMP or LN gets

5  money from the hospital.  We have a fixed number for

6  overhead that we take out, which is the same every

7  month.  And then we calculate our revenue share on

8  that amount?

9      A    Yes.  I believe that's correct.

10     Q    With a certain percentage going to LN and

11  then the remaining percentages going to Allied and its

12  shareholders?

13     A    Yes.

14              MR. MILLER:  Why don't we take a break

15  real quick.  Been going for a little over an hour.

16              THE VIDEOGRAPHER:  The time is 1:11,

17  and we are now off the record.

18              (Off the record.)

19              THE VIDEOGRAPHER:  We're back on the

20  record.  The time is 2:16.

21  BY MR. MILLER:

22     Q    Mr. Palmer, we're back from lunch.  Are you

23  ready to continue your deposition?

24     A    Yes.

25     Q    You understand that even though we've taken

                                        Page 144

1   a lunch break, you're still under oath?

2        A    Yes.

3        Q    Did you speak with anyone during the break

4   about this case or about the testimony you've given?

5        A    No.

6        Q    You mentioned you have Mint Mobile as your

7   carrier.  Who was your carrier before Mint Mobile?

8        A    I think it was AT&T.

9        Q    Have you had contact with any of the

10  attorneys for Mr. Ellis, Mr. Nichols, MJ Cortez

11  related to this case or in preparation for your

12  deposition?

13       A    I talked to somebody last week.  I'm trying

14  to remember that lawyer's name.  And I can't -- I -- I

15  don't know who he worked for, actually.

16       Q    Did you speak with Mr. Ellis's lawyer about

17  the declaration prior to your deposition today?

18       A    No.

19       Q    Did you request a copy of your declaration

20  from Mr. Ellis's lawyer?

21       A    Which lawyers are Mr. Ellis's?

22       Q    Right here.  Mr. Hobbs.

23            THE WITNESS:  Mister -- yeah.  You're

24  who I talked to last week; right?

25            MR. HOBBS:  No.  I mean, I'm not on

Page 145

```
 1    record, but no.

 2                THE WITNESS:  I don't think so.

 3    BY MR. MILLER:

 4         Q    Did you request a copy of your

 5    declaration --

 6         A    Oh, no.  No.  It was sent to me with this.

 7         Q    That's the way you got a copy of your

 8    declaration?

 9         A    I had one sent to me as well from someone.

10    Oh, that would've been an email.  All right.  Never

11    mind.

12         Q    Let me go about it this way.

13         A    Okay.

14         Q    You did receive a subpoena in this case, and

15    I believe it's been marked as an exhibit to your

16    deposition.  Is that true?

17         A    Yes, I believe it was.

18         Q    Did you review that subpoena before you

19    showed up today?

20         A    No.  Oh, I'm -- that's my copy.

21         Q    Well, I guess, that begs the question.  If

22    you didn't review the subpoena, how'd you know you

23    needed to be here today?

24         A    Well, no.  I -- I looked at the time.  But

25    did -- I didn't read through it.
```

Page 146

1       Q     Did you read through the requests for

2    documents?

3       A     No.

4       Q     Did you review the declaration that was

5    attached to your subpoena?

6       A     The one I did earlier?  That -- that's on

7    the declaration?

8       Q     Exhibit Number 6, which you were presented

9    in your deposition, had a request for production as

10   well as a copy of your declaration attached.  My

11   question is, did you review your declaration before

12   showing up here today?

13      A     Let me look at the declaration.  Yes, that.

14   Okay.  Oh, yes.  Yes.  Yeah, I -- I have now.  Yes.

15      Q     Well, my question was, before you showed up

16   today, did you review it?

17      A     Yes.  Yes, sir.

18      Q     And did you -- okay.

19      A     Yeah, I -- I looked at the list of documents

20   and didn't have any.

21      Q     Did you make an effort to actually search

22   for the documents?

23      A     Yes.

24      Q     What efforts did you make to search for

25   documents?

Page 147

```
 1        A    I went back through -- I went back through
 2   emails.  I went back through to make sure I didn't
 3   have anything on QuickBooks or anything, and I didn't.
 4   The only thing that I had were -- were the tax
 5   returns.
 6        Q    When you did your review for documents, you
 7   found tax returns belonging to which entity?
 8        A    MMP, Clay, Lewis, and Allied.
 9        Q    And did you bring those documents with you?
10        A    No.
11        Q    What years do you have tax returns for for
12   those entities?
13        A    I think '16 and '17.
14        Q    Any for '18?
15        A    I don't -- no, I don't think so.  But I'd
16   be -- I'll be happy to -- I will be happy to check and
17   get it to you if I have them.
18        Q    Thank you.
19                  MR. CHESTER:  Okay.  Hang on a second.
20                  THE WITNESS:  Okay.
21                  MR. CHESTER:  Do not give out my
22   client's tax returns without getting clearance from me
23   and the court.
24                  THE WITNESS:  Okay.  All right.
25                  But now, any document requests you
```

Page 148

```
1    would have like that would go through him and he'll
2    call me and say okay; right?
3                    MR. CHESTER:  It needs to.  Yes.
4                    THE WITNESS:  Okay.
5    BY MR. MILLER:
6        Q    What about emails?  Did you search for
7    emails?
8        A    I did.  Oh, that -- that's how I got Kelly
9    Dawson's email -- emailing.  Yeah.  I mean, I
10   didn't -- I didn't find any.
11       Q    So you searched emails?
12       A    Mm-hmm.
13       Q    Is that a yes?
14       A    Yes.  That's a yes.
15       Q    What email account did you search?
16       A    Mine, L-P dot accounting.
17       Q    L-P --
18       A    P dot accounting at Hotmail.
19       Q    You have any other email addresses?
20       A    No.
21       Q    Did you have a work email while you were
22   employed with LN?
23       A    Yeah.  Yeah.
24       Q    What was that email address?  Do you recall?
25       A    No.  No.  And it was on -- it was on the
```

Page 149

1    desktop.  And I never accessed it or couldn't begin to

2    tell you what a password would be.

3        Q    Since leaving employment of LN, have you

4    accessed that email account that you had as an

5    employee of LN?

6        A    No.

7        Q    Is that a no?

8        A    No.

9        Q    Any correspondence that you had as an

10   employee of LN related to LN business, would you have

11   used that LN email account and/or your L-P dot

12   accounting Hotmail account?

13       A    It would've been one or the other.  But I

14   tried to keep everything with LN on the LN.

15       Q    Understood.  But you'll admit there were

16   occasions, whether intentionally or inadvertently, you

17   used --

18       A    It's -- it's possible.  Oh, I'm sorry.  Go

19   ahead.

20       Q    -- you utilized your L-P dot accounting at

21   Hotmail dot com account?

22       A    It's possible.  Yes.

23       Q    With respect to your search of emails, and

24   specifically your L-P dot accounting at Hotmail dot

25   com address, what specific terms did you use?

Page 150

1        A      I think I just -- I think I put in Clay

2    Ellis and Lewis Nichols.

3        Q      So you searched for emails to and from Clay

4    Ellis, and you searched for emails to and from Lewis

5    Nichols?

6        A      I think so.  Yes.  Yeah.

7        Q      Did you search for emails from anyone else?

8        A      I don't think so.  No.

9        Q      Did you search emails to anyone else?

10       A      No.

11       Q      You testified earlier that there was an

12   initial single page write-up that you provided to

13   Mr. Dawson.  Do you recall that?

14       A      Yes.

15       Q      Did you search for that?

16       A      Yes, I did.  I searched all over for that.

17       Q      And I want to know specifically what you

18   searched for when you made those efforts.

19       A      I searched emails.  I searched -- I searched

20   my -- my Word documents.  That's it.  Email and the

21   Word documents.

22       Q      All right.  So do you have a folder of Word

23   documents that you went in and looked at?

24       A      Yeah.

25       Q      Okay.  And then you also searched your email

Page 151

1    account?

2         A    Correct.

3         Q    And what specific search terms did you use

4    when you were looking for this correspondence with you

5    and Mr. Dawson related to a document that you

6    submitted to him?

7         A    Search terms or date driven.  I saw the date

8    on the -- well, the date that I -- I tried to get

9    ahold of -- that 9/6 date was on the -- on the

10   declaration.  I said, "Well, I had to have sent it to

11   him sometime around then."  And then I -- and then I

12   looked back into '22.  And I just didn't see it.

13        Q    All right.  So the declaration you're

14   referring to, which has been marked as an exhibit, was

15   signed September the 6th of 2022?

16        A    Correct.

17        Q    And your search terms were date driven, as

18   you testified?

19        A    Right.

20        Q    And you were looking for the initial draft

21   of the document that you prepared?

22        A    Right.  So I backed it -- and I knew -- I

23   knew a pretty good period of time had passed.  So I

24   went back.

25        Q    How far did you go back?

Page 152

1        A     Into mid-'20 -- mid to late '20, '21.

2        Q     So not a full year?

3        A     Not -- not a full year, but close.

4        Q     All right.  So you've sent the parameters

5   with respect to the dates that you were searching.

6   What other search terms, if any, did you use?

7        A     I think I -- the only one I used was

8   affidavit, and nothing came up with affidavit.

9        Q     Did you search declaration?

10       A     No.

11       Q     Did you search for Kelly Dawson's email?

12       A     I -- I did a search for Kelly Dawson, yeah,

13   and nothing.

14       Q     Did you do a search in your email for emails

15   that you sent to Kelly Dawson?

16       A     Yes.  It's -- it's the same search.  It'll

17   pull up anything to or from.

18       Q     And so your testimony is that something that

19   you sent to Kelly Dawson from late 2021 through

20   September 6th of 2022, you were not able to locate?

21       A     Correct.

22       Q     You also searched for Word documents;

23   correct?

24       A     Yes.  Yes.

25       Q     Because whatever it is that you prepared,

Page 153

1     you created it in Word?

2          A     Yes.

3          Q     And you created it on your computer?

4          A     Yes.

5          Q     Is that a laptop or a desktop?

6          A     Laptop.

7          Q     Is that at your home?

8          A     Yes.

9          Q     Is that your work computer?

10         A     Yes.

11         Q     Same one that you were using back in 2021

12    and '22?

13         A      That's a good question.  I don't know.  It

14    could be, but I -- I had gotten one.  Not since then,

15    but right around that time.  Yeah.

16         Q     All right.  If you've since gotten a new

17    computer, did you throw away the old one?

18         A     No, it's sitting up in a closet.

19         Q     So you still have it?

20         A     Yeah.

21         Q     Did you search that computer for your Word

22    documents?

23         A     No.

24         Q     Are you saying that it may be on that

25    computer?

Page 154

1        A      It's possible, not likely.

2        Q      And is that a laptop?

3        A      Yes.

4        Q      Okay.  And that email that's up in the

5    closet -- or excuse me.  Strike that.  The computer

6    that's up in the closet, the laptop, where it's

7    possible this document resides, what kind of computer

8    is that?

9        A      That would be a Dell -- PC.

10        Q      All right.  And the laptop that you're

11    currently using, what kind of computer is that?

12        A      Same.  Dell.

13        Q      And is it fair for me to assume that you did

14    not go search this old computer for any documents

15    related to this case?

16        A      I did not.

17        Q      The folder that you create where you save

18    your Word documents, do you keep those documents

19    within that folder forever or do you have some sort of

20    policy where you go through and delete items?

21        A      I don't have a policy.

22        Q      So if you created this document, it should

23    be on one of the two computers?

24        A      Yes, but I couldn't find it.

25        Q      There's no other computers that it should be

Page 155

1    on; correct?

2         A    No.

3         Q    And the document you're referring to was a

4    single page Word document that you emailed to

5    Mr. Dawson?

6         A    Yes.

7         Q    And was there any other email communication

8    between you and Mr. Dawson related to the initial

9    draft that you said you prepared?

10        A    I think we saw -- the emails we saw earlier,

11   you know, where he -- he asks had I finished it up.

12   And yeah.

13        Q    You're talking about the emails from

14   September of '22?

15        A    Well, it -- it's one of the exhibits.  Oh,

16   I'm sorry.  No.  These are -- these are texts.  These

17   are texts.

18        Q    Well, let's look at --

19        A    Exhibit 7?

20        Q    Exhibit 8, Exhibit 9 from September the 2nd

21   of 2022 and September the 5th of 2022.  Are those the

22   emails you're referring to?

23        A    Yes.

24        Q    Okay.  Let me ask my question again and make

25   sure we're on the same page.

Page 156

1      A      Okay.

2      Q      Outside of these emails that we're seeing

3   here today from September of 2022, was there any other

4   email correspondence back and forth between you and

5   Mr. Dawson related to this initial draft you've

6   described?

7      A      I don't think so.

8      Q      Okay.  Was there any phone call around the

9   time that you sent this initial draft with Mr. Dawson?

10     A      I don't remember.

11     Q      You mentioned that you prepared this draft

12  affidavit or declaration that you've not located

13  related to claims of libel or slander.  Did I

14  understand your testimony?

15     A      Yeah.  Well, that -- that's what he -- and

16  that was in response -- when he -- when he first

17  contacted me.

18     Q      And so when he first contacted you, it had

19  to be sometime in 2021 or at least --

20     A      Yes.  Yes, that's fair.  Yeah.

21     Q      Because you, as I understand your testimony,

22  prepared this affidavit or this one-page document in

23  response to that call?

24     A      Yes.  And then a long time went by and I

25  didn't hear anything and -- yeah, until the '22.

Page 157

1       Q     Prior to getting that call from Mr. Dawson,

2    had you ever talked with him before?

3       A     At the office.  He -- he'd been there a

4    couple of times.

5       Q     In relation to what?

6       A     He was working with -- with management to

7    see what he could do to get Blue Cross Blue Shield to,

8    you know, turn back on the spigot, start paying again.

9       Q     Related to business?

10      A     Bloodwork.  Yes.  Yes.

11      Q     All right.  What information did you have

12   related to claims of libel that may or may not exist

13   between Mr. Dawson and Mr. Ellis?

14      A     None.  None.  He -- well, no, he -- he said

15   on the -- on the phone that -- that Clay was trying to

16   ruin -- ruin him professionally, and was saying things

17   that weren't true, or something to that effect.  And

18   he -- and he was going to sue him for defamation or

19   libel.  That's -- and that's the extent of it.

20      Q     So what you're telling us is that Mr. Dawson

21   contacted you sometime in late 2021 --

22      A     I think, yeah.

23      Q     -- told you that Mr. Ellis was trying to

24   ruin his career, and that Mr. Dawson wanted to

25   prosecute some sort of defamation or libel claim

Page 158

1   against him?

2        A    Correct.

3        Q    And although you did not have any

4   information to support that, you prepared a one-page

5   summary and sent it to him?

6        A    He wanted to know what my -- what my

7   relation -- I mean, what I did within the office.

8   Yeah.  It was --

9        Q    Well, did you put any information in there

10  about how Mr. Ellis was making false statements about

11  Mr. Dawson, trying to ruin his career?

12       A    No.  No.  I didn't have any -- any -- I

13  didn't know anything about it 'til he called me.

14       Q    So the call from Mr. Dawson to you in late

15  September of 2021 is along the lines of:  "Mr. Ellis

16  is making false statements about me.  I would like you

17  to put together an affidavit to support what I'm

18  trying to do here"?

19       A    He wanted me to put together an affidavit of

20  what my role was.

21       Q    Your role within the company?

22       A    Within the company.  Yes.

23       Q    Did it have anything to do with the false

24  statements that Mr. Dawson said were being made by

25  Mr. Ellis?

                                          Page 159

```
 1        A    No.  Actually, I -- I didn't -- I didn't
 2   really think much of it at the time because it's like:
 3   "What does this have to -- you know, what does this
 4   have to do with me?  I don't know anything about this,
 5   you know."
 6        Q    Did you sign that document you sent to him?
 7        A    Probably not.  Just, you know:  "Here.
 8   Here's what you wanted."  And --
 9        Q    And then you heard nothing else about that
10   document until September of 2022?
11        A    Right.
12        Q    Lewis Nichols, I know you helped him out
13   with an IRS audit in 2019.  Was he a client of yours?
14        A    Not at that time.  This was for a prior
15   year, a return I'd done.
16        Q    Okay.  What year was that?  Do you recall?
17        A    No, I don't.
18        Q    So it was some year prior to 2019?
19        A    Yeah.  Yeah.  It probably -- chances are
20   it'd be 2017.
21        Q    And he was getting audited by the IRS, and
22   you were helping him?
23        A    Correct.
24        Q    And he was paying you?
25        A    Yes.
```

Page 160

1      Q     So was he a client of yours?

2      A     Well, yes, for that.  Yeah.

3      Q     And then when did you delete his number from

4    your cell phone?

5      A     It would've been probably -- probably '21,

6    '22.

7      Q     Do you routinely go through your phone and

8    delete former clients from your cell phone?

9      A     I do if they're former clients.

10     Q     You don't ever expect or want any business

11   from them again?

12     A     I really didn't expect to hear from Lewis.

13     Q     Did you delete any and all text messages

14   that you had when you deleted his cell phone number?

15     A     I -- I don't know.  I -- I think when you

16   delete the phone number, it just takes everything with

17   it.  But I don't know, though.

18     Q     All right.  So when you deleted Mr. Ellis's

19   number from your phone and Mr. Cortez's number from

20   your phone, in your mind, any text messages with them

21   would've also been deleted?

22     A     I think so.  I mean, I -- I can do a search

23   for Lewis Nichols now and see if there's any texts

24   there.  I don't think there is.  I don't know.

25     Q     Well, if he's not in your phone, how would

Page 161

1    you search for him?

2        A    Well, you -- you can do a search on the text

3    page, not the phone page.   Just do search for --

4        Q    Did you understand my question, Mr. Palmer?

5        A    Ask -- ask me again, please.

6        Q    If you don't have his name and number saved

7    in your phone, my question is, how are you going to

8    search for texts to and from him?

9        A    Well, just you -- well, you had just asked

10   me if by deleting the number, did I also delete the

11   texts.  Well, and I don't know.  But I do now.  No

12   results.

13       Q    Do you use social media.

14       A    I do Facebook occasionally.

15       Q    Have you ever corresponded with Lewis

16   Nichols, MJ Cortez, or Clay Ellis via social media?

17       A    No.

18       Q    Do you use WhatsApp or Snapchat?

19       A    No.

20       Q    Do you even know what those are?

21       A    I -- I know they exist.

22       Q    Are they on your cell phone?

23       A    No.

24       Q    Was Lewis Nichols audited in relation to

25   some personal tax return that you prepared?

Page 162

1        A     Yes, it was his personal.

2        Q     Outside of your Hotmail account that we

3    talked about, your email account that you had while

4    you were at LN, did you, within the past ten years,

5    have any other email accounts?

6        A     No.

7        Q     In a general fashion, can you tell me, with

8    respect to the relationship between LN and Allied,

9    those companies, what did they do in terms of, you

10   know, getting test results and then having them

11   delivered to hospitals for testing?

12       A     Ask me one more time.  I want to make

13   sure --

14       Q     Sure.  And I'll break it up to make it

15   easier.

16       A     Okay.

17       Q     With respect to --

18                MR. CHESTER:  And can you also specify

19   which Allied company you're referring to, please?

20                MR. MILLER:  Will do.  Thank you.

21   BY MR. MILLER:

22       Q     With respect to LN Professional Agreement

23   and its agreement with Allied Management, what role in

24   that relationship and that services agreement did LN

25   Professional Management play?

Page 163

1        A     Well, we -- we collected revenues and did

2    the reports and submitted remittances to them on a

3    monthly basis.

4        Q     Administrative, would you consider it?

5        A     Yeah.  Yeah.

6        Q     What role in that relationship did either

7    Allied Lab Solutions Management or Allied Lab

8    Solutions play?

9        A     I'm not sure what you're asking.  I'm sorry.

10   Go ahead.

11       Q     Sure.  With respect to the service agreement

12   between LN Professional Management and Allied Lab

13   Solutions Management, with respect to that

14   relationship, I'm asking about the Allied side now.

15   What did they do?

16       A     I don't know.

17       Q     You just knew what LN did?

18       A     LN did, yeah.  Yeah, it was all outward

19   bound.

20       Q     Did LN have any role in actually obtaining

21   the blood samples from patients, if you know?

22       A     LN, our involvement started when the courier

23   would go pick up blood samples to -- we didn't have

24   any role -- the doctor then would order the test.

25       Q     LN never got involved up until a point in

Page 164

1    time when blood had been drawn and put into a vial,

2    ready for a courier pickup?

3          A    Correct.

4          Q    We talked about overhead earlier in general,

5    with respect to the spreadsheets.  Would that include

6    things like rent, electricity, utilities?

7          A    Yes.

8          Q    Any other broad categories of overhead that

9    would be included within that?

10         A    I don't know off hand if payroll's included

11   in that or not.

12         Q    So personnel expenses for LN?

13         A    Correct.

14         Q    Did it include payroll for any other

15   individuals employed by any other organization?

16         A    No.

17         Q    All right.  So payroll may or may not have

18   been included?

19         A    Correct.

20         Q    Any other categories of overhead outside of

21   rent, utilities?

22         A    I -- I don't know if anything else.  I don't

23   know.

24         Q    As the bookkeeper, did you review expenses,

25   review bills, invoices, things like that that were

                                      Page 165

1    charged to overhead?

2         A    Yes.  I mean, I -- I accounted for them.

3    Now if -- yeah.

4         Q    But after several months of operating, you

5    guys had a pretty basic understanding as to the

6    approximate about of overhead?

7         A    Right.  Right.

8         Q    So it's not something you did precisely

9    every month?

10        A    Correct.

11        Q    And just to be clear, outside of rent,

12   utilities, office space, are there any other things

13   that were included in overhead that were, you know,

14   major contributors?

15        A    I don't know.

16        Q    Did somebody provide you with the expenses

17   and charges that should be included in the overhead,

18   or how did you ascertain what those were?

19        A    I don't remember precisely at all now.  It's

20   just a guess.  We probably would go back to the

21   service agreement.

22        Q    Those overhead charges and expenses, were

23   those put into QuickBooks?

24        A    Yes.

25        Q    And were they categorized as overhead in

Page 166

1    QuickBooks?

2        A    Yes.  Well, it's categorized as rent,

3    utilities, yeah.

4        Q    And the summation of all those is what

5    you're referring to as overhead?

6        A    Yeah.  Right.  Yes.

7        Q    And as far as you recall, you don't remember

8    if payroll was included within that --

9        A    I don't -- I don't remember.

10       Q    All right.  Let's look at your declaration,

11   which I know you talked with Mr. Chester about, the

12   one from September of 2022.  It's been marked as

13   Exhibit Number --

14                  MR. HOBBS:  5.

15                  MR. MILLER:  5.  Thank you, Mr. Hobbs.

16   BY MR. MILLER:

17       Q    You got it there, Mr. Palmer?

18       A    I do.

19       Q    Okay.  You talked with Mr. Chester about

20   this previously.  My understanding from your testimony

21   is, you drafted about a page and a half, roughly, of

22   this, and then Mr. Dawson took liberty and drafted the

23   rest of it without your knowledge?

24                  MR. CHESTER:  Object to the form.

25   Misstates the testimony.

                                        Page 167

1    BY MR. MILLER:

2         Q    And if I've misstated your testimony,

3    Mr. Palmer, I ask that you correct anything that I

4    misstated.

5         A    Yeah, I -- it's a page, page and a half.

6    And -- and yeah.  Like I said, a lot of this, he -- he

7    filled in -- or he filled in or supplemented.  And

8    there was no consultation with me.

9         Q    Okay.  So at least with respect -- and I

10   understand you say page, page and a half.  With

11   respect to the first page that we see on Exhibit

12   Number 5, you prepared that?

13        A    Parts.

14        Q    All right.  I understand, based on some

15   email communication that we can look at that was an

16   exhibit, before signing Exhibit Number 5, you reviewed

17   it and noted a spelling error?

18        A    Correct.  This one on the first page.

19        Q    Okay.  So the circle that we see that's a

20   little bit faded out in black there circling

21   Mr. Ellis's last name, you did that?

22        A    Yes, that's my circle.

23        Q    Okay.  And you did that before you signed

24   this declaration under oath?

25        A    Well, at the same time.  I mean, in the same

Page 168

1    sitting.

2         Q    And you'll agree with me that that spelling

3    error that you noted was in the same sentence as, "Con

4    conspirator to further Clay Ellis's scheme to defraud

5    the Allied company shareholders"?  You'll agree with

6    me that your --

7         A    It is.  There it is.  Right there.

8         Q    When you corrected that spelling error, did

9    you make any attempts to notify Mr. Dawson that the

10   remainder of that sentence was absolutely false?

11        A    No.

12        Q    And you realized when you were signing this

13   that you'd be subject to perjury if you made false

14   statements?

15        A    Yes.

16        Q    And so after reviewing at least up to that

17   sentence, did you review any other pages of this

18   declaration before you signed it?

19        A    I mean, my process was -- yeah, just -- I

20   mean, I just --

21        Q    Glanced at it?

22        A    Glanced at it.  Yeah.

23        Q    But you'll agree with me that every

24   paragraph in this declaration that you glanced at

25   discusses Clay Ellis and how he was skimming money or

Page 169

1    fraudulently diverting money from the Allied

2    companies?

3         A    I do know that I've read it in depth, but I

4    just -- yeah.

5         Q    And when you skimmed this before signing

6    it --

7                    MR. CHESTER:  Hang on.  He wasn't

8    finished with his answer.

9    BY MR. MILLER:

10        Q    Were you finished, Mr. Palmer?

11        A    Well, I mean, I -- yeah, "Clay Ellis

12   specifically directed me to -- checks to the member

13   Allied" -- it's like, "Yeah, okay," you know.  It

14   was -- it was that kind of -- yeah.

15        Q    Sure.  You'll agree with me that every

16   single paragraph in here paints Mr. Ellis in a

17   negative light with respect to his dealings with

18   Allied?

19        A    Yes.

20        Q    And despite that, when you glanced over it

21   and signed it, you never thought to tell Mr. Dawson

22   that, "Hey, this is not true"?

23        A    No.

24        Q    And certainly when you sent him an email on

25   September the 6th of 2022 sending the declaration

Page 170

1   back, you never said in your email, "Mr. Dawson, I'm

2   going to sign this, but some of this isn't true"?

3        A    No.

4        Q    What I said is correct?  You never told

5   Mr. Dawson in that --

6        A    Oh, yeah.  Right.  Correct.

7        Q    If you'll take a look at Exhibits Number 8

8   and 9, these are the emails forwarding the

9   declarations.

10       A    Okay.

11       Q    Looking at the email marked as Exhibit

12  Number 8, you'll see it was sent from Mr. Dawson to

13  you at your Hotmail account on September the 2nd of

14  2022?

15       A    Mm-hmm.

16       Q    Is that true?

17       A    Yes.

18       Q    Mr. Dawson tells you, "I went off the notes

19  I took from our call last week."  Does he not?

20       A    Yes, he did.

21       Q    And do you dispute having a call with

22  Mr. Dawson a week prior to this email?

23       A    No.

24       Q    Did Mr. Dawson in this email offer to speak

25  with you about the declaration if you had any

Page 171

1    questions?

2         A    No.  I don't remember that at all.

3         Q    Well, let's look at the email, Exhibit

4    Number 8.  Do you see where Mr. Dawson says, "I can

5    call you to go over it if you'd like."  Do you see

6    that?

7         A    Yes.

8         Q    Did you request a call with Mr. Dawson to go

9    over the contents of the declaration?

10        A    No.

11        Q    Did you ever tell Mr. Dawson that this

12   declaration is not consistent with the call you had

13   the week before?

14        A    No.

15        Q    Did you ever text Mr. Dawson at the number

16   he provided you there in this email that this

17   affidavit is inaccurate and not consistent with the

18   call from the week prior?

19        A    No.

20        Q    All right.  Let's look at Exhibit Number 9.

21   This is the September 5, 2022, email from Mr. Dawson

22   to you with, it looks to be, an updated version of

23   that prior declaration that we just looked at; true?

24        A    Appears to be, yes.

25        Q    Does Mr. Dawson tell you that he made a

Page 172

1    couple of changes to the declaration?

2        A    Yes.

3        Q    Did you ever tell him that you disagreed

4    with any of the changes made?

5        A    No.

6        Q    Did Mr. Dawson ask you to let him know after

7    you had a chance to review it?

8        A    Well, yeah, right there.

9        Q    Did you ever tell Mr. Dawson that you just

10   skimmed the declaration and never reviewed it?

11       A    I didn't even tell him that much.

12       Q    In fact, I'm looking for the email now.  In

13   fact, you sent it back to him on September the 6th,

14   2022, and just said, "Signed, copy attached," or

15   something along those lines?

16       A    Right.

17       Q    Is that a yes?

18       A    Yes.

19       Q    Oh, I believe you also told him that you had

20   noted a spelling error.

21       A    Okay.

22       Q    Is that true?

23       A    I think so.  Yes.  I believe I did.

24       Q    Actually, Mr. Palmer, I'd like you to look

25   at Exhibit Number 7.  This is the text messages.

Page 173

```
 1        A     Okay.
 2        Q     You'll agree with me that, on September the
 3   5th of 2022, Mr. Dawson texted you about the
 4   declaration?
 5        A     Yes.
 6        Q     Did he not ask for your thoughts on the
 7   contents of the declaration in this text?
 8        A     No.  He asked me what -- what's on here.
 9   I -- when I got it, I kind of stuck it aside.  Didn't
10   give it a second thought.  Then he texted me this, so
11   I -- "Oh, okay," just signed it, sent it back to him.
12                    MR. MILLER:  Objection.  Non-
13   responsive.
14   BY MR. MILLER:
15        Q     In this text from September the 5th of 2022
16   at 4:20 to you from Mr. Dawson, does Mr. Dawson not
17   ask you if you had any thoughts on the declaration he
18   had sent you?
19        A     What date again?
20        Q     September the 5th of 2022 at the top.
21        A     No -- no, he did.  No, it's in the text.
22   Yes.
23        Q     Right.  He asked you for your thoughts about
24   the declaration?
25        A     Right.  And --
```

Page 174

1      Q     Your response was --

2      A     No response.

3      Q     Well, let's look down.

4      A     Well, "It's on the way.  Typo page 1."  Yes.

5      Q     Let me get my question out.

6      A     Oh, sorry.

7      Q     In response to that text, the next day is

8   September the 6th of 2022 at 8:46 in the morning, your

9   response was:  "It's on the way.  One type on page 1";

10  correct?

11     A     Correct.

12     Q     And he responds to you, "Thank you," next

13  page; true?

14     A     Correct.

15     Q     So not even in this text message, outside of

16  telling him that there was a type, did you tell

17  Mr. Dawson there was anything untrue or false or

18  inconsistent in the declaration?

19     A     Correct.

20     Q     When did you first learn that you signed

21  something that you testified today was essentially a

22  hundred percent not true?

23     A     When I got the subpoena.

24     Q     And when was that?

25     A     I don't know.  What's the day of the

Page 175

1    subpoena?  Where's the delivered copy.  It's in here

2    somewhere.  Oh, here it is.  February 1, '24.

3        Q    Was that the first day, February the 1st of

4    2024 when you got that subpoena, that you realized

5    that you signed something that was, essentially,

6    completely untrue?

7                    MR. CHESTER:  Objection.  Asked and

8    answered.

9                    THE WITNESS:  And I would say yes.

10   BY MR. MILLER:

11       Q    At no point prior to February the 1st of

12   2024, did you know that you signed something that

13   you're saying now was completely untrue?

14       A    Correct.

15       Q    Let's look at Exhibit Number 10.  You've

16   testified previously today that you understand the

17   ramifications of perjury?

18       A    Yes.

19       Q    And you understood that you were signing the

20   declaration that we've looked at under the penalty of

21   perjury?

22       A    Yes.

23       Q    And according to your testimony today, for

24   the first time ever on February 1st of 2024, you

25   learned that you had committed perjury?

                                      Page 176

1      A     Yes.

2      Q     But you wait 20 days to send Mr. Dawson an

3   email asking for your original document --

4      A     Yes.  Yeah.  I -- I tried to find it.  I

5   tried to find it, couldn't find it.  So yeah.  So

6   yeah.

7      Q     Did you call Mr. Dawson when you realized

8   that you signed something that was completely untrue?

9      A     I don't know.

10      Q     Well, we can --

11      A     I -- I can look.  No, I did not call.  I

12   don't -- I don't have his phone number.

13      Q     Did you call anyone, reach out to anyone

14   between February 1, 2024, when you realized you signed

15   something that was untrue and committed perjury, and

16   when you sent this email to Mr. Dawson on February

17   21st of 2024?

18      A     No, I didn't call anyone?

19      Q     Didn't call anybody?

20      A     I didn't contact -- yeah.  No.

21      Q     Knowing that you had committed perjury?

22      A     Correct.

23      Q     In the email that you sent to Mr. Dawson on

24   February the 21st of 2024, you don't tell him in there

25   that he took liberty with your declaration.  Do you?

                                            Page 177

1      A     No.

2      Q     Is there anything in writing to anyone where

3 you allege that Kelly Dawson essentially drafted a

4 declaration that was a hundred percent untrue, and you

5 just signed it and didn't even care to look at it?

6      A     There's nothing in writing.  No.

7      Q     Who's the first person you told after

8 February 1st of 2024 that you essentially committed

9 perjury?

10      A     Don't know that I've told anyone.

11      Q     Outside of an email from you to Mr. Dawson

12 some point in late 2021 with your original write-up

13 that you prepared, are you aware of any other emails

14 exchanged between you and Mr. Dawson related to any

15 affidavits or declarations other than what we see in

16 the exhibits we just looked at?

17      A     No.

18      Q     Has anybody threatened you to change your

19 testimony from your declaration?

20      A     No.

21      Q     Has anybody promised you anything if you

22 will change your testimony?

23      A     No.

24      Q     Has anybody threatened to sue you for

25 defamation, libel, slander, anything like that related

Page 178

1    to the declaration that you signed in September of

2    2022?

3         A    No.

4         Q    Back in September 2022 when you signed that

5    declaration, were you trying to hurt Mr. Ellis in some

6    way?

7         A    No.

8         Q    What was the issue between you and Mr. Ellis

9    in your relationship?  Why weren't y'all on good terms

10   when you --

11              MR. CHESTER:  Objection.  Asked and

12   answered.

13   BY MR. MILLER:

14        Q    Why weren't y'all on good terms when you

15   left?

16        A    We were just different personalities.

17        Q    There's nothing outside of you guys just

18   have different personalities?

19        A    No.  No, nothing else outside of that.

20        Q    Yeah, let me take it back from you,

21   Mr. Palmer.  I'm going to mark it as an exhibit.  I'll

22   give you that one.

23        A    Thank you.

24              MR. MILLER:  I'm not going to mark that

25   first page.  I'm actually going to remove that first

1    page.

2    BY MR. MILLER:

3        Q    Mr. Palmer, let me hand you what I've marked

4    as Exhibit Number 12.

5                    (Exhibit 12 was marked for

6                    identification.)

7        A    Okay.

8        Q    I'm going to give you time to read whatever

9    you need to do.  But just generally looking at this

10   document, is this something you've ever seen before?

11       A    I think I've seen this.

12       Q    Is this the service agreement between LN

13   Professional Management and Allied Lab Solutions

14   Management?

15       A    Yes.

16       Q    Is this something that you reviewed when you

17   set up the spreadsheets we discussed earlier?

18       A    I believe it is.  I'm looking for the --

19       Q    Feel free to read as much as you want, but

20   if you go to the last page, that may be the portion

21   you're looking for.

22       A    Thank you.  This just -- the rest is just

23   outlining rights and responsibilities basically.

24       Q    With respect to Exhibit 12 --

25       A    Yes.  Okay.  Let me see.

                                        Page 180

1    Q    -- when you prepared the spreadsheets -- or

2    I guess, let me ask it this way.  When you prepared

3    the initial spreadsheet with the baked-in formulas,

4    did you utilize Exhibit B from Exhibit 12, at least

5    part, in doing the calculations?

6    A    Yeah, I -- okay.  Go ahead.  What was the

7    question?

8    Q    Did you utilize this document, Exhibit B to

9    Exhibit --

10   A    In part.  Yeah, in part --

11   Q    And I'm not trying to fuss, but let me

12   finish the question.

13   A    Oh, I'm sorry.  Go ahead.

14   Q    With respect to the spreadsheet we talked

15   about earlier that had the formulas baked in for the

16   revenue share, did you utilize Exhibit B in part in

17   creating those formulas?

18   A    Yes.

19   Q    Okay.  What portion of this Exhibit B was

20   baked into the Excel spreadsheet?

21   A    Well, it would the 40 percent of net

22   collected revenues and the second paragraph, minus the

23   aggregate cost -- aggregate of cost of goods sold.

24   Q    All right.  Let's --

25   A    And that was fleshed out.  It was fleshed

                                              Page 181

1    out, I think, by Lewis and Clay.  So what -- what that

2    actually meant.

3        Q    When you say it was fleshed or that was

4    fleshed out by Lewis and Clay as to what that meant,

5    what are you talking about?

6        A    Well, here, it -- it just -- it says, "Minus

7    the aggregate of cost of goods sold -- of cost of

8    goods sold of such services and products."  That

9    basically was the beginning of, "Okay, well, what's --

10   what's our cost of good, our overhead?"

11       Q    So when you say that's something Clay and

12   Lewis hashed out, you're referring to the cost of

13   goods sold?

14       A    Yes.  And I believe in the -- I've been

15   calling it overhead.  Yeah.

16       Q    So in your spreadsheet, what you're terming

17   as overhead, it's your understanding that is referring

18   to cost of goods sold?

19       A    I believe so.  Yes.

20       Q    Okay.  And with respect to cost of goods

21   sold, we're looking at things like you described

22   earlier, rent, utilities?

23       A    Rent, utilities, cost of couriers would

24   probably be included.  And again, I don't know whether

25   or not payroll was included.  I don't know.

Page 182

1      Q    Is there any other document or agreement

2   that further defines cost of goods sold?

3      A    Not that I'm aware of.

4      Q    When you say Clay and Lewis "hashed it out,"

5   you're saying they, themselves, determined what would

6   be included in the cost of goods sold?

7      A    Well, when they fleshed it out, we just --

8   we got together and this was what -- this is what, you

9   know -- Lewis understands what -- what, you know,

10   the -- the details of the agreement.  And so he

11   relayed that to me.

12      Q    Okay.  And I guess however they defined it,

13   it didn't really matter, because after a few months,

14   you guys determined what the "cost of goods sold"

15   would be, and that amount was the overhead amount?

16      A    Yes.  Yes.  Yeah, that -- that's fair.

17   Yeah.

18      Q    Okay.  And so in other words, the "cost of

19   goods sold," based on your own testimony and how this

20   spreadsheet worked, didn't fluctuate based on the

21   number of tests evaluated, because it was a fixed

22   price?

23      A    Well, and most of our costs were fixed.

24      Q    So you'll agree with me?  In other words,

25   you guys were able to use a fixed overhead number in

Page 183

1   this Excel spreadsheet because you guys realized what

2   those costs of goods sold over time were going to be

3   didn't fluctuate based on the number of tests

4   performed?

5        A    Correct.  Our costs were fixed.  We did --

6   we didn't have to hire more people because we had more

7   samples.  Same number of people.  Same number in the

8   billing department.  Everything, you know, was just --

9        Q    Now with respect to other items included --

10  strike that.  With respect to other information that

11  was baked into the formula, distributions to Allied

12  and their shareholders, where'd you get that

13  information?

14       A    Well, distribution, as it says here, was to

15  be 40 percent -- 40 percent of the net collected

16  revenues.

17       Q    So you just knew based on this that 40

18  percent of the net collected revenues were going to go

19  to Allied?

20       A    Correct.  Yeah.

21       Q    Did you have any involvement in deciding how

22  that 40 percent was then divided among the various

23  Allied shareholders?

24       A    No.

25       Q    Did your spreadsheet that we're talking

Page 184

1    about, the monthly ones that you did every month, did

2    it specify how much of the 40 percent net collected

3    revenues that went to Allied, how it was divided among

4    the Allied shareholders?

5        A    No.  It was -- again, I cut a check to

6    Allied, and --

7        Q    What Allied did with the money after it got

8    it, you weren't involved in that?

9        A    Correct.  Yeah.

10       Q    In other words, you didn't prepare

11   spreadsheets about how Allied divided its funds once

12   it got its 40 percent?

13       A    Maybe.  Because I don't remember who all was

14   involved in Allied.  On some of them, it was just --

15   just one entity.  On some of them, it was -- it was

16   different doctor groups.  And three or four doctor

17   groups could be included in one of the entities.  And

18   they would have -- and they would have that level of

19   detail.

20       Q    When you say included in one of the

21   entities, are you referring to one of the LN partner

22   entities or one of the Allied shareholders?

23       A    Well, one -- you know, Allied -- like I

24   said, we wrote half a dozen checks.  And some of them

25   had -- had granularity at the doctor level.  And I

Page 185

1    think some of them were just aggregated.

2        Q    Not to beat a dead horse, but on the

3    spreadsheets that you were preparing, did it further

4    break down that 40 percent that went to Allied to the

5    various Allied shareholders?

6        A    The check would not.  The check would go to

7    Allied, and it would be -- and with it, there was an

8    associated breakdown for Allied to do what they do.

9        Q    Understood.  But that spreadsheet that went

10   with the 40 percent check that was a single check,

11   that spreadsheet that went with it, those formulas as

12   to how that 40 percent was broken down was baked into

13   that spreadsheet already?

14       A    Yes.  Yes.

15       Q    Mr. Palmer, I'm going to mark as Exhibit

16   13 --

17       A    Anybody got a paper clip?

18       Q    I can get you one.  Why don't you throw that

19   on there.

20       A    Yeah.  Sure.

21            MR. MILLER:  One for each of you.

22            MR. CHESTER:  Thank you.

23   BY MR. MILLER:

24       Q    All right, Mr. Palmer, let me hand you

25   Exhibit Number 13.  There's a variety of spreadsheet

Page 186

1   looking documents in here.  Looking at the first page

2   here at the top, it says, "Allied One June Collection

3   Activity."  Was this the spreadsheet that you were

4   preparing, or was this done by somebody else?

5                    (Exhibit 13 was marked for

6                    identification.)

7        A    I prepared this.

8        Q    Okay.  And where is the breakdown to the

9   particular shareholders of Allied?  Is that on the

10  next page?

11       A    I don't know.  Let's see.  It appears to be.

12  Yes.

13       Q    Okay.  Was this a single spreadsheet that we

14  see here over two pages?

15       A    This is what -- the spreadsheet monster

16  thing, it just -- this is the summary of it.

17       Q    All right.  And actually, it looks like it

18  may be over the first three pages, at least for the

19  June collection activity.  Would you agree with me on

20  that?

21       A    This -- this isn't familiar to me.

22       Q    And when you say "this," if you look down at

23  the bottom right --

24       A    Oh, I'm sorry.  Page 2.

25       Q    It's all right.  When you look down at the

Page 187

1    bottom right, there will be a number --

2         A    2.

3         Q    2?

4         A    2.

5         Q    Defendants 2, that's not familiar to you?

6         A    I don't remember this.

7         Q    Is that something you prepared ever?

8         A    I don't think -- no.  No.

9         Q    Well, let's clarify.  So we're looking at

10   Exhibit Number 13, looking at the first page of this

11   exhibit, "June Collection Activity."  That looks like

12   something you would prepare.  Did I understand your

13   testimony correct?

14        A    Yes.  Yes.

15        Q    Looking at the second page, "Allied One,"

16   it's got a list of various partners.  That does not

17   look like something you would prepare?

18        A    No.

19        Q    All right.  Let's look back to page number

20   1, Exhibit Number 13.  We see under "June activity

21   totals," we see a bunch of description and a bunch of

22   numbers.  What is all that referring to, "Total new

23   cases, collected cases, average collection"?

24        A    These are cases that -- that we picked up

25   from -- picked up from the doctor's offices.  And then

Page 188

1    404 would be the collected cases.

2         Q    Okay.  So tell me the distinction between

3    "Total new cases received by billing department" and

4    "Collected cases."

5         A    Well, you might have a -- you might pick up

6    a blood sample in January and get paid for it in

7    March.

8         Q    All right.  So what this is referring to is,

9    in June of unnamed year -- I don't see it anywhere --

10   there was a total of new cases, in other words, new

11   samples received, of 593.  Is that the way to

12   interpret it?

13        A    Yes.

14        Q    With respect to collected cases, that means

15   cases that were actually paid?

16        A    Yes.

17        Q    In other words, the hospital that was doing

18   the testing got paid by the insurance carrier, and

19   then the hospital that did the testing paid MMP?

20        A    Yes.

21        Q    All right.  And then the average collection

22   per case, what does that mean?

23        A    Well, four oh -- it's just the average

24   collection on the 404 was $2,873.45.

25        Q    All right.  So you take the total number

Page 189

1    received from the hospital over the number of cases

2    that you were paid for, and you get an average?

3         A    Yes.  Yeah.  Just an average.

4         Q    And tell me what the "Average billed amount

5    per case" means?

6         A    That's what -- what insurance would've been

7    billed for that test.

8         Q    And then what's the "Patient responsibility

9    case"?

10        A    Some of these -- sometimes they had -- they

11   had a patient -- a copay kind of thing.

12        Q    All right.  And so is the difference between

13   "Average collection case" and "Average billed case"

14   just the difference between what an insurance company

15   is willing to pay versus what it's charged by the

16   hospital?

17        A    Yes.

18        Q    "Gross income total," what is that referring

19   to?

20        A    Well, gross income -- look at all, would be

21   404 times $2,873.45.

22        Q    So was that the amount of money based on

23   those collected cases that MMP would have received

24   from the hospitals?

25        A    Yes.

Page 190

1      Q    Does this refer to all the hospitals that

2  were doing the testing in aggregate or is it broken

3  down by hospital?

4      A    It would've been aggregate.

5      Q    "Expenses, lab cost," what is that?

6      A    That's our -- what the hospitals charged us.

7      Q    Explain that to me.  What does that mean?

8      A    Well, we send them -- we send the -- the

9  labs -- or the samples to the labs -- the hospitals,

10  and they charge us X amount and send them that amount.

11      Q    Okay.  So the gross income, the 1,160,000

12  number we see, if I understand what you're saying,

13  that's not what MMP or LN received from the hospitals?

14      A    Correct.  That's correct.

15      Q    That was the total revenue that the hospital

16  got, and they sent you that amount less its lab costs?

17      A    Yeah, I think that's correct.

18      Q    Okay.  Was there some sort of itemization or

19  any sort of documentation that you would get from the

20  hospitals to substantiate what the lab costs were?

21      A     It -- it came with -- yeah.  I forget what

22  form it -- I mean, it came with the check.  And I

23  forget exactly what it looked like.  But yeah.

24      Q    Okay.  So in other words, you'd get

25  something -- and I'm simplifying -- from, let's say,

Page 191

1    Knox County Hospital that says, "Here's your $100 for

2    your five collected cases, but we had $20 in expenses,

3    so you're only getting 100 of the 120 collected"?

4         A    Yes.  Yes.

5         Q    Okay.  And that was with every check that

6    you guys got from the hospitals?

7         A    I believe so.  Yeah.

8         Q    All right.  "Net income before

9    distribution," is that just the delta between gross

10   income and lab costs?

11        A    Yes.

12        Q    "Gross distributable income at 40 percent,"

13   is that $385,000 40 percent of the net income before

14   distribution?

15        A    Yes.

16        Q    And that's how much would be transferred

17   before any other expenses to Allied?

18        A    Well, there's a management fee and a Texas

19   franchise holdback, but --

20        Q    Okay.  Let's talk about those.

21        A    And I'm --

22        Q    So you would calculate the 40 percent gross

23   distributable to Allied based on the net income before

24   distribution; correct?

25        A    One more time, please?

                                        Page 192

1       Q     Sure.  The 40 percent number is based on the

2    net income before distribution?  Take the number --

3       A     Yes.  Yes.

4       Q     Take that number, multiply it by 40 percent?

5       A     By 40.  Yeah.

6       Q     But before you cut any check to Allied, are

7    you saying there was some additional monies withheld?

8       A     Well, there's the management fee and the

9    Texas franchise holdback.  That management fee might

10   be the allocable overhead.

11      Q     All right.  Let me ask you the question.

12   With respect to the management fee, do you know what

13   that is?

14      A     That might be our allocable overhead.

15      Q     Was Mr. Ellis not getting a 1 percent amount

16   from the net income before distribution for his

17   involvement in this?  Is that not what that management

18   fee refers to?

19      A     Well, it -- it could be.

20      Q     You don't know?

21      A     I don't know.

22      Q     Well, who put in the management fee amount?

23      A     Oh, I probably would have.

24      Q     Well, is that a formula or do you know?

25      A     Well, it -- on this, it appears to be a

                                                      Page 193

1     formula, 1 percent.

2          Q     In the service agreement, did you see

3     anything in there about a management fee, 1 percent?

4          A     I didn't see one.  No.

5          Q     Where did that come from?

6          A     I don't know.

7          Q     You didn't put it in there?

8          A     I would've been told to put it in there?

9          Q     By whom?

10         A     Probably Clay.  I don't know.

11         Q     Tell me about the Texas franchise tax

12    holdback.  What is that?

13         A     We were subject to franchise tax.  And I

14    don't even remember anything about the franchise tax

15    holdback.  This must've been a later year.

16         Q     On any --

17         A     But anyway, no, I -- I don't know.

18         Q     On any reports that you prepared,

19    spreadsheets that you prepared, did you have a Texas

20    franchise tax holdback?

21         A     No.  We were accruing what we were going to

22    owe.

23         Q     So you never held back $5,000 from any

24    period during your tenure of completing these reports?

25         A     Well, I mean, I probably prepared this.  So

                                             Page 194

1    I did it here.  But I can't tell you the origins of it

2    or anything like that.

3         Q    The $5,000, was that something done every

4    month?

5         A    No.  No.  I don't think it was.

6         Q    Why was it done in June of whatever year

7    this is versus any other month?

8         A    I can't say for sure, but I would suspect we

9    had just filed our Texas franchise tax, and were

10   trying to recoup some -- some of the money from that.

11        Q    The "Net distributable income amount," is

12   that the amount that was distributed to Allied?

13        A    Yes.

14        Q    Okay.  I did not see on here anywhere

15   overhead that we discussed earlier.

16        A    I don't either.  Except say it could be

17   included in the lab cost.

18        Q    Let me make sure I understand.  What you're

19   saying is lab cost may refer to monies that the

20   hospital kept for their expenses in addition to --

21        A    Our overhead.

22        Q    -- a fixed amount of overhead that LN was

23   keeping monthly?

24        A    Correct.  Correct.

25        Q    And there would be documentation of all

                                        Page 195

1    this, so we can see on a granular level how much was

2    hospital lab cost versus how much was LN overhead?

3          A    Yes.  I'm sure there are.

4          Q    All right.  The next page, I understood you

5    to say that you didn't have any involvement in

6    preparing that; true?

7          A    Correct.

8          Q    The fourth page looks like a funds transfer

9    to IBC Bank, I guess, in the amount of $376, and that

10   matches the net distributable amount we saw on the

11   first page; true?

12         A    Correct.

13         Q    Okay.  And IBC Bank, do you know who that

14   belonged to?  Was that Allied Solution Management's

15   account?  Or do you know?

16         A    Well, looks like this was from -- well, this

17   says -- this says it's coming from Allied Lab

18   Solutions Management.

19         Q    Okay.  Let's go to page 7 of Exhibit Number

20   13.

21         A    Okay.

22         Q    We have similar information as we do on page

23   1 of Exhibit Number 13.  Do we not?

24         A    Yes.

25         Q    Okay.  I mean, we got "Total new cases,

                                              Page 196

1    collected cases," and the averages; right?

2        A    Correct.

3        Q    Under "Gross income," we see "Collections,"

4    but this time we see "Sum of prior month insurance

5    adjustments."  Now I know this is December 2018 and

6    you were no longer there.  Do you have any idea what

7    "Sum of prior month insurance adjustments means"?

8        A    It could be claw-backs from the insurance

9    companies.

10       Q    Explain what that means.

11       A    I'm no -- I'm no insurance expert.  But

12   basically, you know, they pay you $100 and then

13   decide, "Well, we overpaid you 20," and they're

14   clawing back 20.  Something along those lines.

15       Q    Now would those be claw-backs of money that

16   LN had in its possession that the hospital was asking

17   back?

18       A    I don't know.

19       Q    Okay.  Well, did you ever have this "Sum of

20   prior month insurance adjustments" on any spreadsheets

21   that you created?

22       A    I don't remember any.

23       Q    I know you don't remember.  But if you did,

24   where would you have gotten the information to put

25   there?

Page 197

1      A    I would -- I would think from billing

2  somehow.  Yeah.

3      Q    I didn.t hear you?  From where?

4      A    I would think from billing -- the billing

5  department somehow.

6      Q    Let's go to -- I'm just picking one randomly

7  here.  Let's go to the next page, page 8.

8      A    Okay.

9      Q    This time at the top right, under "Allied

10  One," it says, "CPRX."  If you look at the next page,

11  it says, "VCM."  "VWL" on the next page, page 10.  Do

12  you have any idea what that means?

13      A    I think VCM is Victory Medical.

14      Q    And how about VWL?

15      A    I don't know.

16      Q    Okay.  And I get it, this was outside of

17  your tenure at LN, but on any of the spreadsheets that

18  you had, did you have those acronyms or letters at the

19  top of any your spreadsheets like that?

20      A    I don't think so.

21      Q    All right.  If you'll turn to page 34.

22      A    Could've told me last page.

23      Q    Oh, I didn't realize it was the last page.

24  I apologize.

25      A    All right.  Okay.

Veritext Legal Solutions
800-336-4000

1      Q    All right.  You see at the top it says,

2    "Allied distribution reports will come to you via

3    email from Larry Palmer."

4      A    I see it.

5      Q    And your email address is Larry --

6      A    There -- there it is.  Larry at medical

7    management.  Yeah.

8      Q    Okay.  So what does that mean, "Allied

9    distribution reports will come to you via email from

10   Larry"?

11     A    The distribution reports were done as part

12   of this spreadsheet, and to divide it up -- this is

13   Allied.  It would divide up the different Allied

14   components, shareholders, their -- their part.  And --

15   and the sum total, if -- if we were talking about

16   June, the sum total of all the -- of all the different

17   distribution reports would tie back to that.

18     Q    Are you saying that these distribution

19   reports are things that we see on pages 1, 2, and 3 of

20   this exhibit?  Is that what it's referring to?

21     A    I don't know about this middle page, but

22   it's -- it was all part of the same spreadsheet.

23     Q    Okay.  Fair enough.  But I understand you to

24   say that, at least with respect to page 2 of this

25   Exhibit, Number 13, you didn't have anything to do

Page 199

1    with the printing of that?

2         A    Man, this is just not ringing a bell at all.

3         Q    Okay.  All right.  Let's go back to page 34.

4    I don't want to call it a paragraph, but the kind of

5    next separated line is, "These are the numbers you

6    will use to plug into each of the MSO spreadsheets:

7    Allied One, Allied Two, et cetera."  What's that mean?

8         A    I forget what MSOs are.

9         Q    Are they the service organizations?

10        A    I -- okay.

11        Q    I'm --

12        A    Yeah.  I -- I know -- medical service

13   organization.  Probably.

14        Q    The MSO spreadsheets, are those the

15   spreadsheets that we've been looking at, if you know?

16        A    Well, I mean, I -- I did -- I did my

17   spreadsheets for Allied One, Allied Two, so.

18        Q    And as far as you know, those are the MSO

19   spreadsheets?

20        A    I think so.  Yeah.

21        Q    It's really hard to read.  But the last sort

22   of paragraph is there.  It says, "EROO Management."

23   Have you ever heard of that company?

24        A    I'm looking for it.

25        Q    It's very, very bottom.  Well, not the very

Page 200

1   bottom, but it's --

2        A    Okay.  Oh, that.  I didn't see that at all.

3   I don't know what that's referring to.

4        Q    What is EROO --

5        A    E-R -- I don't -- I don't remember.  It says

6   that -- it says it's entitled to a 10,000 a month

7   management fee.  Is that what it says?

8        Q    Let me read it.  It says, "EROO," -- I'm

9   going to pronounce it EROO -- "Management is entitled

10  to $10,000 per month management fee to be paid out of

11  the main Allied Management account."  Is EROO

12  Management, do you know if that's Clay Ellis's

13  company?

14       A    I don't remember EROO.

15       Q    Was Clay Ellis in any of your review of the

16  agreements supposed to receive a $10,000 per month

17  management fee?

18       A    I don't remember anything about that.

19       Q    It goes on to say, "The check may be

20  combined in the same envelope with Max Total Health

21  checks and delivered to Clay or Rachel Ellis."  Do you

22  know who Rachel Ellis is?

23       A    That's Clay's wife.

24       Q    What is Max Total Health?

25       A    Max Total, I think -- Max Total Health, I

Page 201

1     think, had to do with the operation in Corpus Christi.

2     I think.   Yeah.

3          Q     And so do you know why Clay or his wife was

4     being delivered, at least according to that page, a

5     $10,000 per month management fee for EROO Management?

6          A     Well, he was -- well, it reads as though

7     that's basically an admin fee for -- an admin fee, you

8     know, of some sort.

9          Q     For doing what?

10         A     Well, he took care -- Clay's -- he was --

11    Clay's -- I think it was Clay's clinic, and they had a

12    doctor there.   But the doctor didn't do, you know,

13    anything besides doctor.

14         Q     Okay.   On this Allied One document where

15    it's talking about the distributions on the MSOs, if

16    you know, why is this directing somebody to give Clay

17    or Rachel Ellis a $10,000 per month management fee?

18         A     I don't know.

19         Q     Are you aware of any agreements, papers,

20    writings, or otherwise, where anyone has agreed that

21    Clay Ellis or EROO Management is entitled to a $10,000

22    per month management fee?

23         A     I'm not aware of anything.

24         Q     Do you know if EROO Management or Clay Ellis

25    or Rachel Ellis was getting a $10,000 per month

                                          Page 202

1    management fee at any point in time?

2        A    I'm not aware of any of that.

3        Q    Mr. Ellis, was he an employee of LN?

4        A    Yes.

5        Q    Did he receive, to your knowledge, a salary

6    through LN?

7        A    Yes.  Yes.

8        Q    Was he a W-2 employee of LN?

9        A    Yes.

10        Q    Was MJ Cortez an employee of LN?

11        A    Yes.

12        Q    In addition to a partner?

13        A    Yes.

14        Q    Lewis Nichols, was he also an employee of

15    LN?

16        A    Yes.

17        Q    And all three of those individuals received

18    W-2s?

19        A    All salaried.  Yes.

20        Q    Do you know anything about the transfer of

21    management of Allied Lab Solutions Management from

22    Clay Ellis to JP Forage?

23        A    Ask me that again, please.

24        Q    Sure.  At one point in time, management of

25    Allied Solutions Management, Inc., was transferred

Page 203

1    from Mr. Ellis to JP Forage.  Do you know anything

2    about that?

3         A    No.

4         Q    Did you even know that before I just

5    mentioned it to you?

6         A    No.

7         Q    Never heard of that before?

8         A    No.  I can't remember that at all.

9         Q    Did MMP ever pay, to your knowledge, EROO

10   Management?

11        A    I don't remember.

12        Q    Are you aware of any agreements between EROO

13   Management and MMP whereby EROO Management was

14   entitled to some form of payment?

15        A    I don't remember.

16        Q    Have you ever met JP Forage?

17        A    Yes.  I met him a couple of times.  He came

18   by the office a couple of times.  And I -- and we had

19   a Christmas party one year.  I think he was there.

20        Q    Outside of those meetings at the office

21   while you were an employee, have you talked with or

22   met with JP Forage?

23        A    No.

24        Q    Have you ever been told why Clay Ellis left

25   Allied Management?

1        A     No.

2                    MR. MILLER:  All right.  Let's take a

3     five-minute break.

4                    THE VIDEOGRAPHER:  The time is 3:40,

5     and we are now off the record.

6                    (Off the record.)

7                    THE VIDEOGRAPHER:  We're back on the

8     record.  The time is 3:48.

9     BY MR. MILLER:

10        Q     Mr. Palmer, are you ready to continue?

11        A     Yes.

12        Q     Got a few more questions just to close up

13     here for today.

14        A     Okay.

15        Q     You talked about a clinic in Corpus that

16     Clay had some involvement in.  Can you tell me about

17     that?

18        A     I don't know a lot of details.  I think -- I

19     think Clay owned the building that the doctor

20     practiced out of.  That's -- yeah.  And -- and then

21     took care of the office, you know -- you know, I'd say

22     the doctor was there, and everything else was handled,

23     you know -- the facility and all that was handled, I

24     think, by Clay.

25        Q     In the --

                                          Page 205

1       A      But I -- you know, I've never been there.

2    I've never, you know -- I didn't do any books for it

3    or anything.

4       Q      In the declaration, which I believe is

5    Exhibit Number 5 if you need to look at it, on the

6    first page, paragraph three, there was a discussion

7    about MJ Cortez getting 10 percent of a certain money.

8    And then Clay Ellis, you know, would get 90 percent of

9    that money after the fact.  Do you recall any

10   discussions about that?

11      A      Yeah, well, when we made partner

12   distributions, it would be distributed to MJ as a

13   partner, and MJ -- and then MJ turned over 90 percent

14   of that to Clay.

15      Q      Do you know why?

16      A      Services rendered.

17      Q      Related to what?

18      A      The operation of the -- the partners

19   company.

20      Q      Operation of LN?

21      A      No, operation of MJC whatever it was.

22      Q      Okay.  MJCX Professional Services?

23      A      Yeah, professional services.  Yeah.

24      Q      What role, if you know, did Clay Ellis have

25   in that company?

                                              Page 206

1      A      I don't know.

2      Q      But regardless, from the partner

3  distributions out of LN, it went to MJCX Professional

4  Services, and then 90 percent of that amount went to

5  Clay Ellis, as you understood it?

6      A      Yes.

7      Q      But you don't know what the relationship was

8  specifically?

9      A      No.  No, I don't know specifically.

10      Q      Let me hand you Exhibit Number 14.  These

11  are screenshots of text messages between you and Clay

12  Ellis.  Did you search for text messages like this

13  prior to today?

14                    (Exhibit 14 was marked for

15                    identification.)

16      A      I -- I did while I was sitting here.  Prior

17  to today, no.

18      Q      Did you and Clay Ellis routinely text

19  related to LN business?

20      A      Yes.

21      Q      I mean, because we see it here on the first

22  page.  We have the texts from December 2017.

23      A      Which side is me and which side -- are these

24  the green Clay or the green me?

25      Q      I believe the green is you.

                                        Page 207

1     A     Okay.

2     Q     And it looks like this span of text messages

3  go all the way through last page of October 2018.  I'm

4  going to correct it, I think.  I just made a mistake.

5  Let me correct something, Mr. Palmer.  The green, I

6  believe, is Mr. Ellis.  The black, I believe, in the

7  text message thread is you.

8     A     Okay.

9     Q     We have text messages, you'll see on the

10  first page, from December of 2017 and then it goes

11  through, on the last page, October 4th of 2018.  Do

12  you see that?

13     A     I don't -- oh, yeah.  Yeah.  I see the

14  dates.  Go ahead.  Yeah.  That's correct.

15     Q     And as of October 4th of 2018, I'm guessing

16  based on these text messages, you were still employed

17  by LN?

18     A     Correct.

19     Q     Are there any text messages that were

20  exchanged between you and Mr. Ellis after October 4th

21  of 2018?

22     A     No.  Not -- not to my knowledge.

23     Q     Would you say that you and Mr. Ellis, during

24  your employment, texted on a daily basis?

25     A     Wasn't necessarily daily, but as -- as

Page 208

1   necessary.

2        Q    Could you give me any sort of frequency with

3   respect to your texts back and forth?

4        A    Not really.  No, it -- there wasn't -- it

5   wasn't a daily thing by any stretch.

6        Q    Why are there no text messages between you

7   and Mr. Ellis after October the 4th of 2018?

8        A    Well, I left there shortly -- that's about

9   the time I was terminated.

10       Q    And so phone records wouldn't show any text

11  messages between you and Mr. Ellis after October the

12  4th of 2018?

13       A    Mine do not.

14            MR. CHESTER:  No Merry Christmas?  No

15  nothing?

16            THE WITNESS:  Nothing.  No.

17            MR. CHESTER:  What number was that?

18            THE WITNESS:  14.

19            MR. MILLER:  14.

20  BY MR. MILLER:

21       Q    Were you a part of any board meetings for LN

22  during your tenure as an employee that you recall?

23       A    We had a partners meeting at a restaurant.

24  That's the only one I can really thing of.  So one.

25  Yes.

                                    Page 209

1       Q    Were you a partner?

2       A    No.  No.

3       Q    As far as you know, were there records kept

4    related to meetings and the like with respect to LN?

5       A    No, I -- I don't think there would be.

6       Q    Do you know anything about Diagnostic

7    Gestalt's departure as a partner from LN?

8       A    No.

9                   MR. MILLER:  All right.  You're going

10   to love and hate this at the same time.  For the

11   purposes of today, I'm done for now.  I'll pass the

12   witness, reserving the right, if we get additional

13   documents, to ask you further questions.  I did just

14   get a message that Zoom logged off.  So I'll pass the

15   witness, but we may need to get that fixed.

16                   THE WITNESS:  An unknown error

17   occurred.

18                   MR. CHESTER:  I'm going to hit join

19   from browser and see what happens.

20                   THE VIDEOGRAPHER:  Is it still plugged

21   into the wall?

22                   THE REPORTER:  Yes.

23                   THE VIDEOGRAPHER:  Okay.  Thank you.

24                   MR. MILLER:  And the power's showing.

25                   THE WITNESS:  It's saying joining

                                            Page 210

1   meeting.  Enter the meeting passcode and --

2                   MR. CHESTER:  Let's spin it and see

3   what happens here.

4                   MR. MILLER:  There we go.

5                   THE WITNESS:  It's back.

6                   THE VIDEOGRAPHER:  Okay.

7                   MR. CHESTER:  I don't see anybody else,

8   but it doesn't matter.

9                   THE VIDEOGRAPHER:  They all logged off

10  maybe.

11                  THE REPORTER:  They probably got kicked

12  out.

13                  MR. MILLER:  Probably got kicked out.

14  I mean --

15                  MR. HOBBS:  Should we go off the record

16  now?

17                  THE VIDEOGRAPHER:  Oh, we're still on

18  the record.  I didn't even realize that.  Thank you.

19                  MR. CHESTER:  Yeah.  You may have to do

20  this, get us --

21                  THE VIDEOGRAPHER:  You want me to go

22  off the record?

23                  MR. CHESTER:  Yeah, let's go off the

24  record.

25                  THE VIDEOGRAPHER:  The time is 3:57 and

                                            Page 211

1    we are now off the record.

2                        (Off the record.)

3                        THE VIDEOGRAPHER:  We're back on the

4    record.  The time is 4:01.

5                            EXAMINATION

6    BY MR. CHESTER:

7        Q    Mr. Palmer, I just have a few follow-up

8    questions.  And I expect there might be some further

9    proceedings regarding the circumstances surrounding

10   your declaration, Exhibit 5.  And so I just want to

11   make sure I have a very clear record on this.  If you

12   think back to this morning when I first got started,

13   you first told me that the first page or page and a

14   half was your words and the rest were not.  Remember

15   that?

16       A    Well, bits and pieces of -- of each -- yeah,

17   of each paragraph.  And yeah.  Yes.

18       Q    Right.  But then when we started going

19   through it, it turns out that basically other than

20   your age and the circumstances of working at LN, that

21   almost none of it was your words, especially about the

22   fraud and the false accounting; right?

23       A    The fraud --

24                        MR. MILLER:  Objection to form.

25   Leading.

1    BY MR. CHESTER:

2          Q    Okay.

3          A    No, the fraud and the skimming.

4          Q    Yeah.  None of that's accurate; right?

5                    MR. MILLER:  Objection.

6                    THE WITNESS:  Correct.

7    BY MR. CHESTER:

8          Q    Okay.  But then when Mr. Miller was asking

9    you, he brought up again at first that maybe the first

10   page, page and a half was correct, but I just want you

11   to say on the record that the testimony you gave me

12   this morning when we went through paragraph by

13   paragraph was accurate.  You stand by that?

14         A    Yes.  I'll have to read the final

15   transcript, but yes.

16         Q    Sure.  Sure.  Good idea.  Now let's look at

17   the draft.  Hold 5 out to the side.  And let's look at

18   the draft, which would probably be either 4 or 6.

19         A    All right.  Let's see.  Here's 6.

20                   MR. HOBBS:  8 or 9.

21                   MR. CHESTER:  8 or 9.  Thank you.

22                   THE WITNESS:  Is this it?

23   BY MR. CHESTER:

24         Q    Let's look at 8.

25         A    Good grief.  Okay.

                                         Page  213

1      Q      Okay.  So set that there and that there.
2   Now looking at 8, this is the one that Kelly Dawson
3   sent you on September 2nd; right?
4      A      Correct.
5      Q      And then Exhibit 5 is the final one that you
6   signed; right?
7      A      Correct.
8      Q      Okay.  Have you compared the two to see any
9   differences?
10     A      No.
11     Q      Okay.  Let me show you a couple.
12     A      All right.
13     Q      If you look at Exhibit 8, in the third
14  paragraph, he says that "Michael John Cortez acted as
15  Clay Ellis's straw man."  Do you see that?
16     A      I do.
17     Q      Is that a word that you would've used?
18     A      No.
19     Q      Okay.  You didn't come up with that word;
20  right?
21     A      No.
22     Q      Okay.  And then --
23     A      I'm not -- I'm not even sure what it means.
24     Q      Okay.  Just don't light a match around it is
25  all I know.  And then when you look at the final

Page 214

1    version that he sent you couple days later, Exhibit 5,

2    he doesn't use the word straw man.  He says, "MJ

3    Cortez acted as Clay Ellis's co-conspirator."  Do you

4    see that?

5          A    I do.

6          Q    And he misspelled co-conspirator, but, you

7    know, that's Mr. Dawson.

8                     MR. MILLER:  Objection.

9    BY MR. CHESTER:

10         Q    Now is co-conspirator a word that you

11   would've used?

12         A    No.

13         Q    Okay.  And did you have any input with

14   Mr. Dawson or whatever other lawyers he was working

15   with to come up with this declaration in changing

16   Exhibit 8 into Exhibit 5?  For example, changing straw

17   man to co-conspirator?

18         A    No.

19         Q    That was all done by the lawyers; right?

20         A    Correct.

21                     MR. MILLER:  Objection.  Leading.

22   BY MR. CHESTER:

23         Q    Was that all done by the lawyers?

24         A    Yes.

25         Q    Okay.  Now I want to look at the last email

                                            Page 215

1    that you sent Mr. Dawson just two weeks ago.  Can you

2    find that one for me?

3        A    I'll give it a shot.  I know it's going to

4    be on the bottom.

5        Q    It's Exhibit 10.

6        A    10.  Yay.  We scored.

7        Q    Always on the bottom.

8        A    Okay.  I have it.

9        Q    Okay.  Now just to recap, Exhibit 10 is an

10   email you sent to Kelly Dawson on February 21st of

11   this year, about two weeks ago; right?

12       A    Correct.

13       Q    Okay.  And it was from you to Kelly Dawson.

14   Nobody was copied; right?

15       A    Correct.

16       Q    But do you see at the top where it says,

17   "John Markham"?

18       A    Okay.

19       Q    Okay.  I'm going to represent to you that it

20   probably says that because Mr. Markham produced this

21   document to me.  And this number down here indicates a

22   Plaintiff's Bates number, which is further indication

23   that Mr. Markham, on behalf of the plaintiffs in this

24   case, produced this document to me.  Okay.  Will you

25   accept that from me?

                                                    Page 216

1      A    Okay.

2      Q    All right.  Now since February 21st, did you

3  send this document to Mr. Markham?

4      A    No.

5      Q    Okay.  So the only people that had it were

6  you and Kelly Dawson; right?

7      A    Correct.

8      Q    So can we safely assume that Mr. Dawson has

9  been in recent contact with Mr. Markham about the

10  subject of your declaration?

11             MR. MILLER:  Objection.  Form.

12             THE WITNESS:  Yes.

13  BY MR. CHESTER:

14      Q    Okay.  Now let's talk about who talked to

15  who and who was going to pay who.  First of all, you

16  and I have never met before today; right?

17      A    Correct.

18      Q    Never talked on the phone; right?

19      A    Right.

20      Q    Never texted, emailed, nothing; right?

21      A    Yup.

22             MR. MILLER:  Leading.

23  BY MR. CHESTER:

24      Q    Okay.  Now Mr. Hobbs first contacted you

25  back in August the first time you got subpoenaed.  Do

Page 217

1    you remember that?

2                    MR. MILLER:  Objection.

3                    THE WITNESS:  Yes.  Yes.  I do.

4    BY MR. CHESTER:

5        Q    Okay.  And didn't you ask him at that time

6    to send you a copy of the declaration?

7        A    Yes, and he did.

8        Q    And he did.  Okay.  And then Mr. Hobbs

9    called you yesterday to make sure you were going to

10   show up; right?

11       A    Correct.

12                    MR. MILLER:  Objection.  Leading.

13   BY MR. CHESTER:

14       Q    Okay.  Other than that, have you and

15   Mr. Hobbs had any conversations?

16       A    I don't think so.

17       Q    Okay.  And neither me nor Mr. Hobbs has ever

18   offered to pay you.  Have we?

19                    MR. MILLER:  Objection.  Leading.

20                    THE WITNESS:  No.  And somebody -- one

21   of these attorneys said I could get reimbursed for

22   time spent.  But I couldn't -- like I say, I didn't

23   even -- I didn't save his number, you know, as a

24   contact or any -- yeah.

25   //

Veritext Legal Solutions
800-336-4000

1    BY MR. CHESTER:

2         Q    Okay.  Was it John Markham?

3         A    I don't know.

4         Q    Okay.  What about Mark Comer [ph]?  Was it

5    Mark Comer [ph]?

6         A    That name doesn't ring a bell.

7         Q    Have you ever spoken to Mark Comer [ph]?

8         A    I don't think so.

9         Q    Okay.  But it had to have been one of the

10   lawyers in this litigation; right?

11        A    I guess.  I mean, yeah.

12                  MR. CHESTER:  All right.  I'll pass the

13   witness.

14                  MR. HOBBS:  I don't have any questions.

15   No more further.

16                       EXAMINATION

17   BY MR. MILLER:

18        Q    Clarification question, Mr. Palmer.  When

19   did you testify you either got an email or some sort

20   of contact from Mr. Hobbs about getting a copy of your

21   declaration?  Was it June, did I hear you say, or did

22   I mishear that?

23        A    It'll be -- I don't -- I don't remember

24   exactly when it was.

25        Q    Okay.  The reason I'm asking is because you

                                          Page 219

1    answered some questions from Mr. Chester about sending

2    or getting an email from Mr. Hobbs related to your

3    declaration.  Do you recall that line of questioning?

4         A    Not exactly.

5         Q    And the reason I'm asking that is because I

6    believe you previously testified the first time you

7    knew you signed something that was untrue was February

8    the 1st of 2024 when you received the subpoena.

9         A    Right.  Right.  Correct.

10        Q    So did you ever get an email from Mr. Hobbs

11   or send an email to Mr. Hobbs related to your

12   declaration back in June, July, or August of last

13   year?

14        A    I got one from him that had the declaration

15   attached to the back.

16        Q    Okay.  So did you know as of that time,

17   June, July, or August of 2023, that you had sworn

18   under oath to something that was untrue?

19        A    No, I didn't know.  I -- I got that and

20   it's:  "Okay, I've got a new date.  Okay.  Good."

21   Yeah.

22        Q    So your testimony to the jury is, you didn't

23   read what was attached to the email that was signed by

24   you at that time?

25        A    Correct.

Page  220

```
 1                    MR. MILLER:  No further questions.

 2                    THE WITNESS:  Okay.

 3                    MR. CHESTER:  None here.

 4                    THE REPORTER:  Mr. Palmer, would you

 5   like to read and -- read and sign, sir?

 6                    THE WITNESS:  Read it now, 160 pages?

 7                    THE REPORTER:  No.  No, not read and

 8   sign.

 9                    MR. CHESTER:  No.  After she types it

10   up.

11                    THE REPORTER:  Would you like to read

12   it --

13                    MR. CHESTER:  She'll send it to you.

14                    THE WITNESS:  Oh, yeah.  Yeah.

15                    THE REPORTER:  Yes.

16                    THE WITNESS:  I don't want to read it

17   right now.

18                    THE REPORTER:  Yes.  Okay.  And would

19   anyone like a copy of the transcript?

20                    MR. CHESTER:  Yes, I would.

21                    MR. MILLER:  Same.

22                    THE REPORTER:  That's mister --

23                    MR. HOBBS:  Same here, please.

24                    THE REPORTER:  Got you.

25                    THE VIDEOGRAPHER:  That concludes the
```

Page 221

1   deposition.   The time is 4:12 p.m. and we are now off

2   the record.

3                        (Signature reserved.)

4                        (Whereupon, at 4:12 p.m., the

5                        proceeding was concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page  222

```
 1                 CERTIFICATE OF DEPOSITION OFFICER
 2                 I, CYNTHIA P. SMITH, the officer before whom
 3      the foregoing proceedings were taken, do hereby
 4      certify that any witness(es) in the foregoing
 5      proceedings, prior to testifying, were duly sworn;
 6      that the proceedings were recorded by me and
 7      thereafter reduced to typewriting by a qualified
 8      transcriptionist; that said digital audio recording of
 9      said proceedings are a true and accurate record to the
10      best of my knowledge, skills, and ability; that I am
11      neither counsel for, related to, nor employed by any
12      of the parties to the action in which this was taken;
13      and, further, that I am not a relative or employee of
14      any counsel or attorney employed by the parties
15      hereto, nor financially or otherwise interested in the
16      outcome of this action.
17                                   CYNTHIA P. SMITH
18                              Notary Public in and for the
19                                   State of Texas
20
21      [X] Review of the transcript was requested.
22
23
24
25
                                                  Page  223
```

1          CERTIFICATE OF TRANSCRIBER

2              I, RONALD MOORE, do hereby certify that this

3    transcript was prepared from the digital audio

4    recording of the foregoing proceeding, that said

5    transcript is a true and accurate record of the

6    proceedings to the best of my knowledge, skills, and

7    ability; that I am neither counsel for, related to,

8    nor employed by any of the parties to the action in

9    which this was taken; and, further, that I am not a

10   relative or employee of any counsel or attorney

11   employed by the parties hereto, nor financially or

12   otherwise interested in the outcome of this action.

13

14

15                              RONALD MOORE

16

17

18

19

20

21

22

23

24

25

                                        Page  224

```
 1   Toth Enterprises II, P.A., Et Al v Forage, Jean-Paul, Et Al

 2   Lawrence  D. Palmer Job No. 6496801

 3                   E R R A T A   S H E E T

 4   PAGE_____ LINE_____ CHANGE_____

 5   _____

 6   REASON_____

 7   PAGE_____ LINE_____ CHANGE_____

 8   _____

 9   REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____  _____

24   Lawrence  D. Palmer                          Date

25

                                              Page 225
```

```
 1   Toth Enterprises II, P.A., Et Al v Forage, Jean-Paul, Et Al
 2   Lawrence  D. Palmer 6496801
 3                 ACKNOWLEDGEMENT OF DEPONENT
 4      I, Lawrence  D. Palmer, do hereby declare that I
 5   have read the foregoing transcript, I have made any
 6   corrections, additions, or changes I deemed necessary as
 7   noted above to be appended hereto, and that the same is
 8   a true, correct and complete transcript of the testimony
 9   given by me.
10
11   _____    _____
12   Lawrence  D. Palmer                      Date
13   *If notary is required
14                      SUBSCRIBED AND SWORN TO BEFORE ME THIS
15                      _____ DAY OF _____, 20____.
16
17
18                      _____
19                      NOTARY PUBLIC
20
21
22
23
24
25
```

Page  226

```
 1    lp.accounting@hotmail.com

 2                            March 11, 2024

 3    Toth Enterprises II, P.A., Et Al v Forage, Jean-Paul, Et Al

 4    DEPOSITION OF: Lawrence  D. Palmer 6496801

 5        The above-referenced witness transcript is

 6    available for read and sign.

 7        Within the applicable timeframe, the witness

 8    should read the testimony to verify its accuracy. If

 9    there are any changes, the witness should note those

10    on the attached Errata Sheet.

11        The witness should sign and notarize the

12    attached Errata pages and return to Veritext at

13    errata-tx@veritext.com.

14        According to applicable rules or agreements, if

15    the witness fails to do so within the time allotted,

16    a certified copy of the transcript may be used as if

17    signed.

18                            Yours,

19                            Veritext Legal Solutions

20

21

22

23

24

25
```

**[& - 2024]**

| **&** | **11** 6:21 73:5,6 | **1s** 19:19,23 | 84:12 86:2 |
|---|---|---|---|
| **&** 1:7 2:5 3:3 | 227:2 | 20:3,18 24:7 | 88:12 98:25 |
| 3:10 4:17 5:6 | **1111** 4:9 | **1st** 176:3,11,24 | 122:18 123:1 |

**&**

**&** 1:7 2:5 3:3 3:10 4:17 5:6

**0**

**00542** 1:16
**04572** 3:21

**1**

**1** 6:11 17:24
18:1 20:11
34:17 35:17
37:2 50:19,24
84:1 175:4,9
176:2 177:14
188:20 193:15
194:1,3 196:23
199:19
**1,160,000**
191:11
**10** 6:20 38:13
38:20 39:2
67:4 111:15
176:15 198:11
206:7 216:5,6
216:9
**10,000** 201:6,10
201:16 202:5
202:17,21,25
**100** 4:18 98:8
111:5 192:1,3
197:12
**101** 87:21
**10:07** 2:4 7:3
**10:08** 7:8

**11** 6:21 73:5,6
227:2
**1111** 4:9
**11:22** 68:20
**11:37** 68:24
**11th** 59:8
**12** 6:22 180:4,5
180:24 181:4
**120** 192:3
**12705** 134:1
**12:02** 90:14
**12:03** 90:18
**13** 6:23 186:16
186:25 187:5
188:10,20
196:20,23
199:25
**13581** 87:20
**13th** 73:11
**14** 6:24 73:11
207:10,14
209:18,19
**1501** 3:12
**16** 16:22
122:13 148:13
**160** 221:6
**17** 148:13
**18** 6:11 148:14
**180** 6:22
**187** 6:23
**19** 6:12
**1985** 14:24
**1:11** 144:16
**1:23** 1:16

**1s** 19:19,23
20:3,18 24:7
**1st** 176:3,11,24
178:8 220:8

**2**

**2** 6:12 18:25
19:2 29:12,24
39:22 40:4
45:2 84:1,20
84:23 85:14
136:10 187:24
188:2,3,4,5
199:19,24
203:8
**2'ed** 36:13
**2,873.45.**
189:24 190:21
**20** 87:5 122:6,7
122:8,8,9
153:1,1 177:2
192:2 197:13
197:14 226:15
**2015** 16:22
86:1 88:4
132:24
**2016** 17:16
18:6 84:1
122:10,12
**2017** 17:16
19:1 84:2
122:11 160:20
207:22 208:10
**2018** 16:22,24
21:22 23:3
25:1 77:11

84:12 86:2
88:12 98:25
122:18 123:1
125:2 126:1
127:2,25 128:5
128:16 134:5
138:20 140:13
197:5 208:3,11
208:15,21
209:7,12
**2019** 21:25
22:5,10 24:14
127:21 160:13
160:18
**2021** 153:19
154:11 157:19
158:21 159:15
178:12
**2022** 34:25
61:12,17
152:15 153:20
156:21,21
157:3 160:10
167:12 170:25
171:14 172:21
173:14 174:3
174:15,20
175:8 179:2,4
**2023** 73:11
220:17
**2024** 2:3 7:3
176:4,12,24
177:14,17,24
178:8 220:8
227:2

Page 1

**[2024.i - 8]**

**2024.i**  7:12
**207**  6:24
**21**  34:19 41:8
   153:1 161:5
**212**  6:6
**219**  6:7
**21st**  67:7
   177:17,24
   216:10 217:2
**22**  6:13 50:8
   52:15,20 54:10
   55:5,14 57:3
   64:16 152:12
   154:12 156:14
   157:25 161:6
**23**  6:14 51:3
**24**  135:19
   176:2
**25554**  223:16
**27**  6:15
**2:16**  144:20
**2nd**  61:11,17
   62:19 64:5,20
   65:22 67:14
   156:20 171:13
   214:3
**2s**  20:5 21:11
   24:10 203:18

**3**

**3**  6:13 22:3,6
   31:6 32:20
   33:22 199:19
**30**  11:13,16
   12:8 14:14
   73:3 86:15

**133**:11,14
**30626**  224:14
**33**  14:14
**34**  198:21
   200:3
**36**  14:15
**376**  196:9
**385,000**  192:13
**3:40**  205:4
**3:48**  205:8
**3:57**  211:25

**4**

**4**  6:14 23:11,15
   27:7 47:22
   213:18
**40**  82:25 85:18
   86:13,18 87:7
   181:21 184:15
   184:15,17,22
   185:2,12 186:4
   186:10,12
   192:12,13,22
   193:1,4,5
**400**  4:9
**404**  189:1,24
   190:21
**435-2371**  4:21
**44**  6:16
**472-0288**  3:16
**495-6000**  4:13
**4:01**  212:4
**4:12**  222:1,4
**4:20**  174:16
**4th**  208:11,15
   208:20 209:7

**209**:12

**5**

**5**  6:15 27:3,4
   47:22 52:15
   69:7 78:6,12
   78:17,22
   167:14,15
   168:12,16
   172:21 206:5
   212:10 213:17
   214:5 215:1,16
**5,000**  21:25
   44:2 126:11,18
   194:23 195:3
**50**  6:17
**512**  3:16 4:13
   4:21 129:18
   130:7
**513**  9:20
**514**  2:6
**523-6329**  3:23
**593**  189:11
**5th**  50:7 52:20
   54:10,23 55:5
   55:13 61:20,21
   65:6 156:21
   174:3,15,20

**6**

**6**  2:3 6:16 7:3
   7:12 34:25
   44:20,23 47:22
   147:8 213:18
   213:19

**61**  6:18
**617**  3:23
**6496801**  2:9
   225:2 226:2
   227:4
**65**  6:19
**67**  6:20
**6th**  4:9 61:21
   61:23 152:15
   153:20 170:25
   173:13 175:8

**7**

**7**  6:17 48:14,20
   48:21 50:2,4
   59:19 156:19
   173:25 196:19
**73**  6:21
**75**  85:13,17,19
   85:23
**75835**  2:7
**75844**  9:21,22
**77**  6:4
**78701**  4:19
**78703**  4:10
**78746**  3:13
**79**  6:5

**8**

**8**  6:18 48:15,20
   48:21 51:3
   61:10,13
   156:20 171:7
   171:12 172:4
   198:7 213:20
   213:21,24

**[8 - adams]**

214:2,13
215:16
**844** 9:23
**8:46** 175:8

**9**

**9** 6:3,19 65:4,7
156:20 171:8
172:20 213:20
213:21
**9/6** 152:9
**90** 38:19 206:8
206:13 207:4
**908** 3:20
**971-2413**
129:18 130:7
**99** 135:18

**a**

**a.m.** 2:4 7:3,8
**a400** 3:12
**abaustin.com**
4:20
**ability** 223:10
224:7
**able** 50:24
143:13 153:20
183:25
**above** 226:7
227:5
**absent** 7:14
**absolutely**
44:13 81:5
138:7 169:10
**abundantly**
84:22

**acadian** 134:1
**accept** 216:25
**access** 95:16
98:20,22
105:19,21
109:13 112:10
112:15 117:7
119:21,23
120:4,13
138:13 140:10
140:12 142:3
**accessed** 150:1
150:4
**accompany**
53:23
**account** 13:2
102:5,13
115:17,20
117:11,12
127:8 141:7
149:15 150:4
150:11,12,21
152:1 163:2,3
171:13 196:15
201:11
**accountant**
14:21 23:5
31:24 33:18
34:21 39:9
41:9 42:21
**accountants**
25:6
**accounted**
166:2

**accounting**
10:23 11:1,12
13:9 14:7,12
14:17 24:21
25:13,17 26:18
31:9 33:16,17
33:24 38:15
39:3 40:22
41:16 42:7,8
48:3,5 63:20
69:9,19 70:9
71:6 97:18
98:10 99:11
115:3,6 133:6
149:16,18
150:12,20,24
212:22
**accounting's**
34:13
**accounts** 102:9
114:23 115:12
115:17,20,25
117:7,10,16
118:22 119:1
141:9 163:5
**accruing**
194:21
**accuracy** 227:8
**accurate** 39:24
40:23 41:4,10
41:11 42:13
66:9,15,16
75:11 76:16
213:4,13 223:9
224:5

**accusations**
70:2
**acknowledge...**
226:3
**acknowledg...**
7:13
**acronyms**
198:18
**acted** 214:14
215:3
**action** 49:4
223:12,16
224:8,12
**actions** 43:5
49:9
**actively** 60:2
**activities** 52:3
**activity** 34:6,10
187:3,19
188:11,20
**actually** 25:11
25:15 28:13
39:13 42:10
62:12 68:10,10
87:25 91:17
96:25 105:10
115:4,11
118:20 141:13
145:15 147:21
160:1 164:20
173:24 179:25
182:2 187:17
189:15
**adams** 1:13 3:7

**[add - allowed]**

| | | | |
|---|---|---|---|
| **add**  28:10 | **affidavits** | 183:10 194:2 | 136:13 137:3 |
| **added**  64:2 | 178:15 | **agreements** | 137:15,19,22 |
| **addition** | **affiliation** | 100:24 136:14 | 138:1,24 139:2 |
| 110:24 195:20 | 89:18 | 136:22 137:7 | 139:2,7,20 |
| 203:12 | **affirmatively** | 137:11 142:9 | 140:16,18,24 |
| **additional** | 39:10 | 201:16 202:19 | 141:13,18 |
| 14:17 75:4,8 | **age**  212:20 | 204:12 227:14 | 142:9 144:11 |
| 119:2 126:2,4 | **agenbroad** | **ahead**  26:2 | 148:8 163:8,19 |
| 127:3 193:7 | 1:12 3:6 | 28:11 56:11 | 163:23 164:7,7 |
| 210:12 | **agent**  11:6,19 | 87:1 91:21,25 | 164:12,14 |
| **additionally** | 11:21,23,24 | 150:19 164:10 | 169:5 170:1,13 |
| 7:14 | 12:19,20,21,24 | 181:6,13 | 170:18 180:13 |
| **additions**  226:6 | 22:24,25 127:5 | 208:14 | 184:11,19,23 |
| **address**  9:18,24 | **aggregate** | **ahold**  152:9 | 185:3,4,6,7,11 |
| 18:19 87:18,19 | 181:23,23 | **al**  7:11,11 | 185:14,22,23 |
| 87:23 134:2 | 182:7 191:2,4 | 225:1,1 226:1 | 186:4,5,7,8 |
| 149:24 150:25 | **aggregated** | 226:1 227:3,3 | 187:2,9 188:15 |
| 199:5 | 186:1 | **allegations** | 192:17,23 |
| **addresses** | **ago**  67:7 73:11 | 69:8 70:20 | 193:6 195:12 |
| 149:19 | 133:11,14 | **allege**  178:3 | 196:14,17 |
| **adjustments** | 216:1,11 | **alleging**  74:10 | 198:9 199:2,8 |
| 197:5,7,20 | **agree**  7:16 | **allied**  1:20 4:4 | 199:13,13 |
| **admin**  202:7,7 | 169:2,5,23 | 31:16 37:7 | 200:7,7,17,17 |
| **administer** | 170:15 174:2 | 38:6 40:14 | 201:11 202:14 |
| 7:13 | 183:24 187:19 | 41:3 42:11 | 203:21,25 |
| **administrative** | **agreed**  202:20 | 75:16,22 76:21 | 204:25 |
| 164:4 | **agreement** | 82:5,8,11,12,23 | **allied's**  42:7 |
| **admit**  150:15 | 81:20 100:13 | 83:8,12,15,15 | **allieds**  100:25 |
| **affidavit**  67:10 | 102:23 109:16 | 83:16,21 84:4 | **allocable** |
| 68:7 70:6 | 136:13,16 | 93:7,11 98:1 | 193:10,14 |
| 73:16 153:8,8 | 137:2,5,8 | 100:4,10 101:2 | **allotted**  227:15 |
| 157:12,22 | 142:16 143:6,8 | 102:16 105:1 | **allow**  25:25 |
| 159:17,19 | 163:22,23,24 | 113:3,4 114:10 | **allowed**  142:4 |
| 172:17 | 164:11 166:21 | 117:24 118:9 | 142:6 |
| | 180:12 183:1 | 121:7,10,13,14 | |

Page 4

**[als - authority]**

| | | | |
|---|---|---|---|
| **als** 75:17 76:21 | 198:24 | 85:21 113:10 | **attempt** 78:4 |
| **amount** 85:9 | **apparently** | 123:18 124:14 | 78:10,15 |
| 87:3 110:6 | 27:21 128:6 | 125:15 132:9 | **attempts** 169:9 |
| 111:1,8 144:8 | **appearance** | 162:9 174:8,23 | **attendance** 8:2 |
| 183:15,15 | 44:21 | 176:7 179:11 | **attorney** 27:18 |
| 190:4,22 | **appears** 172:24 | **asking** 48:20 | 35:12 52:17 |
| 191:10,10,16 | 187:11 193:25 | 54:13,14,21 | 129:15 223:14 |
| 193:15,22 | **appended** | 56:14 81:1 | 224:10 |
| 195:11,12,22 | 226:7 | 90:20 102:20 | **attorneys** |
| 196:9,10 207:4 | **applicable** 7:20 | 102:21 128:24 | 128:23 145:10 |
| **amounts** 40:19 | 227:7,14 | 137:1 164:9,14 | 218:21 |
| 114:7 | **applied** 37:12 | 177:3 197:16 | **audio** 223:8 |
| **analysis** 91:12 | **apply** 15:18 | 213:8 219:25 | 224:3 |
| **ancillary** 83:4 | 16:7 19:10 | 220:5 | **audit** 21:23 |
| **animosity** | **approached** | **asks** 156:11 | 22:4,9,25 |
| 60:15 | 74:14 | **aspects** 116:10 | 24:15 44:3,4 |
| **answer** 15:6 | **approximate** | **assigned** 7:6 | 126:6,7,12 |
| 60:11 63:4 | 166:6 | 83:5 | 127:20 160:13 |
| 113:17 170:8 | **approximately** | **assisted** 120:19 | **audited** 11:21 |
| **answer's** 62:22 | 86:1 88:4 | **associated** | 160:21 162:24 |
| **answered** | 93:17,20 | 126:12,24 | **auditor** 22:14 |
| 124:15 176:8 | 132:24 134:13 | 128:14 186:8 | **august** 51:3 |
| 179:12 220:1 | **april** 134:16 | **assume** 48:3 | 217:25 220:12 |
| **anybody** 43:15 | **arbitrary** 33:16 | 54:2 97:17 | 220:17 |
| 78:20 102:14 | 33:24 | 155:13 217:8 | **aunt's** 133:12 |
| 103:5 124:2,4 | **area** 135:1,4 | **assumed** 54:25 | **austin** 1:3 3:13 |
| 124:5 177:19 | **armbrust** 4:17 | **assuming** 49:5 | 4:10,19 35:6 |
| 178:18,21,24 | **arrangement** | **at&t** 145:8 | 87:19 88:8 |
| 186:17 211:7 | 102:18,20 | **attached** 62:7 | 133:19 134:3 |
| **anymore** 32:5 | 109:22 | 139:23 147:5 | 135:3,20 |
| **anyway** 22:12 | **ascertain** | 147:10 173:14 | **austin.com** |
| 59:4 194:17 | 166:18 | 220:15,23 | 3:14,15 |
| **apologize** 71:9 | **aside** 174:9 | 227:10,12 | **author** 40:1 |
| 80:19 86:8,24 | **asked** 23:8 | **attaching** | **authority** |
| 120:10 132:9 | 27:23 47:21 | 119:15 | 116:21 141:7,8 |

**[authorized - believe]**

**authorized**
  7:12
**automatic**
  97:12
**automatically**
  96:7
**available**   227:6
**avenue**   2:6 4:18
**average**   188:23
  189:21,23
  190:2,3,4,13,13
**averages**   197:1
**aware**   16:13
  27:12 40:21
  43:3 52:23
  55:4,13 70:5
  76:20 123:2
  136:14 137:5
  178:13 183:3
  202:19,23
  203:2 204:12

**b**

**b**   1:6,18 3:3 4:3
  4:9 6:9 15:20
  181:4,8,16,19
**back**   11:11
  13:25 28:5,8
  28:12,23 32:17
  34:17 35:17
  37:16 52:14
  59:1,4,7 64:20
  68:23 69:2,5
  70:1,19 80:10
  90:17 92:8
  93:2 97:2

135:16 142:12
142:20 144:19
144:22 148:1,1
148:2 152:12
152:24,25
154:11 157:4
158:8 166:20
171:1 173:13
174:11 179:4
179:20 188:19
194:23 197:14
197:17 199:17
200:3 205:7
209:3 211:5
212:3,12
217:25 220:12
220:15
**backed**   97:1,8
98:7 99:7
119:20 152:22
**background**
  12:13 90:7,8
  90:22
**backing**   47:25
**backs**   197:8,15
**backup**   96:8
  97:6,12
**backups**   95:23
  96:23
**bake**   100:15
**baked**   118:10
  118:16 181:3
  181:15,20
  184:11 186:12

**bank**   101:22
  102:13 114:23
  115:12,14,17
  115:18,25
  118:22 127:7,9
  127:13 196:9
  196:13
**banking**   115:8
  115:11
**bar**   43:4 51:18
  51:19 52:3
  57:10
**barely**   63:2
**barton**   3:11
**based**   31:23
  74:10 81:16
  84:6 92:18
  98:5,14,16
  101:3 102:8,23
  105:6 109:21
  110:11 118:10
  142:25 168:14
  183:19,20
  184:3,17
  190:22 192:23
  193:1 208:16
**basic**   100:1,12
  112:13 166:5
**basically**   12:22
  58:7 94:14
  99:13 104:14
  109:15 123:8
  180:23 182:9
  197:12 202:7
  212:19

**basics**   70:16
**basis**   88:19
  91:10 99:24
  100:22 104:21
  105:23 106:15
  106:20 107:4
  107:10 108:18
  109:8 113:11
  114:8,16 119:5
  119:20 132:18
  164:3 208:24
**bates**   216:22
**bay**   11:10
**bba**   10:17,19
**beaman**   3:10
  5:6
**beat**   186:2
**beef**   27:21 63:1
**bees**   89:12
**beginning**   40:4
  182:9
**begins**   32:21
  33:22 37:3
  39:22 40:19
**begs**   146:21
**behalf**   3:2 4:2
  4:15 85:20
  113:3 140:21
  216:23
**believe**   10:21
  32:20 77:10,14
  84:13,13 90:6
  91:5 95:25
  96:22 97:14
  98:5 105:14

Page 6

**[believe - business]**

110:3 111:3
118:5 122:19
143:19 144:9
146:15,17
173:19,23
180:18 182:14
182:19 192:7
206:4 207:25
208:6,6 220:6
**bell** 75:6 200:2
219:6
**belonged** 40:14
196:14
**belonging**
148:7
**best** 29:14
42:15 70:23
76:18 84:18
88:18 137:13
223:10 224:6
**bet** 44:14
**better** 89:20
121:6 135:15
137:24 139:4
**bill** 81:9
**billable** 80:7
**billed** 190:4,7
190:13
**billers** 103:20
104:1
**billing** 53:11
88:21,21 93:13
93:17 94:17
103:9,10 104:5
104:9 105:13

105:15 106:11
106:13 108:5
114:5,13,17,21
115:5,9 116:4
116:8,11,13,14
116:16 117:4
118:15,19
129:8 132:11
132:13 184:8
189:3 198:1,4
198:4
**bills** 165:25
**bit** 16:5 117:23
139:4 168:20
**bits** 41:13,13
212:16
**black** 168:20
208:6
**blank** 58:24
**blood** 88:22
89:21 91:9,12
91:12,17,22,24
92:3,7,8,19,23
93:3 94:7
137:16,18
164:21,23
165:1 189:6
**bloodwork**
99:14 125:7
136:7 158:10
**blue** 53:12,12
125:3,4,12,12
125:13,13,14
158:7,7

**board** 120:2
133:4 209:21
**bookkeeper**
165:24
**bookkeeping**
10:2,3,15
18:19 82:16
85:4,8,11,22
86:5,11 99:2
136:1
**books** 30:9,11
30:13 70:16
75:10,16 82:11
82:14,24 83:7
83:12,14,15,20
133:5 206:2
**born** 135:2
**borrow** 77:2
**boss** 113:7
**bother** 50:13
**bottom** 18:8
34:15 187:23
188:1 200:25
201:1 216:4,7
**bought** 32:11
122:22,23
133:11
**bound** 164:19
**break** 49:17
68:15 69:3
90:20 144:14
145:1,3 163:14
186:4 205:3
**breakdown**
118:8 186:8

187:8
**bridget** 3:18
8:12
**brief** 77:7
128:9
**bring** 46:5
47:21 73:19
93:2 148:9
**brittani** 1:13
3:7
**broad** 118:1
165:8
**broadly** 78:20
**broken** 94:10
186:12 191:2
**brook** 89:1
**brookwood**
88:16 89:3,9
**brother** 133:10
**brought** 45:3
109:20 123:8
124:23,24
213:9
**brown** 3:10
4:17 5:6
**browser** 210:19
**building** 4:9
205:19
**built** 110:5
**bunch** 55:6
81:10 188:21
188:21
**burden** 143:4
**business** 10:14
25:17 31:19

Page 7

**[business - checked]**

33:5,9 60:9
129:23 136:6
137:16 150:10
158:9 161:10
207:19
**businesses** 14:5
**bzerner** 3:22

**c**

**c** 3:1 4:1 5:1 7:1
112:13,14
**cable** 90:25
**calculate**
102:16 107:5,7
109:11 118:14
144:7 192:22
**calculation**
138:1
**calculations**
117:23 143:16
181:5
**call** 10:21,22,22
19:20 58:2,3
59:1,9 62:5,5
64:7,20 73:3
73:20 78:2
149:2 157:8,23
158:1 159:14
171:19,21
172:5,8,12,18
177:7,11,13,18
177:19 200:4
**called** 8:21
27:20 59:4,11
60:1 62:25
64:18 72:23,24

74:8 75:1
112:9 128:9
159:13 218:9
**calling** 60:9
182:15
**calls** 58:18
127:15,21,25
128:17
**capacity** 82:23
**care** 1:7 3:4
19:22 28:7
59:2 60:17,19
71:9 72:18
135:6 178:5
202:10 205:21
**career** 60:3
158:24 159:11
**carrier** 135:24
145:7,7 189:18
**carriers** 125:10
**case** 1:15 8:15
17:21 35:11
51:12 52:3,7
55:6 71:13
74:10 79:11,14
97:5,15 106:16
111:3 130:1
140:5 145:4,11
146:14 155:15
189:22 190:5,9
190:13,13
216:24
**cases** 188:23,23
188:24 189:1,3
189:4,10,14,15

190:1,23 192:2
196:25 197:1
**catch** 59:24
**categories**
165:8,20
**categorized**
166:25 167:2
**caught** 61:8
**cause** 44:15
68:11 79:22
**ceased** 77:11
**cell** 129:19,20
129:24 135:23
161:4,8,14
162:22
**certain** 87:10
94:9,9 111:4,7
114:1,3 119:14
144:10 206:7
**certainly** 28:18
57:24 75:20
170:24
**certificate**
223:1 224:1
**certified** 7:17
12:16 227:16
**certify** 223:4
224:2
**cetera** 200:7
**chance** 74:1
173:7
**chances** 160:19
**change** 122:17
123:2,14
142:20 178:18

178:22 225:4,7
225:10,13,16
225:19
**changed**
120:25
**changes** 13:16
28:4 62:15
65:20,22 66:1
67:11 173:1,4
226:6 227:9
**changing** 108:9
215:15,16
**charge** 80:7
191:10
**charged** 27:15
166:1 190:15
191:6
**charges** 166:17
166:22
**chats** 57:8
**check** 12:14
22:3 32:15
38:18 58:3
76:2 94:8
102:12 114:5
114:24 115:10
132:5 137:8
139:1,23
148:16 185:5
186:6,6,10,10
191:22 192:5
193:6 201:19
**check's** 137:9
**checked** 131:1

**[checking - clear]**

**checking** 50:14
81:12
**checks** 31:15
32:22 33:2,4
34:15 42:11
63:17 75:21
76:1,2 101:24
101:25,25
102:1,2,8
137:10,21
140:23 141:12
141:14,15,16
141:17,18,22
142:5,7 170:12
185:24 201:21
**chester** 4:6 6:3
6:6 8:3,3 9:1,3
17:18,23 26:4
26:24 27:1
29:22 33:12
36:2,10,22
37:21 39:18
41:1,19,23
42:3,17 43:2
44:6,19 47:3
47:19 48:8,13
49:12,23 50:1
51:16,22 52:13
53:6,17,22
54:7 55:10,22
56:7,13,21
57:9,19 58:1
58:23 60:14
61:1 63:12
64:1,13 65:18

66:22 67:1
68:14,18 69:1
69:15 70:17
72:6,20 75:15
76:4,15,19,25
77:4 79:14,24
80:2,5 84:15
124:14 130:12
130:16 148:19
148:21 149:3
163:18 167:11
167:19,24
170:7 176:7
179:11 186:22
209:14,17
210:18 211:2,7
211:19,23
212:6 213:1,7
213:21,23
215:9,22
217:13,23
218:4,13 219:1
219:12 220:1
221:3,9,13,20
**chestnut** 9:20
**chevron** 11:9
**chevron's** 11:8
**chief** 139:16
**child** 14:4
15:14
**chose** 10:10
**christi** 202:1
**christmas**
204:19 209:14

**circle** 50:23,24
168:19,22
**circled** 50:22
**circling** 168:20
**circumstances**
212:9,20
**civil** 16:10,13
19:8 24:2
**claim** 49:4
158:25
**claims** 157:13
158:12
**clarification**
219:18
**clarify** 188:9
**claw** 197:8,15
**clawing** 197:14
**clay** 1:17 4:15
5:5 8:4,6 21:6
21:9,11 23:22
27:21 29:13,15
29:25 31:8
32:21 33:23
35:20,21 36:4
36:16 37:3,4,6
37:11 38:5,13
38:19 39:1,22
40:4,13,22
41:24 46:21
52:22 54:3
60:2,5 61:5
63:1 73:20,21
74:10 75:24
76:9 77:15,17
78:2,4 83:13

87:9 88:23
89:7,9 106:7
111:13,14
112:4 113:9,9
113:10,13,15
113:22 115:2
116:8,18,24
119:7 120:1,15
124:1,7 130:23
131:4,20,23
139:12,19
140:2 141:10
141:17 148:8
151:1,3 158:15
162:16 169:4
169:25 170:11
182:1,4,11
183:4 194:10
201:12,15,21
202:3,16,21,24
203:22 204:24
205:16,19,24
206:8,14,24
207:5,11,18,24
214:15 215:3
**clay's** 111:17
139:16,16
201:23 202:10
202:11,11
**clean** 30:9,11
30:13 47:1
75:10
**clear** 46:24
47:1 74:2
84:22 86:9

**[clear - computers]**

109:18 110:22
166:11 212:11
**clearance**
148:22
**client** 54:18
160:13 161:1
**client's** 148:22
**clients** 161:8,9
**clinic** 37:11
202:11 205:15
**clip** 186:17
**clock** 136:8
**close** 51:8
153:3 205:12
**closed** 132:21
**closely** 25:8
**closet** 154:18
155:5,6
**cloud** 95:15,21
98:14,16
**code** 15:21
**collect** 102:2
**collected**
101:11,14
102:4,8 104:3
164:1 181:22
184:15,18
185:2 188:23
189:1,4,14
190:23 192:2,3
197:1
**collection**
101:9 137:17
187:2,19
188:11,23

189:21,24
190:13
**collections**
101:7 197:3
**college** 11:4
13:10
**colorado** 31:22
31:23,25 32:8
33:1,3,5
**colorful** 58:25
**com** 150:21,25
**combination**
101:24
**combined**
201:20
**come** 29:8,10
30:4 51:23
53:7,9 83:18
94:7 103:9
194:5 199:2,9
214:19 215:15
**comer** 219:4,5
219:7
**comerica**
115:15,18
117:8,10,20
141:8 142:3
**comes** 135:16
**coming** 26:10
26:11 54:4
97:23 116:3
124:21 196:17
**comment** 86:23
87:2

**committed**
26:19 41:3
176:25 177:15
177:21 178:8
**common** 40:13
**communicated**
72:21
**communicating**
85:25
**communication**
49:7 78:8,13
78:18 156:7
168:15
**communicati...**
49:2 57:7 78:1
**companies**
32:13 40:14
43:19 82:15
83:21 84:4
98:1 101:12
113:4 129:10
136:3,15 138:3
140:16,18,24
163:9 170:2
197:9
**company** 17:7
17:11 19:15
20:2 25:16
36:21 37:7
38:6 41:4
47:12 81:23
82:16 84:24
87:15,17 90:2
90:3,5,25
98:25 110:20

122:24 123:12
128:15,23
129:3 136:2
138:20 159:21
159:22 163:19
169:5 190:14
200:23 201:13
206:19,25
**compared**
214:8
**compelled**
44:21
**compensation**
85:15
**complete** 18:13
34:13 226:8
**completely**
61:6 62:18
69:21 125:5
176:6,13 177:8
**completing**
194:24
**components**
199:14
**computer**
94:23 95:2,9
96:5,9 97:2,5,9
98:3 99:8
104:22 105:14
111:21 112:3,6
112:15 154:3,9
154:17,21,25
155:5,7,11,14
**computers**
91:14 155:23

**[computers - correct]**

155:25
**con** 37:5 169:3
**concerning**
100:14
**concluded**
222:5
**concludes**
221:25
**conduct** 15:22
**confidential**
6:11,12,13,14
6:15,16,17,18
6:19,20,21,22
6:23,24 17:21
**confirmed**
77:10,14
**confirms** 22:23
**conflict** 37:15
37:17 55:24
**conflicts** 56:20
**congress** 4:18
**connected**
137:18
**connor** 3:9 8:8
46:25 60:12
**consider** 70:23
164:4
**considered**
17:21
**consistent**
172:12,17
**conspirator**
37:5,6 38:10
169:4 215:3,6
215:10,17

**constitute** 7:24
**consultation**
168:8
**cont'd** 4:1 5:1
**contact** 70:6
93:16 145:9
177:20 217:9
218:24 219:20
**contacted**
78:20 157:17
157:18 158:21
217:24
**contents** 172:9
174:7
**continue** 69:3
144:23 205:10
**continued**
134:20
**continuing**
13:9,15
**contractor** 96:6
96:11
**contractual**
100:24 102:18
102:20 109:22
**contributors**
166:14
**conversation**
72:25 73:4
75:3 124:2,4
**conversations**
39:13 52:8
69:5 71:18,19
218:15

**convey** 69:16
**copay** 190:11
**copied** 216:14
**copies** 46:5
111:16,18
**copy** 19:1 22:3
44:20 45:14,16
63:5,7 67:10
67:20 68:6
111:20 112:3
119:4,6,8
145:19 146:4,7
146:20 147:10
173:14 176:1
218:6 219:20
221:19 227:16
**corporate** 14:6
**corporation**
31:21
**corporations**
11:23
**corpus** 37:11
202:1 205:15
**correct** 10:10
10:11 12:4
16:11 17:16
18:9,10 19:6,7
19:12 20:16
21:24 23:2,24
26:16 29:3
30:3,14 31:2,4
31:10,12,15
32:25 33:10
35:8,9,10 36:5
36:8 39:12

41:7,18 44:8
44:11,22 47:18
48:6,11,23
49:1,10 60:11
62:2 66:2
68:13 69:13
73:12 76:23
77:13,16,22
82:1,1 86:3,7
89:15 90:6
92:6 93:5 94:3
100:20 103:3
104:23,24
105:3 106:21
106:22 107:20
107:23,24
108:19,20
112:5 115:19
116:7 119:3
120:24 122:2
124:9,12
125:11 130:5,8
131:5 133:17
134:22 138:9
138:18 140:3
142:6,21 144:9
152:2,16
153:21,23
156:1 159:2
160:23 165:3
165:13,19
166:10 168:3
168:18 171:4,6
175:10,11,14
175:19 176:14

Veritext Legal Solutions
800-336-4000

**[correct - d]**

| | | | |
|---|---|---|---|
| 177:22 184:5 | 206:7 214:14 | 215:1 | 138:21 140:8 |
| 184:20 185:9 | 215:3 | **coupled** 118:19 | 143:21 154:1,3 |
| 188:13 191:14 | **cortez's** 21:3 | **courier** 164:22 | 155:22 197:21 |
| 191:14,17 | 90:7,21,21 | 165:2 | **creating** 181:17 |
| 192:24 195:24 | 130:9,20 131:4 | **couriers** 92:7 | **creation** 113:2 |
| 195:24 196:7 | 161:19 | 92:13 93:1 | **crew** 90:11 |
| 196:12 197:2 | **cost** 123:9,10 | 94:15,15 | **criminal** 16:10 |
| 208:4,5,14,18 | 181:23,23 | 182:23 | 16:14 19:8 |
| 213:6,10 214:4 | 182:7,7,10,12 | **course** 15:20 | 24:2 27:15 |
| 214:7 215:20 | 182:18,20,23 | 24:14 33:4,9 | 57:11 |
| 216:12,15 | 183:2,6,14,18 | **court** 1:1 8:15 | **crockett** 2:7 |
| 217:7,17 | 191:5 195:17 | 17:19 57:22 | 134:23 |
| 218:11 220:9 | 195:19 196:2 | 66:7 68:19 | **cross** 53:12 |
| 220:25 226:8 | **costs** 143:14 | 80:21 133:13 | 125:3,12,13 |
| **corrected** 169:8 | 183:23 184:2,5 | 148:23 | 158:7 |
| **corrections** | 191:16,20 | **cover** 58:17 | **curnock** 5:3 |
| 226:6 | 192:10 | **covered** 13:15 | **current** 12:9,18 |
| **corresponded** | **could've** 26:13 | 39:20 40:16 | **currently** 12:3 |
| 162:15 | 74:3,3 140:4 | **cpa** 13:18,20 | 135:7 155:11 |
| **corresponden...** | 198:22 | 14:11,18,21 | **curtailed** 125:4 |
| 127:3,14 129:4 | **counsel** 8:24 | 16:3 23:13 | **customary** |
| 150:9 152:4 | 10:6,9 57:1 | 49:13 | 19:17 23:9 |
| 157:4 | 223:11,14 | **cpas** 15:18,22 | 48:25 |
| **corroborating** | 224:7,10 | 16:7 | **cut** 137:10,20 |
| 70:19 74:17 | **county** 34:22 | **cprx** 198:10 | 141:13,15 |
| **cortez** 20:8,10 | 34:24 35:2,6 | **crap** 74:5 | 185:5 193:6 |
| 23:22 31:20 | 35:14,15 55:14 | **crashed** 97:6 | **cutting** 63:17 |
| 37:4 38:9,13 | 57:2 92:15 | **create** 97:20,22 | **cv** 1:16 |
| 39:2 77:18,25 | 93:7 114:23,25 | 97:25 99:11,19 | **cynthia** 2:8 7:6 |
| 78:15 89:14,25 | 192:1 | 113:11 155:17 | 223:2,17 |
| 106:9 122:1,4 | **couple** 22:12 | **created** 65:23 | **d** |
| 124:8 126:21 | 53:9 65:20 | 65:24 96:3 | **d** 1:6,18 2:2 3:3 |
| 127:4,15,17 | 128:8,13 158:4 | 99:16 100:7 | 4:3 6:1 7:1 |
| 131:23 145:10 | 173:1 204:17 | 112:8,19 119:5 | 8:20 225:2,24 |
| 162:16 203:10 | 204:18 214:11 | 119:6 121:1 | 226:2,4,12 |

Veritext Legal Solutions
800-336-4000

**[d - delete]**

227:4
**daily**  88:19
   208:24,25
   209:5
**dana**  132:10,11
**data**  99:1
**date**  2:3 51:9
   152:7,7,8,9,17
   174:19 220:20
   225:24 226:12
**dated**  50:7
   73:10
**dates**  153:5
   208:14
**davis**  4:7
**dawson**  27:18
   39:13 40:20
   43:3,12,25
   46:1,13,19
   47:5 50:3,15
   51:11 52:15,23
   53:18 54:9
   55:5,14 56:16
   57:12 59:18
   61:11 62:18
   64:2 65:5,19
   65:23,23 67:15
   67:24 68:4
   69:6 70:18
   71:22 72:11
   151:13 152:5
   153:12,15,19
   156:5,8 157:5
   157:9 158:1,13
   158:20,24

159:11,14,24
167:22 169:9
170:21 171:1,5
171:12,18,22
171:24 172:4,8
172:11,15,21
172:25 173:6,9
174:3,16,16
175:17 177:2,7
177:16,23
178:3,11,14
214:2 215:7,14
216:1,10,13
217:6,8
**dawson's**  54:22
   149:9 153:11
**day**  26:10
   50:10 66:24
   74:2,3 89:21
   89:21 112:18
   116:18,19
   128:7 175:7,25
   176:3 226:15
**days**  61:25
   80:10 88:23
   177:2 215:1
**dba**  17:3,5
**dead**  186:2
**dealings**  170:17
**dealt**  139:18
**december**
   197:5 207:22
   208:10
**decide**  197:13

**deciding**
   184:21
**declaration**
   27:19 32:17
   37:23 41:11
   44:10 45:9
   48:1,16 50:11
   50:14 52:1
   59:23 61:2,22
   62:1,7,8 63:2
   63:13 64:15
   65:10 69:7,8
   69:18,24 70:20
   71:5,15 74:9
   74:11,19 75:11
   78:5,11,16,21
   145:17,19
   146:5,8 147:4
   147:7,10,11,13
   152:10,13
   153:9 157:12
   167:10 168:24
   169:18,24
   170:25 171:25
   172:9,12,23
   173:1,10 174:4
   174:7,17,24
   175:18 176:20
   177:25 178:4
   178:19 179:1,5
   206:4 212:10
   215:15 217:10
   218:6 219:21
   220:3,12,14

**declarations**
   171:9 178:15
**declare**  226:4
**declared**
   132:20
**deducted**  111:1
**deduction**
   111:7
**deductions**
   111:6 143:23
**deemed**  226:6
**defamation**
   27:22 158:18
   158:25 178:25
**defend**  22:4
**defendant**  4:15
   5:4,5 8:6
**defendants**
   1:22 4:2 8:4
   188:5
**defended**  21:22
**defending**
   24:14
**defined**  183:12
**defines**  183:2
**definitely**  28:15
**defraud**  37:7
   38:6 169:4
**defrauding**
   76:21
**degree**  14:11
**delete**  46:18
   112:22,25
   131:6,17,19
   155:20 161:3,8

**[delete - distributed]**

161:13,16
162:10
**deleted** 46:20
131:20,22,25
161:14,18,21
**deleting** 162:10
**deliver** 32:14
33:6 106:17
111:14 112:3
**delivered** 92:14
92:20 107:22
163:11 176:1
201:21 202:4
**delivery** 141:21
**dell** 95:7 155:9
155:12
**delta** 192:9
**department**
24:21 101:7
103:10 104:10
105:15 106:11
106:13 114:5
114:13,18,21
115:9 116:16
117:5 118:15
118:19 184:8
189:3 198:5
**departure**
210:7
**deponent** 226:3
**deposit** 102:2,5
115:1,2
**deposited**
102:9

**deposition** 2:1
7:4,9,22 45:7
58:25 78:7
144:23 145:12
145:17 146:16
147:9 222:1
223:1 227:4
**depth** 57:8
170:3
**described**
89:10 133:3
138:9,12
143:25 157:6
182:21
**description**
6:10 188:21
**desktop** 94:25
95:1,15 96:4
97:18 98:17,20
112:2 120:16
150:1 154:5
**despite** 170:20
**detail** 114:17
185:19
**details** 183:10
205:18
**determine**
83:19 99:12
100:4,10 103:2
107:10 108:22
**determined**
143:12 183:5
183:14
**determining**
113:14,23

**devoted** 85:18
**diagnostic**
122:7,14 210:6
**dianostic** 1:8
3:4
**didn.t** 63:19
198:3
**difference**
190:12,14
**differences**
62:11 214:9
**different** 17:8
31:16 35:19
36:15 99:13
101:18 122:12
125:24 179:16
179:18 185:16
199:13,16
**digital** 223:8
224:3
**diminished**
14:8
**dire** 20:13,16
32:6 35:24
121:17,18,20
122:8,13
**directed** 31:15
32:22 37:3
39:23 40:5
116:18 170:12
**directing** 40:22
202:16
**directly** 38:16
72:21 132:19

**director** 31:24
116:9 136:2
**disagreed**
101:13 173:3
**disavow** 78:10
78:16,21
**disavowing**
78:5
**disbursed** 92:4
139:2
**discard** 71:16
**disciplinary**
51:18
**disclosed**
143:20
**discussed**
180:17 195:15
**discusses**
169:25
**discussion**
206:6
**discussions**
206:10
**dispute** 171:21
**distinction**
27:23 121:5
189:2
**distributable**
192:12,23
195:11 196:10
**distribute**
139:19
**distributed**
91:11 101:2
118:9 139:7

**[distributed - either]**

195:12 206:12

**distribution**
88:22,22 94:4
94:12,17
184:14 192:9
192:14,24
193:2,16 199:2
199:9,11,17,18

**distributions**
98:1 102:16
184:11 202:15
206:12 207:3

**district** 1:1,2
35:12 57:22

**diverting** 170:1

**divide** 199:12
199:13

**divided** 184:22
185:3,11

**division** 1:3

**doctor** 37:14
101:16 136:22
164:24 185:16
185:16,25
202:12,12,13
205:19,22

**doctor's** 188:25

**doctors** 92:6
100:25

**document**
28:25 47:24
122:16 148:25
152:5,21 155:7
155:22 156:3,4
157:22 160:6

160:10 177:3
180:10 181:8
183:1 202:14
216:21,24
217:3

**documentation**
191:19 195:25

**documents**
45:3,6 47:9,20
47:25 48:4,10
48:15,19 53:3
70:1 83:18
96:3 147:2,19
147:22,25
148:6,9 151:20
151:21,23
153:22 154:22
155:14,18,18
187:1 210:13

**doing** 21:18
72:9 79:8 80:8
83:12,14 85:11
86:5,11 91:2
105:13 109:18
119:17,17
133:2 136:6
143:13 181:5
189:17 191:2
202:9

**dollar** 114:24

**dollars** 105:5
114:9,12,14,22

**door** 89:22
91:10 92:14,24

**dot** 149:16,18
150:11,20,21
150:24,24

**douglas** 9:5

**dozen** 137:21
185:24

**dr** 43:16 55:6
57:2 133:9,16

**draft** 28:22
62:6,8,11,15,19
64:4,8,20
65:22,23 67:15
74:13 152:20
156:9 157:5,9
157:11 213:17
213:18

**drafted** 52:1
62:18 167:21
167:22 178:3

**drawn** 92:7
165:1

**drink** 26:12
128:7

**drinks** 133:14

**drive** 76:1
95:15 97:1,6,8
112:13,14
133:21 141:25

**driven** 152:7,17

**drives** 112:11

**drop** 141:25

**due** 101:17

**duly** 8:21 223:5

**duties** 31:1
53:23 63:17

**dylan** 24:17
70:9,13 120:1
124:23 128:3

**e**

**e** 3:1,1 4:1,1 5:1
5:1 6:1,9 7:1,1
201:5 225:3,3
225:3

**earlier** 19:10
40:17 51:6
64:8,15 67:3
67:18 75:2
77:10 83:25
86:23 87:2
108:10 125:15
138:9,12 147:6
151:11 156:10
165:4 180:17
181:15 182:22
195:15

**early** 16:24
134:16

**easier** 163:15

**east** 2:6 11:10

**education**
10:16 13:9,15

**effect** 60:3
158:17

**effort** 147:21

**efforts** 147:24
151:18

**eh** 15:15

**eight** 87:12,12

**either** 26:22
34:9 36:24

**[either - engage]**

78:13,19 80:23
82:14 83:20
99:7 164:6
195:16 213:18
219:19
**elander**   1:12
3:6
**electricity**
165:6
**electronic**
107:25 108:2
**electronically**
119:18
**ellis**   1:17 4:15
5:5 8:4,6 21:9
23:22 29:13,16
29:25 31:8
32:22 33:23
35:20,21 36:4
36:16 37:3
38:5,13 39:1
39:22 40:4,13
40:22 41:24
60:16 61:5
70:22 73:20,21
74:10 77:15,17
77:24 78:2,4
89:9 106:6
124:8,10
125:16,18,22
126:16 127:3
127:24 128:1
131:23 145:10
151:2,4 158:13
158:23 159:10

159:15,25
162:16 169:25
170:11,16
179:5,8 193:15
201:15,21,22
202:17,21,24
202:25 203:3
203:22 204:1
204:24 206:8
206:24 207:5
207:12,18
208:6,20,23
209:7,11
**ellis's**   21:6,11
37:4,6 130:23
131:4 145:16
145:20,21
161:18 168:21
169:4 201:12
214:15 215:3
**eloquent**   40:1
**email**   23:11
28:21 47:4
61:11,17 62:8
64:9 65:5 67:2
73:10 74:2
106:1 108:1
119:15 146:10
149:9,15,19,21
149:24 150:4
150:11 151:20
151:25 153:11
153:14 155:4
156:7 157:4
163:3,5 168:15

170:24 171:1
171:11,22,24
172:3,16,21
173:12 177:3
177:16,23
178:11 199:3,5
199:9 215:25
216:10 219:19
220:2,10,11,23
**emailed**   43:7
43:10 46:1
107:22 119:11
139:24 140:1
156:4 217:20
**emailing**   149:9
**emails**   24:25
127:15,21
128:1,17 148:2
149:6,7,11
150:23 151:3,4
151:7,9,19
153:14 156:10
156:13,22
157:2 171:8
178:13
**embedded**
100:17 102:23
109:23
**empath**   122:7
122:15,25
**employed**
10:12 11:13
71:1 84:24
132:23 149:22
165:15 208:16

223:11,14
224:8,11
**employee**   18:15
18:22 21:9
36:11,12 81:17
81:25 82:2,3,5
82:8,23 84:20
85:10 86:1,11
86:18 87:22
96:13,14 113:3
140:17 150:5
150:10 203:3,8
203:10,14
204:21 209:22
223:13 224:10
**employees**   20:6
21:16 94:18
117:2,4 129:10
133:7
**employer's**
18:12
**employment**
26:11 77:10,25
83:4,7,11
85:15 86:4,6
86:17 88:7
99:3 134:10
150:3 208:24
**ended**   11:9
54:22
**ends**   54:18
**enforcement**
49:2 57:11
**engage**   10:9

Veritext Legal Solutions
800-336-4000

**[engagement - exist]**

engagement
  54:15,17
enrolled   12:16
  12:18,20,24,25
  22:24,25
enter   211:1
entered   17:20
enterprises   1:6
  3:3 7:10 225:1
  226:1 227:3
entire   28:24
  87:24 95:2
entities   35:20
  36:16 42:11
  82:3 99:13
  101:18 126:8,9
  126:13 137:17
  138:10 148:12
  185:17,21,22
entitled   105:2
  201:6,9 202:21
  204:14
entity   137:14
  148:7 185:15
envelope
  201:20
eroo   200:22
  201:4,8,9,11,14
  202:5,21,24
  204:9,12,13
errata   227:10
  227:12,13
error   168:17
  169:3,8 173:20
  210:16

es   223:4
especially
  212:21
esquire   3:8,9
  3:18 4:6,7,16
essence   122:3
  140:20
essentially   57:6
  175:21 176:5
  178:3,8
estimate   85:9
  85:13
et   7:10,11
  200:7 225:1,1
  226:1,1 227:3
  227:3
ethical   15:17
  16:3,6 55:24
  56:16
evaluated
  183:21
event   64:19
everybody
  89:10 116:21
  138:12
everybody's
  30:18
everything's
  38:25 110:8
evidence   70:19
  74:17
evidentiary
  7:21
exact   128:14

exactly   11:7,19
  16:17 105:25
  107:1 109:3
  112:6 125:17
  191:23 219:24
  220:4
exam   14:1
examination
  6:2 9:2 77:5
  79:3 212:5
  219:16
examined   8:23
example   43:17
  70:8 84:1
  114:22 215:16
excel   25:20
  97:20,22,25
  99:10 103:2
  106:15 108:4
  108:17,22
  109:10,23
  111:10 112:1,9
  119:11 139:20
  181:20 184:1
except   8:4
  141:23 195:16
exchanged
  178:14 208:20
excuse   155:5
executed   35:5
executive   89:7
exhibit   6:11,12
  6:13,14,15,16
  6:17,18,19,20
  6:21,22,23,24

  17:24 18:1,25
  19:2 22:3,6
  23:11,15 27:3
  27:4 44:20,23
  45:1 50:2,4
  59:19 61:10,13
  65:4,7 67:4
  69:7 73:5,6
  78:6,11,17,22
  84:1 146:15
  147:8 152:14
  156:19,20,20
  167:13 168:11
  168:16,16
  171:11 172:3
  172:20 173:25
  176:15 179:21
  180:4,5,24
  181:4,4,8,9,16
  181:19 186:15
  186:25 187:5
  188:10,11,20
  196:19,23
  199:20,25
  206:5 207:10
  207:14 212:10
  214:5,13 215:1
  215:16,16
  216:5,9
exhibits   17:18
  83:25 156:15
  171:7 178:16
exist   38:10
  48:10 121:10
  158:12 162:21

Veritext Legal Solutions
800-336-4000

**[expect - first]**

**expect** 161:10
161:12 212:8
**expecting** 81:6
**expenses** 97:23
110:1,4,4
165:12,24
166:16,22
191:5 192:2,17
195:20
**expensive**
123:14
**experience**
25:13
**expert** 197:11
**explain** 191:7
197:10
**explained**
33:23 37:10,18
**explaining** 76:5
**explore** 16:5
**expressway**
3:12
**extent** 76:3
158:19
**external** 97:1,8

**f**

**facebook**
162:14
**facilities** 92:22
93:10
**facility** 91:23
102:11 205:23
**fact** 61:7
173:12,13
206:9

**faded** 168:20
**failed** 123:13
**fails** 227:15
**fair** 41:6,12
46:15 116:18
122:3 130:3
142:8 144:2
155:13 157:20
183:16 199:23
**false** 16:11,15
19:9,11 23:18
23:21 24:1,7
24:10,13 26:18
27:14,15 30:20
63:20 159:10
159:16,23
169:10,13
175:17 212:22
**familiar** 11:25
15:16,21 16:9
187:21 188:5
**family** 1:7 3:3
135:4
**far** 48:9 54:19
71:12 89:8
98:5 120:3,15
123:11 138:19
143:11,23
152:25 167:7
200:18 210:3
**fashion** 163:7
**faster** 25:18
**february** 67:7
176:2,3,11,24
177:14,16,24

178:8 216:10
217:2 220:7
**federal** 11:25
16:10 24:3
48:18,24 51:12
57:16,20 58:8
74:9
**fee** 192:18
193:8,9,12,18
193:22 194:3
201:7,10,17
202:5,7,7,17,22
203:1
**feel** 90:3 180:19
**feet** 111:15
**field** 11:23,24
13:9
**fight** 56:17
**figure** 143:13
**file** 74:9 112:8
112:10,15
**filed** 30:20
195:9
**files** 99:1
112:19
**filing** 16:11,15
19:9
**fill** 24:7,10
**filled** 36:6
168:7,7
**final** 65:12,23
213:14 214:5
214:25
**financial**
134:12

**financially**
223:15 224:11
**find** 149:10
155:24 177:4,5
177:5 216:2
**fine** 19:22
57:14 92:2
**fingerprinted**
12:12
**finish** 25:25
42:25 80:20
91:25 181:12
**finished** 156:11
170:8,10
**firm** 14:7
134:11
**first** 8:21 9:8
11:8 14:3
27:24 28:14
31:6,14 34:18
38:5 39:21
41:7 45:2 50:7
52:6,14 60:1
62:19 64:17
71:21,21 87:25
88:6 125:1
128:23 133:20
133:20 157:16
157:18 168:11
168:18 175:20
176:3,24 178:7
179:25,25
187:1,18
188:10 196:11
206:6 207:21

**[first - future]**

208:10 212:12
212:13,13
213:9,9 217:15
217:24,25
220:6
**five**  14:1 15:3
25:2 29:15,21
34:15,16 86:16
87:12 130:2
192:2 205:3
**fixed**  110:10,13
118:6 143:17
144:5 183:21
183:23,25
184:5 195:22
210:15
**fleshed**  181:25
181:25 182:3,4
183:7
**flip**  45:1
**flow**  40:8 107:1
**flowed**  39:7
**flows**  34:14
100:16
**fluctuate**
110:11 183:20
184:3
**fly**  31:25
**folder**  151:22
155:17,19
**follow**  77:3,7
212:7
**follows**  8:23
**forage**  1:16 4:2
7:11 128:11,18

132:3 203:22
204:1,16,22
225:1 226:1
227:3
**forage's**  132:6
**foregoing**
223:3,4 224:4
226:5
**forever**  155:19
**forget**  11:7
22:11 31:23,25
32:6,12 94:7
96:25 101:9,10
107:1 112:9
128:13,14
191:21,23
200:8
**forgot**  61:6
93:22
**form**  40:24
51:14,20 52:4
53:25 55:9,20
56:6,18 57:5
57:23 69:17
75:13 108:2
167:24 191:22
204:14 212:24
217:11
**former**  133:10
161:8,9
**forms**  84:23
**formula**  108:25
118:10 184:11
193:24 194:1

**formulas**
100:15,17
102:22 109:22
120:22 142:19
142:23 181:3
181:15,17
186:11
**forth**  157:4
209:3
**forward**  72:9
**forwarding**
171:8
**found**  133:22
148:7
**four**  14:11
29:20 61:25
88:23 93:19
185:16 189:23
**fourth**  196:8
**fourths**  10:18
**franchise**
192:19 193:9
194:11,13,14
194:20 195:9
**francisco**  11:10
**franklin**  1:5 3:2
37:10,12 43:16
55:6 57:2
133:9,16
**fraud**  41:2
212:22,23
213:3
**fraudulent**
26:18 29:16
33:8,17 38:15

38:21 39:3
41:15 48:3,5
63:19 69:9,19
70:9 71:6
**fraudulently**
170:1
**free**  83:8 90:3
180:19
**frequency**
209:2
**friend**  37:4
**friendly**  70:24
**friends**  26:5
133:10
**front**  57:21
122:17
**fuck**  58:20
**full**  9:4 31:6
32:21 39:21
40:3 86:18
153:2,3
**functions**  133:6
**funds**  40:14
185:11 196:8
**further**  37:6
128:25 129:4
169:4 183:2
186:3 210:13
212:8 216:22
219:15 221:1
223:13 224:9
**fuss**  181:11
**future**  58:14,18

Page 19

**[g - great]**

| g | | | |
|---|---|---|---|
| **g**  7:1 | 130:13 132:17 | 155:20 161:7 | 212:18 216:3 |
| **gathered** | 148:21 174:10 | 164:10,23 | 216:19 217:15 |
| 142:25 143:2 | 179:22 180:8 | 166:20 172:5,8 | 218:9 |
| **geez**  11:12 | 202:16 209:2 | 180:20 181:6 | **good**  7:5 8:11 |
| **general**  13:3 | 216:3 | 181:13 184:18 | 25:14,25 47:8 |
| 25:17 75:9 | **given**  9:6 | 186:6 196:19 | 74:1 81:3 |
| 133:5 163:7 | 107:22 114:17 | 198:6,7 200:3 | 125:18 133:10 |
| 165:4 | 118:2,18 145:4 | 208:3,14 211:4 | 152:23 154:13 |
| **generally**  45:3 | 226:9 | 211:15,21,23 | 179:9,14 |
| 62:14 180:9 | **giving**  46:15 | **goes**  118:25 | 182:10 213:16 |
| **gentleman** | **glanced**  169:21 | 144:1 201:19 | 213:25 220:20 |
| 24:17 71:18 | 169:22,24 | 208:10 | **goods**  181:23 |
| **germer**  3:10,14 | 170:20 | **going**  13:25 | 182:7,8,13,18 |
| 3:15 5:6 | **glancing**  65:14 | 17:19 23:5 | 182:20 183:2,6 |
| **gestalt**  1:8 3:4 | **glen**  92:10 93:7 | 33:18 37:1 | 183:14,19 |
| 122:7,14 | **go**  15:20 26:2 | 46:16 49:16,17 | 184:2 |
| **gestalt's**  210:7 | 26:24 28:11 | 51:7,11 56:17 | **goof**  87:8 |
| **getting**  51:8 | 32:17 34:17 | 57:15 58:19 | **gosh**  12:13 |
| 53:11 62:7 | 35:12,17 39:19 | 62:10 65:4 | 87:18 |
| 68:8 72:7,11 | 49:23 52:14 | 66:7 70:9 | **gotten**  43:10 |
| 73:13 74:9 | 56:11 60:20 | 71:20 77:19 | 108:7 114:4 |
| 89:21,22,22 | 62:5 66:12,22 | 79:23 81:8 | 154:14,16 |
| 113:5 123:9 | 66:23 68:17 | 92:10 94:11 | 197:24 |
| 148:22 158:1 | 69:5 77:19 | 109:20 110:8 | **governing**  12:1 |
| 160:21 163:10 | 87:1 91:21,24 | 112:10 124:16 | **graduating** |
| 192:3 193:15 | 92:8 102:15 | 124:24 130:12 | 11:4 |
| 202:25 206:7 | 114:23 115:2,5 | 137:9 144:10 | **granular**  196:1 |
| 219:20 220:2 | 115:10 123:16 | 144:11,15 | **granularity** |
| **girls**  132:11,22 | 123:17,22,24 | 158:18 162:7 | 185:25 |
| **gist**  47:24 | 123:25 124:7 | 171:2 179:21 | **grapeland**  9:20 |
| **give**  9:4 11:3 | 124:11,20 | 179:24,25 | 35:16 134:8,21 |
| 54:4 68:19 | 134:6 142:12 | 180:8 184:2,18 | 134:24 |
| 87:18 101:20 | 142:20 146:12 | 186:15 194:21 | **great**  68:16 |
| 116:24 119:6 | 149:1 150:18 | 201:9 208:4 | 133:12 |
| | 152:25 155:14 | 210:9,18 | |

Page 20

**[green - home]**

| | | | |
|---|---|---|---|
| **green** 207:24 | **h** | 200:21 | **hired** 88:3 |

**green** 207:24
207:24,25
208:5
**grew** 135:2
**grief** 213:25
**griffith** 2:5,5
**gross** 190:18,20
191:11 192:9
192:12,22
197:3
**groups** 55:17
136:22 185:16
185:17
**grow** 135:1
**guess** 12:13
26:13 34:16,19
89:20 120:1
123:9 139:22
139:25 146:21
166:20 181:2
183:12 196:9
219:11
**guessing** 34:20
84:8 208:15
**gulf** 11:9
**guy** 14:6,7
25:20 52:1
96:6,9 97:11
98:6
**guy's** 31:23
54:3
**guys** 143:13
166:5 179:17
183:14,25
184:1 192:6

**h**

**h** 6:9 225:3
**half** 28:15
56:11 93:20
106:21 107:18
108:19 119:10
167:21 168:5
168:10 185:24
212:14 213:10
**hammered**
104:15
**hand** 8:18
32:14 65:4
107:21 108:12
108:12 111:15
115:1 165:10
180:3 186:24
207:10
**handed** 111:18
**handled** 205:22
205:23
**hands** 54:16
**hang** 58:20
135:18 148:19
170:7
**happen** 26:14
46:5 131:9
**happened**
26:13 95:9,11
**happens**
210:19 211:3
**happy** 148:16
148:16
**hard** 12:15
16:4 97:1,6,8

200:21
**hashed** 182:12
183:4
**hate** 210:10
**he'll** 149:1
**head** 129:7
132:13
**health** 201:20
201:24,25
**hear** 59:3,6,7
124:4,5 157:25
161:12 198:3
219:21
**heard** 28:22
63:8 160:9
200:23 204:7
**hearing** 71:13
**heights** 133:12
**held** 194:23
**hell** 68:9
124:21
**help** 44:2 53:10
**helped** 160:12
**helpful** 73:16
**helping** 160:22
**hereto** 223:15
224:11 226:7
**hey** 50:13 54:3
64:21 74:12
170:22
**hi** 65:19
**high** 11:21
**highly** 125:4
**hire** 184:6

**hired** 88:3
**hires** 54:15
**history** 11:4
**hit** 101:22
210:18
**hmm** 15:5
20:23 24:24
42:12 50:20
57:17 60:21
61:24 69:4
102:10 149:12
171:15
**hobbs** 4:16 6:4
8:5,5 29:18
45:13 60:23
77:2,6,23
78:25 79:14
145:22,25
167:14,15
211:15 213:20
217:24 218:8
218:15,17
219:14,20
220:2,10,11
221:23
**hold** 16:2
213:17
**holdback**
192:19 193:9
194:12,15,20
**holder** 16:11
**holly** 23:5,13
**home** 9:24
86:14 88:5
129:24 154:7

Page 21

**[honestly - information]**

| | | | |
|---|---|---|---|
| **honestly** 13:6 | 86:13,15 87:4 | 44:24 50:5 | 185:20 195:17 |
| 28:13 72:19 | 87:10,11 136:8 | 61:14 65:8 | **including** 21:1 |
| 74:1 | **house** 26:8,9,12 | 67:5 73:7 | 117:4 |
| **hopeful** 74:22 | 88:2 103:13,18 | 180:6 187:6 | **income** 85:1,14 |
| **horse** 186:2 | 104:1 105:7 | 207:15 | 107:13 108:17 |
| **hose** 100:13 | 106:14 108:11 | **identify** 8:2 | 143:10 190:18 |
| **hospital** 55:15 | 108:15 128:6 | **identifying** | 190:20 191:11 |
| 92:16 93:7,8,8 | 132:15 133:12 | 41:8,9 | 192:8,10,12,13 |
| 94:10 101:7,11 | 133:22 | **ii** 1:6 3:3 7:10 | 192:23 193:2 |
| 109:20 114:6 | **houston** 2:6 | 225:1 226:1 | 193:16 195:11 |
| 114:10,12,14 | 34:24 35:14,15 | 227:3 | 197:3 |
| 115:10 116:3 | **how'd** 146:22 | **illegal** 33:2 | **inconsistent** |
| 144:5 189:17 | **huh** 15:6 | 49:3,8 | 33:15,23 |
| 189:19 190:1 | **hundred** 21:20 | **important** | 175:18 |
| 190:16 191:3 | 97:15 114:9,12 | 95:16 96:3 | **increasingly** |
| 191:15 192:1 | 114:13,22,24 | **impression** | 40:21 |
| 195:20 196:2 | 136:20 175:22 | 66:18 125:17 | **independent** |
| 197:16 | 178:4 | 142:13 | 121:10 |
| **hospitals** 89:23 | **hurt** 179:5 | **improper** 46:23 | **indicates** |
| 101:20,24 | **i** | 49:3,8 | 216:21 |
| 125:8 163:11 | | **inaccurate** 44:9 | **indicating** |
| 190:24 191:1,6 | **ian** 4:7 | 172:17 | 16:23 |
| 191:9,13,20 | **ibc** 115:15,16 | **inadvertently** | **indication** |
| 192:6 | 115:20 117:8 | 150:16 | 216:22 |
| **hotmail** 149:18 | 117:13,20 | **include** 109:10 | **individual** 92:6 |
| 150:12,21,24 | 141:9 142:3 | 165:5,14 | 106:24 113:10 |
| 163:2 171:13 | 196:9,13 | **included** 19:24 | **individual's** |
| **hotmail.com** | **idavis** 4:12 | 36:17 63:17 | 96:17 |
| 227:1 | **idea** 34:7 91:2 | 110:1 118:6 | **individuals** |
| **hour** 49:17 | 95:11 116:6 | 143:18 165:9 | 11:22 165:15 |
| 80:7 85:19 | 121:13 140:7,9 | 165:10,18 | 203:17 |
| 86:18 87:7 | 197:6 198:12 | 166:13,17 | **information** |
| 144:15 | 213:16 | 167:8 182:24 | 23:4,13 29:8 |
| **hours** 14:14 | **identification** | 182:25 183:6 | 69:16 75:5,8 |
| 83:1,1 85:19 | 18:2 19:3 22:7 | 184:9 185:17 | 75:12 84:3,9 |
| | 23:16 27:5 | | |

Veritext Legal Solutions
800-336-4000

**[information - kelly]**

95:17 99:16
100:9,18,19,21
102:14 103:1
103:22,25
104:4 105:5,22
106:14,18,24
107:9 108:3,7
108:21 109:9
111:24 112:1
114:21 118:16
138:16,24
142:25 143:20
158:11 159:4,9
184:10,13
196:22 197:24
**informed** 77:25
**initial** 151:12
152:20 156:8
157:5,9 181:3
**initially** 13:13
88:3 120:22
**initials** 89:16
**input** 62:15
65:22 215:13
**installation**
91:4
**installers** 90:11
**instigated**
140:24
**instruct** 83:11
**instructed**
83:10 140:4
**insurance**
101:12 125:10
189:18 190:6

190:14 197:4,7
197:8,11,20
**intended** 7:19
**intention** 81:8
**intentionally**
150:16
**interest** 15:14
37:15,17 56:20
64:23,25
122:22
**interested**
51:25 65:2
72:7,11 73:15
223:15 224:12
**internet** 87:8
98:22
**interpret**
189:12
**invoice** 96:15
**invoices** 165:25
**involved** 83:20
113:15,23
116:8,10,11
123:1 138:23
140:17 141:21
164:25 185:8
185:14
**involvement**
113:13 164:22
184:21 193:17
196:5 205:16
**involving** 57:12
**irs** 11:6,11,20
12:1,17,24
13:1 21:22

23:25 24:15
160:13,21
**issue** 179:8
**issued** 51:12
**it'd** 116:24
160:20
**it'll** 153:16
219:23
**itemization**
191:18
**items** 155:20
184:9

**j**

**january** 73:11
134:16 189:6
**jean** 1:16 4:2
7:11 225:1
226:1 227:3
**jeff** 4:16 8:5
**jhobbs** 4:20
**job** 2:9 11:8,21
87:3 90:23
99:19,22
105:10 225:2
**jobs** 11:12
**john** 8:14 43:23
57:1 71:18
74:4 214:14
216:17 219:2
**join** 210:18
**joined** 24:21
25:1
**joining** 210:25
**jp** 128:11,17
132:3,6 203:22

204:1,16,22
**judge** 71:12
**julia** 135:10
**july** 220:12,17
**jump** 51:3
**june** 187:2,19
188:11,20
189:9 195:6
199:16 219:21
220:12,17
**junk** 74:1
**jury** 71:12
220:22
**justifications**
40:12

**k**

**k** 19:19,23 20:3
20:11,18 24:7
**katherine** 1:9
3:5
**keep** 14:24
47:13 49:17
84:15 150:14
155:18
**keeping** 22:17
70:16 133:5
195:23
**keller** 1:10 3:5
**kelly** 27:18
39:13 40:20
43:25 46:1,12
46:18,21 50:3
50:15 52:8
61:11,17 62:18
67:15 68:3

**[kelly - knox]**

| | | | |
|---|---|---|---|
| 69:6 149:8 | 48:9 51:25 | 121:5,7,11,12 | 194:10,17 |
| 153:11,12,15 | 52:9 54:3,8,14 | 122:16,18,20 | 196:13,15 |
| 153:19 178:3 | 54:21,23 55:23 | 122:23 123:1 | 197:5,12,18,23 |
| 214:2 216:10 | 57:7 60:4,18 | 123:11 124:25 | 198:15 199:21 |
| 216:13 217:6 | 61:7,8 62:4,24 | 125:2,19,20 | 200:12,15,18 |
| **kept**  112:15 | 63:15,16,17,17 | 126:23 128:11 | 201:3,12,22 |
| 195:20 210:3 | 63:18 64:18 | 128:20 129:11 | 202:3,8,12,16 |
| **kicked**  211:11 | 65:14,20 68:9 | 129:12,13 | 202:18,24 |
| 211:13 | 69:7 70:13,15 | 130:2 132:10 | 203:20 204:1,4 |
| **kind**  13:17 14:7 | 70:15,22 72:3 | 132:21 133:1,7 | 205:18,21,21 |
| 14:8 87:12 | 72:4,4,10,17,17 | 133:9 136:24 | 205:23 206:1,2 |
| 89:20 95:5 | 72:18,18 73:16 | 137:14,20,21 | 206:8,15,24 |
| 104:15 108:12 | 73:25 74:2,4,5 | 139:3,7,11,15 | 207:1,7,9 |
| 155:7,11 | 74:15 75:7,7 | 139:17,19 | 210:3,6 214:25 |
| 170:14 174:9 | 75:25 76:9 | 141:6,20 143:3 | 215:7 216:3 |
| 190:11 200:4 | 77:18 79:22 | 145:15 146:22 | 218:23 219:3 |
| **knew**  17:13 | 80:10,11 83:2 | 151:17 154:13 | 220:16,19 |
| 35:21 36:6 | 83:17 86:14,25 | 156:11 158:8 | **knowing** |
| 57:20 70:16 | 87:9,9 89:4,16 | 159:6,13 160:3 | 177:21 |
| 89:8 93:24 | 89:23,24 90:1 | 160:4,5,7,12 | **knowingly**  16:6 |
| 113:4 117:16 | 90:7 91:8,9,14 | 161:15,17,24 | 16:14 27:14 |
| 118:22 120:15 | 91:15 92:10,12 | 162:11,20,21 | **knowledge** |
| 132:25,25 | 92:24,25 93:14 | 163:10 164:16 | 29:14 38:7 |
| 152:22,23 | 93:22 95:9,24 | 164:21 165:10 | 42:16 76:18 |
| 164:17 184:17 | 97:5 101:8,14 | 165:22,23 | 88:18 121:3,4 |
| 220:7 | 101:15 102:18 | 166:13,15 | 137:13 167:23 |
| **know**  8:13 9:16 | 104:14,16,17 | 167:11 170:3 | 203:5 204:9 |
| 11:6 13:4,4,6,7 | 105:18,18 | 170:13 173:6 | 208:22 223:10 |
| 14:5,6 15:19 | 107:12 109:17 | 175:25 176:12 | 224:6 |
| 16:4 17:5 | 110:6,7,18,19 | 177:9 178:10 | **known**  30:17 |
| 20:11 25:12 | 112:9 113:13 | 182:24,25 | 42:4,18 70:10 |
| 28:4,22 30:11 | 113:16,22,24 | 183:9,9 184:8 | **knox**  55:14 |
| 32:9 34:14 | 114:2,10,20 | 185:23 187:11 | 92:15,17 93:7 |
| 36:1 37:16 | 117:10,13 | 193:12,20,21 | 114:23,25 |
| 38:17 46:21 | 119:1,1 120:3 | 193:24 194:6 | 192:1 |

**[l - liberty]**

| l | | | |
|---|---|---|---|
| **l**  149:16,17 150:11,20,24 | 43:4 49:2 133:10 135:5 | 72:2,15 75:23 76:14,24 77:20 | 185:18,25 196:1 |

**l**  149:16,17
  150:11,20,24
**lab**  1:20 4:4
  31:16 76:7
  82:5,8,11,12
  83:15,16 92:5
  121:7,10,13,14
  136:13 137:3
  164:7,7,12
  180:13 191:5
  191:16,20
  192:10 195:17
  195:19 196:2
  196:17 203:21
**labs**  191:9,9
**lack**  89:20
**landline**  129:19
  129:21
**landlines**  130:4
**landon**  128:20
  128:22
**language**  58:25
**laptop**  94:25
  154:5,6 155:2
  155:6,10
**larry**  7:4,9 35:6
  50:13 65:19
  199:3,5,6,10
**late**  134:16
  153:1,19
  158:21 159:14
  178:12
**law**  13:16 14:7
  15:20 16:10

43:4 49:2
133:10 135:5
**lawrence**  2:2
  8:20 9:5 225:2
  225:24 226:2,4
  226:12 227:4
**laws**  7:21
**lawsuit**  39:14
  43:16 73:19
  75:12
**lawyer**  53:19
  54:15,18 55:23
  55:25 56:15
  58:18 74:8
  145:16,20
**lawyer's**
  145:14
**lawyers**  43:21
  80:18 81:1,21
  145:21 215:14
  215:19,23
  219:10
**layperson**
  56:15
**lead**  94:6,15
**leading**  33:11
  35:22 36:9,19
  39:11 41:17,25
  42:14 44:5
  47:17 48:7
  49:11 51:13
  53:1,21 54:1
  55:8 57:18
  63:21 64:12
  69:14 70:11

72:2,15 75:23
76:14,24 77:20
212:25 215:21
217:22 218:12
218:19
**learn**  91:20
  175:20
**learned**  176:25
**leave**  40:3 56:1
  56:2 58:24
  68:18
**leaving**  123:11
  130:4 150:3
**left**  16:24 21:21
  22:17 23:3
  24:20 25:1
  26:11 32:18,23
  43:16 84:12
  95:10,12 98:25
  112:18 126:1
  126:13 127:2
  127:24 128:5
  128:16 129:3
  131:10 134:5,9
  138:19 140:12
  179:15 204:24
  209:8
**legal**  9:9 35:20
  36:15 40:23
  56:14 227:19
**letter**  54:16
**letters**  198:18
**letting**  123:17
**level**  42:2,8
  64:23,25

185:18,25
196:1
**lewis**  1:16 4:2
  5:4 20:8,15,21
  21:22 23:23
  24:14 37:10
  44:2 46:21
  54:3 70:24
  78:9,13 88:24
  89:6,8 106:8
  113:9 120:3
  121:19 122:3
  126:6,7,18
  127:4,20,22
  131:11,14,22
  132:25 133:1,8
  141:10 148:8
  151:2,4 160:12
  161:12,23
  162:15,24
  182:1,4,12
  183:4,9 203:14
**lewis's**  20:13
  22:15,19
**lexington**  18:19
  88:1,5 133:21
**libel**  27:22
  39:14 52:9
  59:24 157:13
  158:12,19,25
  178:25
**libeled**  60:4,6
**liberty**  167:22
  177:25

**[license - look]**

| | | | |
|---|---|---|---|
| **license** 43:4 | 20:15 121:17 | 115:22 121:21 | **location** 2:5 |
| 49:13 51:19 | 121:18,18 | 121:23 122:4 | 88:20,25 89:5 |
| **licenses** 49:14 | 122:6,7,8,8 | 123:4 126:2,3 | 89:9,11 91:18 |
| **life's** 61:8 | **llp** 4:8 | 126:5,13,24 | 92:21 94:21 |
| **light** 170:17 | **ln** 1:17 4:3 | 127:2 130:3,4 | 104:22 120:7 |
| 214:24 | 16:20,24 17:2 | 132:23 133:4,8 | 120:12 |
| **likely** 40:9 | 17:10,16 18:4 | 133:19 134:3,5 | **lochridge** 4:8 |
| 155:1 | 18:15,23 19:1 | 134:9 135:21 | **log** 8:15 |
| **lindsey** 5:6 | 19:20,20,21 | 136:5,7,12 | **logged** 210:14 |
| **line** 66:13,13 | 20:2,8,16 21:1 | 137:3,6,15,16 | 211:9 |
| 107:13 109:14 | 21:9,16,21 | 140:21,24 | **logistic** 91:7 |
| 130:17 200:5 | 22:17 23:13,19 | 142:9 144:4,10 | **logistics** 89:19 |
| 220:3 225:4,7 | 23:22 24:8,11 | 149:22 150:3,5 | **long** 11:7,15 |
| 225:10,13,16 | 24:21 26:11,19 | 150:10,10,11 | 12:5,7,8 13:11 |
| 225:19 | 30:13 36:3,17 | 150:14,14 | 22:12 28:2 |
| **lines** 89:1 96:16 | 36:24 40:19 | 163:4,8,22,24 | 63:3 130:1 |
| 159:15 173:15 | 41:10 43:16 | 164:12,17,18 | 133:14,14 |
| 197:14 | 47:10 49:4 | 164:20,22,25 | 135:13 157:24 |
| **list** 102:10 | 52:24 53:11,19 | 165:12 180:12 | **longer** 54:18 |
| 104:12,13 | 54:9,12,22 | 185:21 191:13 | 131:24 197:6 |
| 147:19 188:16 | 60:20 70:5 | 195:22 196:2 | **longtime** 37:4 |
| **listen** 66:6 | 75:10,21 76:22 | 197:16 198:17 | **look** 15:7 20:10 |
| **litigation** 43:5 | 77:11,15,25 | 203:3,6,8,10,15 | 32:2,3 40:11 |
| 56:17 57:2 | 81:17,19,21,25 | 206:20 207:3 | 46:3 61:16 |
| 219:10 | 82:3 83:7,11 | 207:19 208:17 | 62:3 68:11 |
| **little** 11:11 | 84:2,12,20,24 | 209:21 210:4,7 | 83:19 90:4 |
| 59:22 117:22 | 85:1,10,13,15 | 212:20 | 114:23 120:16 |
| 131:20 139:4 | 85:18,20,23 | **ln's** 110:25 | 122:13 147:13 |
| 144:15 168:20 | 86:1,6,11,13,17 | **locally** 95:19 | 156:18 167:10 |
| **lived** 34:23 | 86:21 87:22 | 95:22,23 96:2 | 168:15 171:7 |
| **living** 10:1 88:1 | 88:3,14,15,17 | **locate** 153:20 | 172:3,20 |
| 133:18,21 | 88:20 89:18 | **located** 31:21 | 173:24 175:3 |
| 135:20 | 90:1 91:7 | 32:25 33:5 | 176:15 177:11 |
| **llc** 1:8,18,21 3:4 | 94:18 96:16 | 35:12 87:17 | 178:5 187:22 |
| 3:19 4:3,5 | 110:22 115:17 | 157:12 | 187:25 188:17 |

Veritext Legal Solutions
800-336-4000

**[look - markham]**

188:19 190:20
198:10 206:5
213:16,17,24
214:13,25
215:25
**looked**  41:2
146:24 147:19
151:23 152:12
172:23 176:20
178:16 191:23
**looking**  46:9
47:22 61:20
72:9 80:17,25
84:15,16
122:11 152:4
152:20 171:11
173:12 180:9
180:18,21
182:21 187:1,1
188:9,10,15
200:15,24
214:2
**looks**  18:12,14
24:25 65:12,13
65:15 172:22
187:17 188:11
196:8,16 208:2
**lost**  15:14
**lot**  25:12,15
28:3,15 41:14
64:17,21 93:15
109:15 168:6
205:18
**love**  210:10

**low**  64:23,25
**lp.accounting**
227:1
**luckily**  47:7
**lunch**  144:22
145:1

**m**

**mac**  129:13,14
129:14
**mad**  61:5 80:21
**madame**  17:19
**made**  28:4
38:16 65:19
66:1 67:11
69:21,25 70:20
78:4,10,15
86:23 87:2
151:18 159:24
169:13 172:25
173:4 206:11
208:4 226:5
**mailbox**  102:4
**mailed**  76:2
107:23 141:18
**main**  3:20
201:11
**major**  166:14
**make**  24:13
39:25 40:5
66:8 85:24
104:16,18
114:24 115:1,2
115:11 119:4
135:19 147:21
147:24 148:2

156:24 163:12
163:14 169:9
195:18 212:11
218:9
**making**  91:8,14
159:10,16
**man**  46:10
125:1 142:2
200:2 214:15
215:2,17
**management**
1:18,19,21 4:3
4:4,5 18:5
75:17,22 76:21
81:18,22 82:9
82:12 83:16
84:2 115:23
121:8,14
126:24 136:13
137:3,4,6
158:6 163:23
163:25 164:7
164:12,13
180:13,14
192:18 193:8,9
193:12,17,22
194:3 196:18
199:7 200:22
201:7,9,10,11
201:12,17
202:5,5,17,21
202:22,24
203:1,21,21,24
203:25 204:10
204:13,13,25

**management's**
196:14
**manager**  89:19
116:14,15
**manner**  7:22
**manor**  103:14
103:16 104:1
105:8,12,15
106:11,14,25
107:16 108:11
108:15 132:15
**manufacture**
29:16 30:1
**march**  2:3 7:3
7:11 189:7
227:2
**mark**  179:21
179:24 186:15
219:4,5,7
**marked**  18:1
19:2 22:6
23:15 27:4
44:23 50:4
61:13 65:7
67:4 73:6 78:6
78:11,17,22
83:25 146:15
152:14 167:12
171:11 180:3,5
187:5 207:14
**markham**  3:19
8:14 43:23
57:1 71:18
72:22 73:10
74:4,16 79:24

**[markham - miller]**

80:5 216:17,20
216:23 217:3,9
219:2
**markhamread...**
3:22
**marking**  17:19
**married**  135:7
135:14
**marshall**
134:12
**master's**  10:18
**match**  40:8
214:24
**matches**  114:5
196:10
**matter**  7:10
65:10 183:13
211:8
**matters**  13:14
**max**  201:20,24
201:25,25
**mba**  10:25
**mcginnis**  4:8
**mcginnislaw....**
4:11,12
**md**  1:5,10,11
3:2,5,6
**mean**  35:24
42:4,7 64:17
65:14 71:1
73:3 75:25
83:15 85:18
91:7 95:20
96:2,24,25
97:14 109:15

109:15 124:21
124:22,25
136:18,19
137:20 139:1
141:4 145:25
149:9 159:7
161:22 166:2
168:25 169:19
169:20 170:11
189:22 191:7
191:22 194:25
196:25 199:8
200:7,16
207:21 211:14
219:11
**meaning**  27:14
43:16 58:10
**means**  7:23
17:7 95:21
108:2 189:14
190:5 197:7,10
198:12 214:23
**meant**  12:20
73:17 182:2,4
**measure**
123:10
**mechanics**
142:15
**media**  162:13
162:16
**medical**  1:7,18
3:3 4:3 37:16
198:13 199:6
200:12

**meet**  93:21
127:7,9
**meeting**  22:16
127:12 209:23
211:1,1
**meetings**  22:13
127:14,22,25
128:17 204:20
209:21 210:4
**member**  136:2
170:12
**members**  31:16
**memorial**  93:8
**memory**  40:8
69:10 84:7,18
140:3
**mention**  51:17
64:8
**mentioned**  47:5
88:25 91:6
92:15 93:13
94:4 96:11,23
97:11 99:7
145:6 157:11
204:5
**merged**  11:9
**merry**  209:14
**message**  75:9
175:15 208:7
210:14
**messages**  50:3
59:18 127:17
127:22 128:1
161:13,20
173:25 207:11

207:12 208:2,9
208:16,19
209:6,11
**met**  128:13
133:9,11,15
204:16,17,22
217:16
**michael**  214:14
**mid**  153:1,1
**middle**  199:21
**mile**  133:23
**miles**  134:25
**miller**  3:8 6:5,7
8:7,7,9 26:25
33:11 35:22
36:9,19 37:19
39:11,16 40:24
41:17,22,25
42:14,24 44:5
44:17 47:17
48:7,12 49:11
49:24 51:13,20
52:4,11 53:1,4
53:15,21,25
54:5 55:8,20
56:6,18 57:5
57:18,23 58:21
63:10,21,24
64:12 65:16
68:16 69:14
70:11 72:2,15
75:13,23 76:14
76:17,24 77:20
79:4,10 80:4
80:12,24 90:12

**[miller - months]**

90:19 124:18
130:19 144:14
144:21 146:3
149:5 163:20
163:21 167:15
167:16 168:1
170:9 174:12
174:14 176:10
179:13,24
180:2 186:21
186:23 205:2,9
209:19,20
210:9,24 211:4
211:13 212:24
213:5,8 215:8
215:21 217:11
217:22 218:2
218:12,19
219:17 221:1
221:21
**mind** 14:24
19:20 22:17
46:8 83:18
146:11 161:20
**mine** 33:21
62:21 149:16
209:13
**mint** 135:25
145:6,7
**minus** 181:22
182:6
**minute** 46:16
62:11 68:15
73:21 74:12
205:3

**mishear** 219:22
**misquote** 86:24
**missed** 56:11
**misspelled**
215:6
**misstated**
168:2,4
**misstates**
167:25
**mistake** 208:4
**mister** 80:13
145:23 221:22
**mj** 20:8,10 21:3
23:22 31:20
37:4 38:9,13
38:17,18 39:2
77:17 87:9
88:21 89:14,14
89:25 90:7,21
91:6 113:8
120:1,15 122:1
122:4 124:3,8
127:4,5,7,11,15
127:17 130:9
130:20 131:4
131:21,23
141:1,10,17
145:10 162:16
203:10 206:7
206:12,13,13
215:2
**mj's** 32:6
**mjc** 206:21
**mjcx** 90:5
121:23 122:8

122:14 206:22
207:3
**mjtx** 38:17
**mm** 15:5 20:23
24:24 42:12
50:20 57:17
60:21 61:24
69:4 102:10
149:12 171:15
**mmp** 17:3,11
38:14 81:19,22
92:25 93:6,10
102:5 107:13
108:24,24
110:21 112:14
112:19 113:3,7
115:17 116:19
117:11,16
119:2 122:24
136:14 144:1,4
148:8 189:19
190:23 191:13
204:9,13
**mmp's** 107:12
**mobile** 145:6,7
**monday** 119:2
**money** 39:7
40:8 43:12,15
44:7 52:10
101:11 105:10
118:20 142:4
143:9 144:5
169:25 170:1
185:7 190:22
195:10 197:15

206:7,9
**monies** 193:7
195:19
**monster** 187:15
**month** 25:2
32:15 34:12
107:17 108:8
108:18 110:9
111:2,23 112:7
113:5,21
114:25 115:13
119:6 132:21
137:21 138:2
139:6 144:7
166:9 185:1
195:4,7 197:4
197:7,20 201:6
201:10,16
202:5,17,22,25
**monthly** 96:20
99:24 100:2,22
104:21 105:23
106:15,20
107:4,6,7,10,11
108:18,22
109:8 113:11
114:8,16 119:5
132:18 143:16
164:3 185:1
195:23
**months** 22:10
22:12 24:20
67:18 73:11
110:7 143:12
166:4 183:13

Veritext Legal Solutions
800-336-4000

[moore - number]

**moore** 224:2,15
**mopac** 3:12
**morning** 7:5
8:11 59:10
175:8 212:12
213:12
**mother** 135:5
**move** 88:8
**moved** 133:22
134:8,21
**mso** 200:6,14
200:18
**msos** 200:8
202:15
**multiply** 193:4
**must've** 59:4
59:11 194:15

**n**

**n** 3:1 4:1 5:1
6:1 7:1
**name** 7:5 9:4
10:14 17:8
23:7 31:23
32:12,16 79:10
79:22 85:6,6
93:22 94:7
96:10 101:10
135:9,11 142:1
145:14 162:6
168:21 219:6
**named** 24:17
71:18
**names** 32:4,5
93:14,24

**nathan** 1:10
3:5
**near** 11:10
**nearby** 134:24
**necessarily**
208:25
**necessary** 23:4
209:1 226:6
**need** 14:8 49:17
57:12 66:8
67:10 90:4
130:15 139:15
142:20 180:9
206:5 210:15
**needed** 95:14
96:20,22 103:6
118:13 146:23
**needs** 149:3
**negative**
170:17
**neither** 218:17
223:11 224:7
**net** 11:22
143:10 181:21
184:15,18
185:2 192:8,13
192:23 193:2
193:16 195:11
196:10
**never** 14:4
26:17,21 29:11
29:13,13 68:12
73:3,21 119:14
146:10 150:1
164:25 170:21

171:1,4 173:10
194:23 204:7
206:1,2 217:16
217:18,20
**new** 23:4,13
154:16 188:22
189:3,10,10
196:25 220:20
**news** 51:3,9
**nichols** 1:16
4:3 5:4 20:8
21:22 22:4
23:23 24:14
70:24 71:10
78:9,10 89:8
121:19 122:3
126:7,11,18
127:4,20,22
131:11,14,23
133:8 145:10
151:2,5 160:12
161:23 162:16
162:24 203:14
**nichols's** 20:15
20:22
**nine** 11:6
**ninety** 135:18
**non** 37:19
39:16 44:17
52:11 53:4,15
54:5 56:15
58:21 60:12
63:10,24 65:16
174:12

**nonprofit**
127:6,13
**nope** 30:22
131:2
**normal** 33:9
**northcutt**
128:20,22
129:16
**notarize** 227:11
**notary** 7:12
223:18 226:13
226:19
**note** 227:9
**noted** 168:17
169:3 173:20
226:7
**notes** 62:4 64:7
171:18
**notify** 169:9
**np** 1:9,12,13
3:4,6,7
**number** 11:12
20:25 80:9
101:5,6,20
102:7 109:21
110:10,13
113:21 114:4,4
118:1,5 120:21
129:17 130:6,7
130:9,20,23
131:4 132:3,6
135:23 138:15
143:17 144:5
147:8 161:3,14
161:16,19,19

**[number - okay]**

162:6,10
167:13 168:12
168:16 171:7
171:12 172:4
172:15,20
173:25 176:15
177:12 180:4
183:21,25
184:3,7,7
186:25 188:1
188:10,19,20
189:25 190:1
191:12 193:1,2
193:4 196:19
196:23 199:25
206:5 207:10
209:17 216:21
216:22 218:23
**numbers** 103:5
104:25 107:15
111:11 131:6
132:1 188:22
200:5

**o**

**o** 7:1
**oath** 9:10 69:25
145:1 168:24
220:18
**oaths** 7:13
**object** 80:4
130:12 167:24
**objection** 7:14
33:11 35:22
36:9,19 37:19
39:11,16 40:24

41:17,22,25
42:14,24 44:5
44:17 46:25
47:17 48:7,12
49:11 51:13,14
51:20 52:4,11
53:1,4,15,21,25
54:5 55:8,9,20
56:6,18 57:5
57:18,23 58:21
60:12 63:10,21
64:12 65:16
69:14 70:11
72:2,15 75:13
75:23 76:14,17
76:24 77:20
124:14 174:12
176:7 179:11
212:24 213:5
215:8,21
217:11 218:2
218:12,19
**observed** 49:4
49:9
**obtain** 75:5
**obtaining**
164:20
**obviously**
30:21
**occasionally**
162:14
**occasions**
150:16
**occur** 88:12

**occurred** 88:14
210:17
**occurrence**
142:17
**october** 16:24
21:22 25:2
77:11 84:13,18
86:2 126:1
127:2 134:5
138:20 140:13
208:3,11,15,20
209:7,11
**offense** 27:15
**offer** 80:14
171:24
**offered** 79:18
79:21 218:18
**office** 22:14,15
22:17 53:7
82:25 86:13
87:14,23 88:9
88:13,15 89:7
91:18 92:24
93:14 94:20
95:3 99:4,6
101:8 111:17
129:15 132:22
133:23 158:3
159:7 166:12
204:18,20
205:21
**officed** 89:9,10
**officer** 139:16
223:1,2

**offices** 32:13
87:16,17 88:17
110:18,18
188:25
**oh** 11:23 12:12
13:16 18:20
26:2 29:24
30:9 32:20
42:1,25 45:12
45:24 48:21
49:24 59:5
60:1 66:23
77:4 79:2
80:19 91:24
93:24 101:7
107:6 120:9
129:2,7 134:7
146:6,10,20
147:14 149:8
150:18 156:15
171:6 173:19
174:11 175:6
176:2 181:13
187:24 189:23
193:23 198:23
201:2 208:13
211:17 221:14
**okay** 8:10,17
12:9 13:2,8,12
14:10,16,25
15:3,11,24
16:5,9,17,23
17:2,5,10,15
18:3,22 19:14
20:1 21:21

**[okay - organizations]**

| | | | |
|---|---|---|---|
| 22:9,13,16,21 | 71:22,25 72:11 | 195:14 196:13 | **operate**   129:24 |
| 23:3,18,21 | 72:25 73:5,8 | 196:19,21,25 | 143:4 |
| 24:25 25:5,8 | 73:15 74:7 | 197:19 198:8 | **operating** |
| 25:16 26:8,14 | 75:9,16,20 | 198:16,25 | 100:12 142:16 |
| 27:18,25 28:9 | 76:9,20 77:8 | 199:8,23 200:3 | 143:3 166:4 |
| 28:24 30:8,23 | 77:24 79:2,7,8 | 200:10 201:2 | **operation** |
| 31:5,13 33:7 | 79:12,21 81:3 | 202:14 205:14 | 202:1 206:18 |
| 33:13 34:5,10 | 81:14 83:25 | 206:22 208:1,8 | 206:20,21 |
| 34:17,25 35:2 | 84:6,15 87:1 | 210:23 211:6 | **operations** |
| 35:5,11,17 | 101:23 102:21 | 213:2,8,25 | 108:11 116:10 |
| 36:3,15 37:1 | 109:7,19 | 214:1,8,11,19 | 116:19 139:16 |
| 37:22 38:3,9 | 110:24 113:20 | 214:22,24 | **opinion**   56:14 |
| 38:12,21 39:1 | 114:14,19 | 215:13,25 | 72:17 |
| 39:19 40:18 | 115:9 117:16 | 216:8,9,13,18 | **opportunity** |
| 41:2,6 42:4,23 | 117:25 119:8 | 216:19,24 | 10:9 65:21 |
| 43:1 45:13 | 127:12 129:2 | 217:1,5,14,24 | 133:3 |
| 46:17,23 47:7 | 130:6 142:8 | 218:5,8,14,17 | **opposed**   85:22 |
| 47:8,15,20,23 | 144:4 146:13 | 219:2,4,9,25 | 136:23 |
| 48:24 49:13,16 | 147:14,18 | 220:16,20,20 | **order**   17:20 |
| 49:20 50:23 | 148:19,20,24 | 221:2,18 | 37:14,14 100:9 |
| 51:2,17 52:14 | 149:2,4 151:25 | **old**   46:18 81:10 | 103:2 105:19 |
| 52:23 54:4,8 | 155:4 156:24 | 154:17 155:14 | 107:4 108:22 |
| 54:21 55:1,4 | 157:1,8 160:16 | **older**   46:12 | 109:10 116:24 |
| 56:3,3,9,25 | 163:16 167:19 | **once**   34:12 | 118:14 136:23 |
| 57:13,14 58:2 | 168:9,19,23 | 88:24 109:23 | 142:10,16 |
| 59:17,22 60:6 | 170:13 171:10 | 128:6 139:1,2 | 164:24 |
| 60:8,22 61:10 | 173:21 174:1 | 142:19 185:11 | **ordered**   99:15 |
| 61:19 62:3,10 | 174:11 180:7 | **ones**   104:16 | **ordinarily** |
| 62:12,13,18,23 | 180:25 181:6 | 185:1 | 115:1 141:16 |
| 64:4,14,19 | 181:19 182:9 | **ongoing**   51:18 | **ordinary**   33:4 |
| 65:4 66:1,21 | 182:20 183:12 | 57:10 | **organization** |
| 67:7,20,23 | 183:18 187:8 | **online**   98:18 | 141:24 142:1 |
| 68:3,6,12 | 187:13 189:2 | 115:8,10 117:7 | 165:15 200:13 |
| 69:11,21,24 | 191:11,18,24 | 142:3 | **organizations** |
| 70:22 71:4,12 | 192:5,20 | | 200:9 |

Veritext Legal Solutions
800-336-4000

**[original - paints]**

**original** 28:22
32:11 63:7,7
67:10 68:7
128:22 177:3
178:12
**originally**
62:24
**origins** 195:1
**outcome**
223:16 224:12
**outline** 81:11
**outlined** 143:5
143:8
**outlining**
180:23
**outside** 32:5
47:11 85:14
86:20 92:24
109:7 111:6
120:20 123:13
126:7,11,18
127:12,20
136:1 137:4,15
137:18 140:15
143:24 157:2
163:2 165:20
166:11 175:15
178:11 179:17
179:19 198:16
204:20
**outward**
164:18
**overhead** 110:5
110:10,16,17
110:19 111:1,7

118:5 143:2,4
143:7,10,12,14
143:17,24
144:6 165:4,8
165:20 166:1,6
166:13,17,22
166:25 167:5
182:10,15,17
183:15,25
193:10,14
195:15,21,22
196:2
**overlap** 25:3
**overpaid**
197:13
**oversaw** 108:10
**oversee** 116:13
116:15
**overseer**
106:12,13
**owe** 194:22
**own** 66:1 69:22
70:1 86:21
89:25 183:19
**owned** 20:15
35:24,25 37:11
37:12 121:18
122:1,4,5
205:19
**owner** 20:16
35:20,21 36:4
36:17,21,23
90:1 121:20,23
136:2

**owners** 19:15
19:20 20:3,19
23:13 122:5
126:9,14,25
129:10
**ownership**
122:17

**p**

**p** 2:8 3:1,1 4:1
4:1 5:1,1 7:1
149:16,17,18
150:11,20,24
223:2,17
**p.a.** 1:6 3:3
7:10 225:1
226:1 227:3
**p.m.** 222:1,4
**packaged**
92:13
**page** 6:2,10
27:3,7 28:14
28:14,14 29:11
29:12,23,24
31:6 32:20
33:22 34:17
35:17 37:2
39:19,22 40:4
45:2 50:19,24
52:14 63:2,3,3
63:13 64:8,15
69:8 151:12
156:4,25
157:22 159:4
162:3,3 167:21
168:5,5,10,10

168:11,18
175:4,9,13
179:25 180:1
180:20 187:1
187:10,24
188:10,15,19
196:4,8,11,19
196:22 198:7,7
198:10,11,11
198:21,22,23
199:21,24
200:3 202:4
206:6 207:22
208:3,10,11
212:13,13
213:10,10
225:4,7,10,13
225:16,19
**pager** 67:17
**pages** 169:17
187:14,18
199:19 221:6
227:12
**paid** 21:25 22:4
37:15 40:20
43:15 44:2,7,9
53:11 81:6
100:5,11
102:11 104:13
104:14,16
123:9 189:6,15
189:18,19
190:2 201:10
**paints** 170:16

**[palmer - payroll]**

**palmer** 2:2 7:4
7:9 8:17,20 9:4
9:5 10:15
18:18 35:6
41:7 69:2 77:7
79:5 82:16
85:8 90:20
123:17 136:1
144:22 162:4
167:17 168:3
170:10 173:24
179:21 180:3
186:15,24
199:3 205:10
208:5 212:7
219:18 221:4
225:2,24 226:2
226:4,12 227:4
**paper** 186:17
**papers** 202:19
**paperwork**
16:23 58:11
**paragraph**
29:12,15 30:1
30:25 31:6,7
31:14 32:21
33:14,22 34:5
34:18 35:18,19
37:2,2 39:20
39:22 40:4,5
40:11,18 41:8
41:9 169:24
170:16 181:22
200:4,22 206:6
212:17 213:12

213:13 214:14
**paragraph's**
31:3
**paralegal** 5:6
**parameters**
153:4
**paraphrasing**
86:24
**parks** 24:18
26:5,18 70:9
128:3
**part** 11:8 15:4
15:19 16:24
19:24 27:25
28:13,18 31:1
31:14,18 59:25
70:23 83:4,11
89:25 101:3
105:9,9 122:5
181:5,10,10,16
199:11,14,22
209:21
**part's** 34:19
**partial** 10:25
**particular** 89:5
96:16 98:6
125:23 137:4
187:9
**particularly**
12:15 26:7
60:17,19
**parties** 7:15
100:13 223:12
223:14 224:8
224:11

**partner** 8:14
20:10 31:25
36:21 38:11
90:2 121:20
122:18 126:8
185:21 203:12
206:11,13
207:2 210:1,7
**partner's** 38:17
**partners** 19:16
31:17,21,22
32:3,11,13
34:15,16 122:6
122:7,15 126:5
126:14,25,25
133:8 136:17
136:18,23
188:16 206:18
209:23
**partnership**
122:22
**partnerships**
11:22
**parts** 14:1,3
15:3,9,12
29:10 30:23
168:13
**party** 49:3
56:17 204:19
**pass** 15:9 77:1
210:11,14
219:12
**passcode** 211:1
**passed** 14:3
28:3 40:10

152:23
**password**
98:19 150:2
**past** 131:5
139:3 163:4
**patient** 101:15
101:16 104:3
190:8,11
**patients** 102:10
104:13 164:21
**paul** 1:16 3:8
8:7,9 26:24
49:23 66:22
79:10 225:1
226:1 227:3
**pay** 43:12
79:18,21 80:15
190:15 197:12
204:9 217:15
218:18
**paying** 38:13
39:1,2 54:17
158:8 160:24
**payment** 38:16
104:17 126:11
204:14
**payments** 33:8
107:6,7 125:5
125:6 126:13
126:16,19
**payouts** 99:12
107:11 108:23
109:11
**payroll** 110:19
165:14,17

Veritext Legal Solutions
800-336-4000

**[payroll - please]**

167:8 182:25
**payroll's**
  165:10
**pc**  95:6 155:9
**pekar**  1:10 3:5
**penalties**  16:10
  16:14,18 19:8
  24:3
**penalty**  9:13
  27:9 29:2
  37:23 44:10
  45:21 52:2
  61:3 66:8
  176:20
**pending**  51:19
**people**  88:21,22
  91:9,11 93:13
  93:17,22 94:4
  94:13,17,18
  101:9 103:11
  104:6 105:7,12
  105:13 108:5
  108:14 119:20
  120:7,13
  137:10 141:6
  184:6,7 217:5
**percent**  21:20
  38:14,19 39:2
  85:13,17,19
  97:15 98:8
  111:5 122:6,7
  122:8,9 136:21
  175:22 178:4
  181:21 184:15
  184:15,18,22

185:2,12 186:4
186:10,12
192:12,13,22
193:1,4,15
194:1,3 206:7
206:8,13 207:4
**percentage**
  108:24 109:4
  110:11,25
  144:1,10
**percentages**
  144:11
**perform**  114:15
  125:9
**performed**
  184:4
**performing**
  91:6 99:2
**period**  85:2,11
  86:4 152:23
  194:24
**periodic**  119:20
**periodically**
  96:8 98:7
  105:12
**perjury**  9:13,16
  27:10,16 29:2
  37:23 44:10
  45:21 52:2
  61:3 66:8
  169:13 176:17
  176:21,25
  177:15,21
  178:9

**permitted**  7:19
**person**  77:18
  78:2 96:19
  99:14 106:17
  107:16 108:10
  108:14 126:23
  132:13,15,17
  178:7
**personal**  20:22
  21:3,23 60:15
  162:25 163:1
**personalities**
  125:25 179:16
  179:18
**personality**
  125:24
**personally**
  23:22
**personnel**
  165:12
**persuade**  78:5
  78:10,16,21
**ph**  219:4,5,7
**phone**  46:8,24
  47:2 58:20
  66:12 68:4
  73:3 78:2 80:9
  127:25 128:17
  129:19,24
  130:10,21,24
  131:4,7,12,15
  131:23 132:4,7
  135:23 157:8
  158:15 161:4,7
  161:8,14,16,19

161:20,25
162:3,7,22
177:12 209:10
217:18
**physical**  119:8
**physically**
  111:16,17
**physicians**
  92:20
**pick**  92:8 93:1
  164:23 189:5
**picked**  188:24
  188:25
**picking**  198:6
**pickup**  165:2
**pieces**  41:13
  212:16
**pierre**  4:2 7:11
**place**  113:17
**places**  93:4,6
  94:9
**plaintiff's**
  216:22
**plaintiffs**  1:14
  3:2 8:8,12,14
  55:6 79:11
  216:23
**platform**  98:14
  98:16
**play**  163:25
  164:8
**played**  121:14
**please**  8:2,18
  9:4,19,24
  10:16 26:1

**[please - proceedings]**

52:15 130:17
162:5 163:19
192:25 203:23
221:23
**pllc**  3:10 4:17
5:7
**plow**  81:13
**plug**  200:6
**plugged**  210:20
**plus**  143:9
**pmiller**  3:14
**point**  13:12
21:14 22:18
53:18 54:17
59:2 66:19
84:23 112:22
113:8 164:25
176:11 178:12
203:1,24
**policy**  155:20
155:21
**pond**  87:21,23
88:9,12,19
89:11,12 91:18
92:4,21 94:20
95:3 99:4,4
103:11 104:6
104:22 105:13
106:3 132:12
**pool**  133:12
**pop**  88:24
**portion**  180:20
181:19
**position**  128:4

**possession**
197:16
**possible**  8:13
49:19 104:18
111:7 150:18
150:22 155:1,7
**possibly**  46:20
**postgraduate**
14:17
**potential**  55:24
**power's**  210:24
**practice**  37:16
**practiced**
205:20
**prajapati**  1:11
3:6
**precisely**  166:8
166:19
**prep**  134:11
**preparation**
80:8 83:20
120:20 145:11
**prepare**  10:4
19:19,23 20:5
27:18 45:6
82:14 84:3
185:10 188:12
188:17
**prepared**  17:15
19:5 20:2,18
20:21 21:3,6
21:11 76:11
84:6 111:10
139:5 152:21
153:25 156:9

157:11,22
159:4 162:25
168:12 178:13
181:1,2 187:7
188:7 194:18
194:19,25
224:3
**preparer**  12:3
12:17 16:14
18:8 19:12
24:1 47:16
48:25 84:2,8
**preparing**
140:15 186:3
187:4 196:6
**prepping**  80:15
**present**  5:2
88:19 89:4
**presented**
147:8
**pretty**  27:24
60:5 63:15
107:14 134:24
152:23 166:5
**previously**
52:24 132:25
167:20 176:16
220:6
**price**  124:25
183:22
**primarily**
125:3
**print**  112:3
**printed**  46:5
111:16

**printing**  200:1
**prior**  62:21
90:23 145:17
158:1 160:14
160:18 171:22
172:18,23
176:11 197:4,7
197:20 207:13
207:16 223:5
**private**  13:2
**privately**
130:14
**probably**  12:8
73:2 86:15
87:5 127:19
131:20 136:22
137:12 139:12
139:22 141:1
160:7,19 161:5
161:5 166:20
182:24 193:23
194:10,25
200:13 211:11
211:13 213:18
216:20
**problem**  28:24
**problems**  53:12
**procedural**
7:20
**proceed**  8:25
**proceeding**  7:7
7:18 222:5
224:4
**proceedings**
51:18 57:11

Veritext Legal Solutions
800-336-4000

**[proceedings - rachel]**

212:9 223:3,5
223:6,9 224:6
**process** 111:24
138:8 169:19
**processed**
89:22 91:10
**processing**
89:24 102:11
136:7
**produced** 7:17
216:20,24
**production**
147:9
**products** 182:8
**professional**
1:17,19 4:3,4
15:22 18:5
34:21 36:3,18
36:24 47:10
49:4,14 75:10
75:21 81:18,19
81:21 84:2
90:5,8 115:22
121:24 122:9
126:24 137:3,6
163:22,25
164:12 180:13
206:22,23
207:3
**professionally**
158:16
**professionals**
16:21 17:10,16
19:21 26:19
40:19 52:24

76:22
**profit** 109:24
111:12
**program** 91:22
98:10
**promised**
178:21
**pronounce**
201:9
**properly** 31:9
91:11
**prosecute**
158:25
**protective**
17:20
**provide** 102:14
103:5,22
166:16
**provided** 53:2
96:19 103:8
118:15 151:12
172:16
**providing**
120:21
**ptin** 12:5,7,11
16:11 18:11
**public** 223:18
226:19
**pull** 153:17
**purported**
35:20 36:16,23
**purpose** 121:7
121:9
**purposes** 46:23
210:11

**pursued** 14:4
**put** 61:19 84:8
92:23 94:16
100:15,18,22
101:16,20
102:7 103:1,6
103:23 104:2
104:25 106:15
107:3,9,17
108:17,21
109:8,21,23
111:11,25
151:1 159:9,17
159:19 165:1
166:23 193:22
194:7,8 197:24
**putting** 120:22
130:13

**q**

**qualifications**
14:10
**qualified** 13:1
223:7
**quash** 51:12
71:20
**quashed** 51:8
57:16 58:10
72:8,12,23
**quashing** 75:2
**quest** 92:24
136:24
**question** 25:25
78:9 85:24
86:8 91:25
113:18 121:6

128:3,9 139:5
146:21 147:11
147:15 154:13
156:24 162:4,7
175:5 181:7,12
193:11 219:18
**questioned**
81:1
**questioning**
220:3
**questions** 37:24
57:13 79:6
81:2,13 125:15
172:1 205:12
210:13 212:8
219:14 220:1
221:1
**quick** 144:15
**quickbook** 99:1
**quickbooks**
98:12,13,17,18
98:23 115:6
148:3 166:23
167:1
**quickly** 49:19
77:9
**quite** 46:20
74:22
**quotes** 48:16
48:16

**r**

**r** 3:1 4:1 5:1 7:1
201:5 225:3,3
**rachel** 201:21
201:22 202:17

Page 37

**[rachel - referring]**

202:25
**raise**  8:18
**raised**  135:3
**ramifications**
   176:17
**ran**  89:21 91:8
   91:9 106:11
**randomly**
   198:6
**ray**  4:6 8:3
**rchester**  4:11
**reach**  177:13
**reached**  28:19
   28:20
**reaction**  45:23
**read**  3:19 28:6
   28:13,16 44:15
   45:18 50:23
   52:6,6 63:8
   64:22 66:3
   68:8 71:4 74:8
   130:16 146:25
   147:1 170:3
   180:8,19
   200:21 201:8
   213:14 220:23
   221:5,5,6,7,11
   221:16 226:5
   227:6,8
**reads**  202:6
**ready**  49:18
   69:3 74:9
   144:23 165:2
   205:10

**real**  12:14 68:9
   144:15
**realize**  24:1
   198:23 211:18
**realized**  17:10
   169:12 176:4
   177:7,14 184:1
**really**  15:23
   25:14 28:6,17
   64:11 74:6
   75:2 108:16
   123:23 125:19
   160:2 161:12
   183:13 200:21
   209:4,24
**reason**  37:9
   92:12 112:25
   123:6 124:19
   130:14 131:22
   131:25 137:1
   219:25 220:5
   225:6,9,12,15
   225:18,21
**rebecca**  129:6,7
   129:7 132:13
**recall**  32:23
   62:7 73:4 75:6
   77:17 96:19
   97:12 106:4,23
   107:16 109:5
   109:12 110:14
   113:22 119:10
   125:16 132:6
   133:24 142:1
   149:24 151:13

160:16 167:7
   206:9 209:22
   220:3
**recap**  216:9
**receive**  85:14
   104:4 105:2
   118:20 126:12
   126:16,19
   136:10 138:2
   146:14 201:16
   203:5
**received**  75:7
   101:19 104:5
   106:24 111:24
   118:21 189:3
   189:11 190:1
   190:23 191:13
   203:17 220:8
**receiving**  84:23
   119:2
**recent**  217:9
**recognize**  18:4
   18:25 23:11
   27:2 32:5 50:2
**recollection**
   64:10
**reconcile**  114:7
**reconciled**
   115:12
**reconciliation**
   114:15 115:4,7
**reconciling**
   105:10
**record**  7:3,7,8
   7:15 8:2 29:19

68:21,22,24
   90:12,15,16,18
   92:1 130:13
   144:17,18,20
   146:1 205:5,6
   205:8 211:15
   211:18,22,24
   212:1,2,4,11
   213:11 222:2
   223:9 224:5
**recorded**  7:22
   223:6
**recording**
   223:8 224:4
**recordings**
   7:17
**records**  140:16
   209:10 210:3
**recoup**  195:10
**redacted**  18:11
**reduced**  223:7
**refer**  37:3
   191:1 195:19
**reference**  81:21
**referenced**
   227:5
**referring**  19:9
   30:2 34:6 67:2
   67:14,17 81:22
   93:18 94:5
   100:3 143:7
   152:14 156:3
   156:22 163:19
   167:5 182:12
   182:17 185:21

**[referring - required]**

188:22 189:8
190:18 199:20
201:3
**refers** 193:18
**refreshing** 64:9
**regard** 24:23
**regarding** 49:3
97:25 212:9
**regardless**
207:2
**regulations**
12:1
**rehash** 81:10
**reimbursed**
125:9 218:21
**related** 43:16
93:10 99:1
129:9 137:17
139:20 145:11
150:10 152:5
155:15 156:8
157:5,13 158:9
158:12 178:14
178:25 206:17
207:19 210:4
220:2,11
223:11 224:7
**relates** 93:6
99:11
**relation** 60:4
158:5 159:7
162:24
**relationship**
72:5 125:16,18
128:15 137:15

137:16 163:8
163:24 164:6
164:14 179:9
207:7
**relative** 223:13
224:10
**relatively** 114:2
**relayed** 183:11
**relevant** 75:12
95:17 96:3
**rely** 71:16
116:3
**relying** 71:14
**remain** 38:14
39:2
**remainder**
169:10
**remaining**
144:11
**remember**
21:14 23:6,7
24:17 26:10,15
32:4,16 38:19
39:21 53:13
73:8,13 74:6
74:25 75:3,18
75:19 82:13
83:17 87:19
94:1 95:5 97:7
104:19 105:25
106:19 108:16
114:20 119:17
145:14 157:10
166:19 167:7,9
172:2 185:13

188:6 194:14
197:22,23
201:5,14,18
204:8,11,15
212:14 218:1
219:23
**remind** 79:10
**remittance**
101:14
**remittances**
164:2
**remote** 88:4
103:15
**remove** 179:25
**rendered**
206:16
**rent** 165:6,21
166:11 167:2
182:22,23
**rental** 110:18
**rented** 103:14
**replacement**
123:8
**report** 112:9
**reported** 2:8
38:24,25 113:8
113:14,24
**reporter** 7:5,6
8:9,15,17,24
17:20,22 25:24
26:3 56:1,4,10
60:25 68:19
80:21,22
210:22 211:11
221:4,7,11,15

221:18,22,24
**reports** 112:7
112:16 113:11
164:2 194:18
194:24 199:2,9
199:11,17,19
**represent**
22:25 79:11
216:19
**representation**
54:9,22
**represented**
10:6 52:24
55:2
**representing**
8:14 22:21
52:19 53:19
55:5,14,25
56:16 57:1
66:19
**represents**
54:18
**request** 145:19
146:4 147:9
172:8
**requested**
223:21
**requesting**
28:21
**requests** 47:24
147:1 148:25
**require** 98:19
**required**
226:13

Veritext Legal Solutions
800-336-4000

**[requirement - right]**

**requirement**
  14:25
**reserved** 222:3
**reserving**
  210:12
**reside** 134:2
**residential**
  103:18 104:1
**resides** 155:7
**respect** 95:13
  97:17 129:23
  141:12 150:23
  153:5 163:8,17
  163:22 164:11
  164:13 165:5
  168:9,11
  170:17 180:24
  181:14 182:20
  184:9,10
  189:14 193:12
  199:24 209:3
  210:4
**respond** 26:1
**responded**
  68:12
**responds**
  175:12
**response** 67:23
  80:25 157:16
  157:23 175:1,2
  175:7,9
**responses**
  43:11
**responsibilities**
  180:23

**responsibility**
  190:8
**responsive**
  37:20 39:17
  44:18 52:12
  53:5,16 54:6
  58:22 60:13
  63:11,24 65:17
  174:13
**rest** 41:11
  86:15 87:6
  134:3 143:5
  167:23 180:22
  212:14
**restaurant**
  209:23
**results** 46:10
  162:12 163:10
**retain** 67:20
**retrospect**
  60:10
**return** 12:3
  16:11,14,15
  18:5 19:1,5,9
  19:25 24:1,2
  47:15 48:18,25
  160:15 162:25
  227:12
**returns** 10:4
  17:15 18:21
  19:10,14 20:2
  20:22 21:4,7
  21:15,23 23:19
  23:21 26:19
  30:18,21 36:7

  38:24 47:11,13
  48:24 63:20
  84:1,4 87:20
  90:4 133:2,25
  140:16 148:5,7
  148:11,22
**revenue** 11:5
  11:19,21 12:21
  38:14 99:14
  100:14,16
  101:3,5,6,19
  102:7 103:3
  105:5 106:14
  107:3,15 108:3
  108:17 109:7
  109:20,24
  110:12 111:2
  111:24,25
  113:14,21,23
  116:2 117:23
  118:1,8,14,14
  118:18 120:21
  120:22 123:7
  123:14 132:18
  138:15,24
  139:20 143:24
  144:7 181:16
  191:15
**revenues** 97:22
  110:25 124:23
  125:2 164:1
  181:22 184:16
  184:18 185:3
**review** 45:6,9
  45:11 65:21

  142:8 146:18
  146:22 147:4
  147:11,16
  148:6 165:24
  165:25 169:17
  173:7 201:15
  223:21
**reviewed**
  168:16 173:10
  180:16
**reviewing**
  169:16
**revised** 65:10
**reworking**
  28:16
**reyes** 5:6
**rico** 74:10
**rid** 37:17
**right** 8:18,24
  9:9,16,18 10:6
  10:12 13:8
  14:12,20,21
  15:4,21 16:15
  16:19,25 17:1
  17:3,5,8,11,13
  18:13,25 19:16
  19:17,17 20:3
  20:21,24 21:1
  21:7,12,23
  22:1,2,21,24
  23:1,3,9,23,24
  24:3,4,5,21,22
  25:3,4,22
  26:15,17 27:7
  27:10,16,17,24

**[right - saved]**

| | | | |
|---|---|---|---|
| 30:2,4,13,18,21 | 87:25 88:25 | 213:4,19 214:3 | **run**  96:8 |
| 30:23 31:18,19 | 92:1,15,18 | 214:6,12,20 | **running**  90:10 |
| 32:14,19 33:7 | 93:9 101:1 | 215:19 216:11 | 110:8 |
| 33:9,13 34:3 | 102:24,25 | 216:14 217:2,6 | **rust**  129:13,14 |
| 34:11,17,19 | 108:25 109:1,3 | 217:16,18,19 | 129:14 |
| 35:7,9,17,21,23 | 117:22 118:3 | 217:20 218:10 | **s** |
| 36:4,7,11,13,23 | 120:6,8 122:11 | 219:10,12 | **s**  3:1 4:1 5:1 6:9 |
| 37:1,25 39:10 | 123:24 127:5 | 220:9,9 221:17 | 7:1 225:3 |
| 41:15,16,20,24 | 128:7 140:7 | **rights**  180:23 | **safely**  217:8 |
| 42:5,13,18,21 | 142:18,18 | **ring**  75:6 219:6 | **salaried**  203:19 |
| 42:22 43:12 | 145:22,24 | **ringing**  200:2 | **salary**  136:8,9 |
| 44:3,4 45:16 | 146:10 148:24 | **road**  87:21,23 | 203:5 |
| 45:25 47:4,16 | 149:2 151:22 | 89:3 99:4,5 | **sample**  189:6 |
| 48:5,10,14,20 | 152:13,19,22 | **rob**  5:3 | **samples**  37:14 |
| 48:22,25 49:9 | 153:4 154:15 | **rodeo**  125:1 | 37:14 91:17,23 |
| 49:16,20 50:8 | 154:16 155:10 | **role**  91:3 | 91:24 92:19,20 |
| 50:11,16,19,25 | 158:11 160:11 | 121:13 159:20 | 92:23 137:18 |
| 51:2 52:17,24 | 161:18 165:17 | 159:21 163:23 | 164:21,23 |
| 53:8,13,19,20 | 166:7,7 167:6 | 164:6,20,24 | 184:7 189:11 |
| 53:24 56:5 | 167:10 168:14 | 206:24 | 191:9 |
| 57:15,16,21,22 | 169:7 171:6 | **ronald**  224:2 | **san**  11:10 |
| 58:2,24 61:16 | 172:20 173:8 | 224:15 | **sarah**  3:9 8:7 |
| 61:17,23 62:20 | 173:16 174:23 | **room**  124:6,7 | **sarita**  1:11 3:5 |
| 65:1,6,11 | 174:25 181:24 | **rose**  92:10 93:7 | **satisfied**  15:1 |
| 66:18 67:6 | 186:24 187:17 | **roughly**  85:19 | **save**  80:9 95:16 |
| 68:4,14,19 | 187:23,25 | 167:21 | 111:20 112:1,7 |
| 69:2,9,12,22 | 188:1,19 189:8 | **routine**  29:25 | 155:17 218:23 |
| 70:10,18 71:2 | 189:21,25 | **routinely**  161:7 | **saved**  95:14,18 |
| 71:6,9,17,22 | 190:12 192:8 | 207:18 | 95:18 96:4 |
| 72:1,14 73:11 | 193:11 196:4 | **routing**  29:15 | 98:3 99:8 |
| 75:22 76:11,12 | 197:1 198:9,21 | **rp**  1:17 | 112:2,19 120:6 |
| 76:16,22 77:12 | 198:25 199:1 | **ruin**  158:16,16 | 120:8,9,12 |
| 77:13 78:25 | 200:3 205:2 | 158:24 159:11 | 138:6,21 139:6 |
| 79:15 81:19 | 210:9,12 | **rules**  7:21 | 162:6 |
| 83:2 84:16 | 212:18,22 | 15:17 227:14 | |

Veritext Legal Solutions
800-336-4000

**[saving - separated]**

| | | | |
|---|---|---|---|
| **saving** 123:10 | **schooling** 25:13 | 32:3,10 35:24 | 68:11 101:13 |
| **saw** 32:4 | **scored** 216:6 | 45:20 48:1 | 108:3 140:4,23 |
| 124:21 152:7 | **screenshots** | 72:14 80:10 | 177:2 191:8,8 |
| 156:10,10 | 207:11 | 113:19 119:25 | 191:10 217:3 |
| 196:10 | **screw** 15:15 | 130:11 136:20 | 218:6 220:11 |
| **saying** 26:14,15 | **search** 46:14 | 143:3 152:12 | 221:13 |
| 62:25 68:10 | 147:21,24 | 158:7 161:23 | **sending** 170:25 |
| 102:19 109:19 | 149:6,15 | 168:11,19 | 220:1 |
| 110:24 118:25 | 150:23 151:7,9 | 171:12 172:4,5 | **sends** 64:4,19 |
| 154:24 158:16 | 151:15 152:3,7 | 178:15 180:25 | **sense** 39:25 |
| 176:13 183:5 | 152:17 153:6,9 | 187:11,14 | 40:5 |
| 191:12 193:7 | 153:11,12,14 | 188:20,21 | **sent** 23:4 27:25 |
| 195:19 199:18 | 153:16 154:21 | 189:9 191:12 | 27:25 28:7,20 |
| 210:25 | 155:14 161:22 | 194:2,4 195:14 | 28:21 33:3 |
| **says** 34:18 35:5 | 162:1,2,3,8 | 196:1 197:3,4 | 42:10 59:20 |
| 35:19 36:15 | 207:12 | 199:1,4,19 | 62:21 63:1,7 |
| 37:5 51:2 | **searched** 67:22 | 201:2 207:21 | 63:14 64:9,14 |
| 57:21 58:2,6 | 149:11 151:3,4 | 208:9,12,13 | 66:3,24 67:11 |
| 58:19 59:6,9 | 151:16,18,19 | 210:19 211:2,7 | 67:18 69:7,24 |
| 62:3 64:6 | 151:19,19,25 | 213:19 214:8 | 146:6,9 152:10 |
| 65:19 71:5,7 | 153:22 | 214:15 215:4 | 153:4,15,19 |
| 73:9,15 74:22 | **searching** | 216:16 | 157:9 159:5 |
| 75:4 114:13 | 153:5 | **seeing** 74:6 | 160:6 170:24 |
| 115:9 172:4 | **season** 86:15 | 157:2 | 171:12 173:13 |
| 182:6 184:14 | 134:15 | **seemed** 72:13 | 174:11,18 |
| 187:2 192:1 | **second** 29:23 | **seems** 56:19 | 177:16,23 |
| 196:17,17 | 32:21 35:18,19 | **seen** 25:1 74:3 | 191:16 214:3 |
| 198:10,11 | 39:19 40:3 | 74:4 78:6,11 | 215:1 216:1,10 |
| 199:1 200:22 | 41:9 73:3 | 78:17 137:11 | **sentence** 16:18 |
| 201:5,6,7,8 | 90:13 148:19 | 180:10,11 | 35:18 38:12 |
| 214:14 215:2 | 174:10 181:22 | **sees** 8:16 | 40:20 169:3,10 |
| 216:16,20 | 188:15 | **self** 10:12 11:13 | 169:17 |
| **scharon** 1:9 3:4 | **secondly** 38:9 | **send** 28:5 45:14 | **separated** |
| **scheme** 37:6 | **see** 11:5 14:1 | 45:16 58:11 | 200:5 |
| 38:5,10 169:4 | 20:11 29:11 | 62:23 63:6 | |

**[september - signed]**

| | | | |
|---|---|---|---|
| **september** | 182:8 206:16 | **shawn**  1:11 3:6 | **shumate**  3:9 |
| 34:25 50:7 | 206:22,23 | **she'd**  94:16 | 8:8 46:25 |
| 52:15,20 54:10 | 207:4 | **she'll**  221:13 | 60:12 |
| 54:23 55:5,13 | **set**  94:8 96:7 | **sheet**  227:10 | **sic**  38:17 |
| 57:3 61:11,16 | 97:2 98:6 | **sheets**  97:20,22 | **side**  79:13 85:4 |
| 61:20,23 62:19 | 142:10,14,16 | 97:25 | 85:12 86:5,12 |
| 64:5,20 65:6 | 142:22 180:17 | **shepard**  1:9 3:4 | 164:14 207:23 |
| 65:22 67:14 | 214:1 | **shield**  53:12 | 207:23 213:17 |
| 152:15 153:20 | **setting**  97:12 | 125:4,12,14 | **sidebar**  80:5 |
| 156:14,20,21 | 113:15,16,16 | 158:7 | **sides**  55:25 |
| 157:3 159:15 | **several**  22:9 | **shipped**  89:23 | 56:17 |
| 160:10 167:12 | 67:18 143:12 | **shit**  45:12,24 | **sign**  23:18,21 |
| 170:25 171:13 | 166:4 | **shoot**  136:20 | 28:4 43:13 |
| 172:21 173:13 | **shake**  54:16 | **short**  59:9 61:8 | 44:9 69:25 |
| 174:2,15,20 | **share**  103:3 | 88:1 124:17 | 142:7 160:6 |
| 175:8 179:1,4 | 107:12 109:24 | **shortly**  88:7 | 171:2 221:5,8 |
| 214:3 | 110:25 111:12 | 131:10 209:8 | 227:6,11 |
| **serious**  56:20 | 117:23 118:14 | **shot**  216:3 | **signature**  27:2 |
| **served**  44:21 | 120:23 138:25 | **should've** | 141:6,8,16 |
| **server**  95:15 | 139:20 144:7 | 28:15 | 222:3 223:16 |
| 96:2 97:3,4 | 181:16 | **show**  17:24 | 224:14 |
| **serves**  140:3 | **shareholders** | 19:14 46:16 | **signed**  24:1 |
| **service**  91:7 | 37:7 38:6 41:3 | 50:21 62:10 | 27:9,12 28:7 |
| 102:23 109:16 | 41:4 100:5,10 | 73:5 135:17 | 28:24 34:22 |
| 136:14,16,21 | 101:2 102:16 | 137:2 209:10 | 35:3 37:23 |
| 137:2,7 142:9 | 105:2 113:4 | 214:11 218:10 | 44:12 45:20 |
| 143:5,8 164:11 | 117:24 118:9 | **showed**  25:15 | 50:10 52:2 |
| 166:21 180:12 | 138:1,24 139:8 | 25:18 61:10 | 61:2,22,25 |
| 194:2 200:9,12 | 139:21 140:24 | 91:9 146:19 | 62:12,16 66:4 |
| **services**  85:4 | 141:13,19 | 147:15 | 71:10,11,15 |
| 85:12 90:5 | 144:12 169:5 | **showing**  25:16 | 141:14,17 |
| 96:17,20 | 184:12,23 | 46:8 48:4 | 152:15 168:23 |
| 121:24 122:9 | 185:4,22 186:5 | 147:12 210:24 | 169:18 170:21 |
| 134:12 136:12 | 187:9 199:14 | **shows**  23:12 | 173:14 174:11 |
| 137:5 163:24 | | | 175:20 176:5 |

**[signed - spend]**

176:12 177:8
177:14 178:5
179:1,4 214:6
220:7,23
227:17
**signer** 127:7
**significance**
9:10
**signing** 59:23
69:6 168:16
169:12 170:5
176:19
**silent** 38:14
39:3
**similar** 78:9
84:3 138:2
196:22
**simple** 104:18
**simples** 92:3
**simplifying**
191:25
**simply** 93:22
**single** 151:12
156:4 170:16
186:10 187:13
**sir** 8:18 9:19,24
10:16 17:22
29:18 56:22
76:25 82:19
111:19 147:17
221:5
**sit** 94:1 140:7
**site** 95:24 96:2
103:11 104:6
108:6,14

**sitting** 154:18
169:1 207:16
**situation** 29:4
**six** 110:7
**skills** 223:10
224:6
**skim** 40:13
**skimmed** 29:13
73:21 170:5
173:10
**skimming**
30:15 33:2,7
41:20,21 48:2
48:4 52:10
63:23 69:9,19
70:5,8 71:6
73:20 74:10
169:25 213:3
**skyway** 3:11
**slander** 157:13
178:25
**small** 14:5
**smith** 2:8 7:6
129:6,7 132:13
223:2,17
**snapchat**
162:18
**social** 162:13
162:16
**software** 98:10
115:3,6
**sold** 181:23
182:7,8,13,18
182:21 183:2,6
183:14,19

184:2
**sole** 85:1
**solely** 74:11
**solution** 196:14
**solutions** 1:20
4:4 82:6,9,12
82:12 83:15,16
121:7,11,14,15
136:13 137:4
164:7,8,13
180:13 196:18
203:21,25
227:19
**somebody**
101:20 106:2
108:3 137:8
145:13 166:16
187:4 202:16
218:20
**sorry** 29:18,24
30:10 48:18
61:15 64:24
71:11 80:10,19
91:24 92:17
107:6 114:12
120:9,11,11
150:18 156:16
164:9 175:6
181:13 187:24
**sort** 22:23 84:7
96:20 97:12
99:10 115:3
155:19 158:25
191:18,19
200:21 202:8

209:2 219:19
**sorted** 92:9,9
**sound** 16:25
25:3
**sounds** 22:2
25:4
**sour** 125:21
**source** 85:1
**south** 3:12
**southwest**
10:20,22
**space** 166:12
**span** 208:2
**sparkman** 23:6
23:14
**speak** 74:22,23
79:25 80:3
128:4 145:3,16
171:24
**speaking** 74:25
**specific** 37:22
103:25 150:25
152:3
**specifically**
32:22 150:24
151:17 170:12
207:8,9
**specify** 163:18
185:2
**spectrum** 90:9
90:24,25
**spelling** 168:17
169:2,8 173:20
**spend** 85:22

Veritext Legal Solutions
800-336-4000

**[spending - study]**

**spending** 86:10
**spent** 80:8
85:10 86:13
218:22
**spigot** 158:8
**spin** 211:2
**spit** 100:19
111:11
**spits** 101:17
109:24
**split** 86:9
100:14 101:13
143:5,10
**spoken** 219:7
**spreadsheet**
70:14 99:17,20
100:1,3,22
101:17,21
102:8,22 103:2
103:6,23 104:2
105:1 106:15
107:10,17
108:4,18,22
109:8,10,21,23
110:2 111:11
112:1 118:2,6
118:17 142:10
142:13 143:17
181:3,14,20
182:16 183:20
184:1,25 186:9
186:11,13,25
187:3,13,15
199:12,22

**spreadsheets**
25:14,15 34:13
99:10 100:17
102:15 104:21
105:20,24
107:4 109:19
113:2 118:11
119:5,11,16,19
119:23 120:4
120:16,20,25
137:25 138:5
138:13,20
139:5,6,20
140:8 143:21
165:5 180:17
181:1 185:11
186:3 194:19
197:20 198:17
198:19 200:6
200:14,15,17
200:19
**springs** 87:21
87:23 88:9,13
88:20 89:11,13
91:18 92:4,21
94:20 95:3
99:4,5 103:11
104:7,22
105:14 106:3
132:12
**squeaky** 75:10
**sshumate** 3:15
**stand** 34:2,4,8
89:16 213:13

**standards** 16:3
16:6
**start** 54:16
56:8 134:17
158:8
**started** 15:13
53:11 68:8
88:7 117:19
127:6 128:24
164:22 212:12
212:18
**starts** 29:25
31:8 40:12
**state** 9:13
10:21 43:4
51:18 52:3
57:10 223:19
**statement**
36:18
**statements**
24:13 29:16
42:10 75:21
76:5,6,11
159:10,16,24
169:14
**states** 1:1 57:21
**statutes** 11:25
**stenographic**
7:23
**step** 37:17
**stephens** 93:8,9
**stephenville**
128:23
**steps** 13:22,24

**stipulation**
7:24
**stop** 82:22
**stopped** 125:4
125:5
**stored** 95:24
112:12
**straightforward**
42:9 109:16
**straits** 20:13,16
32:6 35:24
121:17,18,20
122:8,14
**straw** 214:15
215:2,16
**stream** 99:14
**street** 3:20 4:9
32:14 33:6
76:2 133:24
141:23,24
**stretch** 137:23
209:5
**strictly** 101:10
139:22
**strike** 55:24
56:15 121:6
138:19 155:5
184:10
**string** 23:12
**structure**
122:18
**stuck** 174:9
**studies** 15:17
**study** 15:24

Page 45

**[studying - tax]**

**studying** 15:11
**stuff** 41:14
  47:12,25 61:8
  63:16 64:21
  91:15 94:16
  98:6
**subject** 13:14
  17:20 24:2
  65:10 169:13
  194:13 217:10
**submitted**
  152:6 164:2
**submitting**
  81:9
**subpoena**
  44:20 51:4,9
  51:12 52:6
  57:16,20 58:9
  71:21 72:8,12
  75:2 146:14,18
  146:22 147:5
  175:23 176:1,4
  220:8
**subpoenaed**
  51:6 217:25
**subscribed**
  226:14
**subscription**
  96:21
**substantiate**
  191:20
**sue** 158:18
  178:24
**suffice** 118:13

**suggest** 58:14
**suggesting** 80:5
**suing** 55:17
**suite** 3:12 4:9
  87:21
**sum** 57:7 197:4
  197:7,19
  199:15,16
**summary** 11:3
  41:6,12 159:5
  187:16
**summation**
  167:4
**superior** 113:7
**supplemented**
  168:7
**support** 69:17
  159:4,17
**supporting**
  48:15 70:19
**supposed** 37:5
  201:16
**sure** 12:14 16:9
  16:17 19:25
  21:20 24:4
  27:22 31:21
  66:8,15,16
  73:1 81:15
  85:24 91:8,14
  92:2 96:5
  97:16 98:9
  104:17 114:24
  115:11 125:5
  132:19 136:21
  139:4,25 148:2

  156:25 163:13
  163:14 164:9
  164:11 170:15
  186:20 193:1
  195:8,18 196:3
  203:24 212:11
  213:16,16
  214:23 218:9
**surprised**
  132:5
**surrounding**
  69:6 212:9
**suspect** 195:8
**suspended** 43:4
**suspension**
  51:19
**suspicious** 34:6
  34:10
**swear** 46:10
  59:20,20
**sweet** 124:17
**sworn** 7:15
  8:21 9:6,13
  74:11 220:17
  223:5 226:14
**system** 104:6
  104:11 105:11
  105:17 113:16
**system's** 104:6
**systems** 113:17

**t**

**t** 6:9 225:3,3
**table** 56:1,2
**tacked** 41:14

**tail** 70:13
**take** 7:7,12
  13:5,24 14:2
  23:5 38:20
  44:15 62:3
  120:16 144:6
  144:14 171:7
  179:20 189:25
  193:2,4 205:2
**taken** 7:10 13:8
  13:22 59:2
  91:23 92:3,19
  144:25 223:3
  223:12 224:9
**takes** 161:16
**talk** 36:3 64:5
  87:8 96:1
  117:22 192:20
  217:14
**talked** 39:21
  127:19 133:16
  145:13,24
  158:2 163:3
  165:4 167:11
  167:19 181:14
  204:21 205:15
  217:14,18
**talking** 81:4
  115:22 137:25
  156:13 182:5
  184:25 199:15
  202:15
**tax** 10:2,2,4,15
  12:3 13:16
  16:11,14 17:15

**[tax - texts]**

17:16 18:5,5
18:18,21 19:1
19:5,9,10,14
20:2,22 21:4,6
21:15,23 23:4
23:12,18,21
24:2 26:18
30:18,20 36:6
38:24 47:11,13
47:15 48:18,24
48:25 63:20
84:1 85:8
86:14 87:20
90:4 122:10,12
122:18 123:1
127:20 133:2,2
134:11,15
136:1 140:15
140:16 148:4,7
148:11,22
162:25 194:11
194:13,14,20
195:9
**taxpayers**   12:1
**telephone**
107:22 127:15
127:21 129:17
130:6
**tell**   8:22 27:21
35:23,25 38:2
39:23 43:7
55:11,18 56:22
56:25 59:22
66:6,9 72:25
73:1 92:5

94:16 96:10
105:1 107:21
109:13 114:22
150:2 163:7
170:21 172:11
172:25 173:3,9
173:11 175:16
177:24 189:2
190:4 194:11
195:1 205:16
**telling**   29:7
83:6 92:19
158:20 175:16
**tells**   115:5
171:18
**ten**   68:15 83:1
86:16 87:4
114:10,10,11
114:11 134:25
163:4
**tennis**   133:13
**tenure**   134:3
194:24 198:17
209:22
**term**   18:18
89:20
**terminated**
54:9 77:15
88:11 123:4
127:13 209:9
**terminating**
78:1
**termination**
88:12 124:17

**terming**   182:16
**terms**   14:10
70:23 71:14
90:8 91:2,22
105:5 134:9
143:16 150:25
152:3,7,17
153:6 163:9
179:9,14
**test**   15:4,17,25
163:10 164:24
190:7
**testified**   8:23
151:11 152:18
175:21 176:16
220:6
**testify**   39:10
219:19
**testifying**   223:5
**testimony**   9:6
9:12 78:5,11
78:16,22,23
81:11,16 84:11
97:13 106:23
108:9 143:11
145:4 153:18
157:14,21
167:20,25
168:2 176:23
178:19,22
183:19 188:13
213:11 220:22
226:8 227:8
**testing**   92:22
93:4,6,10

137:16,18
163:11 189:18
189:19 191:2
**tests**   76:7 125:9
183:21 184:3
**texas**   1:2 7:13
9:14 10:20,21
10:22 88:5
103:16 134:23
192:18 193:9
194:11,19
195:9 223:19
**text**   28:21 46:9
50:2 59:17
68:1 78:2
127:17,21,25
161:13,20
162:2 172:15
173:25 174:7
174:15,21
175:7,15
207:11,12,18
208:2,7,9,16,19
209:6,10
**texted**   43:10
46:1,10 51:9
63:6 174:3,10
208:24 217:20
**texting**   52:16
**texts**   46:12,18
46:21 61:20
68:3 128:17
156:16,17
161:23 162:8
162:11 207:22

**[texts - time]**

209:3
**thank**   8:16 9:1
26:3,25 35:11
49:24 51:2
60:25 76:25
80:22 81:6
148:18 163:20
167:15 175:12
179:23 180:22
186:22 210:23
211:18 213:21
**thanks**   50:15
**theoretically**
119:25 120:1,5
**thing**   13:17
28:22 37:12
52:9,21 63:3
64:6 87:13
148:4 187:16
190:11 209:5
209:24
**things**   25:15
49:21 69:18,25
81:12 83:4
91:8,9 94:9
95:13 96:1
158:16 165:6
165:25 166:12
182:21 199:19
**think**   12:13,18
13:6 14:13,14
14:19,23 21:19
22:19 26:9
28:20 30:19
32:6,24,24

33:20 34:1
37:5 39:20
46:4 52:19
53:10 62:4,22
64:16 71:19,20
71:21,24 72:23
76:2 84:5 87:5
89:1,3 90:9,10
90:23,23 95:4
95:8 96:6,7
97:15 98:8
101:25,25
106:10,16
107:14,24,25
108:1 110:5,5
110:6,6 113:25
115:16 117:19
119:13 122:13
122:21,24
123:15 125:13
128:7 129:14
129:15 136:16
139:9,12,14
141:1,10,11
145:8 146:2
148:13,15
151:1,1,6,8
153:7 156:10
157:7 158:22
160:2 161:15
161:22,24
173:23 180:11
182:1 186:1
188:8 191:17
195:5 198:1,4

198:13,20
200:20 201:25
202:1,2,11
204:19 205:18
205:19,24
208:4 210:5
212:12 218:16
219:8
**third**   27:3
29:12 37:2
124:24 214:13
**thirty**   11:17
**thought**   15:15
52:7,21 59:20
59:23 68:2
170:21 174:10
**thoughts**   50:14
174:6,17,23
**thread**   208:7
**threatened**
178:18,24
**three**   10:17
29:20 55:17,25
56:16,17 63:3
88:23 93:21
124:6 185:16
187:18 203:17
206:6
**throw**   154:17
186:18
**tie**   199:17
**tied**   99:13,14
101:16 102:12
102:12 105:14
105:15

**time**   2:4 7:3,8
8:1 11:13,24
12:8,25 13:11
14:2,13,24
15:14 18:16
22:11 23:19
24:8,11 28:3,3
34:22 40:9,21
44:15 46:22
47:9 57:3 59:8
64:17,17 68:20
68:24 69:17
77:24 79:18
80:8,15,15
81:7,12 82:3
84:24 85:2,9
85:10,13,17,22
86:9,10,18,21
87:3,6,22,24
88:1 90:14,18
93:24 95:3
112:22 117:19
133:11,13,14
133:15 134:19
142:11,17
143:3 144:16
144:20 146:24
152:23 154:15
157:9,24 160:2
160:14 163:12
165:1 168:25
176:24 180:8
184:2 192:25
197:4 198:9
203:1,24 205:4

**[time - two]**

205:8 209:9
210:10 211:25
212:4 217:25
218:5,22 220:6
220:16,24
222:1 227:15
**timeframe**
61:19 227:7
**timely** 91:10
**times** 53:9
128:13 158:4
190:21 204:17
204:18
**today** 9:12 10:7
17:19 29:5
44:22 45:4
47:21 75:9
78:23 79:19
80:16 81:7,21
94:2 134:20
145:17 146:19
146:23 147:12
147:16 157:3
175:21 176:16
176:23 205:13
207:13,17
210:11 217:16
**together** 71:25
72:4 135:13
159:17,19
183:8
**told** 48:2 51:11
59:1,12 71:22
74:11 116:4
124:10 158:23

171:4 173:19
178:7,10 194:8
198:22 204:24
212:13
**took** 9:10 14:2
15:3 22:11,12
62:5 64:7 87:3
101:12 111:13
128:4 167:22
171:19 177:25
202:10 205:21
**top** 40:13 63:16
107:12,12
174:20 187:2
198:9,19 199:1
216:16
**torque** 20:11
32:7,10 122:6
122:14,21
123:3
**total** 57:7
188:22 189:3
189:10,25
190:18 191:15
196:25 199:15
199:16 201:20
201:24,25,25
**totals** 188:21
**toth** 1:5 3:2
7:10 225:1
226:1 227:3
**town** 133:22
**trade** 85:6
**trail** 134:1

**train** 124:25
**trained** 24:24
**training** 13:5
25:10,11,12
**transcriber**
224:1
**transcript** 7:17
135:17 213:15
221:19 223:21
224:3,5 226:5
226:8 227:5,16
**transcriptionist**
223:8
**transfer** 196:8
203:20
**transferred**
92:4 192:16
203:25
**transmitted**
75:20 105:22
**transmitting**
23:12 138:23
**travel** 35:2
**travis** 34:22
35:2,6 57:2
133:12
**tried** 150:14
152:8 177:4,5
**trouble** 52:2
**true** 21:9 30:6
30:24 31:3,11
33:14 34:19
35:7,9,10
36:18 38:15
39:5,10 40:15

40:16,17 48:14
48:17 64:21
74:12,20 81:18
92:22 97:18
107:19 117:8
119:21 120:13
146:16 158:17
170:22 171:2
171:16 172:23
173:22 175:13
175:22 196:6
196:11 223:9
224:5 226:8
**truth** 8:22,22
8:23 71:14
**try** 16:2 77:9
104:17
**trying** 53:10,12
60:2,2 91:20
104:18,19
105:4 145:13
158:15,23
159:11,18
179:5 181:11
195:10
**turn** 79:5
127:10 158:8
198:21
**turned** 19:11
76:8,8 206:13
**turns** 212:19
**twenty** 130:2
135:15,19
**two** 14:2,3,23
15:3,9 25:5

**[two - veritext.com.]**

29:20 67:7
88:18 93:20
96:1 106:20
107:18 108:18
117:16 118:22
119:10 135:15
141:6,16
155:23 187:14
200:7,17 214:8
216:1,11
**tx**   2:7 3:13 4:10
4:19 227:13
**tying**   118:19
**type**   175:9,16
**types**   13:14
221:9
**typewriting**
223:7
**typo**   50:18,24
175:4

**u**

**uh**   15:6,7
**ultimately**
100:23 106:10
**under**   7:20
9:13 14:21
16:10 18:8,21
27:9 29:2
37:23 44:10
45:20 52:2
61:3 66:7,18
69:25 85:6
142:13 145:1
168:24 176:20
188:20 197:3

198:9 220:18
**undergraduate**
15:19
**underpayment**
76:21
**understand**
7:16 9:9,12
29:4 57:10
79:13,16 80:17
84:7,11 88:11
92:18 101:1
102:19 105:4
107:3 119:19
120:19 127:19
134:24 136:5
136:12 143:11
144:25 157:14
157:21 162:4
168:10,14
176:16 188:12
191:12 195:18
199:23
**understanding**
81:16 85:25
98:13 104:15
104:20 105:6
166:5 167:20
182:17
**understands**
183:9
**understood**
52:16 85:24
94:12 128:4
150:15 176:19
186:9 196:4

207:5
**unethical**   43:5
52:3
**unh**   15:7
**united**   1:1
57:21
**unknown**
210:16
**unnamed**   189:9
**unrelated**   86:5
138:3,10
**untrue**   175:17
176:6,13 177:8
177:15 178:4
220:7,18
**update**   99:22
104:21 105:20
105:23 108:4
**updated**   100:2
100:2 104:7
105:12,16
108:7,7 172:22
**use**   17:8 18:18
98:16 99:12
103:23 114:22
129:24 136:25
150:25 152:3
153:6 162:13
162:18 183:25
200:6 215:2
**used**   81:17
90:22 100:4
102:15 115:4
140:23 150:11
150:17 153:7

214:17 215:11
227:16
**username**
98:19
**uses**   7:19
**using**   66:7
136:24 154:11
155:11
**utilities**   165:6
165:21 166:12
167:3 182:22
182:23
**utilize**   115:8
181:4,8,16
**utilized**   98:11
150:20

**v**

**v**   1:15 225:1
226:1 227:3
**vaguely**   16:12
91:4
**variety**   186:25
**various**   11:25
23:12 40:12
184:22 186:5
188:16
**vcm**   198:11,13
**veracity**   71:15
**verify**   115:8
116:2 227:8
**veritext**   7:7
227:12,19
**veritext.com.**
227:13

**[version - witness]**

| | | | |
|---|---|---|---|
| **version** 172:22 215:1 | **waiting** 59:3,6 59:7 | 137:24 138:16 140:10 146:7 | 185:3 186:4,9 186:11 207:3,4 |
| **versus** 85:11 86:11 121:14 190:15 195:7 196:2 | **waldoboro** 3:21 | 146:12 175:4,9 179:6 181:2 189:11 208:3 | 213:12 |
| **vial** 165:1 | **walk** 111:15 | **we've** 49:16 | **west** 4:9 9:20 |
| **victory** 1:7 3:3 37:13 198:13 | **walked** 111:17 112:18 | 74:8 78:6,11 78:17 109:20 | **western** 1:2 |
| **videoconfere...** 3:18 4:7 5:7 | **wall** 210:21 | 109:22 118:20 144:25 176:20 | **what'd** 58:5 134:9 |
| **videographer** 5:3 7:2 68:20 68:23 90:14,17 144:16,19 205:4,7 210:20 210:23 211:6,9 211:17,21,25 212:3 221:25 | **want** 45:2 49:17 50:13 58:15 69:5 80:20 81:10 86:24 95:23 96:6 97:6 117:19,22 151:17 161:10 163:12 180:19 200:4 211:21 212:10 213:10 215:25 221:16 | 200:15 **wednesday** 2:3 7:11 **week** 43:8 46:2 46:4,4 62:5 64:7 74:23 80:1 83:1 86:15,18 87:4 88:23 145:13 145:24 171:19 171:22 172:13 172:18 | **whatsapp** 162:18 **where'd** 134:6 184:12 **white** 132:10 132:11 **wholly** 20:15 **widespread** 70:8 **wife** 201:23 202:3 |
| **view** 118:1 | | | **wife's** 135:9 |
| **violate** 16:6 | **wanted** 8:13 60:4 62:14 | **weeks** 67:7 216:1,11 | **william** 1:5 3:2 |
| **virtue** 12:21 | 87:9 120:17 158:24 159:6 159:19 160:8 | **went** 40:21 62:4 64:6,17 | **willing** 190:15 |
| **volunteering** 21:15 | | 87:14,15 92:10 92:21 93:1,3 | **wire** 76:1 101:23 139:24 141:5 142:4 |
| **vs** 7:11 | **wanting** 68:6 | 94:9 107:1 | **wires** 140:23 140:25 |
| **vwl** 198:11,14 | **wants** 54:4 | 114:10,10,11 114:11 117:20 | **wise** 125:24 |
| **w** | **warning** 46:15 | 133:13 134:11 | **wish** 44:12 |
| **w** 3:8 20:5 21:11 24:10 36:13 84:20,23 85:14 136:10 203:8,18 | **wasn.t** 137:22 **way** 25:18 37:10,18 39:6 50:18 54:23 92:9 97:7 116:2 117:21 129:10 131:3 | 148:1,1,2 151:23 152:24 157:24 171:18 | **withheld** 193:7 **witness** 7:15,16 8:21 25:23 26:2 29:20 35:23 36:20 39:12 40:25 41:18 42:1,15 |
| **wait** 73:21 74:12 135:18 177:2 | | | |

**[witness - yeah]**

42:25 47:1,18
51:15,21 52:5
53:2 54:2
55:21 56:3,5,9
56:11,19 57:6
57:24 60:24
63:22 66:23
68:17 70:12
72:3,16 75:14
75:24 76:18
77:1,21 79:2
79:25 80:3,6
80:23 124:16
130:15,18
145:23 146:2
148:20,24
149:4 176:9
209:16,18
210:12,15,16
210:25 211:5
213:6,22
217:12 218:3
218:20 219:13
221:2,6,14,16
223:4 227:5,7
227:9,11,15
**wiz**   25:14 70:14
**word**   9:20 66:9
151:20,21,22
153:22 154:1
154:21 155:18
156:4 214:17
214:19 215:2
215:10

**wording**   37:8
39:4,8
**words**   33:24
34:2 38:2
39:23 41:12,14
86:10 114:19
115:5 123:16
125:8 144:4
183:18,24
185:10 189:10
189:17 191:24
212:14,21
**work**   9:18 10:2
10:25 11:3
14:17,20 16:20
81:17 82:21
83:1,22 85:7
95:13 97:17
125:20 126:2,4
126:8 133:2
134:11,13
140:20 143:13
149:21 154:9
**workday**   85:18
**worked**   11:10
14:5 20:2 21:1
23:25 24:23
25:8 41:10
53:8 69:12
86:14 88:2
90:9 91:15
92:5 93:21
95:3 103:20
107:18 108:12
108:15 116:22

131:24 134:19
145:15 183:20
**worker**   89:12
**working**   17:2
54:12 71:25
72:4 85:2,10
85:22 86:10,21
87:11 88:4,8
88:20 95:14
105:7 133:18
134:17 135:21
158:6 212:20
215:14
**workstation**
82:21 83:24
94:22
**workweek**
85:19 87:7
**worry**   58:6,8
79:23
**worth**   11:22
**would've**   20:13
21:11 23:9
25:2 30:17
36:17 42:4,18
50:10 60:10
70:5,10 74:1
82:20 83:2,5
83:10,13,23,23
103:9 112:8
139:24 140:1,6
146:10 150:13
161:5,21 190:6
191:4 194:8
214:17 215:11

**wreck**   60:2
**wrench**   20:12
32:7,10 122:6
122:14,21
123:3
**write**   27:24
31:15 32:22
34:15 38:18
142:4 151:12
178:12
**writing**   137:8
178:2,6
**writings**   202:20
**written**   7:24
139:1 141:12
**wrong**   41:7
135:16
**wrote**   27:25
28:14,19 50:15
51:4 69:18
185:24

---

**x**

**x**   6:1,9 191:10
223:21

---

**y**

**y'all**   25:5,8,23
64:5 91:13,17
135:13 179:9
179:14
**yay**   216:6
**yeah**   10:11,24
11:2,7,18 12:2
12:10,15,20,21
13:11,13,13

Page 52

**[yeah - zooming]**

| | | | |
|---|---|---|---|
| 14:22,22,22,24 | 72:9,13,14 | 164:18,18 | 195:6 204:19 |
| 15:2,6,8,16,19 | 73:8 74:14 | 166:3 167:3,6 | 216:11 220:13 |
| 16:19 17:1,12 | 76:3,6,6,8,10 | 168:5,6 169:19 | **years** 11:4,6,14 |
| 17:14 18:14,15 | 77:22 80:19 | 169:22 170:4 | 11:17 12:8 |
| 18:24 19:19,24 | 83:9 84:14 | 170:11,13,14 | 14:9 16:20 |
| 20:14,15,25,25 | 86:16,19,22 | 171:6 173:8 | 17:16 20:1,9 |
| 21:17 22:2,19 | 87:5,15,16,20 | 177:4,5,6,20 | 20:24,25 21:1 |
| 22:20 23:7,10 | 89:3,12 90:11 | 179:20 181:6 | 61:7 71:1 84:4 |
| 24:24 25:4,7,9 | 91:1 92:23 | 181:10 182:15 | 93:21 106:21 |
| 25:19,24 28:7 | 96:12 97:14 | 183:16,17 | 107:18 108:19 |
| 28:8,18 29:1 | 101:9 102:4,10 | 184:20 185:9 | 119:10 130:2 |
| 29:14,24 30:19 | 102:13 103:17 | 186:20 190:3 | 133:11,14 |
| 31:10,20 32:3 | 103:19 104:7 | 191:17,21,23 | 135:15 148:11 |
| 32:20,24,24 | 104:19 111:19 | 192:7 193:5 | 163:4 |
| 33:6 34:16,16 | 112:13 115:24 | 198:2 199:7 | **yesterday** |
| 34:24 35:1,1,8 | 116:5,7,17 | 200:12,20 | 218:9 |
| 35:10,16 36:8 | 117:14,15 | 202:2 205:20 | **yup** 50:6,9,12 |
| 38:4 39:12 | 120:2 123:8 | 206:11,23,23 | 65:9 77:4 79:9 |
| 40:8,16,17 | 125:13,14 | 208:13,13,14 | 122:15 217:21 |
| 41:18 42:16,16 | 127:11 129:8 | 211:19,23 | **z** |
| 42:20,20 44:4 | 134:20 135:5 | 212:16,17 | **zerner** 3:18,19 |
| 45:11,11,19 | 137:21,21 | 213:4 218:24 | 8:11,12 |
| 46:3,3 47:1,14 | 138:7,17 139:3 | 219:11 220:21 | **zoom** 210:14 |
| 47:14 50:22 | 139:9,24,25 | 221:14,14 | **zooming** 72:18 |
| 51:1,15 52:5 | 140:4 141:10 | **year** 13:16,16 | |
| 53:2,3,9,10,14 | 143:9 145:23 | 14:11,23 18:5 | |
| 53:20 54:2,4 | 147:14,19 | 28:2 62:25,25 | |
| 54:11,20,20 | 149:9,23,23 | 64:15 86:16 | |
| 57:14,14 58:4 | 151:6,24 | 88:10 122:10 | |
| 58:4 59:5,7,13 | 153:12 154:15 | 122:12,18 | |
| 59:14,16,16 | 154:20 156:12 | 123:1 133:20 | |
| 62:22 64:16 | 157:15,20,25 | 134:7,7,14 | |
| 65:3 66:23,24 | 158:22 159:8 | 136:10 153:2,3 | |
| 67:6,9 69:4 | 160:19,19 | 160:15,16,18 | |
| 70:25,25 71:3 | 161:2 164:5,5 | 189:9 194:15 | |

Page 53

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.



CAUSE NO. D-1-GN-20-003463

| | | |
|---|---|---|
| TOTH ENTERPRISES II, P.A., AND | § | IN THE DISTRICT COURT |
| WILLIAM FRANLIN, M.D., | § | |
| *Plaintiffs.,* | § | |
| | § | 201st JUDICIAL DISTRICT |
| | § | |
| v. | § | |
| | § | |
| CLAY ELLIS | § | TRAVIS COUNTY, TEXAS |
| *Defendant* | § | |

## UNSWORN DECLARATION OF LARRY PALMER

| | |
|---|---|
| THE STATE OF TEXAS | § |
| COUNTRY OF TRAVIS | § |

"My name is Larry Palmer. I am over the age of 21 years old, I am of sound mind, I am capable of making this Declaration, and I do so freely. I have personal knowledge of the facts contained herein, I attest that the statements herein are true accurate and correct.

I am a professional accountant, in Travis County, Austin, Texas. In or around mid-2015, I was hired by Clay Ellis to work as the accountant for LN Professional Management LLC., d/b/a Medical Management Professionals—("LN"), Allied Lab Solutions Management LLC., and Allied Lab Solutions LLC. I continued working with these companies until mid-2018. These were different legal entities all of which were Clay Ellis was the purported owner and directed all day-to-day operations.

Although Clay Ellis directed every day-to-day operation, was in-charge of all financial accounts, was in-charge of all hiring and firing, I found out later, Clay Ellis, did not have his name on the various companies he owned, aside from Allied Lab Solutions Management LLC., and Allied Lab Solutions LLC. His longtime friend, Michael John Cortez-a/k/a MJ Cortez, acted as Clay Elli's con-conspirator to further Clay Ellis' scheme to defraud the Allied company shareholders. This was done namely by Clay Ellis paying MJ Cortez 10% of MMP revenue to remain silent about fraudulent accounting for the funds that would flow down stream from MMP.

My duties included all accounting operations, which included receiving funds from the medical facilities that were clients of Medical Management Professionals LLC. As it was set up, clients would pay Medical Management Professionals LLC, then Medical Management Professionals LLC, would pay LN Professional Management LLC., then LN Professional Management LLC., would make payment to Allied Lab Solutions Management LLC., and Allied Lab Solutions LLC. At the time of the initial payment, Clay Ellis changed how the money was to be distributed. Instead of the funds being sent to LN Professional Management LLC, he directed that 10% of the money

off the top was to be sent to MJ Cortez, another employee at MMP.  MJ Cortez did not have authority to hire, fire, manage, or direct me in my role as accountant, nor was he a principal of MMP.  However, even lacking any meaningful role, Clay Ellis directed that MJ Cortez's 10% be skimmed off the top for his participation in the Ellis scheme.

Clay Ellis then directed the balance of those funds, minus MJ Cortez's 10%, to be paid to LN Professional Management LLC.  The agreement with LN Professional Management LLC, and the Allied Companies was that LN Professional Management LLC., was to receive 55% of the revenue, and the rest payable between the Allied companies.  With the 10% directed by Clay Ellis to be paid to MJ Cortez, the net to LN Professional Management was less than that to which it was entitled and consequently, the net received by Allied Lab Solutions members was also reduced.

For various justifications that Clay Ellis would manufacture, it was common that Clay Ellis would skim off the top from funds that belonged to the Allied Companies.  Clay Ellis would direct funds above the 55% LN Professionals was entitled to, to be paid to Clay Ellis personally, or Clay Ellis' LLC in Colorado, or one of Clay Ellis' other Texas LLC's, and Lewis Nichols for his role as co-conspirator of LN Professionals LLC.  Clay Ellis would tell me to write the checks and because he appeared to have the right to hire, fire, and direct me, complied with his directions.

Any amounts LN Professionals LLC ever paid to any party were at the sole direction of Clay Ellis. While Clay Ellis was not legally an owner of LN Professional Management LLC., and Medical Management Professionals LLC., he directed every operational aspect thereto as though he were the sole owner.  As time went on, I became increasingly aware that the accounting Clay Ellis was directing me to do was not legal and looked like there was fraud being committed against the shareholders of the Allied company shareholders.

It was routine for Clay Ellis to manufacture fraudulent settlement statements which did not reflect the actual amounts received by MMP.  By increasing the monies paid to him, and then providing false or inaccurate settlement statements, Clay Ellis was written checks in excess of the amounts reflected on the statements.  This resulted in him taking more money than he was allowed from the Allied company shareholders.  The funds that LN Professionals LLC received from their clients would vary, but the numbers were substantial.  For most months, the revenue that was received and later skimmed and stolen was well over several hundred thousand dollars a month.  There were millions of dollars that were received from various hospital clients.  There was always a sizeable amount skimmed and taken by Clay Ellis for himself and directed to his personal companies. These payments were taken off the top, before any split to LN Professionals and Allied Lab Solutions, and then to the members of Allied Lab Solutions.  The funds that were skimmed or stolen from the Allied company shareholders would be distributed to Clay Ellis and Lewis Nichols, with MJ Cortez already receiving his 10% money off the top.

As part of my duties as the accountant for MMP, I was aware of the employees and employee compensation.  The payments that I am referring to for Clay Ellis which were taken off the top, were not paid to him as an employee, as they were not rerated as employee compensation.

Clay Ellis made all decisions as though he owned LN Professional Management LLC., and Medical Management LLC., and he was compensated at the exact same rate at the legal owner of LN Professional Management LLC., Lewis Nichols.  At the same time Clay Ellis was not the legal owner of LN Professional Management LLC., and Medical Management LLC., he held him self

out to all parties he was in-fact the owner of these companies. This would have all believing Clay Ellis was the owner of these two companies and they could reasonably rely on his directions and representations, and reasonably believed him exercising complete and absolute dominion and control of these two companies was derived from his ownership thereof.

Even though Clay Ellis was not properly accounting for funds that should have gone to the Allied Companies' shareholders, he would manufacture statements for me to use to generate payments to the Allied Companies that those at the Allied company shareholders would receive as an accurate and correct reflection of the funds. If Clay Ellis did not manufacture accounting, the Allied companies' shareholders would have received much more revenue than they actually did.

Clay Ellis specifically directed me to write checks to the members of Allied Lab Solutions, including William Franklin, M.D., and Toth II Enterprises, P.A. The amounts to those checks were always the net amounts after the monies off the top that Clay Ellis had directed be paid, including M.J. Cortez, but also himself and on multiple occasions one of his corporations, including one corporation which I understood was located in Colorado.

Clay Ellis always explained away inconsistent and arbitrary accounting. Over time, I found their accounting to be suspect, I feared fraudulent accounting. I challenged Clay Ellis about these inaccuracies. My demand for strict accounting to Clay Ellis was met with fierce rejection and culminated in me leaving that company. I refused to be complicit in these fraudulent accounting schemes, and this unethical and fraudulent. In reality, I was one of the few Clay Ellis was unable to buy silence from.

All this suspicious activity was clearly known by Clay Ellis, Lewis Nichols, and MJ Cortez. It is equally clear that all three were aware of the scheme as they were recipients of the checks directed to be sent them by Clay Ellis. All three were clearly acting on concert as they received checks and payments and the statements reflecting the changing accounting and misstatements of revenue which were then sent to Allied Lab Solutions members. This was all done at the direction of Clay Hill to me specifically and I was told to write the checks as those statements reflected."

Executed on this ___6 th___ day of September, 2022, by Larry Palmer, in Travis County, Austin, Texas, United States of America.

By: _____          Date: ___9/6/22___
   Larry Palmer
   DECLARANT

CAUSE NO. D-1-GN-20-003463

| TOTH ENTERPRISES II, P.A., AND | § | IN THE DISTRICT COURT |
|---|---|---|
| WILLIAM FRANLIN, M.D., | § | |
|    *Plaintiffs.,* | § | |

§                    201st JUDICIAL DISTRICT
§
v.                                              §
§
CLAY ELLIS. et al.,                             §          TRAVIS COUNTY, TEXAS
    *Defendant*                                 §

## UNSWORN DECLARATION
(Texas Civil Practice and Remedies Code, Section §132.001)

My name is:      Larry Palmer

My date of birth is:   12 / 09 / 55

My address is:   PO Box 190  Grapeland , TX 75844

I declare under penalty of perjury that all information in the attached document entitled Unsworn Declaration of Larry Palmer, I have personal knowledge of, are true, accurate and correct.

Signed in Travis County, Austin, Texas on ___6th___ day of September, 2022.

By: _____
    Larry Palmer

Pursuant to Texas Civil Practice and Remedies Code Section §132.001, an unsworn declaration may be used in lieu of a written sworn declaration, verification, certification, oath, or affidavit required by statute or required by a rule, order or requirement adopted as provided by law. This provision does not apply to a lien required to be filed with a county clerk, an instrument concerning real or personal property required to be filed with a county clerk, or an oath of office or an oath required to be taken before a specified official other than a notary public. An unsworn declaration made under this section must be 1). in writing, 2). signed by the person making the declaration as true under penalty of perjury and 3). in substantially the form used above.

**(END OF DOCUMENT)**

**John Markham**

---

---------- Forwarded message ---------
From: **Larry PALMER** <lp.accounting@hotmail.com>
Date: Wed, Feb 21, 2024, 8:48 AM
Subject: original affidavit
To: Kelly Dawson <kcmd777@gmail.com>

I need a copy of the original affidavit I sent you before you made the changes

Larry Palmer
Palmer Tax & Bookkeeping
512.971.2413



1

**PLT003296**

**From:** John Markham <jmarkham@markhamreadzerner.com>
**Sent:** Friday, January 13, 2023 4:14 PM
**To:** larp1@ev1.net; Larry Palmer; lpaccounting@hotmail.com
**Subject:** FW: Draft message to Larry Palmer

Hello, Mr. Palmer:

I am an attorney who, for the last year along with my firm, have been working with Dr. William Franklin, Victory Medical, and certain Allied entities on various legal matters, including several litigated matters. We are about to bring a lawsuit against Clay Ellis and various others for the skimming that they engaged in of monies paid by various rural hospitals in Texas to LN Professional Management ("MMP") which MMP was to pay, in part to Allied and its member investors. As you know, an earlier lawsuit was filed by Mark Collmer, with whom we are also working, but we have now concluded that that lawsuit has a "standing" flaw and so we are filing another one which is much larger and will be filed in federal court.

I have read, and have a copy of, your detailed affidavit previously filed relating to this matter, and based upon your experience as an accountant working with Clay Ellis in the past, it was certainly quite helpful. I am hoping that I can speak with you sometime next week about that affidavit because there is some additional information I would like to obtain from you, and I also wanted to discuss with you that when we file this lawsuit you will at some point be a witness and we want to minimize any inconvenience that causes you.

I imagine that you are busy and so we would be happy to pay for your time. We can meet by telephone or in person, as you like, and I will call you early next week to see if and when this can be arranged.

I look forward to  speaking with you at a convenient time.

Regards,

John Markham

