# EXHIBIT C

8/16/2022 3:59 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-22-003731
Ruben Tamez

D-1-GN-22-003731

Cause No. _____

| | | |
|---|---|---|
| TOTH ENTERPRISES II, P.A. D/B/A | § | IN THE DISTRICT COURT OF |
| VICTORY MEDICAL & FAMILY | § | |
| CARE, | § | |
| *Plaintiff,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| HEALTH CARE SERVICE | § | |
| CORPORATION, A MUTUAL LEGAL | § | |
| RESERVE COMPANY, RICK | § | |
| HADDOCK, CRISTINA FERNANDEZ, | § | |
| AND ANGELICA COLMENERO | § | 419TH, DISTRICT COURT |
| COLLINS, | § | |
| *Defendants.* | § | _____ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION  REQUEST FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTION, DECLARATORY JUDGMENT, AND DAMAGES

COMES NOW, Plaintiff Toth Enterprises II, P.A., d/b/a Victory Medical & Family Care Plaintiff and for causes of action against Defendants Health Care Service Corporation, A Mutual Legal Reserve Company, Rick Haddock, Cristina Hernandez and Angelica Colmenero Collins, would show as follows:

### Level of Case

1.     Plaintiff requests that this case be considered a Level III case and that the Court enter a Docket Control Order under TRCP 190.4(a).

### Parties

2.     Plaintiff Toth Enterprises II, P.A., d/b/a Victory Medical & Family Care is a professional association organized under the laws of the state of Texas, having its principle place of Business in Texas and the members of which are all domiciled in Texas.

3.      Defendant Health Care Service Corporation, A Mutual Legal Reserve Company, is a foreign corporation, incorporated in the State of Illinois, doing business in the State of Texas as Blue Cross Blue Shield of Texas, a Division of Health Care Service Corporation.   Texas Corporation with its principal place of business in Travis County, Texas.  Said Defendant does not maintain a registered agent in the State of Texas, even though it does business regularly in the State of Texas.  Said Defendant may be served under the Texas Business Corporations Act, by service on the Secretary of State, or the Assistant Secretary of State, or with any clerk having charge of the corporation department of his office, duplicate copies of such process, notice, or demand.  In the event any such process, notice, or demand is served on the Secretary of State, he shall immediately cause one of the copies thereof to be forwarded by registered mail, addressed to the corporation at its registered office, Blue Cross Blue Shield of Texas, 1001 East Lookout Drive, Richardson, Texas 75265-2730.  Any service so had on the Secretary of State shall be returnable in not less than thirty (30) days.

4.      Defendant Rick Haddock is an individual residing in Collin County, Texas at 16 Carter Court, Allen, Texas 75002, where he may be served with service of process. Defendant Haddock has a TDL XXXXXXX216 and SSN XXX-XX-XXXX (unknown).

5.      Defendant Cristina Fernandez is an individual residing and/or working in Austin, Travis County, Texas 78750 and may be served with service of process at her place of business 9442 Capital of Texas Hwy North, Suite 500 Arboretum Plaza II, Austin, TX 78759.  Defendant Fernandez's driver's license number and SSN are unknown.

6.      Defendant Angelica Colmenero Collins is an individual residing at 8804 Black Oak St., Austin, Travis County, Texas 78729 and may be served with service of process at her place of business 9442 Capital of Texas Hwy North, Suite 500, Arboretum Plaza II, Austin, TX 78759 or

1

at her residence, 8804 Black Oak St., Austin, Texas 78729.  Defendant Collins driver's license number is XXXXXXX079. Her SSN XXX-XX-XXXX is unknown.

## Jurisdiction

7.      Pursuant to Rule 47 of the Texas Rules of Civil Procedure, the damages sought are within the jurisdictional limits of the Court.  Plaintiff seeks monetary relief in excess of $1,000,000. Plaintiff demands judgment for all the other relief to which Plaintiff is entitled  in the premises.

## Venue

8.      Venue is proper under Texas Civil Practices and Remedies Code §§65.023, (county where defendant is domiciled), §15.002, et seq., (General Venue, County of Defendant's Residence, natural person), and §15.005 (Multiple Defendants).

9.      Venue is proper in Travis County because a substantial amount of the events alleged herein took place within this County, a substantial number of the patients harmed by the conduct alleged reside in this County, and Plaintiff and its business operations are located in Travis County and have been harmed in this county by Defendants actions in this Travis County as alleged below. Additionally, the services to be performed under the contract at issue take place in Travis County. Two of the Defendants are also domiciled in Travis County and regularly transact business in Travis Cunty.

## General Background of this Action

10.     As explained in the allegations that follow, this is an action seeking injunctive relief, a declaratory judgment, and damages by reason of Defendants' illegal termination of the longstanding healthcare insurance contract with Plaintiff, an Austin-based medical facility.

11.     Plaintiff seeks a Temporary Restraining Order, as well as a Preliminary Injunction and Permanent Injunction to preserve the *status quo* for Plaintiff as well as for the approximately

15,000 patients in and around the Austin area who are affected by the unilateral cancellation of Victory Medical as an authorized provider under plans for Blue Cross Blue Shield of Texas. This cancellation was done without notice to plan participants and with notice to Plaintiff, an authorized provider for over 11 years.

## Probable Right to Relief

12.     Contractually, there are certain requirements and restrictions that Blue Cross has agreed to abode before any cancellation occurs, not the least of which, except in cases not here applicable, was 90-day requirement of advance notice of cancellation.

13.     Patients of Victory Medical began noticing that Blue Cross was claiming that Plaintiff was no longer a provider on or about August 2, 2022. No notice of any kind had been provided stating that any such cancellation was imminent, threatened or scheduled.

14.     Moreover, such notice is not allowed under any of the agreements between Plaintiff and Blue Cross.

15     Under the terms of the Provider Agreement, either party may cancel the arrangement which has existed since 2011 upon the giving of 90 days notice. This was not done.

16.     Additionally, under the contract, in the event that notice is given of cancellation for cause, and only under certain specified circumstances involving risk to patient care, none of which occurred in this case.

17.     Blue Cross has been involved in an arbitration with Victory Medical for 18 months over billing charge dispute.   All those charges occurred in 2016-2018.  Nothing has changed in that case.  No new knowledge has been learned.  What is actually occurring is that Blue Cross has elected to claim this in order to gain leverage over Victory Medical and to compromise the health

3

of patients of Victory Medical to gain leverage in the arbitration. This is improper and in violation of the notice requirements in the Provider Agreement.

18.     Nothing in any Provider Agreement allows Blue Cross to throw 15,000+ patients off the health care rolls of Victory Medical in order to gain leverage in a billing dispute over bills 4-6 years old.

19.     After Victory Medical asked what Blue Cross was going on, several things occurred. **First**, Blue Cross claimed that Victory Medical voluntarily cancelled this agreement. On or about August 2, 2022, Blue Cross began information patients that Victory Medical had therefore abandoned them by voluntarily cancelling its status as an approved provider. **Second**, when Victory Medical contested and informed the patients this was incorrect, Blue Cross then decided on another story, namely, that Victory Medical had been cancelled as a provider. However, this could not have been true since Blue Cross had sent no notice to subscribers (patients) nor to Victory Medical. **Third**, when confronted with this latest falsehood, Blue Cross then sent a letter which arrived on Friday, August 12, 2022, ten days after Blue Cross began implementing its unilateral and improper cancellation of the Patients' and Victory Medical's benefits. This letter claimed that Blue Cross was using the old allegations referred to above in paragraph 17 hereof and which were 18 months old to immediately cancel Victory Medical as a current approved provider for Blue Cross. This placed and places the 15,000+ patients of Victory Medical who are Blue Cross beneficiaries at risk of having no approved provider and Victory Medical with a loss of those patients and revenue.

20.     This August 12 letter allegedly attempted to justify retroactively the cancellation of Victory Medical as an approved provider. There is no contractual provision allow retroactive cancellation of provider status under the terms of the Provider Agreement. Advanced notice is clearly required for the health and safety of the patients.

21.     Because the notice requirements under the Provider Agreement were not met, Blue Cross is not allowed to unilaterally cancel Plaintiff as an approved provider much less do so when it would result in 15,000 patients being left stranded without medical care..

22.     Consequently, not only does Plaintiff Victory Medical has a probably right to relief, it has an absolute right to relief and to reinstatement of its status as a Provider under the terms of the Provider Agreement.

23.     To preserve the *status quo*, this Court should enter the Temporary Restraining Order as requested.

24.     In sum, none of those requirements incumbent on Blue Cross were met.  Moreover, the individual Defendants either individually or in concert have caused to be disseminated incorrect and false information concerning Plaintiff and this cancellation of Plaintiff as an authorized provider.

**<u>Immediate Irreparable Injury</u>**

25.     The effect of this unilateral, unjustified and unjustifiable cancellation is that Victory Medical patients suddenly are without the services of their physician who has been their authorized provider, with no notice to the patients themselves, nor to Victory Medical.

26.     The effects of this unilateral cancellation of Victory Medical as an authorized provider without notice to patients or Plaintiff has resulted in the following so far:

    a.  Referrals of approximately 130 patients to specialists, 35 of those referrals are considered critical to be seen asap, is a denial of those referrals[1].

    b.  Delayed lab tests for those same referrals.[2]

---

[1] Declaration of Yessenia Noa, Victory Medical Center, coordinator of primary care provider referrals to specialists.  Attached as Exhibit B.
[2] Declaration of Yessenia Noa, Victory Medical Center, coordinator of primary care provider referrals. Attached as Exhibit B.

5

c.  Delays in getting new providers identified for those critical referrals.[3]

d.  Inability to have continued monitoring for kidney cancer patient;[4]

e.  Denial of referral for that same kidney cancer patient;[5]

f.  Placing health in jeopardy of that kidney cancer patient because of the delay in getting seen by another specialist/medical monitor for 24 medications for kidney cancer patient;[6]

g.  Delayed referral to oncologist stemming from kidney cancer;[7]

h.  Cancellation of lab tests and medical assessment for complex diabetes;[8]

i.  Inability to get a referral to an accepting doctor for diabetic;[9]

j.  Disruption of care for a 20 year past patient of Victory Medical with high cholesterol, high blood pressure, pre-diabetes chronic problems.[10]

k.  Inability to obtain renewal prescription for unique medication developed by Dr. William Franklin, Victory Medical, to treat chronic insomnia;[11]

l.  Secure continued care and medication for school-aged child, a client of Plaintiff since age 5, to treat disabilities which treatment allows him to stay in school.[12]

27.  Persons who need re-authorizations of medications cannot have those done until a newly established relationship with another "authorized" provider of Blue Cross. Patients who have had surgeries recommended by Victory Medical physicians cannot have those performed since the

---

[3] Declaration of Yessenia Noa. Attached as Exhibit B.
[4] Declaration of Arturo Dominguez, attached as Exhibit C.
[5] Declaration of Arturo Dominguez, attached as Exhibit C.
[6] Declaration of Arturo Dominguez, attached as Exhibit C.
[7] Declaration of Arturo Dominguez, attached as Exhibit C.
[8] Declaration of Sarithia Pothuluri, attached as Exhibit D.
[9] Declaration of Sarithia Pothuluri, attached as Exhibit D.
[10] Letter from Russell Remington, patient of Victory Medical for last 20 years, attached as Exhibit E.
[11] Declaration of Joshua Masongsong, attached hereto as Exhibit F.
[12] Declaration of the mother of E., a school aged child with disabilities, attached hereto as Exhibit G.

recommendation was no longer from an "authorized physician". Those referrals will all have to be denied and rescinded. Parents of children who had scheduled their children for required shots and immunizations with Victory Medical now must seek another "authorized" physician, establish a new relationship, have a new exam before meeting school requirements. Certain medications require that the physician conduct and exam prior to the renewal of that prescription. Those cannot be performed until a new physician is assigned and a new relationship established, and exam scheduled and performed.[13]

28.    Ordinarily, this would be done as a matter of course. However, **Blue Cross cancelling the authorized status of Victory Medical all at one time, without advance notice, resulted in 15,000 patients needing to be re-assigned all at once, suddenly, without opportunity to manage their medical care and without any attempt to match the new physician's specialty with the medical needs of the patients. The records themselves and transferring 15,000 patients records to numerous physicians throughout the region will result in delayed medical care and treatment, particularly to some patients for whom time and continued care is critical.**[14]

29.    If this termination is not ordered reversed by this Court, it will wreak havoc on the healthcare of at least 15,000 patients in and around the Austin Texas area, many with affected family members, who will no longer have the certain access to the doctor or other caregiver of their choice who they and their families have used for many years, thus requiring them to start over with a new doctor or caregiver who is wholly unfamiliar with their medical history and current

---

[13] Declaration of Dr. John S. Kim, M.D., attached hereto as Exhibit H.
[14] Declaration of Dr. John S. Kim, M.D., attached hereto as Exhibit H.

7

medical condition, thus compromising continuity of care, and jeopardizing their health and safety.[15]

30.    This wrongful termination will also cause the loss of employment by many hardworking and conscientious caregivers and their staff as well as the closure of various of the branch offices of Victory Medical.[16]

31.    This action seeks a temporary restraining order, a preliminary and a permanent injunction preventing this termination or ordering it reversed pending a trial on the merits of this case, and also seeks a declaratory judgment that the termination was wrongful and has no effect, damages as determined by this Court, and those proved and awarded at trial.

32.    To the extent that Blue Cross complaints that money damages are sufficient to make Plaintiff whole, this ignores the nature of the services provided, that this is healthcare and continuing healthcare vital to the lives and health of those 15,000+ patient.

**Individual Defendant's Roles**

33.    Defendant Rick Haddock (hereinafter Haddock") is the Vice President of Network Management for Blue Cross in Texas.  He operates from the Texas offices of Blue Cross in Ricardson, Texas, and he has primary responsibility for determining which doctors and medical facilities will be granted, and thereafter maintained in, in-network status allowing those physicians and medical facilities to treat many of the patients insured under Blue Cross health insurance plans under which, without such status, those patients medical costs will not be reimbursed by those plans, which in practical terms means that those patients will not seek out or remain under the treatment of physicians and medical facilities that are not in network. Within Texas and specifically as it relates to the wrongful conduct of Blue Cross referred to in this Complaint,

---

[15] Declaration of Dr. John S. Kim, M.D., attached hereto as Exhibit H.
[16] Declaration of Dr. John S. Kim, M.D., attached hereto as Exhibit H.

8

Defendant Haddock, in his capacity as Network Manager in Texas, did and caused to be done all the Blue Cross actions described below, doing so in concert with Defendant Fernandez referred to in the next numbered paragraph below.

34.    Defendants Cristina Fernandez and Angelica Colmenero Collins are the regional representatives/supervisors of Blue Cross operating out of Travis County, Texas.  In their role as representatives of Blue Cross, they assist Defendant Haddock in determining which doctors and medical facilities will be allowed, and maintained as in-network status so that patients insured by Blue Cross medical plans can have their medical costs reimbursed by Blue Cross if they are treated by in network physicians and facilities. Within Texas and specifically as it relates to the wrongful conduct of Blue Cross referred to in this Complaint, Defendant Fernandez, in her capacity assisting Defendant Haddock in Network Management here in Texas, and Defendant Angelica Collins, did and caused to be done all the actions of Blue Cross described below, doing so in concert with Defendant Haddock as described herein above and below.

35.    The actions below of Blue Cross were done by or caused to be done by Defendants Haddock and Fernandez who at all times referred to below were acting on behalf of Blue Cross and within the scope of their authority given to them by Blue Cross to manage the acceptance and maintenance of in network physicians and facilities in Texas. Accordingly, they are liable vicariously for all of the wrongdoing described below. Accordingly, when any allegation stated below refers to Blue Cross and its actions, these actions were done by or caused to be done by Defendants Haddock, Collins and Fernandez.

### Victory Medical's Operation and its Relationship with Blue Cross

36.    Plaintiff Victory is a Professional Association offering medical services to the Texas public through its medical offices.

9

37.     Victory Medical operates a principal medical care facility and three separate satellite locations around the Austin, Texas area, specifically in Austin, West Lake, Cedar Park, and Marble Falls. It has been in operation for 20 years. Currently, it provides primary and specialty medical care for over 60,000 Texans, approximately 15,000 of whom are insured by Blue Cross.

38.     Like all the other patients using medical services of Victory Medical, these Blue Cross insured patients have relied upon Victory Medical caregivers[17] for their medical care, sometimes for many years and for the health care of their entire families. However, when insured by Blue Cross for their medical care, they may only continue to use Victory Medical caregivers if these caregivers and Victory Medical have a providers contract with Blue Cross that designates Victory Medical and its physicians and caregivers as authorized to treat these patients and have that treatment paid by Blue Cross.

39.     Victory Medical is operated by an administrative staff and by over 50 caregivers, including physicians, nurse practitioners and nurses. For decades, the Victory medical facilities have dispensed a wide array of medical services to the public in and around the Austin metropolitan area. Victory Medical provides its caregivers with state-of-the-art medical facilities, equipment and administrative support so that they can effectively practice their varying medical specialties.

40.     Specifically, the Victory facilities provide their caregivers with all the needed collateral support, including office space, waiting rooms, examination rooms, all manner of medical supplies, a variety of medical equipment, physician cross referring, nursing and physician's assistant support, all manner of diagnostics (X-ray, blood work, etc.), pharmacy services, and billing services to send bills for their services to the health care insurers who have insured the patients they are treating.

---

[17]As used in this Verified Complaint, the term "caregivers" means licensed physicians, nurse practitioners, and nurses.

10

41.     Current Blue Cross patients receive medical services paid for under their Blue Cross health plans covering their medical expenses.  However Blue Cross health plans require those Blue Cross patients to only use facilities and caregivers who have agreements with Blue Cross to treat Blue Cross insured patients as Blue Cross authorized providers. Victory Medical and its caregivers have had such a provider agreement with Blue Cross for many years.

42.     That agreement is entitled "Group Management Care Agreement" (hereinafter the "Blue Cross/Victory Agreement"), having an effective date of November 16, 2011. This Blue Cross/Victory Agreement has been in effect since that time and allows the many persons insured by Blue Cross to visit Victory Medical for medical treatment of many kinds and provides that such treatments will be reimbursed by Blue Cross in its capacity as the health care insurer for its covered members.  A copy of this Agreement is attached as Exhibit A.

43.     Of the approximate 60,000 Austin, Texas area patients receiving their health care from Victory Medical, approximately 15,000 of them are insured for their medical needs by Blue Cross.

44.     Many of these patients have been treated for years by Victory Medical caregivers for serious medical conditions which must be continuously attended to by a medical caregiver who is familiar with their chronic condition. Continuity of medical care is key to the health and potentially even the life of these patients.

45.     Under the Blue Cross Agreement, specifically Exhibit A, Part VIII "Term and Termination," commencing at page 11, Blue Cross may only terminate its Blue Cross Agreement in one of two circumstances: (i) upon 90 days notice to Victory Medical, so that it can afford an opportunity to notify its patients covered by a Blue Cross Health Plan that they may no longer use Victory as their care provider unless they wish to seek health care coverage under a different

11

health care plan that will allow them to continue being treated by Victory Medical, or (ii) when there is cause for termination without the 90-day notice period.

46.     However, if Blue Cross seeks to terminate the Blue Cross Agreement with Victory Medical without providing 90 days notice, the Blue Cross/Victory Agreement provides, in Part VIII(C) at page 12 thereof, that it may only do so upon specific notice by Blue Cross to Victory Medical that there is either (i) " a threat of imminent harm to patient health," an action by the State of Texas against a Victory Medical caregiver's license to practice medicine, or "fraud or malfeasance."

47.     In the event that there is a termination by Blue Cross of the Blue Cross/Victory Agreement, Part VIII(E), provides that the patients be "provided reasonable advance notice" so that they can have an orderly transition of their medical care from the terminated physician or his facility to a new physician who given his practice area and experience is capable to competently handle their medical needs. No such notice was given either to the 15,000 patients involved or to Victory Medical.

48.     Blue Cross representatives have stated that the only reason for termination is allegedly that Victory Medical did not "renew" its contract on July 31, 2021.  However, there is no such requirement in the contract between Blue Cross and Victory Medical.  This "requirement" is nonexistent, and never has been a requirement.  In short, Blue Cross has invented a subterfuge which does not exist in the Agreement, has never existed, and now is simply unilaterally cancelling the authorized provider for 15,000 patients of Victory Medical, when it is not permitted to do so.

49.     Despite being requested to reinstate Victory Medical, Blue Cross has refused to do so, relying instead on this non-existent requirement of a renewal of the contract in existence since

12

2011.  The immediate harm is both to Victory Medical as it is losing 15,000 patients, but also to the care of those patients, and to the business of Victory Medical with a substantial loss of revenue, and the resultant termination of many employees. This unauthorized termination has also damaged the well-earned reputation of Victory Medical as a reliable medical facility with word being spread that it has been abruptly terminated by the largest health insurer in Texas.

50.     As both Defendants Haddock and Fernandez well know, there has been no such occurrence and particularly no fraud or malfeasance of an imminent nature or otherwise and Blue Cross has never given any notice of termination based on any of the above-referenced conduct allowing termination on less than 90 days notice to Victory medical as required under the Blue Cross/Victory Agreement.

51.     While Blue Cross and Victory Medical have an 18-month old disagreement about certain billings, now in arbitration, **this is an old matter, inapplicable to the Agreement**, and **does** not warrant any abrupt termination of the entire Blue Cross/Victory Agreement.

52.     Despite this, commencing on July 30, 2022, Blue Cross, acting by and through Defendants Haddock and Fernandez, sent out a notice to all of the 15,000 Victory Medical patients insured by Blue Cross that they may not any longer use Victory Medical, its physicians, nurse practitioners, nurses or facilities for those patient's health care, telling them abruptly to go elsewhere.

53.     Moreover, Blue Cross, acting by and through Defendants Haddock and Fernandez, has sent many of these patients an "assignment" of a new physician who has absolutely no familiarity with the medical history of the patients involved, and the Blue Cross Defendants made these assignments without any consultation with the patient to learn what his or her medical needs are currently, without any information about the patient's medical history, nor any consideration of

13

whether the "assigned" physician has any competence or experience in treating the medical condition of the patient to whom that physician has been "assigned."

54.     Such behavior by Defendants Blue Cross, Haddock and Hernandez is grossly irresponsible to the health and safety of the thousands of patients involved and is against the public interest which values, or should value, continuity in the delicate and important matter of providing informed health care and doing so in a reliable and consistent manner.

55.     Indeed, as of the date of the filing of this Verified Complaint, Victory Medical has at least 34 Blue Cross insured patients in active process of being referred by their physicians at Victory to specialists for important if not critical treatment by those specialists needed for their medical conditions. These include referrals for cardiology, oncology and orthopedics and these referrals have been explicitly made on a "stat" basis, which is the commonly used term in the medical profession for urgent or immediate action. These referrals are now in jeopardy if this termination is not restrained by this Court with the consequence that 34 people have their urgent referrals cancelled.

56.     In addition to those interrupted "stat" referrals, for all those Victory patients who have been assigned new physicians in the above-described, completely uninformed way, even if they do not have any "stat" need for a specialist referral, such assignments are completely irresponsible for the reasons described above. For those Victory Medical patients for whom Blue Cross has not "assigned" new physicians, leaving these patients to seek out their own replacement physician in the already overcrowded medical facilities in and around Austin Texas is a virtually impossible undertaking and particularly one that cannot be accomplished soon and certainly not soon enough in the case of those patients needing care now for existing conditions.

14

57.     This abrupt, improper and improperly-noticed termination is therefore dangerously disruptive of the important health care needs of these patients who, if this termination stands and it not reversed by this Court, will cause many thousands of Victory Medical patients to face a dangerous risk to their health care and thus to their health and safety. This is a highly dangerous and unfair position for Blue Cross to have caused for thousands of innocent citizens in and around Austin.

58.     Moreover, this wrongful termination, without any notice, much less the reasonable notice required under the Blue Cross/Victory Agreement at Part VIII(E), will cause irreparable harm to Victory medical. If this termination is not reversed by this Court, it will leave Victory medical with an immediate loss of 35% of its patients and thus 35 % of its revenues. This is an economically unsupportable position for Victory Medical because the underlying costs of supporting its staff, physicians and other caregivers, which costs were assumed and put into place in reliance on these now-terminated revenues, will remain while these revenues will no longer be available to help pay these costs.

59.     Unless these Defendants are restrained and enjoined, Victory Medical will have to lay off many employees and caregivers and will need to close at least two of its branch offices, which will also adversely affect Victory Medical patients who are insured by other healthcare insurers but who have used these branch offices and their caregivers for their medical care.

60.     In addition, because Defendants Haddock, Fernandez and Blue Cross have notified thousands of individuals that they may no longer use Victory Medical and have done so directly, without any explanation, and publicly with notice to each of them and with no notice to Victory so that Victory could explain the termination to its long-time patients and work with them to find

new caregivers, Blue Cross has left the defamatory impression that there is something so improper or unsafe about Victory Medical that it had to be terminated in this abrupt manner.

61.     Defendants' termination of the Blue Cross/Victory Agreement is wrongful and a breach of the Blue Cross Agreement which, for the reasons set forth above, will cause irreparable harm to Victory Medical and this honorable Court should restrain and enjoin this wrongful termination, ordering the *status quo ante* by ordering Haddock, Fernandez and Blue Cross to reinstate the Blue Cross/Victory Agreement that has been in place for many years at least until there has been an orderly transition to well-suited and qualified caregivers to replace those at Victory.

## COUNT I

### (Breach of Contract)

62.     Victory Medical repeats and realleges each allegation made above as if repleaded in its entirety in this paragraph.

63.     The above-described termination of the Blue Cross/Victory Agreement by Defendants without proper cause and with no notice as required by that agreement is a breach of contract. It is also a breach by Blue Cross of the implied covenant of good faith and fair dealing. Despite the clear obligation to provide notice to both Victory Medical (Part VIII(C) and to the patients (Part VIII(E), Blue Cross did neither and failed to do so in a way that has wreaked havoc on 15,000 persons in need of medical care and many innocent employees at Victory medical.

64.     Victory Medical has suffered monetary damages as a result of that breach in an amount that it will show at trial and Blue Cross is liable to Victory Medical for all damages thus proved.

## COUNT II

### (Fraud and Intentional Misrepresentation)

65.     Victory Medical repeats and realleges each allegation made above as if repleaded in its entirety in this paragraph.

66.     By sending out to many Victory Medical Patients email and letter communications stating that Victory Medical abruptly is no longer allowed to provide medical care for those patients, Defendants Haddock, Fernandez and Blue Cross have defamed Victory Medical by clearly implying and leaving the clear impression that because of the abrupt termination of the important medical relationship between those patients and Victory Medical,  Victory Medical must have done something that makes it unable or unfit to practice medicine.

67.     These Defendants' communications have damaged the reputation of Victory Medical.

68.     These statements by Defendants Haddock, Fernandez and Blue Cross are false in that Blue Cross is fully able and fit to dispense medical treatment and advice as it has done for many years.

69.     The above has damaged the reputation of Victory Medical to its core as a health care provider who has been thus disparaged and defamed by the largest health insurance provider in Texas.

70.     Victory Medical has suffered damages from this libel and the amount of that damage will be shown at trial and Defendants Haddock, Fernandez, and Blue Cross are liable for those damages as will be proved at trial.

## COUNT III

### (Business Disparagement)

71.     Defendants published or authorized the publishing of false and disparaging information about the business though specifically disseminating false information about the termination and

17

voluntary termination by Victory Medical as its status as an authorized provider for Blue Cross plan participants who were patients at Victory Medical. Defendants' misrepresentations were intended to and did in fact reflect that Defendants were saying that Victory Medical left the patients without notice and without authorized medical care at Victory Medical.

72.   Defendants acted with malice in that such representations were false and intended to affect the doctor patient relationship between Victory Medical and its Blue Cross plan participants.

73.   Defendant acted without privilege as there is no privilege to disseminate such false and misleading information.

74.   Defendant's actions resulted in special damages to the plaintiff for which Plaintiff seeks actual damages, as well as injunctive relief in the form of a Temporary Restraining Order, Preliminary Injunction and Permanent Injunction.

## COUNT IV

### (Libel and Slander)

75.   Defendants disseminated false statements as to Plaintiff verbally in response to call ins to Defendant Blue Cross call centers and in written communications as well. Those communications were to patients of Victory Medical who were also Blue Cross plan participants.

76.   Those statements were not only false but also defamatory.

77.   Such statements defamed the Plaintiff to its economic damage but also to damage to the doctor-patient relationship with individual patients of Victory Medical.

78.   Such statements were made with actual knowledge of their falsehood or made with reckless disregard for the truth of such statement. Moreover, Defendants knew or should have known that such statements were false when made.

18

## COUNT V

### (Declaratory Relief)

79.     Victory Medical repeats and realleges each allegation made above as if repleaded in its entirety in this paragraph.

80.     Plaintiff seeks declaratory judgment that Defendants have unilaterally terminated the contract Blue Cross has with Victory Medical claiming that it has a right to do so when no such right existed.  Defendant Blue Cross claims that it had such a right to terminate the contract.

81.     Conversely, Victory Medical claims that this termination was wrongful, and that Defendants Haddock, Fernandez and Blue Cross have no right to do so.

82.     A justiciable controversy therefore exists between Victory Medical and Defendants.

83.     Moreover, the termination has just gone into effect with shocked and troubled patients seeking guidance as to what they should do now about the above-described, abrupt change in their health care situation.

84.     This controversy is therefore ripe for this Court's decision because the position of the parties is clear, and they are completely at odds with each other.

85.     Moreover, the termination of the Blue Cross/Victory Agreement is causing and will continue to cause irreparable harm to Victory Medical because it will lose its patients who had given their medical business to Victory Medical for many years, it has damaged Victory Medical's reputation by sending termination letters to its longtime and once loyal patients who now have reason to believe, incorrectly, that Victory Medical is acting improperly or incompetently. These beliefs on the part of its patients will not be corrected unless this Court orders this termination to be reversed and these beliefs are irreparably damaging to the long-term viability of Victory Medical.

86.    This termination will also cause Victory Medical to lay off many of its employees and terminate various of its branches, both of which will be impossible to undue. This will cause potentially ruinous hardships to Victory Medical.

87.    Conversely, Defendants Blue Cross, Haddock and Fernandez will suffer no hardship if they continue honoring its contract obligations with Victory Medical under a contract which has been in place now for many years. The balance of hardships thus tips decidedly in favor of Victory Medical and against Blue Cross.

88.    Moreover, the causing of patients to use physicians wholly unfamiliar with their medical needs and medical history is against the public interest by putting these patients at risk of their health.

89.    This court should therefore restrain temporarily and thereafter preliminarily enjoin the termination by Blue Cross of the Blue Cross/Victory Agreement pending trial of this matter.

WHEREFORE, PREMISES CONSIDERED, Plaintiff asks this Court to enter a judgment in their favor as follows:

(A)    That this Court immediately issue a Temporary Restraining Order to maintain the *status quo* and ordering Defendants as follows:

1.    Ordering Blue Cross to reinstate its Blue Cross Agreement with Victory Medical immediately;

2.    Order Blue Cross to desist from telling the patients that Victory Medical is no longer an authorized provider;

3.    Order that Blue Cross advise each patient that it has already told that Victory Medical is not an authorized provider be informed that Victory Medical is in fact and authorized provider;

20

4.     Order Blue Cross to advise each patient of Victory medical that Blue Cross has reassigned to another provider be rescinded and advised that that patient can stay with Victory medical as its authorized provider under their BCBS Plan;

5.     Order Cristina Fernandez and Angelica Collins and Rick Haddock to cease and desist from instructing representatives of Blue Cross to advise patients with Victory Medical that Victory Medical is not an authorized provider;

6.     Further Order that Defendants Cristina Fernandez and Angelica Collins and Rick Haddock reinstate Victory Medical on the list of authorized providers and further that these Defendants instruct the representatives to cease and desist from instructing patients of Victory Medical that it voluntarily withdrew from the Blue Cross program and left the patients without Victory Medical as an authorized provider;

**And further**,

(B) that upon the expiration of the Temporary Restraining Order that this Court enter a Preliminary Injunction and a Permanent Injunction as follows:

1.     Ordering Blue Cross to reinstate its Blue Cross Agreement with Victory Medical forthwith;

2.     Order Blue Cross to desist from telling the patients that Victory Medical is no longer an authorized provider;

3.     Order that Blue Cross advise each patient that it has already told that Victory Medical is not an authorized provider be informed that Victory Medical is in fact and authorized provider;

21

4.     Order Blue Cross to advise each patient of Victory medical that Blue Cross has reassigned to another provider be rescinded and advised that that patient can stay with Victory medical as its authorized provider under their BCBS Plan;

5.     Order Cristina Fernandez and Angelica Collins and Rick Haddock to cease and desist from instructing representatives of Blue Cross to advise patients with Victory medical that Victory Medical is no an authorized provider;

6.     Further Order that Defendants Cristina Fernandez and Angelica Collins and Rick Haddock reinstate Victory Medical on the list of authorized providers and further that these Defendants instruct the representatives to cease and desist from instructing patients of Victory Medical that it voluntarily withdrew from the Blue Cross program and left the patients without Victory Medical as an authorized provider;

**And further that upon final trial,**

(C) that this Court enter a Permanent Injunction and judgment for damages as follows:

(1)     Actual Damages for breach of contract, libel, slander, business disparagement, fraud and misrepresentations;

(2)     Declaratory Judgment that the termination was a violation of the contract between Blue Cross and Victory Medical,

(3)     Awarding Plaintiff damages as proved at trial, including attorneys' fees and all costs of suit herein: and

(4)     Awarding such other and further relief as this Court deems just and proper;

(5)     And for such other and further relief, at law and in equity, to which Plaintiff may be justly entitled.

22

Respectfully submitted,

COLLMER LAW GROUP

/s/ Mark W. Collmer
Mark W. Collmer, Esq.
State Bar No. 0462420
Mark@Collmerlaw.com
3700 Montrose
Houston, Texas 77006
Tel: (713) 337-4040
Fax: (713) 337-4040


MARKHAM READ ZERNER LLC

/s/ John J. Markham
John J. E. Markham, II (MA BBO No. 638579)
*[Seeking Pro hac vice status]*
One Commercial Wharf West
Boston, Massachusetts 02110
Tel: (617) 523-6329
jmarkham@markhamreadzerner.com
bzerner@markhamreadzerner.com
*Of Counsel for Plaintiff*
*Pro Vac Vice Application Pending*

/s/Kelly Dawson
Kelly C. Dawson
The Dawson Group P.C.
1000 Cordova Pl. PMB 287
(505) 573-5020 Tel
(512) 789-2489 Fax
Kcmd777@gmail.com
Texas Bar No. 24068025
ATTORNEY FOR VICTORY MEDICAL

23

**Verification**

I, William Franklin, M.D., as authorized representative of Victory Medical, have read the forgoing Verified Complaint and declare under penalty of perjury that the facts stated therein are true to the best of his knowledge and belief.

Executed this 16th day of August in Austin, Texas.

_____
William Franklin, M.D.

SUBSCRIBED AND SWORN TO BEFORE ME by William Franklin, M.D., on this 16th day of August , 2022 to certify which witness by hand and seal of office.

_____
Notary Public, State of Texas

09/03/2025
_____
My Commission Expires:

MICHELLE LYNNE FLAMANT
My Notary ID # 128031066
Expires September 3, 2025

24

# EXHIBIT A

## GROUP MANAGED CARE AGREEMENT

### FOR PPO/POS NETWORK PARTICIPATION

**Exhibit A**

This Agreement is entered into by and between Blue Cross and Blue Shield of Texas, a Division of Health Care Service Corporation, a Mutual Legal Reserve Company ("BCBSTX") and Victory Medical & Family Care, a professional entity organized in the state of Texas ("Medical Group").

As of the Effective Date, this Agreement includes the following:

Yes No
☒ ☐ Medical Group Agreement
☐ ☒ Hospital Based Medical Group Provider Attachment
☒ ☐ Attachment A, Compensation / Claims Submission

BCBSTX has entered into an agreement to delegate Credentialing to Medical Group. This includes:

☐ ☒ Attachment B, Credentialing Delegation Agreement
☐ ☒ Business Associate Addendum

Medical Group is a:

☐ Specialist Group
☐ Primary Care Physician Group
☒ Primary and Specialty Care Group

Any Notice required or allowed to be given pursuant to the terms and provisions of this Agreement shall be sent to BCBSTX at:

Blue Cross and Blue Shield of Texas
9442 Capital of TX Hwy N. Ste 500, Arboretum II
Austin, TX 78759

and to Medical Group and/or Medical Group Providers at:

**Multiple Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the undersigned have executed this Agreement to be effective as of the Effective Date set forth below.

**BLUE CROSS AND BLUE SHIELD OF TEXAS**          **MEDICAL GROUP**

**A scanned, imaged, electronic, photocopy or stamp of the signatures hereunder shall have the same force and effect as an originally executed signature.**

Authorized Signature:                             Authorized Signature:

_M. 87.8_                                          _Michelle Holle_

Printed Name: M. Shannon Stansbury              Printed Name: Michelle Holle

Title: Vice President, Network Management        Title: Administrator

Date: 11/16/11                                    Date: 11/10/11

Effective Date: 11/10/11                          NPI: 1 5 4 4 9 0 1 9 1

## PART I. DEFINITIONS

**Agreement** means this contract and all attachments, addenda and amendments appended hereto.

**Applicable Laws** means all federal and Texas laws and regulations that are applicable to any provisions of this Agreement, including, without limiting the foregoing, the Texas Insurance Code.

**Clean Claim** means a clean claim as defined by applicable Texas law and regulation.

**Coinsurance** means, if applicable, the specified percentage of the fee for a Covered Service that is payable by the Subscriber. The Subscriber's obligation to make Coinsurance payments may be subject to an annual out-of-pocket maximum.

**Copayment** means the amount required to be paid to Medical Group or Medical Group Provider by or on behalf of a Subscriber in connection with the services rendered by Medical Group or Medical Group Provider.

**Covered Services** means those health services specified and defined as Covered Services under the terms of a Subscriber's Health Plan.

**Debarment** means the prohibition of a Provider from receiving compensation for services provided under any federal health benefit plan or program, including, without limiting the foregoing, Medicare, Medicaid, and the Federal Employees Health Benefits Plan ("FEP"), as reported by the federal Office of Personnel Management ("OPM"), Office of the Inspector General ("OIG"), the Center for Medicare and Medicaid Services ("CMS"), Office of Foreign Assets Control ("OFAC") or other applicable agency.

**Deductible** means, if applicable, the specified annual amount of payment for certain Covered Services, expressed in dollars, that the Subscriber is required to pay before the Subscriber can receive any benefits for the Covered Services to which the Deductible applies.

**Emergency Care** means health care services provided in a Hospital emergency facility or comparable facility to evaluate and stabilize medical conditions of a recent onset and severity, including but not limited to severe pain, that would lead a prudent layperson possessing an average knowledge of medicine and health to believe that such person's condition, sickness or injury is of such a nature that failure to get immediate medical care could result in: (1) placing the patient's health in serious jeopardy; (2) serious impairment to bodily functions; (3) serious dysfunction of any bodily organ or part; (4) serious disfigurement; or (5) in the case of a pregnant woman, serious jeopardy to the health of the fetus. A different definition of Emergency Care may be applicable to self-funded plans as set forth in Subscriber's benefit document.

**Health Plan** means any group or individual health benefits plan other than a health maintenance organization, whether insured or self-funded, which provides its participants access to health care services that is operated, administered or underwritten, in whole or in part by BCBSTX, a Blue Cross and/or Blue Shield Plan in another state, a subsidiary of a Blue Cross and/or Blue Shield Plan in another state or a BCBSTX affiliate and that has entered into any agreement to provide or administer Covered Services. The phrase "provide or administer" includes an insurance arrangement, an administrative services agreement, or an arrangement whereby an employer or welfare benefit plan contracts with BCBSTX or a Blue Cross and/or Blue Shield Plan in another state to utilize all or part of a BCBSTX managed care network. The term affiliate includes, but is not limited to any licensed entity in which BCBSTX or Health Care Service Corporation has an ownership interest.

**In-Network Provider** means a Provider of health care services that has a managed care agreement with BCBSTX or another Blue Cross and/or Blue Shield plan.

**In-Network Services** means Covered Services provided to Subscribers by an In-Network Provider or are provided in accordance with the Health Plan's requirements for in-network benefits.

**Inpatient** means a Subscriber admitted to a hospital as a registered bed patient and who requires the acute bed patient overnight setting.

**Medical Director** means a physician designated by BCBSTX, or such physician's designee, who is responsible for monitoring the provision of Covered Services to Subscribers.

**Medical Group** means the above named entity that has entered into this Agreement with BCBSTX to provide or arrange for the provision of Covered Services to Subscribers. Where applicable by context, Medical Group also means Medical Group Providers. Medical Group shall require that Medical Group Providers comply with the provisions of this Agreement that are applicable by context to Medical Group Providers.

**Medical Group Provider** means an individual physician or Provider appropriately licensed to provide health care services who participates in Medical Group and includes, without limiting the foregoing, Medical Group Primary Care Physician, Medical Group Specialist, and Medical Group obstetrician/gynecologist.

**Medically Necessary or Medical Necessity** means health care services that a Medical Group or Medical Group Provider, exercising prudent clinical judgment, would provide to a Subscriber for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are: (a) in accordance with generally accepted standards of medical practice; (b) clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the Subscriber's illness, injury or disease; and (c) not primarily for the convenience of the Subscriber, Medical Group or Medical Group Provider, or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that Subscriber's illness, injury or disease. For these purposes, "generally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, Physician Specialty Society recommendations and the views of Physicians practicing in relevant clinical areas and any other relevant factors.

**Notice** means any notice required or allowed to be given pursuant to the terms and provisions of this Agreement. Notices shall be sent in writing by United States mail, certified mail, traceable commercial delivery, or electronic transmission, and shall be deemed to be given when received. Notices sent by United States mail shall be deemed to be received on the third business day following their deposit in the United States mail.

**Out-of-Network Provider** means a Provider of health care services that is not an In-Network Provider.

**Payer** means an entity other than BCBSTX that is financially responsible for payment for Covered Services under a Health Plan.

**POS Plan** means a Health Plan that requires the designation of a Primary Care Physician (PCP) who must coordinate all Covered Services, including Proper Referrals to Specialists and Preauthorizations when required, in order for the Subscriber to receive the highest level of benefits under the Health Plan.

**POS Subscribers** means Subscribers covered under POS Plans.

**Preauthorization** means BCBSTX's prior approval of the Medical Necessity for certain services provided to Subscribers and as required by the Health Plan.

**Primary Care Physician** means a physician designated by BCBSTX as a Primary Care Physician, with respect to POS Plan, an In-Network Provider who has agreed to be responsible for providing basic health services, coordinating the care of individual POS Subscribers, and as applicable, referring those Subscribers to other In-Network Providers.

**Proper Referral** means in the case of a POS Plan that requires the designation of a Primary Care Physician an authorization for Covered Services by the Primary Care Physician to any other Provider, and such authorization shall be made as provided in the Provider Manual. Where a Health Plan requires a particular Covered Service to be preauthorized, a Proper Referral must include such Preauthorization for such services to be In-Network Services.

**Provider** means any appropriately licensed provider of health care services.

**Provider Manual** means BCBSTX policies, procedures, and guidelines as set forth in a manual as supplemented by written materials, including BCBSTX Provider correspondence and the Blue Cross and Blue Shield of Texas Web site, which may be revised from time to time, subject to the provisions of **Part X, General Provisions, Section N, Modifications.** In the event of a conflict between the Provider Manual and terms of this Agreement, the terms of this Agreement shall apply.

**Serious Reportable Events** means, as defined by the National Quality Forum (NQF), adverse events that are serious, but largely preventable, and of concern to both the public and health care providers and as may be more fully described in the Provider Manual.

**Specialist** means an In-Network Provider who is a physician or health care professional, other than a Primary Care Physician.

**Subscriber** means any individual who is eligible to receive Covered Services under a Health Plan unless otherwise specified by BCBSTX.

**UM Agent** means an entity that is a licensed utilization review agent under applicable law and is designated to perform utilization management ("UM") in connection with the care of Subscribers of a Health Plan, which is usually indicated on the Subscriber's identification card. The administrator of the applicable Health Plan may designate BCBSTX or another licensed utilization review agent to act as UM Agent for purposes of this Agreement and may designate one or more UM Agents to perform various UM activities. To the extent that BCBSTX has been designated as the UM Agent, BCBSTX may delegate any of BCBSTX's obligations to perform UM to any other entity licensed or otherwise permitted, in accordance with Applicable Laws, to perform UM in Texas.

**UM Program** means the guidelines, standards and procedures for UM activities that are used in connection with the applicable Health Plan, as more fully described in this Agreement.

**Urgent Care** means medical care that is delivered in a facility dedicated to the delivery of unscheduled, walk-in medical care that is not Emergency Care to any Subscriber outside of a hospital emergency department or comparable facility.

## PART II. OBLIGATIONS OF MEDICAL GROUP

A. **Covered Services.**

1. If Medical Group includes Primary Care Physicians, each Medical Group Primary Care Physician shall provide primary care services to Subscribers within the scope of Primary Care Physician's practice or license and, with respect to POS Subscribers, agrees to assume primary responsibility for coordinating the overall health care of POS Subscribers and to provide or arrange for all other Covered Services subject to the terms and conditions of this Agreement. Further, such Primary Care Physician shall make available to Subscribers those health education programs routinely provided by Primary Care Physician.

2. If Medical Group includes Specialists, each Medical Group Specialist shall provide to such Subscribers those Covered Services that such Specialist commonly performs within Specialist's scope of practice or license subject to the terms and conditions of this Agreement. For POS Subscribers for whom Covered Services require a Proper Referral, Medical Group Specialist agrees to render services only upon a Proper Referral.

3. In the event a Medical Group Provider desires to utilize or refer to another Provider to provide Covered Services, the Medical Group Provider shall consider, and inform the Subscriber concerning, the availability of any In-Network Provider with a specialty comparable to any Out-of-Network Provider considered by the Medical Group Provider. Any use of an Out-of-Network Provider, other than for Emergency Care, must be authorized in advance by BCBSTX for such services to be In-Network Services.

B. **Availability.** Medical Group shall ensure that Covered Services are readily available during Medical Group's regular business hours on business days. Medical Group shall provide such services in the same manner, in accordance with the same standards, and within the same time availability as such services are provided to other patients without regard to the degree or frequency of utilization of such

Covered Services by Subscribers. In the event Medical Group Provider is temporarily unavailable, Medical Group Provider may provide Covered Services through a designee, provided that such designee must have an equivalent competence and specialty, and must agree to provide Covered Services to Subscribers under the same compensation arrangements and comply with BCBSTX procedures. Medical Group may make a special arrangement with BCBSTX in the event of the extended temporary absence of Medical Group Provider.

C. **Standard of Care.** Medical Group shall, and shall require Medical Group Providers to, comply with all Applicable Laws and all applicable professional standards, and shall require Covered Services to be provided by Medical Group Providers in accordance with generally accepted medical and surgical practices and standards prevailing in the applicable medical community at the time of treatment. In addition, Medical Group and Medical Group Providers shall comply with the standards adopted by the BCBSTX's quality improvement and UM Program set forth in the Provider Manual.

D. **Licensure and Medical Staff Requirements.** Medical Group warrants and represents as a material term of this Agreement that each Medical Group Provider has and will continue to have, as long as this Agreement remains in effect, all the requisite licenses/certifications required by the state of Texas and such other governmental and professional boards and bodies having authority over Medical Group Provider's business/profession, including where applicable, a currently valid, unrestricted license to practice medicine in the state of Texas, and further that each Medical Group Provider who is a physician is and will be a member in good standing with admitting privileges at, and on the staff of at least one In-Network Provider hospital. Except with respect to stabilization following Emergency Care, Medical Group will require that Subscribers be admitted only to In-Network Provider hospital(s) unless BCBSTX Preauthorizes the admission.

E. **Proper Referral and Preauthorization for POS Subscribers.**

1. As applicable, for POS Subscribers, Medical Group Primary Care Physicians referring a Subscriber to another Provider for treatment shall comply with all Proper Referral and Preauthorization procedures set forth in this Agreement and in the Provider Manual. Medical Group Providers will only refer to In-Network Providers except in cases of Emergency Care or, if Preauthorized by BCBSTX, when no In-Network Providers are available to provide the necessary services.

2. If applicable, for Subscribers of POS Plans, Medical Group Specialist shall comply with all Proper Referral and Preauthorization procedures set forth in this Agreement and in the Provider Manual. For POS Subscribers, Medical Group Specialists shall provide Covered Services only upon a Proper Referral or Preauthorization, as applicable, except in cases requiring Emergency Care. For POS Subscribers, Medical Group Specialist shall discuss with and seek approval from the referring In-Network Provider prior to rendering or arranging any continuing treatment which is beyond the specific treatment described in the Proper Referral. In addition, Medical Group Specialist shall not refer a POS Subscriber to another physician or Provider without the prior concurrence of the POS Subscriber's Primary Care Physician, as applicable.

3. Subject to the terms of POS Subscriber's benefit document, POS Subscriber may directly access, from In-Network Providers, Covered Services that are Urgent Care. Information regarding Subscriber's care will be shared with POS Subscriber's Primary Care Physician.

4. Costs of services rendered to a POS Subscriber by Medical Group or a Medical Group Provider without a Proper Referral or Preauthorization where required shall be the financial responsibility of Medical Group or Medical Group Provider. The involvement of BCBSTX or other administrator of any Health Plan and/or the applicable UM Agent in decisions relating to the coverage of services rendered to POS Subscribers under these Health Plans shall not diminish the ultimate and sole responsibility of Medical Group for any professional authority over their professional practice with respect to the care of such Subscribers.

F. **Facilities, Equipment and Staff.** The following requirements shall be met or performed by Medical Group and/or Medical Group Providers, as applicable:

1. Provide and maintain facilities and/or equipment which are of adequate capacity, clean, safe, readily accessible to Subscribers and, where appropriate, properly licensed and/or registered.

2. Assure the appropriate supervision of, licensure/certification of, and insurance coverage for, all employed or subcontracted staff who provide Subscribers Covered Services that are performed under the direction of Medical Group Providers.

3. Have written policies that are implemented and enforced and that describe the duties of any employed or subcontracted physician assistants, advanced practice nurses and other individuals other than physicians in accordance with statutory requirements for licensure, delegation, collaboration and supervision as appropriate.

If any employee or subcontractor of Medical Group violates any of the provisions of Applicable Laws or the Provider Manual or commits any act or engages in any conduct for which Medical Group's license/certification may be revoked or suspended by the state of Texas (whether or not such authority revokes or suspended said license/certification) or is otherwise disciplined by such licensing authority or any professional organization having authority over such employee or contracting agent, BCBSTX may immediately require the employee or contractor to cease rendering services to Subscribers under this Agreement.

G. **Administrative Services.** Medical Group shall perform or contract for all administrative and support services necessary for Medical Group to perform Medical Group's obligations under this Agreement and as set forth in the Provider Manual.

H. **BCBSTX Complaint Procedures.** Medical Group and Medical Group Providers shall cooperate with BCBSTX in identifying, processing and in supporting BCBSTX's resolution of all Subscriber complaints and grievances. In the event Medical Group has a complaint, Medical Group also agrees to use the Provider complaint procedure set forth in the Provider Manual, and the procedures required in **Part X, General Provisions, Section I, Dispute Resolution** as described in this Agreement.

I. **Subscriber Identification.** Medical Group Provider shall request Subscriber to present Subscriber's BCBSTX identification card each time Subscriber seeks Covered Services. Obtaining information concerning eligibility at the time of service by Medical Group as described in this Agreement is not a verification and does not guarantee payment by BCBSTX.

J. **Termination of the Medical Group Provider/Patient Relationship.**

1. Under certain circumstances, Medical Group Provider may terminate Medical Group Provider's professional relationship with a Subscriber as provided for and in accordance with the provisions of the Provider Manual. Medical Group Provider may not terminate Medical Group Provider's relationship with a Subscriber because of such Subscriber's medical condition or the amount, types or cost of Covered Services that are required by the Subscriber.

2. Medical Group acknowledges that a Subscriber may transfer to another In-Network Provider or Medical Group Provider's care in accordance with the Subscriber's benefit document. Medical Group shall require that the Medical Group Provider provide patient records, reports and other documentation regarding such Subscriber at no cost upon request in order to facilitate such transfer.

K. **Required Disclosures.** Medical Group shall notify BCBSTX at least thirty (30) days in advance if there is a change in the business address, telephone number, hours of operation, tax identification number, other billing information or services provided by Medical Group or Medical Group Provider. Additionally, Medical Group shall notify BCBSTX immediately in writing upon the occurrence of any of the following events:

1. Medical Group's, Medical Group Provider's, or any Medical Group employee's or subcontractor's applicable license or certification to practice in Texas or DEA/DPS registration is suspended, revoked, terminated or subject to terms of probation or other restriction (whether or not such action is stayed); or Debarment of Medical Group, Medical Group Provider, or any Medical Group employee or subcontractor, or inclusion of Medical Group, Medical Group Provider, or any Medical Group employee or subcontractor in the OFAC/OIG/GSA/OPM list;

2. A Medical Group Provider's medical staff privileges at any hospital are denied, suspended, restricted, revoked or voluntarily relinquished in lieu of disciplinary action;

3. Medical Group, Medical Group Provider or any Medical Group employee or subcontractor, becomes the subject of any disciplinary proceeding, Debarment or action before the Texas State Board of Medical Examiners or a similar agency in any state;

4. A Medical Group Provider, or any Medical Group employee or subcontractor, is charged with or indicted for, or convicted of, fraud or a felony;

5. An act of nature or any event beyond Medical Group's or a Medical Group Provider's reasonable control occurs, which substantially interrupts all or a portion of Medical Group's or a Medical Group Provider's business or practice or which has a materially adverse effect on Medical Group's ability to perform Medical Group's obligations under this Agreement;

6. The material modification or termination, or reduction in the amount, of the insurance coverage required for participation in BCBSTX, or replacement of coverage which is canceled or terminated;

7. Medical Group or Medical Group Provider learns of any claim or malpractice action or other lawsuit or other action brought against Medical Group or any Medical Group Provider, or Medical Group employee or subcontractor, or becomes aware of a malpractice judgment or settlement against Medical Group, Medical Group Provider or any Medical Group employee or subcontractor;

8. Significant changes in administrative capacity, including information systems, and operational staff that may have a material adverse effect on Medical Group's ability to perform Medical Group's obligations under this Agreement; or

9. Any other situation which could reasonably be expected to affect the ability of Medical Group or Medical Group Provider to carry out Medical Group's obligations under this Agreement.

L. **Provider Directory.** Medical Group agrees that BCBSTX may list such information as Medical Group or Medical Group Provider's name, specialty, address, telephone number and board status and other information in BCBSTX publications provided to In-Network Providers and Subscribers and may use such information in advertising and marketing materials and to provide to Subscribers information regarding other In-Network Providers.

M. **Medical Group Status.**

1. Medical Group certifies that neither Medical Group, Medical Group Providers nor Medical Group's employees or subcontractors have been: (a) charged with a criminal offense in connection with obtaining, attempting to obtain, or performing of a public (federal, state or local) contract or subcontract, (b) listed by a federal governmental agency as debarred, (c) proposed for Debarment or suspension or otherwise excluded from federal program participation, (d) been convicted of or had a civil judgment rendered against Medical Group, Medical Group Providers, Medical Group's employees or subcontractors regarding dishonesty or breach of trust, including but not limited to, the commission of a fraud including mail fraud or false representations, violation of a fiduciary relationship, violation of federal or state antitrust statutes, securities offenses, embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, tax evasion, or receiving stolen property; or (e) within a three (3) year period preceding the date of this Agreement, had one or more public transactions (federal, state or local) terminated for cause or default.

2. Medical Group acknowledges and agrees that Medical Group has a continuing obligation to notify BCBSTX in writing within seven (7) business days if any of the above-referenced representations change. Medical Group further acknowledges and agrees that any misrepresentation of Medical Group's status or any change in Medical Group's status at any time during the term of this Agreement may be grounds for immediate termination of this Agreement, at the sole discretion of BCBSTX.

N. **BCBSTX Credentialing Procedures.** Medical Group shall cooperate and comply with, and be subject to, BCBSTX credentialing and recredentialing policies and procedures. Medical Group further acknowledges and agrees that, except as may be required by Applicable Laws, a Medical Group Provider will not become an In-Network Provider in BCBSTX until approved by BCBSTX pursuant to such credentialing policies and procedures and that continued participation in BCBSTX is subject to the recredentialing process at intervals provided for in such policies and procedures. If Medical Group is delegated for credentialing, Medical Group agrees to abide by the terms in this section and **Attachment B**.

O. **Capacity.** Medical Group or Medical Group Provider must give BCBSTX not less than ninety (90) day prior Notice of closing Primary Care Physician's practice to new Subscribers. Notwithstanding practice closure, Medical Group or Medical Group Provider agrees to accept all existing patients who are or become Subscribers. Medical Group agrees that BCBSTX shall have no obligation to guarantee any minimum number of Subscribers to Medical Group and that Medical Group shall accept all patients enrolling as BCBSTX Subscribers except as set forth to the contrary herein.

P. **Medical Group Subcontracts with Physicians and Providers.**

1. Medical Group shall furnish to BCBSTX in advance of its use the standard form of all subcontracts between Medical Group and any Medical Group Providers, including any material changes to such forms, in accordance with the Provider Manual. In addition, Medical Group shall provide to BCBSTX the executed signature page of each such contract and any material changes to such contract. Medical Group will ensure such Medical Group Providers comply with all terms and conditions set forth in the Subscriber's benefit documents and this Agreement.

2. Contracts between Medical Group and Medical Group Providers must contain provisions requiring such Medical Group Providers to comply with the provisions of this Agreement, and the Provider Manual where applicable, and must allow such Medical Group Providers to terminate such contracts on ninety (90) days advance Notice, and may not contain restrictions on such Provider's right to contract directly, or indirectly through another medical group, with BCBSTX after termination of such Medical Group Provider's contract with Medical Group.

## PART III. OBLIGATIONS OF BCBSTX

A. **Provider Manual.** BCBSTX shall make available to Medical Group the Provider Manual. The Provider Manual may be revised by BCBSTX from time to time and in accordance with this Agreement.

B. **Identification Cards.** BCBSTX shall issue identification cards to Subscribers.

C. **Service Preauthorizations.** BCBSTX shall Preauthorize Covered Services as set forth in the Provider Manual and in accordance with the provisions of the Health Plan and this Agreement.

D. **Advisory Review Panel.** BCBSTX may establish one or more health services delivery advisory review panels to advise BCBSTX on a variety of issues. Medical Group Providers may be requested from time to time by BCBSTX to serve as members on such panels.

E. **Credentialing.** BCBSTX shall administer a credentialing and recredentialing program pursuant to which the credentials of Provider applicants are reviewed and approved for acceptance as In-Network Providers.

F. **Complaints.** BCBSTX will establish and maintain a complaint procedure as required by the Provider Manual and Applicable Laws.

## PART IV. COMPENSATION

A. **Payment.**

1. BCBSTX or Payer shall pay Medical Group for Covered Services rendered to Subscribers less any applicable Subscriber Copayments, Coinsurance or Deductible amounts as described in **Attachment A, Compensation/Claims Submission**. Medical Group shall accept such

compensation, and any applicable Subscriber Copayment, Coinsurance or Deductible as Medical Group's only compensation for Covered Services. If the Health Plan is a secondary insurer, then a claim must include the amount paid as a covered claim by the primary insurer to be a Clean Claim. Any dispute arising from such payment shall be resolved in accordance with **Part X, General Provisions, Section I, Dispute Resolution.**

2. **Recovery of Overpayments and Underpayments**

   a. In the event that BCBSTX or Payer determines an overpayment, including a duplicate payment, has been made, Medical Group and/or Medical Group Provider agree to promptly make repayment to BCBSTX or Payer when requested. If Medical Group and/or Medical Group Provider fail to make such repayment within the time period specified in the Provider Manual, Medical Group and/or Medical Group Provider shall allow overpayments to be deducted from future payments, for the same or different Subscribers, with an explanation of the action taken.

   b. Overpayments determined by Medical Group and/or Medical Group Provider on a claim or claims, including duplicate payments, shall be refunded promptly to BCBSTX or Payer, but in any event not later than thirty (30) days following such determination.

   c. Any underpayments shall be added to future payments by BCBSTX or Payer to Medical Group and/or Medical Group Provider.

   d. Any dispute arising from a deduction or payment with respect to an overpayment or underpayment shall be resolved in accordance with the Provider complaint procedures set forth in **Part II, Obligations of Medical Group, Section H, BCBSTX Complaint Procedures.**

B. **Copayments, Coinsurance and Deductibles.** The collection of Subscriber Copayment, Coinsurance or Deductible amounts is the sole responsibility of Medical Group Provider. Medical Group shall require Medical Group Providers to diligently pursue, and have responsibility for, collection of any applicable Copayment, Coinsurance or Deductible amount from Subscribers and shall in no event offer, publicize or advertise any waiver or other reduction of any Copayment, Coinsurance or Deductible amount unless specifically authorized in writing by BCBSTX. All Copayments, Coinsurance and Deductible amounts shall be as specified in the benefit document, and the amounts of the Copayments, Coinsurance or Deductible which Medical Group Provider is authorized to collect from the Subscriber shall not exceed the amounts so specified.

C. **Claims Submission.** Medical Group shall submit complete and properly executed claims to BCBSTX within the required filing period, as described in **Attachment A, Compensation/Claims Submission.**

D. **Subscriber Nonliability and Hold Harmless.**

   1. Medical Group hereby agrees that in no event, including, but not limited to, non-payment by BCBSTX or Payer, insolvency of BCBSTX or Payer or breach of this Agreement, shall Medical Group or Medical Group Providers bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against Subscriber or persons other than BCBSTX acting on Subscriber's behalf for Covered Services. This provision shall not prohibit collection of supplemental charges or Copayment, Coinsurance or Deductible amounts payable in accordance with the terms of Subscriber's benefit document.

   2. Medical Group further agrees that: (a) this provision shall survive the termination of this Agreement regardless of the cause giving rise to termination and shall be construed to be for the benefit of the Subscriber; and (b) this provision supersedes any oral or written contrary agreement now existing or hereafter entered into between Medical Group or a Medical Group Provider and Subscriber or persons acting on their behalf.

E. **Billing for Non-Covered Services.** In the event that BCBSTX determines and informs Medical Group that a proposed service is not a Covered Service, including but not limited to services that are determined to be experimental/investigational or not Medically Necessary, Medical Group must

inform the Subscriber in writing in advance of the service being rendered that the service is a non-Covered Service in order to be allowed under this Agreement to bill the Subscriber for the service rendered. The Subscriber must also acknowledge this disclosure in writing and agree to accept the service as a non-Covered Service billable directly to the Subscriber. In the event the Subscriber's benefits are exhausted, Medical Group may continue to provide treatment to the Subscriber if the Subscriber agrees in writing to pay for those services; provided, however, that Medical Group may not charge the Subscriber more than the amount allowed as described in Attachment A.

F. **Third Party Collections.** Medical Group shall cooperate with BCBSTX in the collection on BCBSTX's behalf of third party payments including workers' compensation, third party liens and other third party liability according to the procedures set forth in the Provider Manual. Medical Group agrees that Medical Group or Medical Group Provider will file claims with BCBSTX even if Medical Group believes or knows that there is third party liability and the existence of third party liability will not affect Medical Group's or Medical Group Provider's total compensation for Covered Services.

G. **Coordination of Benefits.** Medical Group shall comply with the requirements of Applicable Laws and the Provider Manual regarding Covered Services involving coordination of benefits. Medical Group agrees to submit applicable claims and encounter information concerning other carriers to BCBSTX even if Medical Group believes that coordination of benefits may apply and BCBSTX is not the primary carrier. In the event that the Subscriber is eligible for benefits under any other health benefits plan for Covered Services, Medical Group's total compensation for such Covered Services from all sources, including any Copayments, Coinsurance or Deductible amounts payable by the Subscriber to Medical Group, shall not exceed the amount that would have been payable to Medical Group under this Agreement without taking into consideration such other coverage.

## PART V.  QUALITY IMPROVEMENT AND UTILIZATION MANAGEMENT

A. **BCBSTX Responsibilities.** BCBSTX shall conduct peer review, quality improvement and the UM Program in accordance with Applicable Laws. BCBSTX's UM Program may include the establishment of advisory review panels to conduct quality of care and utilization review activities in accordance with Applicable Laws. All BCBSTX quality improvement and UM forms, records and other information shall remain the property of BCBSTX and shall remain confidential.

B. **Medical Group Responsibilities.** Medical Group agrees to comply with and be subject to the quality improvement program and the UM Program conducted by BCBSTX and cooperate with peer review activities, all as set forth in the Provider Manual, and to promote Subscriber participation in BCBSTX disease management programs as applicable. These programs may be revised from time to time, and may include, but are not limited to, Preauthorizations of elective Inpatient services, concurrent review of Inpatient lengths of stay, review of referrals, internal peer review and external audit systems. Medical Group shall have sole authority and responsibility for the care of any Subscriber who is a patient of Medical Group.

C. **Shared Records.** Upon request, Medical Group shall make available to BCBSTX's quality improvement and utilization review committee any records of Medical Group's quality improvement and utilization review activities pertaining to Subscribers. BCBSTX will protect the confidentiality of information that is the product of Medical Group's peer review process.

## PART VI. RECORDS

A. **Subscriber Record.** Medical Group and Medical Group Providers shall establish and maintain an accurate medical record, including electronic record, for each Subscriber with whom Medical Group Providers have an encounter that, at a minimum, shall include such information about the Subscriber and a description of all services rendered to the Subscriber as dictated by generally accepted medical and surgical practices and standards and as required by the Provider Manual ("Medical Records"). Medical Group Provider shall maintain accurate financial books and records, including electronic records, concerning Covered Services provided to each Subscriber, including any charges to and payments received from the Subscriber by Medical Group ("Financial Records"). Medical Group shall maintain the Medical Records and Financial Records for a period of at least ten (10) years after the records cease to be active records. The obligations of Medical Group to maintain and provide

access to records under this **Part VI. Records**, does not cease upon termination of this Agreement without cause or for any cause.

B. **Access to Medical Records.**   Subject to compliance with Applicable Laws and applicable professional standards regarding the confidentiality of Medical Records, Medical Group and Medical Group Provider shall:

1. Provide BCBSTX, upon request and at no charge, copies of specified sections of Subscriber Medical Records that are in the custody of Medical Group or Medical Group Provider;

2. Upon five (5) days advance notice, or such shorter notice as may be reasonably required by the circumstances, allow BCBSTX authorized personnel access to inspect and copy Medical Records on Medical Group's or Medical Group Provider's premises during regular business hours;

3. Transmit information from Subscriber Medical Records by telephone to BCBSTX for purposes of Preauthorization or other UM activities or quality improvement; and

4. Provide copies of specified sections of Subscriber Medical Records, upon reasonable request and at no charge, to any other Provider treating such Subscriber.

C. **Access to Financial Records.**  Upon five (5) days advance notice, or such shorter notice as may be reasonably required by the circumstances, BCBSTX shall have access to inspect, audit and copy all Financial Records during regular business hours.  Medical Group shall maintain Financial Records and provide copies of such information to BCBSTX, upon BCBSTX's reasonable request, at no charge.

D. **Regulatory Compliance.**  Medical Group shall maintain such records and information and provide them to the Texas Department of Insurance and other applicable regulatory agencies as may be necessary for compliance by BCBSTX with Applicable Laws.  All such records shall be open to inspection during regular business hours by state and federal authorities.

### PART VII.  INSURANCE AND INDEMNIFICATION

A. **Medical Group Insurance.**  Medical Group and each Medical Group Provider agree to maintain such policies of general and professional liability insurance as are necessary to insure Medical Group, Medical Group Providers and their employees or subcontractors against any claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance by Medical Group, Medical Group Provider, or any Medical Group employees or subcontractors of Medical Group's obligations under this Agreement.  BCBSTX determines the limits of coverage necessary.

B. **Certificates.**  Certificates of insurance or other evidence indicating the term and extent of the insurance required by **Part VII, Section A, Medical Group Insurance,** shall be provided by Medical Group to BCBSTX upon BCBSTX's request.

C. **BCBSTX Insurance.**  BCBSTX shall procure and maintain such policies of general and professional liability and other insurance, which may include self-insurance, as shall be necessary to insure BCBSTX and BCBSTX's employees against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any services by BCBSTX, the use of any property and facilities provided by BCBSTX, and activities performed by BCBSTX in connection with this Agreement.

D. **Indemnification.**  Medical Group and BCBSTX understand that this Agreement is not one to insure and/or indemnify and shall not be so construed.  Each party shall be solely responsible for its own negligence, acts or omissions.

### PART VIII.  TERM AND TERMINATION

A. **Term.**  This Agreement shall be effective as of the Effective Date and shall continue until otherwise terminated in accordance with this Agreement.

B. **Termination Notice Period.**

1. Either party may terminate this Agreement at any time without cause or for any cause by giving the other party at least ninety (90) days advance Notice.

2. Medical Group may terminate this Agreement upon thirty (30) days advance Notice to be given within thirty (30) days following Medical Group's receipt from BCBSTX of information concerning a decrease in compensation, or the posting of such information on the Blue Cross and Blue Shield Web site, pursuant to **Part X, Section E, Compensation Information**.

C. **Immediate Termination or Suspension.** BCBSTX may, in its sole discretion, immediately suspend or terminate this Agreement, or may suspend or terminate the participation of Medical Group Provider, upon Notice by BCBSTX to Medical Group if there is a threat of imminent harm to patient health, action against Medical Group's or Medical Group Provider's license to practice, or fraud or malfeasance, including without limiting the foregoing any of the following:

1. Failure to comply with the requirements contained in **Part II, Obligations of Medical Group, Section C, Standard of Care**, including:

   a. Suspension, surrender, or revocation of Medical Group's or Medical Group Provider's narcotics number or license to practice medicine or render services in any state;

   b. Professional or other conduct by Medical Group, Medical Group Provider, or Medical Group employee or subcontractor, which is detrimental to patient welfare and care;

   c. Conviction of Medical Group, Medical Group Provider, or Medical Group employee or subcontractor, of a felony involving lying, cheating, stealing, abuse of controlled substances, or sexual misconduct.

2. Becoming subject to the grounds for termination set forth in **Part II, Obligations of Medical Group, Section M, Medical Group Status**.

D. **Review of Termination.** In the event of termination of Medical Group by BCBSTX, if Medical Group is terminated for reasons other than at Medical Group's request, BCBSTX shall provide a written explanation to Medical Group of the reason(s) for termination. Except in a case of termination under **Part VIII, Section C, Immediate Termination or Suspension**, Medical Group may, within thirty (30) days following the Notice of termination, request in writing that a review be conducted by BCBSTX's advisory review panel and BCBSTX will conduct such a review consistent with Applicable Laws. Within sixty (60) days following receipt of Medical Group's written request for review, BCBSTX will notify Medical Group of BCBSTX's review decision. At Medical Group's request, Medical Group shall be entitled to an expedited review of such termination by BCBSTX's advisory review panel. At Medical Group's request, BCBSTX will provide Medical Group with a copy of the recommendation of the advisory review panel. The decision of the advisory review panel must be considered by, but is not binding upon, BCBSTX.

E. **Effect of Termination.** As of the date of termination, this Agreement shall be considered of no further force or effect and each of the parties shall be relieved and discharged from this Agreement except that:

1. Termination shall not affect any rights or obligations hereunder which have previously accrued or shall hereafter arise with respect to any occurrence prior to termination and such rights and obligations shall continue to be governed by the terms of this Agreement.

2. Termination of this Agreement shall not release Medical Group from the obligation to continue ongoing treatment under the terms of this Agreement and in accordance with the dictates of medical prudence, of a Subscriber of "special circumstance" as defined by Applicable Laws, including but not limited to, Subscribers with a disability, acute condition or life-threatening illness, or Subscribers past the 24th week of pregnancy, or BCBSTX or Payer from the obligation to compensate Medical Group for such Covered Services at the rate set forth in this Agreement. Special circumstance shall be identified by Medical Group, who must request that Subscriber be permitted to continue under Medical Group's care and who must agree not to seek payment from

Subscriber for any amounts for which Subscriber would not be responsible if the Agreement had not terminated. Disputes regarding continuity of care will be resolved according to the dispute resolution procedures set forth in the Provider Manual and this Agreement. Medical Group's and BCBSTX's obligations hereunder shall continue until the earlier of the appropriate transfer of Subscriber's care to another In-Network Provider or the expiration of ninety (90) days from the effective date of termination of the Agreement. Additionally, Medical Group's and BCBSTX's obligations hereunder shall continue up to nine (9) months in the case of a Subscriber who at the time of the termination has been diagnosed with a terminal illness and shall extend through delivery of a child, immediate postpartum care, and the follow-up checkup within the first six (6) weeks of delivery for a Subscriber who, at the time of the termination, is past the 24th week of pregnancy. Medical Group agrees to cooperate in the referral of Subscribers to other In-Network Providers in order to assure continuation of care. In the event that BCBSTX has not used due diligence to make alternative care arrangements available to Subscriber within ninety (90) days after receipt by BCBSTX of Notice from Medical Group or Subscriber, and such arrangements are not available to Subscriber within such ninety (90) day period, BCSTX shall thereafter compensate Medical Group for continued care at the BCBSTX allowable amount for comparable services provided by a comparable Provider that is not an In-Network Provider. Nothing herein shall be construed as requiring BCBSTX to agree to cover continued care rendered by Medical Group who BCBSTX deems unfit to care for Subscribers by reason of incompetence or unprofessional behavior or otherwise.

3.  Medical Group agrees, at BCBSTX's option, to provide Covered Services to Subscribers during the notice period set forth in **Part VIII, Section B**, including any Subscribers who become eligible during such period under the terms of the Subscriber's benefit document and in accordance with the terms of this Agreement. Medical Group shall be compensated for Covered Services rendered in accordance with this Section and the fees set forth in Attachment A of this Agreement, until appropriate transfer of Subscribers is achieved or alternate compensation for Covered Services acceptable to Medical Group has been determined.

In the event of termination of the Agreement, BCBSTX will provide reasonable advance Notice to Subscribers receiving care from Medical Group of the impending termination, except that if Medical Group is terminated for a reason other than at the request of Medical Group and has made a timely request for review by an advisory review panel, BCBSTX will not notify Subscribers of Medical Group's termination prior to the time the advisory review panel makes a formal recommendation. If Medical Group is terminated or suspended immediately pursuant to **Part VIII, Section C, Immediate Termination or Suspension**, BCBSTX may notify Subscribers immediately. Medical Group agrees to cooperate with BCBSTX and upon request to provide reasonable assistance to effect such Notice.

## PART IX. RELATIONSHIP OF PARTIES

A.  **Independent Contractors.** None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between BCBSTX and Medical Group other than that of independent entities contracting with each other hereunder solely for the purpose of effecting the provisions of this Agreement. Neither of the parties hereto, nor any of their respective employees, shall be construed to be the agent, employer or representative of the other. None of the provisions of this Agreement shall be construed to in any way limit BCBSTX's authority or responsibility to comply with all regulatory requirements.

B.  **Blue Cross and Blue Shield Association.** Medical Group hereby expressly acknowledges that this Agreement constitutes a contract solely between Medical Group and BCBSTX, which is an independent corporation operating under a license from the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield Plans, (the "Association") permitting BCBSTX to use the Blue Cross and Blue Shield Service Marks in the state of Texas, and that BCBSTX is not contracting as the agent of the Association. Medical Group further acknowledges and agrees that Medical Group has not entered into this Agreement based upon representations by any person other than BCBSTX and that no person, entity, or organization other than BCBSTX shall be held accountable or liable to Medical Group for any of BCBSTX's obligations to Medical Group created under this Agreement. This paragraph shall not create any additional obligations whatsoever on the part of BCBSTX other than those obligations created under other provisions of this Agreement.

C. **No Third Party Beneficiary.** This Agreement is entered into by and between Medical Group and BCBSTX solely for their benefit. Except for **Part IV, Compensation, Section D, Subscriber Nonliability and Hold Harmless,** there is no intent by either party to (a) create or establish any third party beneficiary status or (b) increase the rights of any Subscriber or any other person, firm or other entity not a party to this Agreement with respect to the duties of either party to any person or create any rights on behalf of any person with respect to either party.

## PART X. GENERAL PROVISIONS

A. **Administrative Functions.** BCBSTX and Medical Group acknowledge that BCBSTX may delegate certain responsibilities or activities that are provided for in this Agreement.

B. **Assignment.** No part of this Agreement, or any rights, duties or obligations described herein, shall be assigned, encumbered or delegated except as expressly provided for in this Agreement without the prior express written consent of both parties. Notwithstanding the foregoing, BCBSTX, without Medical Group's consent, may validly assign this Agreement to any affiliate of BCBSTX. BCBSTX's standing or routine contractual arrangements for the acquisition and use of facilities, services, supplies, equipment and personnel from other parties shall not constitute an assignment under this Agreement.

C. **BlueChoice Solutions.** The contract terms and fee allowables provided under this Agreement also apply to BlueChoice Solutions if Provider's applicable BCBSTX provider numbers are determined to be eligible for BlueChoice Solutions.

D. **Captions.** The captions contained herein are for reference purposes only and shall not affect the meaning of this Agreement.

E. **Compensation Information.** Medical Group is entitled, upon written request, and in accordance with Applicable Laws, to all information necessary to determine that Medical Group is being compensated in accordance with the terms of this Agreement. Medical Group may consult the Blue Cross and Blue Shield of Texas Web site for further information and instructions.

F. **Compliance.** Each party shall comply with Applicable Laws, and with applicable provisions of the Provider Manual.

G. **Confidentiality of Proprietary Information.** Each of the parties and the parties' employees shall maintain in confidence during the term of this Agreement and thereafter, except as otherwise required by Applicable Laws, (1) all Subscriber information including medical information, learned through the operation of this Agreement, (2) all confidential Provider information, including information disclosed as part of the peer review process, (3) quality assurance and utilization review information, (4) all financial information related to this Agreement, (5) all proprietary business information that has been identified as confidential and maintained as confidential by the other party, (6) the provisions of any amendment to this Agreement that would have been protected as confidential had they originally been contained herein, and (7) any other information required to be maintained in confidence by Applicable Laws (collectively "Confidential Information"), unless disclosure of a specific part of the Confidential Information is otherwise required to accomplish the purposes of this Agreement and is permitted by Applicable Laws. Each of the parties and the parties' employees shall use best efforts to safeguard and protect Confidential Information against any unauthorized disclosure by any person and shall refrain from using or allowing any other person to use any Confidential Information in any way that is considered detrimental to the other party or Subscriber.

H. **Cooperation of Parties.** Medical Group and BCBSTX agree to meet and confer in good faith on common problems including, but not limited to, problems concerning utilization of services, credentialing, Preauthorization, claims or reporting procedures and information and forms provided to Medical Group for use in conjunction with Subscribers.

I. **Dispute Resolution.** BCBSTX or Medical Group, as the case may be, shall give Notice to the other of the existence of a dispute. In order to avoid the cost and time consuming nature of litigation, any dispute between BCBSTX and Medical Group arising out of, relating to, involving the interpretation

of, or in any other way pertaining to this Agreement or any prior Agreement between BCBSTX and Medical Group shall be resolved using alternative dispute resolution mechanisms instead of litigation. BCBSTX and Medical Group agree and acknowledge that it is their mutual intention that this provision be construed broadly so as to provide for mediation and/or arbitration of all disputes arising out of their relationship as third-party Payer and Medical Group. The parties further agree that resolution of any dispute pursuant to this Agreement shall be in accordance with the procedures detailed below.

1. **External Review Process.**

   Medical Group may elect to subject certain disputes to an external review process ("External Review Election") as follows:

   a. Subject to the provisions of the Provider Manual, Medical Group may elect to subject certain disputes regarding claim payment to the Billing Dispute External Review Process as described therein. The resulting determination with respect to payment of any claims that are the subject of disputes so submitted shall be binding on the parties and not be subject to the other provisions contained herein for dispute resolution.

   b. Subject to the provisions of the Provider Manual, Medical Group may, if Medical Group is acting on behalf of a Subscriber, elect to subject certain disputes concerning a determination by BCBSTX that a service is not or will not be a Covered Service because it is not Medically Necessary or is experimental or investigational in nature ("Adverse Determination") to the External Review process described in the Provider Manual. The resulting determination with respect to the appropriateness of such Adverse Determination shall be binding on the parties and not be subject to the other provisions contained herein for dispute resolution.

2. **Initial Resolution by Meeting or Mediation of Dispute.** If Medical Group has not made an External Review Election, and BCBSTX and Medical Group mutually agree that a meeting to attempt to resolve the dispute would be advantageous, representatives of BCBSTX and Medical Group shall meet not later than thirty (30) calendar days after delivery of the Initial Notice in order to attempt to resolve the dispute. Subsequent meetings may be held, if mutually agreed. If no meeting is mutually agreed, or if the dispute is not resolved at any meetings held, the party giving the Initial Notice shall submit the dispute to mediation by an organization or company specializing in providing neutral, third-party mediators. The mediation process shall be coordinated by the submitting party with the mediator and shall be subject to the following agreed-upon conditions:

   a. The parties agree to participate in the mediation in good faith;

   b. The parties agree to have present at the mediation one or more individuals with decision-making authority regarding the matters in dispute. Either party may, at that party's option, be represented by counsel. Medical Group may, at Medical Group's option, also have present at the mediation a representative of any professional society in which Medical Group is a member;

   c. The mediation will be held within sixty (60) days of the submission to mediation unless the parties mutually agree on a later date. The mediation will be held in one of the following cities, which is closest to the principal office of Medical Group, to be designated in writing by Medical Group, unless BCBSTX and Medical Group mutually agree to an alternative location: Abilene, Amarillo, Austin, Corpus Christi, Dallas, El Paso, Houston, Lubbock, Lufkin, Midland-Odessa, San Angelo, San Antonio, Texarkana, Waco, Wichita Falls, and Brownsville.

   d. The parties shall each bear their own costs and shall each pay one-half of the mediator's fees and costs, unless the mediator determines that one party did not participate in the mediation in good faith, in which case that party shall pay all of the mediator's fees and costs;

   e. The parties agree that the obligation to mediate (but not the obligation to arbitrate) is not applicable to any dispute that was pending in any court on the Effective Date of this

Agreement, or that had been submitted to binding arbitration on or before the Effective Date of this Agreement.

3.  **Binding Arbitration.** In the event Medical Group has not made an External Review Election and mediation is not successful in resolving the dispute, either BCBSTX or Medical Group may submit the dispute to final and binding arbitration under the commercial rules and regulations of the American Health Lawyers Association, subject to the following:

    a.  The arbitration shall be conducted by a single arbitrator selected by the parties from a list furnished by the American Health Lawyers Association. If the parties are unable to agree on an arbitrator from the list, the arbitrator shall be appointed by the American Health Lawyers Association;

    b.  The arbitrator shall be required to render a written decision resolving all disputes, and designating one party as the "prevailing party";

    c.  Except in the case of fraud, no arbitration decision may require any adjustment in reimbursements or payments respecting any dispute involving services rendered more than eighteen (18) months prior to receipt of the Initial Notice;

    d.  The costs of arbitration, including the arbitrator's fee and any reporting or other costs, but excluding lawyers', consultants' and witness fees, shall be borne by the non-prevailing party unless the arbitrator determines as part of the award that such allocation is inequitable under the totality of the circumstances. In the event that the dispute in arbitration concerns the appropriateness of BCBSTX's adjudications of claims, the party challenging the adjudications shall have the initial burden of proving that there is a reasonable probability that the disputed claims adjudications were incorrect adversely to that party. When the other party reasonably determines that it is required in its defense, or is required by the discovery process or otherwise by law, to research the basis for the adjudications of challenged claims for which such reasonable probability has not been proven, the other party shall be awarded the administrative cost for such research for each such claim that is found in the arbitration proceeding, after such research, not to have been adjudicated incorrectly adversely to the challenging party;

    e.  The arbitration hearing will be held in one of the following cities, to be designated in writing by Medical Group, which is closest to the principal office of Medical Group, to be designated in writing by Medical Group, unless BCBSTX and Medical Group mutually agree to an alternative location: Abilene, Amarillo, Austin, Corpus Christi, Dallas, El Paso, Houston, Lubbock, Lufkin, Midland-Odessa, San Angelo, San Antonio, Texarkana, Waco, Wichita Falls, and Brownsville.

    f.  Medical Group acknowledges that this arbitration provision precludes Medical Group from filing an action at law or in equity and from having any dispute covered by this Agreement resolved by a judge or a jury. Medical Group further acknowledges that this arbitration provision precludes Medical Group from participating in a class action filed by any other Medical Group or any other plaintiff claiming to represent Medical Group or Medical Group's interest. Medical Group agrees to opt-out of any class action filed against BCBSTX that raises claims covered by this Agreement to arbitrate, including, but not limited to, class actions that are currently pending.

4.  **Exceptions.** The foregoing in this **Part X, Section I, Dispute Resolution**, to the contrary notwithstanding, the provisions thereof shall not be applicable to the following:

    a.  Any legal proceeding brought by a third party against BCBSTX, Medical Group or any Medical Group Provider (a "Defendant"), as well as any cross claim or third-party claim by such Defendant against BCBSTX, Medical Group or Medical Group Provider;

    b.  The rate of compensation payable to Medical Group for Covered Services pursuant to **Part IV, Compensation**; or

    c.  Termination of this Agreement pursuant to **Part VIII, Section B, Termination Notice Period.**

J.  **Entire Agreement.** This Agreement, together with any attachments hereto contains the entire understanding between the parties and supersedes all prior agreements, either oral or in writing, with respect to the subject matter hereof. In the event of any conflict between the provisions of the attachments and addenda to this Agreement and the provisions of this Agreement other than the attachments and addenda, the provisions of the attachments and addenda shall prevail.

K.  **Force Majeure.** No party will be liable for any failure to timely perform obligations under this Agreement if prevented from doing so by a cause or causes beyond commercially reasonable control including, but not limited to, acts of God or nature, fires, floods, storms, earthquakes, riots, strikes, wars or restraints of government.

L.  **Genders and Numbers.** Use of the masculine, feminine or neuter gender and the singular or plural numbers shall be deemed to include the others whenever the context so indicates or requires.

M.  **Governing Law.** This Agreement shall be governed in all respects by the laws of the state of Texas as well as any regulations promulgated thereunder, except as otherwise required by Applicable Laws.

N.  **Modifications.** This Agreement may be amended and the Provider Manual may be revised as follows:

    1.  This Agreement may be amended by mutual written agreement of the parties. Notwithstanding the foregoing, however, BCBSTX may amend this Agreement and/or any attachment to the Agreement as follows:

        a.  upon thirty (30) days prior Notice to Medical Group or such longer time period as may be required by Applicable Laws when the amendment is not materially adverse to Medical Group. In such event, Medical Group may terminate this Agreement by giving Notice of such termination to BCBSTX within thirty (30) days of Medical Group's receipt of such Notice of amendment, to be effective no earlier than thirty (30) days after such termination Notice is given; or

        b.  upon ninety (90) days prior Notice when the amendment is materially adverse to Medical Group. In such event, Medical Group may terminate this Agreement by giving Notice of such termination to BCBSTX within thirty (30) days of Medical Group's receipt of such Notice of amendment, to be effective no earlier than the end of such amendment Notice period, unless within sixty-five (65) days following the date of such amendment Notice BCBSTX gives Notice to Medical Group that BCBSTX will not carry into effect such amendment.

    Medical Group's failure to give Notice of termination to BCBSTX within thirty (30) days of Medical Group's receipt of a Notice of amendment shall constitute agreement to and acceptance of such amendment by Medical Group. The amendment shall be effective on the effective date provided in BCBSTX's Notice of amendment, provided the amendment required by Applicable Laws shall be effective no later than the date required by such law or regulation and may be implemented beginning on that date by BCBSTX.

    2.  The Provider Manual may be revised by BCBSTX from time to time, or upon ninety (90) days prior Notice, when the revision is materially adverse to Medical Group. In such event, Medical Group may terminate this Agreement by giving Notice of such termination to BCBSTX within thirty (30) days of Medical Group's receipt of such Notice of revision, to be effective no earlier than the end of such revision Notice period, unless within sixty-five (65) days following the date of such revision Notice BCBSTX gives Notice to Medical Group that BCBSTX will not apply such revision to Medical Group.

    Medical Group's failure to give Notice of termination to BCBSTX within thirty (30) days of Medical Group's receipt of a Notice of Provider Manual revision shall constitute agreement to and acceptance of such revision by Medical Group. The revision shall be effective on the effective date provided in BCBSTX's Notice of Provider Manual revision, provided the revision

required by Applicable Laws shall be effective no later than the date required by such law or regulation and may be implemented beginning on that date by BCBSTX.

O. **No Solicitation.** Medical Group shall not, and Medical Group shall use best efforts to assure that Medical Group Providers shall not solicit, influence or induce or attempt to solicit, influence or induce any Subscriber to disenroll from any Health Plan or enroll in any other health care plan that would require such Subscriber to disenroll from a Health Plan. Furthermore, Medical Group and Medical Group Providers shall not solicit, influence or induce employers or other entities with which BCBSTX has entered into agreements to provide health care benefits to cease doing business with BCBSTX or diminish or otherwise affect their business relationship with BCBSTX. BCBSTX shall not solicit, influence or induce or attempt to solicit, influence or induce any Subscriber not to select Medical Group as Subscriber's Primary Care Physician, if applicable.

P. **Partial Invalidity.** If for any reason any provision of this Agreement is held invalid, the remaining provisions shall remain in full force and effect.

Q. **Patient Communications.** Nothing contained in this Agreement is intended to prohibit or discourage Medical Group from discussing with or communicating in good faith to a current, prospective or former patient, or patient's designee, information or opinions regarding: (1) the patient's health care, including, but not limited to, the patient's medical condition or treatment options, including alternative medications, regardless of BCBSTX coverage limitations; or (2) the provisions, terms, requirements or services of the BCBSTX as they relate to the medical needs of the patient.

R. **Patient Protection and Affordable Health Care Act and Health Care and Education Reconciliation Act of 2010.** The parties acknowledge and agree that in the event BCBSTX develops and markets an Exchange plan pursuant to the Patient Protection and Affordable Health Care Act and Health Care and Education Reconciliation Act of 2010, the rates set forth in this Agreement may not be applicable to such Exchange plans.

S. **Retaliation.** BCBSTX acknowledges and agrees not to engage in any retaliatory action against Medical Group, including termination of this Agreement, because Medical Group has on behalf of a Subscriber reasonably filed a complaint against BCBSTX or has appealed a decision of BCBSTX.

T. **Self-Funded Plans.** Medical Group will provide services to persons enrolled in those employer-funded health benefit plans ("Self-Funded Plans"), for which BCBSTX provides administrative services and network access and management, on the same terms and conditions as Medical Group provides such services to Subscribers. Medical Group will be compensated for providing services to persons enrolled in Self-Funded Plans using the same methodology and on the same terms and conditions as are applicable for services provided to Subscribers. Medical Group acknowledges and agrees that BCBSTX does not underwrite the Self-Funded Plans' benefits. The Self-Funded Plans, and not BCBSTX, have sole financial responsibility for all benefits for persons enrolled in Self-Funded Plans.

U. **Use of BCBSTX Name.** Medical Group agrees not to use the names, symbols, marketing names, trademarks or service marks of BCBSTX in any advertising or promotional material or literature without the express, prior, written consent of BCBSTX and will cease any and all usage previously consented to upon withdrawal by BCBSTX of such consent or termination of the Agreement.

V. **Waiver of Breach.** The waiver of any breach of this Agreement by either party shall not constitute a continuing waiver of any subsequent breach of either the same or any other provision of this Agreement.

# EXHIBIT B

STATE OF TEXAS   §
§
TRAVIS COUNTY   §

<u>DECLARATION OF YESSENIA NOA</u>

"My name is Yessenia Noa, I reside in Austin, Travis County, Texas.  I am over the age of twenty-one (21), I am of sound mind capable of making this declaration and do so willingly, free from influence and duress, and state as follows:

I work at Victory Medical Center—(hereinafter "VMC").  I am in charge of coordinating primary care provider referrals to specialists.  As of the date we became aware there was a coverage issue with Blue Cross Blue Shield of Texas—(hereinafter "BCBS")—was approximately one-hundred thirty (130).  Around August 3, 2022, noticed that our referrals were being sent back, and that is how we became aware of a network issue with BCBS.

Of the one-hundred thirty (130) referrals we have pending, approximately thirty-five (35) are critical.  These referrals are to all the specialists, to include cardiologist, urologists, oncologists.  For those, that are critical, we note that on the referral and the specialist do their very best to get them in as soon as possible.

We now will begin the process of calling all of these patients to alert them their referral was denied, that they will have to find a new primary care provider, and they will all have to start the process all over.  Locating a new primary care provider, waiting for a date they can be seen, having lab tests done, waiting for a follow up appoint, etcetera.  This is a time delay these patients cannot afford.

We have no way to assess how severe the damage will be to these patients' health, but we do know there are always consequences for these delays."

**FURTHER DECLARANT SAYETH NOT**

By: _____        Date: 8/14/2022
    Yessenia Noa

**JURAT**

"My name is Yessenia Noa, my date of birth is _8/30/1985_, my address is 4303 Victory Dr, Austin, Texas 78704, Austin, Travis County, Texas. I declare under penalty of perjury that the foregoing is true and correct."

**EXECUTED** in Travis County, State of Texas, on this ____ day of August, 2022.

**(END OF DOCUMENT)**

# EXHIBIT C

STATE OF TEXAS      §
                    §
HAYS COUNTY         §

## DECLARATION OF ARTURO DOMINGUEZ

"My name is Arturo Dominguez., I reside in Austin, Hays County, Texas. I am over the age of twenty-one (21), I am of sound mind capable of making this declaration and do so willingly, free from influence and duress, and state as follows:

I have been a patient of Victory Medical Center—(hereinafter "VMC")—for the past several years. I have health care coverage from the Marketplace Health, administered by Blue Cross Blue Shield of Texas—(hereinafter "BCBS"). My plan with BCBS is Blue Advantage HMO, which is currently active.

I had kidney cancer that was removed. However, the cancer left me with limited kidney functionality. Because of that, I see Dr. Kim at VMC on a regular basis for care. Currently, I am on kidney dialysis. My kidney dialysis treatment is three (3) time a week and lasts for four (4) hours each treatment. My kidney cancer has created various side effects for which I see Dr. Kim at VMC. I am currently waiting for BCBS to approve my referral to an oncologist urologist stemming from my kidney cancer. Additionally, there is a referral for a gastrointestinal specialist from VMC.

VMC also oversees my daily maintenance of medications. I rely on VMC to monitor my blood, and kidney functions, and refill the twenty-four (24) medications I take daily. Because of my established relationship with VMC, they understand the need to monitor, and adjust my medications when needed. My medical needs are complex, and my health is jeopardized with time delays and gaps in treatment. My cancer necessitates constant monitoring.

I have not received notification from BCBS that there is an issue with my coverage, or that there is an issue with my primary care provider. However, I have been made aware that BCBS has cancelled their contract without notice to VMC. That obviously places me in a very compromised position.

I am now unsure how I will refill the twenty-four (24) prescriptions I take daily. I am now aware that my referrals to specialists are on hold, and I am unsure what effect BCBS's cancellation will have on my dialysis treatments. I do not know why BCBS did not give me notice of this. I do know that BCBS's cancellation of VMC's contract will put my health care in jeopardy. My health issues are complex and need constant monitoring. For example, I go to VMC approximately every two (2) months. I was scheduled to go in a few weeks, but now, I will not be able to so to get my needed blood work done, and have my medications refilled.

I have been made aware that most primary care providers do not accept Marketplace Health plans, and when they do, they have strict caps. I am now fearful that I will not be able to find another provider. However, even if I am so lucky, I am aware it will take months to get me back into the care I currently have. This creates obvious gaps in care that someone in my condition cannot afford."

**FURTHER DECLARANT SAYETH NOT**

By: _____          Date: 8/12/22
Arturo Dominguez.

**(PAGE TO FOLLOW)**

## JURAT

"My name is Arturo Dominguez, my date of birth is ___9/24/1975___ , and I reside

at 259 Jacksdaw Dr., 78737,  Austin, Hays County, Texas.  I declare under penalty of perjury

that the foregoing is true and correct.

**EXECUTED** in Hays County, State of Texas, on this _12_ day of August, 2022.

By _____

Arturo Dominguez
**DECLARANT**

**(END OF DOCUMENT)**

# EXHIBIT D

STATE OF TEXAS      §
                    §
TRAVIS COUNTY       §

### DECLARATION OF SARITHA POTHULURI

"My name is Saritha Pothuluri., I reside in Austin, Travis County, Texas. I am over the age of twenty-one (21), I am of sound mind capable of making this declaration and do so willingly, free from influence and duress, and state as follows:

I have been a patient with Victory Medical Center—(hereinafter "VMC")—for the past nine (9) years. I have health care coverage under the Marketplace Health, a/k/a Affordable Care Act, that is administered by Blue Cross Blue Shield of Texas—(hereinafter "BCBS"). My plan is known as Blue Cross HMO Gold.

I recently received a letter from BCBS which indicated that I was no longer able to see my primary care provider at VMC. I have worked with my primary care provider at VMC for many years to manage my diabetes.

I was due to go into VMC this week for maintenance with my diabetes. I was scheduled to go in for lab tests and to see my primary care provider to assess medications. Because BCBS has apparently terminated their contract with VMC that will not happen now. Unattended diabetes can result in long-term complications that include nerve damage that is irreparable.

Additionally, because BCBS has cancelled their contract with VMC, I am not unable to get the referral to my ophthalmologist. Again, my inability not to get medical attention from a specialist exposes me to unknown irreversible health care consequences.

I am aware that most primary care providers in Austin do not accept Marketplace Health. I spoke with my Doctor at VMC, and he made me aware that BCBS's termination came to them as a surprise as well.

Even though I have health care insurance I am can now be viewed as non-insured, as I know it will be near impossible to find a primary care provider that takes my Marketplace Health insurance. This is all in light of the fact that I was due for laboratory testing and refills on medication this week which I am not long able to do. Again, my condition, untreated, and unmanaged has long term irreversible affects."

**FURTHER DECLARANT SAYETH NOT**

By: _____          Date: _8/12/22_
Saritha Pothuluri.

## JURAT

"My name is Saritha Pothuluri, my date of birth is _1-28 /971_ , I reside at 259 Jacksdaw Dr., 78737, Austin, Travis County, Texas. I declare under penalty of perjury that the foregoing is true and correct.

**EXECUTED** in Travis County, State of Texas, on this _12_ day of August, 2022.

By _____
Saritha Pothuluri
**DECLARANT**

**(END OF DOCUMENT)**

# EXHIBIT E

Russell Remington
7006 Smokey Hill Road
Austin, Texas 78736

8/14/22

To Whom It May Concern,


I have been treated at Victory Medical for the past 20 years. The relationship I have with my doctor and the plan that we have for managing my high cholesterol, high blood pressure and pre-diabetes is extremely important to me and my family. I did not respond well to traditional front-line approaches and if I had to suddenly change medical providers I am afraid that my new doctors would not understand how to best care for me. It has taken my doctor and I several years to figure out the best plan and I can't just abruptly switch to a new doctor to manage these chronic problems. I would hope that a health insurance company would understand and support this.


Respectfully,

Russell Remington

# EXHIBIT F

STATE OF TEXAS　　　§

　　　　　　　　　　§

TRAVIS COUNTY　　　§

### DECLARATION OF JOSHUA MASONGSONG

"My name is Joshua Masongsong, I reside in Austin, Travis County, Texas. I am over the age of twenty-one (21), I am of sound mind capable of making this declaration and do so willingly, free from influence and duress, and state as follows:

I have gone to Victory Medical Center—(hereinafter "VMC")—for many years now. My health insurance coverage is with Blue Cross Blue Shield of Texas—(hereinafter "BCBS")—which is administered by Anthem.

I have suffered for many years from chronic insomnia, and I have had difficulty finding a primary care provider that was able to properly treat this condition. However, my primary care provider, Dr. William Franklin was able to address this issue. This was though a unique medication that was developed by Dr. Franklin, and available to my though my coverage.

I am aware that there is a coverage issue with BCBS and I have also become aware that I will no longer be able to get this medication as I am no longer a covered patient at VMC. This of course is due to the fact that BCBS cancelled their coverage. This is all very new, as we were not given notice.

The loss of this medication has immediate threats on mental wellbeing. Moreover, looking VMC as my primary care provider will cause me irreparable harm."

**FURTHER DECLARANT SAYETH NOT**

### (PAGE TO FOLLOW)

By: _~~(signature)~~_
　　Joshua Masongsong

Date:

### JURAT

"My name is Joshua Masongsong, my date of birth is ＿＿＿＿＿＿＿＿, my address is ＿＿＿＿＿＿＿＿ Austin, Texas 78704, Austin, Travis County, Texas. I declare under penalty of perjury that the foregoing is true and correct."

**EXECUTED** in Travis County, State of Texas, on this ＿＿＿＿ day of August, 2022.

# EXHIBIT G

Krista Jordan-Remington
7006 Smokey Hill Road
Austin, Texas 78736
512.293.3807

To Whom It May Concern,

My son, E█████████, has been a client at Victory Medical since the age of 5. We have always been very happy with the care we received there. My son was diagnosed with severe ADHD and dyslexia by a neuropsychologist when he started the first grade. Our provider at Victory Medical at the time, John Kim, MD, was able to prescribe E███ his stimulant medication which allowed him to focus at school and stay at grade level. Over the years we transitioned to another Victory provider, Shawn Elander, NP, who also was able to prescribe the stimulant medication for my son who is now enrolled at the University of Texas at Austin as a mathematics major. Without the stimulant medication my son cannot maintain enough focus to get through a full hour or more of lecture, nor can he focus long enough to complete detailed homework assignments. On the rare occasions when he arrives at school and has forgotten to take his medications he literally just comes home. There is no point in him attempting academics without this tool to help with his disabilities.

Recently we were told that E███'s relationship with his provider at Victory Medical is in jeopardy because of our insurance, BCBS of Texas. This change appeared abrupt and we were totally unprepared. E███ was in the last 2 weeks of his semester and trying to prepare for final exams. We had come to the end of his stimulant prescription and needed a refill. The idea that we would need to scramble to find another provider without him missing any doses was overwhelming. Jeopardizing his access to his stimulant medication put serious strain on him during a time when he was already feeling a lot of stress due to the upcoming finals. Even missing one day of his medications could have a negative impact on his GPA. We feel strongly that his relationship with his Victory provider should not be disrupted for reasons unrelated to what is best for his physical and mental health. Establishing himself with a medical provider that he trusts, who knows his history and how to best support his disabilities, is key to his future success. As a parent of a child who has struggled mightily to overcome his disabilities I am shocked and outraged that an insurance company would interfere with his care in this way.

Respectfully,

*Krista Jordan-Remington* 8/14/22

Krista Jordan-Remington

# EXHIBIT H

STATE OF TEXAS   §
                 §
TRAVIS COUNTY    §

### DECLARATION OF JOHN S. KIM., MD

"My name is John S. Kim., MD., I reside in Austin, Travis County, Texas.  I am over the age of twenty-one (21), I am of sound mind capable of making this declaration and do so willingly, free from influence and duress, and state as follows:

I am Board Certified in Family Medicine, and have practiced at Victory Medical Center—(hereinafter "VMC")—for the past twenty-five (25) years. In those twenty-five (25) years, my patient census has been as high as 2,500 patients at a time.  I oversee Physician Assistants—(hereinafter "PAs") and Nurse Practitioners—(hereinafter "NPs").

My practice at VMC covers the full spectrum of medical care to include cancer patients, patients with cardiology problems, diabetic patients, and patients with complex medical issues.

Family medicine is founded on and made effective by and through the patient/provider bond.  Many of the large health issues develop over time, and knowledge of patient history is critical.  It is highly unusual for a provider to be placed in a compromising situation by an insurance company though termination.  However, that is the set of circumstances that we are now faced with by Blue Cross Blue Shield of Texas—(hereinafter "BCBS")—terminating the provider contract with VMC without notice.

I received a text message from a concerned patient that the patient received a letter from BCBS that he needed to designate a new primary care provider.  I assumed this was in error as something of such magnitude is unheard of.  I investigated the matter and found out this was in-fact the case.  Without reservation, this termination without notice will have long term

incalculable effects on patient care including necessary referrals to specialists, follow up exams, refilling medications, and the overall provider deficiency it will now create.

While providing family care, when we assess a larger health concern with a patient, for example a heart issue, we will refer them to an in-network cardiologist. Because BCBS terminated VMC without notice, all of the pending referrals to all cardiologists have stopped overnight. This places all of these patients in peril. Now, the only alternative these patients have, is to start the patient care process all over again. Even though I have seen a patient, done all the necessary laboratory testing on the patient, and found they are in need of a specialist, I am unable to refer them.

At a moment when time is not a luxury these patients have, patients must now start a very time-consuming process all over again. The patients must now locate a new reputable BCBS in-network primary provider. There is currently a primary provider deficiency in Austin, so the patients will have anywhere from a month to a three month wait until they are able to see their new primary provider. This unnecessary delay will clearly cause incalculable irreversible adverse effects on long-term patient health.

Regarding my patients with complex health issues, this abrupt termination by BCBS compounds the severity of health concerns because of the unnecessary disruption of the continuity of their care. In these cases, patients with more complex issues have benefited from our mutual established relationship and my understanding of the patient's medical history which allows a faster, more accurate assessment. If these patients have to establish care with a new provider, it will require multiple visits for them to get the new physician up to date on their medical history, which will inevitably delay their medical treatment. Again, this will cause incalculable irreversible adverse long-term effects on patient health care.

BCBS's termination will undoubtedly leave many of these patients without a primary care provider. Most of my patients who have BCBS use it as a secondary insurance coverage for their primary insurance which is Medicare. VMC accepts patients who use Medicare insurance, but most other clinics do not. These patients are elderly, most of whom require a specialist's care. They will have extreme difficulty finding another primary care provider that accepts Medicare and will face paying significant additional out of pocket expenses, not to mention the added delay in accessing medical care, solely because of BCBS's actions. This will certainly have an incalculable irreversible adverse long-term impact on patients and their health care.

BCBS's termination will also leave those patients that have health care coverage through the Marketplace provided under the Affordable Care Act—(hereinafter "ACA")—without a primary care provider. While VMC prides itself on giving care to as many as possible, regardless of profits, not all providers do. I am personally aware that many primary care providers either do not accept patients with coverage from a Marketplace plan, or they have very limited numerical caps on those that they will accept. These patients' health coverage will end overnight, and this will undoubtedly have an incalculable irreversible adverse impact on patient long-term health care.

As a direct result of BCBS's termination, our practice will also have suffered irreparable harm. Because BCBS has started sending out notices to our patients, we are already seeing dramatic patient movement from our practice. Consequently, our practice will have to adjust the scope of services we offer, the number of staff we will be able to maintain, and number the of patients we will be able to see. This will further exacerbate the provider deficiency that Austin is already experiencing.

This absolute unwarranted disruption by BCBS has caused nothing but chaos with our clinic and our patients.  Our patients' care should never be placed in harm's way like this.  I have practiced for twenty-five (25) years, and BCBS's unnoticed termination is unprecedented."

**FURTHER DECLARANT SAYETH NOT**

By:_____        Date:____8/14/22____
   John S. Kim, MD. Board
   Certified in Family Medicine.

### JURAT

"My  name is John S. Kim, MD, my date of birth is ___February 24, 1970___, my address is 4303 Victory Dr 78704,  Austin, Travis County, Texas.  I declare under penalty of perjury that the foregoing is true and correct.

**EXECUTED** in Travis County, State of Texas, on this __14th__ day of August, 2022.

By_____
   John S. Kim MD
   **DECLARANT**

**(END OF DOCUMENT)**