**EXHIBIT 2**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

WILLIAM FRANKLIN, MD, TOTH
ENTERPRISES II, P.A. D/B/A VICTORY
MEDICAL & FAMILY CARE, DIAGNOSTIC
GESTALT, LLC, SHARON SHEPARD, NP,
KATHERINE KELLER, DO, NATHAN
PEKAR, MD, SARITA PRAJAPATI, MD,
SHAWN AGENBOARD-ELANDER, NP, and
BRITANI ADAMS, NP,

      Plaintiffs,

         vs.

JEAN-PAUL FORAGE, LEWIS NICHOLS,
CLAY ELLIS, and LN PROFESSIONAL
MANAGEMENT LLC, d/b/a MEDICAL
MANAGEMENT PROFESSIONAL, and
ALLIED LAB SOLUTIONS
MANAGEMENT, LLC,

    Defendants

Case No. 1:23-cv-00542-RP

**DECLARATION OF KELLY DAWSON ESQ.**

I, Kelly Dawson, Esq., declare as follows:

(1)    I am a member of the Bar of the State of Texas and based upon the prior

activities stated below, I make this declaration to address my communications with Larry

Palmer and how he came to execute and swear under oath to a declaration ("Palmer

Declaration") that he has now recanted. That declaration is attached in full at Exhibit B of

the First Amended Complaint (Docket Entry No. 14) in this case. It is dated September 9,

2022 at or near the date that Mr. Palmer signed it under oath and sent it to me.

(2)    In the manner outlined below, I spoke to Mr. Palmer and discussed the facts

of the Palmer Declaration, took notes as we spoke, then drafted the Palmer Declaration. He reviewed it and then signed it.

(3)     I contacted Mr. Palmer in my capacity as a lawyer acting for a medical group entitled Toth Enterprises PA dba Victory Medical Group ("Toth") which is a group of medical caregivers in Austin run by Dr. William Franklin. He had had become concerned that in a business arrangement these Toth doctors had with Defendant LN Professional Management dba MMP ("MMP") that MMP had not been paying to Plaintiffs all the money they were due under a contractual arrangement under which MMP would pay Plaintiffs their agreed upon share of the monies MMP collected for certain laboratory services which Plaintiffs and Defendants jointly performed for the labs under an agreement MMP had with various participating rural hospitals.

(4)     I made my first contact with Mr. Palmer in the last week of August 2022 by telephone. I called him because he was at some point the accountant for MMP and both Dr. Franklin and I had seen his name on some of the monthly statements which had gone from MMP to each of the Plaintiffs, those statements being sent every month and purporting to be what was owed each Plaintiff as a result of the lab services provided. Such amounts were supposed to be calculated by paying each Plaintiff the appropriate percentage which was due each Plaintiff from MMP.

(5)     Mr. Palmer confirmed that he had been the accountant for MMP for some time and that he was still doing business as Larry Palmer Accounting but that he was no longer working for MMP or Clay Ellis.

(6)     Mr. Palmer further detailed to me what he described to be "skimming" by

Clay Ellis and the other Defendants of monies MMP had been paid by the various participating rural hospitals after they had been paid for the jointly rendered lab services by the health insurance carriers reimbursing those labs for the lab services which MMP and Plaintiffs had assisted with jointly.

(7)    He further informed me that he had quit working for MMP because they had been taking money from those proceeds that did not belong to them and that he did not want to be part of that.

(8)    Then, I wrote up what he had told me in the above-referenced telephone conversation in the form of a declaration and sent it to him for him to consider. I sent that draft declaration back to him by email dated September 2, 2022. A copy of that email is attached as Exhibit A hereto and the draft declaration which accompanied that email is also attached following that email. In the email by which I sent that draft declaration to Mr. Palmer I wrote:

Hey, Larry:

Thank you again. Take a look at this and let me know what you think. I went off the notes I took from our call last week. I can call to go over it if you'd like. Text me when you're ready. (512)202-5523 Thank you.

(9)    I then sent him another version with some slight changes to the draft asking him to "Let me know when you have an opportunity to review it. Thank you." That email is attached as Exhibit B. The changes, minor, were contained in a draft declaration which is also included in Exhibit B.

(10)    Later that same day on September 5, 2022, I sent a text to Mr. Palmer (copy attached as Exhibit C) in which I wrote, "Hey Larry, don't want to bother. Just checking

if you had thoughts on that Declaration. Thanks." The next day he responded, "It's on the way. One typo page 1." His reference to having spotted a typo led me to believe that he had actually read the draft. At no time did Mr. Palmer ever state to me that the draft was inaccurate.

(11)   Mr. Palmer's response indicated to me that he had read it and had approved it. I note that he is a professional accountant and that I believed that he would be careful before signing something since the majority of what he signed professionally were federal tax documents where accuracy is at a premium.

(12)   On September 6, 2022, he sent me back the executed copy which is the one filed as Exhibit B to the First Amended Complaint (Docket Entry No 14) in this case. His cover email simply stated: "signed." That email and the executed copy are attached as Exhibit D hereto and the declaration is dated September 6, 2022. Once I received this executed declaration I sent it to a Houston-based attorney by the name of Mark Collmer who thereafter filed it in a case he had brought on behalf of Dr. Franklin in state court in a case entitled *Toth Enterprises II, PA, et al. v. Clay Ellis, et al.*, Cause No. D-1-GN-20-003469 (in the District Court of Travis County, 201st Judicial District).

(13)   The Palmer Declaration was filed in that state case as part of the opposition to a motion for summary judgment that Clay Ellis had filed. See a copy of that Opposition filed in the state case attached as Exhibit E hereto in full.

(14)   At no time until Mr. Palmer recanted his declaration at the recent deposition on March 6, 2024 did I have any indication from him that the declaration was in any way inaccurate in any of the ways he claimed several weeks ago at his deposition.

(15)   At some point after the Palmer Declaration had been filed in the state case, I sent a copy of it to attorney John Markham. I did not tell him that Mr. Palmer had subsequently expressed any doubts about its accuracy because Mr. Palmer had not done so.

I declare under penalty of perjury under the laws of the United States and the State of Texas that the foregoing is true and correct to the best of my memory.

Executed this 5th, of April, 2024 in Santa Fe , New Mexico.

Kelly Dawson, Esq.

**EXHIBIT A - 1**

**John Markham**

---------- Forwarded message ---------
From: **Kelly Dawson** <kcmd777@gmail.com>
Date: Fri, Sep 2, 2022 at 11:21 AM
Subject: Draft Declaration for Clay Ellis
To: <lp.accounting@hotmail.com>


Hey Larry:

Thank you again.  Take a look at this, and let me know what you think.  I went off the notes I took from our call last week.  I can call you to go over it if you'd like. Text me when you're ready (512) 202-5523 Thank you.



Best Regards,
Kelly C. Dawson
The Dawson Group P.C.
Attorney & Counselor at Law
1000 Cordova Pl., PMB 287
Santa Fe, NM 87505
(505) 573-5020
(512) 519-2073 Fax
kcmd777@gmail.com - e-mail

**PRIVILEGED & CONFIDENTIAL COMMUNICATION:**
This e-mail and any files transmitted with it is confidential and is intended solely for the use of the individual or entity to whom they are addressed.  This communication may contain material protected by the Attorney-Client Privilege and/or constitute attorney work product.  If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited.  If you have received this e-mail in error, please immediately notify us by telephone at (512) 582-9005 or return by e-mail to kdawson@thedawsongroup.us  You will be reimbursed for reasonable costs incurred in notifying us.

**PLT003282**

**EXHIBIT A - 2**

CAUSE NO. D-1-GN-20-003463

| | | |
|---|---|---|
| TOTH ENTERPRISES II, P.A., AND | § | IN THE DISTRICT COURT |
| WILLIAM FRANLIN, M.D., | § | |
| *Plaintiffs.,* | § | |
| | § | 201st JUDICIAL DISTRICT |
| | § | |
| v. | § | |
| | § | |
| CLAY ELLIS | § | TRAVIS COUNTY, TEXAS |
| *Defendant* | § | |

## <u>DECLARATION OF LARRY PALMER</u>

| | |
|---|---|
| THE STATE OF TEXAS | § |
| COUNTRY OF TRAVIS | § |

"My name is Larry Palmer. I am over the age of 21 years old, I am of sound mind, I am capable of making this Declaration, and I do so freely. I have personal knowledge of the facts contained herein, I attest that the statements herein are true accurate and correct.

I am a professional accountant, in Travis County, Austin, Texas.  In or around mid-2015,  I was hired by Clay Ellis to work as the accountant for LN Professional Management LLC., d/b/a Medical Management Professionals—("LN"), Allied Lab Solutions Management LLC., and Allied Lab Solutions LLC.  I continued working with these companies until mid-2018.  These were different legal entities all of which were Clay Ellis was the purported owner and directed all day-to-day operations.

Although Clay Ellis directed every day-to-day operation, was in-charge of all financial accounts, was in-charge of all hiring and firing, I found out later, Clay Ellis, did not have his name on the various companies he owned, aside from Allied Lab Solutions Management LLC., and Allied Lab Solutions LLC.  His longtime friend Michael-John Cortez, acted as Clay Ellis' strawman for Medical Management Professionals LLC, and Lewis Nichols as the strawman for LN Professional Management LLC.

My duties included all accounting operations, which included receiving funds from the medical facilities that were clients of Medical Management Professionals LLC.  In practice, clients would pay Medical Management Professionals LLC, then Medical Management Professionals LLC, would pay LN Professional Management LLC., then LN Professional Management LLC., would make payment to Allied Lab Solutions Management LLC., and Allied Lab Solutions LLC.  At the initial payment, Clay Ellis directed that MJ Cortez was to receive 10% paid to Medical

PLT003283

**EXHIBIT A - 3**

Management Professionals LLC., for acting as his role as strawman. MJ Cortez did not have authority to hire, fire, manage, or direct me in my role as accountant, that was Clay Ellis, and Clay Ellis alone.  However, even lacking any meaningful role, Clay Ellis directed that MJ Cortez's 10% be skimmed off the top for his collusion in the scheme.

Clay Ellis then directed the balance of those funds, minus MJ Cortez's 10%, to be paid to LN Professional Management LLC.  The agreement with LN Professional Management LLC, and the Allied Companies was that LN Professional Management LLC., was to receive 55% of the revenue, and the rest payable between the Allied companies.

For various justifications that Clay Ellis would manufacture, it was common that Clay Ellis would skim off the top from funds that belonged to the Allied Companies.  Clay Ellis would direct funds above the 55% LN Professionals was entitled to, to be paid to Clay Ellis personally, or Clay Ellis' LLC in Colorado, or one of Clay Ellis' other Texas LLC's, and Lewis Nichols for his role as strawman of LN Professionals LLC.

Any amounts LN Professionals LLC ever paid to any party were at the sole direction of Clay Ellis.  While Clay Ellis was not legally an owner of LN Professional Management LLC., and Medical Management Professionals LLC., he directed every operational aspect thereto as though he were the sole owner.  As time went on, I became increasingly aware that the accounting Clay Ellis was directing me to do was not legal and looked like there was fraud being committed against the shareholders of the Allied company shareholders.

It was routine for Clay Ellis to manufacture settlement statements which resulted him taking more money than he was allowed from the Allied company shareholders.  The funds that LN Professionals LLC received from their clients would vary, but the numbers were substantial.  For most months, the revenue that was received and later skimmed and stolen was well over several hundred thousand dollars a month.  There were millions of dollars that were received by LN Professionals LLC, and there was always a sizeable amount skimmed and stolen by Clay Ellis. The funds that were skimmed or stolen from the Allied company shareholders would be distributed to Clay Ellis and Lewis Nichols, with MJ Cortez already receiving his 10% hush money off the top.

Clay Ellis made all decisions as though he owned LN Professional Management LLC., and Medical Management LLC., and he was compensated at the exact same rate at the legal owner of LN Professional Management LLC., Lewis Nichols.  At the same time Clay Ellis was not the legal owner of LN Professional Management LLC., and Medical Management LLC., he held him self out to all parties he was in-fact the owner of these companies.  This would have all believing Clay Ellis was the owner of these two companies and they could reasonably rely on his directions and representations, and reasonably believed him exercising complete and absolute dominion and control of these two companies was derived from his ownership thereof.

Even though Clay Ellis was not properly accounting for funds that should have gone to the Allied Companies' shareholders, he would manufacture statements for me to generate payments to the Allied Companies that those at the Allied company shareholders would then rely on as true accurate and correct.  If Clay Ellis did not manufacture accounting, the Allied companies'

**EXHIBIT A - 4**

shareholders would have received much more revenue than they actually did.  Those funds which belonged to the Allied company shareholders were wrongfully stolen by Clay Ellis and Lewis Nichols.

Clay Ellis always explained away inconsistent and arbitrary accounting.  Over time, I found their accounting to be suspect, I feared fraudulent accounting.  I challenged Clay Ellis about these inaccuracies.  My demand for strict accounting to Clay Ellis was met with fierce rejection and culminated in me leaving that company.  I refused to be complicit in these fraudulent accounting schemes, and my refusal to not comply with this unethical and fraudulent behavior lead to Clay Ellis making false accusations about my competency, and work ethic.  In reality, I was one of the few Clay Ellis was unable to buy silence from.

All this suspicious activity was clearly known by Clay Ellis, Lewis Nichols, and MJ Cortez.  The installation of Lewis Nichols, and MJ Cortez as strawmen for a company Clay Ellis represented as though he owned, directed day-to-day operations as though he was the owner, and received massive company payments as though he was an owner, was clear and convincing the three were acting in concert to further a conspiracy to steal funds from the Allied companies' shareholders."

Executed on this _____ day of September, 2022, by Larry Palmer, in Travis County, Austin, Texas, United States of America.


By:_____          Date:_____
     Larry Palmer
     DECLARANT


### JURAT

"My Name is Larry Palmer, my date of birth is _____, and my address is, _____, in Travis County, Austin, Texas, United States of America. I declare under penalty of perjury that the foregoing is true and correct.


By:_____
     Larry Palmer


**(END OF DOCUMENT)**

**EXHIBIT B - 1**

**John Markham**

---------- Forwarded message ---------
From: **Kelly Dawson** <kcmd777@gmail.com>
Date: Mon, Sep 5, 2022 at 3:08 PM
Subject: Revised Declaration
To: <lp.accounting@hotmail.com>, Mark Collmer <mark@collmerlaw.com>


Hi Larry:

I made a couple of changes to this. Let me know when you have an opportunity to review it.  Thank you.



Best Regards,
Kelly C. Dawson
The Dawson Group P.C.
Attorney & Counselor at Law
1000 Cordova Pl., PMB 287
Santa Fe, NM 87505
(505) 573-5020
(512) 519-2073 Fax
kcmd777@gmail.com - e-mail

**PRIVILEGED & CONFIDENTIAL COMMUNICATION:**
This e-mail and any files transmitted with it is confidential and is intended solely for the use of the individual or entity to whom they are addressed.  This communication may contain material protected by the Attorney-Client Privilege and/or constitute attorney work product.  If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited.  If you have received this e-mail in error, please immediately notify us by telephone at (512) 582-9005 or return by e-mail to kdawson@thedawsongroup.us  You will be reimbursed for reasonable costs incurred in notifying us.

**PLT003286**

**EXHIBIT B - 2**

CAUSE NO. D-1-GN-20-003463

| | | |
|---|---|---|
| TOTH ENTERPRISES II, P.A., AND | § | IN THE DISTRICT COURT |
| WILLIAM FRANLIN, M.D., | § | |
| *Plaintiffs.,* | § | |
| | § | 201st JUDICIAL DISTRICT |
| | § | |
| v. | § | |
| | § | |
| CLAY ELLIS | § | TRAVIS COUNTY, TEXAS |
| *Defendant* | § | |

### UNSWORN DECLARATION OF LARRY PALMER

| | |
|---|---|
| THE STATE OF TEXAS | § |
| COUNTRY OF TRAVIS | § |

"My name is Larry Palmer. I am over the age of 21 years old, I am of sound mind, I am capable of making this Declaration, and I do so freely. I have personal knowledge of the facts contained herein, I attest that the statements herein are true accurate and correct.

I am a professional accountant, in Travis County, Austin, Texas. In or around mid-2015, I was hired by Clay Ellis to work as the accountant for LN Professional Management LLC., d/b/a Medical Management Professionals—("LN"), Allied Lab Solutions Management LLC., and Allied Lab Solutions LLC. I continued working with these companies until mid-2018. These were different legal entities all of which were Clay Ellis was the purported owner and directed all day-to-day operations.

Although Clay Ellis directed every day-to-day operation, was in-charge of all financial accounts, was in-charge of all hiring and firing, I found out later, Clay Ellis, did not have his name on the various companies he owned, aside from Allied Lab Solutions Management LLC., and Allied Lab Solutions LLC. His longtime friend, Michael John Cortez-a/k/a MJ Cortez, acted as Clay Elli's con-conspirator to further Clay Ellis' scheme to defraud the Allied company shareholders. This was done namely by Clay Ellis paying MJ Cortez 10% of MMP revenue to remain silent about fraudulent accounting for the funds that would flow down stream from MMP.

My duties included all accounting operations, which included receiving funds from the medical facilities that were clients of Medical Management Professionals LLC. As it was set up, clients would pay Medical Management Professionals LLC, then Medical Management Professionals LLC, would pay LN Professional Management LLC., then LN Professional Management LLC., would make payment to Allied Lab Solutions Management LLC., and Allied Lab Solutions LLC.

PLT003287

**EXHIBIT B - 3**

At the time of the initial payment, Clay Ellis changed how the money was to be distributed. Instead of the funds being sent to LN Professional Management LLC, he directed that 10% of the money off the top was to be sent to MJ Cortez, another employee at MMP. MJ Cortez did not have authority to hire, fire, manage, or direct me in my role as accountant, nor was he a principal of MMP. However, even lacking any meaningful role, Clay Ellis directed that MJ Cortez's 10% be skimmed off the top for his participation in the Ellis scheme.

Clay Ellis then directed the balance of those funds, minus MJ Cortez's 10%, to be paid to LN Professional Management LLC. The agreement with LN Professional Management LLC, and the Allied Companies was that LN Professional Management LLC., was to receive 55% of the revenue, and the rest payable between the Allied companies. With the 10% directed by Clay Ellis to be paid to MJ Cortez, the net to LN Professional Management was less than that to which it was entitled and consequently, the net received by Allied Lab Solutions members was also reduced.

For various justifications that Clay Ellis would manufacture, it was common that Clay Ellis would skim off the top from funds that belonged to the Allied Companies. Clay Ellis would direct funds above the 55% LN Professionals was entitled to, to be paid to Clay Ellis personally, or Clay Ellis' LLC in Colorado, or one of Clay Ellis' other Texas LLC's, and Lewis Nichols for his role as co-conspirator of LN Professionals LLC. Clay Ellis would tell me to write the checks and because he appeared to have the right to hire, fire, and direct me, complied with his directions.

Any amounts LN Professionals LLC ever paid to any party were at the sole direction of Clay Ellis. While Clay Ellis was not legally an owner of LN Professional Management LLC., and Medical Management Professionals LLC., he directed every operational aspect thereto as though he were the sole owner. As time went on, I became increasingly aware that the accounting Clay Ellis was directing me to do was not legal and looked like there was fraud being committed against the shareholders of the Allied company shareholders.

It was routine for Clay Ellis to manufacture fraudulent settlement statements which did not reflect the actual amounts received by MMP. By increasing the monies paid to him, and then providing false or inaccurate settlement statements, Clay Ellis was written checks in excess of the amounts reflected on the statements. This resulted in him taking more money than he was allowed from the Allied company shareholders. The funds that LN Professionals LLC received from their clients would vary, but the numbers were substantial. For most months, the revenue that was received and later skimmed and stolen was well over several hundred thousand dollars a month. There were millions of dollars that were received from various hospital clients. There was always a sizeable amount skimmed and taken by Clay Ellis for himself and directed to his personal companies. These payments were taken off the top, before any split to LN Professionals and Allied Lab Solutions, and then to the members of Allied Lab Solutions. The funds that were skimmed or stolen from the Allied company shareholders would be distributed to Clay Ellis and Lewis Nichols, with MJ Cortez already receiving his 10% money off the top.

As part of my duties as the accountant for MMP, I was aware of the employees and employee compensation. The payments that I am referring to for Clay Ellis which were taken off the top, were not paid to him as an employee, as they were not rerated as employee compensation.

**EXHIBIT B - 4**

Clay Ellis made all decisions as though he owned LN Professional Management LLC., and Medical Management LLC., and he was compensated at the exact same rate at the legal owner of LN Professional Management LLC., Lewis Nichols.  At the same time Clay Ellis was not the legal owner of LN Professional Management LLC., and Medical Management LLC., he held him self out to all parties he was in-fact the owner of these companies.  This would have all believing Clay Ellis was the owner of these two companies and they could reasonably rely on his directions and representations, and reasonably believed him exercising complete and absolute dominion and control of these two companies was derived from his ownership thereof.

Even though Clay Ellis was not properly accounting for funds that should have gone to the Allied Companies' shareholders, he would manufacture statements for me to use to generate payments to the Allied Companies that those at the Allied company shareholders would receive as an accurate and correct reflection of the funds.  If Clay Ellis did not manufacture accounting, the Allied companies' shareholders would have received much more revenue than they actually did.

Clay Ellis specifically directed me to write checks to the members of Allied Lab Solutions, including William Franklin, M.D., and Toth II Enterprises, P.A.  The amounts to those checks were always the net amounts after the monies off the top that Clay Ellis had directed be paid, including M.J. Cortez, but also himself and on multiple occasions one of his corporations, including one corporation which I understood was located in Colorado.

Clay Ellis always explained away inconsistent and arbitrary accounting.  Over time, I found their accounting to be suspect, I feared fraudulent accounting.  I challenged Clay Ellis about these inaccuracies.  My demand for strict accounting to Clay Ellis was met with fierce rejection and culminated in me leaving that company.  I refused to be complicit in these fraudulent accounting schemes, and this unethical and fraudulent.  In reality, I was one of the few Clay Ellis was unable to buy silence from.

All this suspicious activity was clearly known by Clay Ellis, Lewis Nichols, and MJ Cortez.  It is equally clear that all three were aware of the scheme as they were recipients of the checks directed to be sent them by Clay Ellis.  All three were clearly acting on concert as they received checks and payments and the statements reflecting the changing accounting and misstatements of revenue which were then sent to Allied Lab Solutions members.  This was all done at the direction of Clay Hill to me specifically and I was told to write the checks as those statements reflected."

Executed on this _____ day of September, 2022, by Larry Palmer, in Travis County, Austin, Texas, United States of America.


By:_____          Date:_____
    Larry Palmer
    DECLARANT

EXHIBIT C - 1



PLT003279

EXHIBIT C - 2



PLT003280

**EXHIBIT C - 3**



PLT003281

**EXHIBIT D - 1**

**John Markham**

---

---------- Forwarded message ---------
From: **Larry PALMER** <lp.accounting@hotmail.com>
Date: Tue, Sep 6, 2022 at 8:46 AM
Subject: Re: Revised Declaration
To: Kelly Dawson <kcmd777@gmail.com>


signed

Larry Palmer
Palmer Tax & Bookkeeping
512.971.2413

---

**From:** Kelly Dawson <kcmd777@gmail.com>
**Sent:** Monday, September 5, 2022 4:08 PM
**To:** lp.accounting@hotmail.com <lp.accounting@hotmail.com>; Mark Collmer <mark@collmerlaw.com>
**Subject:** Revised Declaration

Hi Larry:

I made a couple of changes to this. Let me know when you have an opportunity to review it.  Thank you.



Best Regards,
Kelly C. Dawson
The Dawson Group P.C.
Attorney & Counselor at Law
1000 Cordova Pl., PMB 287
Santa Fe, NM 87505
(505) 573-5020
(512) 519-2073 Fax
kcmd777@gmail.com - e-mail

**PRIVILEGED & CONFIDENTIAL COMMUNICATION:**
This e-mail and any files transmitted with it is confidential and is intended solely for the use of the individual or entity to whom they are addressed.  This communication may contain material protected by the Attorney-Client Privilege and/or constitute attorney work product.  If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited.  If you have received this e-mail in error, please immediately notify us by telephone at (512) 582-9005 or return by e-mail to kdawson@thedawsongroup.us  You will be reimbursed for reasonable costs incurred in notifying us.

**PLT003291**

**EXHIBIT D - 2**

CAUSE NO. D-1-GN-20-003463

| | | |
|---|---|---|
| TOTH ENTERPRISES II, P.A., AND | § | IN THE DISTRICT COURT |
| WILLIAM FRANLIN, M.D., | § | |
| *Plaintiffs.,* | § | |
| | § | 201st JUDICIAL DISTRICT |
| | § | |
| v. | § | |
| | § | |
| CLAY ELLIS | § | TRAVIS COUNTY, TEXAS |
| *Defendant* | § | |

## UNSWORN DECLARATION OF LARRY PALMER

| | |
|---|---|
| THE STATE OF TEXAS | § |
| COUNTRY OF TRAVIS | § |

"My name is Larry Palmer. I am over the age of 21 years old, I am of sound mind, I am capable of making this Declaration, and I do so freely. I have personal knowledge of the facts contained herein, I attest that the statements herein are true accurate and correct.

I am a professional accountant, in Travis County, Austin, Texas. In or around mid-2015, I was hired by Clay Ellis to work as the accountant for LN Professional Management LLC., d/b/a Medical Management Professionals—("LN"), Allied Lab Solutions Management LLC., and Allied Lab Solutions LLC. I continued working with these companies until mid-2018. These were different legal entities all of which were Clay Ellis was the purported owner and directed all day-to-day operations.

Although Clay Ellis directed every day-to-day operation, was in-charge of all financial accounts, was in-charge of all hiring and firing, I found out later, Clay Ellis, did not have his name on the various companies he owned, aside from Allied Lab Solutions Management LLC., and Allied Lab Solutions LLC. His longtime friend, Michael John Cortez-a/k/a MJ Cortez, acted as Clay Elli's con-conspirator to further Clay Ellis' scheme to defraud the Allied company shareholders. This was done namely by Clay Ellis paying MJ Cortez 10% of MMP revenue to remain silent about fraudulent accounting for the funds that would flow down stream from MMP.

My duties included all accounting operations, which included receiving funds from the medical facilities that were clients of Medical Management Professionals LLC. As it was set up, clients would pay Medical Management Professionals LLC, then Medical Management Professionals LLC, would pay LN Professional Management LLC., then LN Professional Management LLC., would make payment to Allied Lab Solutions Management LLC., and Allied Lab Solutions LLC. At the time of the initial payment, Clay Ellis changed how the money was to be distributed. Instead of the funds being sent to LN Professional Management LLC, he directed that 10% of the money

PLT003292

off the top was to be sent to MJ Cortez, another employee at MMP.  MJ Cortez did not have authority to hire, fire, manage, or direct me in my role as accountant, nor was he a principal of MMP.  However, even lacking any meaningful role, Clay Ellis directed that MJ Cortez's 10% be skimmed off the top for his participation in the Ellis scheme.

Clay Ellis then directed the balance of those funds, minus MJ Cortez's 10%, to be paid to LN Professional Management LLC.  The agreement with LN Professional Management LLC, and the Allied Companies was that LN Professional Management LLC., was to receive 55% of the revenue, and the rest payable between the Allied companies.  With the 10% directed by Clay Ellis to be paid to MJ Cortez, the net to LN Professional Management was less than that to which it was entitled and consequently, the net received by Allied Lab Solutions members was also reduced.

For various justifications that Clay Ellis would manufacture, it was common that Clay Ellis would skim off the top from funds that belonged to the Allied Companies.  Clay Ellis would direct funds above the 55% LN Professionals were entitled to, to be paid to Clay Ellis personally, or Clay Ellis' LLC in Colorado, or one of Clay Ellis' other Texas LLC's, and Lewis Nichols for his role as co-conspirator of LN Professionals LLC.  Clay Ellis would tell me to write the checks and because he appeared to have the right to hire, fire, and direct me, complied with his directions.

Any amounts LN Professionals LLC ever paid to any party were at the sole direction of Clay Ellis.  While Clay Ellis was not legally an owner of LN Professional Management LLC., and Medical Management Professionals LLC., he directed every operational aspect thereto as though he were the sole owner.  As time went on, I became increasingly aware that the accounting Clay Ellis was directing me to do was not legal and looked like there was fraud being committed against the shareholders of the Allied company shareholders.

It was routine for Clay Ellis to manufacture fraudulent settlement statements which did not reflect the actual amounts received by MMP.  By increasing the monies paid to him, and then providing false or inaccurate settlement statements, Clay Ellis was written checks in excess of the amounts reflected on the statements.  This resulted in him taking more money than he was allowed from the Allied company shareholders.  The funds that LN Professionals LLC received from their clients would vary, but the numbers were substantial.  For most months, the revenue that was received and later skimmed and stolen was well over several hundred thousand dollars a month.  There were millions of dollars that were received from various hospital clients.  There was always a sizeable amount skimmed and taken by Clay Ellis for himself and directed to his personal companies.  These payments were taken off the top, before any split to LN Professionals and Allied Lab Solutions, and then to the members of Allied Lab Solutions.  The funds that were skimmed or stolen from the Allied company shareholders would be distributed to Clay Ellis and Lewis Nichols, with MJ Cortez already receiving his 10% money off the top.

As part of my duties as the accountant for MMP, I was aware of the employees and employee compensation.  The payments that I am referring to for Clay Ellis which were taken off the top, were not paid to him as an employee, as they were not rerated as employee compensation.

Clay Ellis made all decisions as though he owned LN Professional Management LLC., and Medical Management LLC., and he was compensated at the exact same rate at the legal owner of LN Professional Management LLC., Lewis Nichols.  At the same time Clay Ellis was not the legal owner of LN Professional Management LLC., and Medical Management LLC., he held him self

**EXHIBIT D - 4**

out to all parties he was in-fact the owner of these companies. This would have all believing Clay Ellis was the owner of these two companies and they could reasonably rely on his directions and representations, and reasonably believed him exercising complete and absolute dominion and control of these two companies was derived from his ownership thereof.

Even though Clay Ellis was not properly accounting for funds that should have gone to the Allied Companies' shareholders, he would manufacture statements for me to use to generate payments to the Allied Companies that those at the Allied company shareholders would receive as an accurate and correct reflection of the funds. If Clay Ellis did not manufacture accounting, the Allied companies' shareholders would have received much more revenue than they actually did.

Clay Ellis specifically directed me to write checks to the members of Allied Lab Solutions, including William Franklin, M.D., and Toth II Enterprises, P.A. The amounts to those checks were always the net amounts after the monies off the top that Clay Ellis had directed be paid, including M.J. Cortez, but also himself and on multiple occasions one of his corporations, including one corporation which I understood was located in Colorado.

Clay Ellis always explained away inconsistent and arbitrary accounting. Over time, I found their accounting to be suspect, I feared fraudulent accounting. I challenged Clay Ellis about these inaccuracies. My demand for strict accounting to Clay Ellis was met with fierce rejection and culminated in me leaving that company. I refused to be complicit in these fraudulent accounting schemes, and this unethical and fraudulent. In reality, I was one of the few Clay Ellis was unable to buy silence from.

All this suspicious activity was clearly known by Clay Ellis, Lewis Nichols, and MJ Cortez. It is equally clear that all three were aware of the scheme as they were recipients of the checks directed to be sent them by Clay Ellis. All three were clearly acting on concert as they received checks and payments and the statements reflecting the changing accounting and misstatements of revenue which were then sent to Allied Lab Solutions members. This was all done at the direction of Clay Hill to me specifically and I was told to write the checks as those statements reflected."

Executed on this ___6 +h___ day of September, 2022, by Larry Palmer, in Travis County, Austin, Texas, United States of America.

By: _____      Date: __9/6/22__

Larry Palmer
DECLARANT

CAUSE NO. D-1-GN-20-003463

| | | |
|---|---|---|
| TOTH ENTERPRISES II, P.A., AND | § | IN THE DISTRICT COURT |
| WILLIAM FRANLIN, M.D., | § | |
|     *Plaintiffs.,* | § | |

PLT003294

**EXHIBIT D - 5**

|  |  |  |
|---|---|---|
|  | § | 201st JUDICIAL DISTRICT |
|  | § |  |
| v. | § |  |
|  | § |  |
| CLAY ELLIS. et al., | § | TRAVIS COUNTY, TEXAS |
| *Defendant* | § |  |

## UNSWORN DECLARATION

(Texas Civil Practice and Remedies Code, Section §132.001)

My name is:    Larry Palmer

My date of birth is:    12/09/55

My address is:    PO Box 190 Grapeland, TX 75844

I declare under penalty of perjury that all information in the attached document entitled Unsworn Declaration of Larry Palmer, I have personal knowledge of, are true, accurate and correct.

Signed in Travis County, Austin, Texas on ____6th____ day of September, 2022.

By: _____

Larry Palmer

Pursuant to Texas Civil Practice and Remedies Code Section §132.001, an unsworn declaration may be used in lieu of a written sown declaration, verification, certification, oath, or affidavit required by statute or required by a rule, order or requirement adopted as provided by law. This provision does not apply to a lien required to be filed with a county clerk, an instrument concerning real or personal property required to be filed with a county clerk, or an oath of office or an oath required to be taken before a specified official other than a notary public. An unsworn declaration made under this section must be 1). in writing, 2). signed by the person making the declaration as true under penalty of perjury and 3). in substantially the form used above.

**(END OF DOCUMENT)**

PLT003295

**EXHIBIT E - 1**

9/6/2022 11:45 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-20-003469
Nancy Rodriguez

Cause No. D-1-GN-20-003469

| | | |
|---|---|---|
| TOTH ENTERPRISES II, P.A., AND | § | IN THE DISTRICT COURT OF |
| WILLIAM FRANKLIN, M.D. | § | |
| *Plaintiffs*, | § | |
| | § | |
| vs. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| CLAY ELLIS, | § | |
| *Defendant* | § | 201ˢᵗ JUDICIAL DISTRICT |

## PLAINTIFFS' RESPONSE TO DEFENDANT CLAY ELLIS' NO-EVIDENCE AND TRADITIONAL MOTIONS FOR SUMMARY JUDGMENT (AMENDED)

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Toth Enterprises II, P.A., and William Franklin, M.D., Plaintiffs in the above styled and captioned matter, and file this Response to Defendant's Motion for Summary Judgment(Amended)  and would show unto the Court as follows:

### Defendant's Motion is deficient as a matter of law under TRCP

1.      Defendant Ellis' latest Motion for summary judgment is nothing more than a recitation of the causes of action with some elements and with "no evidence" appendaged to each of the elements. It is non-specific, fails to state what is the specific missing proof, and basically is disallowed under the TRCP.

2.      TRCP 166a requires for a No-evidence Motion for Summary Judgment that the Movant be specific as to the basis for the Motion, not just generally state there is no case and what is your proof. However, that is exactly what Defendant Ellis has done.  There is no specificity to the Motion other than to state the elements of the causes of action, and that there is no proof for any of the 8 causes of action.  If a missing factual element is entirely missing, Plaintiffs are left to conjecture as to what missing elements are for many of the causes of action.  This is defective on its face and should be denied.

**EXHIBIT E - 2**

3.      As stated in the Comment to the 1997 change which brought forth the no-evidence motion:

> *"This comment is intended to inform the construction and application of the rule. Paragraph (i) authorizes a motion for summary judgment based on the assertion that, after adequate opportunity for discovery, there is no evidence to support one or more specified elements of an adverse party's claim or defense. A discovery period set by pretrial order should be adequate opportunity for discovery unless there is a showing to the contrary, and ordinarily a motion under paragraph (i) would be permitted after the period but not before. **The motion must be specific in challenging the evidentiary support for an element of a claim or defense; paragraph (i) does not authorize conclusory motions or general no-evidence challenges to an opponent's case."***

The bulk of the motion is recitation of the causes of action and just saying "there is no evidence of..." This is no more than a conclusory motion or general no-evidence motion stating that there is no liability and no causation and no damages.  But as to a specific fact that there is no evidence for a cause of action or what is the missing factual element, Defendant's motion is silent and Plaintiffs are left to speculate what is the misssing factual element.

4.      The Motion is tantamount to simply saying e.g., in a negligence case, "there is no negligence, no causation and no damages" and therefore summary judgment is proper.  Each of the denials follows the same format.  It is in essence the following, e.g., with regard to contract claims: (1) there is no contract, (2) that contract that Defendant just said did not exist and the terms of which are not identified was not breached, and (3) the breach of that contract, which does not exist and the terms of which are undefined, did not cause any harm to Plaintiffs.   Defendant's Motion is fatally defective and the Motion should be denied on its face.

5.      Additionally, as shown herein, the record reflects that Defendant Ellis withheld the identity and existence of the accountant who he directed to make payments and divert funds to himself.[1]  He

---

[1]See Defendant Clay Ellis' Responses to Requests for Disclosure, attached as Exhibit H.

2

**EXHIBIT E - 3**

also failed to identify those persons who would have knowledge of payments to MMP and thus to ALS and ALS Management.[2]  He also has "lost" the books and records of Allied Lab Solutions and Allied Lab Solutions Management.  The explanations are varied and contradictory.  He was deposed and lied about the funds received by MMP, and which Plaintiffs contend should have been sent to ALS members, William Franklin, M.D., and Toth II Enterprises, LLC, both plaintiffs in this suit.

6.     Having gotten rid of the books and records of ALS and ALS Management, and refusing to disclose the identities of the accountants for MMP, and the witness for Knox County Hospital District, Defendant Ellis now claims that there is no evidence that he actually got money in the end and therefore, he is entitled to a no-evidence summary judgment on some cause of action, unidentified, for which this is a critical element. The Motion continues to be defective. Defendant's Motion is defective and should be striken.

Dispute as to Timeliness of the No-evidence Motion for Summary Judgment

7.     Defendant Ellis contends that although this was filed as a level 3 case, Plaintiffs are charged with the burden of securing a Docket Control Order and failing which, Plaintiffs' case is a Level 2 case.  If Defendant Ellis is believed, as a level 2 case, discovery was cutoff during COVID.  This is contrary to the TRCP which states that any party on motion or the Court on its own may enter a Docket Control Order.

8.     However, no one mentioned this as Level 2 case until after Defendant Ellis noticed the earlier filed Motion for Summary Judgment for hearing (July 22, 2022) and Plaintiffs requested that the parties file a Docket Control Order.  At that point, Defendant Ellis suddenly decided that all discovery was concluded in this case a couple of years ago or around June 23, 2020.  This was

---

[2]See Defendant Clay Ellis' Responses to Requests for Disclosure, attached as Exhibit H.

interestingly three days later than Ellis suggested date, the following was filed: Original Answer of Defendants LN Professional Management, LLC d/b/a Medical Management Professionals and Lewis Nichols (filed July 26, 2021).  Therefore, if Defendant Ellis' contention is correct, then Defendants LN Professional Management, LLC d/b/a Medical Management Professionals and Lewis Nichols are not allowed to send discovery in this case.  Or, Defendant Ellis is wrong and a proper Docket Control Order should be entered in this case.

9.      In that event, as it seems the correct avenue to take, Defendant Ellis' Motion is untimely and will be heard, if at all, after the close of discovery in accordance with Rule 166a(I).

10.     Plaintiffs sent a request to Defendants to see if they would submit an Agreed Docket Control Order.  Defendant Ellis' counsel replied that discovery was cut off and even if not, the time for discovery probably would have run so he would not agree.  There was no apparent basis for this other than conjecture.  Defendant LN Professional Management and Lewis Nichols neither agreed nor disagreed.

11.     This case is one of several involving the same parties or at least the same funds in part. During the window of 2020 and 2022, there was pending an arbitration between Knox County Hospital District and Blue Cross Blue Shield.  This was to secure payment of the amounts which would be due under the distribution agreement set forth herein.  In fact, this was only resolved and paid in March 2022.[3]

12.     Currently, there is another lawsuit between the parties before this Court plus Allied Lab

---

[3]*Knox County Hospital District v. Healthcare Service Corporation, a Mutual Legal Reserve Company, dba Blue Cross Blue Shield of Texas,* Cause No. 10107, originally filed in 50th Judicial District Court of Knox County, Texas, removed to United States District Court for the Western District of Texas, Wichita falls Division, Cause No. 7:19-cv-00095-O, 12/17/2019, referred to arbitration.

**EXHIBIT E - 5**

Solutions LLC and Allied Lab Solutions Management which is pending in Knox County District Court.[4]  The funds from the settlement with Blue Cross Blue Shield (in excess of $6,000,000) are also pending in Knox County District Court as the disposition of those funds is under the control of the District Court in Knox County.

13.    Defendant Ellis will no doubt claim nothing was going on in this case but that does not mean that matters affecting these parties and monies which are subject to the same dispute were not being litigated and are being litigated elsewhere.

14.    Consequently, a proper Docket Control Order is called for in this case.  Plaintiffs are filing a Motion for Entry of a Docket Control Order so that this case can have an orderly disposition, possibly in coordination with the other existing case in Knox County, Texas, but this is yet to be determined.  Discovery is ongoing in that case.

<u>PLAINTIFFS RESPONSE TO DEFENDANT CLAY MOTIONS FOR SUMMARY JUDGMENT</u>[5]

15.    Subject to the foregoing Motion to Strike and Request for Entry of a Docket Control Order referenced herein above, Plaintiffs file the following response.

16.    Defendant Ellis is claiming that there is no evidence that he took funds that were those of

---

[4]*Knox County Hospital District v. Toth Enterprises II, P.A., William Franklin, M.D., Allied Lab Solutions, LLC, Allied Lab Solutions Management, LLC, Clay Ellis, Lewis Nichols, LN Professional Management, LLC, and LN Professional Management LLC d/b/a Medical Management Professionals;* Cause No. 10301, pending in 50th Judicial District Court, Knox County, Texas.

[5]As stated herein above, Defendant Ellis initially filed a notice of hearing on its pending Motion for Summary Judgment which was a Traditional MSJ primarily, replying on the only evidence which consisted of the Affidavit of Clay Ellis.  About a month later, August 19, 2022, Defendant Ellis changed its position and filed a No-evidence Motion on all causes of action, with the exception of a Traditional MSJ on "aiding and abetting" as a cause of action. Plaintiff had already filed a response and sur-reply to the first filed MSJ.  This included much of the materials used in this Response to the latest Motion for Summary Judgment.

**EXHIBIT E - 6**

Plaintiffs herein.  Ellis further claims that of the many causes of action alleged against him for malfeasance in taking funds that were not his and rightly belonged to Plaintiffs, there is no evidence on any of the causes of action.  Defendant Ellis contends that there is no evidence that he took any funds.  Howevfer, this is contradicted by the Declaration of Larry Palmer, the accountant for LN Professionals aka Medical management Professionals and Allied Lab Solutions and Allied Lab Solutions Management.  He very clearly states that Clay Ellis directed him to divert funds to Ellis and his companies, and that Ellis further prepared false statements of account to give to Plaintiffs herein.[6]  Furthermore, the evidence from the deposition of Clay Ellis coupled with the declarations of J.P. Forage and Stephen Kuehler show that monies went missing at the middle level of this three tiered set of corporations, i.e., at LN Professionals aka Medical Management Professionals.  There are only a few persons at that level and Clay Ellis admitted that none of thethem diverted any funds. This leaves only Clay Ellis.  Consequently, if there are missing funds, there is substantial evidence that Clay Ellis is responsible, by his own admission of the facts necessary to establish this.[7]

17.    Defendant Ellis filed two Motion for Summary Judgment, the second of the two is an Amended Motion for summary supplanting the operative original.

18.    Defendant would show that there is evidence on each of the elements for the causes of action alleged.  The individual elements and the rejoinder to them is set forth in Paragraphs 100 to 141. However, the background of Defendant Ellis, including the status of discovery and Ellis' reply, as well as his pleadings provide context.

Defendant Ellis' conduct is relevant to the suit and the claims

---

[6]See Declaration of Larry Palmer, attached as Exhibit G.

[7]See Deposition of Clay Ellis excerpts cited herein in below.  .

**EXHIBIT E - 7**

19.     First, Defendant Ellis tried to avoid service of the suit. Despite apparently denying he was who he was on at least two occasions to the process server, he followed that up with moving for summary judgment 3 ½ months after the suit began.  The Court did not entertain this untimely filing.

20.     Second, Defendant Ellis then followed this up by producing no documents in discovery and naming only the parties as witnesses with knowledge of relevant facts and the subsequent Managing Partner of ALS and ALS Management, J. P. Forage, M.D.

21.     For reasons set forth below, this is significant since as the former Managing Member and sole Board Member of Allied Lab Solutions and Allied Lab Solutions Management, Defendant Ellis would be in charge of the company books and records including the records of accounting. Defendant Ellis has multiple options and changing testimony on why those records disappeared, but they are important since his testimony was that no money was received that should have been distributed to members of Allied Lab Solutions.  Records of the Knox County Hospital District tell a different story and reflect that in excess of $2,000,000 was diverted from ALS members by Clay Ellis. Thus, this suit.

Brief History of the Suit and its Inception

22.     The following dates of events in this case are relevant to this discussion because they reflect Defendant's prevarications and evasiveness under oath about the books and records of ALS and ALS Management over which he had control, including the funds to be distributed, as well as his suspicious conduct when pressed on what he did with the books and records:

April 10, 2020          **Pre-suit requests for record - none produced.**  Plaintiffs making demand on Clay Ellis to produce the books and records of the Allied Lab Solutions, LLC, and Allied Law Solutions Management, LLC. Defendant Ellis did not produce the books and records despite this request.

**EXHIBIT E - 8**

| | |
|---|---|
| July 2, 2020 | Plaintiffs file their suit against Clay Ellis for diverting and taking funds properly due them under various agreements. The amounts are in the multiple millions of dollars. |

July 11, 2020      **Ellis lies about his name to avoid service.** The process server goes to Ellis' residence and a man was coming out of the house. The server told him he was looking for Clay Ellis, he was a process sever and had delivery for Ellis. The man said Ellis was not there and said to try his office next week. The server asked for the address and Ellis told him it is public record and drove off in a white pickup which was registered to Ellis.

July 16, 2020      **Ellis will not come to the door to get served.** After an interim unsuccessful attempt, the process server rings the doorbell multiple times with no answer even though the pickup truck registered to Clay Ellis is parked at the home of Clay Ellis. The process server confirms a picture of Ellis looks like the person who denied being Ellis at the first attempt.

July 17, 2020      Motion for Substituted Service is filed

July 20, 2020      Court grants an Order for Substituted Service on Clay Ellis

July 31, 2020      Defendant Ellis files an answer to the lawsuit.

Sept 23, 2020      Plaintiffs send RFD's to Defendant Ellis

Oct 23, 2020       **Ellis withholds names of accountant and other person involved in diversion of funds**. Defendant Ellis responds to RFD's producing nothing, naming three witnesses - the two parties and Dr. J.P. Forage, the subsequent managing member of ALS and ALS Management.

Nov 17, 2020       Defendant Ellis files his Motion for Summary Judgment on Traditional and No-Evidence Grounds, claiming adequate time for discovery has elapsed. *The only evidence that Defendant produces is his Affidavit denying possession of the monies or the books and records of Allied Lab Solutions, LLC or Allied Lab Solutions Management, LLC.*

Nov 23, 2020       Plaintiff send a request for production to Defendant

Dec 21, 2020       **Ellis claims no revenue to ALS and ALS Management in his deposition because there was no revenue to MMP.** Defendant

**EXHIBIT E - 9**

|  | Ellis' deposition is taken and he denies revenue was received which would be paid to ALS members. This was false as shown by records of Knox County Hospital, produced as an exhibit to this response. |
|---|---|
| Dec 23, 2020 | **Ellis claims to have lost the books and records of the LLC.** Ellis, the former managing member of ALS and ALS Management claims to have lost books and records of showing revenue and what should have been paid to Plaintiffs herein. Defendant responds producing no document of any kind, claiming to not have any documents of any kind. |
| Jan 29, 2020 | Court grants the Plaintiffs' Motion for Continuance of the hearing on Defendant's Motion Traditional and No-evidence for Summary Judgment. |
| July 22, 2022 | Defendant Ellis notices the hearing on its Motion for Traditional and No-evidence Motion for Summary Judgment |
| August 19, 2022 | Defendant Ellis files a new Amended Motion for Summary Judgment with no proof of any kind, claiming to be a No-evidence MSJ of all causes of action. |

24.    Plaintiffs have previously filed a response to Defendant Ellis' Motion for Summary Judgment, much of which is included herein, is actually in the earlier response. This should therefore be considered in supplement to that prior Response to Ellis' Motion for Summary Judgment.

<u>Structure of Relevant Companies and flow of payments</u>

25.    Clay Ellis set up the following corporations and installed himself as the managing member and sole member of the Allied Lab Solutions Management and a member of the Board of Directors of Allied Lab Solutions. The purpose of these companies dealt with providing lab services and the billing for lab services. The corporations are as follows:

      a.    Allied Lab Solutions, LLC

      b.    Allied Lab Solutions Management, LLC

9

EXHIBIT E - 10

    c.       LN Professionals aka Medical Management Professionals

    d.       LN Professionals Management, LLC.

26.    Clay Ellis was in control and managed all of these entities during the relevant time period.[8] He set up ALS and ALS Management, set up the bank accounts, prepared statements and disbursed funds to other members of ALS, including Plaintiffs herein, William Franklin, M.D., and Toth Enterprises II, PA.  He was the sole managing member of ALS and ALS Management. Consequently not only was he involved in management of the companies, but he handled the monies and distribution of those funds of the members.[9]

27.    In addition to ALS and ALS Management, Clay Ellis was also running LN Professionals and LN Professionals Management.[10]  This put him in line with handling monies received from lab services companies, such as Knox County Hospital District, who actually ran the tests and did billing for those services.  They would render certain funds in accordance with an agreement between Knox County Hospital District and LN Professionals.  Those funds would then be paid in an agreed percentage with ALS and its members.  By controlling the funds after they left Knox County Hospital District by virtue of his work at LN Professionals and ALS, Clay Ellis controlled the distribution of those funds.[11] 138

---

[8]See Declaration of Larry Palmer, attached as Exhibit G, but also quoted in total in Paragraph 138 infra.

[9]See Declaration of Larry Palmer, attached as Exhibit G, but also quoted in total in Paragraph 138 infra.  See also quotes from deposition of Clay ellis.

[10]See Declaration of Larry Palmer, attached as Exhibit G, but also quoted in total in Paragraph 138 infra.

[11]See Declaration of Larry Palmer, attached as Exhibit G, but also quoted in total in Paragraph 138 infra.

EXHIBIT E - 11

28.    Reports were generated by Ellis which were given to his fellow members at ALS.[12]  As the facts reveal, those reports were fraudulent in understating the funds disbursed from Knox County, and thus received by ALS to be distributed.[13]   Clay Ellis was handling these processes and the monies from the receipt by LN to the distribution checks to his fellow ALS members.[14]

29.    Ellis' contention in his Original Motion for Summary Judgment, and his deposition and affidavit attached to his Motion for Summary Judgment that no monies were received which were to be distributed to Plaintiffs is controverted by the three primary persons - Stephen A. Kuehler, CEO of Knox County Hospital District, J.P Forage, M.D, present owner of ALS and ALS Management, and the testimony of Clay Ellis himself.

30.    A chart of the corporations involved is set forth below and as described herein below in detail, sets forth the flow of funds that is at issue.

_____

[12]See Declaration of Larry Palmer, attached as Exhibit G, but also quoted in total in Paragraph 138 infra.

[13]See Declaration of Larry Palmer, attached as Exhibit G, but also quoted in total in Paragraph 138 infra.

[14]See Declaration of Larry Palmer, attached as Exhibit G, but also quoted in total in Paragraph 138 infra.

**EXHIBIT E - 12**



This Chart shows that monies from the Hospital District which performed lab work flows to MMP and in turn is supposed to flow to ALS and its subscribers, including Plaintiffs herein.

31.     The evidence included herewith shows that substantial monies, in excess of $5,000,000 are missing, having flowed from the Knox County Hospital District to MMP, but it never was distributed to the ALS or its subscribers.

32.     Clay Ellis claims that no more money came into MMP early 2019.[15]  He claimed that MMP a/k/a LN Professionals has no revenue and has had no revenue since the Spring of 2019.[16] Consequently, there was no more money to send to ALS Management in trust to disburse to subscribers William Franklin and Toth Enterprises II.  Clay Ellis also testified that he was working for both MMP and ALS Management at the same time.[17]   He also testified that of the 5 employees

---

[15]Deposition of Clay Ellis, page 84, lines 11-16, attached as Exhibit A.

[16]Deposition of Clay Ellis, page 85, lines 15-21.

[17]Deposition of Clay Ellis, page 135, lines 14-23.

EXHIBIT E - 13

at MMP, he being one of them, none of the others - Lewis Nichols, M.J. Cortez, Rebecca Smith, or Dama White - ever took money that was not theirs.[18]  And yet, money is missing.

33.     Stephen A. Kuehler testifies that not only were there monies paid to MMP, but he produces the Monthly Reports for each of those months.   He also produces the checks written to MMP from May 2019 to June 2020.  He also produces a chart which sets forth the amounts paid for each month of the relationship between all these parties.[19]

34.     According to the Chart, the payments made by Knox County Hospital District to MMP from May 2019 till June 2020 are as follows:

| 5/9/2019 | $3,282.327.93 |
|---|---|
| 6/11/2019 | $1,035.884.75 |
| 7/10/2019 | $188,136.57 |
| 8/14/2019 | $27,752.96 |
| 9/17/2019 | $16,885.78 |
| 10/17/2019 | $19,229.21 |
| 11/19/219 | $148,740.03 |
| 12/12/2019 | $184,024.16 |
| 01/14/2020 | $38,329.28 |
| 2/13/2020 | $47,671.61 |
| 3/19/2020 | $26,689.12 |
| 4/14/2020 | $13,992.17 |
| 5/13/2020 | $6,571.25 |
| 6/16/2020 | $619,414.61 |

---

[18]Deposition of Clay Ellis, page 117, lines 8-20.

[19]See Declaration of Stephen Q. Kuehler, attached hereto as Exhibit B.

**EXHIBIT E - 14**

| 7/14/2020 | $52,432.67 |
|---|---|

35.     The total amount of these funds sent to MMP for which it is undisputed were not sent on the to subscribers, including Plaintiffs herein is $5,764,082.08.   This represents 75% of the net received by Knox County Hospital District during this time.[20]   The gross to ALS and its subscribers would have been $3,074,177.11 with $3,043,435.34 to be distributed to the subscribers.   With each unit having the value of 1/100th of that number of $30,434.35, Plaintiff William Franklin, M.D. has lost $91,303.06 (3 units) and Toth Enterprises II, P.A., has lost $2,556,485.69.[21]   Those are funds disbursed by Knox County Hospital District which never arrived to be held in trust for disbursing by ALS Management.

36.     This establishes that money properly due the subscribers of ALS was sent to MMP.   Clay Ellis was working at MMP during this time frame and since then as well up till the present.

37.     At the other end of the money flow, it is undisputed that William Franklin and Toth Enterprises II, PA., did not receive any funds after April 2019.   However, the Declaration of J.P. Forage also states no monies were received from MMP after April 2019.   He includes with his Declaration as the custodian of business records for ALS and ALS Management that records that he has in his possession, and the Monthly Reports.   There are none after April 2019.[22]

38.     Therefore, the missing money is at the middle level - MMP.   Defendant Ellis testified that there were 5 people working at MMP: Lewis Nichols, Clay Ellis, M.J. Cortez, Dana White, and

---

[20]See Declaration of Stephen A. Kuehler, attached as Exhibit B.

[21]See Declaration of J. P. Forage, M.D., attachments of Monthly Reports, attached hereto as Exhibit C.

[22]See Declaration of J.P. Forage, M.D., attached hereto as Exhibit  C.

14

**EXHIBIT E - 15**

Rebecca Smith.[23]  Ellis was asked as to each person whether he had ever known Lewis Nichols, M.J.

Cortez, Rebecca Smith, or White to ever take money that was not theirs, in other words to steal or

embezzle.  As to each person, he said "never."[24]  This leaves only one person left by Defendant Ellis'

own admission - himself.

39.     There are several charts setting forth the relationships of the various entities and two charts

setting for the money disbursement based on the Declarations and documents.

40.     A man suddenly coming into great wealth would be hard pressed to bury it in the backyard

and do nothing with it.  Looking at the sudden lifestyle changes of Defendant Ellis, it appears that

he has done just that.  In the section below setting forth the lifestyle changes, the new million dollar

home, the new airplane (not new to him, but new), these changes are noted.  They are not necessary

but are certainly consistent with what Plaintiffs allege happened and Ellis' role.  There may be others

involved, but his role is laid out here.

**II.   Background and Evidence Overview**

41.     Plaintiffs sued Defendant Ellis claiming that he wrongfully has monies due Plaintiffs.

Plaintiffs are subscribers to Allied Lab Solutions, LLC.  The monies paid to Allied Lab Solutions

are handled by Allied Lab Solutions Management, LLC.  This company holds monies in trust

pending their distribution to the subscribers of Allied Lab Solutions according to the number of units

owned by the particular subscriber.  William Franklin, M.D., owns 3 units and Toth Enterprises II,

P.A., owns 84 units.  The total number of units is 100.

42.     Lab Services, i.e., the actual testing and running of the labs, are done by several hospitals,

---

[23]Deposition of Clay Ellis, page 86, lines 3-17.

[24]Deposition of Clay Ellis, page 117, lines 8-20.

15

EXHIBIT E - 16

including Knox County Hospital District Hospital. Other services for each of the patients for whom labs are ordered are performed by the subscriber doctors. These include creating requisition slips for the laboratory, setting up a facility for holding and storing laboratory samples (e.g., some have to be frozen, some centrifuged), explaining what the labs to be performed to the patient, what laboratory and its significance. Later when the lab results come in, other services include interpreting the lab, determine if there is any urgent need, or if so, then contacting patient immediately to explain to patient the urgency and what needs to be done.

43.     Medical Management Professionals (MMP) serves as the facilitator for these services, picking up samples, and confirming that services and lab are performed.[25]

44.     The hospital services for performing the lab are billed to the appropriate insurance carrier and hopefully paid by that carrier.

45.     The funds received by the hospital, after the expenses are deducted, are then distributed as follows: 25% retained by the hospital, 35% to MMP, and 40% to Allied Lab Solutions Management, LLC to be distributed to the subscribers. William Franklin, M.D., and Toth Enterprises II, P.A., were subscribers, owning 3 units and 84 units respectively out of 100 units. ALS Management functions as a trustee receiving and distributing the funds when they are received.[26]   For those services, ALS Management receives 1% of the monies received, i.e., 1% of the 40% received for distribution to the subscribers.[27]

## III. Entities Involved

---

[25]Deposition of of Clay Ellis.

[26]Deposition of Clay Ellis, page 78, lines 12-17.

[27]Deposition of Clay Ellis, page 114, lines 21 to page 115, line 2.

EXHIBIT E - 17

46.   The entities involved are as follows as well as their role is set forth below:

a.   <u>Knox County Hospital District</u> - performed lab services and sent and received billing for lab services.  Of the funds received for lab services, it retained 25% and sent the remaining 75% to LN Professionals.

b.   <u>Glen Rose Medical Center</u> - performed lab services and sent and received billing for lab services.  Of the funds received for lab services, it retained 25% and sent the remaining 75% to LN Professionals.

c.   <u>LN Professionals, LLC</u> - middleman company where Clay Ellis now works and is his primary employer.  Owned by Lewis Nichols (hence the "LN") which received funds from the hospitals for lab services reimbursemnts.  Those funds were redistributed to ALS and its subscribers, including Plaintiffs herein Williams Franklin, M.D., and Toth II Enterprises, LLC.

d.   <u>MMP</u> - a/k/a for Medical Management Professionals which itself was another name for LN Professionals, LLC.

e.   <u>Medical Management Professionals</u> - another name for the middle man LN Professionals, LLC.

f.   <u>Allied Lab Solutions, LLC</u> - laboratory data and patient management company for whom Clay Ellis was the managing director.  Set up by Clay Ellis and the corporate structure of ALS and ALS Management were determined by Ellis.  Redistributed to Plaintiffs William Franklin, M.D., and Toth Enterprises II, LLC. Was paid a 1% handling fee.

g.   <u>Allied Lab Services Management, LLC</u> - corporate managing entity for ALS.  Set up

17

by Clay Ellis.  Sole function of Ellis was to receive funds and redistribute them to the subscribers, which included Plaintiffs.

h.  <u>William Franklin, M.D.</u> - Plaintiff herein, and a subscriber to Allied Lab Solutions, LLC. Was entitled to 3% of any net funds received by ALS under the subscriber agreement.  As a medical professional responsible for management of these patients, he was actually performing medical services, not simply.

i.  <u>Toth Enterprises II, LLC.</u> - Plaintiff herein, and a subscriber to Allied Lab Solutions, LLC. Was entitled to 84% of any net funds received by ALS under the subscriber agreement.

## IV.  <u>Plaintiffs' Witnesses in Support of the Response to MSJs - Traditional & No-Evidence</u>

47.  Relevant witnesses for purposes of this Response to Defendant's Motion for No-Evidence and Traditional Summary Judgment are as follows:

48.  <u>Stephen A. Kuehler</u> - CEO of Knox County Hospital District; sent approximately $2,450,000 dollars to MMP a/k/a LN Professionals which never made it to ALS or Plaintiffs William Franklin and Toth Enterprises II, LLC, from May 2019 to June 2020.  Mr. Kuehler has supplied a Declaration proving up the checks and Monthly reports from May 2019 to June 2020 reflecting that MMP received $2,450,000 in checks for funds under the Agreement between Knox County and MMP/LN Professionals.  Those funds were to be redistributed to ALS and from there to Plaintiffs.  It also appears that the largest check, May 2019, was also not distributed to ALS subscribers William Franklin, M.D., and Toth Enterprises II, P.A.[28]  The primary contact for Knox County Hospital and Stephen A. Kuehler was Clay Ellis.

---

[28]See Declaration of Stephen A. Kuehler, attached hereto as Exhibit B.

18

EXHIBIT E - 19

49.   <u>Clay Ellis</u> - Defendant and architect of the set-up of the three level billing scheme and as evidence indicates, holder of funds to which he is not entitled.  Provided an affidavit claiming that he has received no monies which should be the property of Plaintiffs.  Basically, a general denial answer verified by Defendant Clay Ellis.  Denies having any documents of ALS/ALS Management.  Claims to have given them to JP Forage, CEO/Managing Director of ALS/ALS Management and then he destroyed the computer. Denies having any records or any monies.  His deposition casts substantial doubt on his affidavit and his story.  That is outlined herein below in detail.

50.   <u>Jean-Pierre Forage, M.D.</u> - current Managing Director/CEO of Allied Lab Services, LLC, and Managing Director/CEO of Allied Lab Services Management, LLC.  Confirms that no monies were received after April 2019.  Proves up the Monthly Reports with the breakdown of monies received prior and that the other monies, which would have deserved equal treatment, did not arrive.

51.   <u>Larry Palmer</u> - accountant with LN Professionals aka Medical Management Professionals, who was directed by Clay Ellis personally to Clay Ellis's personal companies and to divert other monies as directed by Ellis so that they would not appear on the ledger of funds for the members of ALS, including Plaintiffs in this case. [29] He was also told by Clay Ellis when and in what amount to pay funds to Plaintiffs in this case.[30]

52.   <u>William Franklin, M.D.</u> - subscriber and partial owner of ALS to whom monies received by ALS were to be redistributed to him.

**V.    Ellis denies having monies due William Franklin, M.D., or Toth Enterprises II, P.A.  - the proof is otherwise**

---

[29]Declaration of Larry Palmer, attached as Exhibit G.

[30]Declaration of Larry Palmer, attached as Exhibit G.

53.     Ellis' Original Motion for Summary Judgment is based on Ellis' single affidavit that his mere denial is sufficient to sustain summary judgment.  This is legally incorrect since it is the affidavit of an interested witness.  In fact, it is nothing more than a simple, verified denial.

54.     Ellis' Amended Motion for Summary Judgment is based on nothing other than the claim that Plaintiffs do not have evidence on the elements of the causes of action asserted.  The missing facts for each of those causes of action are not identified other than a conclusory statement that there is no evidence of the elements plead. For reasons set forth herein, Defendant Ellis' Motion should be striken as defective and not in compliance with the Texas Rules of Civil Procedure requirements for No- evidence MSJ's, and alternatively, be denied in its entirety.

55.     Defendant Ellis was deposed on the issue of the missing money December 21, 2020.  In his deposition, he claimed that there was no money in his possession and that in fact, there was no money due ALS or ALS Management for redistribution to the subscribers after April 2019.  This is simply false.  This is the time at which Ellis is believed to have diverted funds due to the subscribers of ALS but LN Professionals a/k/a Medical Management Professionals continued to receive substantial funds which should have been rendered downstream to Plaintiffs.[31]

56.     A Monthly Report is generated for every payments from Knox County Hospital District to payments to MMP.  Of the funds received by Knox County HD, 25% of the funds are kept by the hospital, and the remainder is sent to MMP.   Ellis admits this in his deposition.[32]  Ellis further admits that of the funds received by MMP, 45% is kept by MMP and the remainder is distributed

---

[31]Declaration of Stephen Kuehler, attached as Exhibit B.

[32]Deposition of Clay Ellis, page 109, line 18.

20

**EXHIBIT E - 21**

to ALS for distribution to the subscribers.[33]

57.    MMP did not send any more funds to ALS/ALS Management after April 2019.  However, MMP continued to receive payments from Knox County Hospital District.  The CEO of Knox County HD, Stephen A. Kuehler, testified in his Declaration that $2,425,725.17 was sent to MMP from May 2019 to June 2020.[34]

56.    Therefore, at least $2,425,725.17 is missing from May 2019 to June 2020 and unaccounted for at the middle level, the level at which Clay Ellis is presently employed.  The April 2019 payment to Knox County Hospital District in the amount of $4,655,200.29, which resulted in a payment to MMP in the amount of $3,282,327.93 is also unaccounted for.  As set forth on the Chart attached herto, Plaintiffs would have been entitled to: $51,992.07 - William Franklin, M.D., and $1,455,778.09 - Toth Enterprises II, P.A.

57.    Clay Ellis claimed in his deposition that MMP had no revenue after April 2019.[35]  This was a lie.  Copies of the checks from Knox County, one of several providers, prove that to be incorrect with not just the Monthly Reports from the Hospital to MMP but also the Checks to MMP.[36]

58.    Clay Ellis claimed that MMP was still in business but had received no funds and that the company was just going through the motions with no revenue.[37]  This was a demonstrably untrue.

---

[33]Deposition of Clay Ellis, page 110, line 24 through page 111, line 9.

[34]See Declaration of Stephen A. Kuehler, attached as Exhibit B

[35]Deposition of Clay Ellis, page 84, lines 11-16 and page 85, lines 18-21

[36]See Declaration of Stephen A. Kuehler, attached as Exhibit B.

[37]Deposition of Clay Ellis, page 86, line 3 through page 88, line 3 and page 138, lines 17-21.

21

**EXHIBIT E - 22**

59.     Clay Ellis admits that there are 5 employees of LN Partners a/k/a MMP.  (Deposition of Clay Ellis, pg. 86/ln.3-7). When asked for each one of those persons if they took money that was not theirs, he stated unequivocally that they had not.[38]

60.     *Since we know $2,425,725, at a minimum, is missing, and further that it is missing at the MMP level of redistribution, and that Ellis lied about revenue, and no one else at the company by Ellis' admission took any funds that were not theirs, the only person left is Ellis who has these funds.*

## VI.   Examples of Distribution - one done correctly and a second, shows missing money

61.     Based on the evidence and the calculations contained in the Declarations and the testimony of Clay Ellis, it is possible to illustrate how the money distribution worked and how much is missing



from just one month - May 2019.

---

[38]Deposition of Clay Ellis, page 117, lines 8-20.

**EXHIBIT E - 23**

62.      The following are taken from the Monthly Reports attached to the Declaration of Stephen A. Kuehler.  In the first example, the last month that MMP redistributed funds in accordance with their agreements, the funds were sent as required.

63.      Money in April was sent as required.[39]  However, in the very next month, the largest payment went missing and was not forwarded.[40]  The damages to Plaintiffs are set forth on the chart and the calculations from the Monthly Report of Knox County Hospital District.



VII.    **Ellis Lifestyle Changes**

64.      Significantly, Ellis did not produce a complete ledger of distributions to Ellis or one of his controlled companies, Clayisawsome, LLC, or Clayisreallyawsome, LLC.  Ellis denied receiving any

---

[39]See Declaration of Stephen Kuehler, Exhibit B attached.

[40]See Declaration of J.P. Forage, M.D., Exhibit C attached.

EXHIBIT E - 24

money from MMP since April 2019.[41]

65.    Clay Ellis is not a degreed professional.  He has no license other than a driver's license.[42] He has no obvious means of substantial support other than his employment with MMP prior to May 2019.[43]  His salary from MMP has never been six figures with no bonus distributions on top of that.[44] However, Ellis' lifestyle certainly raises the suspicion of ill-gotten gains.  He has two aircraft - a 2018 Cirrus SR22T and a Beechcraft B200 - that he owns.  He has a house worth upwards of, if not over, $1,000,000.[45]

66.    The Ellis buying spree apparently began in May 2017 when he sold his house at 1315 Elkins Lane, Cedar Park, Texas 78613 valued at $354,461.[46]  Within a month, actually 6/19/2017, he purchased a home at 303 Nautilus, Lakeway, Texas valued at $766,939 (2017 tax valuation) and $845,771 (2018 valuation).[47]

67.    Not content with this substantial upgrade, he then went on another buying spree in 2018 purchasing a new Cirrus SR-22T, a turbo-charged luxury aircraft.  Ellis agreed it cost around $700,000 new.[48]  This is the second in his fleet of aircraft but represented a substantial upgrade from

---

[41]Deposition of Clay Ellis, page 84, lines 11-16 and page 85, lines 18-21.

[42]Deposition of Clay Ellis, page 8, lines 14-16.

[43]Deposition of Clay Ellis, page 150, lines 1-5.

[44]Deposition of Clay Ellis, page 150, lines 1-10.

[45]See Travis County Appraisal District appraisal attached hereto as Exhibit D.

[46]See Williamson County Appraisal District Report attached hereto as Exhibit E, second page reflecting sale.

[47]See Travis County Appraisal District appraisal attached hereto as Exhibit D.

[48]Deposition of Clay Ellis, page 153, lines 21-24.

**EXHIBIT E - 25**

the Beechcraft 200 he had already owned.[49]

68.     Within one year after Ellis sells his interest in ALS and ALS Management and begins to work one level up in the money stream, he suddenly comes into substantial revenue allowing his lifestyle change.  However, also within less than a year, the money stops flowing downstream from MMP to ALS and the subscribers.  Mr. Ellis then destroys the records of ALS in his possession, and according to him, he gives it to Goodwill, since he typically gets rid of his computers every two years.

69.     All of this is certainly evidence upon which reasonable minds of a juror might conclude that Ellis has taken monies not his.  The only monies missing are those due to the subscribers of ALS, including Plaintiffs herein.

### Books and records of Allied Lab Solutions & Allied Lab Solutions Management

70..     Ellis as the former managing member of Alied Lab Solutions and Allied Lab Solutions Management, LLC, was responsible for maintaining the books and records of those companies, That would include the accounting records as well.

71.     Notably, Ellis claim that he does not have them, is not sure where they are, and has a changing story as to what he did with them.

72.     Since he is accused of diverting funds of the company, stealing company assets, diverting funds due to the Plaintiff members, this would seem to be a set of records that would greatly help his contention that he did nothing wrong.  However, this is not the case.

73.     Ellis denies have any books and records of ALS or ALS Management.  His only proof of this is his one sentence denial in his affidavit used in support of the Original Motion for Summary

---

[49]Deposition of Clay Ellis, page 153, lines 17-20.

EXHIBIT E - 26

Judgment, and one that was originally noticed for hearing on September 13, 2022, that states: "Since 2018, I have not had possession over any books and records of ALS Management or ALS."

74.     Ellis was deposed on this precise point.  His story about the books and records of ALS and ALS Management is tortured and confusing.  He presents a multiple choice approach to the books and records.

75.     First, Ellis postulates that the records were given to J.P. Forage, M.D., the successor owner of ALS Management.[50]   However, Dr. Forage in his declaration attests that he does not have complete books and records.  In fact, Ellis has not produced books and records of accounting prior to the time he took responsibility for the distributions for ALS and ALS Management, nor did he give them to Dr. Forage.

76.     Second, Ellis claims that the books and records were on his home computer and when he sold the company to Dr. Forage, he no longer had access to the files on his own computer, which he admits were on his home computer, that he owned and was still in his house.  This strains credulity for anyone who has ever owned a computer.

77.     Third, Ellis claims that the books and records, some of them anyway, are in some Cloud account to which he no longer has access and cannot remember whether it is Excel or some other "Cloud" account.[51]

78.     Fourth, Ellis claims that this computer on which the books and records of ALS and ALS Management were stored was: Option 1 - given to Goodwill because he throws away his computers

---

[50]Deposition of Clay Ellis, page 312, lines 7-10.

[51]Deposition of Clay Ellis, page 37, line 23 through page 38, line 11 and page 38, lines12-16.

26

EXHIBIT E - 27

every two years ("doesn't everybody" he testified)  or Option 2 - it got a virus and had to be replaced.[52]

79.     It is undisputed that Ellis is the last person to have complete books and records of ALS and ALS Management.  It is similarly undisputed that even after he sold the company to Dr. Forage he still had those records in his possession and on his computer.

80.     These are the facts from Clay Ellis' deposition on this subject:

a.      He set up the companies ALS and ALS Management.[53]

b.      He solely determined how they were to be set up.[54]

c.      He paid for the set up and the attorneys. [55]

d.      As part of his duties, he maintained the books and records of ALS and ALS Management.[56]

e.      He was the bookkeeper for ALS and ALS Management.[57]

f.      He set up the accounting and was solely responsible for this.[58]

g.      He determined the type of software to use.[59]

---

[52]Deposition of Clay Ellis, page 131, lines 2-4.

[53]Deposition of Clay Ellis, page 2, lines 15-17 and page 41, line 8 through page 42, line 2.

[54]Deposition of Clay Ellis, page 27, lines 3-5 and lines 9-24.

[55]Deposition of Clay Ellis, page 27, lines 6-8 and lines 16-18.  Also page 41, line18 through page 2, line 2.

[56]Deposition of Clay Ellis, page 123, lines 7-11.

[57]Deposition of Clay Ellis, page 26, lines 17-19.

[58]Deposition of Clay Ellis, page 30, lines 9-15.

[59]Deposition of Clay Ellis, page 32, lines 5-8.

EXHIBIT E - 28

h.      Ellis says the records were on a computer he owned and was in his house. [60]

i.      When he sold the company he did not hand over the ALS/ALS Management computer over to the new owner.[61]

j.      When asked the question of "where is that computer?", he responded "That's a good question.  I don't have that computer or any of them - for that matter." [62]

k.      He says he gave this computer to Goodwill.[63]

l.      This was his decision.[64]

m.      Claims that he is in the habit of giving away his computer every two years.[65]

n.      Does not know if he had a backup in the Cloud of the books and records.[66]

o.      Claims he is "barely literate when it comes to computers".[67]

p.      Did not keep a copy of the books and records of this company.[68]

q.      Did not keep any copy of the books and records on a zip drive.[69]

---

[60]Deposition of Clay Ellis, page 32, lines 9-17.

[61]Deposition of Clay Ellis, page 32, lines18-23.

[62]Deposition of Clay Ellis, page 32, lines 24 through page 33, line 1.

[63]Deposition of Clay Ellis, page 33, lines 2-4.

[64]Deposition of Clay Ellis, page 33, lines 9-12.

[65]Deposition of Clay Ellis, page 33, lines 9-12.

[66]Deposition of Clay Ellis, page 33, lines 22-25.

[67]Deposition of Clay Ellis, page 33, lines3-4.

[68]Deposition of Clay Ellis, page 34, lines10-12.

[69]Deposition of Clay Ellis, page 34, lines13-14.

28

**EXHIBIT E - 29**

r.       The books and records existed on his computer "in [his] Excel program, among other locations on his computer.[70]

s.       When he sold ALS and ALS Management, he claims that he no longer had access to the books of those companies, even though it was on the computer sitting in his house in his home office.[71]

t.       Has no proof that he gave this computer to anyone.[72]

81.      Demand was made on Ellis to produce the books and records of ALS and ALS Management which he had in his possession.  This demand was by a letter demand.  Although Ellis had a lawyer call for him in response, no records were forthcoming, nor did he at that time deny having any records.

82.      The current CEO/Managing Director of ALS and ALS Management, J.P Forage, M.D., did not receive complete records from Ellis either.

83.      The following facts are forth in the Declaration of J.P. Forage, M.D. and contradict the testimony of Defendant Clay Ellis:

a.       "The only records of Allied Lab Solutions, LLC, and Allied Lab Solutions Management, LLC, that I was provided were given to me by Clay Ellis and consisted of a box containing Subscription Agreements for the members of Allis Lab Solutions and banking information with the account numbers for all the accounts"

b.       Therefore, all the other records of the company prior to when he took over the

---

[70]Deposition of Clay Ellis, page 34, lines 13-14.

[71]Deposition of Clay Ellis, page 39, line16 through page 40, line 15.

[72]Deposition of Clay Ellis, page 41, lines 9-13.

**EXHIBIT E - 30**

        company were missing

    c.      This would include every record, payment, receipt calculation, tax return, K-1 return for the prior years 2016-2018 were missing from what was given to Dr. Forage

    d.      Dr. Forage does not have complete records of Allied Lab Solutions, LLC, since its inception

    e.      Nor does he have possession of complete records of Allied Lab Management Solutions, LLC, since its inception.

    f.      Even though these companies existed since 2016, he does not have books and records from the commencement of the company to the time that he assumed his present position other than the Subscription Agreements.

    g.      He has not destroyed any records and has diligently searched for books and records in his possession.[73]

84.    Clay Ellis did not provide the books and records of times prior to when Dr. Forage took over the company obligations in May 2018 although he has admitted that he had them. He is the last known person to have those complete books and records. Ellis has simply denied having anything, thinks he may have been on a computer which he gave away sometime.

85.    The Original Motion for Summary Judgment filed by Ellis was a Traditional Motion for Summary Judgment on the books and records of Allied Lab Solutions, LLC, and Allied Lab Solutions Management, LLC, Ellis had the burden to show by undisputed evidence that is clear, positive and direct that he is not in possession of these records. At most, he simply denied having them, has no clear explanation for what happened to them, and the only explanation for why he no

---

    [73]See Declaration of J.P. Forage, M.D., attached as Exhibit B with attachments.

**EXHIBIT E - 31**

longer has that computer is that he "throws away his computers every couple of years"..."doesn't everyone?".

86.     This testimony, on which Ellis bears the burden of proof does at trial and under the original MSJ did not meet any evidentiary standard.   In reality, if those records are in fact destroyed, Plaintiffs are entitled to an instruction on spoliation at the time of trial.

87.     On the No-Evidence Motion for Summary Judgment that Ellis be commanded to turn over the books and records and that he be enjoined to do so, the last person who admitted to be in possession of the ALS records is Defendant Ellis. He admitted that he generated those records, kept them on his computer in his home, and including after he sold ALS and ALS Management to Dr. J. P. Forage.[74]

88.     Defendant Ellis when he recently Notice the original Motion for Summary Judgment for hearing, amended that Motion since Ellis looks not just like an unreliable witness, but his story as to the books and records of the company from which it is accused that he took monies to which he was not entitled would never be believed.

89.     Since he could not be credible witness, he then filed a No-Evidence Motion for Summary Judgment on all the causes of action plead against him.   Basically since he could not credibly attest, he now claims Plaintiffs do not have evidence that he trook monies.

90.     Ellis lost the books and records of the companies.   Ellis withheld the names of those persons

---

[74]"Sale of the company" is a grand term for what was actually done, which was for $1 or "a small amount, Ellis would not admit to the amount just that it was "low. See Deposition of Clay Ellis, page 23, line 20 to page 21, line 13. Dr. Forage had the obligations that Ellis has previously been doing to disburse funds sent to ALS for redistribution to the subscribers.  As is shown in the other documents, once Forage came on, Ellis took steps to throttle the funds upstream so that they were diverted prior to coming to ALS or ALS Management.

**EXHIBIT E - 32**

that did the accounting for MMP and ALS and ALS Management, as well as what is shown further herein in the Declaration of Larry Palmer, the accountant for MMP and ALS and ALS Management which Ellis used and directed, as well as his co-conspirators.  Certainly having gotten rid of the records and withheld the identities of witnesses with knowledge of his malfeasance, Ellis has attempted to hide evidence of his conduct, albeit unsuccessfully..

**Standard of Proof that Defendant must meet to be entitled to Summary Judgment**

91.	In responding to a no-evidence motion for summary judgment, Plaintiff need only produce more than a scintilla of evidence on each contested element.  All doubts are to be resolved in favor of the non-movant as far as evidence is concerned.[75]  Evidence is no more than a scintilla if it is "so weak as to do no more than create a mere surmise or suspicion" of a fact.  Id.

92.	Plaintiff would show that the evidence from the documents, the declarations and exhibits attached thereto, and the deposition of Clay Ellis raise certainly more than a scintilla and thus the Motion should be denied.

93.	If the nonmovant presents more than a scintilla of evidence to support the challenged ground, the court should deny the motion.[76]  A genuine issue of material fact exists if the nonmovant produces more than a scintilla of evidence establishing the existence of the challenged element.[77] Less than a scintilla of evidence exists when the evidence is so weak as to do no more than create

---

[75]  *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750-51 (Tex. 2003).

[76]See Forbes, Inc. v. Granada Biosciences, 124 S.W.3d 167, 172 (Tex. 2003); King Ranch v. Chapman, 118 S.W.3d 742, 750 (Tex. 2003); Wal-Mart Stores, Inc. v. Rodriguez, 92 S.W.3d 502, 506 (Tex. 2002)

[77]See Ford Motor Co. v. Ridgway, 135 S.W.3d 598 (Tex. 2004); Morgan v. Anthony, 27 S.W.3d 928 (Tex. 2000).

**EXHIBIT E - 33**

a mere surmise or suspicion of fact.[78]

94.     More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair minded people to differ in their conclusions.[79]

95.     Plaintiffs would submit that the evidence is clear despite Defendant's denial, that monies due these subscribers - Plaintiffs herein - is missing.  The evidence is also clear that Defendant Ellis who set up this three level scheme, quit working for ALS, moved upstream and then within a short time, substantial money ceased being sent to the ALS Management to hold in trust for the subscribers.

96.     Reasonable minds could certainly conclude that the missing money, the lifestyle changes, the new aircraft, the million dollar home for a man who never was paid six figures by his employer yet suddenly has all these new assets, indicates that perhaps this is the explanation.

97.     Moreover, from Defendant's own testimony, no one else who worked at MMP or LN Professional Management/LN Professionals took any money and yet the money is missing. Reasonable minds could conclude that Defendant has these funds, ill-gotten.

98.     Defendant's Motion also addresses the injunctive relief claiming that in the absence of a cause of action, no injunctive relief can issue.  This is largely irrelevant since there is substantial evidence upon which the claims of Plaintiffs rest.

99.     Defendant's Motion should be denied in its entirety.

<u>ELEMENTS PORTION OF DEFENDANT'S MSJ</u>

100.     Defendant Ellis has listed several causes of action with a simple statement that as to the

---

[78]See Special Car Servs. v. AAA Texas, Inc., No. 14-98-00628-CV, 1999 Tex. App. LEXIS 4200 (Tex. App.—Houston [14th Dist.] June 3, 1999, no pet.) (not design. for pub.); Medrano v. City of Pearsall, 989 S.W.2d 141, 143 (Tex. App.—San Antonio 1999, no pet.).

[79]See Ford Motor Co. v. Ridgway, 135 S.W.3d 598.

**EXHIBIT E - 34**

elements, there is no evidence as to each of those elements.  The conclusory failure of this portion of the Motion for No-Evidence MSJ has already been discussed herein above.  However, as the evidence is before this Court and recited herein, Plaintiffs would respond on each of these contentions as follows, citing the principal and the evidence is cited herein above.

_Defendant Ellis First Contention:_ _Money had and received: There is no evidence that Ellis holds any money that in equity and good conscience rightfully belongs to Plaintiffs._

101.    All that need be shown for money had and received is that Plaintiffs have a superior right to monies in the possession of Ellis.  As set forth above, Ellis was in control of the funds at the MMP level as well as the ALS level sufficient to direct payments of funds including to himself and in fact prepared the statements for funds, albeit false ones, to be distributed.  He directed the accountant on to whom and in what amount to direct funds, including to his fellow members at ALS.  He diverted funds to himself and his corporations that otherwise would have gone to Plaintiffs herein.  Accordingly, as the person in control of the funds to be given to Plaintiffs, but whose funds he diverted to himself, he is therefore responsible for return of those funds.  This is without regard to fault, which is well set forth herein elsewhere, but that he took money that should have gone to Plaintiffs and directed it to himself.  Consequently, he had money and received it for forwarding to Plaintiffs and simply did not do so, keeping it and diverting it to himself.

_Defendant Ellis' Second Contention:_ _2. Breach of fiduciary duty._
       _a.     There is no evidence that Ellis owed Plaintiffs any fiduciary duty._
       _b.     There is no evidence that Ellis breached any fiduciary duty._
       _c.     There is no evidence that any breach of a fiduciary duty by Ellis caused Plaintiffs damages_

102.    Defendant does not state which fiduciary duty to which he is referring that he is contesting.  As the holder of funds for his fellow members, he certainly had a fiduciary duty as to them.

**EXHIBIT E - 35**

Moreover, because of the closeness of the relationship and of the governing member and the individual members such as the Plaintiffs herein.  Because Ellis was uniquely close in his relationship, controlling both the monies of ALS/ALS Management as well as LN Professionals aka Medical Management Professionals (MMP) he would be quite close to the funds, the representations to others as well as the members and the contol of the funds and the explanation of funds received as well as disbursed.  This places him as the managing partner of ALS and ALS Management in the position of owning a fiduciary obligation to the fellow members, Plaintiffs herein.[80]

103.    The Texas Supreme Court recognized that a fiduciary obligation could arise under circumstances similar to those in the instant case.  *Allen v. Devon Energy Holdings, L.L.C.* 367 S.W.3d 355 (Tex. App.—Houston [1st Dist.] 2012, pet. granted, judgm't vacated w.r.m.).  In *Allen*, a minority member of an LLC sued the LLC and its majority member and sole manager, alleging that the majority member/sole manager misrepresented and failed to disclose material facts in connection with the redemption of the minority member's interest in the LLC. The court concluded that corporate case law supported imposing a formal fiduciary duty in a situation like that at issue, i.e., that the majority member's position as the controlling member and sole manager ws sufficient to create a formal fiduciary duty to the minority member in a transaction in which the minority member's interest was being redeemed (thus increasing the ownership of the majority member). The court also relied on the similarity of the relationship between the parties in the case at issue and the relationship between the general partner and a limited partner of a limited partnership

---

[80]See *ETRG Invs., LLC v. Hardee* (*In re Hardee*), 2013 WL 1084494 (Bankr. E.D. Tex. 2013) (concluding managing member owed LLC formal fiduciary duties based on agency law; managing member owed formal fiduciary duties to LLC based on implication of Texas LLC law that managers and managing members owe fiduciary duties of care, loyalty, and obedience similar to corporate directors; managing member owed no fiduciary duties to other members).

as support for recognizing a fiduciary duty between the controlling member/manager and passive minority member with respect to the operation and management of the LLC. The court also concluded that an exculpation provision in the articles of organization referring to the manager's "duty of loyalty to [the LLC] or its members" could be read to create a fiduciary duty to the members individually.

104.    In the instant case, not only does there exist that close relationship between the managing member and the individual member Plaintiffs, but additionally Defendant Ellis controlled the funds into and from the accounts to be distributed to the members.  Moreover, the Membership Agreement refers to the fiduciary obligation of the managing member to the LLC but because of the control over all aspects of the ALS and ALS Management including the sales, accounting and funds, he owed this to the members as well.

105.    The second contention under the Fiduciary Contention is that there was no evidence that Ellis breached his fiduciary obligation.  Evidence of taking funds that were intended for the Plaintiff members, fellow members of ALS and ALS Management, is evidence of breach.

106.    Additionally, as shown in the Declarations of Franklin and Palmer, Clay Ellis by diverting the funds to himself profitted from the transactions with, among others, Knox County Hospital District.  Consequently, the burden of proof to is upon Ellis to show that he discharged his fiduciary obligation.  Because this is a no-evidence motion for summary judgment, and Ellis offers no evidence to show he discharged his obligations, the motion in this respect should be denied.

107.    Moreover, Defendant Ellis has only a general denial on file for his answer.  This means that no affirmative defenses are raised, and Plaintiffs have no burden to negate affirmative defenses of any kind, including that Ellis might claim to have discharged his fiduciary duty.

**EXHIBIT E - 37**

108.    Another aspect, deriving from the lack of any affirmative defenses of Ellis is that a business judgment exception and any other affirmative defense to explain his diversion of funds, not that there could be, is not available.

109.    As to the damages for breach of a fiduciary obligation, approximately $2,425,725, at a minimum, is missing as a result of Ellis diversion of funds, or participation in the diversion of funds. Consequently, since this was as a result of the breach of his fiduciary obligations of loyalty, full disclosure, fair and honest dealing, owed to the fellow members, diverting members funds would fall within that category.  The damages while not specific since Ellis has not divulged the total amount of this diversion, but for Knox County Hospital alone, it would be at least the members share of those funds.  Evidence of the amount of that loss is set forth in the charts ncluded herein and the Declaration of William Franklin, M.D.,  and is basically the members percentage times the loss.  For William Franklin, M.D., he was a 3% shareholder.  Toth Enterprises II was an 82% shareholder. Their individual damages are estimate as at least 3% of the missing funds for Franklin and 82% of the missing funds for Toth Enterprises II, P.A.

*Defendant Ellis Third Contention: 3. Fraud.*
> *a.    There is no evidence that Ellis made any misrepresentation.*
> *b.    There is no evidence that Plaintiffs relied on any misrepresentation made by Ellis.*
> *c.    There is no evidence that any misrepresentation of Ellis caused Plaintiffs any injury*

110.    Misrepresentations were both verbal as well and written in the form of the false and inaccurate monthly reports generated by Ellis and the payments based thereon.  A false report means that Plaintiffs in relying on the accuracy of the reports, and the income, as well as the fairness or the disbursement, relied on Ellis and his disbursement to be correct.  They relied on his statements that the monies received were a particular amount and the the checks received correctly represented the

business disbursement that their agreement called for. Ellis preparation of false statements, as shown by the Declaration of Stephen Kuehler, CEO of Knox County Hospital District, reflecting a variance of millions of dollars is not only shocking in its brazenness by Ellis, but reflects the damages as well.

111.    Ellis in an attempt to cover up the continued payments further falsely represented to Plaintiff Franklin that ALS would be filing bankruptcy because of lack of revenue. However this was also false as that was never done, and further the largest checks were received at the tail end of the payments and went entirely unreported by Ellis.

112.    Eliss claims that there is no evidence that Plaintiffs relied on the statements however that is precisely what they did, relying on the accuracy of those false statements in receiving funds, not contesting payments, and continuing to participate in the arrangement.

113    Additionally, Ellis agreed to handle the affairs of ALS and ALS Management as the managing member, but also to handle the afairs of LN Professionals aka MMP. Handling the affairs would not have including diverting funds and preparing false statements for the members to rely on.

114.    Damages are as set foth in the body herein above, they are basically the amounts taken as had Plaintiffs not relied on the accuracy of the representations from Ellis as to amounts received, they would not have lost those funds to his diversion.

115.    Significantly, Ellis does not have to keep the diverted funds himself for this to represent damages to the Plaintiff members. The amount of the funds diverted is the gross amount of the damages to the members, with the individual members percentage reflecting that individual loss.

*Defendant Ellis Fourth Contention*: *4. Fraudulent inducement.*
    *a.*    *There is no evidence that Ellis made any misrepresentation.*
    *b.*    *There is no evidence that Plaintiffs relied on any misrepresentation made by Ellis in entering into a binding contract based on such representation.*
    *c.*    *There is no evidence that any misrepresentation of Ellis caused Plaintiffs any injury*

EXHIBIT E - 39

116.    As set forth in the Declaration of Williams Franklin, M.D., Ellis represented that he would

handle the day to day business of ALS and ALS Management.   Handling the affairs by any

reasonable construction would include not stealing the monies that otherwise should be distributed

to the members of ALS, including Plaintiffs herein. However, by diverting those funds, especially

at the very start of the payments,[81] indicates that Defendant Ellis was intending to divert funds from

the very beginning of the relationship.   This in evidence of fraud in the inducement, to get Plaintiffs

to sign onto the agreement to allow Defendant Ellis to handle the day to day affairs of ALS and ALS

Management without supervision other than himself.   Additionally, the monthly reports which were

falsified and misrepresented the business revenue are misrepresentations that allowed for this

Subscription Agreement to continue with Ellis at the helm.

117.    Damages as a result of this fraudulent inducement was again the percentage of the amount

diverted of each of the Plaintiff members.   There is some evidence, more than a scintilla, that the

members relied on the representations of Ellis in entering the Subscription Agreements, as well as

entering into the agreement to allow Ellis to serve as the managing partner of ALS and ALS

Management as well as allowing him to handle day to day operations of LN Partners aka MMP.   The

fact that Ellis immediately upon getting the permission to handle day to day operations of both

levels, began to divert funds, is evidence that he intended to defraud members of ALS and intended

to do so from the start.

_Defendant Ellis' Fifth Contention:_ _5. Negligent misrepresentation._
        a.    *There is no evidence that Ellis gave false information to Plaintiffs.*
        b.    *There is no evidence that Plaintiffs justifiably relied on any false information*
        *provided by Ellis.*
        c.    *There is no evidence that any negligent misrepresentation of Ellis proximately*

---

[81]See Declaration of Willaim Palmer, included as an Exhibit hereto.

**EXHIBIT E - 40**

*caused Plaintiffs any damages*.

118.    The evidence exists in the record that Ellis gave false information of a verbal as well as written variety.  Ellis provided false monthly statements, inaccurately state revenue while diverting funds for his own use or just diverting funds and falsely representing revenue.[82]  Ellis also misrepresented the amount of funds being received by ALS as well as MMP to Plaintiff Franklin. He further claimed verbally that there was no revenue, and folowed that with a false statement, when in fact the funds recevied were substantial.

119.    As with the other representations, Plaintiff were intended to rely on those statements and in fact did rely on the monthly statements.  It is a stretch to claim that while the statements were falsely representing minimal revenue, Plaintiffs did not rely on them.  The fact that this misreprsentative statements continued while the members of ALS were simply getting this report, reflects the efficiency and continued misrepresentations that allowed Defendant Ellis continue diverting the funds for his own use as well as that of MJ Cortez and LN Nichols, while providing false accounting.

120.    In the event that Ellis claims that he was unaware that the statements were inaccurate, then they were negligently supplied and thus, were the cause of damage to Plaintiffs.  Continuation of the scheme by Ellis and LN Nichols as well as other beneficiaries of the diverted funds is evidence that Plaintiffs were relying on the statements and payments that followed. The statements were either intentionally false, or Ellis failed to ascertain theire accuracy, he cannot have it both ways, not for the same statement anyway.  Regardless, there is evidence that the monthly statements as well as the representations by Ellis were inaccurate, and that Plaintiffs relied on them to their damage.

121.    Damages as a result of these representations are as with the other claims a percentage of the

---

[82]See Declaration of Larry Palmer, attached hereto asa Exhibit G.

losses from funds diverted by Ellis that otherwise would have been paid to the members, including Plaintiffs. There is some evidence, more than a scintilla, that the members relied on the representations of Ellis in entering the Subscription Agreements, as well as entering into the agreement to allow Ellis to serve as the managing partner of ALS and ALS Management as well as allowing him to handle day to day operations of LN Partners aka MMP, in agreeing to allow him to serve in two capacities handling the day to day operations of ALS/ALS Management and LN Professionals aka MMP. The fact that Ellis immediately upon getting the permission to handle day to day operations of both levels, began to divert funds, is evidence that he intended to defraud members of ALS and intended to do so from the start. However, even if he did not originally intend to do so from the inception, his failure to disclose that he was taking monies was a misrepresentation, including a negligent misrepresentation, that he was fulfilling his fiduciary obligations and acting in good faith in handling funds of members of ALS, including Plaintiffs.

122.    The damages while not specific since Ellis has not divulged the total amount of this diversion, but for Knox County Hospital alone, it would be at least the members share of those funds. Evidence of the amount of that loss is set forth herein above and again recited in Paragraph 109 and 124, and is basically the members percentage times the loss. For William Franklin, M.D., he was a 3% shareholder. Toth Enterprises II was an 82% shareholder.

6. *Defendant Ellis Sixth Contention: Conversion.*
       a.     *There is no evidence that Ellis has unlawfully and without authorization assumed or exercised dominion or control over any property to the exclusion of, or inconsistent with, Plaintiffs' rights as owner.*

123.    The undisputed evidence is that Defendant Ellis controlled and handled the disbursements of funds for individual members of ALS, including Plaintiffs herein. By diverting the funds due to

**EXHIBIT E - 42**

Plaintiffs, claiming them as being less than they actually were, he took funds due to Plaintiffs. AS the managing member of ALS and ALS Management, Ellis handed monies due to Plaintiffs and instead ot disbursing them in accordance with the Subscription Agreements as well as the representations of Ellis in the monthly accounting statements, he simply took those funds for himself. Perhaps not all the missing monies were taken by him, but the evidence of his sudden wealth indicates a substantial amount of those funds were taken by him.

124.    Toth Enterprises II, P.A., was the holder of approximately 82% of the subscription percentage. This means that of the over $2,425,725.00 dollars missing (a minimum figure as it is only Knox County Hospital monies, not including Glen Rose Hospital District, a much larger revenue source), it lost at least 82.5% of that number or $2,001,223.12. Taking monies to which you aren not entitled is conversion. There is more than a scintilla of evidence as to that amount.

_Defendant Ellis Seventh Contention_: _Unjust enrichment._
   a.    _There is no evidence that Ellis obtained a benefit of Plaintiffs by fraud, duress, or the taking of an undue advantage._
   b.    _There is no evidence that Ellis wrongfully secured or passively received a benefit belonging to Plaintiffs which would be unconscionable to retain._

125.    The evidence herein is replete with the facts that Ellis by controlling the funds and reporting on the funds for LN Professionals aka MMP and ALS and ALS Management was able to divert funds to himself as well as others and then prepare and disseminate monthly reports which did not reflect actual amounts received. By doing this, he was able to take monies to which he was not entitled, and keep them away from Plaintiffs. Because he was both the controller of funds and reporting for the all those entities, he was able to control the evidence of his malfeasance while preparing inaccurate monthly reports. Because the funds were diverted to him specifically, and even if not, to other participants in the scheme, he was unjustly enriched in at least those amounts.

**EXHIBIT E - 43**

126.   It would certainly be unconscionable to allow Defendant Ellis to keep funds which he diverted from Plaintiffs and allow him to keep the fruits of his misrepresentations.

127.   As stated herein above in multiple locations, the amount of those damages are at least the missing monies that are known in excess of $2,425,725, plus interest from the time of the taking, or diversion of funds to himself or his contolled companies.

*Defendant Ellis' Eighth Contention: Breach of contract.*
    *a.    There is no evidence of a valid contract between Plaintiffs and Ellis.*
    *b.    There is no evidence that Ellis breached any such contract.*
    *c.    There is no evidence that Plaintiffs sustained any damages as the result of any breach by Ellis.*

128.   Defendant Ellis is non-specific as to which contract his is referring to as there being no evidence of its existence or breach of that contract which Ellis contends does not exist.  This is as stated herein  at the beginning of the Response.  For this reason, this contention is so vague as to be difficult to reply to.  Assuming that any contract is sufficient, Defendant Ellis agreed to handle the day to day operations of ALS and ALS Management properly.  This agreement was at the beginning when Ellis was trying to get Plaintiff Franklin to agree to participate in these companies which Ellis was planning to set up.  Accordingly, that would be an agreement.

129.   Implicit in that agreement to handle day to day affairs is not to do so in accordance with standard business practices.  Stealing or diverting funds from his fellow members of ALS and ALS Management would not be fulfilling that agrement.  In fact, it would be directly contrary to his agreement at the beginning with Plaintiff Franklin and the agreement with the LLC of which Plaintiffs are third-party beneficiaries.

130.   Preparing false statements is also contrary to standard business practices.  It is certainly some evidence that Defendant Ellis is not fulfilling his agreement to handle the day to day operations of

EXHIBIT E - 44

ALS and ALS Management.

131.    According to the Subscription Agreement, the managing member, Defendant Ellis, agreed

to the following:

      a.    Keep the books and records of Allied Lab Solutions

132.    As the managing member of ALS, Ellis was responsible for maintaining the bools and

records of the company.  The Agreement provides as follows:

> 8.2 Books and Records. The officers of the Company, subject to the oversight of the
> Board of Managers, shall keep books of account and records relative to the
> Company's business. The books shall be prepared in accordance with generally
> accepted accounting principles consistently applied. The cash method of accounting
> shall be used by the Company for income tax purposes. The Company's books and
> records shall at all times be maintained at the principal business office of the
> Company or its accountants (and to the extent required by the Law, at the registered
> office of the Company) and such books and records (or copies thereof) shall be
> available for inspection at the principal office of the Company (or such other location
> as shall be determined by the Board of Managers) by the Members or their duly
> authorized representatives during reasonable business hours. The books and records
> shall be preserved for at least four (4) years after the term of the Company ends.

It is undisputed that Clay Ellis lost the books and records of the Company.  This is a breach of his

agreement to maintain those records and losing them, whether by losing the computer, donating the

computer on which are the records, or just having no ability to disclose what he did with them, is a

breach of that Agreement.

      b.    Company Accounts

133.    The Agreement further provided that only company accounts could be created and thus, the

Clay Ellis personal accounts was a breach of his agreement as an officer of the company.

    The Agreement provided as follows:

8.1 Bank Accounts; Investments. The Board of Managers or officers of the Company
may establish one or more bank accounts into which all Company funds shall be

**EXHIBIT E - 45**

deposited. Funds deposited in the Company's bank accounts may be withdrawn only to pay Company debts or obligations or to be distributed to the Members under this Agreement.

Defendant Ellis by diverting funds that would be due to members or even to ALS with the members as third-party beneficiaries, was breaching his agreement to comply with this Agreement and not create these side accounts through which he laundered the monies that he skimmed.

134.    Breach of those provisions was the amount of the skimmed amount diverted or in excess of $2,425,725 plus interest.

_Defendant Ellis Ninth Contention:_ _Civil conspiracy._
   a.    _There is no evidence of a meeting of the minds between Ellis and another person on an object or course of action._
   b.    _There is no evidence of an unlawful overt act._
   c.    _There is no evidence that any unlawful overt act caused Plaintiffs' damages._

135.    Defendant Ellis has confused the elements of criminal conspiracy with those of a civil conspiracy.  The actual allegations in the Plaintiffs First Amended Petition are as follows:

"Civil Conspiracy/Joint and Several Liability

39. Defendants coordinated the diversion of funds, and the withholding of information and the provision of false information as to the amounts received that were properly to be distributed to Plaintiffs herein despite their being due and owing. The overt acts included diverting funds, assisting Defendant Clay Ellis in taking funds which were due to Plaintiffs, taking funds which were not due to Defendants herein and either keeping them for themselves or causing them to be diverted from their rightful owners. The damages to Plaintiffs from this unlawful diversion are in excess of $3,000,000+, as set forth herein above.

40. Defendants are jointly and severally liable for their participation in the conspiracy, regardless of when they participated. Accordingly, Plaintiff seeks all damages jointly and severally from each Defendant."

There is no requirement that the act be criminal as Defendant Ellis claims.  Consequently, Ellis motion in this regard seeks dismissal on a cause of action that is not plead.  There is no claim of a cause of action for criminal conspiracy.

45

EXHIBIT E - 46

136.    The actual elements of a civil conspiracy were recently set forth by the Texas Supreme Court:

> *In civil conspiracy, the plaintiff seeks to hold the defendant liable for an injury caused by a third party who has acted in combination with the defendant for a common purpose. Chu v. Hong, 249 S.W.3d 441, 444–45 (Tex. 2008); Carroll v. Timmers Chevrolet, Inc., 592 S.W.2d 922, 925 (Tex. 1979).*

There is no requirement that the conspiracy be to commit an illegal act.  The common purpose however in this case is the diversion of funds due Plaintiffs and the preparation of false monthly reports in furtherance thereof along with the joint participation of Lewis Nichols and Clay Ellis, recipients of those ill-gotten funds.

137.    The evidence is that Defendant along with MJ Cortez as well as Lewis Nichols conspired to skim funds off the top for monies received that would ultimately be distributed to Plaintiffs herein. The accountant for MMP, Larry Palmer, describes that conspiracy in stark terms in his declaration. It is quoted herein total as it is significant and clearly outlines the scheme for diverting funds put in place by Clay Ellis and implemented which allowed him to divert millions of dollars to his personal accounts and direction.

138.    The accountant for LN Professionals aka MMP and ALS and ALS Management was directly involved in following Clay Ellis directions to divert funds and convrt them to his personal accounts. He states as follows:

**"My name is Larry Palmer. I am over the age of 21 years old, I am of sound mind, I am capable of making this Declaration, and I do so freely. I have personal knowledge of the facts contained herein, I attest that the statements herein are true accurate and correct.**

**I am a professional accountant, in Travis County, Austin, Texas. In or around mid-2015, I was hired by Clay Ellis to work as the accountant for LN Professional Management LLC., dba Medical Management Professionals-("LN"), Allied Lab Solutions Management LLC., and Allied Lab Solutions LLC. I continued working with these companies until mid-201 8. These were different legal entities all of which were Clay Ellis was the purported owner and directed all day-to-day operations.**

**EXHIBIT E - 47**

Although Clay Ellis directed every day-to-day operation, was in-charge of all financial accounts, was in-charge of all hiring and firing, I found out later, Clay Ellis, did not have his name on the various companies he owned, aside from Allied Lab Solutions Management LLC., and Allied Lab Solutions LLC. His longtime friend, Michael John Cortez-akla MJ Cortez acted as Clay ellis' co-conspirator to further Clay Ellis' scheme to defraud the Allied company shareholders.. This was done namely by Clay Ellis paying MJ Cortez l0%of MMP revenue toremain silent about fraudulent accounting for the funds that would flow down stream from MMP.

My duties included all accounting operations, which included receiving funds from the medical facilities that were clients of Medical Management Professionals LLC. As it was set up, clients would pay Medical Management Professionals LLC, then Medical Management Professionals LLC, would pay LN Professional Managernent LLC., then LN Professional Managentent LLC., would make paymcnt to Allicd Lab Solutions Management LLC., and Allicd Lab Solutions LLC.

At the time of the initial payment, Clay Ellis changed how the money was to be distributed. Instead of the funds being sent to LN Professional Management LLC, he directed that l0% of the money off the top was to be scnt to MJ Cortez, another employee at MMP. MJ Cortez did not have authority to hire, fire, manage, or direct me in my role as accountant, nor was he a principal of MMP. However, eveu lacking any meaningful role, Clay Ellis directed that MJ Cortez's l0% be skimmed off the top fbr his participation in the Ellis scheme.

Clay Ellis then directed the balance of those funds, minus MJ Cortez's 10%, to be paid to LN Professional Management Lt,C. The agreement with LN Professional Management LLC, and the Allicd Companics was that L.N Profcssional Managemcnt LLC., was to receive 55% of the revenue, and the rest payable between the Allied companies. With the l0% directed by Clay Ellis to be paid to MJ Cortez, the net to LN Professional Management was less than that to which it was entitled and consequcntly, the net rcceived by Allied Lab Solutions membcrs was also reduced.

For various justifications that Clay Ellis would manufacture, it was common that Clay Ellis would skim off the top from funds that belonged to the Allied Companies. Clay Ellis would direct funds above the 55% LN Professionals was entitled to, to bc paid to Clay Ellis personally, or Clay Ellis' LLC in Colorado, or one of Clay Ellis' other Texas Corporations, and Lewis Nichols for his role as coconspirator of LN Professionals LLC. Clay Ellis would tell rne to write the checks and because he appeared to have the right to hire, fire, and direct me, complied with his directions.

Any amounts LN Professionals LLC ever paid to any party were at the sole direction of Clay Ellis. While Clay Ellis was not legally an owner of LN Professional Management LLC., and Medical Management Prot'essionals LLC., he directed evcry operational aspect thereto as though hc were the sole owner. As tirne went on, I became increasingly aware that the

47

accounting Clay Ellis was directing me to do was not legal and looked like there was fraud being committed against the shareholders of the Allied company shareholders.

It was routine for Clay Ellis to manufacture fraudulent settlenrent statements which did not reflect the actual amounts received by MMP. By increasing themonies paid to him, and then providing lalse or inaccurate settlement statements, Clay Ellis was written checks in excess of the amounts reflected on the statements. This resulted in him taking more money than he was allowed from the Allied company shareholders. The funds that LN Professionals LLC received from their clients would vary, but thc numbers were substantial. For most months, the revenue that was received and later skimmed and stolen was well over several hundred thousand dollars a month. There were millions of dollars that were received from various hospital clients. There was always a sizeable amount skimmed and taken by Clay Ellis for himself and directed to his personal companies.

These payments were taken off the top, before any split to LN Professionals and Allied Lab Solutions, and then to the members of Allied Lab Solutions. The funds that were skimmed or stolen from the Allied company shareholders would be distributed toClay Ellis and l,ewis Nichols, with MJ Cortez already receiving his l0% money off the top.

As part of my duties as the accountant for MMP, I was aware of the employees and employee compensation. The payments that I am referring to for Clay Ellis which were taken off the top, were  not paid to him as an cmploycc, as they were not rerated as employcc compensation. Clay Ellis made all decisions as though he owned LN Professional Management LLC., and Medical Management LLC., and he was compcnsated at the exact same rate at the legal owner of LN Professional Management LLC, Lewis Nichols. At the same time Clay Ellis was not the legal owner of LN Professional Managenrent LLC., and Medical Management LLC, he held him self out to all parties he was in-tact the owner of thcsc companics. lhis would have all believing Clay Ellis was the owner of these two companies and they could reasonably rely on his directions and representations, and reasonably believed him exercising cornplete and absolute dominion and control of these two companies was derived from his ownership thereof.

Even though Clay Ellis was not properly accounting for funds that should have gone to the Allied Companies' shareholders, he would manufacture statements for me to use to generate payments to the Allied Companics that those at the Allicd company shareholders would reccivc as an accurate and correct reflection of the funds. If Clay Ellis did not manufacture accounting, the Allied companies' shareholders would have received rnuch more revenue than they actually did.  Clay Ellis specifically directed me to write checks to the members of Allied Lab Solutions, including Williarn Franklin, M.D., and Toth II Enterprises, P.A. The amounts to those checks were always the net amounts after the monies off the top that Clay Ellis had directed be paid, including M.J. Cortez, but also himself and on multiple occasions one of his corporations, including one colporation which I understood was located in Colorado.

Clay Ellis always explained away inconsistent and arbitrary accounting. Over time, I found

**EXHIBIT E - 49**

their accounting to be suspect, I feared fraudulent accounting. I challenged Clay Ellis about these inaccuracies. My demand for strict accounting to Clay Ellis was met with fierce rejection and culminated in me leaving that company. I refused to be complicit in these fraudulent accounting schemes, and this unethical and fraudulent. In reality, I was one of the few Clay Ellis was unable to buy silence from.

All this suspicious activity was clearly known by Clay Ellis. Lewis Nichols, and MJ Cortez. It is equally clear that all three were aware of the scheme as they were recipients of the checks directed to be sent them by Clay Ellis. All three were clearly acting on concert as they received checks and payments and the statements reflecting the changing accounting and misstatements of revenue which were then sent to Allied Lab Solutions members. This was all done at the direction of Clay Ellis to me specifically and I was told to write the checks as those statements reflected."

139. Consequently, not only is there evidence of conspiracy between Clay Ellis, MJ Cortez and Lewis Nichols, there is implementation of that scheme to defraud members of ALS including Plaintiffs herein. The amounts of the losses, monies diverted are at a minimum the monies in excess of $2,425,725, and could run much higher as these are only the funds from Knox County Hospital District which were diverted and not reported.

140. Notably, Ellis in his deposition denied that any such funds from Knox County existed however, the CEO of Knox County attested to the contrary and attached copies of the actual checks written.

141. Skimming funds off the top, preparing false statements, disbursing those skimmed funds to other persons, Lewis Nichols and MJ Cortez, is evidence of a conspiracy to commit an unlawful act, to wit, fraud, money laundering and use of the US mails to perpetrate a fraud; however, in order to hold Defendant Ellis the act need only be wrongful andf involve and underlying tort, which taking someone else's money, preparing false reports to hide it, and lying about it is a certainly wrongful tort as outlined herein above in the listed causes of action.

EXHIBIT E - 50

Defendant's Traditional Motion for Summary Judgment

142.    Defendant has also moved for summary judgment claiming that aiding and abetting is not a trort and therefore it is entitled to a traditional summary judgment.  Defendant is procedurally improper.

143.    A claim that a pleading is incorrect or involves a cause of action that does not exist is subject to special exception.  Defendant in this case did not file any special exceptions to this portion of the pleading.

144.    Claiming this is a traditional motion for summary judgment, with no evidence in suport thereof, with no special exception previously filed, is a procedural error.

145.    This should be denied as it is not the vehicle to require Plaintiff to replead a cause of action.

        WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that the Court Strike Defendant Clay Ellis' Amended Motion for No-Evidence and Traditional Summary Judgment, and in the alternative, deny the Motion as filed, and for such other and further relief to which Plaintiffs may show themselves justly entitled, at law or in equity.

                                Respectfully submitted,

                                **COLLMER LAW GROUP**

                                By:      /s/Mark W. Collmer
                                        Mark W. Collmer
                                        State Bar No. 04626420
                                        Mark@collmerlaw.com
                                        Conrad B. Guthrie
                                        State Bar No. 45006102
                                        Conrad@collmerlaw.com
                                        3700 Montrose
                                        Houston, Texas 77006
                                        TEL:   (713) 337-4040
                                        FAX:   (713) 337-4044

                                        50

**EXHIBIT E - 51**

ATTORNEYS FOR PLAINTIFFS

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of foregoing instrument has been served on all counsel of record in accordance with the Texas Rules of Civil Procedure on September 6, 2022.

/s/Conrad B. Guthrie
Conrad B. Guthrie

51