# EXHIBIT 3

## AFFIDAVIT OF MARK W. COLLMER

State of Texas     §
                    §
County of Harris     §

Before me the undersigned authority on this day personally appeared Mark W. Collmer, known by me to the person is subscribed below and upon his oath did state as follows:

"My name is Mark W. Collmer. I am over the age of 18, have never been convicted of a crime or offense involving moral turpitude and have personal knowledge of the statements herein below.

I was an attorney of record in the following cases:
> (a) *Toth Enterprises II, P.A. and William Franklin, M.D. v. Clay Ellis,* No. D-1-GN-20-003469, in the 201st District Court, Travis County, Texas, filed July 2, 2020, ("Travis County Case") and
> (b) *Knox County Hospital District, vs. Toth Enterprises II, P.A., William Franklin, M.D., Allied Lab Solutions, LLC, Allied Lab Solutions Management, LLC, Clay Ellis, Lewis Nichols, LN Professional Management, LLC, and LN Professional Management LLC d/b/a Medical Management Professionals,* Cause No. 10301, in the 50th Judicial District Court of Knox County, Texas, filed May 23, 2022. ("Knox County case")

As an attorney of record in those cases, I was a recipient of the filings in those cases which were saved on my law firm computer. I have reviewed those in preparation for this Affidavit. The Exhibits attached and referenced herein are true and correct copies of the materials kept on the computer as filings in the respective cases.

### Travis County Case:
On November 11, 2020, Defendant Clay Ellis filed a No-evidence Motion for Summary Judgment in that case. Plaintiffs' Response to that Motion was filed on January 14, 2021. Included as attachments to that Response as evidence were the testimony of Clay Ellis, Declaration of Stephen A. Kuehler with attachments, and the Declaration of J. P. Forage, M.D. with attachments. The Court continued case. A copy of that response (without the attachments which are lengthy) is attached hereto as Exhibit A.

On August 19, 2022, Defendant Ellis filed an Amended No-Evidence Motion for Summary Judgment. As part of the Response to that Amended Motion, Plaintiffs filed the Unsworn Declaration of Larry Palmer ("Declaration of Larry Palmer"). Plaintiffs also filed the same Declarations and deposition excerpts as were filed in response to the Defendant Ellis' previous motion. The Response was filed on

September 6, 2022.

Defendant Ellis filed an Objection to the Declaration of Larry Palmer, a copy of which is attached. The gravaman of the objection was only that Palmer was not a witness disclosed in Responses to Requests for Disclosure. A copy of Ellis' Objection is attached as Exhibit B.

**Knox County Case:**
In the Knox County case, on October 4, 2022, the Declaration of Larry Palmer was filed as an attachment to a Response to the Joint Motion to Dismiss Interpleader and Vacate Order Granting Interpleader filed by Ellis, and others, including Lewis Nichols, LN Professional Management, LLC d/b/a Medical Management Professionals.

Defendant Nichols filed a Reply to that filing which did not include any contest that the Palmer Declaration was false. The only objection to the Declaration of Larry Palmer was contained in footnote 2 in which LN stated the following: "Movants herein move to strike the Unsworn Declaration of Larry Palmer as hearsay and conclusory." No contrary evidence from LN or Ellis was produced in direct contradiction to the Declaration of Larry Palmer. A copy of that Response, entitled "The LN Movants' Reply Brief Concerning Joint Motion to Dismiss Interpleader and Vacate Order Granting Interpleader" is attached as Exhibit C.

Neither Ellis not Lewis Nichols, LN Professional Management, LLC d/b/a Medical Management Professionals filed any affidavit proof from themselves as declarants that the statements in the Declaration of Larry Palmer were false, or inaccurate, for any of the above filings in the Travis County case or the Knox County case.

I had no indication that Mr. Palmer was going to recant what he testified to in his declaration until I heard about his testimony given at his deposition in this federal case on March 6, 2024.

Further affiant sayeth not."

Mark W. Collmer

Subscribed to and sworn to before me on this the 18th day of April 2024 .

Notary Public

Terri L Gehin
My Commission Expires
6/8/2026
Notary ID
1130494

Page 2 of 2

# Exhibit A

Cause No. D-1-GN-20-003469

| | | |
|---|---|---|
| TOTH ENTERPRISES II, P.A., AND | § | IN THE DISTRICT COURT OF |
| WILLIAM FRANKLIN, M.D. | § | |
| *Plaintiffs*, | § | |
| | § | |
| vs. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| CLAY ELLIS, | § | |
| *Defendant* | § | 201ˢᵗ JUDICIAL DISTRICT |

### PLAINTIFFS' MOTION FOR CONTINUANCE AND IN THE ALTERNATIVE, RESPONSE TO DEFENDANT CLAY ELLIS' TRADITIONAL AND NO-EVIDENCE MOTIONS FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Toth Enterprises II, P.A., and William Franklin, M.D., Plaintiffs in the above styled and captioned matter, and file this Motion for Continuance and in the alternative, Response to Defendant's Motion for Summary Judgment and would show unto the Court as follows:

### MOTION FOR CONTINUANCE

1.      Defendant's Motion for Summary Judgment is untimely.  The No-evidence Motion for Summary Judgment was filed three and a half months after Defendant filed his answer in this case. The parties had exchanged some minor written discovery but no substantial discovery had yet taken place.  Since then, Plaintiff has taken the deposition of Clay Ellis.  The transcript was received Monday, January 11, 2021 - this week!

2.      This lawsuit is based on the claim that Defendant Ellis failed and continues to fail to produce records of two companies for which he was the managing director and that he diverted funds properly due to Plaintiffs to himself.

3.      Under TRCP 166a, the no-evidence motion for summary judgment cannot be filed until the nonmovant has had "an adequate time for discovery".  Three and a half months for a multi-million

dollar wrongful diversion of funds, involving hundreds of individual lab tests and insurance reimbursements, hundreds of documents and pages, funneled through four companies, is not adequate time for discovery.

4.    After avoiding the service of process of this case, including denying who he was twice, only 3 ½ months elapsed between the time of Defendant's answer and the filing of the no-evidence motion.  The setting of the Motion itself was over the holidays to further impede any push for discovery.

5.    The following dates of events in this case are relevant to this discussion because not only do they indicate inadequate time for discovery has elapsed, Defendant's avoidance of service and suspicious conduct:

| | |
|---|---|
| July 2, 2020 | Plaintiffs file their suit against Clay Ellis for diverting and taking funds properly due them under various agreements.  The amounts are in the multiple millions of dollars. |
| July 11, 2020 | The process server goes to Ellis' residence and a man was coming out of the house.  The server told him he was looking for Clay Ellis, he was a process sever and had delivery for Ellis.  The man said Ellis was not there and said to try his office next week.  The server asked for the address and Ellis told him it is public record and drove off in a white pickup which was registered to Ellis. |
| July 16, 2020 | After an interim unsuccessful attempt, the process server rings the doorbell multiple times with no answer even though the pickup truck registered to Clay Ellis is parked at the home of Clay Ellis. The process server confirms a picture of Ellis looks like the person who denied being Ellis at the first attempt. |
| July 17, 2020 | Motion for Substituted Service is filed |
| July 20, 2020 | Court grants an Order for Substituted Service on Clay Ellis |
| July 31, 2020 | Defendant Ellis files an answer to the lawsuit. |

| | |
|---|---|
| Sept 23, 2020 | Plaintiffs send RFD's to Defendant Ellis |
| Oct 23, 2020 | Defendant Ellis responds to RFD's producing nothing, naming three witnesses - the two parties and Dr. J.P. Forage. |
| Nov 17, 2020 | Defendant Ellis files his Motion for Summary Judgment on Traditional and No-Evidence Grounds, claiming adequate time for discovery has elapsed. *The only evidence that Defendant produces is his Affidavit denying possession of the monies or the books and records of Allied Lab Solutions, LLC or Allied Lab Solutions Management, LLC.* |
| Nov 23, 2020 | Plaintiff send a request for production to Defendant |
| Dec 23, 2020 | Defendant responds producing no document of any kind, claiming to not have any documents of any kind. |

6.     Having avoided service, and in all likelihood misrepresented his identity to the process server, Defendant now files his Motion for Summary Judgment with limited discovery having been conducted.

7.     The filing of the lawsuit was preceded by Plaintiffs making demand on Clay Ellis to produce the books and records of the Allied Lab Solutions, LLC, and Allied Law Solutions Management, LLC.  Defendant Ellis did not produce the books and records despite this request.  Copies of those demands are attached hereto.

8.     Plaintiffs also attempted to subpoena banking records of LN Professional Management, LLC.  This entity, controlled by Lewis Nichols, prominent in this Response filed a motion to quash to prevent those records from being produced until a hearing could be held.  The Motion to Quash was filed December 10, 2020, not long before the Christmas holiday. This has yet to be heard and needs to be set for hearing.

10.     Plaintiff contemplated taking several other depositions and had time set aside but needed the

deposition of Defendant Ellis first as well as documents, since Ellis has produced none. The transcript of the deposition of Defendant Ellis arrived Monday this week.

11.     Plaintiff anticipates taking the depositions of the hospitals which paid monies to MMP to confirm the amount of the monies diverted.  They are expected to be in the many millions of dollars. The missing monies which have been determined so far are in the multiple millions of dollars.

12.     Plaintiff also anticipates taking the depositions of all persons in the intermediary company - MMP or LN Professionals.  Plaintiff can show that monies went from the hospitals to MMP, that was properly that of the subscribers to ALS, but that money never arrived.

13.     Plaintiff also anticipates identifying and securing financial information on Defendant Ellis' sudden windfall and lifestyle change as outlined herein below.

14.     Additionally, Plaintiffs wish to continue all no evidence motions until the completion of discovery as set forth in the Comment to Rule 166a, where it states that ordinarily a No-evidence Motion will be permitted after the conclusion of the discovery period, not before.  Given the documents and banking records intensity of this case, the matter should be treated thusly.

15.     Plaintiffs would submit that theses depositions and this discovery is necessary for a fair adjudication of this matter.

        WHEREFORE, PREMISES CONSIDERED, Plaintiffs request that this Court continue this matter from its present setting until the discovery can be completed.

### PLAINTIFFS' RESPONSE TO DEFENDANT'S TRADITIONAL AND NO-EVIDENCE MOTION FOR SUMMARY JUDGMENT

        Plaintiffs respond to Defendants Motion as follows:

### I.  Summary of Argument

16.     Despite Defendant's denial, and the untimeliness of Defendant's Motion, Defendant's Motion is without merit and contradicted by the Affidavits of Stephen Kuehler, J.P. Forage M.D., William Franklin, and the testimony of Defendant Clay Ellis taken in this case.

17.     As the Movant on the Traditional Motion for Summary Judgment, Defendant Ellis must show that as a matter of undisputed fact (1) he does not have any funds that are properly those of Plaintiffs William Franklin, M.D., or Toth Enterprises II, LLC, and (2) he does not have any books and records of Allied Lab Solutions, LLC, or Allied Lab Solutions Management, LLC.

18.     Defendant Ellis also claims that there is no evidence that he has any books and records of Allied Lab Solutions, LLC, or Allied Lab Solutions Management, LLC.  He also claims there is no evidence that he has any monies properly due to Plaintiffs William Franklin, M.D., and Toth Enterprises II, P.A.

19.     The only proof that Defendant Ellis has produced is his affidavit in which he denies having access to the bank accounts of ALS or ALS Management and therefore, he is not liable.

20.     However, Defendant Ellis is clearly an interested witness and the sole witness in support of his Motion for Summary Judgment.  Under Rule 166a,

> A summary judgment may be based on uncontroverted testimonial evidence of an interested witness, or of an expert witness as to subject matter concerning which the trier of fact must be guided solely by the opinion testimony of experts, if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted.

The Affidavit of Clay Ellis is contradicted by the Affidavits of JP Forage (present managing director/CEO of ALS and ALS Management) and Stephen Kuehler (CEO of Knox County Hospital District).  Moreover, the tale as recounted by Clay Ellis himself which forms the basis of his conclusory affidavit lacks credibility.   Additionally, because this traditional Motion for Summary

Judgment was filed at the inception of the case, before any substantial meaningful discovery had taken place, it could not be readily controverted.  Morever, since it is entirely dependent on Clay Ellis affidavit that he does not have any money distributed from the accounts of ALS or ALS Management, it could not be readily controverted.

21.     However, it is in fact controverted by the three primary persons - Stephen A. Kuehler, CEO of Knox County Hospital District, J.P Forage, M.D, present owner of ALS and ALS Management, and the testimony of Clay Ellis himself.

22.     A chart of the corporations involved is set forth below and as described herein below in detail, sets forth the flow of funds that is at issue.



This Chart shows that monies from the Hospital District which performed lab work flows to MMP and in turn is supposed to flow to ALS and its subscribers, including Plaintiffs herein.

23.     The evidence included herewith shows that substantial monies, in excess of $5,000,000 are missing, having flowed from the Knox County Hospital District to MMP, but it never was

distributed to the ALS or its subscribers.

24.    Clay Ellis claims that no more money came into MMP early 2019.[1]  He claimed that MMP a/k/a LN Professionals has no revenue and has had no revenue since the Spring of 2019.[2] Consequently, there was no more money to send to ALS Management in trust to disburse to subscribers William Franklin and Toth Enterprises II.  Clay Ellis also testified that he was working for both MMP and ALS Management at the same time.[3]   He also testified that of the 5 employees at MMP, he being one of them, none of the others - Lewis Nichols, M.J. Cortez, Rebecca Smith, or Dama White - ever took money that was not theirs.[4]  And yet, money is missing.

25.    Stephen A. Kuehler testifies that not only were there monies paid to MMP, but he produces the Monthly Reports for each of those months.   He also produces the checks written to MMP from May 2019 to June 2020.  He also produces a chart which sets forth the amounts paid for each month of the relationship between all these parties.[5]

26.    According to the Chart, the payments made by Knox County Hospital District to MMP from May 2019 till June 2020 are as follows:

| 5/9/2019 | $3,282.327.93 |
| 6/11/2019 | $1,035.884.75 |
| 7/10/2019 | $188,136.57 |

---

[1]Deposition of Clay Ellis, page 84, lines 11-16, attached as Exhibit A.

[2]Deposition of Clay Ellis, page 85, lines 15-21.

[3]Deposition of Clay Ellis, page 135, lines 14-23.

[4]Deposition of Clay Ellis, page 117, lines 8-20.

[5]See Affidavit of Stephen Q. Kuehler, attached hereto as Exhibit B.

| | |
|---|---|
| 8/14/2019 | $27,752.96 |
| 9/17/2019 | $16,885.78 |
| 10/17/2019 | $19,229.21 |
| 11/19/219 | $148,740.03 |
| 12/12/2019 | $184,024.16 |
| 01/14/2020 | $38,329.28 |
| 2/13/2020 | $47,671.61 |
| 3/19/2020 | $26,689.12 |
| 4/14/2020 | $13,992.17 |
| 5/13/2020 | $6,571.25 |
| 6/16/2020 | $619,414.61 |
| 7/14/2020 | $52,432.67 |

27.     The total amount of these funds sent to MMP for which it is undisputed were not sent on the

to subscribers, including Plaintiffs herein is $5,764,082.08.  This represents 75% of the net received

by Knox County Hospital District during this time.[6]  The gross to ALS and its subscribers would

have been $3,074,177.11with $3,043,435.34 to be distributed to the subscribers.  With each unit

having the value of 1/100th of that number of $30,434.35, Plaintiff William Franklin, M.D. has lost

$91,303.06 (3 units) and Toth Enterprises II, P.A., has lost $2,556,485.69.[7]  Those are funds

disbursed by Knox County Hospital District which never arrived to be held in trust for disbursing

by ALS Management.

28.     This establishes that money properly due the subscribers of ALS was sent to MMP.  Clay

---

[6]See Declaration of Stephen A. Kuehler, attached as Exhibit B.

[7]See Declaration of J. P. Forage, M.D., attachments of Monthly Reports, attached hereto
as Exhibit C.

Ellis was working at MMP during this time frame and since then as well up till the present.

29.     At the other end of the money flow, it is undisputed that William Franklin and Toth Enterprises II, PA., did not receive any funds after April 2019.  However, the Declaration of J.P. Forage also states no monies were received from MMP after April 2019.  He includes with his Declaration as the custodian of business records for ALS and ALS Management that records that he has in his possession, and the Monthly Reports.  There are none after April 2019.[8]

30.     Therefore, the missing money is at the middle level - MMP.  Defendant Ellis testified that there were 5 people working at MMP: Lewis Nichols, Clay Ellis, M.J. Cortez, Dana White, and Rebecca Smith.[9]  Ellis was asked as to each person whether he had ever known Lewis Nichols, M.J. Cortez, Rebecca Smith, or White to ever take money that was not theirs, in other words to steal or embezzle.  As to each person, he said "never."[10]  This leaves only one person left by Defendant Ellis' own admission - himself.

31.     There are several charts setting forth the relationships of the various entities and two charts setting for the money disbursement based on the Declarations and documents.

32.     A man suddenly coming into great wealth would be hard pressed to bury it in the back yard and do nothing with it.  Looking at the sudden lifestyle changes of Defendant Ellis, it appears that he has done just that.  In the section below setting forth the lifestyle changes, the new million dollar home, the new airplane (not new to him, but new), these changes are noted.  They are not necessary but are certainly consistent with what Plaintiffs allege happened and Ellis' role.  There may be others

---

[8]See Declaration of J.P. Forage, M.D., attached hereto as Exhibit  C.

[9]Deposition of Clay Ellis, page 86, lines 3-17.

[10]Deposition of Clay Ellis, page 117, lines 8-20.

involved, but his role is laid out here.

33.     Additionally, Defendant appears to have attempted to avoid service by denying he was who he was.  The process server has filed an affidavit in this matter setting forth the efforts and apparent denials of Mr. Ellis as to his identity.  The behavior is not that of an innocent man.

34.     Additionally, as his story as to the books and records is not "clear, positive, direct, free from inconsistencies and could be readily controverted" as is required.  As noted herein below, he is evasive, changes his story, describes a story that is changing and unbelievable.  As the movant, he is required to prove as a matter of undisputed fact that he does not have the books and records.  The only proof is his affidavit.  Upon further examination in his deposition, that affidavit and his story about the books, as well as the Declaration of JP Forage establish that he did not turn over the books and records as he claimed.  His explanation about destroying his computer, or getting a virus, (he cannot decide which) is itself incredible and suspicious.  In light of the missing monies, his sole testimony should be rejected and the Motion in all respects denied.

35.     Consequently, his affidavit cannot support a traditional Motion for Summary Judgment.  In every case, the evidence is to the contrary.

## II.  Background and Evidence Overview

36.     Plaintiffs sued Defendant Ellis claiming that he wrongfully has monies due Plaintiffs. Plaintiffs are subscribers to Allied Lab Solutions, LLC.  The monies paid to Allied Lab Solutions are handled by Allied Lab Solutions Management, LLC.  This company holds monies in trust pending their distribution to the subscribers of Allied Lab Solutions according to the number of units owned by the particular subscriber.  William Franklin, M.D., owns 3 units and Toth Enterprises II, P.A., owns 84 units.  The total number of units is 100.

37.     Lab Services, i.e., the actual testing and running of the labs, are done by several hospitals, including Knox County Hospital District Hospital.  Other services for each of the patients for whom labs are ordered are performed by the subscriber doctors.  These include creating requisition slips for the laboratory, setting up a facility for holding and storing laboratory samples (e.g., some have to be frozen, some centrifuged), explaining what the labs to be performed to the patient, what laboratory and its significance.  Later when the lab results come in, other services include interpreting the lab, determine if there is any urgent need, or if so, then contacting patient immediately to explain to patient the urgency and what needs to be done.

38.     Medical Management Professionals (MMP) serves as the facilitator for these services, picking up samples, and confirming that services and lab are performed.

39.     The hospital services for performing the lab are billed to the appropriate insurance carrier and hopefully paid by that carrier.

40.     The funds received by the hospital, after the expenses are deducted, are then distributed as follows: 25% retained by the hospital, 35% to MMP, and 40% to Allied Lab Solutions Management, LLC to be distributed to the subscribers.  William Franklin, M.D., and Toth Enterprises II, P.A., were subscribers, owning 3 units and 84 units respectively out of 100 units.  ALS Management functions as a trustee receiving and distributing the funds when they are received.[11]  For those services, ALS Management receives 1% of the monies received, i.e., 1% of the 40% received for distribution to the subscribers.[12]

---

[11]Deposition of Clay Ellis, page 78, lines 12-17.

[12]Deposition of Clay Ellis, page 114, lines 21 to page 115, line 2.

### III. **Entities Involved**

41.     The entities involved are as follows as well as their role is set forth below:

a.     <u>Knox County Hospital District</u> - performed lab services and sent and received billing for lab services.  Of the funds received for lab services, it retained 25% and sent the remaining 75% to LN Professionals.

b.     <u>Glen Rose Medical Center</u> - performed lab services and sent and received billing for lab services.  Of the funds received for lab services, it retained 25% and sent the remaining 75% to LN Professionals.

c.     <u>LN Professionals, LLC</u> - middleman company where Clay Ellis now works and is his primary employer.  Owned by Lewis Nichols (hence the "LN") which received funds from the hospitals for lab services reimbursemnts.  Those funds were redistributed to ALS and its subscribers, including Plaintiffs herein Williams Franklin, M.D., and Toth II Enterprises, LLC.

d.     <u>MMP</u> - a/k/a for Medical Management Professionals which itself was another name for LN Professionals, LLC.

e.     <u>Medical Management Professionals</u> - another name for the middle man LN Professionals, LLC.

f.     <u>Allied Lab Solutions, LLC</u> - laboratory data and patient management company for whom Clay Ellis was the managing director.  Set up by Clay Ellis and the corporate structure of ALS and ALS Management were determined by Ellis.  Redistributed to Plaintiffs William Franklin, M.D., and Toth Enterprises II, LLC. Was paid a 1% handling fee.

g.   Allied Lab Services Management, LLC - corporate managing entity for ALS.  Set up by Clay Ellis.  Sole function of Ellis was to receive funds and redistribute them to the subscribers, which included Plaintiffs.

h.   William Franklin, M.D. - Plaintiff herein, and a subscriber to Allied Lab Solutions, LLC. Was entitled to 3% of any net funds received by ALS under the subscriber agreement.  As a medical professional responsible for management of these patients, he was actually performing medical services, not simply

i.   Toth Enterprises II, LLC. - Plaintiff herein, and a subscriber to Allied Lab Solutions, LLC. Was entitled to 84% of any net funds received by ALS under the subscriber agreement.

## IV.   Plaintiffs' Witnesses in Support of the Response to MSJ - Traditional & No-Evidence

42.   Relevant witnesses for purposes of this Response to Defendant's Motion for Traditional and No-evidence Summary Judgment are as follows:

43.   Stephen A. Kuehler - CEO of Knox County Hospital District; sent approximately $2,450,000 dollars to MMP a/k/a LN Professionals which never made it to ALS or Plaintiffs William Franklin and Toth Enterprises II, LLC, from May 2019 to June 2020.  Mr. Kuehler has supplied a Declaration proving up the checks and Monthly reports from May 2019 to June 2020 reflecting that MMP received $2,450,000 in checks for funds under the Agreement between Knox County and MMP/LN Professionals.  Those funds were to be redistributed to ALS and from there to Plaintiffs.  It also appears that the largest check, May 2019, was also not distributed to ALS subscribers William Franklin, M.D., and Toth Enterprises II, P.A.[13]  The primary contact for Knox County Hospital and

---

[13]See Declaration of Stephen A. Kuehler, attached hereto as Exhibit B.

Stephen A. Kuehler was Clay Ellis.

44.     Clay Ellis - Defendant and architect of the set-up of the three level billing scheme and as evidence indicates, holder of funds to which he is not entitled.  Provided an affidavit claiming that he has received no monies which should be the property of Plaintiffs.  Basically, a general denial answer verified by Defendant Clay Ellis.  Denies having any documents of ALS/ALS Management. Claims to have given them to JP Forage, CEO/Managing Director of ALS/ALS Management and then he destroyed the computer. Denies having any records or any monies.  His deposition casts substantial doubt on his affidavit and his story.  That is outlined herein below in detail.

45.     Jean-Pierre Forage, M.D. - current Managing Director/CEO of Allied Lab Services, LLC, and Managing Director/CEO of Allied Lab Services Management, LLC.  Confirms that no monies were received after April 2019.  Proves up the Monthly Reports with the breakdown of monies received prior and that the other monies, which would have deserved equal treatment, did not arrive.

46.     William Franklin, M.D. - subscriber and partial owner of ALS to whom monies received by ALS were to be redistributed to him.

## V.     Ellis denies having monies due William Franklin, M.D., or Toth Enterprises II, P.A. - the proof is otherwise

47.     Ellis' Motion for Summary Judgment is based on Ellis' single affidavit that his mere denial is sufficient to sustain summary judgment.  This is legally incorrect since it is the affidavit of an interested witness.  In fact, it is nothing more than a simple, verified denial.

48.     Defendant Ellis was deposed on the issue of the missing money December 21, 2020.  In his deposition, he claimed that there was no money in his possession and that in fact, there was no money due ALS or ALS Management for redistribution to the subscribers after April 2019.  This is

simply false. This is the time at which Ellis is believed to have diverted funds due to the subscribers of ALS but LN Professionals a/k/a Medical Management Professionals continued to receive substantial funds which should have been rendered downstream to Plaintiffs.

49.    A Monthly Report is generated for every payments from Knox County Hospital District to payments to MMP. Of the funds received by Knox County HD, 25% of the funds are kept by the hospital, and the remainder is sent to MMP.   Ellis admits this in his deposition.[14]  Ellis further admits that of the funds received by MMP, 35% is kept by MMP and the remainder is distributed to ALS for distribution to the subscribers.[15]

50.    MMP did not send any more funds to ALS/ALS Management after April 2019. However, MMP continued to receive payments from Knox County Hospital District. The CEO of Knox County HD, Stephen A. Kuehler, testified in his Declaration that $2,425,725.17 was sent to MMP from May 2019 to June 2020.

51.    Therefore, at least $2,425,725.17 is missing from May 2019 to June 2020 and unaccounted for at the middle level, the level at which Clay Ellis is presently employed. The April 2019 payment to Knox County Hospital District in the amount of $4,655,200.29, which resulted in a payment to MMP in the amount of $3,282,327.93 is also unaccounted for. As set forth on the Chart attached herto, Plaintiffs would have been entitled to: $51,992.07 - William Franklin, M.D., and $1,455,778.09 - Toth Enterprises II, P.A.

52.    Clay Ellis claimed in his deposition that MMP had no revenue after April 2019.[16]  This was

---

[14]Deposition of Clay Ellis, page 109, line 18.

[15]Deposition of Clay Ellis, page 110, line 24 through page 111, line 9.

[16]Deposition of Clay Ellis, page 84, lines 11-16 and page 85, lines 18-21

a lie. Copies of the checks from Knox County, one of several providers, prove that to be incorrect with not just the Monthly Reports from the Hospital to MMP but also the Checks to MMP.[17]

53.    Clay Ellis claimed that MMP was still in business but had received no funds and that the company was just going through the motions with no revenue.[18]  This was a demonstrably untrue.

54.    Clay Ellis admits that there are 5 employees of LN Partners a/k/a MMP.  (Deposition of Clay Ellis, pg. 86/ln.3-7). When asked for each one of those persons if they took money that was not theirs, he stated unequivocally that they had not.[19]

55.    *Since we know $2,425,725, at a minimum, is missing, and further that it is missing at the MMP level of redistribution, and that Ellis lied about revenue, and no one else at the company by Ellis' admission took any funds that were not theirs, the only person left is Ellis who has these funds.*

**VI.    Examples of Distribution - one done correctly and a second, shows missing money**

56.    Based on the evidence and the calculations contained in the Declarations and the testimony of Clay Ellis, it is possible to illustrate how the money distribution worked and how much is missing from just one month - May 2019.

57.    The following are taken from the Monthly Reports attached to the Declaration fo Stephen A. Kuehler.  In the first example, the last month that MMP redistributed funds in accordance with their agreements, the funds were sent as required.

---

[17]See Declaration of Stephen A. Kuehler, attached as Exhibit B.

[18]Deposition of Clay Ellis, page 86, line 3 through page 88, line 3 and page 138, lines 17-21.

[19]Deposition of Clay Ellis, page 117, lines 8-20.



Money in April was sent as required.  However, in the very next month, the largest payment went missing and was not forwarded.  The damages to Plaintiffs are set forth on the chart and the calculations from the Monthly Report of Knox County Hospital District.



17

## VII.   Ellis Lifestyle Changes

58.     Significantly, Ellis did not produce a complete ledger of distributions to Ellis or one of his controlled companies, Clayisawsome, LLC, or Clayisreallyawsome, LLC. Ellis denied receiving any money from MMP since April 2019.[20]

59.     Clay Ellis is not a degreed professional. He has no license other than a driver's license.[21] He has no obvious means of substantial support other than his employment with MMP prior to May 2019.[22] His salary from MMP has never been six figures with no bonus distributions on top of that.[23] However, Ellis' lifestyle certainly raises the suspicion of ill-gotten gains. He has two aircraft - a 2018 Cirrus SR22T and a Beechcraft B200 - that he owns. He has a house worth upwards of, if not over, $1,000,000.[24]

60.     The Ellis buying spree apparently began in May 2017 when he sold his house at 1315 Elkins Lane, Cedar Park, Texas 78613 valued at $354,461.[25] Within a month, actually 6/19/2017, he purchased a home at 303 Nautilus, Lakeway, Texas valued at $766,939 (2017 tax valuation) and $845,771 (2018 valuation).[26]

61.     Not content with this substantial upgrade, he then went on another buying spree in 2018

---

[20]Deposition of Clay Ellis, page 84, lines 11-16 and page 85, lines 18-21.

[21]Deposition of Clay Ellis, page 8, lines 14-16.

[22]Deposition of Clay Ellis, page 150, lines 1-5.

[23]Deposition of Clay Ellis, page 150, lines 1-10.

[24]See Travis County Appraisal District appraisal attached hereto as Exhibit D.

[25]See Williamson County Appraisal District Report attached hereto as Exhibit E, second page reflecting sale.

[26]See Travis County Appraisal District appraisal attached hereto as Exhibit D.

purchasing a new Cirrus SR-22T, a turbo-charged luxury aircraft. Ellis agreed it cost around $700,000 new.[27] This is the second in his fleet of aircraft but represented a substantial upgrade from the Beechcraft 200 he had already owned.[28]

62.     Within one year after Ellis sells his interest in ALS and ALS Management and begins to work one level up in the money stream, he suddenly comes into substantial revenue allowing his lifestyle change. However, also within less than a year, the money stops flowing downstream from MMP to ALS and the subscribers. Mr. Ellis then destroys the records of ALS in his possession, and according to him, he gives it to Goodwill, since he typically gets rid of his computers every two years.

63.     All of this is certainly evidence upon which reasonable minds of a juror might conclude that Ellis has taken monies not his. The only monies missing are those due to the subscribers of ALS, including Plaintiffs herein.

### Books and records of Allied Lab Solutions & Allied Lab Solutions Management

64.     Ellis denies have any books and records of ALS or ALS Management. His only proof of this is his one sentence denial in his affidavit that states: "Since 2018, I have not had possession over any books and records of ALS Management or ALS."

65.     Ellis was deposed on this precise point. His story about the books and records of ALS and ALS Management is tortured and confusing. He presents a multiple choice approach to the books and records.

66.     First, Ellis postulates that the records were given to J.P. Forage, M.D., the successor owner

---

[27]Deposition of Clay Ellis, page 153, lines 21-24.

[28]Deposition of Clay Ellis, page 153, lines 17-20.

of ALS Management.[29]  However, Dr. Forage in his declaration attests that he does not have complete books and records.  In fact, Ellis has not produced books and records of accounting prior to the time he took responsibility for the distributions for ALS and ALS Management, nor did he give them to Dr. Forage.

67.     Second, Ellis claims that he books and records were on his home computer and when he sold the company to Dr. Forage, he no longer had access to the files on his own computer, which he admits were on his home computer, that he owned and was still in his house.  This strains credulity for anyone who has ever owned a computer.

68.     Third, Ellis claims that the books and records, some of them anyway, are in some Cloud account to which he no longer has access and cannot remember whether it is Excel or some other "Cloud" account.[30]

69.     Fourth, Ellis claims that this computer on which the books and records of ALS and ALS Management were stored was: Option 1 - given to Goodwill because he throws away his computers every two years ("doesn't everybody" he testified)  or Option 2 - it got a virus and had to be replaced.[31]

70.     It is undisputed that Ellis is the last person to have complete books and records of ALS and ALS Management.  It is similarly undisputed that even after he sold the company to Dr. Forage he still had those records in his possession and on his computer.

---

[29]Deposition of Clay Ellis, page 312, lines 7-10.

[30]Deposition of Clay Ellis, page 37, line 23 through page 38, line 11 and page 38, lines12-16.

[31]Deposition of Clay Ellis, page 131, lines 2-4.

71.     These are the facts from Clay Ellis' deposition on this subject:

   a.     He set up the companies ALS and ALS Management.[32]

   b.     He solely determined how they were to be set up.[33]

   c.     He paid for the set up and the attorneys. [34]

   d.     As part of his duties, he maintained the books and records of ALS and ALS Management.[35]

   e.     He was the bookkeeper for ALS and ALS Management.[36]

   f.     He set up the accounting and was solely responsible for this.[37]

   g.     He determined the type of software to use.[38]

   h.     Ellis says the records were on a computer he owned and was in his house. [39]

   i.     When he sold the company he did not had over the ALS/ALS Management computer over to the new owner.[40]

   j.     When asked the question of "where is that computer?" , he responded "That's a good

---

[32]Deposition of Clay Ellis, page 2, lines 15-17 and page 41, line 8 through page 42, line 2.

[33]Deposition of Clay Ellis, page 27, lines 3-5 and lines 9-24.

[34]Deposition of Clay Ellis, page 27, lines 6-8 and lines 16-18.  Also page 41, line18 through page 2, line 2.

[35]Deposition of Clay Ellis, page 123, lines 7-11.

[36]Deposition of Clay Ellis, page 26, lines 17-19.

[37]Deposition of Clay Ellis, page 30, lines 9-15.

[38]Deposition of Clay Ellis, page 32, lines 5-8.

[39]Deposition of Clay Ellis, page 32, lines 9-17.

[40]Deposition of Clay Ellis, page 32, lines18-23.

question.  I don't have that computer or any of them - for that matter." [41]

k.      He says he gave this computer to Goodwill.[42]

l.      This was his decision.[43]

m.      Claims that he is in the habit of giving away his computer every two years.[44]

n.      Does not know if he had a backup in the Cloud of the books and records.[45]

o.      Claims he is "barely literate when it comes to computers".[46]

p.      Did not keep a copy of the books and records of this company.[47]

q.      Did not keep any copy of the books and records on a zip drive.[48]

r.      The books and records existed on his computer "in [his] Excel program, among other locations on his computer.[49]

s.      When he sold ALS and ALS Management, he claims that he no longer had access to the books of those companies, even though it was on the computer sitting in his

---

[41]Deposition of Clay Ellis, page 32, lines 24 through page 33, line 1.

[42]Deposition of Clay Ellis, page 33, lines 2-4.

[43]Deposition of Clay Ellis, page 33, lines 9-12.

[44]Deposition of Clay Ellis, page 33, lines 9-12.

[45]Deposition of Clay Ellis, page 33, lines 22-25.

[46]Deposition of Clay Ellis, page 33, lines3-4.

[47]Deposition of Clay Ellis, page 34, lines10-12.

[48]Deposition of Clay Ellis, page 34, lines13-14.

[49]Deposition of Clay Ellis, page 34, lines 13-14.

house in his home office.[50]

    t.      Has no proof that he gave this computer to anyone.[51]

72.    Demand was made on Ellis to produce the books and records of ALS and ALS Management which he had in his possession.  This demand was by a letter demand.  Although Ellis had a lawyer call for him in response, no records were forthcoming, nor did he at that time deny having any records.

73.    The current CEO/Managing Director of ALS and ALS Management, J.P Forage, M.D., did not receive complete records from Ellis either.

74.    The following facts are forth in the Affidavit of J.P. Forage, M.D. and contradict the testimony of Defendant Clay Ellis:

    a.      "The only records of Allied Lab Solutions, LLC, and Allied Lab Solutions Management, LLC, that I was provided were given to me by Clay Ellis and consisted of a box containing Subscription Agreements for the members of Allis Lab Solutions and banking information with the account numbers for all the accounts"

    b.      Therefore, all the other records of the company prior to when he took over the company were missing

    c.      This would include every records, payment, receipt calculation, tax return, K-1 return for the prior years 2016-2018 were missing from what was given to Dr. Forage

    d.      Dr. Forage does not have complete records of Allied Lab Solutions, LLC, since its inception

---

[50]Deposition of Clay Ellis, page 39, line16 through page 40, line 15.

[51]Deposition of Clay Ellis, page 41, lines 9-13.

e.   Nor does he have possession of complete records of Allied Lab Management Solutions, LLC, since its inception.

f.   Even though these companies existed since 2016, he does not have books and records from the commencement of the company to the time that he assumed his present position other than the Subscription Agreements.

g.   He has not destroyed any records and has diligently searched for books and records in his possession.

75.   Clay Ellis did not provide the books and records of times prior to when Dr. Forage took over the company obligations in May 2018 although he has admitted that he had them.  He is the last known person to have those complete books and records.  Ellis has simply denied having anything, thinks he may have been on a computer which he gave away sometime.

76.   Because this is a Traditional Motion for Summary Judgment on the books and records of Allied Lab Solutions, LLC, and Allied Lab Solutions Management, LLC, Ellis has the burden to show by undisputed evidence that is clear, positive and direct that he is not in possession of these records.  At most, he has simply denied having them, has no clear explanation for what happened to them, and the only explanation for why he no longer has that computer is that he "throws away his computers every couple of years"…"doesn't everyone?".

77.   This testimony, on which Ellis bears the burden of proof does not meet the 166a standard. In reality, if those records are in fact destroyed, Plaintiffs are entitled to an instruction on spoliation at the time of trial. Regardless, at this time, with this evidence, Defendant is not entitled to summary judgment based on his simple denial, clearly not when he admits that he had them.

78.   On the No-Evidence Motion for Summary Judgment that Ellis be commanded to turn over

24

the books and records and that he be enjoined to do so, the last person who admitted to be in

possession of the ALS records is Defendant Ellis. He admitted that he generated those records, kept

them on his computer in his home, and including after he sold ALS and ALS Management to Dr. J.

P. Forage.[52]

### **Standard of Proof that Defendant must meet to be entitled to Summary Judgment**

79.     To obtain relief through a traditional motion for summary judgment, the movant must

establish that no issue of material fact exists and that it is entitled to judgment as a matter of law.

A defendant who moves for summary judgment must either disprove at least one element of each

of the plaintiff's causes of action or plead and conclusively establish each essential element of any

affirmative defense, thereby rebutting the plaintiff's causes of action.  An issue is conclusively

established "if reasonable minds could not differ about the conclusion to be drawn from the facts in

the record." [53]

80.     If the nonmovant presents more than a scintilla of evidence to support the challenged ground,

the court should deny the motion.[54]  A genuine issue of material fact exists if the nonmovant

---

[52]"Sale of the company" is a grand term for what was actually done, which was for $1 or "a small amount, Ellis would not admit to the amount just that it was "low. See Deposition of Clay Ellis, page 23, line 20 to page 21, line 13. Dr. Forage had the obligations that Ellis has previously been doing to disburse funds sent to ALS for redistribution to the subscribers.  As is shown in the other documents, once Forage came on, Ellis took steps to throttle the funds upstream so that they were diverted prior to coming to ALS or ALS Management.

[53]Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen, 525 S.W.3d 671, 681 (Tex. 2017) (citing Childs v. Haussecker, 974 S.W.2d 31, 44 (Tex. 1998)).

[54]See Forbes, Inc. v. Granada Biosciences, 124 S.W.3d 167, 172 (Tex. 2003); King Ranch v. Chapman, 118 S.W.3d 742, 750 (Tex. 2003); Wal-Mart Stores, Inc. v. Rodriguez, 92 S.W.3d 502, 506 (Tex. 2002)

produces more than a scintilla of evidence establishing the existence of the challenged element.[55]
Less than a scintilla of evidence exists when the evidence is so weak as to do no more than create
a mere surmise or suspicion of fact.[56]

81.    More than a scintilla of evidence exists when the evidence rises to a level that would
enable reasonable and fair minded people to differ in their conclusions.[57]

82.    Plaintiffs would submit that the evidence is clear despite Defendant's denial, that moniesdue
these subscribers - Plaintiffs herein - is missing.  The evidence is also clear that Defendant Ellis who
set up this three level scheme, quit working for ALS, moved upstream and then within a short time,
substantial money ceased being sent to the ALS Management to hold in trust for the subscribers.

83.    Reasonable minds could certainly conclude that the missing money, the lifestyle changes, the
new aircraft, the milion dollar home for a man who never was paid six figures by his employer yet
suddenly has all these new assets, indicates that perhaps this is the explanation.

84.    Moreover, from Defendant's own testimony, no one else who worked at MMP or LN
Professional Management/LN Professionals took any money and yet the money is missing.
Reasonable minds could conclude that Defendant has these funds, ill-gotten.

85.    Defendant's Motion also addresses the injunctive relief claiming that in the absence of a
cause of action, no injunctive relief can issue.  This is largely irrelevant since there is substantial

---

[55]See Ford Motor Co. v. Ridgway, 135 S.W.3d 598 (Tex. 2004); Morgan v. Anthony, 27 S.W.3d 928 (Tex. 2000).

[56]See Special Car Servs. v. AAA Texas, Inc., No. 14-98-00628-CV, 1999 Tex. App. LEXIS 4200 (Tex. App.—Houston [14th Dist.] June 3, 1999, no pet.) (not design. for pub.); Medrano v. City of Pearsall, 989 S.W.2d 141, 143 (Tex. App.—San Antonio 1999, no pet.).

[57]See Ford Motor Co. v. Ridgway, 135 S.W.3d 598.

evidence upon which the claims of Plaintiffs rest.

86.     Defendant's Motion should be denied in its entirety.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that the Court grant Plaintiffs

Motion for Continuance, and in the alternative, deny Defendants' Motions for Summary Judgment

in their entirety, and for such other and further relief to which Plaintiffs may show themselves justly

entitled at law or in equity.

Respectfully submitted,

**COLLMER LAW GROUP**

By:      /s/Mark W. Collmer
         Mark W. Collmer
         State Bar No. 04626420
         Mark@collmerlaw.com
         Conrad B. Guthrie
         State Bar No. 45006102
         Conrad@collmerlaw.com
         3700 Montrose
         Houston, Texas 77006
         TEL:   (713) 337-4040
         FAX:   (713) 337-4044

ATTORNEYS FOR PLAINTIFFS

STATE OF TEXAS                      §
                                   §
COUNTY OF HARRIS                    §

BEFORE ME, the undersigned authority, on this day personally appeared Mark W. Collmer, attorney for Plaintiffs in the above entitled and numbered cause of action, and stated that he is cognizant of the facts and allegations in the above and foregoing Motion for Continuance and that the allegations contained therein are true and correct.

_____
MARK W. COLLMER.

SUBSCRIBED AND SWORN to before me on this ___14th___ day of January 2021.

_____
Notary Public

CONRAD BRUCE GUTHRIE
My Notary ID # 125917757
Expires January 20, 2024

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of foregoing instrument has been served on all counsel of record in accordance with the Texas Rules of Civil Procedure on January 14, 2021.

/s/Conrad B. Guthrie
Conrad B. Guthrie

28

# Exhibit B

CAUSE NO. D-1-GN-20-003469

TOTH ENTERPRISES II, P.A., and           §           IN THE DISTRICT COURT
WILLIAM FANKLIN, M.D.,                    §
   *Plaintiff*s,                            §
                                             §           201st JUDICIAL DISTRICT
v.                                        §
                                             §
CLAY ELLIS,                               §
   *Defendant*.                             §           TRAVIS COUNTY, TEXAS

## DEFENDANT CLAY ELLIS'S OBJECTION TO
## UNSWORN DECLARATION OF LARRY PALMER

Defendant Clay Ellis ("**Ellis**") files his Objection to Unsworn Declaration of Larry Palmer and respectfully shows the Court as follows:

**A.**    **Plaintiffs Did Not Previously Disclose Larry Palmer As A Witness.**

On September 9, 2022, Plaintiffs served their response to Ellis's amended motion for summary judgment, which included as an attachment the Unsworn Declaration of Larry Palmer ("**Palmer Declaration**").[1]  Prior to that date, Plaintiffs had never before disclosed Larry Palmer as a witness in response to requests for disclosure or any other discovery response.[2]

Under Rule 193.6 of the Texas Rules of Civil Procedure, discovery that is not timely disclosed and witnesses who are not timely identified are inadmissible as evidence.  *Fort Brown Villas III Condo. Ass'n, Inc. v. Gillenwater*, 285 S.W.3d 879, 881 (Tex. 2009).  The sanction of exclusion of such evidence is automatic, and a party complaining of the failure to disclose need not move to compel or seek sanctions as an intermediate step.  *Cresson Interest, LLC v. Rooster*,

---

[1] Plaintiffs' response to Ellis's motion for summary judgment bears a file-stamp of September 6, 2022.  Plaintiffs' Response to Defendant Clay Ellis' No-Evidence and Traditional Motions for Summary Judgment (Amended) ("**Response**") at 1.  However, it was not served on counsel for Ellis until September 9, 2022.  Exhibit A, Affidavit of Jeff Hobbs ("**Hobbs Aff.**") at ¶ 5 and Exhibit A-1.  *See also* Response at Automated Certificate of eService (showing service on Ellis's counsel on September 9, 2022 at 10:57:27 a.m.).  In addition, the record of electronic signature for William Franklin's declaration attached to Plaintiffs' response shows that William Franklin viewed and electronically signed his declaration on September 7, 2022, the date after the Response was purportedly filed. Response at Exhibit H, Unsworn Declaration of William G. Franklin, M.D.
[2] Exhibit A, Hobbs Aff. at ¶¶ 3, 4, 6 and Exhibit A-1 and Exhibit A-2.

**Defendant Clay Ellis's Objection to Affidavit of Larry Palmer – Page 1 of 3**

No. 02-21-00366-CV, 2022 WL 3904968, at *4 (Tex. App.—Fort Worth Aug. 31, 2022, no pet. h.) (mem. op.).  A party offering the undisclosed evidence has the burden to establish good cause for the untimely disclosure or a lack of unfair surprise or prejudice the other parties, and a finding of good cause of lack of unfair surprise or unfair prejudice must be supported by the record.  TEX. R. CIV. P. 193.6(a).  The evidentiary exclusion under Rule 193.6 applies equally to trials and summary judgment proceedings.  *Gillenwater*, 285 S.W.3d at 881-82; *Cresson Interest, LLC*, 2022 WL 3904968, at *4.

Plaintiffs offer no evidence of good cause for their untimely disclosure of Larry Palmer, nor evidence of lack of surprise or lack of unfair prejudice to Ellis.  Accordingly, Ellis objects to the Palmer Declaration and moves that it be stricken from the summary judgment record.  *See, e.g., Gillenwater*, 285 S.W.3d at 882 (holding trial court properly exercised its discretion in excluding summary judgment affidavit of expert who was not timely disclosed prior to summary judgment response); *Cresson Interest, LLC*, 2022 WL 3904968, at *5 (holding trial court properly exercised discretion in striking summary judgment declarations of witnesses whom plaintiff failed to disclose prior to summary judgment response).

Respectfully submitted,

/s/ *Jeff Hobbs*

**JEFFREY J. HOBBS**
State Bar No. 24012837
**ARMBRUST & BROWN, PLLC**
100 Congress Avenue, Suite 1300
Austin, Texas  78701
Telephone (512) 435-2300
Telecopier (512) 435-2360
Email:  jhobbs@abaustin.com

**ATTORNEYS FOR DEFENDANT
CLAY ELLIS**

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the above and foregoing instrument to be delivered via electronic service and email to the following counsel on September 13, 2022.

Mark W, Collmer
mark@collmerlaw.com
COLLMER LAW GROUP
3700 Montrose
Houston, Texas 77006
Fax:  (713) 337-4044

Jim Clements
jim@clementsfirm.com
Clements Legal Services, P.C.
9442 Capital of Texas Hwy. N.
Arboretum Plaza One, Suite 500
Austin, Texas 78759
Fax:  (512) 961-3281

_____/s/ *Jeff Hobbs*_____
Jeff Hobbs

# Exhibit A

CAUSE NO. D-1-GN-20-003469

| | | |
|---|---|---|
| TOTH ENTERPRISES II, P.A., and | § | IN THE DISTRICT COURT |
| WILLIAM FANKLIN, M.D., | § | |
|    *Plaintiffs*, | § | |
| | § | 201st JUDICIAL DISTRICT |
| v. | § | |
| | § | |
| CLAY ELLIS, | § | |
|    *Defendant*. | § | TRAVIS COUNTY, TEXAS |

## AFFIDAVIT OF JEFF HOBBS

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

Before me, the undersigned notary, on this day, personally appeared Jeff Hobbs, a person whose identity is known to me. After I administered an oath to him, upon his oath, he said:

1.     My name is Jeff Hobbs. I am over 18 years of age, have never been convicted of a felony, and am capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2.     I am the attorney of record for Defendant Clay Ellis in the above-styled case. As counsel for that party, I am familiar with the pleadings, written discovery requests and responses, and other papers filed and served by the parties in this case.

3.     Attached to this affidavit as **Exhibit A-1** is a true and correct copy of an email sent on September 23, 2020 by my assistant Martha Adams to Mark Collmer, attorney of record for the Plaintiffs in this case, with a copy to me, transmitting Defendant's First Set of Interrogatories and First Requests for Production to Plaintiffs and Defendant's Requests for Disclosure to Plaintiffs, and attached to that email are true and correct copies of those discovery requests.

**Affidavit of Jeff Hobbs – Page 1 of 2**

4.     Attached to this affidavit as Exhibit A-1 is a true and correct copy of Plaintiffs'
Response to Request for Disclosure from Defendant Clay Ellis, which was served by counsel for
Plaintiffs on October 23, 2020.

5.     Attached to this affidavit as **Exhibit A-3** is a true and correct copy of an email
notification of service I received on September 9, 2022 for Plaintiffs' Response to Defendant
Clay Ellis' No-Evidence and Traditional Motions for Summary Judgment (Amended)
("**Response**").   I did not receive a copy of the Response prior to receiving that email on
September 9, 2022.

6.     Prior to receiving the Response on September 9, 2022, at no time had Plaintiffs or
their counsel in this case disclosed Larry Palmer as a person with relevant knowledge in response
to Defendant's Requests for Disclosure to Plaintiffs, or as a relevant witness in this case in any
other discovery response.

Jeff Hobbs

Signed under oath before me on September 12, 2022.

MARTHA ANN ADAMS
Notary Public, State of Texas
Notary ID# 267719-7
My Commission Expires
JANUARY 30, 2025

Notary Public, State of Texas

**Affidavit of Jeff Hobbs – Page 2 of 2**

# Exhibit A-1

## Jeff Hobbs

| | |
|---|---|
| **From:** | Martha Adams |
| **Sent:** | Wednesday, September 23, 2020 2:20 PM |
| **To:** | 'mark@collmerlaw.com' |
| **Cc:** | Jeff Hobbs |
| **Subject:** | Toth Enterprises, et al. v. Clay Ellis |
| **Attachments:** | Clay Ellis First Set of Interrogatories and First Request for Production to Plaintiffs.pdf; Clay Ellis Request for Disclosure to Plaintiffs.pdf |

Attached are the following in the above-referenced matter:

1. *Defendant's First Set of Interrogatories and First Requests for Production to Plaintiffs*; and
2. *Defendant's Request for Disclosure to Plaintiffs.*

Thank you,
Martha



**Martha Adams**
Legal Secretary to Jeff Hobbs
Tara Allen Esteves
Michael J. Whellan
and Bruce Scrafford
Armbrust & Brown, PLLC
100 Congress Avenue, Suite 1300
Austin, Texas 78701-2744
(512) 435-2363 - Direct
(512) 435-2360 - Facsimile
madams@abaustin.com
www.abaustin.com



THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS CONFIDENTIAL AND IS INTENDED ONLY FOR THE NAMED ADDRESSEE(S). THIS MESSAGE MAY BE PROTECTED BY ATTORNEY/CLIENT PRIVILEGE. IF THE READER OF THIS E-MAIL MESSAGE IS NOT AN INTENDED RECIPIENT (OR THE INDIVIDUAL RESPONSIBLE FOR THE DELIVERY OF THIS E-MAIL MESSAGE TO AN INTENDED RECIPIENT), BE ADVISED THAT ANY REUSE, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS E-MAIL MESSAGE IS PROHIBITED. IF YOU HAVE RECEIVED THIS E-MAIL MESSAGE IN ERROR, PLEASE NOTIFY THE SENDER AND DELETE THE MESSAGE. THANK YOU.

CAUSE NO. D-1-GN-20-003469

| | | |
|---|---|---|
| TOTH ENTERPRISES II, P.A., AND | § | IN THE DISTRICT COURT |
| WILLIAM FANKLIN, M.D., | § | |
|    *Plaintiffs*,. | § | |
| | § | 201ST JUDICIAL DISTRICT |
| v. | § | |
| | § | |
| CLAY ELLIS, | § | |
|    *Defendant*. | § | TRAVIS COUNTY, TEXAS |

## DEFENDANT'S FIRST SET OF INTERROGATORIES AND
## FIRST REQUESETS FOR PRODUCTION TO PLAINTIFFS

     Defendant Clay Ellis hereby serves its First Set of Interrogatories and First Requests for

Production on Plaintiffs Toth Enterprises II, P.A. and William Franklin, M.D.  Written responses

and any objections to the requests herein, and all documents responsive to the requests, are due

on or before 30 days from the date of service at the offices of  Clay Ellis's counsel.

                      Respectfully submitted,

                        */s/ Jeffrey J. Hobbs*
                        **JEFFREY J. HOBBS**
                        State Bar No. 24012837
                        **ARMBRUST & BROWN, PLLC**
                        100 Congress Avenue, Suite 1300
                        Austin, Texas  78701
                        Telephone (512) 435-2300
                        Facsimile (512) 435-2360
                        jhobbs@abaustin.com
                        **ATTORNEYS FOR DEFENDANT**
                        **CLAY ELLIS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a true and correct copy of the above and foregoing instrument to be delivered via electronic service and email to the following counsel on September 23, 2020.

Mark W, Collmer
mark@collmerlaw.com
COLLMER LAW GROUP
3700 Montrose
Houston, Texas 77006
Fax: (713) 337-4044

/s/ Jeff Hobbs
Jeff Hobbs

## DEFINITIONS

"**Lawsuit**" means the lawsuit styled *Toth Enterprises II, P.A. and William Franklin, M.D. v. Clay Ellis*, Cause No. D-1-GN-20-003469 in the 201st District Court, Travis County, Texas.

"**Toth**" means Toth Enterprises II, P.A., a Plaintiff in the Lawsuit, and includes its offers, directors, employees, agents, and representatives.

"**Franklin**" means William Franklin, M.D., a Plaintiff in the Lawsuit, and includes his employees, agents, and representatives.

"**Ellis**" means Clay Ellis, a Defendant in the Lawsuit, and includes his employees, agents, and representatives.

"**Petition**" means Plaintiffs' Original Petition for Damages and for Injunctive Relief filed in the Lawsuit.

"**ALS**" means Allied Lab Solutions, LLC, and includes its managers, members, employees, agents, and representatives.

"**ALS Management**" means Allied Lab Solutions Management, LLC, and includes its managers, members, employees, agents, and representatives.

"**Allocations**" has the same meaning as used throughout the Petition.

"**Person**" means any natural person, corporation, general partnership, limited partnership, limited liability partnership, limited liability company, firm, association, joint venture, organization, or other entity.

"**Communication**" means any communication, oral or written, and includes without limitation statements, discussions, in-person conversations, telephone conversations, voice messages, remarks, questions, inquiries, requests, applications, notices, demands, answers, responses, e-mails, letters, text messages, notes, memoranda, and facsimiles.

"**Any**" means any and all.

"**And**" and "**or**" mean and/or.

"**Document**" is defined to be synonymous in meaning and equal in scope to the usage of this phrase in Texas Rule of Civil Procedure 192.3(b), and includes, but is not limited to, any tangible things, papers, letters, facsimiles, invoices, bills, statements, e-mails, text messages, books, notes, accounts, drawings, plats, plans, maps, sketches, surveys, graphs, charts, photographs, electronic or videotape recordings, data, and data compilations, and includes documents, data and information in electronic and/or magnetic form.  A draft of a non-identical copy is a separate document within the meaning of this term.

"**Regarding**" when specifying a document, communication, or subject matter, shall mean any document or communication that constitutes, contains, embodies, reflects, identifies, states, refers to, relates to, deals with, or is any manner whatsoever pertinent to that subject.

## INTERROGATORIES

1.    If Toth or Franklin allege any misrepresentation of Ellis that supports their claims in the Lawsuit, provide the following information for each alleged misrepresentation:

    (a)    The date the misrepresentation was made;

    (b)    The person who communicated the misrepresentation;

    (c)    The person to whom the misrepresentation was communicated;

    (d)    The substance of the misrepresentation;

    (e)    Whether the misrepresentation was oral or transmitted written, electronically, or otherwise;

    (f)    If the misrepresentation was written, the Bates numbers or other information to sufficiently identify the document containing the misrepresentation;

    (g)    If the misrepresentation was oral, identify all persons who witnessed the misrepresentation.

2.  If Toth or Franklin claim that Ellis controlled, managed, or governed ALS Management during 2019 or 2020, describe all facts supporting that contention.

3.  If Toth or Franklin claim that Ellis controlled, managed, or governed ALS during 2019 or 2020, describe all facts supporting that contention.

4.  If Toth or Franklin claim that Ellis had access to the books and records of ALS Management during 2019 or 2020, describe all facts supporting that contention.

5.  State the total amount, in dollar and cents, of "funds of the members of ALS, including Plaintiffs" that Ellis took and absconded with, as alleged in Paragraph 11 of the Petition.

6.  Describe all facts supporting the allegation in Paragraph 14 of the Petition that "Ellis is actually in possession of those books," including but not limited to the physical location of those materials.

## REQUESTS FOR PRODUCTION

Please produce the following:

1.  The Amended and Restated Company Agreement of Allied Lab Solutions, LLC, as referenced in Paragraph 7 of the Petition, and any amendments thereto.

2.  All documents regarding the allegation in Paragraph 10 of the Petition that "[t]he business of ALS continued to be profitable except the monies were not given to their rightful owners, i.e., the members of ALS."

3.  All annual and monthly profit and loss statements for ALS from 2018 to the present.

4.  All documents regarding the allegation in Paragraph 11 of the Petition that "[r]ather than make the Allocations as provided for under the Agreement, Clay Ellis took funds of the Members of ALS, including Plaintiffs herein, and absconded with them."

5.  All documents regarding the allegation in Paragraph 12(a) of the Petition that Clay Ellis "[c]laim[ed] that the company, Allied Lab Solutions, LLC, as going to take bankruptcy, and thus, not to expect monies . . . ."

6.  All documents regarding the allegation in Paragraph 12(b) of the Petition that Clay Ellis "[withheld] any annual reports or monthly reports on funds received by Allied Lab Solutions, LLC."

7.  All documents regarding the allegation in Paragraph 12(c) of the Petition that Clay Ellis "[r]epresent[ed] that the company was ceasing to do business and no more funds should be expected while continuing to accept funds on behalf of the company and then absconding with those funds."

8.  All documents regarding the allegation in Paragraph 12(d) of the Petition that Clay Ellis "[d]ivert[ed] funds which were properly those of Plaintiffs and other members of Allied Lab Solutions, LLC, to himself."

9.  All documents regarding the allegation in Paragraph 12(e) of the Petition that Clay Ellis "[s]ecret[ed] the books and refus[ed] to allow their inspection and despite notice and demand to inspect the book [sic] and records of the corporation."

10. All communication between Toth and Ellis regarding a request for inspection or access to the books and records of ALS.

11. All communications between Franklin and Ellis regarding a request for inspection or access to the books and records of ALS.

12. All communication between Michelle Hollie and Ellis regarding a request for inspection or access to the books and records of ALS.

13. All communications between Michelle Hollie and Ellis regarding a request for inspection or access to the books and records of ALS.

14. All documents regarding Allocations from ALS to Franklin.

15. All documents regarding Allocations from ALS to Toth.

14. All communications between Toth and Ellis regarding any Allocations for which Toth seeks recovery in the Lawsuit.

15. All communications between Toth and Ellis regarding any Allocations for which Toth seeks recovery in the Lawsuit.

16. All communications between Toth and any person regarding any Allocations for which Toth seeks recovery in the Lawsuit.

17. All communications between Toth and any person regarding any Allocations for which Toth seeks recovery in the Lawsuit.

18. All communications between Michelle Hollie and Ellis regarding any Allocations for which Toth seeks recovery in the Lawsuit.

19. All communications between Michelle Hollie and Ellis regarding any Allocations for which Toth seeks recovery in the Lawsuit.

20. All communications between Michelle Hollie and any person regarding any Allocations for which Toth seeks recovery in the Lawsuit.

21. All communications between Michelle Hollie and any person regarding any Allocations for which Toth seeks recovery in the Lawsuit.

22. All documents regarding the allegation in Paragraph 24 of the Petition that "for three years previously distributions were received on a regular monthly basis from ALS to the members."

23. All communication between Toth and ALS regarding a request for inspection or access to the books and records of ALS.

24. All communications between Franklin and ALS regarding a request for inspection or access to the books and records of ALS.

25. All communication between Toth and ALS Management regarding a request for inspection or access to the books and records of ALS.

26. All communications between Franklin and ALS Management regarding a request for inspection or access to the books and records of ALS.

27. All communication between Toth and any person regarding a request for inspection or access to the books and records of ALS.

28. All communications between Franklin and any person regarding a request for inspection or access to the books and records of ALS.

29. All communication between Toth and ALS regarding a request for inspection or access to the books and records of ALS.

30. All communications between Michelle Hollie and ALS regarding a request for inspection or access to the books and records of ALS.

31. All communication between Michelle Hollie and ALS Management regarding a request for inspection or access to the books and records of ALS.

32. All communications between Michelle Hollie and ALS Management regarding a request for inspection or access to the books and records of ALS.

33. All communication between Michelle Hollie and any person regarding a request for inspection or access to the books and records of ALS.

34. All communications between Michelle Hollie and any person regarding a request for inspection or access to the books and records of ALS.

35. All contracts or agreements between Toth and any person or entity operating a business that competes with ALS.

36.     All contracts or agreements between Franklin and any person or entity operating a business that competes with ALS.

CAUSE NO. D-1-GN-20-003469

| | | |
|---|---|---|
| TOTH ENTERPRISES II, P.A., AND | § | IN THE DISTRICT COURT |
| WILLIAM FANKLIN, M.D., | § | |
| *Plaintiffs,.* | § | |
| | § | 201ST JUDICIAL DISTRICT |
| v. | § | |
| | § | |
| CLAY ELLIS, | § | |
| *Defendant.* | § | TRAVIS COUNTY, TEXAS |

## DEFENDANT'S REQUEST FOR DISCLSOURE TO PLAINTIFFS

Pursuant to Rule 194 of the Texas Rules of Civil Procedure, Defendant Clay Ellis requests that Plaintiffs disclose, within thirty (30) days of service of this request, the information or material described in Rule 194.2(a)-(l).

Respectfully submitted,

*/s/ Jeffrey J. Hobbs*
**JEFFREY J. HOBBS**
State Bar No. 24012837
**ARMBRUST & BROWN, PLLC**
100 Congress Avenue, Suite 1300
Austin, Texas 78701
Telephone (512) 435-2300
Facsimile (512) 435-2360
jhobbs@abaustin.com
**ATTORNEYS FOR DEFENDANT**
**CLAY ELLIS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a true and correct copy of the above and foregoing instrument to be delivered via electronic service and email to the following counsel on September 23, 2020.

Mark W, Collmer
mark@collmerlaw.com
COLLMER LAW GROUP
3700 Montrose
Houston, Texas 77006
Fax: (713) 337-4044


＿＿＿/s/ *Jeff Hobbs*＿＿＿＿＿＿＿＿＿＿＿＿＿
Jeff Hobbs

# Exhibit A-2

Cause No. D-1-GN-20-003469

| | | |
|---|---|---|
| TOTH ENTERPRISES II, P.A., AND | § | IN THE DISTRICT COURT OF |
| WILLIAM FRANKLIN, M.D. | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| CLAY ELLIS, | § | |
| *Defendants* | § | 201st JUDICIAL DISTRICT |

## **PLAINTIFFS' RESPONSE TO REQUEST FOR DISCLOSURE**
## **FROM DEFENDANT CLAY ELLIS**

TO:     Defendant Clay Ellis by and through his attorney of record, Jeffrey J. Hobbs, ARMBRUST & BROWN, PLLC, 100 Congress Avenue, Suite 1300, Austin, Texas 78701

COME NOW, TOTH ENTERPRISES II, P.A., AND WILLIAM FRANKLIN, M.D., Plaintiffs in the above-referenced matter, and in accordance with Rule 194.2 of the Texas Rules of Civil Procedure serve this Response to Request for Disclosure from Defendant Clay Ellis providing the`following information:

(a)     The correct names of the parties to the lawsuit;

**RESPONSE**

Plaintiffs
Toth Enterprises II, P.A.
William Franklin, M.D.

Defendant
Clay Ellis

(b)     The name, address, and telephone number of any potential parties;

**RESPONSE**

Discovery is incomplete and in its inception.  Will supplement if appropriate.

(c)     The legal theories and, in general, the factual bases of the responding party's claims or defenses (the responding party need not marshal all evidence that may be offered at trial);

**RESPONSE**

With regard to the **factual basis**, please see Plaintiffs' Original Petition in relevant part which states:

Plaintiffs Toth Enterprises II, P.A., and William Franklin, M.D., are members of Allied Lab Solutions, LLC ("ALS"). ALS is involved in providing certain management, administrative and/or marketing services to a another company, LN Management, and other services. LN Management is involved in providing lab and billing services for various medical providers. ALS is operated under an "Amended and Restated Company Agreement of Allied Lab Solutions, LLC.

Under the Agreement with Allied Lab Solutions, LLC, Plaintiffs are entitled to Allocations in accordance with their percentage ownership. Those Allocations are to be made at a minimum annually, but in practice were made more frequently.

Allied Lab Solutions, LLC (ALS) has a "Board of Managers", as that term is defined in the Amended and Restated Company Agreement of Allied Lab Solutions ("the Agreement"). The Board of Managers "means the governing body of the Company, having all the rights, duties and powers of the managers of a limited liability company under the Law, subject to the terms of this Agreement." The Initial Board of Managers under the Agreement consisted of one entity, managed, governed and thus, controlled by Clay Ellis, to wit, Allied Lab Solutions Management, LLC (ALS Management).

The business of Allied Lab Solutions, LLC, continued profitably from its inception. During 2019 or 2020, the exact date is unknown to Plaintiffs, Clay Ellis ceased making Allocations which would otherwise have been due. The business of ALS continued to be profitable except the monies were not given to their rightful owners, i.e., the Members of ALS.

Rather than make the Allocations as provided for under the Agreement, Clay Ellis took funds of the Members of ALS, including Plaintiffs herein, and absconded with them.

As part of his scheme to defraud and continuing to take funds which were not his but those of the Members of Allied Lab Solutions, LLC, he took several steps to hide his actions, including:

    a.    Claiming that the company, Allied Lab Solutions, LLC, was going to take bankruptcy, and thus, not to expect any monies but this never happened;

    b.    Withholding any annual reports or monthly reports on funds received by Allied Lab Solutions, LLC;

    c.    Representing that the company was ceasing to do business and no more funds should be expected while continuing to accept funds on behalf of the company and then absconding with those funds;

        d.      Diverting funds which were properly those of Plaintiffs and other Members of Allied Lab Solutions, LLC, to himself;

        e.      Secreting the books and refusing to allow their inspection despite notice and demand to inspect the book and records of the corporation.

By virtue of controlling, managing and governing Allied Lab Solutions Management, LLC, Clay Ellis had access to the books and records of Allied Lab Solutions, LLC, which is properly maintained would have revealed this conversion of funds of the Members of ALS.

Defendant Ellis is actually in possession of those books and has refused to produce same.

Under Section 8.2 of the Agreement, the officers of the Company, to wit, including Clay Ellis, as Managing Partner and Director of ALS, "subject to the oversight of the Board of Managers, shall keep the books of account and records relative to the Company's business." The Board of Managers consists of one entity, ALS Management, controlled solely by Clay Ellis. Therefore, the Board of Managers in essence provides no supervision over the officers of the Company since they are one in the same.

Consequently, when demand was made on Clay Ellis to produce the books and records of the Company, he was obligated to produce the books and records for inspection. They were not to this date produced and their exact location and state remain unknown.

With regard to the **legal basis**, please see Plaintiffs' Original Petition in relevant part which states:

<u>Money Had and Received</u>

Defendant is liable to Plaintiffs for a claim for Money Had and Received.

Defendant Ellis has access to funds which were not his, and were the property of Plaintiffs. The exact amount of the funds is unknown but historically, the funds distributed were in the millions of dollars per year. Suddenly and mysteriously with no explanation, Defendant Ellis has no funds to distribute and refuses to produce Books and Records in his possession for an accounting of those funds, their receipt and the net amounts which were the Allocations of the Members, including Plaintiffs herein.

The funds taken by Ellis and in his control should be returned to the Plaintiffs in equity and good conscience. Plaintiffs have the superior right to those funds.

Additionally, to the extent that any of the funds have been converted into other types

3

of assets, including aircraft, real estate, or stock accounts, same should be forfeited to the Members of ALS, with the Allocation that should have been given to Plaintiffs returned to them.

Plaintiffs also sue for conversion.

<u>Tolling of the Statute of Limitations</u>

Defendant's conduct tolls the running of any statute of limitations.  This tolling is continuing as Defendant has refused to produce the Book and Records of ALS and continues to refuse to produce same.  Withholding information, withholding the accounting, withholding information of the amounts received by ALS and thus, the Allocated amounts due, tolls the running of any statute of limitations, contractual or statutory.

See Plaintiffs' Answers to Interrogatories for additional information, including narrative description in Answer to No. 1.

(d)     The amount and any method of calculating economic damages;

**RESPONSE**

Because Defendant has not produced the requested reports, and discovery is in its inception in this case, the amount is not yet known but is believed to be in excess of $1,000,000.  Plaintiffs will supplement as is appropriate.

(e)     The name, address, and telephone number of persons having knowledge of relevant facts, and a brief statement of each identified person's connection with the case;

**RESPONSE**

William Franklin, M.D.
c/o Collmer Law Group
3700 Montrose, Suite 100
Houston, Texas 77006
(713) 337-4040
*Plaintiff*

Clay Ellis
303 Nautilus Avenue
Lakeway, Texas 78738
c/o
Jeffrey J. Hobbs
ARMBRUST & BROWN, PLLC
100 Congress Avenue, Suite 1300

4

Austin, Texas 78701
(512) 435-2300
*Defendant*

Michelle Holle
Chief Executive Officer
Victory Medical
4303 Victory Drive
Austin, TX  78704
office 512-462-3627
*Present at meetings, familiar with Defendant*
Lewis Nichols
Chief Executive Officer and Director
LN Professional Management LLC
d/b/a Medical Management Professionals
13581 Pond Springs Road
Austin, Texas 78729
512-585-3742
Lnichols3458@gmail.com
*LN Professionals and LN Professionals Management officer*

Jean-Pierre Forage, M.D.
Director
Allied Lab Solutions Management, LLC
2121 Lohman's Crossing Road, Suite 504410
Lakeway, Tx 78734-5217
512-970-4900
jforage@austin.rr.com
*Familiar with Allied Lab Solutions Management books/witnesses/records missing*

Dr. Jean-Pierre Forage
Director
Allied Lab Solutions, LLC
1841 S Lakeline Blvd, Suite 101140
Cedar Park, Tx 78613
512-970-4900
jforage@austin.rr.com
*Familiar with Allied Lab Solutions books/witnesses/records missing*

Plaintiffs also disclose any and all persons with knowledge of relevant facts disclosed by any and all other parties in this case.

(f)     For any testifying expert:

(1)     the expert's name, address, and telephone number;

## RESPONSE

Discovery is in its inception. Plaintiffs will supplement and disclose any retained experts and their information at the time of Plaintiffs' Expert Designation.

**Other witnesses as potential expert witnesses:**

Further, to the extent they may express opinions during factual and/or expert testimony, Plaintiffs may call the following hostile witnesses, adverse witnesses, and/or witnesses identified by any Defendant in this matter (pursuant to Rule 182 of the Texas Rules of Civil Procedure and/or pursuant to Rule 610 of the Texas Rules of Evidence and/or the case law thereunder) as expert witnesses herein:

(1)     Any of the expert witnesses designated in the future by the defendant(s) herein.

(2)     Any of the persons identified in any Defendant's Answers to Plaintiffs' Interrogatories herein (and/or named in the documents produced by said Defendant and attached to their respective Answers to Plaintiffs' Interrogatories); and,

(3)     Any of the persons listed in any Defendant's Production Responses to Plaintiffs' Production Requests herein (and/or named in the documents produced by said Defendant and attached to their respective Production Responses to Plaintiffs' Production Requests).

(4)     Any of the persons listed in any Defendant's Responses to Request for Disclosure herein (and/or named in the documents produced by said Defendant and attached to their respective Responses to Plaintiffs' Requests for Disclosure).

(5)     Plaintiffs reserve the right to dispute the qualifications and opinions of any such designated experts.

(6)     Plaintiffs further reserve the right to designate and present expert opinion testimony of rebuttal witnesses to evidence presented by any defendant that cannot, at this time, be reasonably anticipated.

**Other potential experts:**

Because not all witnesses in this action have been deposed, and because documentary discovery is incomplete, it is difficult to determine the full scope of the subject matter and issues these witnesses will be called to testify about and Plaintiffs may be unable to state at this time all subjects on which experts may testify.  To the degree that additional discovery makes it necessary, Plaintiffs reserve the right to supplement or

amend his expert designation.

Plaintiffs reserve the right to withdraw or de-designate the designation of any expert prior to testimony, and to positively aver that such previously designated expert will not be called as a witness at trial and to re-designate that expert as a consulting only expert who cannot be called by opposing counsel.

(2)    the subject matter on which the expert will testify;

**RESPONSE**

Discovery is in its inception. Plaintiffs will supplement and disclose any retained experts and their information at the time of Plaintiffs' Expert Designation.

(3)    the general substance of the expert's mental impressions and opinions and a brief summary of the basis for them, or if the expert is not retained by, employed by, or otherwise subject to the control of the responding party, documents reflecting such information;

**RESPONSE**

Discovery is in its inception. Plaintiffs will supplement and disclose any retained experts and their information at the time of Plaintiffs' Expert Designation.

(4)    if the expert is retained by, employed by, or otherwise subject to the control of the responding party:

(A)    all documents, tangible things, reports, models, or date compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert's testimony; and

**RESPONSE**

Discovery is in its inception. Plaintiffs will supplement and disclose any retained experts and their information at the time of Plaintiffs' Expert Designation.

(B)    the expert's current resume and bibliography;

**RESPONSE**

Discovery is in its inception. Plaintiffs will supplement and disclose any retained experts and their information at the time of Plaintiffs' Expert

Designation.

(g)    Any discoverable indemnity and insuring agreements;

**RESPONSE**

Not applicable to Plaintiffs.

(h)    Any discoverable settlement agreements;

**RESPONSE**

None at this time.

(i)    Any discoverable witness statements;

**RESPONSE**

None at this time.

(j)    In a suit alleging physical or mental injury and damages from the occurrence that is the subject of the case, all medical records and bills that are reasonably related to the injuries or damages asserted or, in lieu thereof, an authorization permitting the disclosure of such medical records and bills;

**RESPONSE**

Not applicable.

(k)    In a suit alleging physical or mental injury and damages from the occurrence that is the subject of the case, all medical records and bills obtained by the responding party by virtue of an authorization furnished by the requesting party;

**RESPONSE**

Not applicable.

(l)    the name, address, and telephone number of any person who may be designated as a responsible third party.

**RESPONSE**

None known to Plaintiffs at this time.

8

Respectfully submitted,

**COLLMER LAW GROUP**

By:     /s/ Conrad B. Guthrie
          Mark W. Collmer
          State Bar No. 04626420
          Conrad B. Guthrie
          State Bar No. 45006102
          3700 Montrose Blvd., Suite 100
          Houston, Texas 77010
          TEL:  (713) 337-4040
          FAX:  (713) 337-4044
          ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and correct copy of the above and foregoing instrument has been served upon all known counsel of record in accordance with the Texas Rules of Civil Procedure by the Texas electronic filing service on this the 23rd day of October 2020.

          /s/Conrad B.Guthrie
          Conrad B.Guthrie

### Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Conrad Guthrie on behalf of Mark Collmer
Bar No. 4626420
funkydoctor.conrad@gmail.com
Envelope ID: 47494442
Status as of 10/23/2020 10:03 PM CST

Associated Case Party: Toth Enterprises II, P.A.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark W.Collmer | | mark@collmerlaw.com | 10/23/2020 10:01:38 PM | SENT |

Associated Case Party: William Franklin, M.D.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Conrad Guthrie | | conrad@collmerlaw.com | 10/23/2020 10:01:38 PM | SENT |

Associated Case Party: Clay Ellis

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jeff Hobbs | | jhobbs@abaustin.com | 10/23/2020 10:01:38 PM | SENT |

# Exhibit A-3

**Jeff Hobbs**

| | |
|---|---|
| **From:** | no-reply@efilingmail.tylertech.cloud |
| **Sent:** | Friday, September 9, 2022 11:00 AM |
| **To:** | Jeff Hobbs |
| **Subject:** | Notification of Service for Case:  D-1-GN-20-003469, TOTH ENTERPRISES VS ELLIS for filing Answer/Response, Envelope Number: 68100214 |



# Notification of Service

Case Number: D-1-GN-20-003469
Case Style: TOTH ENTERPRISES VS ELLIS
Envelope Number: 68100214

This is a notification of service for the filing listed. Please click the link below to retrieve the submitted document. If the link does not work, please copy the link and paste into your browser. You can also obtain this document by following the steps on this article.

| Filing Details | |
|---|---|
| **Case Number** | D-1-GN-20-003469 |
| **Case Style** | TOTH ENTERPRISES VS ELLIS |
| **Date/Time Submitted** | 9/9/2022 10:57 AM CST |
| **Filing Type** | Answer/Response |
| **Filing Description** | Plaintiffs' Response to Defendant Clay Ellis' No-Evidence and Traditional Motions for Summary Judgment (Amended) |
| **Filed By** | Conrad Guthrie |
| **Service Contacts** | TOTH ENTERPRISES II PA:<br><br>Mark Collmer (mark@collmerlaw.com)<br><br><br>WILLIAM FRANKLIN:<br><br>Conrad Guthrie (conrad@collmerlaw.com)<br><br><br>CLAY ELLIS:<br><br>Jeff Hobbs (jhobbs@abaustin.com)<br><br><br>LN PROFESSIONAL MANAGEMENT LLC: |

| | Jim Clements (jim@clementsfirm.com) |
|---|---|

| Document Details | |
|---|---|
| **Served Document** | Download Document |
| This link is active for 30 days. | |

# Exhibit C

**CAUSE NO. 10301**

| | | |
|---|---|---|
| **KNOX COUNTY HOSPITAL DISTRICT,** | § | **IN THE DISTRICT COURT** |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **TOTH ENTERPRISES II, P.A.,** | § | |
| **WILLIAM FRANKLIN, M.D., ALLIED** | § | **50th JUDICIAL DISTRICT** |
| **LAB SOLUTIONS, LLC, ALLIED LAB** | § | |
| **SOLUTIONS MANAGEMENT, LLC,** | § | |
| **CLAY ELLIS, LEWIS NICHOLS, LN** | § | |
| **PROFESSIONAL MANAGEMENT** | § | |
| **LLC, AND LN PROFESSIONAL** | § | |
| **MANAGEMENT LLC D/B/A MEDICAL** | § | |
| **MANAGEMENT PROFESSIONALS** | § | |
| *Defendants.* | § | **KNOX COUNTY, TEXAS** |

## THE LN MOVANTS' REPLY BRIEF CONCERNING JOINT MOTION TO DISMISS INTERPLEADER AND VACATE ORDER GRANTING INTERPLEADER

NOW COME Defendants Lewis Nichols, LN Professional Management, LLC d/b/a Medical Management Professionals ("LN Defendants") and Clay Ellis (collectively, "LN Movants"), and file this Reply Brief Concerning Joint Motion to Dismiss Interpleader And Vacate Order Granting Interpleader, and would show the Court as follows:

## I.     INTRODUCTION

1.     The ALS Defendants' Response To The Joint Motion To Dismiss Interpleader And Vacate Order Granting Interpleader, Request For Enforcement And For Injunctive Relief (hereafter "Response") is legally flawed and contains several serious misstatements of fact. The Joint Motion To Dismiss was filed by, among other parties, the plaintiff herein, Knox, through its newly substituted attorneys, and with full knowledge and permission of Knox. The LN Movants would show that interpleader is not appropriate in this case, and that this action should never have been filed by Knox's former attorney, Kelly Dawson.  A fundamental requirement for

interpleader is entirely lacking in this case: that Knox be exposed to multiple liability. The fact that the ALS Defendants have made certain claims against the LN Defendants cannot justify an interpleader here, as those alleged claims could not possibly be asserted against Knox. But this is not the only fatal flaw in the ALS Defendants' allegations. The ALS Defendants have no standing to make their claims, which are nonetheless meritless. Indeed, the ALS Defendants showed their hand and abandoned these identical claims in the prior-filed Travis County suit.

## II.      THE FIRM OF DUANE MORRIS LLP NOW REPRESENTS KNOX

2.      The ALS Defendants state in paragraph 4 of their Response that Duane Morris LLP does not have permission to appear and substitute in as new counsel. This is false. An unopposed motion to substitute was granted via an Order dated September 27, 2022, a copy of which is attached hereto as **Exhibit A**. As indicated in the motion to substitute, Knox requested the substitution, and all counsel, including the lawyer for the ALS Defendants and Knox's former counsel, Kelly Dawson, consented to it, or at a minimum, did not oppose it.

## III.     KNOX'S FORMER ATTORNEY HAS NUMEROUS CONFLICTS AND FILED THE INTERPLEADER FOR HIS OWN PERSONAL GAIN

3.      Plaintiff's former counsel, Kelly Dawson, has numerous conflicts in this matter, which are the subject of a Motion To Disqualify Counsel, which was previously set for hearing on October 11, 2022 but is now moot in light of the agreed substitution of counsel. However, in light of the Response filed by the ALS Defendants, Mr. Dawson's conflicts and ethical lapses are still relevant. For one thing, Mr. Dawson formerly represented the LN Defendants *in this very matter* and obtained confidential information during that representation.[1] Additionally, Mr. Dawson filed false documents with the Secretary of State purporting to be the manager of Allied Lab Solutions, LLC and Allied Lab Solutions Management, LLC, both of which are defendants

---

[1] Further implicating attorney ethics, attorney Lina Reyes Trevino signed the Response as co-counsel even though

herein, and are the parties opposing dismissal of the interpleader. Mr. Dawson did not, and could not, comply with the statutory requirements to appoint himself as manager, and Mr. Dawson's false sworn statements to the Secretary of State with the intent to defraud or harm third parties constitute a felony. *See* TEX. BUS. ORG. CODE § 4.008.

4.      Moreover, Attorney Kelly Dawson recently represented one of the ALS Defendants, Toth Enterprises II, P.A. ("Toth"), in a separate but tangentially related case in Travis County. Interestingly, the ALS Defendants' attorney in ***this lawsuit*** is co-counsel with Attorney Kelly Dawson, jointly representing Toth in that Travis County case. A true and correct copy of Toth's petition in that Travis County case, which Attorney Kelly Dawson signed on behalf of Toth, is attached hereto as **Exhibit B**.  On information and belief, Attorney Kelly Dawson, conspired with the attorney for the ALS Defendants (his co-counsel in the aforementioned Travis County case) in this case and induced him to write a letter on behalf of the ALS Defendants to Knox making a claim to the funds which are the subject of this interpleader with no basis in law or fact, and requesting Knox's counsel (Dawson) to file an interpleader. Mr. Dawson then filed this interpleader, but it is unclear whether he explained the import and ramifications of such a filing to his client, Knox, or if he disclosed his own personal motivation for doing so.

5.      Attorney Dawson then improperly obtained an *ex parte* Order in this case granting the interpleader and attorneys' fees. These fees were to be awarded to Dawson personally—not his client, Knox. This was done before the LN Defendants had even made an appearance herein, and before Defendant Clay Ellis had ever been served with process.  This order, dated June 8, 2022, should be vacated because an order granting an interpleader, unless agreed to by all parties, can only be granted after notice and hearing. *See Taliaferro v. Texas Commerce Bank-Hurst*, 669 S.W.2d 172, 174 (Tex. App.—Fort Worth 1984, no writ). Not only was there no hearing and no

---

she formerly represented Knox in a closely related matter.

agreement, but many of the defendants had not even made an appearance. Contrary to the assertions made by the ALS Defendants in their Response, the LN Movants are not alleging or accusing the Court of any improper action or *ex parte* communications. Presumably, Attorney Dawson falsely presented the June 8 Order as an agreed order, which it clearly was not.

## IV.   THE UNMERITORIOUS CLAIMS THE ALS DEFENDANTS ALLEGE AGAINST THE LN DEFENDANTS CANNOT JUSTIFY AN INTERPLEADER EVEN IF THEY WERE VALID

6.      As stated in the Joint Motion to Dismiss, there is no contractual or other relationship between the ALS Defendants and Knox. Thus, Knox could not possibly be liable to the ALS Defendants under any legal theory even if the ALS Defendants were owed money (they are not) by the LN Defendants. To establish interpleader under Tex. R. Civ. P. 43, a plaintiff is required to show that it is exposed to multiple liability. That cannot be established here. Conspicuously, the ALS Defendants make no attempt in their Response to explain how Knox is exposed to multiple liability. Knox's only liability is to the LN Defendants, and the LN Defendants have agreed to indemnify Knox in the unlikely and legally unjustifiable event the ALS Defendants attempt to assert a claim against Knox.

## V.    THE CLAIMS OF THE ALS DEFENDANTS AGAINST THE LN DEFENDANTS WERE ABANDONED IN TRAVIS COUNTY SHORTLY BEFORE A SUMMARY JUDGMENT RULING BECAUSE THE ALS DEFENDANTS HAVE NO STANDING OR CAPACITY, AND NO MONEY IS OWED TO THEM

7.      As outlined above, the ALS Defendants' putative claims against the LN Defendants would not justify an interpleader by Knox. But even more fundamentally, those claims are wholly without merit. The claims being made herein by the ALS Defendants were first asserted by Defendants Toth Enterprises II, P.A. ("Toth") and William Franklin, M.D. ("Franklin") in a Travis County lawsuit styled Cause No. D-1-GN-20-003469; *Toth Enterprises II, P.A., and William Franklin, M.D. v. Clay Ellis, et al*; In the 201st Judicial District Court of Travis County,

Texas. Defendant Clay Ellis, who is wrongfully accused of misappropriating funds, moved for summary judgment. After two postponements sought by Toth and Franklin, a hearing was held on September 13, 2022 before the Honorable Amy Clark-Meachum, Presiding Judge of Travis County. Toth and Franklin relied on the Unsworn Declaration of Larry Palmer,[2] which is attached to their Response herein, among other evidence. Judge Clark was skeptical of Palmer's conclusory Declaration and the arguments of Toth and Franklin in general, but took the matter under advisement. ***The very next day***, Toth and Franklin nonsuited the entire Travis County case before Judge Clark could rule. A clearer sign of what the ALS Defendants truly think about their claims against the LN Defendants cannot be imagined.  Now they want to assert identical claims in this Court, but once the interpleader is properly dismissed, the LN Defendants will move to transfer venue of the ALS Defendants' claims back to Travis County, and they will have to explain their blatant forum shopping to Judge Clark.

8.      Additionally, as explained in the Joint Motion to Dismiss, the ALS Defendants have no standing or capacity to assert claims against the LN Defendants because they are merely some of the members of Allied Lab Solutions, LLC, which in turn is one of the members of Allied Lab Management, LLC, who is the only entity with a contract and possible claim against the LN Defendants. This was all pointed out in the Travis County lawsuit which the ALS Defendants nonsuited.

9.      Finally, as previously stated in the Joint Motion to Dismiss, the LN Defendants do not owe any money to Allied Lab Management LLC; the opposite is true. It is Allied Lab Management LLC that owes the LN Defendants money.

---

[2] Movants herein move to strike the Unsworn Declaration of Larry Palmer as hearsay and conclusory.

## VI.     PRAYER FOR RELIEF

Wherefore, premises considered, LN Movants respectfully pray that the Order granting interpleader dated June 8, 2022 be vacated, and that Plaintiff's interpleader action be dismissed with prejudice. LN Movants further request any such other and further relief to which the parties may show themselves justly entitled.

Respectfully submitted,

Ray Chester (SBN: 04189065)
Ian Davis (SBN: 24120793)
**McGINNIS LOCHRIDGE LLP**
1111 West Sixth Street, Bldg. B, Ste. 400
Austin, Texas 78703
512-495-6000 Telephone
512-505-6351 Fax
rchester@mcginnislaw.com
idavis@mcginnislaw.com
(Motion to substitute pending)

By:      */s/ Ray Chester*
         Ray Chester


Jim Clements (SBN: 00787251)
**CLEMENTS LEGAL SERVICES, P.C.**
9442 Capital of Texas Highway North
Arboretum Plaza One, Suite 500
Austin, Texas 78759
512-478-4489 Telephone
512-961-3281 Fax
jim@clementsfirm.com

By:*/s/Jim Clements*
         Jim Clements

**ATTORNEYS FOR LN DEFENDANTS**

Jeffrey J. Hobbs
State Bar No. 24012837
**ARMBRUST & BROWN, PLLC**
100 Congress Avenue, Suite 1300
Austin, Texas 78701
512-435-2300 Telephone
512-435-2360 Fax
jhobbs@abaustin.com

By:*/s/Jeffrey J. Hobbs*
        Jeffrey J. Hobbs

**ATTORNEYS FOR CLAY ELLIS**

## CERTIFICATE OF SERVICE

I hereby certify, by my signature below, that a true and correct copy of the above and foregoing has been electronically filed and forwarded, via the Texas E-filing Manager, to the following on the 6th day of October, 2022:

Jim Clements
State Bar No. 00787251
**CLEMENTS LEGAL SERVICES, P.C.**
9442 Capital of Texas Highway North
Arboretum Plaza One, Suite 500
Austin, Texas 78759
512-478-4489 Telephone
512-961-3281 Fax
jim@clementsfirm.com

Jeffrey J. Hobbs
State Bar No. 24012837
**ARMBRUST & BROWN, PLLC**
100 Congress Avenue, Suite 1300
Austin, Texas 78701
512-435-2300 Telephone
512-435-2360 Fax
jhobbs@abaustin.com

Mark W. Collmer
State Bar No. 04626420
**COLLMER LAW GROUP**
3700 Montrose
Houston, Texas 77006
713-337-4040 Telephone
713-337-4044 Fax
Mark@collmerlaw.com

Lina Reyes Trevino
Attorney at Law
TBN 00788268
P.O. Box 11
Benjamin, Texas 79505
940-459-2241
kcattorney@srcaccess.net

Brad Thompson
Katie A. Fillmore
**DUANE MORRIS LLP**
Las Cimas IV
900 S. Capital of Texas Hwy., Suite 300
Austin, Texas 78746-5435
512-277-2300 Telephone
512-277-2301 Fax
BThompson@duanemorris.com
KAFillmore@duanemorris.com

/s/ Ray Chester
RAY CHESTER

**EXHIBIT A**

Filed 9/27/2022 9:00 AM
Lisa Cypert
Combination Clerk
Knox County, Texas
By Jeannie Clark

## CAUSE NO. 10301

| | | |
|---|---|---|
| **KNOX COUNTY HOSPITAL DISTRICT,** | § | **IN THE DISTRICT COURT** |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | |
| | § | **50th JUDICIAL DISTRICT** |
| **TOTH ENTERPRISES II, P.A.,** | § | |
| **WILLIAM FRANKLIN, M.D., ALLIED** | § | |
| **LAB SOLUTIONS, LLC, ALLIED LAB** | § | |
| **SOLUTIONS MANAGEMENT, LLC,** | § | |
| **CLAY ELLIS, LEWIS NICHOLS, LN** | § | |
| **PROFESSIONAL MANAGEMENT** | § | |
| **LLC, AND LN PROFESSIONAL** | § | |
| **MANAGEMENT LLC D/B/A MEDICAL** | § | |
| **MANAGEMENT PROFESSIONALS** | § | |
| *Defendants.* | § | **KNOX COUNTY, TEXAS** |

## <u>ORDER</u>

After considering the Unopposed Motion to Substitute Counsel filed by Plaintiff Knox County Hospital District ("Knox"), the Court here by GRANTS the Motion.

Attorneys Brad Thompson and Katie Fillmore of the law firm of Duane Morris LLP will be substituted as counsel of record for Knox. Attorney Kelly Dawson of The Dawson Law Group, PC, is discharged as attorney of record for Plaintiff Knox.

Signed: _____9/27/2022_____

_____

HONORABLE JENNIFER HABERT

**EXHIBIT A**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Katherine Fillmore
Bar No. 24069717
KAFillmore@duanemorris.com
Envelope ID: 68616288
Status as of 9/27/2022 10:23 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| John Bradford Thompson | | BThompson@duanemorris.com | 9/26/2022 3:00:26 PM | SENT |
| Mark W.Collmer | | mark@collmerlaw.com | 9/26/2022 3:00:26 PM | SENT |
| Conrad Guthrie | | conrad@collmerlaw.com | 9/26/2022 3:00:26 PM | SENT |
| Katherine AFillmore | | KAFillmore@duanemorris.com | 9/26/2022 3:00:26 PM | SENT |
| Kelly C.Dawson | | kcmd777@gmail.com | 9/26/2022 3:00:26 PM | SENT |
| Jeff Hobbs | | jhobbs@abaustin.com | 9/26/2022 3:00:26 PM | SENT |
| Jim Clements | | jim@clementsfirm.com | 9/26/2022 3:00:26 PM | SENT |
| Ray Chester | | rchester@mcginnislaw.com | 9/26/2022 3:00:26 PM | SENT |
| Kim McBride | | kmcbride@mcginnislaw.com | 9/26/2022 3:00:26 PM | SENT |

**EXHIBIT B**

8/16/2022 3:59 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-22-003731
Ruben Tamez

D-1-GN-22-003731

Cause No. _____

| | | |
|---|---|---|
| TOTH ENTERPRISES II, P.A. D/B/A | § | IN THE DISTRICT COURT OF |
| VICTORY MEDICAL & FAMILY | § | |
| CARE, | § | |
| *Plaintiff,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| HEALTH CARE SERVICE | § | |
| CORPORATION, A MUTUAL LEGAL | § | |
| RESERVE COMPANY, RICK | § | |
| HADDOCK, CRISTINA FERNANDEZ, | § | |
| AND ANGELICA COLMENERO | § | 419TH, DISTRICT COURT |
| COLLINS, | § | |
| *Defendants.* | § | \_\_\_\_\_ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION  REQUEST FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTION, DECLARATORY JUDGMENT, AND DAMAGES

COMES NOW, Plaintiff Toth Enterprises II, P.A., d/b/a Victory Medical & Family Care Plaintiff and for causes of action against Defendants Health Care Service Corporation, A Mutual Legal Reserve Company, Rick Haddock, Cristina Hernandez and Angelica Colmenero Collins, would show as follows:

### Level of Case

1.      Plaintiff requests that this case be considered a Level III case and that the Court enter a Docket Control Order under TRCP 190.4(a).

### Parties

2.      Plaintiff Toth Enterprises II, P.A., d/b/a Victory Medical & Family Care is a professional association organized under the laws of the state of Texas, having its principle place of Business in Texas and the members of which are all domiciled in Texas.

3.     Defendant Health Care Service Corporation, A Mutual Legal Reserve Company, is a foreign corporation, incorporated in the State of Illinois, doing business in the State of Texas as Blue Cross Blue Shield of Texas, a Division of Health Care Service Corporation.   Texas Corporation with its principal place of business in Travis County, Texas.  Said Defendant does not maintain a registered agent in the State of Texas, even though it does business regularly in the State of Texas.  Said Defendant may be served under the Texas Business Corporations Act, by service on the Secretary of State, or the Assistant Secretary of State, or with any clerk having charge of the corporation department of his office, duplicate copies of such process, notice, or demand.  In the event any such process, notice, or demand is served on the Secretary of State, he shall immediately cause one of the copies thereof to be forwarded by registered mail, addressed to the corporation at its registered office, Blue Cross Blue Shield of Texas, 1001 East Lookout Drive, Richardson, Texas 75265-2730.  Any service so had on the Secretary of State shall be returnable in not less than thirty (30) days.

4.     Defendant Rick Haddock is an individual residing in Collin County, Texas at 16 Carter Court, Allen, Texas 75002, where he may be served with service of process. Defendant Haddock has a TDL XXXXXXX216 and SSN XXX-XX-XXXX (unknown).

5.     Defendant Cristina Fernandez is an individual residing and/or working in Austin, Travis County, Texas 78750 and may be served with service of process at her place of business 9442 Capital of Texas Hwy North, Suite 500 Arboretum Plaza II, Austin, TX 78759.  Defendant Fernandez's driver's license number and SSN are unknown.

6.     Defendant Angelica Colmenero Collins is an individual residing at 8804 Black Oak St., Austin, Travis County, Texas 78729 and may be served with service of process at her place of business 9442 Capital of Texas Hwy North, Suite 500, Arboretum Plaza II, Austin, TX 78759 or

1

at her residence, 8804 Black Oak St., Austin, Texas 78729.  Defendant Collins driver's license number is XXXXXXX079. Her SSN XXX-XX-XXXX is unknown.

**Jurisdiction**

7.      Pursuant to Rule 47 of the Texas Rules of Civil Procedure, the damages sought are within the jurisdictional limits of the Court.  Plaintiff seeks monetary relief in excess of $1,000,000. Plaintiff demands judgment for all the other relief to which Plaintiff is entitled  in the premises.

**Venue**

8.      Venue is proper under Texas Civil Practices and Remedies Code §§65.023, (county where defendant is domiciled), §15.002, et seq., (General Venue, County of Defendant's Residence, natural person), and §15.005 (Multiple Defendants).

9.      Venue is proper in Travis County because a substantial amount of the events alleged herein took place within this County, a substantial number of the patients harmed by the conduct alleged reside in this County, and Plaintiff and its business operations are located in Travis County and have been harmed in this county by Defendants actions in this Travis County as alleged below. Additionally, the services to be performed under the contract at issue take place in Travis County. Two of the Defendants are also domiciled in Travis County and regularly transact business in Travis Cunty.

**General Background of this Action**

10.     As explained in the allegations that follow, this is an action seeking injunctive relief, a declaratory judgment, and damages by reason of Defendants' illegal termination of the longstanding healthcare insurance contract with Plaintiff, an Austin-based medical facility.

11.     Plaintiff seeks a Temporary Restraining Order, as well as a Preliminary Injunction and Permanent Injunction to preserve the *status quo* for Plaintiff as well as for the approximately

15,000 patients in and around the Austin area who are affected by the unilateral cancellation of Victory Medical as an authorized provider under plans for Blue Cross Blue Shield of Texas. This cancellation was done without notice to plan participants and with notice to Plaintiff, an authorized provider for over 11 years.

## **Probable Right to Relief**

12.     Contractually, there are certain requirements and restrictions that Blue Cross has agreed to abode before any cancellation occurs, not the least of which, except in cases not here applicable, was 90-day requirement of advance notice of cancellation.

13.     Patients of Victory Medical began noticing that Blue Cross was claiming that Plaintiff was no longer a provider on or about August 2, 2022. No notice of any kind had been provided stating that any such cancellation was imminent, threatened or scheduled.

14.     Moreover, such notice is not allowed under any of the agreements between Plaintiff and Blue Cross.

15     Under the terms of the Provider Agreement, either party may cancel the arrangement which has existed since 2011 upon the giving of 90 days notice. This was not done.

16.     Additionally, under the contract, in the event that notice is given of cancellation for cause, and only under certain specified circumstances involving risk to patient care, none of which occurred in this case.

17.     Blue Cross has been involved in an arbitration with Victory Medical for 18 months over billing charge dispute.   All those charges occurred in 2016-2018.  Nothing has changed in that case.  No new knowledge has been learned.  What is actually occurring is that Blue Cross has elected to claim this in order to gain leverage over Victory Medical and to compromise the health

of patients of Victory Medical to gain leverage in the arbitration. This is improper and in violation of the notice requirements in the Provider Agreement.

18.    Nothing in any Provider Agreement allows Blue Cross to throw 15,000+ patients off the health care rolls of Victory Medical in order to gain leverage in a billing dispute over bills 4-6 years old.

19.    After Victory Medical asked what Blue Cross was going on, several things occurred. **First,** Blue Cross claimed that Victory Medical voluntarily cancelled this agreement. On or about August 2, 2022, Blue Cross began information patients that Victory Medical had therefore abandoned them by voluntarily cancelling its status as an approved provider. **Second,** when Victory Medical contested and informed the patients this was incorrect, Blue Cross then decided on another story, namely, that Victory Medical had been cancelled as a provider. However, this could not have been true since Blue Cross had sent no notice to subscribers (patients) nor to Victory Medical. **Third,** when confronted with this latest falsehood, Blue Cross then sent a letter which arrived on Friday, August 12, 2022, ten days after Blue Cross began implementing its unilateral and improper cancellation of the Patients' and Victory Medical's benefits. This letter claimed that Blue Cross was using the old allegations referred to above in paragraph 17 hereof and which were 18 months old to immediately cancel Victory Medical as a current approved provider for Blue Cross. This placed and places the 15,000+ patients of Victory Medical who are Blue Cross beneficiaries at risk of having no approved provider and Victory Medical with a loss of those patients and revenue.

20.    This August 12 letter allegedly attempted to justify retroactively the cancellation of Victory Medical as an approved provider. There is no contractual provision allow retroactive cancellation of provider status under the terms of the Provider Agreement. Advanced notice is clearly required for the health and safety of the patients.

4

21.     Because the notice requirements under the Provider Agreement were not met, Blue Cross

is not allowed to unilaterally cancel Plaintiff as an approved provider much less do so when it

would result in 15,000 patients being left stranded without medical care..

22.     Consequently, not only does Plaintiff Victory Medical has a probably right to relief, it has

an absolute right to relief and to reinstatement of its status as a Provider under the terms of the

Provider Agreement.

23.     To preserve the *status quo*, this Court should enter the Temporary Restraining Order as

requested.

24.     In sum, none of those requirements incumbent on Blue Cross were met.  Moreover, the

individual Defendants either individually or in concert have caused to be disseminated incorrect

and false information concerning Plaintiff and this cancellation of Plaintiff as an authorized

provider.

### Immediate Irreparable Injury

25.     The effect of this unilateral, unjustified and unjustifiable cancellation is that Victory

Medical patients suddenly are without the services of their physician who has been their authorized

provider, with no notice to the patients themselves, nor to Victory Medical.

26.     The effects of this unilateral cancellation of Victory Medical as an authorized provider

without notice to patients or Plaintiff has resulted in the following so far:

    a.  Referrals of approximately 130 patients to specialists, 35 of those referrals are

       considered critical to be seen asap, is a denial of those referrals[1].

    b.  Delayed lab tests for those same referrals.[2]

---

[1] Declaration of Yessenia Noa, Victory Medical Center, coordinator of primary care provider referrals to specialists.  Attached as Exhibit B.
[2] Declaration of Yessenia Noa, Victory Medical Center, coordinator of primary care provider referrals. Attached as Exhibit B.

5

c.  Delays in getting new providers identified for those critical referrals.[3]

d.  Inability to have continued monitoring for kidney cancer patient;[4]

e.  Denial of referral for that same kidney cancer patient;[5]

f.  Placing health in jeopardy of that kidney cancer patient because of the delay in getting seen by another specialist/medical monitor for 24 medications for kidney cancer patient;[6]

g.  Delayed referral to oncologist stemming from kidney cancer;[7]

h.  Cancellation of lab tests and medical assessment for complex diabetes;[8]

i.  Inability to get a referral to an accepting doctor for diabetic;[9]

j.  Disruption of care for a 20 year past patient of Victory Medical with high cholesterol, high blood pressure, pre-diabetes chronic problems.[10]

k.  Inability to obtain renewal prescription for unique medication developed by Dr. William Franklin, Victory Medical, to treat chronic insomnia;[11]

l.  Secure continued care and medication for school-aged child, a client of Plaintiff since age 5, to treat disabilities which treatment allows him to stay in school.[12]

27.  Persons who need re-authorizations of medications cannot have those done until a newly established relationship with another "authorized" provider of Blue Cross. Patients who have had surgeries recommended by Victory Medical physicians cannot have those performed since the

---

[3] Declaration of Yessenia Noa. Attached as Exhibit B.
[4] Declaration of Arturo Dominguez, attached as Exhibit C.
[5] Declaration of Arturo Dominguez, attached as Exhibit C.
[6] Declaration of Arturo Dominguez, attached as Exhibit C.
[7] Declaration of Arturo Dominguez, attached as Exhibit C.
[8] Declaration of Sarithia Pothuluri, attached as Exhibit D.
[9] Declaration of Sarithia Pothuluri, attached as Exhibit D.
[10] Letter from Russell Remington, patient of Victory Medical for last 20 years, attached as Exhibit E.
[11] Declaration of Joshua Masongsong, attached hereto as Exhibit F.
[12] Declaration of the mother of E., a school aged child with disabilities, attached hereto as Exhibit G.

recommendation was no longer from an "authorized physician". Those referrals will all have to be denied and rescinded. Parents of children who had scheduled their children for required shots and immunizations with Victory Medical now must seek another "authorized" physician, establish a new relationship, have a new exam before meeting school requirements. Certain medications require that the physician conduct and exam prior to the renewal of that prescription. Those cannot be performed until a new physician is assigned and a new relationship established, and exam scheduled and performed.[13]

28.     Ordinarily, this would be done as a matter of course. However, **Blue Cross cancelling the authorized status of Victory Medical all at one time, without advance notice, resulted in 15,000 patients needing to be re-assigned all at once, suddenly, without opportunity to manage their medical care and without any attempt to match the new physician's specialty with the medical needs of the patients. The records themselves and transferring 15,000 patients records to numerous physicians throughout the region will result in delayed medical care and treatment, particularly to some patients for whom time and continued care is critical.[14]**

29.     If this termination is not ordered reversed by this Court, it will wreak havoc on the healthcare of at least 15,000 patients in and around the Austin Texas area, many with affected family members, who will no longer have the certain access to the doctor or other caregiver of their choice who they and their families have used for many years, thus requiring them to start over with a new doctor or caregiver who is wholly unfamiliar with their medical history and current

---

[13] Declaration of Dr. John S. Kim, M.D., attached hereto as Exhibit H.
[14] Declaration of Dr. John S. Kim, M.D., attached hereto as Exhibit H.

7

medical condition, thus compromising continuity of care, and jeopardizing their health and safety.[15]

30.     This wrongful termination will also cause the loss of employment by many hardworking and conscientious caregivers and their staff as well as the closure of various of the branch offices of Victory Medical.[16]

31.     This action seeks a temporary restraining order, a preliminary and a permanent injunction preventing this termination or ordering it reversed pending a trial on the merits of this case, and also seeks a declaratory judgment that the termination was wrongful and has no effect, damages as determined by this Court, and those proved and awarded at trial.

32.     To the extent that Blue Cross complaints that money damages are sufficient to make Plaintiff whole, this ignores the nature of the services provided, that this is healthcare and continuing healthcare vital to the lives and health of those 15,000+ patient.

<u>**Individual Defendant's Roles**</u>

33.     Defendant Rick Haddock (hereinafter Haddock") is the Vice President of Network Management for Blue Cross in Texas.  He operates from the Texas offices of Blue Cross in Ricardson, Texas, and he has primary responsibility for determining which doctors and medical facilities will be granted, and thereafter maintained in, in-network status allowing those physicians and medical facilities to treat many of the patients insured under Blue Cross health insurance plans under which, without such status, those patients medical costs will not be reimbursed by those plans, which in practical terms means that those patients will not seek out or remain under the treatment of physicians and medical facilities that are not in network. Within Texas and specifically as it relates to the wrongful conduct of Blue Cross referred to in this Complaint,

---

[15] Declaration of Dr. John S. Kim, M.D., attached hereto as Exhibit H.
[16] Declaration of Dr. John S. Kim, M.D., attached hereto as Exhibit H.

Defendant Haddock, in his capacity as Network Manager in Texas, did and caused to be done all the Blue Cross actions described below, doing so in concert with Defendant Fernandez referred to in the next numbered paragraph below.

34.     Defendants Cristina Fernandez and Angelica Colmenero Collins are the regional representatives/supervisors of Blue Cross operating out of Travis County, Texas.  In their role as representatives of Blue Cross, they assist Defendant Haddock in determining which doctors and medical facilities will be allowed, and maintained as in-network status so that patients insured by Blue Cross medical plans can have their medical costs reimbursed by Blue Cross if they are treated by in network physicians and facilities. Within Texas and specifically as it relates to the wrongful conduct of Blue Cross referred to in this Complaint, Defendant Fernandez, in her capacity assisting Defendant Haddock in Network Management here in Texas, and Defendant Angelica Collins, did and caused to be done all the actions of Blue Cross described below, doing so in concert with Defendant Haddock as described herein above and below.

35.     The actions below of Blue Cross were done by or caused to be done by Defendants Haddock and Fernandez who at all times referred to below were acting on behalf of Blue Cross and within the scope of their authority given to them by Blue Cross to manage the acceptance and maintenance of in network physicians and facilities in Texas. Accordingly, they are liable vicariously for all of the wrongdoing described below. Accordingly, when any allegation stated below refers to Blue Cross and its actions, these actions were done by or caused to be done by Defendants Haddock, Collins and Fernandez.

### Victory Medical's Operation and its Relationship with Blue Cross

36.     Plaintiff Victory is a Professional Association offering medical services to the Texas public through its medical offices.

9

37.     Victory Medical operates a principal medical care facility and three separate satellite locations around the Austin, Texas area, specifically in Austin, West Lake, Cedar Park, and Marble Falls. It has been in operation for 20 years. Currently, it provides primary and specialty medical care for over 60,000 Texans, approximately 15,000 of whom are insured by Blue Cross.

38.     Like all the other patients using medical services of Victory Medical, these Blue Cross insured patients have relied upon Victory Medical caregivers[17] for their medical care, sometimes for many years and for the health care of their entire families. However, when insured by Blue Cross for their medical care, they may only continue to use Victory Medical caregivers if these caregivers and Victory Medical have a providers contract with Blue Cross that designates Victory Medical and its physicians and caregivers as authorized to treat these patients and have that treatment paid by Blue Cross.

39.     Victory Medical is operated by an administrative staff and by over 50 caregivers, including physicians, nurse practitioners and nurses. For decades, the Victory medical facilities have dispensed a wide array of medical services to the public in and around the Austin metropolitan area. Victory Medical provides its caregivers with state-of-the-art medical facilities, equipment and administrative support so that they can effectively practice their varying medical specialties.

40.     Specifically, the Victory facilities provide their caregivers with all the needed collateral support, including office space, waiting rooms, examination rooms, all manner of medical supplies, a variety of medical equipment, physician cross referring, nursing and physician's assistant support, all manner of diagnostics (X-ray, blood work, etc.), pharmacy services, and billing services to send bills for their services to the health care insurers who have insured the patients they are treating.

---

[17]As used in this Verified Complaint, the term "caregivers" means licensed physicians, nurse practitioners, and nurses.

41.    Current Blue Cross patients receive medical services paid for under their Blue Cross health plans covering their medical expenses. However Blue Cross health plans require those Blue Cross patients to only use facilities and caregivers who have agreements with Blue Cross to treat Blue Cross insured patients as Blue Cross authorized providers. Victory Medical and its caregivers have had such a provider agreement with Blue Cross for many years.

42.    That agreement is entitled "Group Management Care Agreement" (hereinafter the "Blue Cross/Victory Agreement"), having an effective date of November 16, 2011. This Blue Cross/Victory Agreement has been in effect since that time and allows the many persons insured by Blue Cross to visit Victory Medical for medical treatment of many kinds and provides that such treatments will be reimbursed by Blue Cross in its capacity as the health care insurer for its covered members. A copy of this Agreement is attached as Exhibit A.

43.    Of the approximate 60,000 Austin, Texas area patients receiving their health care from Victory Medical, approximately 15,000 of them are insured for their medical needs by Blue Cross.

44.    Many of these patients have been treated for years by Victory Medical caregivers for serious medical conditions which must be continuously attended to by a medical caregiver who is familiar with their chronic condition. Continuity of medical care is key to the health and potentially even the life of these patients.

45.    Under the Blue Cross Agreement, specifically Exhibit A, Part VIII "Term and Termination," commencing at page 11, Blue Cross may only terminate its Blue Cross Agreement in one of two circumstances: (i) upon 90 days notice to Victory Medical, so that it can afford an opportunity to notify its patients covered by a Blue Cross Health Plan that they may no longer use Victory as their care provider unless they wish to seek health care coverage under a different

11

health care plan that will allow them to continue being treated by Victory Medical, or (ii) when there is cause for termination without the 90-day notice period.

46.    However, if Blue Cross seeks to terminate the Blue Cross Agreement with Victory Medical without providing 90 days notice, the Blue Cross/Victory Agreement provides, in Part VIII(C) at page 12 thereof, that it may only do so upon specific notice by Blue Cross to Victory Medical that there is either (i) " a threat of imminent harm to patient health," an action by the State of Texas against a Victory Medical caregiver's license to practice medicine, or "fraud or malfeasance."

47.    In the event that there is a termination by Blue Cross of the Blue Cross/Victory Agreement, Part VIII(E), provides that the patients be "provided reasonable advance notice" so that they can have an orderly transition of their medical care from the terminated physician or his facility to a new physician who given his practice area and experience is capable to competently handle their medical needs. No such notice was given either to the 15,000 patients involved or to Victory Medical.

48.    Blue Cross representatives have stated that the only reason for termination is allegedly that Victory Medical did not "renew" its contract on July 31, 2021. However, there is no such requirement in the contract between Blue Cross and Victory Medical. This "requirement" is nonexistent, and never has been a requirement. In short, Blue Cross has invented a subterfuge which does not exist in the Agreement, has never existed, and now is simply unilaterally cancelling the authorized provider for 15,000 patients of Victory Medical, when it is not permitted to do so.

49.    Despite being requested to reinstate Victory Medical, Blue Cross has refused to do so, relying instead on this non-existent requirement of a renewal of the contract in existence since

12

2011. The immediate harm is both to Victory Medical as it is losing 15,000 patients, but also to the care of those patients, and to the business of Victory Medical with a substantial loss of revenue, and the resultant termination of many employees. This unauthorized termination has also damaged the well-earned reputation of Victory Medical as a reliable medical facility with word being spread that it has been abruptly terminated by the largest health insurer in Texas.

50.     As both Defendants Haddock and Fernandez well know, there has been no such occurrence and particularly no fraud or malfeasance of an imminent nature or otherwise and Blue Cross has never given any notice of termination based on any of the above-referenced conduct allowing termination on less than 90 days notice to Victory medical as required under the Blue Cross/Victory Agreement.

51.     While Blue Cross and Victory Medical have an 18-month old disagreement about certain billings, now in arbitration, **this is an old matter, inapplicable to the Agreement**, and **does** not warrant any abrupt termination of the entire Blue Cross/Victory Agreement.

52.     Despite this, commencing on July 30, 2022, Blue Cross, acting by and through Defendants Haddock and Fernandez, sent out a notice to all of the 15,000 Victory Medical patients insured by Blue Cross that they may not any longer use Victory Medical, its physicians, nurse practitioners, nurses or facilities for those patient's health care, telling them abruptly to go elsewhere.

53.     Moreover, Blue Cross, acting by and through Defendants Haddock and Fernandez, has sent many of these patients an "assignment" of a new physician who has absolutely no familiarity with the medical history of the patients involved, and the Blue Cross Defendants made these assignments without any consultation with the patient to learn what his or her medical needs are currently, without any information about the patient's medical history, nor any consideration of

13

whether the "assigned" physician has any competence or experience in treating the medical condition of the patient to whom that physician has been "assigned."

54.     Such behavior by Defendants Blue Cross, Haddock and Hernandez is grossly irresponsible to the health and safety of the thousands of patients involved and is against the public interest which values, or should value, continuity in the delicate and important matter of providing informed health care and doing so in a reliable and consistent manner.

55.     Indeed, as of the date of the filing of this Verified Complaint, Victory Medical has at least 34 Blue Cross insured patients in active process of being referred by their physicians at Victory to specialists for important if not critical treatment by those specialists needed for their medical conditions. These include referrals for cardiology, oncology and orthopedics and these referrals have been explicitly made on a "stat" basis, which is the commonly used term in the medical profession for urgent or immediate action. These referrals are now in jeopardy if this termination is not restrained by this Court with the consequence that 34 people have their urgent referrals cancelled.

56.     In addition to those interrupted "stat" referrals, for all those Victory patients who have been assigned new physicians in the above-described, completely uninformed way, even if they do not have any "stat" need for a specialist referral, such assignments are completely irresponsible for the reasons described above. For those Victory Medical patients for whom Blue Cross has not "assigned" new physicians, leaving these patients to seek out their own replacement physician in the already overcrowded medical facilities in and around Austin Texas is a virtually impossible undertaking and particularly one that cannot be accomplished soon and certainly not soon enough in the case of those patients needing care now for existing conditions.

14

57.     This abrupt, improper and improperly-noticed termination is therefore dangerously disruptive of the important health care needs of these patients who, if this termination stands and it not reversed by this Court, will cause many thousands of Victory Medical patients to face a dangerous risk to their health care and thus to their health and safety. This is a highly dangerous and unfair position for Blue Cross to have caused for thousands of innocent citizens in and around Austin.

58.     Moreover, this wrongful termination, without any notice, much less the reasonable notice required under the Blue Cross/Victory Agreement at Part VIII(E), will cause irreparable harm to Victory medical. If this termination is not reversed by this Court, it will leave Victory medical with an immediate loss of 35% of its patients and thus 35 % of its revenues. This is an economically unsupportable position for Victory Medical because the underlying costs of supporting its staff, physicians and other caregivers, which costs were assumed and put into place in reliance on these now-terminated revenues, will remain while these revenues will no longer be available to help pay these costs.

59.     Unless these Defendants are restrained and enjoined, Victory Medical will have to lay off many employees and caregivers and will need to close at least two of its branch offices, which will also adversely affect Victory Medical patients who are insured by other healthcare insurers but who have used these branch offices and their caregivers for their medical care.

60.     In addition, because Defendants Haddock, Fernandez and Blue Cross have notified thousands of individuals that they may no longer use Victory Medical and have done so directly, without any explanation, and publicly with notice to each of them and with no notice to Victory so that Victory could explain the termination to its long-time patients and work with them to find

15

new caregivers, Blue Cross has left the defamatory impression that there is something so improper or unsafe about Victory Medical that it had to be terminated in this abrupt manner.

61.     Defendants' termination of the Blue Cross/Victory Agreement is wrongful and a breach of the Blue Cross Agreement which, for the reasons set forth above, will cause irreparable harm to Victory Medical and this honorable Court should restrain and enjoin this wrongful termination, ordering the *status quo ante* by ordering Haddock, Fernandez and Blue Cross to reinstate the Blue Cross/Victory Agreement that has been in place for many years at least until there has been an orderly transition to well-suited and qualified caregivers to replace those at Victory.

## COUNT I

### (Breach of Contract)

62.     Victory Medical repeats and realleges each allegation made above as if repleaded in its entirety in this paragraph.

63.     The above-described termination of the Blue Cross/Victory Agreement by Defendants without proper cause and with no notice as required by that agreement is a breach of contract. It is also a breach by Blue Cross of the implied covenant of good faith and fair dealing. Despite the clear obligation to provide notice to both Victory Medical (Part VIII(C) and to the patients (Part VIII(E), Blue Cross did neither and failed to do so in a way that has wreaked havoc on 15,000 persons in need of medical care and many innocent employees at Victory medical.

64.     Victory Medical has suffered monetary damages as a result of that breach in an amount that it will show at trial and Blue Cross is liable to Victory Medical for all damages thus proved.

16

## COUNT II

### (Fraud and Intentional Misrepresentation)

65. Victory Medical repeats and realleges each allegation made above as if repleaded in its entirety in this paragraph.

66. By sending out to many Victory Medical Patients email and letter communications stating that Victory Medical abruptly is no longer allowed to provide medical care for those patients, Defendants Haddock, Fernandez and Blue Cross have defamed Victory Medical by clearly implying and leaving the clear impression that because of the abrupt termination of the important medical relationship between those patients and Victory Medical, Victory Medical must have done something that makes it unable or unfit to practice medicine.

67. These Defendants' communications have damaged the reputation of Victory Medical.

68. These statements by Defendants Haddock, Fernandez and Blue Cross are false in that Blue Cross is fully able and fit to dispense medical treatment and advice as it has done for many years.

69. The above has damaged the reputation of Victory Medical to its core as a health care provider who has been thus disparaged and defamed by the largest health insurance provider in Texas.

70. Victory Medical has suffered damages from this libel and the amount of that damage will be shown at trial and Defendants Haddock, Fernandez, and Blue Cross are liable for those damages as will be proved at trial.

## COUNT III

### (Business Disparagement)

71. Defendants published or authorized the publishing of false and disparaging information about the business though specifically disseminating false information about the termination and

17

voluntary termination by Victory Medical as its status as an authorized provider for Blue Cross plan participants who were patients at Victory Medical. Defendants' misrepresentations were intended to and did in fact reflect that Defendants were saying that Victory Medical left the patients without notice and without authorized medical care at Victory Medical.

72.     Defendants acted with malice in that such representations were false and intended to affect the doctor patient relationship between Victory Medical and its Blue Cross plan participants.

73.     Defendant acted without privilege as there is no privilege to disseminate such false and misleading information.

74.     Defendant's actions resulted in special damages to the plaintiff for which Plaintiff seeks actual damages, as well as injunctive relief in the form of a Temporary Restraining Order, Preliminary Injunction and Permanent Injunction.

### COUNT IV

### (Libel and Slander)

75.     Defendants disseminated false statements as to Plaintiff verbally in response to call ins to Defendant Blue Cross call centers and in written communications as well. Those communications were to patients of Victory Medical who were also Blue Cross plan participants.

76.     Those statements were not only false but also defamatory.

77.     Such statements defamed the Plaintiff to its economic damage but also to damage to the doctor-patient relationship with individual patients of Victory Medical.

78.     Such statements were made with actual knowledge of their falsehood or made with reckless disregard for the truth of such statement. Moreover, Defendants knew or should have known that such statements were false when made.

18

## COUNT V

### (Declaratory Relief)

79.     Victory Medical repeats and realleges each allegation made above as if repleaded in its entirety in this paragraph.

80.     Plaintiff seeks declaratory judgment that Defendants have unilaterally terminated the contract Blue Cross has with Victory Medical claiming that it has a right to do so when no such right existed. Defendant Blue Cross claims that it had such a right to terminate the contract.

81.     Conversely, Victory Medical claims that this termination was wrongful, and that Defendants Haddock, Fernandez and Blue Cross have no right to do so.

82.     A justiciable controversy therefore exists between Victory Medical and Defendants.

83.     Moreover, the termination has just gone into effect with shocked and troubled patients seeking guidance as to what they should do now about the above-described, abrupt change in their health care situation.

84.     This controversy is therefore ripe for this Court's decision because the position of the parties is clear, and they are completely at odds with each other.

85.     Moreover, the termination of the Blue Cross/Victory Agreement is causing and will continue to cause irreparable harm to Victory Medical because it will lose its patients who had given their medical business to Victory Medical for many years, it has damaged Victory Medical's reputation by sending termination letters to its longtime and once loyal patients who now have reason to believe, incorrectly, that Victory Medical is acting improperly or incompetently. These beliefs on the part of its patients will not be corrected unless this Court orders this termination to be reversed and these beliefs are irreparably damaging to the long-term viability of Victory Medical.

19

86.     This termination will also cause Victory Medical to lay off many of its employees and terminate various of its branches, both of which will be impossible to undue. This will cause potentially ruinous hardships to Victory Medical.

87.     Conversely, Defendants Blue Cross, Haddock and Fernandez will suffer no hardship if they continue honoring its contract obligations with Victory Medical under a contract which has been in place now for many years. The balance of hardships thus tips decidedly in favor of Victory Medical and against Blue Cross.

88.     Moreover, the causing of patients to use physicians wholly unfamiliar with their medical needs and medical history is against the public interest by putting these patients at risk of their health.

89.     This court should therefore restrain temporarily and thereafter preliminarily enjoin the termination by Blue Cross of the Blue Cross/Victory Agreement pending trial of this matter.

        WHEREFORE, PREMISES CONSIDERED, Plaintiff asks this Court to enter a judgment in their favor as follows:

(A)     That this Court immediately issue a Temporary Restraining Order to maintain the *status quo* and ordering Defendants as follows:

        1.      Ordering Blue Cross to reinstate its Blue Cross Agreement with Victory Medical immediately;

        2.      Order Blue Cross to desist from telling the patients that Victory Medical is no longer an authorized provider;

        3.      Order that Blue Cross advise each patient that it has already told that Victory Medical is not an authorized provider be informed that Victory Medical is in fact and authorized provider;

20

4.     Order Blue Cross to advise each patient of Victory medical that Blue Cross has reassigned to another provider be rescinded and advised that that patient can stay with Victory medical as its authorized provider under their BCBS Plan;

5.     Order Cristina Fernandez and Angelica Collins and Rick Haddock to cease and desist from instructing representatives of Blue Cross to advise patients with Victory Medical that Victory Medical is not an authorized provider;

6.     Further Order that Defendants Cristina Fernandez and Angelica Collins and Rick Haddock reinstate Victory Medical on the list of authorized providers and further that these Defendants instruct the representatives to cease and desist from instructing patients of Victory Medical that it voluntarily withdrew from the Blue Cross program and left the patients without Victory Medical as an authorized provider;

**And further**,

(B) that upon the expiration of the Temporary Restraining Order that this Court enter a Preliminary Injunction and a Permanent Injunction as follows:

1.     Ordering Blue Cross to reinstate its Blue Cross Agreement with Victory Medical forthwith;

2.     Order Blue Cross to desist from telling the patients that Victory Medical is no longer an authorized provider;

3.     Order that Blue Cross advise each patient that it has already told that Victory Medical is not an authorized provider be informed that Victory Medical is in fact and authorized provider;

21

4.      Order Blue Cross to advise each patient of Victory medical that Blue Cross has reassigned to another provider be rescinded and advised that that patient can stay with Victory medical as its authorized provider under their BCBS Plan;

5.      Order Cristina Fernandez and Angelica Collins and Rick Haddock to cease and desist from instructing representatives of Blue Cross to advise patients with Victory medical that Victory Medical is no an authorized provider;

6.      Further Order that Defendants Cristina Fernandez and Angelica Collins and Rick Haddock reinstate Victory Medical on the list of authorized providers and further that these Defendants instruct the representatives to cease and desist from instructing patients of Victory Medical that it voluntarily withdrew from the Blue Cross program and left the patients without Victory Medical as an authorized provider;

**And further that upon final trial,**

(C) that this Court enter a Permanent Injunction and judgment for damages as follows:

(1)      Actual Damages for breach of contract, libel, slander, business disparagement, fraud and misrepresentations;

(2)      Declaratory Judgment that the termination was a violation of the contract between Blue Cross and Victory Medical,

(3)      Awarding Plaintiff damages as proved at trial, including attorneys' fees and all costs of suit herein: and

(4)      Awarding such other and further relief as this Court deems just and proper;

(5)      And for such other and further relief, at law and in equity, to which Plaintiff may be justly entitled.

22

Respectfully submitted,

COLLMER LAW GROUP

/s/ Mark W. Collmer
Mark W. Collmer, Esq.
State Bar No. 0462420
Mark@Collmerlaw.com
3700 Montrose
Houston, Texas 77006
Tel: (713) 337-4040
Fax: (713) 337-4040


MARKHAM READ ZERNER LLC

/s/ John J. Markham
John J. E. Markham, II (MA BBO No. 638579)
*[Seeking Pro hac vice status]*
One Commercial Wharf West
Boston, Massachusetts 02110
Tel: (617) 523-6329
jmarkham@markhamreadzerner.com
bzerner@markhamreadzerner.com
*Of Counsel for Plaintiff*
*Pro Vac Vice Application Pending*

/s/Kelly Dawson
Kelly C. Dawson
The Dawson Group P.C.
1000 Cordova Pl. PMB 287
(505) 573-5020 Tel
(512) 789-2489 Fax
Kcmd777@gmail.com
Texas Bar No. 24068025
ATTORNEY FOR VICTORY MEDICAL

### Verification

I, William Franklin, M.D., as authorized representative of Victory Medical, have read the forgoing Verified Complaint and declare under penalty of perjury that the facts stated therein are true to the best of his knowledge and belief.

Executed this 16th day of August in Austin, Texas.

_____
William Franklin, M.D.


SUBSCRIBED AND SWORN TO BEFORE ME by William Franklin, M.D., on this 16th day of August, 2022 to certify which witness by hand and seal of office.

_____
Notary Public, State of Texas

09|03|2025
_____
My Commission Expires:

MICHELLE LYNNE FLAMANT
My Notary ID # 128031066
Expires September 3, 2025

# EXHIBIT A

NOV-10-2011  15:54

P.001

## GROUP MANAGED CARE AGREEMENT

### FOR PPO/POS NETWORK PARTICIPATION

Exhibit A

This Agreement is entered into by and between Blue Cross and Blue Shield of Texas, a Division of Health Care Service Corporation, a Mutual Legal Reserve Company ("BCBSTX") and Victory Medical & Family Care, a professional entity organized in the state of Texas ("Medical Group").

As of the Effective Date, this Agreement includes the following:

Yes   No
☒    ☐   Medical Group Agreement
☐    ☒   Hospital Based Medical Group Provider Attachment
☒    ☐   Attachment A, Compensation / Claims Submission

BCBSTX has entered into an agreement to delegate Credentialing to Medical Group. This includes:

☐    ☒   Attachment B, Credentialing Delegation Agreement
☐    ☒   Business Associate Addendum

Medical Group is a:

☐    Specialist Group
☐    Primary Care Physician Group
☒    Primary and Specialty Care Group

Any Notice required or allowed to be given pursuant to the terms and provisions of this Agreement shall be sent to BCBSTX at:

Blue Cross and Blue Shield of Texas
9442 Capital of TX Hwy N, Ste 500, Arboretum II
Austin, TX 78759

and to Medical Group and/or Medical Group Providers at:

**Multiple Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the undersigned have executed this Agreement to be effective as of the Effective Date set forth below.

**BLUE CROSS AND BLUE SHIELD**          **MEDICAL GROUP**
**OF TEXAS**

**A scanned, imaged, electronic, photocopy or stamp of the signatures hereunder shall have the same force and effect as an originally executed signature.**

Authorized Signature:                      Authorized Signature:

Printed Name: M. Shannon Stansbury         Printed Name: Michelle Holle

Title: Vice President, Network Management   Title: Administrator

Date:  11/16/11                            Date:  11/10/11

Effective Date:  11/10/11                  NPI:  1544901 91

## PART I. DEFINITIONS

**Agreement** means this contract and all attachments, addenda and amendments appended hereto.

**Applicable Laws** means all federal and Texas laws and regulations that are applicable to any provisions of this Agreement, including, without limiting the foregoing, the Texas Insurance Code.

**Clean Claim** means a clean claim as defined by applicable Texas law and regulation.

**Coinsurance** means, if applicable, the specified percentage of the fee for a Covered Service that is payable by the Subscriber. The Subscriber's obligation to make Coinsurance payments may be subject to an annual out-of-pocket maximum.

**Copayment** means the amount required to be paid to Medical Group or Medical Group Provider by or on behalf of a Subscriber in connection with the services rendered by Medical Group or Medical Group Provider.

**Covered Services** means those health services specified and defined as Covered Services under the terms of a Subscriber's Health Plan.

**Debarment** means the prohibition of a Provider from receiving compensation for services provided under any federal health benefit plan or program, including, without limiting the foregoing, Medicare, Medicaid, and the Federal Employees Health Benefits Plan ("FEP"), as reported by the federal Office of Personnel Management ("OPM"), Office of the Inspector General ("OIG"), the Center for Medicare and Medicaid Services ("CMS"), Office of Foreign Assets Control ("OFAC") or other applicable agency.

**Deductible** means, if applicable, the specified annual amount of payment for certain Covered Services, expressed in dollars, that the Subscriber is required to pay before the Subscriber can receive any benefits for the Covered Services to which the Deductible applies.

**Emergency Care** means health care services provided in a Hospital emergency facility or comparable facility to evaluate and stabilize medical conditions of a recent onset and severity, including but not limited to severe pain, that would lead a prudent layperson possessing an average knowledge of medicine and health to believe that such person's condition, sickness or injury is of such a nature that failure to get immediate medical care could result in: (1) placing the patient's health in serious jeopardy; (2) serious impairment to bodily functions; (3) serious dysfunction of any bodily organ or part; (4) serious disfigurement; or (5) in the case of a pregnant woman, serious jeopardy to the health of the fetus. A different definition of Emergency Care may be applicable to self-funded plans as set forth in Subscriber's benefit document.

**Health Plan** means any group or individual health benefits plan other than a health maintenance organization, whether insured or self-funded, which provides its participants access to health care services that is operated, administered or underwritten, in whole or in part by BCBSTX, a Blue Cross and/or Blue Shield Plan in another state, a subsidiary of a Blue Cross and/or Blue Shield Plan in another state or a BCBSTX affiliate and that has entered into any agreement to provide or administer Covered Services. The phrase "provide or administer" includes an insurance arrangement, an administrative services agreement, or an arrangement whereby an employer or welfare benefit plan contracts with BCBSTX or a Blue Cross and/or Blue Shield Plan in another state to utilize all or part of a BCBSTX managed care network. The term affiliate includes, but is not limited to any licensed entity in which BCBSTX or Health Care Service Corporation has an ownership interest.

**In-Network Provider** means a Provider of health care services that has a managed care agreement with BCBSTX or another Blue Cross and/or Blue Shield plan.

**In-Network Services** means Covered Services provided to Subscribers by an In-Network Provider or are provided in accordance with the Health Plan's requirements for in-network benefits.

**Inpatient** means a Subscriber admitted to a hospital as a registered bed patient and who requires the acute bed patient overnight setting.

**Medical Director** means a physician designated by BCBSTX, or such physician's designee, who is responsible for monitoring the provision of Covered Services to Subscribers.

**Medical Group** means the above named entity that has entered into this Agreement with BCBSTX to provide or arrange for the provision of Covered Services to Subscribers. Where applicable by context, Medical Group also means Medical Group Providers. Medical Group shall require that Medical Group Providers comply with the provisions of this Agreement that are applicable by context to Medical Group Providers.

**Medical Group Provider** means an individual physician or Provider appropriately licensed to provide health care services who participates in Medical Group and includes, without limiting the foregoing, Medical Group Primary Care Physician, Medical Group Specialist, and Medical Group obstetrician/gynecologist.

**Medically Necessary** or **Medical Necessity** means health care services that a Medical Group or Medical Group Provider, exercising prudent clinical judgment, would provide to a Subscriber for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are: (a) in accordance with generally accepted standards of medical practice; (b) clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the Subscriber's illness, injury or disease; and (c) not primarily for the convenience of the Subscriber, Medical Group or Medical Group Provider, or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that Subscriber's illness, injury or disease. For these purposes, "generally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, Physician Specialty Society recommendations and the views of Physicians practicing in relevant clinical areas and any other relevant factors.

**Notice** means any notice required or allowed to be given pursuant to the terms and provisions of this Agreement. Notices shall be sent in writing by United States mail, certified mail, traceable commercial delivery, or electronic transmission, and shall be deemed to be given when received. Notices sent by United States mail shall be deemed to be received on the third business day following their deposit in the United States mail.

**Out-of-Network Provider** means a Provider of health care services that is not an In-Network Provider.

**Payer** means an entity other than BCBSTX that is financially responsible for payment for Covered Services under a Health Plan.

**POS Plan** means a Health Plan that requires the designation of a Primary Care Physician (PCP) who must coordinate all Covered Services, including Proper Referrals to Specialists and Preauthorizations when required, in order for the Subscriber to receive the highest level of benefits under the Health Plan.

**POS Subscribers** means Subscribers covered under POS Plans.

**Preauthorization** means BCBSTX's prior approval of the Medical Necessity for certain services provided to Subscribers and as required by the Health Plan.

**Primary Care Physician** means a physician designated by BCBSTX as a Primary Care Physician, with respect to POS Plan, an In-Network Provider who has agreed to be responsible for providing basic health services, coordinating the care of individual POS Subscribers, and as applicable, referring those Subscribers to other In-Network Providers.

**Proper Referral** means in the case of a POS Plan that requires the designation of a Primary Care Physician an authorization for Covered Services by the Primary Care Physician to any other Provider, and such authorization shall be made as provided in the Provider Manual. Where a Health Plan requires a particular Covered Service to be preauthorized, a Proper Referral must include such Preauthorization for such services to be In-Network Services.

**Provider** means any appropriately licensed provider of health care services.

**Provider Manual** means BCBSTX policies, procedures, and guidelines as set forth in a manual as supplemented by written materials, including BCBSTX Provider correspondence and the Blue Cross and Blue Shield of Texas Web site, which may be revised from time to time, subject to the provisions of **Part X, General Provisions, Section N, Modifications**.  In the event of a conflict between the Provider Manual and terms of this Agreement, the terms of this Agreement shall apply.

**Serious Reportable Events** means, as defined by the National Quality Forum (NQF), adverse events that are serious, but largely preventable, and of concern to both the public and health care providers and as may be more fully described in the Provider Manual.

**Specialist** means an In-Network Provider who is a physician or health care professional, other than a Primary Care Physician.

**Subscriber** means any individual who is eligible to receive Covered Services under a Health Plan unless otherwise specified by BCBSTX.

**UM Agent** means an entity that is a licensed utilization review agent under applicable law and is designated to perform utilization management ("UM") in connection with the care of Subscribers of a Health Plan, which is usually indicated on the Subscriber's identification card.  The administrator of the applicable Health Plan may designate BCBSTX or another licensed utilization review agent to act as UM Agent for purposes of this Agreement and may designate one or more UM Agents to perform various UM activities.  To the extent that BCBSTX has been designated as the UM Agent, BCBSTX may delegate any of BCBSTX's obligations to perform UM to any other entity licensed or otherwise permitted, in accordance with Applicable Laws, to perform UM in Texas.

**UM Program** means the guidelines, standards and procedures for UM activities that are used in connection with the applicable Health Plan, as more fully described in this Agreement.

**Urgent Care** means medical care that is delivered in a facility dedicated to the delivery of unscheduled, walk-in medical care that is not Emergency Care to any Subscriber outside of a hospital emergency department or comparable facility.

### PART II.  OBLIGATIONS OF MEDICAL GROUP

A.  **Covered Services.**

1.  If Medical Group includes Primary Care Physicians, each Medical Group Primary Care Physician shall provide primary care services to Subscribers within the scope of Primary Care Physician's practice or license and, with respect to POS Subscribers, agrees to assume primary responsibility for coordinating the overall health care of POS Subscribers and to provide or arrange for all other Covered Services subject to the terms and conditions of this Agreement.  Further, such Primary Care Physician shall make available to Subscribers those health education programs routinely provided by Primary Care Physician.

2.  If Medical Group includes Specialists, each Medical Group Specialist shall provide to such Subscribers those Covered Services that such Specialist commonly performs within Specialist's scope of practice or license subject to the terms and conditions of this Agreement.  For POS Subscribers for whom Covered Services require a Proper Referral, Medical Group Specialist agrees to render services only upon a Proper Referral.

3.  In the event a Medical Group Provider desires to utilize or refer to another Provider to provide Covered Services, the Medical Group Provider shall consider, and inform the Subscriber concerning, the availability of any In-Network Provider with a specialty comparable to any Out-of-Network Provider considered by the Medical Group Provider.  Any use of an Out-of-Network Provider, other than for Emergency Care, must be authorized in advance by BCBSTX for such services to be In-Network Services.

B.  **Availability.**  Medical Group shall ensure that Covered Services are readily available during Medical Group's regular business hours on business days.  Medical Group shall provide such services in the same manner, in accordance with the same standards, and within the same time availability as such services are provided to other patients without regard to the degree or frequency of utilization of such

Covered Services by Subscribers. In the event Medical Group Provider is temporarily unavailable, Medical Group Provider may provide Covered Services through a designee, provided that such designee must have an equivalent competence and specialty, and must agree to provide Covered Services to Subscribers under the same compensation arrangements and comply with BCBSTX procedures. Medical Group may make a special arrangement with BCBSTX in the event of the extended temporary absence of Medical Group Provider.

C. **Standard of Care.** Medical Group shall, and shall require Medical Group Providers to, comply with all Applicable Laws and all applicable professional standards, and shall require Covered Services to be provided by Medical Group Providers in accordance with generally accepted medical and surgical practices and standards prevailing in the applicable medical community at the time of treatment. In addition, Medical Group and Medical Group Providers shall comply with the standards adopted by the BCBSTX's quality improvement and UM Program set forth in the Provider Manual.

D. **Licensure and Medical Staff Requirements.** Medical Group warrants and represents as a material term of this Agreement that each Medical Group Provider has and will continue to have, as long as this Agreement remains in effect, all the requisite licenses/certifications required by the state of Texas and such other governmental and professional boards and bodies having authority over Medical Group Provider's business/profession, including where applicable, a currently valid, unrestricted license to practice medicine in the state of Texas, and further that each Medical Group Provider who is a physician is and will be a member in good standing with admitting privileges at, and on the staff of at least one In-Network Provider hospital. Except with respect to stabilization following Emergency Care, Medical Group will require that Subscribers be admitted only to In-Network Provider hospital(s) unless BCBSTX Preauthorizes the admission.

E. **Proper Referral and Preauthorization for POS Subscribers.**

1. As applicable, for POS Subscribers, Medical Group Primary Care Physicians referring a Subscriber to another Provider for treatment shall comply with all Proper Referral and Preauthorization procedures set forth in this Agreement and in the Provider Manual. Medical Group Providers will only refer to In-Network Providers except in cases of Emergency Care or, if Preauthorized by BCBSTX, when no In-Network Providers are available to provide the necessary services.

2. If applicable, for Subscribers of POS Plans, Medical Group Specialist shall comply with all Proper Referral and Preauthorization procedures set forth in this Agreement and in the Provider Manual. For POS Subscribers, Medical Group Specialists shall provide Covered Services only upon a Proper Referral or Preauthorization, as applicable, except in cases requiring Emergency Care. For POS Subscribers, Medical Group Specialist shall discuss with and seek approval from the referring In-Network Provider prior to rendering or arranging any continuing treatment which is beyond the specific treatment described in the Proper Referral. In addition, Medical Group Specialist shall not refer a POS Subscriber to another physician or Provider without the prior concurrence of the POS Subscriber's Primary Care Physician, as applicable.

3. Subject to the terms of POS Subscriber's benefit document, POS Subscriber may directly access, from In-Network Providers, Covered Services that are Urgent Care. Information regarding Subscriber's care will be shared with POS Subscriber's Primary Care Physician.

4. Costs of services rendered to a POS Subscriber by Medical Group or a Medical Group Provider without a Proper Referral or Preauthorization where required shall be the financial responsibility of Medical Group or Medical Group Provider. The involvement of BCBSTX or other administrator of any Health Plan and/or the applicable UM Agent in decisions relating to the coverage of services rendered to POS Subscribers under these Health Plans shall not diminish the ultimate and sole responsibility of Medical Group for any professional authority over their professional practice with respect to the care of such Subscribers.

F. **Facilities, Equipment and Staff.** The following requirements shall be met or performed by Medical Group and/or Medical Group Providers, as applicable:

1. Provide and maintain facilities and/or equipment which are of adequate capacity, clean, safe, readily accessible to Subscribers and, where appropriate, properly licensed and/or registered.

2. Assure the appropriate supervision of, licensure/certification of, and insurance coverage for, all employed or subcontracted staff who provide Subscribers Covered Services that are performed under the direction of Medical Group Providers.

3. Have written policies that are implemented and enforced and that describe the duties of any employed or subcontracted physician assistants, advanced practice nurses and other individuals other than physicians in accordance with statutory requirements for licensure, delegation, collaboration and supervision as appropriate.

If any employee or subcontractor of Medical Group violates any of the provisions of Applicable Laws or the Provider Manual or commits any act or engages in any conduct for which Medical Group's license/certification may be revoked or suspended by the state of Texas (whether or not such authority revokes or suspended said license/certification) or is otherwise disciplined by such licensing authority or any professional organization having authority over such employee or contracting agent, BCBSTX may immediately require the employee or contractor to cease rendering services to Subscribers under this Agreement.

G. **Administrative Services.** Medical Group shall perform or contract for all administrative and support services necessary for Medical Group to perform Medical Group's obligations under this Agreement and as set forth in the Provider Manual.

H. **BCBSTX Complaint Procedures.** Medical Group and Medical Group Providers shall cooperate with BCBSTX in identifying, processing and in supporting BCBSTX's resolution of all Subscriber complaints and grievances. In the event Medical Group has a complaint, Medical Group also agrees to use the Provider complaint procedure set forth in the Provider Manual, and the procedures required in **Part X, General Provisions, Section I, Dispute Resolution** as described in this Agreement.

I. **Subscriber Identification.** Medical Group Provider shall request Subscriber to present Subscriber's BCBSTX identification card each time Subscriber seeks Covered Services. Obtaining information concerning eligibility at the time of service by Medical Group as described in this Agreement is not a verification and does not guarantee payment by BCBSTX.

J. **Termination of the Medical Group Provider/Patient Relationship.**

1. Under certain circumstances, Medical Group Provider may terminate Medical Group Provider's professional relationship with a Subscriber as provided for and in accordance with the provisions of the Provider Manual. Medical Group Provider may not terminate Medical Group Provider's relationship with a Subscriber because of such Subscriber's medical condition or the amount, types or cost of Covered Services that are required by the Subscriber.

2. Medical Group acknowledges that a Subscriber may transfer to another In-Network Provider or Medical Group Provider's care in accordance with the Subscriber's benefit document. Medical Group shall require that the Medical Group Provider provide patient records, reports and other documentation regarding such Subscriber at no cost upon request in order to facilitate such transfer.

K. **Required Disclosures.** Medical Group shall notify BCBSTX at least thirty (30) days in advance if there is a change in the business address, telephone number, hours of operation, tax identification number, other billing information or services provided by Medical Group or Medical Group Provider. Additionally, Medical Group shall notify BCBSTX immediately in writing upon the occurrence of any of the following events:

1. Medical Group's, Medical Group Provider's, or any Medical Group employee's or subcontractor's applicable license or certification to practice in Texas or DEA/DPS registration is suspended, revoked, terminated or subject to terms of probation or other restriction (whether or not such action is stayed); or Debarment of Medical Group, Medical Group Provider, or any Medical Group employee or subcontractor, or inclusion of Medical Group, Medical Group Provider, or any Medical Group employee or subcontractor in the OFAC/OIG/GSA/OPM list;

2. A Medical Group Provider's medical staff privileges at any hospital are denied, suspended, restricted, revoked or voluntarily relinquished in lieu of disciplinary action;

3. Medical Group, Medical Group Provider or any Medical Group employee or subcontractor, becomes the subject of any disciplinary proceeding, Debarment or action before the Texas State Board of Medical Examiners or a similar agency in any state;

4. A Medical Group Provider, or any Medical Group employee or subcontractor, is charged with or indicted for, or convicted of, fraud or a felony;

5. An act of nature or any event beyond Medical Group's or a Medical Group Provider's reasonable control occurs, which substantially interrupts all or a portion of Medical Group's or a Medical Group Provider's business or practice or which has a materially adverse effect on Medical Group's ability to perform Medical Group's obligations under this Agreement;

6. The material modification or termination, or reduction in the amount, of the insurance coverage required for participation in BCBSTX, or replacement of coverage which is canceled or terminated;

7. Medical Group or Medical Group Provider learns of any claim or malpractice action or other lawsuit or other action brought against Medical Group or any Medical Group Provider, or Medical Group employee or subcontractor, or becomes aware of a malpractice judgment or settlement against Medical Group, Medical Group Provider or any Medical Group employee or subcontractor;

8. Significant changes in administrative capacity, including information systems, and operational staff that may have a material adverse effect on Medical Group's ability to perform Medical Group's obligations under this Agreement; or

9. Any other situation which could reasonably be expected to affect the ability of Medical Group or Medical Group Provider to carry out Medical Group's obligations under this Agreement.

L. **Provider Directory.** Medical Group agrees that BCBSTX may list such information as Medical Group or Medical Group Provider's name, specialty, address, telephone number and board status and other information in BCBSTX publications provided to In-Network Providers and Subscribers and may use such information in advertising and marketing materials and to provide to Subscribers information regarding other In-Network Providers.

M. **Medical Group Status.**

1. Medical Group certifies that neither Medical Group, Medical Group Providers nor Medical Group's employees or subcontractors have been: (a) charged with a criminal offense in connection with obtaining, attempting to obtain, or performing of a public (federal, state or local) contract or subcontract, (b) listed by a federal governmental agency as debarred, (c) proposed for Debarment or suspension or otherwise excluded from federal program participation, (d) been convicted of or had a civil judgment rendered against Medical Group, Medical Group Providers, Medical Group's employees or subcontractors regarding dishonesty or breach of trust, including but not limited to, the commission of a fraud including mail fraud or false representations, violation of a fiduciary relationship, violation of federal or state antitrust statutes, securities offenses, embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, tax evasion, or receiving stolen property; or (e) within a three (3) year period preceding the date of this Agreement, had one or more public transactions (federal, state or local) terminated for cause or default.

2. Medical Group acknowledges and agrees that Medical Group has a continuing obligation to notify BCBSTX in writing within seven (7) business days if any of the above-referenced representations change. Medical Group further acknowledges and agrees that any misrepresentation of Medical Group's status or any change in Medical Group's status at any time during the term of this Agreement may be grounds for immediate termination of this Agreement, at the sole discretion of BCBSTX.

N. **BCBSTX Credentialing Procedures.** Medical Group shall cooperate and comply with, and be subject to, BCBSTX credentialing and recredentialing policies and procedures. Medical Group further acknowledges and agrees that, except as may be required by Applicable Laws, a Medical Group Provider will not become an In-Network Provider in BCBSTX until approved by BCBSTX pursuant to such credentialing policies and procedures and that continued participation in BCBSTX is subject to the recredentialing process at intervals provided for in such policies and procedures. If Medical Group is delegated for credentialing, Medical Group agrees to abide by the terms in this section and **Attachment B**.

O. **Capacity.** Medical Group or Medical Group Provider must give BCBSTX not less than ninety (90) day prior Notice of closing Primary Care Physician's practice to new Subscribers. Notwithstanding practice closure, Medical Group or Medical Group Provider agrees to accept all existing patients who are or become Subscribers. Medical Group agrees that BCBSTX shall have no obligation to guarantee any minimum number of Subscribers to Medical Group and that Medical Group shall accept all patients enrolling as BCBSTX Subscribers except as set forth to the contrary herein.

P. **Medical Group Subcontracts with Physicians and Providers.**

1. Medical Group shall furnish to BCBSTX in advance of its use the standard form of all subcontracts between Medical Group and any Medical Group Providers, including any material changes to such forms, in accordance with the Provider Manual. In addition, Medical Group shall provide to BCBSTX the executed signature page of each such contract and any material changes to such contract. Medical Group will ensure such Medical Group Providers comply with all terms and conditions set forth in the Subscriber's benefit documents and this Agreement.

2. Contracts between Medical Group and Medical Group Providers must contain provisions requiring such Medical Group Providers to comply with the provisions of this Agreement, and the Provider Manual where applicable, and must allow such Medical Group Providers to terminate such contracts on ninety (90) days advance Notice, and may not contain restrictions on such Provider's right to contract directly, or indirectly through another medical group, with BCBSTX after termination of such Medical Group Provider's contract with Medical Group.

## PART III. OBLIGATIONS OF BCBSTX

A. **Provider Manual.** BCBSTX shall make available to Medical Group the Provider Manual. The Provider Manual may be revised by BCBSTX from time to time and in accordance with this Agreement.

B. **Identification Cards.** BCBSTX shall issue identification cards to Subscribers.

C. **Service Preauthorizations.** BCBSTX shall Preauthorize Covered Services as set forth in the Provider Manual and in accordance with the provisions of the Health Plan and this Agreement.

D. **Advisory Review Panel.** BCBSTX may establish one or more health services delivery advisory review panels to advise BCBSTX on a variety of issues. Medical Group Providers may be requested from time to time by BCBSTX to serve as members on such panels.

E. **Credentialing.** BCBSTX shall administer a credentialing and recredentialing program pursuant to which the credentials of Provider applicants are reviewed and approved for acceptance as In-Network Providers.

F. **Complaints.** BCBSTX will establish and maintain a complaint procedure as required by the Provider Manual and Applicable Laws.

## PART IV. COMPENSATION

A. **Payment.**

1. BCBSTX or Payer shall pay Medical Group for Covered Services rendered to Subscribers less any applicable Subscriber Copayments, Coinsurance or Deductible amounts as described in **Attachment A, Compensation/Claims Submission**. Medical Group shall accept such

compensation, and any applicable Subscriber Copayment, Coinsurance or Deductible as Medical Group's only compensation for Covered Services. If the Health Plan is a secondary insurer, then a claim must include the amount paid as a covered claim by the primary insurer to be a Clean Claim. Any dispute arising from such payment shall be resolved in accordance with **Part X, General Provisions, Section I, Dispute Resolution.**

2. **Recovery of Overpayments and Underpayments**

   a. In the event that BCBSTX or Payer determines an overpayment, including a duplicate payment, has been made, Medical Group and/or Medical Group Provider agree to promptly make repayment to BCBSTX or Payer when requested. If Medical Group and/or Medical Group Provider fail to make such repayment within the time period specified in the Provider Manual, Medical Group and/or Medical Group Provider shall allow overpayments to be deducted from future payments, for the same or different Subscribers, with an explanation of the action taken.

   b. Overpayments determined by Medical Group and/or Medical Group Provider on a claim or claims, including duplicate payments, shall be refunded promptly to BCBSTX or Payer, but in any event not later than thirty (30) days following such determination.

   c. Any underpayments shall be added to future payments by BCBSTX or Payer to Medical Group and/or Medical Group Provider.

   d. Any dispute arising from a deduction or payment with respect to an overpayment or underpayment shall be resolved in accordance with the Provider complaint procedures set forth in **Part II, Obligations of Medical Group, Section H, BCBSTX Complaint Procedures.**

B. **Copayments, Coinsurance and Deductibles.** The collection of Subscriber Copayment, Coinsurance or Deductible amounts is the sole responsibility of Medical Group Provider. Medical Group shall require Medical Group Providers to diligently pursue, and have responsibility for, collection of any applicable Copayment, Coinsurance or Deductible amount from Subscribers and shall in no event offer, publicize or advertise any waiver or other reduction of any Copayment, Coinsurance or Deductible amount unless specifically authorized in writing by BCBSTX. All Copayments, Coinsurance and Deductible amounts shall be as specified in the benefit document, and the amounts of the Copayments, Coinsurance or Deductible which Medical Group Provider is authorized to collect from the Subscriber shall not exceed the amounts so specified.

C. **Claims Submission.** Medical Group shall submit complete and properly executed claims to BCBSTX within the required filing period, as described in **Attachment A, Compensation/Claims Submission.**

D. **Subscriber Nonliability and Hold Harmless.**

   1. Medical Group hereby agrees that in no event, including, but not limited to, non-payment by BCBSTX or Payer, insolvency of BCBSTX or Payer or breach of this Agreement, shall Medical Group or Medical Group Providers bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against Subscriber or persons other than BCBSTX acting on Subscriber's behalf for Covered Services. This provision shall not prohibit collection of supplemental charges or Copayment, Coinsurance or Deductible amounts payable in accordance with the terms of Subscriber's benefit document.

   2. Medical Group further agrees that: (a) this provision shall survive the termination of this Agreement regardless of the cause giving rise to termination and shall be construed to be for the benefit of the Subscriber; and (b) this provision supersedes any oral or written contrary agreement now existing or hereafter entered into between Medical Group or a Medical Group Provider and Subscriber or persons acting on their behalf.

E. **Billing for Non-Covered Services.** In the event that BCBSTX determines and informs Medical Group that a proposed service is not a Covered Service, including but not limited to services that are determined to be experimental/investigational or not Medically Necessary, Medical Group must

inform the Subscriber in writing in advance of the service being rendered that the service is a non-Covered Service in order to be allowed under this Agreement to bill the Subscriber for the service rendered. The Subscriber must also acknowledge this disclosure in writing and agree to accept the service as a non-Covered Service billable directly to the Subscriber. In the event the Subscriber's benefits are exhausted, Medical Group may continue to provide treatment to the Subscriber if the Subscriber agrees in writing to pay for those services; provided, however, that Medical Group may not charge the Subscriber more than the amount allowed as described in Attachment A.

F.  **Third Party Collections.**  Medical Group shall cooperate with BCBSTX in the collection on BCBSTX's behalf of third party payments including workers' compensation, third party liens and other third party liability according to the procedures set forth in the Provider Manual. Medical Group agrees that Medical Group or Medical Group Provider will file claims with BCBSTX even if Medical Group believes or knows that there is third party liability and the existence of third party liability will not affect Medical Group's or Medical Group Provider's total compensation for Covered Services.

G.  **Coordination of Benefits.**  Medical Group shall comply with the requirements of Applicable Laws and the Provider Manual regarding Covered Services involving coordination of benefits. Medical Group agrees to submit applicable claims and encounter information concerning other carriers to BCBSTX even if Medical Group believes that coordination of benefits may apply and BCBSTX is not the primary carrier. In the event that the Subscriber is eligible for benefits under any other health benefits plan for Covered Services, Medical Group's total compensation for such Covered Services from all sources, including any Copayments, Coinsurance or Deductible amounts payable by the Subscriber to Medical Group, shall not exceed the amount that would have been payable to Medical Group under this Agreement without taking into consideration such other coverage.

### PART V.  QUALITY IMPROVEMENT AND UTILIZATION MANAGEMENT

A.  **BCBSTX Responsibilities.**  BCBSTX shall conduct peer review, quality improvement and the UM Program in accordance with Applicable Laws. BCBSTX's UM Program may include the establishment of advisory review panels to conduct quality of care and utilization review activities in accordance with Applicable Laws. All BCBSTX quality improvement and UM forms, records and other information shall remain the property of BCBSTX and shall remain confidential.

B.  **Medical Group Responsibilities.**  Medical Group agrees to comply with and be subject to the quality improvement program and the UM Program conducted by BCBSTX and cooperate with peer review activities, all as set forth in the Provider Manual, and to promote Subscriber participation in BCBSTX disease management programs as applicable. These programs may be revised from time to time, and may include, but are not limited to, Preauthorizations of elective Inpatient services, concurrent review of Inpatient lengths of stay, review of referrals, internal peer review and external audit systems. Medical Group shall have sole authority and responsibility for the care of any Subscriber who is a patient of Medical Group.

C.  **Shared Records.**  Upon request, Medical Group shall make available to BCBSTX's quality improvement and utilization review committee any records of Medical Group's quality improvement and utilization review activities pertaining to Subscribers. BCBSTX will protect the confidentiality of information that is the product of Medical Group's peer review process.

### PART VI.  RECORDS

A.  **Subscriber Record.**  Medical Group and Medical Group Providers shall establish and maintain an accurate medical record, including electronic record, for each Subscriber with whom Medical Group Providers have an encounter that, at a minimum, shall include such information about the Subscriber and a description of all services rendered to the Subscriber as dictated by generally accepted medical and surgical practices and standards and as required by the Provider Manual ("Medical Records"). Medical Group Provider shall maintain accurate financial books and records, including electronic records, concerning Covered Services provided to each Subscriber, including any charges to and payments received from the Subscriber by Medical Group ("Financial Records"). Medical Group shall maintain the Medical Records and Financial Records for a period of at least ten (10) years after the records cease to be active records. The obligations of Medical Group to maintain and provide

access to records under this **Part VI. Records**, does not cease upon termination of this Agreement without cause or for any cause.

B. **Access to Medical Records.**   Subject to compliance with Applicable Laws and applicable professional standards regarding the confidentiality of Medical Records, Medical Group and Medical Group Provider shall:

1. Provide BCBSTX, upon request and at no charge, copies of specified sections of Subscriber Medical Records that are in the custody of Medical Group or Medical Group Provider;

2. Upon five (5) days advance notice, or such shorter notice as may be reasonably required by the circumstances, allow BCBSTX authorized personnel access to inspect and copy Medical Records on Medical Group's or Medical Group Provider's premises during regular business hours;

3. Transmit information from Subscriber Medical Records by telephone to BCBSTX for purposes of Preauthorization or other UM activities or quality improvement; and

4. Provide copies of specified sections of Subscriber Medical Records, upon reasonable request and at no charge, to any other Provider treating such Subscriber.

C. **Access to Financial Records.**  Upon five (5) days advance notice, or such shorter notice as may be reasonably required by the circumstances, BCBSTX shall have access to inspect, audit and copy all Financial Records during regular business hours.  Medical Group shall maintain Financial Records and provide copies of such information to BCBSTX, upon BCBSTX's reasonable request, at no charge.

D. **Regulatory Compliance.**  Medical Group shall maintain such records and information and provide them to the Texas Department of Insurance and other applicable regulatory agencies as may be necessary for compliance by BCBSTX with Applicable Laws.  All such records shall be open to inspection during regular business hours by state and federal authorities.

### PART VII.  INSURANCE AND INDEMNIFICATION

A. **Medical Group Insurance.**  Medical Group and each Medical Group Provider agree to maintain such policies of general and professional liability insurance as are necessary to insure Medical Group, Medical Group Providers and their employees or subcontractors against any claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance by Medical Group, Medical Group Provider, or any Medical Group employees or subcontractors of Medical Group's obligations under this Agreement.  BCBSTX determines the limits of coverage necessary.

B. **Certificates.**  Certificates of insurance or other evidence indicating the term and extent of the insurance required by **Part VII, Section A, Medical Group Insurance**, shall be provided by Medical Group to BCBSTX upon BCBSTX's request.

C. **BCBSTX Insurance.**  BCBSTX shall procure and maintain such policies of general and professional liability and other insurance, which may include self-insurance, as shall be necessary to insure BCBSTX and BCBSTX's employees against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any services by BCBSTX, the use of any property and facilities provided by BCBSTX, and activities performed by BCBSTX in connection with this Agreement.

D. **Indemnification.**  Medical Group and BCBSTX understand that this Agreement is not one to insure and/or indemnify and shall not be so construed.  Each party shall be solely responsible for its own negligence, acts or omissions.

### PART VIII.  TERM AND TERMINATION

A. **Term.**  This Agreement shall be effective as of the Effective Date and shall continue until otherwise terminated in accordance with this Agreement.

PPOMG0208                          11 of 18

B. **Termination Notice Period.**

1. Either party may terminate this Agreement at any time without cause or for any cause by giving the other party at least ninety (90) days advance Notice.

2. Medical Group may terminate this Agreement upon thirty (30) days advance Notice to be given within thirty (30) days following Medical Group's receipt from BCBSTX of information concerning a decrease in compensation, or the posting of such information on the Blue Cross and Blue Shield Web site, pursuant to **Part X, Section E, Compensation Information.**

C. **Immediate Termination or Suspension.** BCBSTX may, in its sole discretion, immediately suspend or terminate this Agreement, or may suspend or terminate the participation of Medical Group Provider, upon Notice by BCBSTX to Medical Group if there is a threat of imminent harm to patient health, action against Medical Group's or Medical Group Provider's license to practice, or fraud or malfeasance, including without limiting the foregoing any of the following:

1. Failure to comply with the requirements contained in **Part II, Obligations of Medical Group, Section C, Standard of Care,** including:

   a. Suspension, surrender, or revocation of Medical Group's or Medical Group Provider's narcotics number or license to practice medicine or render services in any state;

   b. Professional or other conduct by Medical Group, Medical Group Provider, or Medical Group employee or subcontractor, which is detrimental to patient welfare and care;

   c. Conviction of Medical Group, Medical Group Provider, or Medical Group employee or subcontractor, of a felony involving lying, cheating, stealing, abuse of controlled substances, or sexual misconduct.

2. Becoming subject to the grounds for termination set forth in **Part II, Obligations of Medical Group, Section M, Medical Group Status.**

D. **Review of Termination.** In the event of termination of Medical Group by BCBSTX, if Medical Group is terminated for reasons other than at Medical Group's request, BCBSTX shall provide a written explanation to Medical Group of the reason(s) for termination. Except in a case of termination under **Part VIII, Section C, Immediate Termination or Suspension,** Medical Group may, within thirty (30) days following the Notice of termination, request in writing that a review be conducted by BCBSTX's advisory review panel and BCBSTX will conduct such a review consistent with Applicable Laws. Within sixty (60) days following receipt of Medical Group's written request for review, BCBSTX will notify Medical Group of BCBSTX's review decision. At Medical Group's request, Medical Group shall be entitled to an expedited review of such termination by BCBSTX's advisory review panel. At Medical Group's request, BCBSTX will provide Medical Group with a copy of the recommendation of the advisory review panel. The decision of the advisory review panel must be considered by, but is not binding upon, BCBSTX.

E. **Effect of Termination.** As of the date of termination, this Agreement shall be considered of no further force or effect and each of the parties shall be relieved and discharged from this Agreement except that:

1. Termination shall not affect any rights or obligations hereunder which have previously accrued or shall hereafter arise with respect to any occurrence prior to termination and such rights and obligations shall continue to be governed by the terms of this Agreement.

2. Termination of this Agreement shall not release Medical Group from the obligation to continue ongoing treatment under the terms of this Agreement and in accordance with the dictates of medical prudence, of a Subscriber of "special circumstance" as defined by Applicable Laws, including but not limited to, Subscribers with a disability, acute condition or life-threatening illness, or Subscribers past the 24th week of pregnancy, or BCBSTX or Payer from the obligation to compensate Medical Group for such Covered Services at the rate set forth in this Agreement. Special circumstance shall be identified by Medical Group, who must request that Subscriber be permitted to continue under Medical Group's care and who must agree not to seek payment from

Subscriber for any amounts for which Subscriber would not be responsible if the Agreement had not terminated. Disputes regarding continuity of care will be resolved according to the dispute resolution procedures set forth in the Provider Manual and this Agreement. Medical Group's and BCBSTX's obligations hereunder shall continue until the earlier of the appropriate transfer of Subscriber's care to another In-Network Provider or the expiration of ninety (90) days from the effective date of termination of the Agreement. Additionally, Medical Group's and BCBSTX's obligations hereunder shall continue up to nine (9) months in the case of a Subscriber who at the time of the termination has been diagnosed with a terminal illness and shall extend through delivery of a child, immediate postpartum care, and the follow-up checkup within the first six (6) weeks of delivery for a Subscriber who, at the time of the termination, is past the 24th week of pregnancy. Medical Group agrees to cooperate in the referral of Subscribers to other In-Network Providers in order to assure continuation of care. In the event that BCBSTX has not used due diligence to make alternative care arrangements available to Subscriber within ninety (90) days after receipt by BCBSTX of Notice from Medical Group or Subscriber, and such arrangements are not available to Subscriber within such ninety (90) day period, BCSTX shall thereafter compensate Medical Group for continued care at the BCBSTX allowable amount for comparable services provided by a comparable Provider that is not an In-Network Provider. Nothing herein shall be construed as requiring BCBSTX to agree to cover continued care rendered by Medical Group who BCBSTX deems unfit to care for Subscribers by reason of incompetence or unprofessional behavior or otherwise.

3. Medical Group agrees, at BCBSTX's option, to provide Covered Services to Subscribers during the notice period set forth in **Part VIII, Section B**, including any Subscribers who become eligible during such period under the terms of the Subscriber's benefit document and in accordance with the terms of this Agreement. Medical Group shall be compensated for Covered Services rendered in accordance with this Section and the fees set forth in Attachment A of this Agreement, until appropriate transfer of Subscribers is achieved or alternate compensation for Covered Services acceptable to Medical Group has been determined.

In the event of termination of the Agreement, BCBSTX will provide reasonable advance Notice to Subscribers receiving care from Medical Group of the impending termination, except that if Medical Group is terminated for a reason other than at the request of Medical Group and has made a timely request for review by an advisory review panel, BCBSTX will not notify Subscribers of Medical Group's termination prior to the time the advisory review panel makes a formal recommendation. If Medical Group is terminated or suspended immediately pursuant to **Part VIII, Section C, Immediate Termination or Suspension**, BCBSTX may notify Subscribers immediately. Medical Group agrees to cooperate with BCBSTX and upon request to provide reasonable assistance to effect such Notice.

## PART IX. RELATIONSHIP OF PARTIES

A. **Independent Contractors.** None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between BCBSTX and Medical Group other than that of independent entities contracting with each other hereunder solely for the purpose of effecting the provisions of this Agreement. Neither of the parties hereto, nor any of their respective employees, shall be construed to be the agent, employer or representative of the other. None of the provisions of this Agreement shall be construed to in any way limit BCBSTX's authority or responsibility to comply with all regulatory requirements.

B. **Blue Cross and Blue Shield Association.** Medical Group hereby expressly acknowledges that this Agreement constitutes a contract solely between Medical Group and BCBSTX, which is an independent corporation operating under a license from the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield Plans, (the "Association") permitting BCBSTX to use the Blue Cross and Blue Shield Service Marks in the state of Texas, and that BCBSTX is not contracting as the agent of the Association. Medical Group further acknowledges and agrees that Medical Group has not entered into this Agreement based upon representations by any person other than BCBSTX and that no person, entity, or organization other than BCBSTX shall be held accountable or liable to Medical Group for any of BCBSTX's obligations to Medical Group created under this Agreement. This paragraph shall not create any additional obligations whatsoever on the part of BCBSTX other than those obligations created under other provisions of this Agreement.

C. **No Third Party Beneficiary.** This Agreement is entered into by and between Medical Group and BCBSTX solely for their benefit. Except for Part IV, **Compensation, Section D, Subscriber Nonliability and Hold Harmless,** there is no intent by either party to (a) create or establish any third party beneficiary status or (b) increase the rights of any Subscriber or any other person, firm or other entity not a party to this Agreement with respect to the duties of either party to any person or create any rights on behalf of any person with respect to either party.

## PART X. GENERAL PROVISIONS

A. **Administrative Functions.** BCBSTX and Medical Group acknowledge that BCBSTX may delegate certain responsibilities or activities that are provided for in this Agreement.

B. **Assignment.** No part of this Agreement, or any rights, duties or obligations described herein, shall be assigned, encumbered or delegated except as expressly provided for in this Agreement without the prior express written consent of both parties. Notwithstanding the foregoing, BCBSTX, without Medical Group's consent, may validly assign this Agreement to any affiliate of BCBSTX. BCBSTX's standing or routine contractual arrangements for the acquisition and use of facilities, services, supplies, equipment and personnel from other parties shall not constitute an assignment under this Agreement.

C. **BlueChoice Solutions.** The contract terms and fee allowables provided under this Agreement also apply to BlueChoice Solutions if Provider's applicable BCBSTX provider numbers are determined to be eligible for BlueChoice Solutions.

D. **Captions.** The captions contained herein are for reference purposes only and shall not affect the meaning of this Agreement.

E. **Compensation Information.** Medical Group is entitled, upon written request, and in accordance with Applicable Laws, to all information necessary to determine that Medical Group is being compensated in accordance with the terms of this Agreement. Medical Group may consult the Blue Cross and Blue Shield of Texas Web site for further information and instructions.

F. **Compliance.** Each party shall comply with Applicable Laws, and with applicable provisions of the Provider Manual.

G. **Confidentiality of Proprietary Information.** Each of the parties and the parties' employees shall maintain in confidence during the term of this Agreement and thereafter, except as otherwise required by Applicable Laws, (1) all Subscriber information including medical information, learned through the operation of this Agreement, (2) all confidential Provider information, including information disclosed as part of the peer review process, (3) quality assurance and utilization review information, (4) all financial information related to this Agreement, (5) all proprietary business information that has been identified as confidential and maintained as confidential by the other party, (6) the provisions of any amendment to this Agreement that would have been protected as confidential had they originally been contained herein, and (7) any other information required to be maintained in confidence by Applicable Laws (collectively "Confidential Information"), unless disclosure of a specific part of the Confidential Information is otherwise required to accomplish the purposes of this Agreement and is permitted by Applicable Laws. Each of the parties and the parties' employees shall use best efforts to safeguard and protect Confidential Information against any unauthorized disclosure by any person and shall refrain from using or allowing any other person to use any Confidential Information in any way that is considered detrimental to the other party or Subscriber.

H. **Cooperation of Parties.** Medical Group and BCBSTX agree to meet and confer in good faith on common problems including, but not limited to, problems concerning utilization of services, credentialing, Preauthorization, claims or reporting procedures and information and forms provided to Medical Group for use in conjunction with Subscribers.

I. **Dispute Resolution.** BCBSTX or Medical Group, as the case may be, shall give Notice to the other of the existence of a dispute. In order to avoid the cost and time consuming nature of litigation, any dispute between BCBSTX and Medical Group arising out of, relating to, involving the interpretation

of, or in any other way pertaining to this Agreement or any prior Agreement between BCBSTX and Medical Group shall be resolved using alternative dispute resolution mechanisms instead of litigation. BCBSTX and Medical Group agree and acknowledge that it is their mutual intention that this provision be construed broadly so as to provide for mediation and/or arbitration of all disputes arising out of their relationship as third-party Payer and Medical Group. The parties further agree that resolution of any dispute pursuant to this Agreement shall be in accordance with the procedures detailed below.

1. **External Review Process.**

   Medical Group may elect to subject certain disputes to an external review process ("External Review Election") as follows:

   a. Subject to the provisions of the Provider Manual, Medical Group may elect to subject certain disputes regarding claim payment to the Billing Dispute External Review Process as described therein. The resulting determination with respect to payment of any claims that are the subject of disputes so submitted shall be binding on the parties and not be subject to the other provisions contained herein for dispute resolution.

   b. Subject to the provisions of the Provider Manual, Medical Group may, if Medical Group is acting on behalf of a Subscriber, elect to subject certain disputes concerning a determination by BCBSTX that a service is not or will not be a Covered Service because it is not Medically Necessary or is experimental or investigational in nature ("Adverse Determination") to the External Review process described in the Provider Manual. The resulting determination with respect to the appropriateness of such Adverse Determination shall be binding on the parties and not be subject to the other provisions contained herein for dispute resolution.

2. **Initial Resolution by Meeting or Mediation of Dispute.** If Medical Group has not made an External Review Election, and BCBSTX and Medical Group mutually agree that a meeting to attempt to resolve the dispute would be advantageous, representatives of BCBSTX and Medical Group shall meet not later than thirty (30) calendar days after delivery of the Initial Notice in order to attempt to resolve the dispute. Subsequent meetings may be held, if mutually agreed. If no meeting is mutually agreed, or if the dispute is not resolved at any meetings held, the party giving the Initial Notice shall submit the dispute to mediation by an organization or company specializing in providing neutral, third-party mediators. The mediation process shall be coordinated by the submitting party with the mediator and shall be subject to the following agreed-upon conditions:

   a. The parties agree to participate in the mediation in good faith;

   b. The parties agree to have present at the mediation one or more individuals with decision-making authority regarding the matters in dispute. Either party may, at that party's option, be represented by counsel. Medical Group may, at Medical Group's option, also have present at the mediation a representative of any professional society in which Medical Group is a member;

   c. The mediation will be held within sixty (60) days of the submission to mediation unless the parties mutually agree on a later date. The mediation will be held in one of the following cities, which is closest to the principal office of Medical Group, to be designated in writing by Medical Group, unless BCBSTX and Medical Group mutually agree to an alternative location: Abilene, Amarillo, Austin, Corpus Christi, Dallas, El Paso, Houston, Lubbock, Lufkin, Midland-Odessa, San Angelo, San Antonio, Texarkana, Waco, Wichita Falls, and Brownsville.

   d. The parties shall each bear their own costs and shall each pay one-half of the mediator's fees and costs, unless the mediator determines that one party did not participate in the mediation in good faith, in which case that party shall pay all of the mediator's fees and costs;

   e. The parties agree that the obligation to mediate (but not the obligation to arbitrate) is not applicable to any dispute that was pending in any court on the Effective Date of this

Agreement, or that had been submitted to binding arbitration on or before the Effective Date of this Agreement.

3.  **Binding Arbitration.** In the event Medical Group has not made an External Review Election and mediation is not successful in resolving the dispute, either BCBSTX or Medical Group may submit the dispute to final and binding arbitration under the commercial rules and regulations of the American Health Lawyers Association, subject to the following:

    a.  The arbitration shall be conducted by a single arbitrator selected by the parties from a list furnished by the American Health Lawyers Association. If the parties are unable to agree on an arbitrator from the list, the arbitrator shall be appointed by the American Health Lawyers Association;

    b.  The arbitrator shall be required to render a written decision resolving all disputes, and designating one party as the "prevailing party";

    c.  Except in the case of fraud, no arbitration decision may require any adjustment in reimbursements or payments respecting any dispute involving services rendered more than eighteen (18) months prior to receipt of the Initial Notice;

    d.  The costs of arbitration, including the arbitrator's fee and any reporting or other costs, but excluding lawyers', consultants' and witness fees, shall be borne by the non-prevailing party unless the arbitrator determines as part of the award that such allocation is inequitable under the totality of the circumstances. In the event that the dispute in arbitration concerns the appropriateness of BCBSTX's adjudications of claims, the party challenging the adjudications shall have the initial burden of proving that there is a reasonable probability that the disputed claims adjudications were incorrect adversely to that party. When the other party reasonably determines that it is required in its defense, or is required by the discovery process or otherwise by law, to research the basis for the adjudications of challenged claims for which such reasonable probability has not been proven, the other party shall be awarded the administrative cost for such research for each such claim that is found in the arbitration proceeding, after such research, not to have been adjudicated incorrectly adversely to the challenging party;

    e.  The arbitration hearing will be held in one of the following cities, to be designated in writing by Medical Group, which is closest to the principal office of Medical Group, to be designated in writing by Medical Group, unless BCBSTX and Medical Group mutually agree to an alternative location: Abilene, Amarillo, Austin, Corpus Christi, Dallas, El Paso, Houston, Lubbock, Lufkin, Midland-Odessa, San Angelo, San Antonio, Texarkana, Waco, Wichita Falls, and Brownsville.

    f.  Medical Group acknowledges that this arbitration provision precludes Medical Group from filing an action at law or in equity and from having any dispute covered by this Agreement resolved by a judge or a jury. Medical Group further acknowledges that this arbitration provision precludes Medical Group from participating in a class action filed by any other Medical Group or any other plaintiff claiming to represent Medical Group or Medical Group's interest. Medical Group agrees to opt-out of any class action filed against BCBSTX that raises claims covered by this Agreement to arbitrate, including, but not limited to, class actions that are currently pending.

4.  **Exceptions.** The foregoing in this **Part X, Section I, Dispute Resolution,** to the contrary notwithstanding, the provisions thereof shall not be applicable to the following:

    a.  Any legal proceeding brought by a third party against BCBSTX, Medical Group or any Medical Group Provider (a "Defendant"), as well as any cross claim or third-party claim by such Defendant against BCBSTX, Medical Group or Medical Group Provider;

    b.  The rate of compensation payable to Medical Group for Covered Services pursuant to **Part IV, Compensation;** or

    c. Termination of this Agreement pursuant to **Part VIII, Section B, Termination Notice Period**.

J. **Entire Agreement**. This Agreement, together with any attachments hereto contains the entire understanding between the parties and supersedes all prior agreements, either oral or in writing, with respect to the subject matter hereof. In the event of any conflict between the provisions of the attachments and addenda to this Agreement and the provisions of this Agreement other than the attachments and addenda, the provisions of the attachments and addenda shall prevail.

K. **Force Majeure**. No party will be liable for any failure to timely perform obligations under this Agreement if prevented from doing so by a cause or causes beyond commercially reasonable control including, but not limited to, acts of God or nature, fires, floods, storms, earthquakes, riots, strikes, wars or restraints of government.

L. **Genders and Numbers**. Use of the masculine, feminine or neuter gender and the singular or plural numbers shall be deemed to include the others whenever the context so indicates or requires.

M. **Governing Law**. This Agreement shall be governed in all respects by the laws of the state of Texas as well as any regulations promulgated thereunder, except as otherwise required by Applicable Laws.

N. **Modifications**. This Agreement may be amended and the Provider Manual may be revised as follows:

1. This Agreement may be amended by mutual written agreement of the parties. Notwithstanding the foregoing, however, BCBSTX may amend this Agreement and/or any attachment to the Agreement as follows:

    a. upon thirty (30) days prior Notice to Medical Group or such longer time period as may be required by Applicable Laws when the amendment is not materially adverse to Medical Group. In such event, Medical Group may terminate this Agreement by giving Notice of such termination to BCBSTX within thirty (30) days of Medical Group's receipt of such Notice of amendment, to be effective no earlier than thirty (30) days after such termination Notice is given; or

    b. upon ninety (90) days prior Notice when the amendment is materially adverse to Medical Group. In such event, Medical Group may terminate this Agreement by giving Notice of such termination to BCBSTX within thirty (30) days of Medical Group's receipt of such Notice of amendment, to be effective no earlier than the end of such amendment Notice period, unless within sixty-five (65) days following the date of such amendment Notice BCBSTX gives Notice to Medical Group that BCBSTX will not carry into effect such amendment.

Medical Group's failure to give Notice of termination to BCBSTX within thirty (30) days of Medical Group's receipt of a Notice of amendment shall constitute agreement to and acceptance of such amendment by Medical Group. The amendment shall be effective on the effective date provided in BCBSTX's Notice of amendment, provided the amendment required by Applicable Laws shall be effective no later than the date required by such law or regulation and may be implemented beginning on that date by BCBSTX.

2. The Provider Manual may be revised by BCBSTX from time to time, or upon ninety (90) days prior Notice, when the revision is materially adverse to Medical Group. In such event, Medical Group may terminate this Agreement by giving Notice of such termination to BCBSTX within thirty (30) days of Medical Group's receipt of such Notice of revision, to be effective no earlier than the end of such revision Notice period, unless within sixty-five (65) days following the date of such revision Notice BCBSTX gives Notice to Medical Group that BCBSTX will not apply such revision to Medical Group.

Medical Group's failure to give Notice of termination to BCBSTX within thirty (30) days of Medical Group's receipt of a Notice of Provider Manual revision shall constitute agreement to and acceptance of such revision by Medical Group. The revision shall be effective on the effective date provided in BCBSTX's Notice of Provider Manual revision, provided the revision

required by Applicable Laws shall be effective no later than the date required by such law or regulation and may be implemented beginning on that date by BCBSTX.

O. **No Solicitation.** Medical Group shall not, and Medical Group shall use best efforts to assure that Medical Group Providers shall not solicit, influence or induce or attempt to solicit, influence or induce any Subscriber to disenroll from any Health Plan or enroll in any other health care plan that would require such Subscriber to disenroll from a Health Plan. Furthermore, Medical Group and Medical Group Providers shall not solicit, influence or induce employers or other entities with which BCBSTX has entered into agreements to provide health care benefits to cease doing business with BCBSTX or diminish or otherwise affect their business relationship with BCBSTX. BCBSTX shall not solicit, influence or induce or attempt to solicit, influence or induce any Subscriber not to select Medical Group as Subscriber's Primary Care Physician, if applicable.

P. **Partial Invalidity.** If for any reason any provision of this Agreement is held invalid, the remaining provisions shall remain in full force and effect.

Q. **Patient Communications.** Nothing contained in this Agreement is intended to prohibit or discourage Medical Group from discussing with or communicating in good faith to a current, prospective or former patient, or patient's designee, information or opinions regarding: (1) the patient's health care, including, but not limited to, the patient's medical condition or treatment options, including alternative medications, regardless of BCBSTX coverage limitations; or (2) the provisions, terms, requirements or services of the BCBSTX as they relate to the medical needs of the patient.

R. **Patient Protection and Affordable Health Care Act and Health Care and Education Reconciliation Act of 2010.** The parties acknowledge and agree that in the event BCBSTX develops and markets an Exchange plan pursuant to the Patient Protection and Affordable Health Care Act and Health Care and Education Reconciliation Act of 2010, the rates set forth in this Agreement may not be applicable to such Exchange plans.

S. **Retaliation.** BCBSTX acknowledges and agrees not to engage in any retaliatory action against Medical Group, including termination of this Agreement, because Medical Group has on behalf of a Subscriber reasonably filed a complaint against BCBSTX or has appealed a decision of BCBSTX.

T. **Self-Funded Plans.** Medical Group will provide services to persons enrolled in those employer-funded health benefit plans ("Self-Funded Plans"), for which BCBSTX provides administrative services and network access and management, on the same terms and conditions as Medical Group provides such services to Subscribers. Medical Group will be compensated for providing services to persons enrolled in Self-Funded Plans using the same methodology and on the same terms and conditions as are applicable for services provided to Subscribers. Medical Group acknowledges and agrees that BCBSTX does not underwrite the Self-Funded Plans' benefits. The Self-Funded Plans, and not BCBSTX, have sole financial responsibility for all benefits for persons enrolled in Self-Funded Plans.

U. **Use of BCBSTX Name.** Medical Group agrees not to use the names, symbols, marketing names, trademarks or service marks of BCBSTX in any advertising or promotional material or literature without the express, prior, written consent of BCBSTX and will cease any and all usage previously consented to upon withdrawal by BCBSTX of such consent or termination of the Agreement.

V. **Waiver of Breach.** The waiver of any breach of this Agreement by either party shall not constitute a continuing waiver of any subsequent breach of either the same or any other provision of this Agreement.

# EXHIBIT B

**EXHIBIT B**

STATE OF TEXAS   §
                 §
TRAVIS COUNTY    §

### DECLARATION OF YESSENIA NOA

"My name is Yessenia Noa, I reside in Austin, Travis County, Texas.  I am over the age

of twenty-one (21), I am of sound mind capable of making this declaration and do so willingly,

free from influence and duress, and state as follows:

I work at Victory Medical Center—(hereinafter "VMC").  I am in charge of coordinating

primary care provider referrals to specialists.  As of the date we became aware there was a

coverage issue with Blue Cross Blue Shield of Texas—(hereinafter "BCBS")—was

approximately one-hundred thirty (130).  Around August 3, 2022, noticed that our referrals were

being sent back, and that is how we became aware of a network issue with BCBS.

Of the one-hundred thirty (130) referrals we have pending, approximately thirty-five (35)

are critical.  These referrals are to all the specialists, to include cardiologist, urologists,

oncologists.  For those, that are critical, we note that on the referral and the specialist do their

very best to get them in as soon as possible.

We now will begin the process of calling all of these patients to alert them their referral

was denied, that they will have to find a new primary care provider, and they will all have to start

the process all over.  Locating a new primary care provider, waiting for a date they can be seen,

having lab tests done, waiting for a follow up appoint, etcetera.  This is a time delay these

patients cannot afford.

We have no way to assess how severe the damage will be to these patients' health, but we do know there are always consequences for these delays."

**FURTHER DECLARANT SAYETH NOT**

By: _____      Date: 8/14/2022
Yessenia Noa

**JURAT**

"My name is Yessenia Noa, my date of birth is ___8/30/1985___, my address is 4303 Victory Dr, Austin, Texas 78704, Austin, Travis County, Texas.  I declare under penalty of perjury that the foregoing is true and correct."

**EXECUTED** in Travis County, State of Texas, on this ____day of August, 2022.

**(END OF DOCUMENT)**

# EXHIBIT C

STATE OF TEXAS    §
                   §
HAYS COUNTY    §

## DECLARATION OF ARTURO DOMINGUEZ

"My name is Arturo Dominguez., I reside in Austin, Hays County, Texas. I am over the age of twenty-one (21), I am of sound mind capable of making this declaration and do so willingly, free from influence and duress, and state as follows:

I have been a patient of Victory Medical Center—(hereinafter "VMC")—for the past several years. I have health care coverage from the Marketplace Health, administered by Blue Cross Blue Shield of Texas—(hereinafter "BCBS"). My plan with BCBS is Blue Advantage HMO, which is currently active.

I had kidney cancer that was removed. However, the cancer left me with limited kidney functionality. Because of that, I see Dr. Kim at VMC on a regular basis for care. Currently, I am on kidney dialysis. My kidney dialysis treatment is three (3) time a week and lasts for four (4) hours each treatment. My kidney cancer has created various side effects for which I see Dr. Kim at VMC. I am currently waiting for BCBS to approve my referral to an oncologist urologist stemming from my kidney cancer. Additionally, there is a referral for a gastrointestinal specialist from VMC.

VMC also oversees my daily maintenance of medications. I rely on VMC to monitor my blood, and kidney functions, and refill the twenty-four (24) medications I take daily. Because of my established relationship with VMC, they understand the need to monitor, and adjust my medications when needed. My medical needs are complex, and my health is jeopardized with time delays and gaps in treatment. My cancer necessitates constant monitoring.

I have not received notification from BCBS that there is an issue with my coverage, or that there is an issue with my primary care provider. However, I have been made aware that BCBS has cancelled their contract without notice to VMC. That obviously places me in a very compromised position.

I am now unsure how I will refill the twenty-four (24) prescriptions I take daily. I am now aware that my referrals to specialists are on hold, and I am unsure what effect BCBS's cancellation will have on my dialysis treatments. I do not know why BCBS did not give me notice of this. I do know that BCBS's cancellation of VMC's contract will put my health care in jeopardy. My health issues are complex and need constant monitoring. For example, I go to VMC approximately every two (2) months. I was scheduled to go in a few weeks, but now, I will not be able to so to get my needed blood work done, and have my medications refilled.

I have been made aware that most primary care providers do not accept Marketplace Health plans, and when they do, they have strict caps. I am now fearful that I will not be able to find another provider. However, even if I am so lucky, I am aware it will take months to get me back into the care I currently have. This creates obvious gaps in care that someone in my condition cannot afford."

**FURTHER DECLARANT SAYETH NOT**

By: _____          Date: 8/12/22
Arturo Dominguez.


**(PAGE TO FOLLOW)**

**JURAT**

"My  name is Arturo Dominguez, my date of birth is _9/24/1975_ , and I reside

at 259 Jacksdaw Dr., 78737,  Austin, Hays County, Texas.  I declare under penalty of perjury

that the foregoing is true and correct.

**EXECUTED** in Hays County, State of Texas, on this _12_ day of August, 2022.


By _____

Arturo Dominguez
**DECLARANT**


**(END OF DOCUMENT)**

# EXHIBIT D

STATE OF TEXAS   §
                 §
TRAVIS COUNTY   §

## DECLARATION OF SARITHA POTHULURI

"My name is Saritha Pothuluri., I reside in Austin, Travis County, Texas. I am over the age of twenty-one (21), I am of sound mind capable of making this declaration and do so willingly, free from influence and duress, and state as follows:

I have been a patient with Victory Medical Center—(hereinafter "VMC")—for the past nine (9) years. I have health care coverage under the Marketplace Health, a/k/a Affordable Care Act, that is administered by Blue Cross Blue Shield of Texas—(hereinafter "BCBS"). My plan is known as Blue Cross HMO Gold.

I recently received a letter from BCBS which indicated that I was no longer able to see my primary care provider at VMC. I have worked with my primary care provider at VMC for many years to manage my diabetes.

I was due to go into VMC this week for maintenance with my diabetes. I was scheduled to go in for lab tests and to see my primary care provider to assess medications. Because BCBS has apparently terminated their contract with VMC that will not happen now. Unattended diabetes can result in long-term complications that include nerve damage that is irreparable.

Additionally, because BCBS has cancelled their contract with VMC, I am not unable to get the referral to my ophthalmologist. Again, my inability not to get medical attention from a specialist exposes me to unknown irreversible health care consequences.

I am aware that most primary care providers in Austin do not accept Marketplace Health. I spoke with my Doctor at VMC, and he made me aware that BCBS's termination came to them as a surprise as well.

Even though I have health care insurance I am can now be viewed as non-insured, as I know it will be near impossible to find a primary care provider that takes my Marketplace Health insurance.  This is all in light of the fact that I was due for laboratory testing and refills on medication this week which I am not long able to do.  Again, my condition, untreated, and unmanaged has long term irreversible affects."

**FURTHER DECLARANT SAYETH NOT**

By: _____          Date: __8/12/22__
    Saritha Pothuluri.

## JURAT

"My  name is Saritha Pothuluri, my date of birth is __1-28  1971__ , I reside at 259 Jacksdaw Dr., 78737, Austin, Travis County, Texas.  I declare under penalty of perjury that the foregoing is true and correct.

**EXECUTED** in Travis County, State of Texas, on this 12 day of August, 2022.

By _____
   Saritha Pothuluri
   **DECLARANT**

## (END OF DOCUMENT)

# EXHIBIT E

Russell Remington
7006 Smokey Hill Road
Austin, Texas 78736

8/14/22

To Whom It May Concern,


I have been treated at Victory Medical for the past 20 years. The relationship I have with my doctor and the plan that we have for managing my high cholesterol, high blood pressure and pre-diabetes is extremely important to me and my family. I did not respond well to traditional front-line approaches and if I had to suddenly change medical providers I am afraid that my new doctors would not understand how to best care for me. It has taken my doctor and I several years to figure out the best plan and I can't just abruptly switch to a new doctor to manage these chronic problems. I would hope that a health insurance company would understand and support this.


Respectfully,

Russell Remington

# EXHIBIT F

STATE OF TEXAS          §

                        §

TRAVIS COUNTY           §


## DECLARATION OF JOSHUA MASONGSONG


"My name is Joshua Masongsong, I reside in Austin, Travis County, Texas. I am over the age of twenty-one (21), I am of sound mind capable of making this declaration and do so willingly, free from influence and duress, and state as follows:

I have gone to Victory Medical Center—(hereinafter "VMC")—for many years now. My health insurance coverage is with Blue Cross Blue Shield of Texas—(hereinafter "BCBS")—which is administered by Anthem.

I have suffered for many years from chronic insomnia, and I have had difficulty finding a primary care provider that was able to properly treat this condition. However, my primary care provider, Dr. William Franklin was able to address this issue. This was though a unique medication that was developed by Dr. Franklin, and available to my though my coverage.

I am aware that there is a coverage issue with BCBS and I have also become aware that I will no longer be able to get this medication as I am no longer a covered patient at VMC. This of course is due to the fact that BCBS cancelled their coverage. This is all very new, as we were not given notice.

The loss of this medication has immediate threats on mental wellbeing. Moreover, looking VMC as my primary care provider will cause me irreparable harm."


**FURTHER DECLARANT SAYETH NOT**


### (PAGE TO FOLLOW)


By: _[signature]_                    Date:

Joshua Masongsong


### JURAT


"My name is Joshua Masongsong, my date of birth is                              , my

address is                                                                Austin,

Texas 78704, Austin, Travis County, Texas. I declare under penalty of perjury that the foregoing is true and correct."


**EXECUTED** in Travis County, State of Texas, on this          day of August, 2022.

# EXHIBIT G

**EXHIBIT B**

Krista Jordan-Remington
7006 Smokey Hill Road
Austin, Texas 78736
512.293.3807

To Whom It May Concern,

My son, E███████████, has been a client at Victory Medical since the age of 5. We have always been very happy with the care we received there. My son was diagnosed with severe ADHD and dyslexia by a neuropsychologist when he started the first grade. Our provider at Victory Medical at the time, John Kim, MD, was able to prescribe E███ his stimulant medication which allowed him to focus at school and stay at grade level. Over the years we transitioned to another Victory provider, Shawn Elander, NP, who also was able to prescribe the stimulant medication for my son who is now enrolled at the University of Texas at Austin as a mathematics major. Without the stimulant medication my son cannot maintain enough focus to get through a full hour or more of lecture, nor can he focus long enough to complete detailed homework assignments. On the rare occasions when he arrives at school and has forgotten to take his medications he literally just comes home. There is no point in him attempting academics without this tool to help with his disabilities.

Recently we were told that E███'s relationship with his provider at Victory Medical is in jeopardy because of our insurance, BCBS of Texas. This change appeared abrupt and we were totally unprepared. E███ was in the last 2 weeks of his semester and trying to prepare for final exams. We had come to the end of his stimulant prescription and needed a refill. The idea that we would need to scramble to find another provider without him missing any doses was overwhelming. Jeopardizing his access to his stimulant medication put serious strain on him during a time when he was already feeling a lot of stress due to the upcoming finals. Even missing one day of his medications could have a negative impact on his GPA. We feel strongly that his relationship with his Victory provider should not be disrupted for reasons unrelated to what is best for his physical and mental health. Establishing himself with a medical provider that he trusts, who knows his history and how to best support his disabilities, is key to his future success. As a parent of a child who has struggled mightily to overcome his disabilities I am shocked and outraged that an insurance company would interfere with his care in this way.

Respectfully,

*Krista Jordan-Remington*     8/14/22
Krista Jordan-Remington

# EXHIBIT H

STATE OF TEXAS §
§
TRAVIS COUNTY §

### DECLARATION OF JOHN S. KIM., MD

"My name is John S. Kim., MD., I reside in Austin, Travis County, Texas. I am over the age of twenty-one (21), I am of sound mind capable of making this declaration and do so willingly, free from influence and duress, and state as follows:

I am Board Certified in Family Medicine, and have practiced at Victory Medical Center—(hereinafter "VMC")—for the past twenty-five (25) years. In those twenty-five (25) years, my patient census has been as high as 2,500 patients at a time. I oversee Physician Assistants—(hereinafter "PAs") and Nurse Practitioners—(hereinafter "NPs").

My practice at VMC covers the full spectrum of medical care to include cancer patients, patients with cardiology problems, diabetic patients, and patients with complex medical issues.

Family medicine is founded on and made effective by and through the patient/provider bond. Many of the large health issues develop over time, and knowledge of patient history is critical. It is highly unusual for a provider to be placed in a compromising situation by an insurance company though termination. However, that is the set of circumstances that we are now faced with by Blue Cross Blue Shield of Texas—(hereinafter "BCBS")—terminating the provider contract with VMC without notice.

I received a text message from a concerned patient that the patient received a letter from BCBS that he needed to designate a new primary care provider. I assumed this was in error as something of such magnitude is unheard of. I investigated the matter and found out this was in-fact the case. Without reservation, this termination without notice will have long term

incalculable effects on patient care including necessary referrals to specialists, follow up exams, refilling medications, and the overall provider deficiency it will now create.

While providing family care, when we assess a larger health concern with a patient, for example a heart issue, we will refer them to an in-network cardiologist. Because BCBS terminated VMC without notice, all of the pending referrals to all cardiologists have stopped overnight. This places all of these patients in peril. Now, the only alternative these patients have, is to start the patient care process all over again. Even though I have seen a patient, done all the necessary laboratory testing on the patient, and found they are in need of a specialist, I am unable to refer them.

At a moment when time is not a luxury these patients have, patients must now start a very time-consuming process all over again. The patients must now locate a new reputable BCBS in-network primary provider. There is currently a primary provider deficiency in Austin, so the patients will have anywhere from a month to a three month wait until they are able to see their new primary provider. This unnecessary delay will clearly cause incalculable irreversible adverse effects on long-term patient health.

Regarding my patients with complex health issues, this abrupt termination by BCBS compounds the severity of health concerns because of the unnecessary disruption of the continuity of their care. In these cases, patients with more complex issues have benefited from our mutual established relationship and my understanding of the patient's medical history which allows a faster, more accurate assessment. If these patients have to establish care with a new provider, it will require multiple visits for them to get the new physician up to date on their medical history, which will inevitably delay their medical treatment. Again, this will cause incalculable irreversible adverse long-term effects on patient health care.

BCBS's termination will undoubtedly leave many of these patients without a primary care provider. Most of my patients who have BCBS use it as a secondary insurance coverage for their primary insurance which is Medicare. VMC accepts patients who use Medicare insurance, but most other clinics do not. These patients are elderly, most of whom require a specialist's care. They will have extreme difficulty finding another primary care provider that accepts Medicare and will face paying significant additional out of pocket expenses, not to mention the added delay in accessing medical care, solely because of BCBS's actions. This will certainly have an incalculable irreversible adverse long-term impact on patients and their health care.

BCBS's termination will also leave those patients that have health care coverage through the Marketplace provided under the Affordable Care Act—(hereinafter "ACA")—without a primary care provider. While VMC prides itself on giving care to as many as possible, regardless of profits, not all providers do. I am personally aware that many primary care providers either do not accept patients with coverage from a Marketplace plan, or they have very limited numerical caps on those that they will accept. These patients' health coverage will end overnight, and this will undoubtedly have an incalculable irreversible adverse impact on patient long-term health care.

As a direct result of BCBS's termination, our practice will also have suffered irreparable harm. Because BCBS has started sending out notices to our patients, we are already seeing dramatic patient movement from our practice. Consequently, our practice will have to adjust the scope of services we offer, the number of staff we will be able to maintain, and number the of patients we will be able to see. This will further exacerbate the provider deficiency that Austin is already experiencing.

This absolute unwarranted disruption by BCBS has caused nothing but chaos with our clinic and our patients. Our patients' care should never be placed in harm's way like this. I have practiced for twenty-five (25) years, and BCBS's unnoticed termination is unprecedented."

**FURTHER DECLARANT SAYETH NOT**

By: _____          Date: __8/14/22__
John S. Kim, MD. Board
Certified in Family Medicine.

## JURAT

"My  name is John S. Kim, MD, my date of birth is __February 24, 1970__, my address is 4303 Victory Dr 78704,  Austin, Travis County, Texas.  I declare under penalty of perjury that the foregoing is true and correct.

**EXECUTED** in Travis County, State of Texas, on this __14th__ day of August, 2022.

By_____
John S. Kim MD
**DECLARANT**

**(END OF DOCUMENT)**